# Appendix Exhibit 4

# Claimant's Brief in Opposition  to Motion to Dismiss

R000081-R000224

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
EXPEDITED LABOR ARBITRATION TRIBUNAL

| | | |
|---|---|---|
| BUILDING & CONSTRUCTION LABORERS LOCAL UNION NO. 310 | ) ) ) | CASE NO. 53 300 E 00098 09 |
| | ) | ARBITRATOR MARVIN J. FELDMAN, |
| Claimant, | ) ) | ESQ. |
| vs. | ) ) | CASE MGR. CAROLYN BRIDGES |
| UNIVERSITY HOSPITAL HEALTH SYSTEMS, INC., *et al.,* | ) ) ) ) | **CLAIMANT'S BRIEF IN OPPOSITION TO MOTION TO DISMISS ON ISSUE OF ARBITRABILITY** |
| Respondents. | | |

## I.  THE PROJECT LABOR AGREEMENT AND THIS CLAIM FOR ARBITRATION

### A.  PLA Provisions

On or around December 1, 2007, Respondent University Hospital Health System ("UH")
entered into a Project Labor Agreement ("PLA") with each separate union within the Cleveland
Building and Construction Trades Council, including Claimant Building and Construction
Laborers Local Union No. 310 ("Union").  The purpose of the PLA was described in Paragraph
8 which states:

> Time is of the essence in the completion of the Covered Projects.  Therefore, this
> Agreement establishes, among other things, **binding rules and methods for. . the
> prompt settlement of all misunderstandings, disputes, grievances** and
> jurisdictional problems that may arise during the construction of the Covered
> Projects in order to assure complete continuity of operation and maintenance of
> harmonious and peaceful labor relations.  **The terms and conditions of this
> Agreement shall define and govern the relationship among UH and the
> Unions.  The terms and conditions of this Agreement shall also supersede the
> terms and conditions of the [Unions'] Trade Agreements.**  However, it is
> understood and agreed by the Unions that UH, by reason of its execution or
> implementation of this Agreement, shall not be considered to be a joint employer
> with. . . any of the Contractors. . .(Emphasis added).  (Joint Ex. at ¶8).

Because the PLA precluded the Owner from acting as an employer, the PLA included

provisions to delineate the separate role of UH, the Unions and contractors that would eventually

R000081

work on Covered Projects. Paragraph 29 of the PLA established distinct roles for UH and its contractors, providing:

> [UH] and the Contractors retain full and exclusive authority for the management of their operations . . . Except as expressly limited by the provisions of this Agreement, the Contractors have the exclusive right to direct their working forces, including but not limited to the rights to select and utilize the means, methods, techniques, procedures and tools and materials for construction, and to hire, schedule, select supervision and tradesmen, promote, transfer, lay off, discharge, and make and enforce work rules for employees.

(Joint Ex. at ¶29).

Because the PLA was formed to create prompt and efficient mechanisms for the settlement of misunderstandings and grievances, the PLA set specific and expedited methods for resolving disputes. Paragraph 26 of the Agreement established expedited arbitration through the American Arbitration Association as the method for resolving any disputes. Paragraph 26 provides:

> **[I]f the Parties to this Agreement have any disagreements over the interpretation or application of this Agreement (including on-site compliance), the aggrieved party shall have the right to process such dispute under the expedited settlement and arbitration procedures of the American Arbitration Association (except where judicial action is specifically provided for in Paragraph 23 or any other provision of this Agreement)(emphasis added)[1]**

(Joint. Ex. at ¶26).

These expedited arbitration procedures defined in Paragraph 26, on their face, supersede grievance and arbitration procedures in any of the Unions' collective bargaining agreements. Paragraph 26 reads: "If a worker has any grievance about the terms and/or application of this Agreement **which are not covered by other provisions of this Agreement relating to dispute**

---

[1] Paragraph 23 authorized immediate suit for ex parte injunction against a Union violating the PLA's no strike clause or against the Owner or a Contractor for violating the PLA's no lockout provision. Paragraph 19 authorized immediate judicial relief for violation of union security provisions. Neither of these specific exceptions to expedited binding arbitration is at issue here.

R000082

**resolution,** then such dispute shall be handled under the procedures set forth in the applicable collective bargaining agreements."(emphasis added).  (Joint Ex. at ¶25).

### B.   This  Claim Arising Under the PLA

In December 2007, UH and the Union, along with seventeen other local trade unions under the Cleveland Building and Construction Trade Council, signed the PLA, which set forth rules to determine the relationship between UH, Unions, and the various contractors on-site. (Record at 34).  The rules included the Management Rights provision in Paragraph 29, which specifically reserved the right of employee management for each individual contractor.  Since in and around early February 2009, the Owner—UH—breached the specific provisions of the PLA and, contrary to the specific limitations established by Paragraph 29, usurped the role of the contractor and improperly called for the termination of laborer Mike Harting.  In response to UH's actions, on February 20, 2009, the Union filed a grievance and sought expedited arbitration under Paragraph 26 of the PLA.

Michael Harting was a laborer and long time Union member who had been successfully employed for various contractors at or around the UH site for an extended period of time. (Record at 22).  From January 2009 until his termination on February 2, 2009, Harting was employed by Rivera Construction, one of several subcontractors at the site, to perform work on the Rainbow Neonatal Intensive Care Unit project.  (Record at 24-28).  Harting was under the supervision and direction of project manager, Gilbane Building Company ("Gilbane") and Ozanne Construction ("Ozanne").  (Record at 41).

R000083

On the evening of February 2, 2009, Union Business Agent, Sebastian Trusso, received a phone call from first shift Union steward Mike Ferrito. (Record at 35). Ferrito told Trusso that he had received a call from Gilbane saying that Harting was to be removed from the job. (Id). Trusso contacted Harting by phone and advised him that Gilbane was removing him from the job and instructing him to report to Gilbane's trailer. (Id). Trusso told Harting that he would arrive the next morning to get to the "bottom of whatever it is that's going on." (Record at 36).

The next morning, Trusso, Ferrito, and Union business agent Kevin Clegg, went to see Todd Gerber, Gilbane's site superintendent. (Record at 36). Gerber was unable to meet with the Union representatives at that time but instructed them to meet with Gilbane's supervisor, Pat Toney. (Record at 37). Toney told the Union that "all he knew was that word had come down from University Hospital that he [Harting] had to be removed from the job. . ." (Record at 37-38). Trusso told Toney that he was there to get Harting's job back. (Record at 38). Toney stated that he was very upset that Harting was let go but "it was out of his hands." (Record at 38). Toney advised Trusso to meet with Margaret Hewitt, the UH representative involved in Harting's removal. (Record at 38).

That afternoon, Trusso contacted and arranged a meeting with Hewitt. (Record at 39). Trusso and Clegg met with Hewitt and UH's attorney. (Id). Trusso told Hewitt that the Union was there to get Harting's job back and asked what he could do to get Harting back to work. (Record at 39). Hewitt told Trusso that she would review Harting's termination but did not believe that she would change her decision. (Record at 40). Hewitt has never advised the Union of a change in UH's position. (Record at 40).

4

R000084

After Harting's termination, Trusso also contacted Rivera Construction. (Record at 43). Rivera's owner told Trusso that Rivera was not involved in the decision to remove Harting; the decision was directed by Gilbane, UH's agent and construction manager. (Id; Joint Ex. 1 at ¶6).

In response to the direct violation of Paragraph 29 of the PLA, the Union filed the grievance against UH and its agent, Gilbane, over the UH/Gilbane actions that resulted in the removal of Harting. The Union did not initiate a separate collective bargaining grievance against the subcontractor, Rivera Construction, because the grievance was fruitless; Rivera did not cause Harting's termination and was powerless to stop his removal.

Having usurped the role of employers and contractors in violation of the explicit provisions of Paragraph 29 of the PLA, UH and Gilbane continue to subvert the PLA by seeking to derail the arbitration mechanism set for the prompt and efficient resolution of all disputes arising under the PLA. The efforts by UH and Gilbane to circumvent arbitration should be rejected and the case should proceed on the merits.

## II.  STATEMENT OF POSITION

### 1.  The Grievance Was Brought by a Party to the PLA Concerning an Issue Arising Under the PLA.

UH argues that arbitration should be denied because UH did not agree to arbitrate. UH fictitiously relies on several factors to demonstrate that it did not agree to arbitrate in this matter: (1) Harting, the grievant, is a "worker" and not a party to the PLA and (2) the grievance deals with his termination, which UH claims is not an issue under the PLA. Therefore, according to UH, Harting can only file a grievance against his employer/contractor pursuant to Paragraph 25 of the PLA. (Record at 14). However these arguments should be dismissed as red herrings. On the face of the grievance, the Union, not Harting, is the party filing the grievance. The subject of the grievance, whether UH violated Paragraph 29 of the PLA, arises directly under the PLA to

R000085

which the Union and UH are parties. Therefore, this grievance is pursued properly under Paragraph 26 of the PLA and arbitrability should be presumed.

The United States Supreme Court recognized in the <u>Boston Harbor</u> decision that PLAs are "valid labor contract(s) under §§8(e) and (f) [of the National Labor Relations Act]. <u>Building & Construction Trades Council v. Associated Builders (Boston Harbor)</u>, 507 U.S. 218, 230 (1993). The Union, as part of Cleveland Building and Construction Trade Council, negotiated and agreed with the UH over the mandatory terms for resolution of disputes. UH, having reaped the benefits of expedited labor management relations since 2007 is obviously not questioning the validity of the PLA.

UH disregards the gravamen of the Union's grievance—that UH usurped the rights of the employers under Paragraph 29 of the PLA—when claiming that the grievance is somehow limited to an issue of whether a subcontractor properly discharged the Union's member.     To achieve the purposes of the PLA—efficiency, streamlined work rules, no strikes, harmony—UH relinquished any right that it might have had to hire, fire, or discipline construction employees. Paragraph 29 (if followed by UH) insured that contractors retained their sole right to hire, fire, discipline and lay off employees. Yet, UH chose to disregard the separation of rights and responsibilities and acted as if it was the employer of the Union's member in this instance. UH/Gilbane, not Rivera, fired Harting. The sole remedy for the Union and Harting under these circumstances is the PLA grievance before the arbitrator. Consider the alternatives:

1)   A Union grievance against Rivera. Result: fruitless. Rivera reconfirms its explanation to the Union's business agent that Rivera did not discharge the Union member, wanted to continue his employment and was prevented from doing so by UH's explicit directive to remove Harting from the site. It is a well settled principle of labor-management relations that Unions and its members are not required to pursue futile and unnecessary procedures that would unreasonably delay resolution of the grievance and obtaining a hearing on the

R000086

merits.  *See e.g.* Winter v. Teamsters, Local No. 639, 569 F.2d 146 (1977); Bassett v. Teamsters, Local Union No. 705, 773 F.2d 932 (1985).

2) Court action under Paragraph  19 of the PLA for immediate judicial relief.  Result: dismissal of the court action because Paragraph 19 authorizes direct court action only if a contractor fails to become party to a collective bargaining agreement with the appropriate craft.  No issue involving a contractor's failure to sign a contract is at issue in this case.

3) Court action under Paragraph 23 of the PLA.  Result:  dismissal of the lawsuit because Paragraph 23 pertains to violations of the no strike/no lockout provisions of the agreement.

4) Job action by the Union in the form of informational or other picketing.  Result: immediate court action by UH against the Union to enjoin picketing or similar collective action prohibited by the labor peace provisions of the PLA.

5) Court action by the Union and/or its individual member against UH in court for wrongful discharge or employment discrimination.  Result:  dismissal on the ground that UH (as alleged in this grievance) was not the employer and because the Union—if suing directly—would have failed to exhaust the specific arbitration remedies established by the PLA.

This case should compel the arbitrator to ensure that the arbitration remedies that were voluntarily created are given full force and effect.  As UH representatives are swift to argue, this PLA covers millions of dollars of construction at different UH-owned sites.  No PLA will be effective for this undertaking unless the expedited arbitration safety valve for dispute resolution is preserved.  No harmony will remain if UH is permitted to selectively decide which disputes can be arbitrated and which will leave Unions—and their members—with no remedy.  Wrongs with no remedy destroy labor peace.  Bargained for remedies are key to effective implementation of visionary agreements like this PLA.

The Arbitrator should reject UH's argument that Harting is not a party to the PLA and therefore, cannot bring a grievance under the PLA.  As stated, the Union, not Harting, filed the grievance.  Harting may not be a direct party to the PLA but he is a direct member of the Union

R000087

that is a signatory of the PLA. Harting, when he became a dues paying member of the Union, assigned his rights of representation to the Union. The Union has a duty to bring a grievance on Harting's behalf and represent him in such grievance, which is the case here. The Union, because it is a signatory party, has the power and duty to challenge the violation of the Agreement as alleged in the claim presented to the American Arbitration Association. It is settled law that a union's actions in the grievance procedure are entitled to deferential review. Vaca v. Sipes, 386 U.S. 171, 190 (1967); Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 78 (1991). The rights of grievance under a labor-management agreement belong to the Union, not the individual. In the Matter of Hughes Tool Company v. United Steelworkers of America, Locals Nos. 1742 and 2457, 56 N.L.R.B. 981, 983 (1944). Therefore, arbitrability should be assumed.

## 2. **The presumption of arbitrability is not overcome by the "motion to dismiss"**

Particularly since the Steelworkers Trilogy, grievances under labor agreements are presumed to be arbitrable. In United Steelworks of America v. American Mfg. Co., 363 U.S. 564, 566(1960), the Court, relying on the language of Section 203(d) of the Labor Management Relations Act, 29 U.S.C. §173(d), stated that the preferred method for dispute resolution between labor and management is arbitration but that this method "can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play." Under the presumption of arbitrability, "if the [labor] agreement contains an arbitration clause . . . it should be presumed that the parties intended to arbitrate the dispute unless there is 'positive assurance' that the arbitration clause does not cover the matter. 'In cases involving broad arbitration clauses the Court has found the presumption of arbitrability 'particularly applicable,' and only an express provision excluding a particular grievance from

8

arbitration or 'the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 583 (1960); Int'l Bhd. of Elec. Workers, Local 21 v. Ill. Bell Tel. Co., 491 F.3d 685, 687-88 (7th Cir. 2007) (quoting AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) (internal quotations omitted).

As explained in this Statement of Position, the Union contends that the grievance squarely arises under the parties' PLA and that the Union is entitled to prevail on the merits. When a question arises about whether a particular grievance falls within the scope of an arbitration clause, the presumption of arbitrability remains and questions should be resolved in favor of arbitration.  NCR Corp. v. Korala Assoc., LTD., 512 F. 3d 807, 813 (6th Cir. 2008). [2] Therefore, in this case, the Arbitrator should overrule the UH and Gilbane's "motion to dismiss" and proceed to hearing on the merits as required by the presumption in favor of arbitrability.

### 3.  A full hearing is necessary to decide the merits of the grievance and any defenses to it

An arbitrator's role is to receive evidence, assess the credibility of witnesses and make determinations on contract interpretation and application.  As the Supreme Court stated in American Mfg. Co.,  whether the grievant " is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the [grievant] should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for." United Steelworkers of America v. American Mfg. Co., supra.  Accord, Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504 (2001).

---

[2] In the so-called motion to dismiss, the UH and Gilbane principally rely on Korala.  This reliance is entirely misplaced. Korala did not involve arbitration under any labor management agreement.  It did not involve a claim that directly involved language in the agreement or a specific arbitration clause.  Rather, Korala  involved statutory and common law trademark and patent claims and the potential extension of a commercial contract with an arbitration clause to tort and statutory violations.

R000089

Although referred to as an arbitrability challenge, the request for dismissal by UH and Gilbane is (at best) an argument as to the reasons that they should win on the merits of the claim. As discussed above, *supra*, and established by the Record,  the essence of the grievance is that UH usurped the role of contractor to direct the firing of a Union laborer, contrary to the specific limitations on the power of the Owner under Paragraph 29 of the PLA.   UH and Gilbane now improperly seek to prevent the Union from exercising the contractual dispute resolution mechanism to reach the merits of the grievance that squarely arises from within the four corners of the parties' agreement.

## CONCLUSION

For the foregoing reasons, the Union argues that the challenge to arbitrability should be overruled.  The matter should be set for arbitration on the merits at the earliest possible date so that all parties may present evidence and their respective claims and defenses arising under the Project Labor Agreement which contains a broad arbitration clause.

Respectfully submitted,

**GOLDSTEIN GRAGEL LLC**

Susan L. Gragel(#0002785)
  *sgragel@ggcounsel.com*
Ami Van De Ryt( #)
  *avanderyt@ggcounsel.com*
1040 The Leader Building
526 Superior Avenue E.
Cleveland, Ohio 44114
(216) 771-6633
(216) 771-7559 (fax)
Counsel for Building and Construction
Laborers Local Union No. 310

10

R000090

## **CASE ATTACHMENTS**

R000091

# INDEX

Case:                                                                                                    Pg.

Accord, Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504 (2001).........9

Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 78 (1991) ...........................................8

AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) ...........9

Bassett v. Teamsters, Local Union No. 705, 773 F.2d 932 (1985).............................7

Building & Construction Trades Council v. Associated Builders
(Boston Harbor), 507 U.S. 218, 230 (1993) ................................................................6

In the Matter of Hughes Tool Company v. United Steelworkers
 of America, Locals Nos. 1742 and 2457, 56 N.L.R.B. 981, 983 (1944) ....................8

Int'l Bhd. of Elec. Workers, Local 21 v. Ill. Bell Tel. Co.,
491 F.3d 685, 687-88 (7th Cir. 2007) ...........................................................................9

NCR Corp. v. Korala Assoc., LTD., 5123 F. 3d 807, 813 (6th Cir. 2008)...................9

United Steelworks of America v. American Mfg. Co., 363 U.S. 564, 566(1960)........8

United Steelworkers of America v. Warrior & Gulf Navigation Co.,
 363 U.S. 574, 583 (1960).............................................................................................9

Vaca v. Sipes, 386 U.S. 171, 190 (1967)......................................................................8

Winter v. Teamsters, Local No. 639, 569 F.2d 146 (1977) .........................................7

R000092



LEXSEE 507 U.S. 218

## BUILDING AND CONSTRUCTION TRADES COUNCIL OF THE METROPOLITAN DISTRICT, PETITIONER 91-261 v. ASSOCIATED BUILDERS AND CONTRACTORS OF MASSACHUSETTS/RHODE ISLAND, INC., ET AL.; MASSACHUSETTS WATER RESOURCES AUTHORITY, ET AL., PETITIONERS 91-274 v. ASSOCIATED BUILDERS AND CONTRACTORS OF MASSACHUSETTS/RHODE ISLAND, INC, ET AL.

### No. 91-261

### SUPREME COURT OF THE UNITED STATES

*507 U.S. 218; 113 S. Ct. 1190; 122 L. Ed. 2d 565; 1993 U.S. LEXIS 1948; 61 U.S.L.W. 4221; 124 Lab. Cas. (CCH) P10,564; 142 L.R.R.M. 2649; 93 Cal. Daily Op. Service 1652; 93 Daily Journal DAR 2999; 7 Fla. L. Weekly Fed. S 55*

### December 9, 1992, Argued
### March 8, 1993, * Decided

\* Together with No. 91-274, Massachusetts Water Resources Authority et al. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc., et al., also on certiorari to the same court.

**PRIOR HISTORY:** ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT.

**DISPOSITION:** *935 F.2d 345*, reversed and remanded.

### DECISION:

National Labor Relations Act (*29 USCS 151 et seq.*) held not to pre-empt enforcement by Massachusetts agency, acting as owner of construction project, of prehire collective bargaining agreement.

### SUMMARY:

An independent government agency charged by the Massachusetts Legislature with providing water-supply services, sewage collection, and treatment and disposal services for eastern Massachusetts was ordered by the United States District Court for the District of Massachusetts to build sewage treatment facilities for the

cleaning of Boston Harbor. Under the agency's enabling statute and Massachusetts' public bidding laws, the agency was to (1) provide funds for construction, (2) own the facilities to be built, (3) establish all bid conditions, (4) decide all contract awards, (5) pay the contractors, and (6) generally supervise the project. An engineering firm, hired as the agency's project manager, negotiated a labor agreement which, among other items, (1) recognized a particular union as the exclusive bargaining agent for all craft employees, and (2) established a 10-year no-strike commitment. The agency approved the agreement and adopted a bid specification, which required each contractor and subcontractor to agree to abide by the agreement and to be bound by the agreement's provisions. In response to a charge by a contractors' association that the agreement violated the National Labor Relations Act (NLRA) (*29 USCS 151 et seq.*), the general counsel of the National Labor Relations Board found that (1) the agreement was a valid prehire agreement under 8(f) of the NLRA (*29 USCS 158(f)*), and (2) the agreement's provisions limiting work on the project to contractors who agreed to abide by the

agreement were lawful under a construction-industry proviso to 8(e) of the NLRA (*29 USCS 158(e)*). An organization representing nonunion construction industry employers--seeking, among other items, to enjoin enforcement of the bid specification as pre-empted under the NLRA--brought suit in the District Court against the agency, the engineering firm, and the union. The District Court denied the organization's motion for a preliminary injunction. On appeal, the United States Court of Appeals for the First Circuit reversed, expressing the view that the bid specification was pre-empted under the *NLRA (135 BNA LRRM 2713, 117 CCH LC 10392, 1990-2 CCH Trade Cases 69229)*. The Court of Appeals subsequently vacated this opinion, but on rehearing en banc, the Court of Appeals again reversed the District Court, expressing the view that (1) the agency's intrusion into the bargaining process was pervasive and was not a permissible sort of peripheral regulation; and (2) the bid specification was pre-empted, because the agency was regulating activities that Congress intended to be unrestricted by governmental power (*935 F2d 345*).

On certiorari, the United States Supreme Court reversed and remanded. In an opinion by Blackmun, J., expressing the unanimous view of the court, it was held that (1) the NLRA does not pre-empt enforcement by a state agency, acting as the owner of a construction project, of an otherwise lawful prehire collective bargaining agreement negotiated by private parties; (2) under the circumstances, the agency's enforcement of the bid specification was not government regulation and was therefore not subject to NLRA pre-emption, as the agency was the proprietor of the construction project under state law and was acting as a purchaser of construction services; (3) permitting the state to participate freely in the marketplace under such circumstances promoted the legislative goals that animated the passage of the 8(e) and 8(f) provisions regarding construction-industry prehire agreements; and (4) thus, a preliminary injunction against enforcement of the bid specification was improper.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

COMMERCE §129.5

National Labor Relations Act -- pre-emption -- state agency's construction project -- prehire collective bargaining agreement --

Headnote:[1A][1B][1C]

The National Labor Relations Act (NLRA) (*29 USCS 151 et seq.*) does not pre-empt enforcement by a state agency, acting as the owner of a construction project, of an otherwise lawful prehire collective bargaining agreement negotiated by private parties; in connection with a state agency's construction of sewage treatment facilities for the cleaning of a harbor, the agency's enforcement of a bid specification requiring each contractor and subcontractor to agree to abide by a prehire collective bargaining agreement negotiated by the agency's hired project manager--which agreement, among other items, recognizes a particular union as the exclusive bargaining agent for all craft employees and establishes a 10-year no-strike commitment--is not government regulation and is therefore not subject to NLRA pre-emption, where (1) the agency is the proprietor of the construction project under state law and is acting as a purchaser of construction services, (2) the agency, in adopting the bid specification, is attempting to insure an efficient project that is completed as quickly and effectively as possible at the lowest cost, (3) enforcement of the bid specification is specifically tailored to the one particular project in question, and (4) it is undisputed that the prehire agreement is a valid labor contract under the provisions of 8(e) and 8(f) of the NLRA (*29 USCS 158(e), 158(f)*) regarding prehire agreements in the construction industry; permitting the state to participate freely in the marketplace under such circumstances promotes the legislative goals that animated the passage of the 8(e) and 8(f) provisions, even though those provisions are not made specifically applicable to the state in such circumstances; thus, a preliminary injunction against enforcement of the bid specification is improper.

[***LEdHN2]

COMMERCE §129

National Labor Relations Act -- pre-emption of state law --

Headnote:[2]

Because the National Labor Relations Act (*29 USCS 151 et seq.*) contains no express pre-emption provision, the United States Supreme Court should not find a state labor provision federally pre-empted unless (1) the provision conflicts with federal law or would frustrate the federal scheme, or (2) the court discerns from the totality

of the circumstances that Congress sought to occupy the field to the exclusion of the states.

[***LEdHN3]

STATES, TERRITORIES, AND POSSESSIONS §22

federal pre-emption --

Headnote:[3]

Consideration of a state law under the *Federal Constitution's supremacy clause* (Art VI, cl 2) starts with the basic assumption that Congress did not intend to displace state law; the United States Supreme Court is reluctant to infer pre-emption of state law.

[***LEdHN4]

COMMERCE §129

National Labor Relations Act -- pre-emption of state regulation --

Headnote:[4A][4B]

The National Labor Relations Act (NLRA) (*29 USCS 151 et seq.*) pre-empts state law in that the NLRA prevents a state from regulating within a zone that is protected and reserved for (1) National Labor Relations Board (NLRB) jurisdiction, or (2) market freedom; the first pre-emption principle, forbidding state and local regulation of activities that are protected by 7 of the NLRA (*29 USCS 157*), or that constitute an unfair labor practice under 8 of the NLRA (*29 USCS 158*), (1) prohibits regulation even of activities that the NLRA only arguably protects or prohibits, and (2) is designed to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' integrated scheme of regulation, embodied in 7 and 8, which scheme includes the choice of the NLRB, rather than state or federal courts, as the appropriate body to implement the NLRA; the second pre-emption principle, which prohibits state and municipal regulation of areas that have been left to be controlled by the free play of economic forces, preserves Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests; however, such pre-emption doctrines apply only to state regulation, and a state does not regulate simply by acting within one of the protected areas.

[***LEdHN5]

COMMERCE §129

National Labor Relations Act -- pre-emption -- action of state as proprietor --

Headnote:[5A][5B][5C]

A state, acting as a proprietor, may manage state-owned property without offending the pre-emption principles of the National Labor Relations Act (*29 USCS 151 et seq.*), given that such acts, which involve the state's interaction with private participants in the marketplace, are not tantamount to regulation or policymaking; in the absence of any express or implied indication by Congress that a state may not manage the state's own property when the state pursues purely proprietary interests, the United States Supreme Court will not infer a restriction on such state conduct.

[***LEdHN6]

COMMERCE §129

STATES, TERRITORIES, AND POSSESSIONS §18

National Labor Relations Act -- pre-emption -- private actors -- supremacy clause --

Headnote:[6]

The fact that a private actor may "regulate" does not mean that the private actor may be "pre-empted" by the National Labor Relations Act (NLRA) (*29 USCS 151 et seq.*), as the *Federal Constitution's supremacy clause* (Art VI, cl 2) does not require pre-emption of private conduct; therefore, private actors may "regulate" as they please, as long as their conduct does not violate the law; thus, a private actor, unlike a state actor, may--without violating the NLRA--participate in a boycott of a supplier on the basis of a labor policy concern rather than a profit motive, even though the private actor, under such circumstances, would be attempting to "regulate" the suppliers and would not be acting as a typical proprietor.

[***LEdHN7]

LABOR §114

construction industry proviso -- prehire agreements

R000095

507 U.S. 218, *; 113 S. Ct. 1190, **;
122 L. Ed. 2d 565, ***LEdHN7; 1993 U.S. LEXIS 1948

--

Headnote:[7]

The construction-industry proviso to 8(e) of the National Labor Relations Act (*29 USCS 158(e)*)--setting forth an exception from 8(e)'s prohibition against "hot-cargo" agreements that require an employer to refrain from doing business with any person not agreeing to be bound by a prehire agreement--permits a general contractor's prehire collective bargaining agreement to require an employer not to hire other contractors performing work on a particular project site unless such contractors agree to become bound by the terms of that agreement.

[***LEdHN8]

LABOR §37

construction industry -- changes to prehire agreement

--

Headnote:[8]

The final proviso to 8(f) of the National Labor Relations Act (NLRA) (*29 USCS 158(f)*) permits construction industry employees, once hired, to utilize the National Labor Relations Board election process under 9(c) and 9(e) of the NLRA (*29 USCS 159(c), 159(e)*) if such employees wish to reject the bargaining representative or to cancel the union security provisions of a prehire agreement.

[***LEdHN9]

LABOR §40

construction industry agreements --

Headnote:[9]

The intent of Congress, in enacting exemptions in 8(e) and 8(f) of the National Labor Relations Act (NLRA) (*29 USCS 158(e), 158(f)*) authorizing certain kinds of project labor agreements in the construction industry, is to accommodate conditions specific to that industry, such conditions including (1) the short-term nature of employment, which makes posthire collective bargaining difficult; (2) the contractor's need for predictable costs and a steady supply of skilled labor; and (3) a longstanding custom of prehire bargaining in the industry.

[***LEdHN10]

APPEAL §1339.5

certiorari -- Federal Court of Appeals decision -- what reviewable --

Headnote:[10A][10B]

On certiorari to review a Federal Court of Appeals' decision as to whether the National Labor Relations Act (NLRA) (*29 USCS 151 et seq.*) pre-empts enforcement by a state authority, acting as the owner of a construction project, of an otherwise lawful prehire collective bargaining agreement negotiated by private parties, the United States Supreme Court will decline to address the application, if any, of 8(d) of the NLRA (*29 USCS 158(d)*) to the agreement, where (1) the Court of Appeals did not rely on that section of the NLRA, and (2) the Supreme Court did not grant certiorari on that question.

## SYLLABUS

Following a lawsuit over its failure to prevent the pollution of Boston Harbor, petitioner Massachusetts Water Resources Authority (MWRA) -- the state agency that provides, *inter alia*, sewage services for eastern Massachusetts -- was ordered to clean up the harbor. Under state law, MWRA provides the funds for construction, owns the sewagetreatment facilities to be built, establishes all bid conditions, decides all contract awards, pays the contractors, and generally supervises the project. Petitioner Kaiser Engineers, Inc., the project manager selected by MWRA, negotiated an agreement with petitioner Building and Construction Trades Council and affiliated organizations (BCTC) that would assure labor stability over the life of the project, and MWRA directed in Specification 13.1 of its solicitation for project bids that each successful bidder must agree to abide by the labor agreement's terms. Respondent organization, which represents nonunion construction industry employers, filed suit against petitioners, seeking, among other things, to enjoin enforcement of Bid Specification 13.1 on the grounds that it is pre-empted under the National Labor Relations Act (NLRA). The District Court denied the organization's motion for a preliminary injunction, but the Court of Appeals reversed, holding that MWRA's intrusion into the bargaining process was pervasive and not the sort of peripheral regulation that

507 U.S. 218, *; 113 S. Ct. 1190, **;
122 L. Ed. 2d 565, ***; 1993 U.S. LEXIS 1948

would be permissible under *San Diego Building Trades Council v. Garmon, 359 U.S. 236, 3 L. Ed. 2d 775, 79 S. Ct. 773,* and that Bid Specification 13.1 was pre-empted under *Machinists v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 49 L. Ed. 2d 396, 96 S. Ct. 2548,* because MWRA was regulating activities that Congress intended to be unrestricted by governmental power.

*Held:* The NLRA does not pre-empt enforcement by a state authority, acting as the owner of a construction project, of an otherwise lawful prehire collective-bargaining agreement negotiated by private parties. This Court has articulated two distinct NLRA pre-emption principles: "*Garmon* pre-emption" forbids state and local regulation of activities that are protected by § 7 of the NLRA or constitute an unfair labor practice under § 8, while "*Machinists* pre-emption" prohibits state and municipal regulation of areas that have been left to be controlled by the free play of economic forces. These pre-emption doctrines apply only to state labor *regulation,* see, *e. g., Machinists, 427 U.S. at 144.* A State may act without offending them when it acts as a proprietor and its acts therefore are not tantamount to regulation or policymaking. Permitting States to participate freely in the marketplace is not only consistent with NLRA pre-emption principles generally but also, in this case, promotes the legislative goals that animated the passage of the NLRA's §§ 8(e) and (f) exceptions regarding prehire agreements in the construction industry. It is undisputed that the agreement between Kaiser and BCTC is a valid labor contract under §§ 8(e) and (f). In enacting the exceptions, Congress intended to accommodate conditions specific to the construction industry, and there is no reason to expect the industry's defining features to depend upon the public or private nature of the entity purchasing contracting services. Absent any express or implied indication by Congress that a State may not manage its own property when pursuing a purely proprietary interest such as MWRA's interest here, and where analogous private conduct would be permitted, this Court will not infer such a restriction. Pp. 224-233.

**COUNSEL:** Charles Fried argued the cause for petitioners. With him on the briefs were David L. Shapiro, John M. Stevens, Arthur G. Telegen, H. Reed Witherby, Mary R. Jeka, Steven H. Goldberg, William J. Curtin, E. Carl Uehlein, Jr., Laurence J. Cohen, Victoria L. Bor, Walter Kamiat, and Laurence Gold.

Deputy Solicitor General Mahoney argued the cause for the United States as amicus curiae urging reversal. With her on the briefs were Solicitor General Starr, Edwin S. Kneedler, Jerry M. Hunter, Nicholas E. Karatinos, Norton J. Come, Linda Sher, and John Emad Arbab.

Maurice Baskin argued the cause for respondents. With him on the briefs was Carol Chandler. [+]

> [+]  Briefs of amici curiae urging reversal were filed for the Common-wealth of Massachusetts et al. by Scott Harshbarger, Attorney General of Massachusetts, and Douglas H. Wilkins, Assistant Attorney General, Hubert H. Humphrey III, Attorney General of Minnesota, Robert J. Del Tufo, Attorney General of New Jersey, and Frank J. Kelley, Attorney General of Michigan; for Mayor Raymond L. Flynn by Albert W. Wallis; and for the National Constructors Association et al. by Robert W. Kopp and John Gaal.
>
>   Briefs of amici curiae urging affirmance were filed for the Associated General Contractors of America by Glen D. Nager, Richard F. Shaw, and Michael E. Kennedy; for the Chamber of Commerce of the United States of America by Clifton S. Elgarten, Stephen A. Bokat, Robin S. Conrad, and Mona C. Zeiberg; for Master Printers of America by Francis T. Coleman and William B. Cowen; for the Merit Shop Foundation et al. by Bruce J. Ennis, Jr.; for the National Right to Work Legal Defense Foundation, Inc., by Hugh L. Reilly, W. James Young, and Edwin Vieira, Jr.; and for the Utility Contractors Association of New England, Inc., et al. by Stephen S. Ostrach and Richard D. Wayne.

**JUDGES:** BLACKMUN, J., delivered the opinion for a unanimous Court.

**OPINION BY:** BLACKMUN

**OPINION**

[*220]  [***571]  [**1192]  JUSTICE BLACKMUN delivered the opinion of the Court.

[***LEdHR1A]  [1A]The issue in this litigation is whether the National Labor Relations Act (NLRA), 49

R000097

507 U.S. 218, *220; 113 S. Ct. 1190, **1192;
122 L. Ed. 2d 565, ***LEdHR1A; 1993 U.S. LEXIS 1948

Stat. 449, as amended, *29 U.S.C. § 151 et seq.*, pre-empts enforcement by a state authority, acting as the owner of a construction project, of an otherwise lawful prehire collective-bargaining agreement negotiated by private parties.

I

The Massachusetts Water Resources Authority (MWRA) is an independent government agency charged by the Massachusetts Legislature with providing water-supply services, sewage collection, and treatment and disposal services for the eastern half of Massachusetts. [***572] Mass. Gen. Laws Ann., ch. 92 App., § 1-1 *et seq.* (1993). Following a lawsuit arising out of its failure to prevent the pollution of Boston Harbor, in alleged violation of the Federal Water Pollution Control Act, 86 Stat. 816, as amended, *33 U.S.C. § 1251 et seq.*, [*221] MWRA was ordered to clean up the harbor. See *United States v. Metropolitan Dist. Comm'n, 757 F. Supp. 121, 123 (Mass. 1991)*. The cleanup project was expected to cost $ 6.1 billion over 10 years. *935 F.2d 345, 347 (CA1 1991)*. The District Court required construction to proceed without interruption, making no allowance for delays from causes such as labor disputes. App. 71 (Affidavit of Richard D. Fox, Director of the Program Management Division of MWRA). MWRA has primary responsibility for the project. Under its enabling statute and the Commonwealth's public-bidding laws, MWRA provides the funds for construction (assisted by state and federal grants), owns the sewage-treatment facilities [**1193] to be built, establishes all bid conditions, decides all contract awards, pays the contractors, and generally supervises the project. See *935 F.2d at 347* (citing Mass. Gen. Laws Ann., ch. 92 App., § 1-1 *et seq.* (1993). Mass. Gen. Laws §§ 149:44A to 149:44I, and 30:39M (1990)).

In the spring of 1988, MWRA selected Kaiser Engineers, Inc., as its project manager. Kaiser was to be primarily in charge of managing and supervising construction activity. Kaiser also was to advise MWRA on the development of a labor-relations policy that would maintain worksite harmony, labor-management peace, and overall stability throughout the duration of the project. To that end, Kaiser suggested to MWRA that Kaiser be permitted to negotiate an agreement with the Building and Construction Trades Council and affiliated organizations (BCTC) that would assure labor stability over the life of the project. App. to Pet. for Cert. in No.

91-274, p. 75a (MWRA Pet. App.). MWRA accepted Kaiser's suggestion, and Kaiser accordingly proceeded to negotiate the Boston Harbor Wastewater Treatment Facilities Project Labor Agreement (Agreement). *Ibid.* The Agreement included: recognition of BCTC as the exclusive bargaining agent for all craft employees; use of specified methods for resolving all labor-related disputes; a requirement that all employees be subject to union-security provisions [*222] compelling them to become union members within seven days of their employment; the primary use of BCTC's hiring halls to supply the project's craft labor force; a 10-year no-strike commitment; and a requirement that all contractors and subcontractors agree to be bound by the Agreement. 935 F.2d at 348. See generally MWRA Pet. App. 107a (full text of Agreement). MWRA's board of directors approved and adopted the Agreement in May 1989 and directed that Bid Specification 13.1 be incorporated into its solicitation of bids for work on the project. [1] *935 F.2d at 347.* [***573] Bid Specification 13.1 provides in pertinent part:

> "Each successful bidder and any and all levels of subcontractors, as a condition of being awarded a contract or subcontract, will agree to abide by the provisions of the Boston Harbor Wastewater Treatment Facilities Project Labor Agreement as executed and effective May 22, 1989, by and between Kaiser . . . on behalf of [MWRA] and [BCTC] . . . and will be bound by the provisions of that agreement in the same manner as any other provision of the contract." MWRA Pet. App. 141a-142a.

1   Massachusetts competitive-bidding laws require MWRA to state its preference for a contract term, such as a project labor agreement, in the form of a bid specification. These laws, which MWRA's Enabling Act explicitly incorporates, see Mass. Gen. Laws Ann., ch. 92 App., § 1-8(g) (1993) (incorporating Mass. Gen. Laws §§ 30:39M, and 149:44A to 149:44H), require that the competitive-bidding process be carried out by the awarding authority. See *Modern Continental Constr. Co. v. Lowell, 391 Mass. 829, 836, 465 N.E.2d 1173, 1177-1178 (1984)*.

R000098

507 U.S. 218, *222; 113 S. Ct. 1190, **1193;
122 L. Ed. 2d 565, ***573; 1993 U.S. LEXIS 1948

In March 1990, a contractors' association not a party to this litigation filed a charge with the National Labor Relations Board (NLRB) contending that the Agreement violated the NLRA. The NLRB General Counsel refused to issue a complaint, finding: (1) that the Agreement is a valid prehire agreement under § 8(f) of the NLRA, 29 U.S.C. § 158(f), which authorizes such agreements in the construction industry; [*223] and (2) that the Agreement's provisions limiting work on the project to contractors who agree to abide by the Agreement are lawful under the construction-industry proviso to § 8(e), 29 U.S.C. § 158(e). This proviso sets forth an exception from § 8(e)'s prohibition against "hot cargo" agreements that require an employer to refrain from doing business with any person not agreeing to be bound by a prehire agreement. *Building & Trades Council (Kaiser Engineers, Inc.)*, Case 1-CE-71, NLRB Advice Memo, June 25, 1990, MWRA Pet. App. 88a.

Also in March 1990, respondent Associated Builders and Contractors of Massachusetts/Rhode Island, [**1194] Inc. (ABC), an organization representing nonunion construction-industry employers, brought this suit against MWRA, Kaiser, and BCTC, seeking, among other things, to enjoin enforcement of Bid Specification 13.1. ABC alleged pre-emption under the NLRA, pre-emption under § 514(c) of the Employee Retirement Income Security Act of 1974, 88 Stat. 897, 29 U.S.C. § 1144(c) (ERISA), violations of the Equal Protection and *Due Process Clauses of the Fourteenth Amendment*, conspiracy to reduce competition in violation of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. § 1, and various state-law claims. Only NLRA pre-emption is at issue here.

The United States District Court for the District of Massachusetts rejected each of ABC's claims and denied its motion for a preliminary injunction. MWRA Pet. App. 76a-83a. The Court of Appeals for the First Circuit reversed and directed entry of a preliminary injunction restraining the use of Bid Specification 13.1, reaching only the issue of NLRA pre-emption. *135 L.R.R.M. 2713 (1990)*. The Court of Appeals subsequently granted a petition for rehearing en banc, vacating the panel opinion. MWRA Pet. App. 84a. Upon rehearing en banc, the Court of Appeals, by a 3-to-2 vote, again reversed the judgment of the District Court, once more reaching only the pre-emption issue. *935 F.2d at 359-360*. The court held that MWRA's intrusion into the [*224] bargaining process was pervasive and not the sort of peripheral

regulation that would be permissible under *San Diego Building Trades Council v. Garmon, 359 U.S. 236, 3 L. Ed. 2d 775, 79 S. Ct. 773 (1959)*. See *935 F.2d at 353*. It also held that Bid Specification [***574] 13.1 was pre-empted under *Machinists v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 49 L. Ed. 2d 396, 96 S. Ct. 2548 (1976)*, because MWRA was regulating activities that Congress intended to be unrestricted by governmental power. Because of the importance of the issue, we granted certiorari, *504 U.S. 908 (1992)*.

II

[***LEdHR2] [2] [***LEdHR3] [3]The NLRA contains no express pre-emption provision. Therefore, in accordance with settled pre-emption principles, we should not find MWRA's bid specification pre-empted ""unless it conflicts with federal law or would frustrate the federal scheme, or unless [we] discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.""

[***LEdHR4A] [4A]*Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 747-748, 85 L. Ed. 2d 728, 105 S. Ct. 2380 (1985)* (citations omitted). We are reluctant to infer pre-emption. See *Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 120 L. Ed. 2d 407, 112 S. Ct. 2608 (1992)*; *Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 91 L. Ed. 1447, 67 S. Ct. 1146 (1947)*. "Consideration under the *Supremacy Clause* starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana, 451 U.S. 725, 746, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981)*. With these general principles in mind, we turn to the particular pre-emption doctrines that have developed around the NLRA.

In *Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. at 748*, we noted: "The Court has articulated two distinct NLRA pre-emption principles." The first, "*Garmon* pre-emption," see *San Diego Building Trades Council v. Garmon, supra*, forbids state and local regulation of activities that are "protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8." *359 U.S. at 244*. See also *Garner v. Teamsters, 346 U.S. 485, 498-499, 98 L. Ed. 228, 74 S. Ct. 161 (1953)* ("When [*225] two separate remedies are brought to bear on the same activity, a conflict is imminent"). *Garmon* pre-emption prohibits regulation even of activities that the NLRA only *arguably* protects or

R000099

prohibits. See *Wisconsin Dept. of Industry v. Gould Inc.,
475 U.S. 282, 286, 89 L. Ed. 2d 223, 106 S. Ct. 1057
(1986).* This rule of pre-emption [**1195] is designed to
prevent conflict between, on the one hand, state and local
regulation and, on the other, Congress' "integrated
scheme of regulation," *Garmon, 359 U.S. at 247,*
embodied in §§ 7 and 8 of the NLRA, which includes the
choice of the NLRB, rather than state or federal courts, as
the appropriate body to implement the Act. *Metropolitan
Life Ins. Co. v. Massachusetts, 471 U.S. at 748-749,* and
n. 26.

In *Garmon,* this Court held that a state court was
precluded from awarding damages to employers for
economic injuries resulting from peaceful picketing by
labor unions that had not been selected by a majority of
employees as their bargaining agent. *359 U.S. at 246.*
The Court said: "Our concern is with delimiting areas of
conduct which must be free from state regulation if
national policy is to be left unhampered." *Ibid.* In *Gould,*
we held that the NLRA [***575] pre-empts a statute
that disqualifies from doing business with the State
persons who have violated the NLRA three times within
a 5-year period. We emphasized there that "the *Garmon*
rule prevents States not only from setting forth standards
of conduct inconsistent with the substantive requirements
of the NLRA, but also from providing their own
regulatory or judicial remedies for conduct prohibited or
arguably prohibited by the Act." *475 U.S. at 286* (citing
*359 U.S. at 247*).

A second pre-emption principle, "*Machinists*
pre-emption," see *Machinists v. Wisconsin Employment
Relations Comm'n, 427 U.S. at 147,* prohibits state and
municipal regulation of areas that have been left "'to be
controlled by the free play of economic forces.'" *Id., at
140* (citation omitted). See also *Golden State Transit
Corp. v. Los* [*226] *Angeles, 475 U.S. 608, 614, 89 L.
Ed. 2d 616, 106 S. Ct. 1395 (1986) (Golden State I);
Golden State Transit Corp. v. Los Angeles, 493 U.S.
103, 111, 107 L. Ed. 2d 420, 110 S. Ct. 444 (1989)
(Golden State II). Machinists* pre-emption preserves
Congress' "intentional balance '"between the uncontrolled
power of management and labor to further their
respective interests."'" *Golden State I, 475 U.S. at 614*
(citations omitted).

In *Machinists,* we held that the Wisconsin
Employment Relations Commission could not designate
as an unfair labor practice under state law a concerted

refusal by a union and its members to work overtime,
because Congress did not mean such self-help activity to
be regulable by the States. *427 U.S. at 148-150.* We said
that it would frustrate Congress' intent to "sanction state
regulation of such economic pressure deemed by the
federal Act 'desirably . . . left for the free play of
contending economic forces . . . .'" *Id., at 150* (citation
omitted). In *Golden State I,* we applied the *Machinists*
doctrine to hold that the city of Los Angeles was
pre-empted from conditioning renewal of a taxicab
operating license upon the settlement of a labor dispute.
*475 U.S. at 618.* We reiterated the principle that a "local
government . . . lacks the authority to '"introduce some
standard of properly 'balanced' bargaining power" . . . or
to define "what economic sanctions might be permitted
negotiating parties in an 'ideal' or 'balanced' state of
collective bargaining."'" *Id., at 619* (quoting *Machinists,
427 U.S. at 149-150*) (internal citation omitted). In
*Golden State II, supra,* we determined that the taxicab
employer who was challenging the city's conduct in
*Golden State I* was entitled to maintain an action under
*42 U.S.C. § 1983* for compensatory damages against the
city. In so holding, we stated that the *Machinists* rule
created a zone free from all regulations, whether state or
federal. *493 U.S. at 112.*

[**1196] III

[***LEdHR4B] [4B] [***LEdHR5A] [5A]When
we say that the NLRA pre-empts state law, we mean that
the NLRA prevents a State [***576] from regulating
[*227] within a protected zone, whether it be a zone
protected and reserved for market freedom, see
*Machinists,* or for NLRB jurisdiction, see *Garmon.* A
State does not regulate, however, simply by acting within
one of these protected areas. When a State owns and
manages property, for example, it must interact with
private participants in the marketplace. In so doing, the
State is not subject to pre-emption by the NLRA, because
pre-emption doctrines apply only to state *regulation.*

Our decisions in this area support the distinction
between government as regulator and government as
proprietor. We have held consistently that the NLRA was
intended to supplant state labor *regulation,* not all
legitimate state activity that affects labor. In *Machinists,*
for example, we referred to Congress' pre-emptive intent
to "leave some activities *unregulated,*" *427 U.S. at 144*
(emphasis added), and held that the activities at issue --
workers deciding together to refuse overtime work --

R000100

were not "*regulable* by States," *id., at 149* (emphasis added). In *Golden State I*, we held that the reason Los Angeles could not condition renewal of a taxicab franchise upon settlement of a labor dispute was that "*Machinists* pre-emption . . . precludes state and municipal *regulation* 'concerning conduct that Congress intended to be *unregulated.*'" *475 U.S. at 614* (emphasis added) (quoting *Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. at 749*). We refused to permit the city's exercise of its regulatory power of license nonrenewal to restrict Golden State's right to use lawful economic weapons in its dispute with its union. See *475 U.S. at 615-619.* As petitioners point out, a very different case would have been presented had the city of Los Angeles purchased taxi services from Golden State in order to transport city employees. Brief for Petitioners 35. In that situation, if the strike had produced serious interruptions in the services the city had purchased, the city would not necessarily have been pre-empted from advising Golden State that it would hire another company if [*228] the labor dispute were not resolved and services resumed by a specific deadline.

In *Gould*, we rejected the argument that the State was acting as proprietor rather than regulator for purposes of *Garmon* pre-emption when the State refused to do business with persons who had violated the NLRA three times within five years. We noted in doing so that *in that case*, "debarment . . . serves plainly as a means of enforcing the NLRA." *475 U.S. at 287.* We said there that "the State concedes, as we think it must, that the point of the statute is to deter labor law violations"; we concluded that "no other purpose could credibly be ascribed." *Ibid.*

Respondents quote the following passage from *Gould*, arguing that it stands for the proposition that the State as proprietor is subject to the same pre-emption limitations as the State as regulator:

"Nothing in the NLRA, of course, prevents private purchasers from boycotting labor law violators. But government occupies a unique position of power in our [***577] society, and its conduct, regardless of form, is rightly subject to special restraints. Outside the area of *Commerce Clause* jurisprudence, it is far from unusual for federal law to prohibit States from making spending decisions in ways that are permissible for private parties . . . . The NLRA, moreover, has long been understood to protect a range of conduct against state but not private interference . . . . The Act treats state action differently from private action not merely because they frequently take different forms, but also because in our system States simply are different from private parties and have a different role to play." *Id., at 290.*

[**1197] The above passage does not bear the weight that respondents would have it support. The conduct at issue in *Gould* was a state agency's attempt to compel conformity with the NLRA. Because the statute at issue in *Gould* addressed [*229] employer conduct unrelated to the employer's performance of contractual obligations to the State, and because the State's reason for such conduct was to deter NLRA violations, we concluded: "Wisconsin 'simply is not functioning as a private purchaser of services,' . . . [and therefore,] for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation." *Id., at 289.* We emphasized that we were "not saying that state purchasing decisions may never be influenced by labor considerations." *Id., at 291.*

[***LEdHR6] [6]The conceptual distinction between regulator and purchaser exists to a limited extent in the private sphere as well. A private actor, for example, can participate in a boycott of a supplier on the basis of a labor policy concern rather than a profit motive. See *id., at 290.* The private actor under such circumstances would be attempting to "regulate" the suppliers and would not be acting as a typical proprietor. The fact that a private actor may "regulate" does not mean, of course, that the private actor may be "pre-empted" by the NLRA; the *Supremacy Clause* does not require pre-emption of private conduct. Private actors therefore may "regulate" as they please, as long as their conduct does not violate the law. As the above passage in *Gould* makes clear, however, States have a qualitatively different role to play from private parties. *Ibid.* When the State acts as regulator, it performs a role that is characteristically a governmental rather than a private role, boycotts notwithstanding. Moreover, as regulator of private conduct, the State is more powerful than private parties. These distinctions are far less significant when the State acts as a market participant with no interest in setting

policy.

[***LEdHR5B] [5B]In *Gould*, we did not address fully the implications of these distinctions. We left open the question whether a State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor and its acts therefore are not "tantamount to regulation" or policymaking. As explained [*230] more fully below, we now answer this question in the affirmative.

IV

[***LEdHR1B] [1B] [***LEdHR7] [7] [***LEdHR8] [8]Permitting the States to participate freely in the market-place is not only consistent with NLRA pre-emption principles generally but also, in these cases, promotes the legislative goals that animated the passage of the §§ 8(e) and (f) exceptions for the construction industry. In 1959, Congress amended the NLRA to add § 8(f) and modify § 8(e). Section 8(f) explicitly permits employers in the construction industry -- but no other employers -- to enter into prehire agreements. Prehire agreements are collective-bargaining agreements providing for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any employees. *935 F.2d at 356; Jim McNeff, Inc. v. Todd, 461 U.S. 260, 265-266, 75 L. Ed. 2d 830, 103 S. Ct. 1753 (1983).* The 1959 amendment adding a proviso to subsection (e) permits a general contractor's prehire agreement to require an employer not to hire other contractors performing work on that particular project site unless they agree to become bound by the terms of that labor agreement. See *Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 657, 72 L. Ed. 2d 398, 102 S. Ct. 2071 (1982).* Section 8(f) contains a final proviso that permits employees, once hired, to utilize the NLRB election process under §§ 9(c) and (e) of the Act, *29 U.S.C. §§ 159(c) and (e),* if they wish to reject the bargaining representative or to cancel the union security provisions of the prehire agreement. See *NLRB v. Iron Workers, 434 U.S. 335, 345, 98 S. Ct. 651, 54 L. Ed. 2d 586 (1978).*

[**1198] It is undisputed that the Agreement between Kaiser and BCTC is a valid labor contract under §§ 8(e) and (f). As noted above, those sections explicitly authorize this type of contract between a union and an employer like Kaiser, which is engaged primarily in the construction industry, covering employees engaged in that industry.

Of course, the exceptions provided for the construction industry in §§ 8(e) and (f), like the prohibitions from which [*231] they provide relief, are not made specifically applicable to the State. This is because the State is excluded from the definition of the term "employer" under the NLRA, see *29 U.S.C. § 152(2),* and because the State, in any event, is acting not as an employer but as a purchaser in this case. Nevertheless, the general goals behind passage of §§ 8(e) and (f) are still relevant to determining what Congress intended with respect to the State and its relationship to the agreements authorized by these sections.

[***LEdHR9] [9]It is evident from the face of the statute that in enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry. Such conditions include, among others, the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a longstanding custom of prehire bargaining in the industry. See S. Rep. No. 187, 86th Cong., 1st Sess., 28, 55-56 (1959); H. R. Rep. No. 741, 86th Cong., 1st Sess., 19-20 (1959).

[***LEdHR5C] [5C] [***LEdHR10A] [10A]There is no reason to expect these defining features of the construction industry to depend upon the public or private nature of [***579] the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement. In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a [*232] restriction. See, *e. g., Maryland v. Louisiana, 451 U.S. at 746* ("Consideration under the *Supremacy Clause* starts with the basic assumption that Congress did not intend to displace state law"). [2] Indeed,

there is some force to petitioners' argument, Brief for Petitioners 25, that denying an option to private owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces identified in *Machinists*.

[***LEdHR10B] [10B]

   2  Respondents suggest in their brief, Brief for Respondents 22, n. 12, that under *H. K. Porter Co. v. NLRB, 397 U.S. 99, 103, 25 L. Ed. 2d 146, 90 S. Ct. 821 (1970)*, § 8(d) of the NLRA expressly prohibits the conduct of MWRA at issue in this case. The Court of Appeals did not rely on this section of the statute, nor did we grant certiorari on this question. We therefore decline the invitation to address the application, if any, of § 8(d) to Bid Specification 13.1.

V

   [***LEdHR1C] [1C] In the instant case, MWRA acted on the advice of a manager hired to organize performance of a cleanup job over which, under Massachusetts law, MWRA is the proprietor. There is no question but that MWRA was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost. As petitioners note, moreover, Brief for Petitioners 26, the challenged action in this litigation was specifically tailored to one particular job, the Boston Harbor cleanup project. There is therefore no basis on which to distinguish the incentives at work here from those that operate elsewhere in the construction industry, incentives that this Court has recognized as legitimate. [**1199] See *Woelke & Romero Framing Co. v. NLRB, 456 U.S. at 662*, and n. 14.

   We hold today that Bid Specification 13.1 is not government regulation and that it is therefore subject to neither *Garmon* nor *Machinists* pre-emption. Bid Specification 13.1 constitutes proprietary conduct on the part of the Commonwealth of Massachusetts, which legally has enforced a valid project labor agreement. As Chief Judge Breyer aptly [*233] noted in his dissent in the Court of Appeals, "when the MWRA, acting in the role of purchaser of construction services, acts just like a private contractor would act, and conditions its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to

find, it does not 'regulate' the workings of the market forces [***580] that Congress expected to find; it exemplifies them." *935 F.2d at 361*.

   Because we find that Bid Specification 13.1 is not pre-empted by the NLRA, it follows that a preliminary injunction against enforcement of this bid specification was improper. We therefore reverse the judgment of the Court of Appeals and remand these cases for further proceedings consistent with this opinion.

   *It is so ordered.*

**REFERENCES**

*48 Am Jur 2d, Labor and Labor Relations 1313*; *48A Am Jur 2d, Labor and Labor Relations 2003*

10A Am Jur Legal Forms 2d, Labor and Labor Relations 159:184, 159:285-159:287, 159:1164

*USCS, Constitution, Art VI, cl 2; 29 USCS 158(e), 158(f)*

Employment Coordinator LR-12,261, LR-12,262, LR-12,265--LR12,267, LR-31,020--LR-31,022

L Ed Digest, Commerce 129.5

L Ed Index, Collective Bargaining; Hiring Employees; Labor and Employment

ALR Index, Collective Bargaining; Labor and Employment; Pre-emption

   Annotation References:

State court jurisdiction as pre-empted by National Labor Relations Act as amended (*29 USCS 141 et seq.*)-- Supreme Court cases. *75 L Ed 2d 988*.

National Labor Relations Act and Labor Management Relations Act as excluding state action--federal cases. *93 L Ed 470, 94 L Ed 984, 95 L Ed 384, 98 L Ed 245, 99 L Ed 559, 100 L Ed 1174*.

Municipal ordinance or other enactment as pre-empted by National Labor Relations Act (*29 USCS 151 et seq.*). *110 ALR Fed 879*.

Validity, construction, and application of the construction

507 U.S. 218, *233; 113 S. Ct. 1190, **1199;
122 L. Ed. 2d 565, ***580; 1993 U.S. LEXIS 1948

industry proviso to NLRA hot cargo provision (*29 USCS 158(e)*). *39 ALR Fed 16.*

Rights of collective action by employees as declared in 7

of National Labor Relations Act (*29 USCS 157*). *6 ALR2d 416.*

R000104



LEXSEE 569 F.2D 146

**EDWARD A. WINTER, APPELLANT v. LOCAL UNION NO. 639, AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND MALONEY CONCRETE COMPANY EDWARD A. WINTER, APPELLANT v. LOCAL UNION NO. 639, AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND MALONEY CONCRETE COMPANY**

**Nos. 75-1948, 75-1949**

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

*569 F.2d 146; 186 U.S. App. D.C. 315; 1977 U.S. App. LEXIS 5422; 97 L.R.R.M. 2372; 83 Lab. Cas. (CCH) P10,302*

**September 13, 1976, Argued**
**December 30, 1977, Decided**

**SUBSEQUENT HISTORY:**   [**1]   As Amended December 30, 1977.

**PRIOR HISTORY:**   Appeals from the United States District Court for the District of Columbia (D.C. Civil 74-532).

**DISPOSITION:**   Affirmed.

**COUNSEL:** John V. Long for Appellant.

Thomas J. Hart, with whom S. G. Lippman was on the brief, for Appellee Local 639 IBT.

Kevin W. Carmody, with whom Charles J. Steele was on the brief, for Appellee, Maloney Concrete Company.

**JUDGES:** Tamm, MacKinnon and Wilkey, Circuit Judges. Opinion for the Court filed by Circuit Judge WILKEY. Dissenting opinion filed by Circuit Judge MacKinnon.

**OPINION BY:** WILKEY

**OPINION**

[*148]   WILKEY, Circuit Judge:

This case involves a suit by plaintiff Winter against his employer, Maloney Concrete Co., for breach of contract, and against his union, Teamsters Local 639, for breach of its duty of fair representation. The facts are simple and undisputed. In 1971, Winter filed a grievance asserting that seniority should be awarded on a company-wide, rather than on a plant-wide, basis. Winter's assertion contradicted long-standing industry practice under the current and preceding collective bargaining contracts. [1] After several meetings with management (one of which Winter attended) the union decided not [**2] to process the grievance further. Winter neither protested nor appealed. Three years later, Winter filed a similar grievance. The union arranged a meeting with management, which Winter failed to attend. Winter did not notify the union to explain his absence. [2] In light of Winter's failure to appear, and in light of the fact that Winter's 1974 grievance was largely a restatement of his 1971 grievance, which had been disposed of on the merits, the union declined to process the 1974 grievance further.

1   *See* Appendix (App.) 22-42, 70.
2   App. 29. In deposition, Winter stated that he refused to appear at the meeting because he had been told that his attendance would be "on [his] own time." App. 46. Operating under this

R000105

569 F.2d 146, *148; 186 U.S. App. D.C. 315;
1977 U.S. App. LEXIS 5422, **2; 97 L.R.R.M. 2372

assumption, he said, he feared that absence from work would have rendered him ineligible for weekend work assignments. App. 46-47. However, under the collective bargaining contract attendance at grievance meetings was an excused absence, and Winter's absence from work would thus not have prejudiced him. *See* App. 29.

[**3] On 3 April 1974 Winter brought suit under § 301 of the Labor-Management Relations Act. [3] He alleged that Maloney had breached the collective bargaining contract by refusing to award him company-wide seniority, and that Local 639 had breached its duty of fair representation by refusing to process his grievance out of political hostility towards him. The district court granted summary judgment both to the union and to the employer, on the ground that Winter had failed to exhaust his internal union remedies. [4] We affirm both grants of summary judgment, although our reasoning departs somewhat from that of the district court.

3  *29 U.S.C. § 185(a) (1970):*

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

4  The district court's orders granting summary judgment are reprinted in App. at 66, 89-90.

[**4] A. *Winter's Suit Against the Union*

The Landrum-Griffin Act specifically permits unions to require their members to exhaust internal union remedies before suing the union. [5] Although this language is discretionary, the circuit courts have unanimously upheld the exhaustion requirement and commended its utility. [6] In this case, [*149] the union constitution and by-laws offer several remedies and expressly require that they be exhausted. [7] The constitution provides that an aggrieved member may file charges with the local Executive Board; if he loses there, he may appeal to the General Executive Board, which may try the case *de novo* and must in any event render decision within 15 days. [8] The constitution also provides for direct appeal to the International president. [9] Winter concededly failed to avail himself of these remedies. He seeks to excuse his neglect by arguing that exhaustion of union remedies would have been futile.

5  *29 U.S.C. § 411(a)(4) (1970):*

> No labor organization shall limit the right of any member thereof to institute an action in any court, . . . *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof. . . .

[**5]

6  *See, e.g., Ruzicka v. General Motors Corp., 523 F.2d 306, 311-12 (6th Cir. 1975)* (citing cases); *Newgent v. Modine Mfg. Co., 495 F.2d 919, 927 (7th Cir. 1974); Imel v. Zohn Mfg. Co., 481 F.2d 181, 183-84 (10th Cir. 1973),* cert. denied, 415 U.S. 915, 39 L. Ed. 2d 469, 94 S. Ct. 1411 (1974); *Brady v. Trans World Airlines, Inc., 401 F.2d 87, 104 (3d Cir. 1968),* cert. denied, 393 U.S. 1048, 21 L. Ed. 2d 691, 89 S. Ct. 680 (1969); *Neal v. System Bd. of Adj., 348 F.2d 722, 726 (8th Cir. 1965).* Insistence on exhaustion of union remedies is usually rationalized as "staying the hand of 'judicial interference with the internal affairs of a labor organization until it has had at least some opportunity to resolve disputes concerning its own internal affairs.'" *Imel, 481 F.2d at 183, quoting Brady, 401 F.2d at 104.*

7  TEAMSTERS, CONST. art. xix, § 12(a) (1971); By-laws of the Drivers, Chauffeurs and Helpers Local Union No. 639, Washington, D.C., art. xxii.

8  TEAMSTERS, CONST. art. xix, §§ 1-3 (1971).

569 F.2d 146, *149; 186 U.S. App. D.C. 315;
1977 U.S. App. LEXIS 5422, **5; 97 L.R.R.M. 2372

9  *Id.* art. vi, § 2(a).

[**6]

Exhaustion of intra-union remedies could be futile for two reasons. First, the union constitution might provide no adequate procedural route to the relief requested. In this case, the plaintiff seeks both money damages and an injunction directing Local 639 to process his grievances nondiscriminatorily in the future. [10] Winter probably could not have obtained money damages through union disciplinary channels. The union constitution provides, however, that decisions and penalties imposed in disciplinary proceedings "may consist of . . . commands to do or perform, or refrain from doing or performing, specified acts." [11] Winter could thus have obtained some of what he seeks, *viz.*, an injunction, by a favorable outcome in the union proceedings. [12] Since the courts generally have insisted on a "clear and positive showing of futility" before excusing a failure to exhaust, [13] we conclude that Winter cannot be excused on the ground that the absence of available procedures would have made exhaustion futile.

10  App. 10-11.
11  TEAMSTERS, CONST. art. xix, § 9(a) (1971).
12  Indeed, Winter does not seriously contend that the union procedures here were *per se* inadequate. *See* Brief of Appellant at 10-12; Reply Brief of Appellant at 4-5.

[**7]

13  *Imel v. Zohn Mfg. Co.,* 481 F.2d 181, 184 (10th Cir. 1973), *cert. denied,* 415 U.S. 915, 39 L. Ed. 2d 469, 94 S. Ct. 1411 (1974).

Exhaustion might be futile, secondly, because union officials are so hostile to a worker that he could not hope to get a fair hearing, regardless of the procedures available. The cases that have excused failure to exhaust on this ground, however, including the cases plaintiff cites, [14] have involved quite extreme facts. [15] Evidently, in order to prevail on this ground Winter must make a specific and convincing showing of union animus.

14  *See* Reply Brief of Appellant at 4.
15  *See, e.g., Fulton Lodge No. 2, IAM v. Nix,* 415 F.2d 212, 216 (5th Cir. 1969), *cert. denied,* 406 U.S. 946, 32 L. Ed. 2d 332, 92 S. Ct. 2044 (1972) (exhaustion futile where remedy was personal appeal to officers with whom expelled

member had "continuing difficulties"); *Farowitz v. Musicians Local 802,* 330 F.2d 999, 1003 (2d Cir. 1964) (exhaustion futile where appellate board had consistently opposed worker's position and had asserted its position in litigation for four years); *Calagaz v. Calhoon,* 309 F.2d 248, 260 (5th Cir. 1962) (exhaustion futile where appeal would be to officers against whom complaint directed); *Adamczewski v. Local 1487, IAM,* 84 L.R.R.M. 2791 (N.D. Ill. 1972) (exhaustion futile prior to enjoining illegal union disciplinary proceedings where other union members who had engaged in same conduct had already been sanctioned in such proceedings).

[**8]  This showing can be made in two ways. First, it might be inferred from the circumstances surrounding the grievance process. In this case, however, the facts create no inference of union hostility, arbitrariness, or bad faith. Plaintiff was proffering, for the second time, what seems to have been a frivolous interpretation of the contract, and inexcusably failed to attend a grievance meeting the union had arranged. Given [*150] this, the union's election not to process his grievance further gives rise to no suggestion of hostility.

Second, a showing of hostility can be made by citing concrete evidence of personal animus. Winter does not do so. He presents some evidence that relevant union officials knew of his political activities in opposition to them. [16] He then makes conclusory allegations that the union was hostile to him on this account. [17] No evidence of actual hostility is shown. In fact, plaintiff's claim seems ultimately to be that he is excused from exhausting union remedies by the mere fact that he has made sworn allegations that the union's conduct was "politically motivated, in bad faith, and discriminatory." [18] This argument is without merit. In any suit alleging [**9] unfair representation, the union member will make allegations (sworn or unsworn) that the union's conduct was politically motivated, in bad faith, and discriminatory. That, indeed, is the gravamen of his case in chief. If such allegations suffice to justify failure to exhaust union remedies, the exhaustion requirement is a nullity.

16  *See* Affidavit of Daniel George, App. 55-56.
17  *See* Complaint, App. 9-10; Brief of Appellant at 4, 12; Reply Brief of Appellant at 5, 13.
18  Brief of Appellant at 12.

569 F.2d 146, *150; 186 U.S. App. D.C. 315;
1977 U.S. App. LEXIS 5422, **9; 97 L.R.R.M. 2372

Such allegations, at any rate, do not satisfy *Fed. R. Civ. P. 56(e)*. In order to survive a motion for summary judgment under that rule, a party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Plaintiff here has set forth no specific facts showing that there is a genuine issue regarding union hostility towards him, [19] and hence regarding the futility of exhausting available union remedies. [*10] For this reason, the district judge properly awarded summary judgment in favor of Local 639.

> 19 As noted above, p. 150 *supra*, and as pointed out in the dissent, Diss. op. at 155, Winter presented some evidence that the business agent who processed his complaint was aware of his political activities. This evidence, however, standing alone, creates no genuine issue for trial on the question of union *hostility*: assuming that union officials knew of Winter's opposition, their refusal to process his grievance on the facts of this case suggests no hostility, unless we adopt the reasoning, rejected by the scholastics, of *post hoc, ergo propter hoc*. In most unfair representation cases, union officials will be *aware* of plaintiff's political activities; it would be odd if they were not. If a mere showing of this *awareness* sufficed to get a plaintiff past summary judgment for failure to exhaust union remedies, summary judgment would effectively be unavailable to the union on this issue.

B. *Winter's* [**11] *Suit Against the Employer*

The district court held that the defense of failure to exhaust intra-union remedies was available, not only to the union, but also to the employer. We disagree, at least on the facts of this case. The few courts that have considered this question have held, almost unanimously, that the defense of failure to exhaust union remedies is *not* available to the employer. [20] The reason is that the union constitution, which provides for the internal remedies, is a "contract" only between the union and its members, and the employer cannot avail himself of the union's contractual defense. [21] No court of appeals has held that the defense is available to the employer; one circuit has said in dictum that it is not. [22] The only court of appeals to suggest otherwise was the Seventh Circuit in *Orphan v. Furnco Construction Corp.*, [23] which implied that the employer might raise the exhaustion

defense if he could show a "*formal appeal* or other procedure provided by the Union constitution or by-laws which *so certainly holds out the prospect of . . . relief* that the plaintiffs could justifiably be expected [*151] to have recourse to it before filing [**12] suit." [24] In *Orphan*, however, the constitution provided for no formal appeals procedure, but merely for "criminal-type prosecutions against Union members and officers charged with specified offenses." [25] The court held that the prospect of relief held out by such procedures was sufficiently uncertain to make the exhaustion defense unavailable to the employer. The procedures at issue here, significantly, are quite similar to those at issue in *Orphan*: the Teamsters' constitution likewise provides no procedures for appealing adverse grievance decisions, but only trial-type procedures for prosecuting offending union members. Even under the *Orphan* dictum, therefore, there is no circuit court authority for making the defense of failure to exhaust union remedies available to the employer on the facts of this case. [26]

> 20  *See, e.g., Orphan v. Furnco Constr. Corp., 466 F.2d 795, 801 & n.12 (7th Cir. 1972)* (citing cases).
> 21  *Id. at 800-01.*
> 22  *See Retana v. Apartment Operators Local 14, 453 F.2d 1018, 1027 n.16 (9th Cir. 1972).*
[**13]
> 23  *466 F.2d 795 (7th Cir. 1972).*
> 24  *Id. at 801* (emphasis added).
> 25  *Id.*
> 26  Several district courts have concluded, to the contrary, that the exhaustion defense should generally be open to the employer. *See Bradley v. Ford Motor Co., 417 F. Supp. 23, 26 (N.D. Ill. 1975); Fleming v. Chrysler Corp., 416 F. Supp. 1258, 1266 (E.D. Mich. 1975); Brookins v. Chrysler Corp., 381 F. Supp. 563, 568-69 (E.D. Mich. 1974); Harrington v. Chrysler Corp., 303 F. Supp. 495 (E.D. Mich. 1969).* Several other district court opinions, whose holding is unclear, may go off on this ground. *See Brookins, 381 F. Supp. at 568* (citing cases). The most convincing rationale for the general availability of the exhaustion defense to the employer derives, collaterally, from *Vaca v. Sipes, 386 U.S. 171, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967)* and *Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 47 L. Ed. 2d 231, 96 S. Ct. 1048 (1976).* In those cases, the Court held generally that the employer is

entitled to rely on the outcome of a grievance arbitration, and is thus insulated from a breach of contract suit, unless the union breached its duty of fair representation during the grievance process. Accordingly, some district courts have reasoned that, once the union is dismissed from the suit owing to its member's failure to exhaust remedies, it would be inequitable to require the employer to defend the suit alone, since exhaustion of remedies might reveal the union's good faith and thus cause the contract action against the employer to evanesce. As the *Brookins* court stated:

> By exhausting his internal remedies the employee may be able to eliminate the very wrong of which he complains, not merely obtain a remedy therefor in another forum. If the union's wrongful refusal to continue the grievance were reversed *without prejudice to his rights*, the employee would no longer have a cause of action for breach of the duty of fair representation, and consequently would have no right under *Vaca* to sue his employer for breach of contract.

*Id. at 569* (emphasis added).

Although this argument is not without appeal, it should be noted that, of the four district court cases cited above three, including *Brookins*, come from the Eastern District of Michigan and all four involve the UAW. The UAW, significantly, has what is probably the most elaborate and comprehensive system of internal appeals of any American union, culminating in an appeal to a non-partisan panel composed of eminent persons with no connection to the Auto Workers. The UAW procedures, virtually unique among unions, may well enable a worker to get redress "without prejudice to his rights." The Teamsters' "criminal-type" procedures, although they may permit Winter to obtain some relief, see p. 5 *supra*, are far less likely to "make him whole." *See 381 F. Supp. at 569.* For much the same reason that the *Orphan* dictum is inapplicable,

therefore, we decline to embrace the *Brookins* rationale here.

[**14] This conclusion, however, does not end the matter. In the district court, the employer urged as its first ground for summary judgment that "there was no breach of the collective bargaining contract by Maloney Concrete Company." [27] The employer repeats this argument here. [28] The trial court did not reach this question. However, this Court has held that "an appellate court has discretion to uphold a summary judgment under a legal theory different from that applied by the trial court, and rest the affirmance 'on any ground that finds support in the record' . . . ." [29] The record in this case is replete with evidence that Maloney did not breach the collective bargaining contract by refusing to award Winter company-wide seniority. [30] [*152] Winter has presented no evidence to contradict Maloney's affidavits. For this reason, there is no genuine issue of fact for trial as to the interpretation of the contract and summary judgment should be awarded to the employer on the ground that there was no breach of the collective bargaining contract by it.

27  App. 67.
28  Brief of Appellant Maloney Concrete Co. at 8-12.

[**15]

29  *United States v. General Motors Corp., 171 U.S. App. D.C. 27, 518 F.2d 420, 441 (1975)* (Leventhal, J.).

30  *See* App. 22-42, 70. The collective bargaining contract was silent as to whether seniority was to be awarded on a company-wide or plant-wide basis. This is not to say, of course, that the contract was "ambiguous." *See* Diss. op. at 154. A collective bargaining contract is too slender a volume to answer all questions that conceivably could arise during the operation of a complex industrial enterprise. *See* Cox, *Reflections Upon Labor Arbitration*, 72 HARV.L.REV. 1482, 1498-99 (1959). It is well established that when gaps in the contract's coverage occur, as they inevitably will, they are "to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement." *United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 580, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960).* The agreement in this case is a multiemployer contract between

Local 639 and seven concrete companies. Six of Local 639's shop stewards (two employed by Maloney, four employed by the other companies) submitted sworn affidavits stating that it had long been the practice in their companies and in the industry as a whole to award seniority only on a plant-wide basis, and that they had never known the practice to be otherwise in their average 20-year experience on the job. App. 31-42. In view of these affidavits, which are uncontested, the "terms" of the collective bargaining contract are perfectly clear.

### [**16] CONCLUSION

Because Winter failed to exhaust his available internal union remedies, the district judge properly granted Local 639's motion for summary judgment. Because there exists no genuine issue as to the employer's breach of the collective bargaining contract, the district judge properly granted Maloney Concrete's motion for summary judgment. The decision of the district court accordingly is

*Affirmed.*

**DISSENT BY:** MacKINNON

**DISSENT**

MACKINNON, Circuit Judge, dissenting:

Appellant Winter, a truck driver engaged in the delivery of concrete in the Washington, D.C. metropolitan area, is an employee of Maloney Concrete Company (hereinafter "Maloney") and a member of Local No. 639 of the Teamsters International Union. Maloney has several plants from which mixed concrete is delivered, and each driver is assigned to a particular plant. The collective bargaining agreement between Maloney and the union has a seniority provision which reads as follows:

When ability, merit, and physical fitness are equal, employees with the greatest seniority will be given preference in advancement to higher-rated jobs, except promotions to positions excluded from the coverage of this agreement. Increases [**17] or decreases of working forces shall also be on the same basis.

(App. 9).

Winter's lawsuit alleges that Maloney breached this provision by according him only "plant wide" rather than "company wide" seniority, and that the union breached its duty of fair representation in its handling of two grievances that he filed in 1971 and 1974 protesting the company's failure to comply in this respect with the collective bargaining agreement.

On motion by the union for summary judgment, the district court dismissed the complaint as to the *union* on the ground that Winter had failed

to exhaust the internal remedies available to all union members under the constitution, such exhaustion being a prerequisite to commencement of any civil action, *Imel v. Zohn Manufacturing Co., 481 F.2d 181 (10th Cir. 1973), cert. denied, 415 U.S. 915, 39 L. Ed. 2d 469, 94 S. Ct. 1411 (1974); compare Vaca v. Sipes, 386 U.S. 171, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967).*

The district court also granted *Maloney's* motion for summary judgment for the following stated reasons:

In view of the Court's holding that plaintiff has failed to [**18] exhaust his internal union remedies, the Court is now compelled to dismiss plaintiff's complaint as to Maloney for similar reasons. *Vaca v. Sipes, supra; Republic Steel v. Maddox, 379 U.S. 650, 13 L. Ed. 2d 580, 85 S. Ct. 614* [*153] *(1965); Scott v. Anchor Motor Freight, Inc., 496 F.2d 276* (6th Cir.), *cert. denied, 419 U.S. 868, 42 L. Ed. 2d 107, 95 S. Ct. 126 (1974); Hubicki v. ACF Industries, Inc., 484 F.2d 519 (3d Cir. 1973).*

(App. 90).

I agree with the majority opinion, on the facts of this case, that the defense of failure to exhaust *union* remedies is not available to the employer, Maloney [1]; but I disagree with its conclusion that it was proper for the district court to grant summary judgment on the

alternative ground that "there was no breach of the collective bargaining contract by Maloney Concrete Company." In my opinion whether there was a breach of the collective bargaining agreement presents a genuine issue of material fact that must be resolved by testimony at trial. *FED. R. CIV. P. 56(c); Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 7 L. Ed. 2d 458, 82 S. Ct. 486 (1962);* [**19] *Ecology Center of Louisiana, Inc. v. Coleman, 515 F.2d 860 (5th Cir. 1975); Underwater Storage, Inc. v. United States Rubber Co., 125 U.S. App. D.C. 297, 371 F.2d 950 (1966), cert. denied, 386 U.S. 911, 17 L. Ed. 2d 784, 87 S. Ct. 859 (1967), on remand 314 F. Supp. 546 (D.D.C. 1970).*

1   Although I agree with the majority's holding that Maloney cannot rely on Winter's failure to exhaust his internal remedies, I adopt a slightly different rationale for doing so, based in part on the analysis in *Brookins v. Chrysler Corporation, Dodge Main Division, 381 F. Supp. 563 (E.D. Mich. 1974).* In *Brookins,* the court gave a cogent summary of the dilemma that the ruling in *Vaca v. Sipes, 386 U.S. 171, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967)* has provoked:

> The answer [to whether an employer may rely on an employee's failure to exhaust his union remedies] seems to turn on whether the union's successful exhaustion defense goes to the merits of the claimed unfair representation or merely to the ripeness of the controversy or plaintiff's capacity to sue. If the former - *i.e.,* if a failure to exhaust internal remedies means that the duty of fair representation has not yet been breached - then plaintiff clearly cannot prove the contrary and the employer may properly rely on the employee's failure to exhaust contractual remedies, for he has through the judgment of dismissal as to the union lost his only legally valid excuse for failing to exhaust. In that sense the employer does indeed get a "free ride" on the union's defense. However, if the union's dismissal

> for failure to exhaust internal remedies recognizes that a breach of the duty of fair representation may have occurred, and holds only that a judicial remedy for that breach is not presently available, then it seems that the plaintiff would be in a position to prove the existence of the breach despite the fact that he cannot at present maintain an action thereon. The wrong could still exist, and would be subject to proof; only the timing of the remedy would be affected by the union's dismissal from the case.

*381 F. Supp. at 567-68.*

Thus, by the same token that an exhaustion of internal union remedies is not an absolute requirement for suit against the union itself, it cannot be an absolute prerequisite to suit against the employer. In the instant case, it is my opinion that there is enough suspicion of union-employee hostility that appellant should not be forced to exhaust his internal union remedies before suing the union for breach of its duty of fair representation. Accordingly, the exhaustion requirement is clearly not "substantive" in the sense the *Brookins* opinion suggests, and thus the employer cannot rely upon it as a defense. Should Winter's claims of official hostility prove unsubstantiated, upon dismissal of his suit against the union his suit against Maloney must also be dismissed, *Vaca v. Sipes, supra;* but he should not as a matter of law be foreclosed from having a hearing on his grievances because he has not exhausted his union grievances.

[**20] The affidavits filed by the appellees assert that it was a long-standing practice at Maloney and in the local industry in general to afford work opportunity to employees, under contracts such as the one involved here, on the basis of plant-wide rather than company-wide seniority (App. 25-42). Winter, however, while not disputing that plant-wide seniority may be the norm in the industry at large, insists that the specific terms of the collective bargaining agreement between Local 639 and Maloney are at variance with any such allegedly "established practice" and require company-wide

R000111

seniority. The bargaining agreement does not explicitly refer to either "plant-wide" or "company-wide" seniority. The relevant provision, set forth above, is from the agreement made with the Maloney Company as a whole, not with its individual plants. In the absence of some specific provision or persuasive evidence to the contrary, an [*154] agreement with a company looks to company-wide, not merely plant-wide, obligations. Maloney introduces a number of affidavits stating that the practice both at Maloney itself and in the industry at large was to have only plant-wide seniority. Not only, however, [**21] is evidence of general practice insufficient to override the express terms of a contract, but also, where a contract's meaning is unclear, summary judgment is inappropriate.

Although summary judgment is possible on questions of contractual interpretation, *see, e.g., Parish v. Howard, 459 F.2d 616 (8th Cir. 1972); Green v. Valve Corp. of America, 428 F.2d 342 (7th Cir. 1970); Universal Fiberglass Corp. v. United States, 400 F.2d 926 (8th Cir. 1968),* where the contract is ambiguous, such disposition is prohibited, *see, e.g., Cram v. Sun Insurance Office, Ltd., 375 F.2d 670 (4th Cir. 1967); Cinocca v. Baxter Laboratories, Inc., 400 F. Supp. 527 (E.D. Okla. 1975).*

Moreover, the burden is on the party moving for summary judgment to prove that there are no material issues of fact (such as ambiguous contract terms), *see, e.g., Adickes v. Kress & Co., 398 U.S. 144, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Action, 538 F.2d 180 (8th Cir. 1976), cert. denied, 429 U.S. 1040, 50 L. Ed. 2d 751, 97 S. Ct. 738 (1977);* [**22] *Evers v. Buxbaum, 102 U.S. App. D.C. 334, 253 F.2d 356 (1958);* and disputed issues of fact may not be tried by affidavit, *Sartor v. Arkansas Malt Gas Corp., 321 U.S. 620, 88 L. Ed. 967, 64 S. Ct. 724 (1944); Redman v. Warrener, 516 F.2d 766 (1st Cir. 1975); Gutor International AG v. Raymond Packer Co., Inc., 493 F.2d 938 (1st Cir. 1974); Hollander v. Pan Am World Airways, Inc., 382 F. Supp. 96 (D. Md. 1973);* 6 MOORE'S FEDERAL PRACTICE para. 56.11 [1.-2] (ed. 1977).

In this case, it cannot be successfully maintained that the terms of this collective bargaining agreement are clear on their face, *cf. Dworman v. Mayor and Board of Aldermen, Governing Body of Town of Morristown, 370 F. Supp. 1056 (D. N.J. 1974); La Salle Co. v. Kane, 8*

*F.R.D. 625 (E.D. N.Y. 1949),* and Maloney has not carried its burden of persuasion that they are in fact unambiguous. The court, then, is presented with a genuine issue of material fact that can be resolved only at trial, to wit, whether:

> The alleged "established practice in the concrete industry in the Washington metropolitan [**23] area that work opportunity is offered employees in the order of seniority on a plant . . . basis . . ." as applied by defendants in this case, violates the seniority provisions of the agreement and discriminatorily violates plaintiff's rights.

(App. 52).

The question of contract interpretation is sufficient to preclude summary judgment in favor of Maloney. In addition, the other issues of material fact presented by Winter's claim that the union breached its duty of fair representation by failing to process his grievances and persisting for political reasons in its refusal to enforce his seniority rights (App. 9-10, 49) would require a similar conclusion as regards Winter's case against Local 639.

On the controverted issue as to whether the union discriminatorily refused to enforce his contractual seniority rights, Winter swears that his allegations of political motivation are made on "personal knowledge of the facts" (App. 11), while the Local contends that it processed plaintiff's grievances and disposed of them on the merits.

We need not reach the question of which of the parties' version of the facts is more credible. Any such determination is clearly to be made by the [**24] fact-finder in an actual trial. This court cannot uphold the summary disposition of genuine issues of material fact. In a summary judgment proceeding a court cannot try issues of fact, but only determine whether there are such issues to be tried, *see, e.g., Heyman v. Commerce and Industry Insurance Co., 524 F.2d 1317, 1319-1320 (2d Cir. 1975);* and genuine questions of fact must be resolved at trial, not merely by affidavits such as were before the district court in this case, *see, e.g., Judge v. City of Buffalo, 524 F.2d 1321 (2d [*155] Cir. 1975); Redman v. Warrener, 516 F.2d 766 (1st Cir. 1975); Aeronca, Inc. v. Style-Crafters, Inc., 499 F.2d 1367 (4th Cir. 1974),* later

appeal, *546 F.2d 1094 (1976)*; *Aulds v. Foster, 484 F.2d 945 (5th Cir. 1973)*; *Jackson v. Griffith, 480 F.2d 261 (10th Cir. 1973)*.

The union contends that Winter "made no attempt to invoke his available internal union remedies" (App. 13), and he in turn rejoins that any attempt to do so would have been futile (App. 9-10, 49). The issue is thus raised as to whether or not the political antagonism [**25] of the union to Winter was sufficiently intense that it would be unreasonable to suppose that his grievances would be fairly advanced by the union. One need not exhaust union remedies if they are shown likely to be futile. *Cf. Verville v. International Ass'n of Machinists & Aerospace Workers, 520 F.2d 615, 620 (6th Cir. 1975)*; *Semancik v. UMW District 5, 466 F.2d 144, 151 (3d Cir. 1972)*; *Farowitz v. Associated Musicians of Greater New York, 330 F.2d 999 (2d Cir. 1964)*.

The critical evidence on this point relates to whether the business agent, Marcey, who handled - or mishandled as the case may be - both of Winter's grievances knew when he did so of Winter's activities in support of Marcey's opponents within the union. Marcey claims that he had "no knowledge other than the allegations in the complaint that Winter was engaged in any internal union political activity" (App. 30). His position, however, is controverted by the affidavit of another member of Local 639 who states that he recollects "Mr. Marcey was present at most of [the] meetings, and in a few cases I believe he chaired the meetings in the absence of President [**26] DeBrouse" when "Mr. Winter was critical of seniority practices and use of temporary employees in the construction industry, and had some argument on these or related matters with President DeBrouse during meetings" (App. 56). When the affidavits reveal such a conflict over facts that substantially affect the position of a party on a material matter, summary judgment is not to be granted, *see, e.g., Jackson v. Griffith, supra, 480 F.2d at 267*; *Machinery Center, Inc. v. Anchor National Life Insurance Co., 434 F.2d 1, 6 (10th Cir. 1970)*. The materiality of this evidence does not lie in a "mere showing of . . . awareness" of Winter's political activity but in Marcey predicating his denial of hostility to Winter on the claim

that he never knew of his political activity within the union. This evidence is thus material on the issue of hostility.

The majority opinion gives far too short shrift to the importance of the fact that the union officials knew of appellant's agitation and activities against their leadership. Of course, this fact alone is not conclusive, but it certainly is probative. In my view, appellant has suggested sufficient other evidence [**27] of the union's hostility that, taken together with his expressed dissatisfaction with the union, he should have his day in court. Knowledge of a union member's protest activities may not prove union bias against him, but - human nature being what it is - it must lead the court closely to scrutinize such evidence for the possibility of such hostility. Applying such scrutiny here, summary judgment is unjustifiable.

At trial, the question of whether Marcey and the union did or did not process Winter's grievances in accordance with their statutory duty must be resolved. At present - despite the broad discretion traditionally accorded to unions in the exercise of their obligation of fair representation, *see Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 97 L. Ed. 1048, 73 S. Ct. 681 (1953)*; Blumrosen, *The Workers and Three Phases of Unionism: Administrative and Judicial Control of the Worker-Union Relationship*, 61 MICH. L. REV. 1435, 1469-1472 (1963) - genuine issues exist as to whether these complaints were processed at all. Assuming that they were, the issue remains as to whether they were fairly evaluated, whether Winter was adequately advised, etc. [**28] Similarly, the question of the construction of the seniority provision of the collective bargaining agreement must be resolved in order to decide the suits against Maloney. When such issues remain controverted and unresolved, the only acceptable procedure is to deny summary judgment, go beyond the affidavits, and hold a trial on the merits. [*156] It is thus my conclusion that the summary judgments granted to Maloney and Local 639 should be vacated and the cases remanded for further proceedings. To this end, I respectfully dissent.

R000113



FOCUS - 4 of 50 DOCUMENTS

JAMES BASSETT, AARON KESNER, and DAVID WASZKOWSKI,
Plaintiffs-Appellants, v. LOCAL UNION NO. 705, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA, Defendant-Appellee

No. 84-2677

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

*773 F.2d 932; 1985 U.S. App. LEXIS 23480; 120 L.R.R.M. 2774; 103 Lab. Cas. (CCH)
P11,646*

April 11, 1985, Argued
September 30, 1985

**PRIOR HISTORY:** [**1] Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 83 C 1988-Prentice H. Marshall, Judge.

**COUNSEL:** Attorney for Plaintiff: Mark S. Stein, Potter, Schaffner & Stein, Chicago, Illinois

Attorney for Defendant: David Mathews, Carmell, Charone & Widmer, Ltd., Chicago, Illinois

**JUDGES:** Cummings, Chief Judge, Flaum, Circuit Judge, and Peck, Senior Circuit Judge. *

> * The Honorable John W. Peck, Senior Circuit Judge for the United State Court of Appeals for the Sixth Circuit, is sitting by designation.

**OPINION BY:** FLAUM

**OPINION**

[*933] FLAUM, Circuit Judge.

Plaintiffs appeal from the district court's dismissal of their suit brought under section 301 of the Labor Management Relations Act, *29 U.S.C. § 185 (1982)*, against defendant Local Union No. 705 of the International Brotherhood of Teamsters ("Local 705") for

breach of its duty of fair representation in the processing of plaintiffs' grievances against their former employer, Glendenning Motorways, Inc. ("Glendenning"). The district court granted summary judgment to the defendant and dismissed the action solely on the ground that plaintiffs had failed [**2] to exhaust internal union remedies. Because we conclude that the internal remedies provided by the Teamsters Union were inadequate either to "reactivate" the plaintiffs' grievances or to award them the full relief they seek in this case under the principles enunciated by the Supreme Court in *Clayton v. International Union, UAW, 451 U.S. 679, 689, 68 L. Ed. 2d 538, 101 S. Ct. 2088 (1981)*, we reverse and remand for further proceedings.

I.

During the relevant events giving rise to this action, the plaintiffs were employed as truck drivers for Glendenning, an interstate trucking firm, and were members of Local 705. Glendenning and Local 705 were parties to a collective-bargaining agreement known as the Joint Area Cartage Agreement (the "JACA"). This agreement created a procedure for adjudicating employee grievances under which such grievances would be conclusively decided by a Joint Grievance Committee ("JGC") composed of both Local 705 officials and employer representatives. Although decisions of the JGC that are reached by majority vote are considered final and binding, the JACA states that if the JGC deadlocks on a

773 F.2d 932, *933; 1985 U.S. App. LEXIS 23480, **2;
120 L.R.R.M. 2774; 103 Lab. Cas. (CCH) P11,646

particular issue, both union and employer are [**3] entitled to resort to all lawful economic or legal recourse as to that issue. In concrete terms, this provision allows the union after a JGC deadlock to sue or to call a strike against the employer.

The JACA also places substantial limitations on the employer's power to subcontract work to other firms. Nevertheless, in 1981 Glendenning began subcontracting certain work to a company called Metro Distribution, Inc. ("Metro"). A dispute over the propriety of this subcontracting gave rise to the present case. When plaintiffs Bassett and Waszkowski and others were laid off by Glendenning in October 1981, purportedly because of a lack of work, they filed grievances pursuant to the JACA challenging Glendenning's subcontracting of work to Metro. Local 705 processed these grievances to the JGC, which in turn issued a decision on November 18, 1981 referring the matter back to the parties for settlement. Representatives of Local 705 and Glendenning reached an agreement on the subcontracting issue in February 1982 that entailed, among other things, Glendenning's payment of backpay to two drivers other than the plaintiffs.

Plaintiffs Bassett and Waszkowski were recalled to work by Glendenning [**4] in January 1982, but were again laid off, this time along with plaintiff Kesner, in February 1982. The plaintiffs filed numerous letters and grievances with Local 705 officials and others protesting Glendenning's subcontracting of work to Metro. Over a period of about six months, Local 705 repeatedly refused to consider any grievances raising the subcontracting issue on the grounds that the matter had already been resolved to the union's satisfaction and that the grievants had failed to provide evidence of any continuing subcontracting violations. At some point during this period, a dispute also developed between the plaintiffs and the union over whether, as Local 705 contended, a portion of the work subcontracted to Metro was being performed outside of Local 705's jurisdictional boundaries, [*934] and thus was not subcontracted in violation of the JACA.

In September 1982, Local 705 consolidated the plaintiffs' grievances with others alleging subcontracting violations and processed these grievances to the JGC. The JGC held hearings in October and November 1982 during which it ordered Glendenning to produce various documents relevant to the grievances, and ordered Local

705 to [**5] select an auditor to review Glendenning's records. Local 705 hired two auditors and instructed them to examine Glendenning's records to determine the amount of work that was subcontracted to Metro between November 1981 and October 1982. Local 705 also told the auditors, however, not to consider any work that was performed outside of its jurisdictional boundaries as defined by the union. The auditors then compiled a report that Local 705 concluded was accurate, but that the plaintiffs and several other employees decided was an underestimate of the amount of work that was illegally subcontracted to Metro. The report was presented to the JGC at a hearing on February 9, 1983, and the JGC voted to accept the report as an accurate reflection of the volume of work performed in violation of the JACA. Nevertheless, after approving the auditors' report, the JGC deadlocked over the amount that Glendenning should pay in final settlement of the grievances.

The plaintiffs initiated the present action on March 22, 1983, originally naming both Local 705 and Glendenning as defendants. Glendenning filed for bankruptcy in April 1983, however, and was ultimately dismissed as a party on plaintiffs' [**6] motion. In July 1983, Local 705 moved for judgment on the pleadings under *FED. R. CIV. P. 12(c)*, contending that the court lacked subject matter jurisdiction because of the plaintiffs' failure to exhaust internal union remedies. In support of this motion, Local 705 stated that plaintiffs had neglected to file charges with the union raising their claim that Local 705 had breached its duty of fair representation, notwithstanding the fact that the Teamsters Union constitution provided an internal procedure for the adjudication of such charges by a neutral union tribunal.

The plaintiffs responded to Local 705's motion by arguing, among other things, that exhaustion was unnecessary in this case because (1) internal union remedies would have been inadequate to afford plaintiffs the full relief they sought judicially, including their reinstatement to employment, and (2) exhaustion of such remedies would have been futile because of union hostility toward the plaintiffs. Local 705 answered plaintiffs' arguments in its reply brief on the *Rule 12(c)* motion by first conceding that in light of plaintiffs' request for reinstatement to employment, internal union remedies could not have afforded [**7] plaintiffs full relief. Rather, Local 705 explained, its position was that these remedies were adequate in the sense that they could

have "reactivated" plaintiffs' grievances under the principles of the Supreme Court's decision in *Clayton v. International Union, UAW, 451 U.S. 679, 689, 68 L. Ed. 2d 538, 101 S. Ct. 2088 (1981)*. As to plaintiffs' argument that exhaustion would have been futile, Local 705 joined issue by pointing to various procedures in the Teamsters constitution aimed at insuring the neutrality of the union tribunal that would have adjudicated the plaintiffs' charges.

The district court issued a memorandum decision denying Local 705's motion on October 25, 1983. With respect to the adequacy of internal union remedies, the district court noted our decisions in *Tinsley v. United Parcel Service, Inc., 635 F.2d 1288, 1290* & n.4 (7th Cir.) ("*Tinsley I*"), vacated, *452 U.S. 934, 69 L. Ed. 2d 949, 101 S. Ct. 3072 (1981)*, reaff'd after remand, *665 F.2d 778, 780 (7th Cir. 1981)* ("*Tinsley II*"), wherein we found that the remedies available under the Teamsters Union constitution were adequate in that [**8] case to make the plaintiffs whole by providing them with compensatory damages. The district court then stated that "upon that assumption" -- that compensatory damages could be obtained by means of internal union procedures -- "we too consider the remedy provided by the Teamsters constitution to be adequate." The district court [*935] devoted the bulk of its analysis to the plaintiffs' allegation that exhaustion of union remedies would have been futile, and ultimately concluded that Local 705 had failed to disprove this allegation sufficiently to justify ruling in its favor on the pleadings.

After approximately six months of discovery and trial preparation, Local 705 filed a motion for summary judgment on April 30, 1984. As grounds for this motion, Local 705 again asserted, among other things, that the court lacked jurisdiction because of plaintiffs' failure to exhaust. This time the district court accepted Local 705's exhaustion argument and granted summary judgment in the union's favor in a memorandum order dated July 16, 1984. The district court in this decision did not further discuss the adequacy of Teamsters remedies to provide full relief or reactivate plaintiffs' grievances, [**9] but rather focused on the plaintiffs' claim that exhaustion would have been futile. In light of the additional evidence that Local 705 had provided to show the nature of the particular remedies that were available to the plaintiffs under the Teamsters constitution, the court found that resort to these remedies would not have been futile.

The plaintiffs now appeal this award of summary judgment, claiming (1) that Teamster Union remedies were inadequate either to grant them full relief or to reactivate their grievances, (2) that exhaustion of these remedies would have been futile, (3) that they reasonably attempted to exhaust union remedies by filing numerous written appeals with Local 705 and Teamsters Union officials, and (4) that the district court's summary judgment ruling on exhaustion grounds was contrary to the law of the case established in its first ruling on the *Rule 12(c)* motion. Because we agree with the plaintiffs' first argument and find it to be dispositive, we need not discuss the others.

II.

The Supreme Court set forth the pertinent principles governing when an employee should be required to exhaust internal union remedies before bringing a section 301 suit against [**10] his union for breach of its duty of fair representation in *Clayton v. International Union, UAW, 451 U.S. 679, 68 L. Ed. 2d 538, 101 S. Ct. 2088 (1981)*. After reviewing at length the various policies underlying an exhaustion requirement, *see id. at 685-89*, the Court concluded that "courts have discretion to decide whether to require exhaustion of internal union procedures," *id. at 689*, and that:

> In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust.

*Id. at 689*. The Court in *Clayton* applied the second of these [**11] factors, concluding that the plaintiffs-employees in that case were not required to

exhaust internal union procedures because these procedures could not have resulted in either reactivation of the plaintiffs' grievance or an award of complete relief. *Id. at 685.*

The Court explained that: "When internal union appeals procedures can result in either complete relief to an aggrieved employee or reactivation of his grievance, exhaustion would advance the national labor policy of encouraging private resolution of contractual labor disputes. In such cases, the internal union procedures are capable of fully resolving meritorious claims short of the judicial forum." *Id. at 692.* With specific reference to the reactivation of a plaintiff's grievance, the Court stated that when such a remedy is available, the policies underlying the Court's decision in *Republic Steel Corp. v. Maddox, 379 U.S. 650, 13 L. Ed. 2d 580, 85* [*936] *S. Ct. 614 (1965),* come into play. *Clayton, 451 U.S. at 692.* The Court held in *Republic Steel* that an employee must exhaust any exclusive grievance and arbitration procedures provided by the [**12] collective-bargaining agreement between his union and his employer before maintaining a suit against his union or employer for breach of that agreement. *379 U.S. at 652-53.* The court accordingly held in *Clayton* that when exhaustion of internal union remedies could result in reactivation of the plaintiffs' grievance within the framework of such a collective-bargaining agreement, exhaustion would be required. *451 U.S. at 692.* Applying these principles to the facts presented in *Clayton,* the Court found exhaustion unnecessary because (1) the internal procedures provided by the plaintiffs' union could not order them reinstated as employees, and thus could not provide them with the full relief they sought in their section 301 action, *id. at 690-91,* and (2) the time for the plaintiffs' union to demand arbitration of their grievances under the procedures provided for in the collective-bargaining agreement had already run before the plaintiffs were notified of the union's prior decision not to pursue these grievances, and thus internal union procedures could not have served to reactivate plaintiffs' grievances within the framework of that [**13] agreement, *id. at 691.*

The issue in the present case is not whether the internal union remedies provided by the Teamsters constitution were adequate to afford plaintiffs all the relief they are now seeking in this section 301 action, but rather whether these remedies could have reactivated plaintiffs' grievances under the principles of *Clayton.*

Indeed, as Local 705 conceded both below and on appeal, Teamsters Union remedies, like the internal union procedures at issue in *Clayton,* could not have afforded complete relief to the plaintiffs in light of their request for reinstatement to employment with Glendenning. This factor distinguishes the instant case from our prior decisions upholding the adequacy of Teamsters Union remedies in *Tinsley I* and *Tinsley II,* because the section 301 complaint at issue in those decisions sought only monetary damages, not reinstatement. *See Tinsley II, 665 F.2d at 780; Tinsley I, 635 F.2d at 1290 n.5.* Local 705 instead claims, as it did below, that Teamsters Union procedures could have resulted in the "reactivation" of plaintiffs' grievances within the meaning of *Clayton.* Since [**14] the JGC deadlocked on the remedial portion of plaintiffs' grievances against Glendenning, Local 705 reasons, the JACA gave the union the right to sue or strike Glendenning to obtain a proper remedy. By following union procedures, Local 705 claims that the plaintiffs might have thereby persuaded the union to initiate a strike or lawsuit against Glendenning.

We cannot accept this argument. First, its premise -- that a union's initiation of a strike or lawsuit against a plaintiff's employer constitutes reactivation of that plaintiff's grievance within the framework of the relevant collective-bargaining agreement -- is of questionable validity. The Court's discussion of reactivation in *Clayton* is directed exclusively to the situation where a union can resubmit the plaintiff's grievance to some kind of "collectively bargained dispute-resolution procedures." *451 U.S. at 692. See also Schultz v. Owens-Illinois, Inc., 696 F.2d 505, 513-14 (7th Cir. 1982); Miller v. General Motors Corp., 675 F.2d 146, 148-49 (7th Cir. 1982).* It is difficult to conceive of a strike or a lawsuit, even when such actions are permitted by the collective-bargaining [**15] agreement, as the kind of dispute-resolution procedures contemplated by the Court in *Clayton.* Further, it is not evident that "exhaustion would advance the national labor policy," *451 U.S. at 692,* when the most that a plaintiff could hope to achieve through such exhaustion is a strike or another lawsuit against his employer.

Nevertheless, we need not decide in this case whether the possibility of a strike or another lawsuit may ever be deemed a reactivation of an employee's grievance for exhaustion purposes under *Clayton.* Even assuming that Local 705's general premise [*937] is correct, its contention fails because Local 705 had no right under the

R000117

773 F.2d 932, *937; 1985 U.S. App. LEXIS 23480, **15;
120 L.R.R.M. 2774; 103 Lab. Cas. (CCH) P11,646

JACA to bring a suit or strike against Glendenning on the majority of plaintiffs' grievances. Despite its deadlock on the question of the exact amount owed by Glendenning as a result of its subcontracting violations, the JGC did render a final decision by majority vote approving the auditor's report on the extent of these violations. By embracing the auditor's report, the JGC rejected the plaintiffs' significantly larger estimate of Glendenning's violations. Hence, given the binding nature of the JGC decision [**16] under the JACA, Local 705 could not have fully "reactivated" the plaintiffs' grievances even by means of a strike or lawsuit.

Local 705 finally asserts that plaintiffs should have been required to exhaust Teamsters remedies because they might thereby have been persuaded that their grievances were meritless. In particular, Local 705 claims that an internal union tribunal might have convinced plaintiffs to accept Local 705's position that much of the work subcontracted by Glendenning was performed outside of Local 705's jurisdictional boundaries, and therefore did not violate the JACA. The mere speculation that internal union procedures could lead the plaintiff to abandon a grievance is not, however, sufficient to require exhaustion of such procedures under *Clayton*. In deciding not to adopt a universal exhaustion requirement in *Clayton*, the Court rejected an argument nearly identical to Local 705's:

> Concededly, a requirement that aggrieved employees exhaust internal remedies might lead to nonjudicial resolution of some contractual grievances. For example, an employee who exhausts

internal union procedures might decide not to pursue his § 301 action in court, either [**17] because the union offered him a favorable settlement, or because it demonstrated that his underlying contractual claim was without merit. However, we decline to impose a universal exhaustion requirement lest employees with meritorious § 301 claims be forced to exhaust themselves and their resources by submitting their claims to potentially lengthy internal union procedures that may not be adequate to redress their underlying grievances.

*451 U.S. at 689.*

Because Teamsters' remedies were inadequate either to provide plaintiffs complete relief, as Local 705 concedes, or to reactivate plaintiff's grievance within the framework of the JACA, as our analysis has led us to conclude, we must hold that plaintiffs were not required to exhaust these remedies as a predicate to maintaining a section 301 suit.

III.

For these reasons, the district court's order granting summary judgment to Local 705 and dismissing plaintiffs' claims is REVERSED and REMANDED for further proceedings consistent with this opinion. Rule 18 shall not apply on remand.

R000118



LEXSEE 386 U.S. 171

**VACA ET AL. v. SIPES, ADMINISTRATOR**

**No. 114**

**SUPREME COURT OF THE UNITED STATES**

*386 U.S. 171; 87 S. Ct. 903; 17 L. Ed. 2d 842; 1967 U.S. LEXIS 2873; 55 Lab. Cas.
(CCH) P11,731; 1 Empl. Prac. Dec. (CCH) P9767; 64 L.R.R.M. 2369*

**November 17, 1966, Argued
February 27, 1967, Decided**

**PRIOR HISTORY:**     CERTIORARI TO THE
SUPREME COURT OF MISSOURI.

**DISPOSITION:**   *397 S. W. 2d 658*, reversed.

**SUMMARY:**

The plaintiff sued the defendant union in the Circuit
Court of Jackson County, Missouri, alleging that he had
been discharged from his employment in violation of the
collective bargaining contract between his employer and
the union, and that the union had arbitrarily refused to
take his grievance to arbitration. After the jury awarded
the plaintiff a verdict for compensatory and punitive
damages, the trial judge set aside the verdict and entered
judgment for the union on the ground that the suit
involved an unfair labor practice which was within the
exclusive jurisdiction of the National Labor Relations
Board. The Kansas City Court of Appeals affirmed.
However, the Supreme Court of Missouri reversed,
holding that the NLRB did not have exclusive
jurisdiction and that the plaintiff could properly recover
damages from the union. (*397 SW2d 658*.)

On certiorari, the United States Supreme Court
reversed. In an opinion by White, J., expressing the views
of five members of the court, it was held that (1) the state
court had jurisdiction in the instant case, (2) as a matter
of federal law, which was controlling, the evidence failed
to establish that the union had acted arbitrarily or in bad
faith so as to have breached its duty of fair representation,
and (3) the union could not properly be held liable for

damages attributable solely to the employer's allegedly
wrongful discharge. In addition to discussing the union's
liability, the opinion stated that a wrongfully discharged
employee may bring an action for breach of a collective
bargaining contract against his employer in the face of a
defense based upon the failure to exhaust contractual
remedies, provided the employee can prove that the union
as bargaining agent breached its duty of fair
representation in its handling of the employee's
grievance.

Fortas, J., joined by Warren, Ch. J., and Harlan, J.,
concurring in the judgment of reversal, would hold that
the Board had exclusive jurisdiction.

Black, J., dissenting, expressed his disagreement
with the court's promulgation in the instant case of a rule
requiring that for an employee to successfully sue his
employer for breach of a collective bargaining contract,
the employee must prove that his attempt to exhaust his
contractual remedies was frustrated by the union's acting
arbitrarily or in bad faith.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

LABOR §39

bargaining agent -- fair representation --

Headnote:[1]

A union which is the exclusive bargaining

R000119

386 U.S. 171, *; 87 S. Ct. 903, **;
17 L. Ed. 2d 842, ***LEdHN1; 1967 U.S. LEXIS 2873

representative of the employees in a bargaining unit has a statutory duty fairly to represent all of the employees, both in its collective bargaining with the employer and in its enforcement of the resulting collective bargaining agreement.

[***LEdHN2]

LABOR §39

bargaining agent -- duties --

Headnote:[2]

An exclusive bargaining agent's statutory authority to represent all members of a designated bargaining unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

[***LEdHN3]

COMMERCE §129.5

union's failure to arbitrate grievance -- governing law --

Headnote:[3]

A discharged employee's complaint in a state court alleging that a union has arbitrarily, capriciously, and without just or reasonable reason or cause refused to take his grievance to arbitration, alleges a breach by the union of a duty grounded in federal statutes, and his cause of action is governed by federal law.

[***LEdHN4]

LABOR §48

NLRB -- powers --

Headnote:[4]

The broad powers conferred by Congress upon the National Labor Relations Board to interpret and to enforce the Labor Management Relations Act (29 USC 141 et seq.) necessarily imply that potentially conflicting rules of law, of remedy, and of administration cannot be permitted to operate.

[***LEdHN5]

COMMERCE §129

LABOR §82

jurisdiction --

Headnote:[5]

As a general rule, neither state nor federal courts have jurisdiction over suits directly involving activity which is arguably subject to 7 or 8 of the National Labor Relations Act (29 USC 157, 158).

[***LEdHN6]

LABOR §115.5

secondary boycott -- remedies --

Headnote:[6]

Section 303 of the Labor Management Relations Act (29 USC 187) expressly permits anyone injured by a violation of 8(b)(4) of the National Labor Relations Act (29 USC 158 (b)(4)), declaring secondary boycotts to be unfair labor practices, to recover damages in a federal court even though such unfair labor practices are also remediable by the National Labor Relations Board.

[***LEdHN7]

LABOR §46

breach of contract -- remedies --

Headnote:[7]

Section 301 of the Labor Management Relations Act (29 USC 185) permits suits for breach of a collective bargaining contract regardless of whether the particular breach is also an unfair labor practice within the jurisdiction of the National Labor Relations Board.

[***LEdHN8]

COMMERCE §129

labor disputes --

Headnote:[8]

Section 14(c) of the National Labor Relations Act as amended (29 USC 164(c)) permits state agencies and courts to assume jurisdiction over labor disputes over

386 U.S. 171, *; 87 S. Ct. 903, **;
17 L. Ed. 2d 842, ***LEdHN8; 1967 U.S. LEXIS 2873

which the National Labor Relations Board declines to assert jurisdiction.

[***LEdHN9]

COMMERCE §129

labor relations -- state power --

Headnote:[9]

State remedies are not pre-empted where the activity regulated is a merely peripheral concern of the Labor Management Relations Act (*29 USC 141 et seq.*) or touches interests so deeply rooted in local feeling and responsibility that in the absence of congressional direction it cannot be inferred that Congress deprived the state of the power to act.

[***LEdHN10]

ADMINISTRATIVE LAW §320

COMMERCE §129

NLRB -- jurisdiction --

Headnote:[10]

A decision that National Labor Relations Board jurisdiction pre-empts federal and state court jurisdiction over a given class of cases must depend upon the nature of the particular interests being asserted and the effect upon the administration of national labor policies of concurrent judicial and administrative remedies.

[***LEdHN11]

LABOR §47

federal laws -- purpose --

Headnote:[11]

The federal labor laws seek to promote industrial peace and the improvement of wages and working conditions by fostering a system of employee organization and collective bargaining.

[***LEdHN12]

LABOR §22

collective bargaining --

Headnote:[12]

The collective bargaining system as encouraged by Congress and administered by the National Labor Relations Board of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit.

[***LEdHN13]

LABOR §95

unfair practice --

Headnote:[13]

The National Labor Relations Board's general counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint.

[***LEdHN14]

LABOR §82

unfair practices -- jurisdiction of courts --

Headnote:[14]

By enacting 8(b) of the National Labor Relations Act (*29 USC 158(b)*), which declares certain union activities to be unfair labor practices, Congress did not intend to oust the courts of their traditional jurisdiction to curb arbitrary conduct by an individual employee's statutory collective bargaining representative.

[***LEdHN15]

LABOR §46

collective bargaining contract -- enforcement --

Headnote:[15]

Under 301 of the Labor Management Relations Act (*29 USC 185*), courts have jurisdiction over suits to enforce collective bargaining agreements even though an employer's conduct which is challenged as a breach of contract is also arguably an unfair labor practice within the jurisdiction of the National Labor Relations Board.

[***LEdHN16]

LABOR §125

R000121

386 U.S. 171, *; 87 S. Ct. 903, **;
17 L. Ed. 2d 842, ***LEdHN16; 1967 U.S. LEXIS 2873

arbitration -- employee's grievance --

Headnote:[16]

If an employee is discharged without cause in violation of a collective bargaining agreement containing grievance and arbitration provisions which are intended to provide the exclusive remedy for breach of contract claims, the fact that the employer's conduct may be an unfair labor practice does not preclude (1) a suit by the union against the employer to compel arbitration of the employee's grievance, (2) the adjudication of the claim by the arbitrator, or (3) a suit to enforce the resulting arbitration award.

[***LEdHN17]

LABOR §46

breach of contract -- remedies --

Headnote:[17A][17B]

If a grievance and arbitration procedure is included in a collective bargaining contract, but the parties do not intend it to be an exclusive remedy, a suit for breach of contract will normally be heard even though such procedure has not been exhausted.

[***LEdHN18]

LABOR §28

LABOR §46

collective bargaining agreement -- enforcement --

Headnote:[18]

An employee who asserts a claim against his employer for breach of a collective bargaining agreement is bound by the terms of the agreement which govern the manner in which contractual rights may be enforced, and he must at least attempt to exhaust exclusive grievance and arbitration procedures established by the agreement.

[***LEdHN19]

ESTOPPEL AND WAIVER §63

LABOR §46

collective bargaining contract -- exhaustion of

remedies --

Headnote:[19]

An employee asserting a claim against his employer for breach of a collective bargaining contract is not limited to the exclusive remedial procedures established by the contract when the conduct of the employer amounts to a repudiation of those contractual procedures, and in such a situation, the employer is estopped by his own conduct to rely on unexhausted grievance and arbitration procedures as a defense to the employee's cause of action.

[***LEdHN20]

LABOR §46

collective bargaining contract -- enforcement --

Headnote:[20]

Without exhausting exclusive remedial procedures provided in a collective bargaining contract, an employee may seek judicial enforcement of his contractual rights if the union has sole power under the contract to invoke the higher stages of the grievance procedures and if the employee has been prevented from exhausting his contractual remedies by the union's wrongful refusal to process the grievance.

[***LEdHN21]

LABOR §46

bargaining agreements -- enforcement --

Headnote:[21]

Congress did not intend to shield employers from the natural consequences of their breaches of collective bargaining agreements by wrongful union conduct in the enforcement of such agreements.

[***LEdHN22]

LABOR §46

collective bargaining contract -- remedy for breach --

Headnote:[22]

A wrongfully discharged employee may bring an

386 U.S. 171, *; 87 S. Ct. 903, **;
17 L. Ed. 2d 842, ***LEdHN22; 1967 U.S. LEXIS 2873

action for breach of a collective bargaining contract against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance.

[***LEdHN23]

LABOR §46

breach of contract -- judicial relief --

Headnote:[23]

The jurisdiction of a court in an employee's suit under 301 of the Labor Management Relations Act (*29 USC 185*) for breach of a collective bargaining contract is no more destroyed by the fact that the employee, as part of his 301 action, finds it necessary to prove an unfair labor practice by the union, than it is by the fact that the suit may involve an unfair labor practice by the employer himself; the court is free to determine whether the employee is barred by the actions of his union representative, and if not, to proceed with the case; if, to facilitate the case, the employee joins the union as a defendant, the situation is not substantially changed, the action is still a 301 suit, and the jurisdiction of the court is not pre-empted by the National Labor Relations Board's jurisdiction over unfair labor practices; and the result is the same if the employee sues the employer and the union in separate actions.

[***LEdHN24]

LABOR §46

collective bargaining contract -- remedies --

Headnote:[24]

If a breach of duty by a union and a breach of a collective bargaining contract by an employer are proved in a breach of contract action under 301 of the Labor Management Relations Act (*29 USC 185*), the court must fashion an appropriate remedy.

[***LEdHN25]

COMMERCE §129.5

collective bargaining -- state court jurisdiction --

Headnote:[25]

A state court has jurisdiction over a discharged employee's action against a union for failure to take the employee's collective bargaining contract grievance against his employer to arbitration, such jurisdiction not being pre-empted by the National Labor Relations Board's jurisdiction over unfair labor practices.

[***LEdHN26]

LABOR §39

fair representation -- breach of union's duty --

Headnote:[26]

A breach of a union's statutory duty of fair representation to the members of a collective bargaining unit of which the union is the exclusive bargaining representative occurs only when the union's conduct toward a member of the unit is arbitrary, discriminatory, or in bad faith.

[***LEdHN27]

LABOR §28

grievances --

Headnote:[27]

A union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion.

[***LEdHN28]

LABOR §125

right to arbitration --

Headnote:[28]

An individual employee does not have an absolute right to have a grievance against his employer taken to arbitration regardless of the provisions of an applicable collective bargaining contract.

[***LEdHN29]

LABOR §39

fair representation -- union's duty --

386 U.S. 171, *; 87 S. Ct. 903, **;
17 L. Ed. 2d 842, ***LEdHN29; 1967 U.S. LEXIS 2873

Headnote:[29]

A union does not breach its duty of fair representation, and thereby open up a suit by an employee for breach of contract, merely because it settles the employee's collective bargaining contract grievance with his employer without taking it to arbitration.

[***LEdHN30]

LABOR §46

settlement of grievance -- remedy for abuse --

Headnote:[30]

A union's statutory duty of fair representation protects an individual employee from arbitrary abuses of the procedures for settlement of grievances by providing him with recourse against both his employer--in a suit under 301 of the Labor Management Relations Act (29 USC 185)--and the union.

[***LEdHN31]

LABOR §46

wrongful discharge -- remedy against union --

Headnote:[31]

In the absence of evidence that a union has acted arbitrarily or in bad faith in failing to take a discharged employee's grievance to arbitration, the mere fact that his discharge by his employer was wrongful is an insufficient ground for awarding him damages in his action against the union.

[***LEdHN32]

EVIDENCE §970.3

sufficiency -- union's breach of duty --

Headnote:[32]

In an action by a discharged employee against a labor union, the evidence does not support a verdict that the union has breached its duty of fair representation, where the union, although concluding that it would be fruitless to take the employee's grievance to arbitration, has processed the grievance through four steps, has attempted to obtain information to sustain the grievance,

has attempted to secure less vigorous work for the employee at his employer's plant, has joined in the employer's efforts to have the employee rehabilitated, and has not been shown to have acted on the basis of bad faith or any personal hostility toward the employee.

[***LEdHN33]

LABOR §39

representation by union -- good faith --

Headnote:[33]

In administering the grievance and arbitration machinery as the statutory agent of the employees in a collective bargaining unit, a union must, in good faith and in a non-arbitrary manner, make decisions as to the merits of particular grievances.

[***LEdHN34]

LABOR §125

arbitration --

Headnote:[34A][34B]

Arbitration of an employee's grievance is an appropriate remedy only when the parties to a collective bargaining agreement have created such a procedure in the agreement.

[***LEdHN35]

LABOR §125

arbitration --

Headnote:[35]

An order compelling arbitration is a remedy which is available when a union breaches its duty of fair representation by failing to take an employee's grievance to arbitration.

[***LEdHN36]

LABOR §17

union's liability --

Headnote:[36]

R000124

386 U.S. 171, *; 87 S. Ct. 903, **;
17 L. Ed. 2d 842, ***LEdHN36; 1967 U.S. LEXIS 2873

A union sued by a discharged employee for failing to take his grievance to arbitration cannot be held liable for damages attributable solely to his employer's alleged breach of contract consisting of wrongfully discharging him, where the union has played no part in such breach of contract.

[***LEdHN37]

PARTIES §82

joinder -- employer and union --

Headnote:[37]

A discharged employee may join his former employer as a defendant in an action by the employee against a union for failing to take his grievance against the employer to arbitration, where the grievance was based on the employer's alleged breach of contract consisting of wrongfully discharging the employee.

[***LEdHN38]

LABOR §17

LABOR §46

joint liability -- employer and union --

Headnote:[38]

Where a union has played no part in an employer's alleged breach of contract consisting of discharging an employee, and the employer has taken no part in the union's alleged breach of duty consisting of failure to take the discharged employee's grievance to arbitration, joint liability of the employer and the union for either wrong is unwarranted.

[***LEdHN39]

LABOR §46

breach of contract -- liability of employer -- damages --

Headnote:[39]

An employer sued by a former employee for a breach of contract consisting of a wrongful discharge cannot be held liable for damages attributable solely to a union's alleged breach of duty consisting of a refusal to take the

employee's grievance to arbitration, where the employer has taken no part in such breach of duty.

**SYLLABUS**

Petitioners, union officials, were sued in a state court by a union member who alleged wrongful discharge by his employer in violation of the collective bargaining agreement and the union's arbitrary refusal to take his grievance to arbitration under the fifth and final step of the bargaining agreement's grievance procedures. The employee, whose duties required strenuous activity, was discharged on the ground of poor health. During the fourth grievance step the union sent the employee to a physician for a complete examination. The report was unfavorable to the employee and the union decided not to take the grievance to arbitration. After a jury verdict for the employee, the trial judge set aside the verdict on the ground that the NLRB had exclusive jurisdiction over the controversy. The Kansas City Court of Appeals affirmed, but the Missouri Supreme Court reversed and ordered the jury's verdict reinstated. *Held*:

1. Since the union's duty, as exclusive agent, fairly to represent all members of a designated unit is based on federal statutes, federal law governs the employee's cause of action for breach of that duty. Pp. 176-177.

2. Although the NLRB has recently held that a union's breach of its statutory duty of fair representation is an unfair labor practice under § 8 (b) of the National Labor Relations Act, it does not follow that the broad pre-emption doctrine defined in *San Diego Building Trades Council v. Garmon, 359 U.S. 236*, holding that the NLRB has exclusive jurisdiction over activity arguably subject to § 8 of the Act, is applicable thereto. Pp. 177-188.

(a) The pre-emption doctrine has not been rigidly applied where it could not be fairly inferred that Congress intended exclusive jurisdiction to lie with the NLRB. Pp. 179-180.

(b) The pre-emption rule has not been applied where the activity regulated was merely a peripheral concern of the Labor Management Relations Act. P. 180.

(c) The doctrine of fair representation, which protects individuals against arbitrary union conduct, might be jeopardized by the NLRB's failure to act in certain cases, if the pre-emption doctrine were applied to

R000125

oust the courts of their traditional jurisdiction to curb arbitrary union conduct. Pp. 181-183.

(d) As a practical matter, in an employee's suit against his employer for breach of contract under § 301 of the Labor Management Relations Act, the employee may well find it necessary to prove a breach of duty by his union, a facet of the case which does not destroy the court's jurisdiction, even if the employee joins the union as a defendant. That being so, the result should be no different if the employee sues the employer and the union in separate actions. Pp. 183-187.

(e) Where a breach of duty by the union and a breach of contract by the employer are proven in a § 301 breach-of-duty action, the court must fashion an appropriate remedy against both defendants. Pp. 187-188.

3. A union breaches its duty of fair representation when its conduct toward a member of the designated unit is arbitrary, discriminatory or in bad faith, but it does not breach that duty merely because it settles a grievance short of arbitration, and the Missouri Supreme Court erred in upholding the jury's verdict solely on the ground that the evidence supported the employee's claim of wrongful discharge. Pp. 190-193.

4. As a matter of federal law the evidence does not support a verdict that the union breached its duty, as the employee, who had no absolute right to have his grievance arbitrated, failed to prove arbitrary or bad-faith conduct by the union in processing his grievance. Pp. 193-195.

5. The claimed damages, which were primarily those suffered as a result of the employer's alleged breach of contract, should not have been all charged to the union, and, if liability were found, it should have been apportioned between the employer and the union according to the damages caused by the fault of each. Pp. 195-198.

**COUNSEL:** David E. Feller argued the cause for petitioners. With him on the brief were Henry A. Panethiere, Russell D. Jacobson, Jerry D. Anker and George G. West.

Allan R. Browne argued the cause and filed a brief for respondent.

Briefs of amici curiae, urging reversal, were filed by Solicitor General Marshall, Robert S. Rifkind, Arnold Ordman, Dominick L. Manoli and Norton J. Come for the United States; by J. Albert Woll, Robert C. Mayer, Laurence Gold and Thomas E. Harris for the American Federation of Labor and Congress of Industrial Organizations; and by Robert L. Hecker and Earl G. Spiker for Swift & Co.

**JUDGES:** Warren, Black, Douglas, Clark, Harlan, Brennan, Stewart, White, Fortas

**OPINION BY:** WHITE

**OPINION**

[*173] [***848] [**907] MR. JUSTICE WHITE delivered the opinion of the Court.

On February 13, 1962, Benjamin Owens filed this class action against petitioners, as officers and representatives of the National Brotherhood of Packinghouse [**908] Workers [1] and of its Kansas City Local No. 12 (the Union), in the Circuit Court of Jackson County, Missouri. Owens, a Union member, alleged that he had been discharged from his employment at Swift & Company's (Swift) Kansas City Meat Packing Plant in violation of the collective bargaining agreement then in force between Swift and the Union, and that the Union had "arbitrarily, capriciously and without just or reasonable reason or cause" refused to take his grievance with Swift to arbitration under the fifth step of the bargaining agreement's grievance procedures.

> 1   Now known as the National Brotherhood of Packinghouse & Dairy Workers.

Petitioners' answer included the defense that the Missouri courts lacked jurisdiction because the gravamen of Owens' suit was "arguably and basically" an unfair labor practice under § 8 (b) of the National Labor Relations Act (N. L. R. A.), as amended, 61 Stat. 141, *29 U. S. C. § 158 (b),* within the exclusive jurisdiction of the National Labor Relations Board (NLRB). After a jury trial, a verdict was returned awarding Owens $ 7,000 compensatory and $ 3,300 punitive damages. The trial judge set aside the verdict and entered judgment for petitioners on the ground that the NLRB had exclusive jurisdiction [*174] over this controversy, and the Kansas City Court of Appeals affirmed. The Supreme Court of Missouri reversed and directed reinstatement of the jury's

R000126

verdict, [2] relying on this Court's decisions in *International Assn. of Machinists v. Gonzales, 356 U.S. 617*, and in *Automobile Workers v. Russell, 356 U.S. 634. 397 S. W. 2d 658*. During the appeal, Owens died and respondent, the administrator of Owens' estate, was substituted. We granted certiorari to consider whether exclusive jurisdiction lies with the NLRB and, if not, whether the finding of Union liability and the relief afforded Owens are consistent with governing principles of federal labor law. *384 U.S. 969*. The American Federation of Labor and Congress of Industrial Organizations (AFL-CIO), Swift, and the United States have filed *amicus* briefs supporting petitioners. Although we conclude that state courts have jurisdiction in this type of case, we hold that federal law governs, that the governing federal standards were not applied here, and that the judgment of the Supreme Court of Missouri must accordingly be reversed.

> 2  Punitive damages were reduced to $ 3,000, the amount claimed by Owens in his complaint.

.I.

In mid-1959, Owens, a long-time high blood pressure patient, became sick and entered a hospital on sick leave from his employment with Swift. After a long rest during which his weight and blood pressure were reduced, Owens was certified by his family physician as fit to resume his heavy work in the packing plant. However, Swift's company doctor examined Owens upon his return and concluded that his blood [***849] pressure was too high to permit reinstatement. After securing a second authorization from another outside doctor, Owens returned to the plant, and a nurse permitted him to resume work [*175] on January 6, 1960. However, on January 8, when the doctor discovered Owens' return, he was permanently discharged on the ground of poor health.

Armed with his medical evidence of fitness, Owens then sought the Union's help in securing reinstatement, and a grievance was filed with Swift on his behalf. By mid-November 1960, the grievance had been processed through the third and into the fourth step of the grievance procedure established by the [**909] collective bargaining agreement. [3] Swift adhered to its position that Owens' poor health justified his discharge, rejecting numerous medical reports of reduced blood pressure proffered by Owens and by the Union. Swift claimed that these reports were not based upon sufficiently

thorough medical tests.

> 3  The agreement created a five-step procedure for the handling of grievances. In steps one and two, either the aggrieved employee or the Union's representative presents the grievance first to Swift's department foreman, and then in writing to the division superintendent. In step three, grievance committees of the Union and management meet, and the company must state its position in writing to the Union. Step four is a meeting between Swift's general superintendent and representatives of the National Union. If the grievance is not settled in the fourth step, the National Union is given power to refer the grievance to a specified arbitrator.

On February 6, 1961, the Union sent Owens to a new doctor at Union expense "to see if we could get some better medical evidence so that we could go to arbitration with his case." R., at 107. This examination did not support Owens' position. When the Union received the report, its executive board voted not to take the Owens grievance to arbitration because of insufficient medical evidence. Union officers suggested to Owens that he accept Swift's offer of referral to a rehabilitation center, and the grievance was suspended for that purpose. Owens rejected this alternative and demanded that the Union take his grievance to arbitration, but the Union [*176] refused. With his contractual remedies thus stalled at the fourth step, Owens brought this suit. The grievance was finally dismissed by the Union and Swift shortly before trial began in June 1964. [4]

> 4  No notice of the dismissal was given to Owens, who by that time had filed a second suit against Swift for breach of contract. The suit against Swift is still pending in a pretrial stage.

In his charge to the jury, the trial judge instructed that petitioners would be liable if Swift had wrongfully discharged Owens and if the Union had "arbitrarily . . . and without just cause or excuse . . . refused" to press Owens' grievance to arbitration. Punitive damages could also be awarded, the trial judge charged, if the Union's conduct was "willful, wanton and malicious." However, the jury must return a verdict for the defendants, the judge instructed, "if you find and believe from the evidence that the union and its representatives acted reasonably and in good faith in the handling and processing of the grievance of the plaintiff." R., at

161-162. The jury then returned the general verdict for Owens which eventually was reinstated by the Missouri Supreme Court.

[***850] II.

Petitioners challenge the jurisdiction of the Missouri courts on the ground that the alleged conduct of the Union was arguably an unfair labor practice and within the exclusive jurisdiction of the NLRB. Petitioners rely on *Miranda Fuel Co., 140 N. L. R. B. 181 (1962),* enforcement denied, *326 F.2d 172 (C. A. 2d Cir. 1963),* where a sharply divided Board held for the first time that a union's breach of its statutory duty of fair representation violates N. L. R. A. § 8 (b). With the NLRB's adoption of *Miranda Fuel,* petitioners argue, the broad pre-emption doctrine defined in *San Diego Building Trades Council v. Garmon, 359 U.S. 236,* becomes [*177] applicable. For the reasons which follow, we reject this argument.

[***LEdHR1] [1] [***LEdHR2] [2] [***LEdHR3] [3]It is now well established that, as the exclusive bargaining representative of the employees in Owens' bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining with Swift, see *Ford Motor Co.* v. *Huffman, 345 U.S. 330;* [**910] *Syres v. Oil Workers International Union, 350 U.S. 892,* and in its enforcement of the resulting collective bargaining agreement, see *Humphrey v. Moore, 375 U.S. 335.*The statutory duty of fair representation was developed over 20 years ago in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act, see *Steele v. Louisville & N. R. Co., 323 U.S. 192; Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210,* and was soon extended to unions certified under the N. L. R. A., see *Ford Motor Co.* v. *Huffman, supra.* Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. *Humphrey v. Moore, 375 U.S., at 342.* It is obvious that Owens' complaint alleged a breach by the Union of a duty grounded in federal statutes, and that federal law therefore governs his cause of action. *E. g., Ford Motor Co.* v. *Huffman, supra.*

Although N. L. R. A. § 8 (b) was enacted in 1947, the NLRB did not until *Miranda Fuel* interpret a breach of a union's duty of fair representation as an unfair labor practice. In *Miranda Fuel,* the Board's majority held that N. L. R. A. § 7 gives employees "the right to be free from unfair or irrelevant or invidious treatment by their exclusive bargaining agent in matters affecting their [*178] employment," and "that Section 8 (b)(1)(A) of the Act accordingly prohibits labor organizations, when acting in a statutory representative capacity, from taking action against any employee upon considerations or classifications which are irrelevant, invidious, or unfair." *140 N. L. R. B., at 185.* The Board also held that an employer who "participates" in such arbitrary union conduct violates § 8 (a)(1), and that the employer and the union may violate §§ 8 (a)(3) and 8 (b)(2), respectively, "when, for arbitrary or irrelevant reasons or upon the basis of an unfair classification, the union attempts to cause or does cause an [***851] employer to derogate the employment status of an employee." [5] *Id., at 186.*

> 5 See also *Cargo Handlers, Inc., 159 N. L. R. B. No. 17; Local 12, United Rubber Workers, 150 N. L. R. B. 312,* enforced, *368 F.2d 12 (C. A. 5th Cir. 1966); Maremont Corp., 149 N. L. R. B. 482; Galveston Maritime Assn., Inc., 148 N. L. R. B. 897; Hughes Tool Co., 147 N. L. R. B. 1573.*

The Board's *Miranda Fuel* decision was denied enforcement by a divided *Second Circuit, 326 F.2d 172 (1963).* However, in *Local 12, United Rubber Workers v. N. L. R. B., 368 F.2d 12,* the Fifth Circuit upheld the Board's *Miranda Fuel* doctrine in an opinion suggesting that the Board's approach will pre-empt judicial cognizance of some fair representation duty suits. In light of these developments, petitioners argue that Owens' state court action was based upon Union conduct that is arguably proscribed by N. L. R. A. § 8 (b), was potentially enforceable by the NLRB, and was therefore pre-empted under the *Garmon* line of decisions.

[***LEdHR4] [4] [***LEdHR5] [5]A. In *Garmon,* this Court recognized that the broad powers conferred by Congress upon the National Labor Relations Board to interpret and to enforce the complex Labor Management Relations Act (L. M. R. A.) necessarily imply that potentially conflicting "rules of law, of remedy, and of administration" cannot be permitted to [*179] operate. *359 U.S., at 242.*In [**911] enacting the National Labor Relations Act and later the Labor Management Relations

386 U.S. 171, *179; 87 S. Ct. 903, **911;
17 L. Ed. 2d 842, ***LEdHR5; 1967 U.S. LEXIS 2873

Act,

"Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal . . . . Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to obviate these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. . . . A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law." *Garner v. Teamsters Union, 346 U.S. 485, 490-491.*

Consequently, as a general rule, neither state nor federal courts have jurisdiction over suits directly involving "activity [which] is arguably subject to § 7 or § 8 of the Act." *San Diego Building Trades Council v. Garmon, 359 U.S., at 245.*

[***LEdHR6] [6] [***LEdHR7] [7] [***LEdHR8] [8]This pre-emption doctrine, however, has never been rigidly applied to cases where it could not fairly be inferred that Congress intended exclusive jurisdiction to lie with the NLRB. Congress itself has carved out exceptions to the Board's exclusive jurisdiction: Section 303 of the Labor Management Relations Act, 1947, 61 Stat. 158, *29 U. S. C. § 187*, expressly permits anyone injured by a violation of N. L. R. A. § 8 (b)(4) to recover damages in a federal court even though such unfair labor practices are also remediable by the Board; § 301 of that Act, 61 Stat. 156, *29 U. S. C. § 185*, permits suits for breach of a collective [*180] bargaining agreement regardless of whether the particular breach is also an unfair labor practice within the jurisdiction of the Board (see [***852] *Smith v. Evening News Assn., 371 U.S. 195*); and N.L. R. A. § 14, as amended by Title VII, § 701 (a) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 541, *29 U. S. C. § 164 (c)*, permits state agencies and courts to assume jurisdiction "over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction" (compare *Guss v. Utah Labor Board, 353 U.S. 1*).

[***LEdHR9] [9] [***LEdHR10] [10]In addition to

these congressional exceptions, this Court has refused to hold state remedies pre-empted "where the activity regulated was a merely peripheral concern of the Labor Management Relations Act . . . . [or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress has deprived the States of the power to act." *San Diego Building Trades Council v. Garmon, 359 U.S., at 243-244.* See, e. g., *Linn v. Plant Guard Workers, 383 U.S. 53* (libel); *Automobile Workers v. Russell, 356 U.S. 634* (violence); *International Assn. of Machinists v. Gonzales, 356 U.S. 617* (wrongful expulsion from union membership); *Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U.S. 740* (mass picketing). See also *Hanna Mining Co. v. Marine Engineers Beneficial Assn., 382 U.S. 181.* While these exceptions in no way undermine the vitality of the pre-emption rule where applicable, they demonstrate that the decision to preempt federal and state court jurisdiction over a given class of cases must depend upon the nature of the particular interests being asserted and the effect upon the administration of national labor policies [**912] of concurrent judicial and administrative remedies.

A primary justification for the pre-emption doctrine -- the need to avoid conflicting rules of substantive law [*181] in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose -- is not applicable to cases involving alleged breaches of the union's duty of fair representation. The doctrine was judicially developed in *Steele* and its progeny, and suits alleging breach of the duty remained judicially cognizable long after the NLRB was given unfair labor practice jurisdiction over union activities by the L. M. R. A. [6] Moreover, when the Board declared in *Miranda Fuel* that a union's breach of its duty of fair representation would henceforth be treated as an unfair labor practice, the Board adopted and applied the doctrine as it had been developed by the federal courts. See *140 N. L. R. B., at 184-186.* Finally, as the dissenting Board members in *Miranda Fuel* have pointed out, fair representation duty suits often require review of the substantive positions taken [***853] and policies pursued by a union in its negotiation of a collective bargaining agreement and in its handling of the grievance machinery; as these matters are not normally within the Board's unfair labor practice jurisdiction, it can be doubted whether the Board brings substantially greater

expertise to bear on these problems than do the courts, which have been engaged in this type of review since the *Steele* decision. [7]

> 6 See *Ford Motor Co.* v. *Huffman, 345 U.S. 330, 332, n. 4.* In *Huffman,* the NLRB submitted an *amicus* brief stating that it had not assumed pre-emptive jurisdiction over fair representation duty issues. Mem. for the NLRB, Nos. 193 and 194, Oct. Term, 1952. In *Syres v. Oil Workers International Union, 350 U.S. 892,* the Court reversed the dismissal of a suit which claimed breach of the duty of fair representation despite express reliance by one respondent on exclusive NLRB jurisdiction. Brief for Resp. Gulf Oil Corp., No. 390, Oct. Term, 1955.
>
> 7 See *Hughes Tool Co., 147 N. L. R. B. 1573, 1589-1590* (Chairman McCulloch and Member Fanning, dissenting in part).

[***LEdHR11] [11] [***LEdHR12] [12] [***LEdHR13] [13] [***LEdHR14] [14]In addition to the above considerations, the unique interests served by the duty of fair representation doctrine [*182] have a profound effect, in our opinion, on the applicability of the pre-emption rule to this class of cases. The federal labor laws seek to promote industrial peace and the improvement of wages and working conditions by fostering a system of employee organization and collective bargaining. See N. L. R. A. § 1, as amended, 61 Stat. 136, *29 U. S. C. § 151.* The collective bargaining system as encouraged by Congress and administered by the NLRB of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit. See, *e. g., J. I. Case Co.* v. *Labor Board, 321 U.S. 332.* This Court recognized in *Steele* that the congressional grant of power to a union to act as exclusive collective bargaining representative, with its corresponding reduction in the individual rights of the employees so represented, would raise grave constitutional problems if unions were free to exercise this power to further racial discrimination. *323 U.S., at 198-199.* Since that landmark decision, the duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law. Were we to hold, as petitioners and the Government urge, that the courts are foreclosed by the NLRB's *Miranda Fuel* decision from this traditional supervisory jurisdiction, the individual employee injured by arbitrary

or discriminatory union conduct could no longer be assured of impartial [**913] review of his complaint, since the Board's General Counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint. See *United Electrical Contractors Assn.* v. *Ordman, 366 F.2d 776,* cert. denied, *385 U.S. 1026.* [8] The existence of even a small group [*183] of cases in which the Board would be unwilling or unable to remedy a union's breach of duty would frustrate the basic purposes underlying the duty of fair representation doctrine. For these reasons, we cannot assume from the NLRB's tardy assumption of jurisdiction in these cases that Congress, when it enacted N. L. R. A. § 8 (b) in 1947, intended to oust the courts of their traditional jurisdiction to curb arbitrary conduct by the individual employee's statutory representative.

> 8 The public interest in effectuating the policies of the federal labor laws, not the wrong done the individual employee, is always the Board's principal concern in fashioning unfair labor practice remedies. See N. L. R. A. § 10 (c), as amended, 61 Stat. 147, *29 U. S. C. § 160 (c); Phelps Dodge Corp.* v. *Labor Board, 313 U.S. 177.* Thus, the General Counsel will refuse to bring complaints on behalf of injured employees where the injury complained of is "insubstantial." See Administrative Decision of the General Counsel, Case No. K-610, Aug. 13, 1956, in CCH N. L. R. B. Decisions, 1956-1957, Transfer Binder, para. 54,059.

[***LEdHR15] [15]B. [***854] There are also some intensely practical considerations which foreclose pre-emption of judicial cognizance of fair representation duty suits, considerations which emerge from the intricate relationship between the duty of fair representation and the enforcement of collective bargaining contracts. For the fact is that the question of whether a union has breached its duty of fair representation will in many cases be a critical issue in a suit under L. M. R. A. § 301 charging an employer with a breach of contract. To illustrate, let us assume a collective bargaining agreement that limits discharges to those for good cause and that contains no grievance, arbitration or other provisions purporting to restrict access to the courts. If an employee is discharged without cause, either the union or the employee may sue the employer under L. M. R. A. § 301. Under this section, courts have jurisdiction over suits to enforce collective bargaining agreements even though the

386 U.S. 171, *183; 87 S. Ct. 903, **913;
17 L. Ed. 2d 842, ***854; 1967 U.S. LEXIS 2873

conduct of the employer which is challenged as a breach of contract is also arguably an unfair labor practice within the jurisdiction of [*184] like the NLRB. *Garmon* and like cases have no application to § 301 suits. *Smith v. Evening News Assn., 371 U.S. 195.*

[***LEdHR16] [16] [***LEdHR17A] [17A] [9] If an employee is discharged without cause in violation of such an agreement, that the employer's conduct may be an unfair labor practice does not preclude a suit by the union [10] against the employer to compel arbitration of the employee's grievance, the adjudication of the claim by the arbitrator, or a suit to enforce the resulting arbitration award. See, *e. g., Steelworkers v. American Mfg. Co., 363 U.S. 564.*

[***LEdHR17B] [17B]

> [9]  If a grievance and arbitration procedure is included in the contract, but the parties do not intend it to be an exclusive remedy, then a suit for breach of contract will normally be heard even though such procedures have not been exhausted. See *Republic Steel Corp.* v. *Maddox, 379 U.S. 650, 657-658*; 6A Corbin, Contracts § 1436 (1962).
> [10]  Occasionally, the bargaining agreement will give the aggrieved employee, rather than his union, the right to invoke arbitration. See *Retail Clerks v. Lion Dry Goods, Inc., 341 F.2d 715*, cert. denied, *382 U.S. 839.*

[***LEdHR18] [18]However, [**914] if the wrongfully discharged employee himself resorts to the courts before the grievance procedures have been fully exhausted, the employer may well defend on the ground that the exclusive remedies provided by such a contract have not been exhausted. Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced. For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement. *Republic Steel Corp.* v. *Maddox, 379 U.S. 650.* [*185] However, because these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant. The problem then is to determine under what

circumstances the individual employee may [***855] obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures.

[***LEdHR19] [19]An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures. Cf. *Drake Bakeries v. Bakery Workers, 370 U.S. 254, 260-263.*See generally 6A Corbin, Contracts § 1443 (1962). In such a situation (and there may of course be others), the employer is estopped by his own conduct to rely on the unexhausted grievance and arbitration procedures as a defense to the employee's cause of action.

[***LEdHR20] [20] [***LEdHR21] [21]We think that another situation when the employee may seek judicial enforcement of his contractual rights arises if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and if*, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance. It is true that the employer in such a situation may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would, in our [*186] opinion, be a great injustice. We cannot believe that Congress, in conferring upon employers and unions the power to establish exclusive grievance procedures, intended to confer upon unions such unlimited discretion to deprive injured employees of all remedies for breach of contract. Nor do we think that Congress intended to shield employers from the natural consequences of their breaches of bargaining agreements by wrongful union conduct in the enforcement of such agreements. Cf. *Richardson v. Texas & N. O. R. Co., 242 F.2d 230, 235-236* (C. A. 5th Cir.).

[***LEdHR22] [22] [***LEdHR23] [23]For these reasons, we think the wrongfully discharged employee may bring an action against his employer in the face of a

defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance. [11] We [**915] may assume for present purposes that such a breach of duty by the union is an unfair labor practice, as the NLRB and the Fifth Circuit have held. The employee's suit against the employer, however, remains a § 301 suit, and the jurisdiction of the courts is no more destroyed by the fact that the employee, as part and [***856] parcel of his § 301 action, finds it necessary to prove an unfair labor practice by the union, than it is by the fact that the suit may involve an unfair labor practice by the employer himself. The court is free to determine [*187] whether the employee is barred by the actions of his union representative, and, if not, to proceed with the case. And if, to facilitate his case, the employee joins the union as a defendant, the situation is not substantially changed. The action is still a § 301 suit, and the jurisdiction of the courts is not pre-empted under the *Garmon* principle. This, at the very least, is the holding of *Humphrey v. Moore, supra,* with respect to pre-emption, as petitioners recognize in their brief. And, insofar as adjudication of the union's breach of duty is concerned, the result should be no different if the employee, as Owens did here, sues the employer and the union in separate actions. There would be very little to commend a rule which would permit the Missouri courts to adjudicate the Union's conduct in an action against Swift but not in an action against the Union itself.

> [11] Accord, *Hiller v. Liquor Salesmen's Union, 338 F.2d 778* (C. A. 2d Cir.); *Hardcastle v. Western Greyhound Lines, 303 F.2d 182* (C. A. 9th Cir.), cert. denied, *371 U.S. 920; Fiore v. Associated Transport, Inc., 255 F.Supp. 596; Bieski v. Eastern Automobile Forwarding Co., 231 F.Supp. 710,* aff'd, *354 F.2d 414* (C. A. 3d Cir.); *Ostrofsky v. United Steelworkers, 171 F.Supp. 782,* aff'd per curiam, *273 F.2d 614* (C. A. 4th Cir.), cert. denied, *363 U.S. 849; Jenkins v. Wm. Schluderberg-T. J. Kurdle Co., 217 Md. 556, 144 A. 2d 88.*

[***LEdHR24] [24]For the above reasons, it is obvious that the courts will be compelled to pass upon whether there has been a breach of the duty of fair representation in the context of many § 301 breach-of-contract actions. If a breach of duty by the union and a breach of contract by the employer are proven, the court must fashion an appropriate remedy. Presumably, in at least some cases, the union's breach of duty will have enhanced or contributed to the employee's injury. What possible sense could there be in a rule which would permit a court that has litigated the fault of employer and union to fashion a remedy only with respect to the employer? Under such a rule, either the employer would be compelled by the court to pay for the union's wrong -- slight deterrence, indeed, to future union misconduct -- or the injured employee would be forced to go to two tribunals to repair a single injury. Moreover, the Board would be compelled in many cases either to remedy injuries arising out of a breach of contract, a task which Congress has not assigned to it, or to leave the individual employee without [*188] remedy for the union's wrong. [12] Given the strong reasons for not pre-empting duty of fair representation suits in general, and the fact that the courts in many § 301 suits must adjudicate whether the [**916] union has breached its duty, we conclude that the courts may also fashion remedies for such a breach of duty.

> [12] Assuming for the moment that Swift breached the collective bargaining agreement in discharging Owens and that the Union breached its duty in handling Owens' grievance, this case illustrates the difficulties that would result from a rule pre-empting the courts from remedying the Union's breach of duty. If Swift did not "participate" in the Union's unfair labor practice, the Board would have no jurisdiction to remedy Swift's breach of contract. Yet a court might be equally unable to give Owens full relief in a § 301 suit against Swift. Should the court award damages against Swift for Owens' full loss, even if it concludes that part of that loss was caused by the Union's breach of duty? Or should it award Owens only partial recovery hoping that the Board will make him whole? These remedy problems are difficult enough when one tribunal has all parties before it; they are impossible if two independent tribunals, with different procedures, time limitations, and remedial powers, must participate.

[***LEdHR25] [25]It follows from the above that the Missouri courts had jurisdiction in this case. Of course, it is quite another problem to determine what remedies may be available [***857] against the Union if a breach of duty is proven. See Part IV, *infra.* But the

unique role played by the duty of fair representation doctrine in the scheme of federal labor laws, and its important relationship to the judicial enforcement of collective bargaining agreements in the context presented here, render the *Garmon* pre-emption doctrine inapplicable.

III.

Petitioners contend, as they did in their motion for judgment notwithstanding the jury's verdict, that Owens failed to prove that the Union breached its duty of fair representation in its handling of Owens' grievance. Petitioners [*189] also argue that the Supreme Court of Missouri, in rejecting this contention, applied a standard that is inconsistent with governing principles of federal law with respect to the Union's duty to an individual employee in its processing of grievances under the collective bargaining agreement with Swift. We agree with both contentions.

A. In holding that the evidence at trial supported the jury's verdict in favor of Owens, the Missouri Supreme Court stated:

"The essential issue submitted to the jury was whether the union . . . arbitrarily . . . refused to carry said grievance . . . through the fifth step . . . .

"We have concluded that there was sufficient substantial evidence from which the jury reasonably could have found the foregoing issue in favor of plaintiff. It is notable that no physician actually testified in the case. Both sides were content to rely upon written statements. Three physicians certified that plaintiff was able to perform his regular work. Three other physicians certified that they had taken plaintiff's blood pressure and that the readings were approximately 160 over 100. It may be inferred that such a reading does not indicate that his blood pressure was dangerously high. Moreover, plaintiff's evidence showed that he had actually done hard physical labor periodically during the four years following his discharge. We accordingly rule this point adversely to defendants." *397 S. W. 2d, at 665.*

Quite obviously, the question which the Missouri Supreme Court thought dispositive of the issue of liability was whether the evidence supported Owens' assertion that he had been wrongfully discharged by Swift, regardless of the Union's good faith in reaching a contrary [*190] conclusion. This was also the major

concern of the plaintiff at trial: the bulk of Owens' evidence was directed at whether he was medically fit at the time of discharge and whether he had performed heavy work after that discharge.

[***LEdHR26] [26]A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. See *Humphrey v. Moore, supra; Ford Motor Co.* v. *Huffman, supra.* There has been considerable debate over the extent of this duty in the context of a union's enforcement of the grievance and arbitration procedures in a collective bargaining agreement. See generally Blumrosen, The Worker and Three Phases of Unionism: Administrative and Judicial Control of the Worker-Union Relationship, 61 Mich. [***858] L. Rev. 1435, 1482-1501 (1963); Comment, Federal [**917] Protection of Individual Rights under Labor Contracts, 73 Yale L. J. 1215 (1964). Some have suggested that every individual employee should have the right to have his grievance taken to arbitration. [13] Others have urged that the union be given substantial discretion (if the collective bargaining agreement so provides) to decide whether a grievance should be taken to arbitration, subject only to the duty to refrain from patently wrongful conduct such as racial discrimination or personal hostility. [14]

13 See *Donnelly v. United Fruit Co., 40 N. J. 61, 190 A. 2d 825;* Report of Committee on Improvement of Administration of Union-Management Agreements, 1954, Individual Grievances, 50 Nw. U. L. Rev. 143 (1955); Murphy, The Duty of Fair Representation under Taft-Hartley, 30 Mo. L. Rev. 373, 389 (1965); Summers, Individual Rights in Collective Agreements and Arbitration, 37 N. Y. U. L. Rev. 362 (1962).

14 See *Sheremet v. Chrysler Corp., 372 Mich. 626, 127 N. W. 2d 313;* Wyle, Labor Arbitration and the Concept of Exclusive Representation, 7 B. C. Ind. & Com. L. Rev. 783 (1966).

[*191] [***LEdHR27] [27] [***LEdHR28] [28]Though we accept the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion, we do not agree that the individual employee has an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement. In L.

386 U.S. 171, *191; 87 S. Ct. 903, **917;
17 L. Ed. 2d 842, ***LEdHR28; 1967 U.S. LEXIS 2873

M. R. A. § 203 (d), 61 Stat. 154, *29 U. S. C. § 173 (d)*, Congress declared that "Final adjustment by a method agreed upon by the parties is . . . the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through this settlement process, frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement. See Cox, Rights Under a Labor Agreement, 69 Harv. L. Rev. 601 (1956).

[***LEdHR29] [29]If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievances would proceed to [*192] arbitration. [15] This would greatly [***859] increase the cost of the grievance machinery and could so overburden the arbitration process as to [**918] prevent it from functioning successfully. See *NLRB v. Acme Industrial Co., 385 U.S. 432, 438*; Ross, Distressed Grievance Procedures and Their Rehabilitation, in Labor Arbitration and Industrial Change, Proceedings of the 16th Annual Meeting, National Academy of Arbitrators 104 (1963). It can well be doubted whether the parties to collective bargaining agreements would long continue to provide for detailed grievance and arbitration procedures of the kind encouraged by L. M. R. A. § 203 (d), *supra*, if their power to settle the majority of grievances short of the costlier and more time-consuming steps were limited by a rule permitting the grievant unilaterally to invoke arbitration. Nor do we see substantial danger to the interests of the individual employee if his statutory agent is given the contractual power honestly and in good faith

to settle grievances short of arbitration. For these reasons, we conclude that a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration.

> 15  Under current grievance practices, an attempt is usually made to keep the number of arbitrated grievances to a minimum. An officer of the National Union testified in this case that only one of 967 grievances filed at all of Swift's plants between September 1961 and October 1963 was taken to arbitration. And the AFL-CIO's *amicus* brief reveals similar performances at General Motors Corporation and United States Steel Corporation, two of the Nation's largest unionized employers: less than .05% of all written grievances filed during a recent period at General Motors required arbitration, while only 5.6% of the grievances processed beyond the first step at United States Steel were decided by an arbitrator.

[***LEdHR30] [30] [***LEdHR31] [31]For these same reasons, the standard applied here by the Missouri Supreme Court cannot be sustained. For if a union's decision that a particular grievance lacks [*193] sufficient merit to justify arbitration would constitute a breach of the duty of fair representation because a judge or jury later found the grievance meritorious, the union's incentive to settle such grievances short of arbitration would be seriously reduced. The dampening effect on the entire grievance procedure of this reduction of the union's freedom to settle claims in good faith would surely be substantial. Since the union's statutory duty of fair representation protects the individual employee from arbitrary abuses of the settlement device by providing him with recourse against both employer (in a § 301 suit) and union, this severe limitation on the power to settle grievances is neither necessary nor desirable. Therefore, we conclude that the Supreme Court of Missouri erred in upholding the verdict in this case solely on the ground that the evidence supported Owens' claim that he had been wrongfully discharged.

[***LEdHR32] [32]B. Applying the proper standard of union liability to the facts of this case, we cannot uphold the jury's award, for we conclude that as a matter of federal law the evidence does not support a verdict that the Union breached its duty of fair representation. As we have stated, Owens could not have

established a breach of that duty merely by convincing the jury that he was in fact fit for work in 1960; he must also have proved arbitrary or bad-faith conduct on the part of the Union in processing his grievance. The evidence revealed that the Union diligently supervised the grievance into the fourth step of the bargaining agreement's procedure, with the Union's business representative serving as Owens' [***860] advocate throughout these steps. When Swift refused to reinstate Owens on the basis of his medical reports indicating reduced blood pressure, the Union sent him to another doctor of his own choice, at Union expense, in an attempt to amass persuasive medical evidence of Owens' fitness for work. When this examination proved unfavorable, the Union [*194] concluded that it could not establish a wrongful discharge. It then encouraged Swift to find light work for Owens at the plant. When this effort failed, the Union determined that arbitration would be fruitless and suggested to Owens that he accept Swift's offer to send him to a heart association for rehabilitation. At this point, Owens' grievance was suspended in the fourth step in the hope that he might be rehabilitated.

[**919] [***LEdHR33] [33]In administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances. See *Humphrey v. Moore, 375 U.S. 335, 349-350*; *Ford Motor Co.* v. *Huffman, 345 U.S. 330, 337-339*. In a case such as this, when Owens supplied the Union with medical evidence supporting his position, the Union might well have breached its duty had it ignored Owens' complaint or had it processed the grievance in a perfunctory manner. See Cox, Rights under a Labor Agreement, 69 Harv. L. Rev., at 632-634. But here the Union processed the grievance into the fourth step, attempted to gather sufficient evidence to prove Owens' case, attempted to secure for Owens less vigorous work at the plant, and joined in the employer's efforts to have Owens rehabilitated. Only when these efforts all proved unsuccessful did the Union conclude both that arbitration would be fruitless and that the grievance should be dismissed. There was no evidence that any Union officer was personally hostile to Owens or that the Union acted at any time other than in good faith. [16] Having concluded that [*195] the individual employee has no absolute right to have his grievance arbitrated under the collective bargaining agreement at issue, and that a breach of the

duty of fair representation is not established merely by proof that the underlying grievance was meritorious, we must conclude that that duty was not breached here.

> 16  Owens did allege and testify that petitioner Vaca, President of the Kansas City local, demanded $ 300 in expenses before the Union would take the grievance to arbitration, a charge which all the petitioners vigorously denied at trial. Under the collective bargaining agreement, the local union had no power to invoke arbitration. See n. 3, *supra*. Moreover, the Union's decision to send Owens to another doctor at Union expense occurred after Vaca's alleged demand, and the ultimate decision not to invoke arbitration came later still. Thus, even if the jury believed Owens' controverted testimony, we do not think that this incident would establish a breach of duty by the Union.

IV.

In our opinion, there is another important reason why the judgment of the Missouri Supreme Court cannot stand. Owens' suit against the Union was grounded on his claim that Swift had discharged him in violation of the applicable collective bargaining agreement. In his complaint, Owens alleged "that, as a direct result of said wrongful breach of said contract, by employer . . . Plaintiff was damaged in the sum [***861] of Six Thousand, Five Hundred ($ 6,500.00) Dollars per year, continuing until the date of trial." For the Union's role in "preventing Plaintiff from completely exhausting administrative remedies," Owens requested, and the jury awarded, compensatory damages for the above-described breach of contract plus punitive damages of $ 3,000. R., at 4. We hold that such damages are not recoverable from the Union in the circumstances of this case.

The appropriate remedy for a breach of a union's duty of fair representation must vary with the circumstances of the particular breach. In this case, the employee's complaint was that the Union wrongfully failed to afford him the arbitration remedy against his employer established by the collective bargaining agreement. But the damages sought by Owens were primarily those suffered [*196] because of the employer's alleged breach of contract. Assuming for the moment that Owens had been wrongfully discharged, Swift's only defense to a direct action for breach of contract would have been the Union's failure to [**920]

resort to arbitration, compare *Republic Steel Corp.* v. *Maddox, 379 U.S. 650*, with *Smith v. Evening News Assn., 371 U.S. 195*, and if that failure was itself a violation of the Union's statutory duty to the employee, there is no reason to exempt the employer from contractual damages which he would otherwise have had to pay. See pp. 185-186, *supra*. The difficulty lies in fashioning an appropriate scheme of remedies.

[***LEdHR34A] [34A] [***LEdHR35] [35]Petitioners urge that an employee be restricted in such circumstances to a decree compelling the employer and the union to arbitrate the underlying grievance. [17] It is true that the employee's action is based on the employer's alleged breach of contract plus the union's alleged wrongful failure to afford him his contractual remedy of arbitration. For this reason, an order compelling arbitration should be viewed as one of the available remedies when a breach of the union's duty is proved. But we see no reason inflexibly to require arbitration in all cases. In some cases, for example, at least part of the employee's damages may be attributable to the union's breach of duty, and an arbitrator may have no power under the bargaining agreement to award such damages against the union. In other cases, the arbitrable issues may be substantially resolved in the course of trying the fair representation controversy. In such situations, the court should be free to decide the contractual claim and to award the employee appropriate damages or equitable relief.

[***LEdHR34B] [34B]

17 Obviously, arbitration is an appropriate remedy only when the parties have created such a procedure in the collective bargaining agreement.

[***LEdHR36] [36] [***LEdHR37] [37] [***LEdHR38] [38]A more difficult question is, what portion of the employee's damages may be charged to the union: in particular, [*197] may an award against a union include, as it did here, damages attributable solely to the employer's breach of contract? We think not. Though the union has violated a statutory duty in failing to press the grievance, it is the employer's unrelated breach of contract which triggered the controversy and which caused this portion of the employee's damages. The employee should have no difficulty recovering these damages from the employer, who cannot, as we have

explained, hide behind the union's wrongful failure to act; in [***862] fact, the employer may be (and probably should be) joined as a defendant in the fair representation suit, as in *Humphrey v. Moore, supra*.It could be a real hardship on the union to pay these damages, even if the union were given a right of indemnification against the employer. With the employee assured of direct recovery from the employer, we see no merit in requiring the union to pay the employer's share of the damages. [18]

18 We are not dealing here with situations where a union has affirmatively caused the employer to commit the alleged breach of contract. In cases of that sort where the union's conduct is found to be an unfair labor practice, the NLRB has found an unfair labor practice by the employer, too, and has held the union and the employer jointly and severally liable for any back pay found owing to the particular employee who was the subject of their joint discrimination. *E. g., Imparato Stevedoring Corp., 113 N. L. R. B. 883 (1955); Squirt Distrib. Co., 92 N. L. R. B. 1667 (1951); H. M. Newman, 85 N. L. R. B. 725 (1949)*. Even if this approach would be appropriate for analogous § 301 and breach-of-duty suits, it is not applicable here. Since the Union played no part in Swift's alleged breach of contract and since Swift took no part in the Union's alleged breach of duty, joint liability for either wrong would be unwarranted.

[***LEdHR39] [39]The governing principle, then, is to apportion liability between the employer and the union according to the damage caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not [**921] be charged to the union, but increases if any [*198] in those damages caused by the union's refusal to process the grievance should not be charged to the employer. In this case, even if the Union had breached its duty, all or almost all of Owens' damages would still be attributable to his allegedly wrongful discharge by Swift. For these reasons, even if the Union here had properly been found liable for a breach of duty, it is clear that the damage award was improper.

*Reversed.*

**CONCUR BY:** FORTAS

**CONCUR**

MR. JUSTICE FORTAS, with whom THE CHIEF JUSTICE and MR. JUSTICE HARLAN join, concurring in the result.

1. In my view, a complaint by an employee that the union has breached its duty of fair representation is subject to the exclusive jurisdiction of the NLRB. It is a charge of unfair labor practice. See *Miranda Fuel Co., 140 N. L. R. B. 181 (1962);* [1] *Local 12, United Rubber Workers, 150 N. L. R. B. 312,* enforced, *368 F.2d 12 (C. A. 5th Cir. 1966).* [2] As is the case with most other [*199] [***863] unfair labor practices, the Board's jurisdiction is preemptive. *Garner v. Teamsters Union, 346 U.S. 485 (1953); Guss v. Utah Labor Board, 353 U.S. 1 (1957); San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959); Local 438, Constr. Laborers v. Curry, 371 U.S. 542 (1963); Plumbers' Union v. Borden, 373 U.S. 690 (1963); Iron Workers v. Perko, 373 U.S. 701 (1963); Liner v. Jafco, Inc., 375 U.S. 301 (1964). Cf. Woody v. Sterling Alum. Prods., Inc., 365 F.2d 448 (C. A. 8th Cir. 1966),* pet. for cert. pending, No. 946, O. T. 1966. There is no basis for failure to apply the preemption principle in the present case, and, as I shall discuss, strong reason for its application. The relationship between the union and the individual employee with respect to the processing of claims to employment rights under the collective bargaining agreement is fundamental to the design and operation of federal labor law. It is not "merely peripheral," as the Court's opinion states. It "presents difficult problems of definition of status, problems which we have held are precisely 'of a kind most wisely entrusted initially to the agency charged with the day-to-day administration of the Act as a whole.'" *Iron Workers v. Perko, supra, 373 U.S., at 706.* Accordingly, the judgment of the Supreme Court of Missouri should be reversed and the complaint dismissed for this reason and on this basis. I agree, however, that if it were assumed that jurisdiction of the subject matter exists, [**922] the judgment would still have to be reversed because of the use by the Missouri court of an improper standard for measuring the union's duty, and the absence of evidence to establish that the union refused further to process Owens' grievance because of bad faith or arbitrarily.

1    This decision of the NLRB was denied enforcement by the Court of Appeals for the Second Circuit but on a basis which did not decide the point relevant here. *NLRB v. Miranda Fuel Co., 326 F.2d 172 (C. A. 2d Cir. 1963).* Only one judge, Judge Medina, took the position that

the NLRB had incorrectly held violation of the duty of fair representation to be an unfair labor practice. As an alternative ground for decision, he held that the NLRB had not had sufficient evidence to support its finding of breach of the duty. Judge Lumbard agreed with this latter holding, and explicitly did not reach the question whether breach of the duty is an unfair labor practice. Judge Friendly dissented. He would have affirmed the NLRB both on the sufficiency of the evidence and on the holding that breach of the duty of fair representation is an unfair labor practice as to which the NLRB can give relief.

2    The opinion by Judge Thornberry for the Fifth Circuit supports the views expressed herein. See also Cox, The Duty of Fair Representation, 2 Vill. L. Rev. 151, 172-173 (1957); Wellington, Union Democracy and Fair Representation: Federal Responsibility in a Federal System, 67 Yale L. J. 1327 (1958).

2. I regret the elaborate discussion in the Court's opinion of problems which are irrelevant. This is not an action by the employee against the employer, and the [*200] discussion of the requisites of such an action is, in my judgment, unnecessary. The Court argues that the employee could sue the employer under L. M. R. A. § 301; and that to maintain such an action the employee would have to show that he has exhausted his remedies under the collective bargaining agreement, or alternatively that he was prevented from doing so because the union breached its duty to him by failure completely to process his claim. That may be; or maybe all he would have to show to maintain an action against the employer for wrongful discharge is that he demanded that the union process his claim to exhaustion of available remedies, and that it refused to do so. [3] I see no need for the Court [***864] to pass upon that question, which is not presented here, and which, with all respect, lends no support to the Court's argument. The Court seems to use its discussion of the employee-employer litigation as somehow analogous to or supportive of its conclusion that the employee may maintain a court action against the union. But I do not believe that this follows. I agree that the NLRB's unfair labor practice jurisdiction does not preclude an action under § 301 against the employer for wrongful discharge [*201] from employment. *Smith v. Evening News Assn., 371 U.S. 195 (1962).* Therefore, Owens might have maintained an action against his employer in the present case. This would be an action to

enforce the collective bargaining agreement, and Congress has authorized the courts to entertain actions of this type. But his claim against the union is quite different in character, as the Court itself recognizes. The Court holds -- and I think correctly if the issue is to be reached -- that the union could not be required to pay damages measured by the breach of the employment contract, because it was not the union but the employer that breached the contract. I agree; but I suggest that this reveals the point for which I contend: that the employee's claim against the union is not a claim under the collective bargaining agreement, but a claim that the union has breached its statutory duty of fair representation. This claim, I submit, is a claim of unfair labor practice and it is within the exclusive jurisdiction of the NLRB. The Court agrees that "one of the available remedies [obtainable, the Court says, by court action] when a breach of the union's duty is proved" is "an order compelling arbitration." This is precisely and uniquely the kind of order which is within the province of the Board. Beyond this, the Court is exceedingly vague as to remedy: "appropriate damages or equitable relief" are suggested as possible remedies, apparently when arbitration is not available. Damages against [**923] the union, the Court admonishes, should be gauged "according to the damage caused by [its] fault" -- i. e., the failure to exhaust remedies for the grievance. The Court's difficulty, it seems to me, reflects the basic awkwardness of its position: It is attempting to force into the posture of a contract violation an alleged default of the union which is not a violation of the collective bargaining agreement but a breach of its separate and basic duty fairly [*202] to represent all employees in the unit. This is an unfair labor practice, and should be treated as such. [4]

      3 Cf. my Brother BLACK's dissenting opinion in this case. Cf. also *Brown v. Sterling Alum. Prods. Corp., 365 F.2d 651, 656-657 (C. A. 8th Cir. 1966)*, cert. denied, *post*, p. 957. *Republic Steel Corp.* v. *Maddox, 379 U.S. 650 (1965)*, does not pass upon the issue. The Court states that "To leave the employee remediless" when the union wrongfully refuses to process his grievance, "would . . . be a great injustice." I do not believe the Court relieves this injustice to any great extent by requiring the employee to prove an unfair labor practice as a prerequisite to judicial relief for the employer's breach of contract. Nor do I understand how giving the employee a cause of action against the *union* is an appropriate way to

remedy the injustice which would exist if the union were allowed to foreclose relief against the *employer*.

    4 The Court argues that since the employee suing the employer for breach of the employment contract would have to show exhaustion of remedies under the contract, and since he would for this purpose have to show his demand on the union and, according to the Court, its wrongful failure to prosecute his grievance, the union could be joined as a party defendant; and since the union could be joined in such a suit, it may be sued independently of the employer. But this is a *non sequitur*. As the Court itself insists, the suit against the union is not for breach of the employment contract, but for violation of the duty fairly to represent the employee. This is an entirely different matter. It is a breach of statutory duty -- an unfair labor practice -- and not a breach of the employment contract.

    3. If we look beyond logic and precedent to the policy of the labor relations design which Congress has provided, court jurisdiction of this type of action seems anomalous and [***865] ill-advised. We are not dealing here with the interpretation of a contract or with an alleged breach of an employment agreement. As the Court in effect acknowledges, we are concerned with the subtleties of a union's statutory duty faithfully to represent employees in the unit, including those who may not be members of the union. The Court -- regrettably, in my opinion -- ventures to state judgments as to the metes and bounds of the reciprocal duties involved in the relationship between the union and the employee. In my opinion, this is precisely and especially the kind of judgment that Congress intended to entrust to the Board and which is well within the pre-emption doctrine that this Court has prudently stated. [5] See cases cited, *supra*, especially [*203] the *Perko* and *Borden* cases, the facts of which strongly parallel the situation in this case. See also *Linn v. Plant Guard Workers, 383 U.S. 53, 72 (1966)* (dissenting opinion). The nuances of union-employee and union-employer relationships are infinite and consequential, particularly when the issue is as amorphous as whether the union was proved guilty of "arbitrary or bad-faith conduct" which the Court states as the standard applicable here. In all reason and in all good judgment, this jurisdiction should be left with the Board and not be placed in the courts, especially with the complex and necessarily confusing guidebook that the

386 U.S. 171, *203; 87 S. Ct. 903, **923;
17 L. Ed. 2d 842, ***865; 1967 U.S. LEXIS 2873

Court now publishes.

> 5   In a variety of contexts the NLRB concerns itself with the substantive bargaining behavior of the parties. For example: (a) the duty to bargain in good faith, see, *e. g., Fibreboard Corp.* v. *Labor Board, 379 U.S. 203 (1964);* (b) jurisdictional disputes, see, *e. g., Labor Board v. Radio Engineers, 364 U.S. 573 (1961);* (c) secondary boycotts and hot cargo clauses, see, *e. g., Orange Belt District Council of Painters No. 48 v. NLRB, 117 U. S. App. D. C. 233, 328 F.2d 534 (1964).*

Accordingly, I join the judgment of reversal, but on the basis stated.

**DISSENT BY:** BLACK

**DISSENT**

MR. JUSTICE BLACK, dissenting.

The Court today opens slightly the courthouse door to an employee's incidental claim against his union for breach of its duty of fair representation, only to shut it in his face when he seeks direct judicial relief for his underlying and more valuable breach-of-contract claim against his employer. This result follows from the Court's announcement in this case, involving an employee's suit against [**924] his union, of a new rule to govern an employee's suit against his employer. The rule is that before an employee can sue his employer under § 301 of the L. M. R. A. for a simple breach of his employment contract, the employee must prove not only that he attempted to exhaust his contractual remedies, but that his attempt to exhaust them was frustrated by "arbitrary, discriminatory, or . . . bad faith" conduct on [*204] the part of his union. With this new rule and its result I cannot agree.

The Court recognizes, as it must, that the jury in this case found at least that Benjamin Owens was fit for work, that his grievance against Swift was meritorious, and that Swift breached the collective bargaining agreement when it wrongfully discharged him. The Court also notes in passing that Owens [*] has a separate action for breach of [***866] contract pending against Swift in the state courts. And in Part IV of its opinion, the Court vigorously insists that "there is no reason to exempt the

employer from contractual damages which he would otherwise have had to pay," that the "employee should have no difficulty recovering these damages from the employer" for his "unrelated breach of contract," and that "the employee [is] assured of direct recovery from the employer." But this reassurance in Part IV gives no comfort to Owens, for Part IV is based on the assumption that the union breached its duty to Owens, an assumption which, in Part III of its opinion, the Court finds unsupported by the facts of this case. What this all means, though the Court does not expressly say it, is that Owens will be no more successful in his pending breach-of-contract action against Swift than he is here in his suit against the union. For the Court makes it clear "that the question of whether a union has breached its duty of fair representation will . . . be a critical issue in a suit under L. M. R. A. § 301," that "the wrongfully discharged employee may bring an action against his employer" only if he "can prove that the union . . . breached its duty of fair representation in its handling of the employee's grievance," and "that the employee, as part and parcel of his § 301 action, finds [*205] it necessary to prove an unfair labor practice by the union." Thus, when Owens attempts to proceed with his pending breach-of-contract action against Swift, Swift will undoubtedly secure its prompt dismissal by pointing to the Court's conclusion here that the union has not breached its duty of fair representation. Thus, Owens, who now has obtained a judicial determination that he was wrongfully discharged, is left remediless, and Swift, having breached its contract, is allowed to hide behind, and is shielded by, the union's conduct. I simply fail to see how it should make one iota of difference, as far as the "unrelated breach of contract" by Swift is concerned, whether the union's conduct is wrongful or rightful. Neither precedent nor logic supports the Court's new announcement that it does.

> *  Owens died while the appeal of his case from the trial court was pending. The administrator of his estate was substituted and is the respondent herein though for simplicity is referred to herein as Owens.

Certainly, nothing in *Republic Steel Corp.* v. *Maddox, 379 U.S. 650,* supports this new rule. That was a case where the aggrieved employee attempted to "completely sidestep available grievance procedures in favor of a lawsuit." *Id., at 653.* Noting that "it cannot be said . . . that contract grievance procedures are inadequate

to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so," *ibid.*, the Court there held that the employee "must *attempt* use of the contract grievance procedure," *id., at 652*, and "must afford the union the opportunity to act on his behalf," *id., at 653*. I dissented on the firm belief that an employee should be free to litigate his own lawsuit with his own lawyer in [**925] a court before a jury, rather than being forced to entrust his claim to a union which, even if it did agree to press it, would be required to submit it to arbitration. And even if, as the Court implied, "the worker would be allowed to sue after he had presented his claim to the union and after he had suffered the inevitable discouragement and delay which necessarily accompanies the union's refusal [*206] to press his claim," *id., at 669*, [***867] I could find no threat to peaceful labor relations or to the union's prestige in allowing an employee to by-pass completely contractual remedies in favor of a traditional breach-of-contract lawsuit for back pay or wage substitutes. Here, of course, Benjamin Owens did not "completely sidestep available grievance procedures in favor of a lawsuit." With complete respect for the union's authority and deference to the contract grievance procedures, he not only gave the union a chance to act on his behalf, but in every way possible tried to convince it that his claim was meritorious and should be carried through the fifth step to arbitration. In short, he did everything the Court's opinion in *Maddox* said he should do, and yet now the Court says so much is not enough.

In *Maddox*, I noted that the "cases really in point are those which involved agreements governed by the Railway Labor Act and which expressly refused to hold that a discharged worker must pursue collective bargaining grievance procedures before suing in a court for wrongful discharge. *Transcontinental & Western Air, Inc.* v. *Koppal, 345 U.S. 653*; *Moore* v. *Illinois Central R. Co., 312 U.S. 630*." *379 U.S., at 666*. I also observed that the Court's decision in *Maddox* "raised the overruling axe so high [over those cases] that its falling is just about as certain as the changing of the seasons." *Id., at 667*. In the latter observation I was mistaken. The Court has this Term, in *Walker v. Southern R. Co., 385 U.S. 196*, refused to overrule in light of *Maddox* such cases as *Moore* and *Koppal*. Noting the long delays attendant upon exhausting administrative remedies under the Railway Labor Act, the Court based this refusal on "the contrast between the administrative remedy" available to Maddox and that available to Walker. If, as the Court

suggested, the availability of an administrative remedy determines whether an employee can sue without first [*207] exhausting it, can there be any doubt that Owens who had no administrative remedy should be as free to sue as Walker who had a slow one? Unlike Maddox, Owens attempted to implement the contract grievance procedures and found them inadequate. Today's decision, following in the wake of *Walker* v. *Southern R. Co.*, merely perpetuates an unfortunate anomaly created by *Maddox* in the law of labor relations.

The rule announced in *Maddox*, I thought, was a "brainchild" of the Court's recent preference for arbitration. But I am unable to ascribe any such genesis to today's rule, for arbitration is precisely what Owens sought and preferred. Today the Court holds that an employee with a meritorious claim has no absolute right to have it either litigated or arbitrated. Fearing that arbitrators would be overworked, the Court allows unions unilaterally to determine not to take a grievance to arbitration -- the first step in the contract grievance procedure at which the claim would be presented to an impartial third party -- as long as the union decisions are neither "arbitrary" nor "in bad faith." The Court derives this standard of conduct from a long line of cases holding that "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, [***868] or in bad faith. " What the Court overlooks is that those cases laid down this standard in the context of situations where the employee's sole or fundamental complaint was against the union. There was not the slightest hint in those cases that the [**926] same standard would apply where the employee's primary complaint was against his employer for breach of contract and where he only incidentally contended that the union's conduct prevented the adjudication, by either court or arbitrator, of the underlying grievance. If the Court here were satisfied with merely holding that in this situation the employee [*208] could not recover damages from the union unless the union breached its duty of fair representation, then it would be one thing to say that the union did not do so in making a good-faith decision not to take the employee's grievance to arbitration. But if, as the Court goes on to hold, the employee cannot sue his employer for breach of contract unless his failure to exhaust contractual remedies is due to the union's breach of its duty of fair representation, then I am quite unwilling to say that the union's refusal to exhaust such remedies -- however nonarbitrary -- does not amount to a

386 U.S. 171, *208; 87 S. Ct. 903, **926;
17 L. Ed. 2d 842, ***868; 1967 U.S. LEXIS 2873

breach of its duty. Either the employee should be able to sue his employer for breach of contract after having attempted to exhaust his contractual remedies, or the union should have an absolute duty to exhaust contractual remedies on his behalf. The merits of an employee's grievance would thus be determined by either a jury or an arbitrator. Under today's decision it will never be determined by either.

And it should be clear that the Court's opinion goes much further than simply holding that an employee has no absolute right to have the union take his grievance to arbitration. Here, of course, the union supervised the grievance into the fourth step of the contract machinery and dropped it just prior to arbitration on its belief that the outcome of arbitration would be unfavorable. But limited only by the standard of arbitrariness, there was clearly no need for the union to go that far. Suppose, for instance, the union had a rule that it would not prosecute a grievance even to the first step unless the grievance were filed by the employee within 24 hours after it arose. Pursuant to this rule, the union might completely refuse to prosecute a grievance filed several days late. Thus, the employee, no matter how meritorious his grievance, would get absolutely nowhere. And unless he could prove that [*209] the union's rule was arbitrary (a standard which no one can define), the employee would get absolutely no consideration of the merits of his grievance -- either by a jury, an arbitrator, the employer, or by the union. The Court suggests three reasons for giving the union this almost unlimited discretion to deprive injured employees of all remedies for breach of contract. The first is that "frivolous grievances" will be ended prior to time-consuming and costly arbitration. But here no one, not even the union, suggests that Benjamin Owens' grievance was frivolous. The union decided not to take it to arbitration simply because the union doubted the chance of success. Even if this was a good-faith doubt, I think the union had the duty to present this contested, but serious, claim to the arbitrator whose very function is to decide such claims on the basis of what he believes to be right. Second, the [***869] Court says that allowing the union to settle grievances prior to arbitration will assure consistent treatment of "major problem areas in the interpretation of the collective bargaining contract." But can it be argued that whether Owens was "fit to work" presents a major problem in the interpretation of the collective bargaining agreement? The problem here was one of interpreting medical reports, not a collective bargaining agreement, and of

evaluating other evidence of Owens' physical condition. I doubt whether consistency is either possible or desirable in determining whether a particular employee is able to perform a particular job. Finally, the Court suggests that its decision "furthers the interest of the union as statutory agent." I think this is the real reason for today's decision which entirely overlooks the interests of the injured employee, the only one who [**927] has anything to lose. Of course, anything which gives the union life and death power over those whom it is supposed to represent furthers its "interest." I simply fail to see how [*210] the union's legitimate role as statutory agent is undermined by requiring it to prosecute all serious grievances to a conclusion or by allowing the injured employee to sue his employer after he has given the union a chance to act on his behalf.

Henceforth, in almost every § 301 breach-of-contract suit by an employee against an employer, the employee will have the additional burden of proving that the union acted arbitrarily or in bad faith. The Court never explains what is meant by this vague phrase or how trial judges are intelligently to translate it to a jury. Must the employee prove that the union in fact acted arbitrarily, or will it be sufficient to show that the employee's grievance was so meritorious that a reasonable union would not have refused to carry it to arbitration? Must the employee join the union in his § 301 suit against the employer, or must he join the employer in his unfair representation suit against the union? However these questions are answered, today's decision, requiring the individual employee to take on both the employer and the union in every suit against the employer and to prove not only that the employer breached its contract, but that the union acted arbitrarily, converts what would otherwise be a simple breach-of-contract action into a three-ring donnybrook. It puts an intolerable burden on employees with meritorious grievances and means they will frequently be left with no remedy. Today's decision, while giving the worker an ephemeral right to sue his union for breach of its duty of fair representation, creates insurmountable obstacles to block his far more valuable right to sue his employer for breach of the collective bargaining agreement.

## REFERENCES

Am Jur 2d, Labor and Labor Relations (Rev ed, Labor 88, 124, 130, 288, 327-329)

US Digest Anno, Commerce 129.5; Evidence 970.3;

R000141

386 U.S. 171, *210; 87 S. Ct. 903, **927;
17 L. Ed. 2d 842, ***869; 1967 U.S. LEXIS 2873

Labor 17, 39, 46, 82, 125

ALR Digests, Labor 28, 35.5, 39, 73

L ed Index to Anno, Labor and Employment

ALR Quick Index, Labor and Labor Unions

Annotation References:

Exhaustion of grievance procedures or of remedies provided in collective bargaining agreement as condition of employee's resort to civil courts for assertedly wrongful discharge. *72 ALR2d 1439.*

What law governs employee's right to damages for wrongful discharge. *61 ALR2d 917.*

Discharge or retirement because of age or physical disability as within provision of collective bargaining contract limiting employer's right to discharge

employees. *56 ALR2d 991.*

Right of individual employee to enforce collective labor agreement against employer. *18 ALR2d 352.*

National Labor Relations Act and Labor Management Relations Act as excluding state action. 93 L ed 470, 94 L ed 984, 95 L ed 384, 98 L ed 245, 99 L ed 559, 100 L ed 1174; 174 ALR 1051.

Federal Labor Relations Acts as affecting state court jurisdiction of suits between member of labor union and union. 10 L ed 2d 1200.

Constitutionality and construction of 301(a) of Labor Management Relations Act (*29 USC 185(a)*), conferring jurisdiction on Federal District Courts in actions for violation of contract between employer and labor organizations. 99 L ed 529, 7 L ed 2d 959, 16 L ed 2d 1143; *17 ALR2d 614.*

R000142



LEXSEE 499 U.S. 65

## AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, PETITIONER v. JOSEPH E. O'NEILL et al.

### No. 89-1493

### SUPREME COURT OF THE UNITED STATES

*499 U.S. 65; 111 S. Ct. 1127; 113 L. Ed. 2d 51; 1991 U.S. LEXIS 1711; 59 U.S.L.W. 4175; 118 Lab. Cas. (CCH) P10,597; 102-69 Fulton County D. Rep. 16B; 136 L.R.R.M. 2721; 91 Cal. Daily Op. Service 1967; 91 Daily Journal DAR 3211*

**January 14, 1991, Argued**
**March 19, 1991, Decided**

**PRIOR HISTORY:**      CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.

**DISPOSITION:**    *886 F. 2d 1438*, reversed.

**DECISION:**

Union's agreement to settle strike held, under circumstances presented, not arbitrary or discriminatory and thus not breach of union's duty of fair representation.

**SUMMARY:**

In 1983, an airline filed a petition for reorganization under Chapter 11 of the Bankruptcy Code and, with the approval of the Bankruptcy Court, repudiated its collective bargaining agreement with the union that represented the airline's pilots. In response, the pilots called a strike that lasted for more than 2 years. The strike was acrimonious, with incidents of violence and the filing of lawsuits, charges, and countercharges. Although most of the approximately 2,000 pilots originally supported the strike, about 600 of them were working by August 1985, along with about 1,000 replacement workers hired by the airline. In September 1985, the airline announced that it would fill a large number of anticipated vacancies by using a system that allowed pilots to bid for positions. In the past, this system had assigned positions by seniority. Although the union authorized striking pilots to submit bids, the airline announced that all the positions had been awarded to working pilots. On October 31, 1985, the union and the airline reached an agreement to end the strike, dispose of all pending litigation, and reallocate the vacant positions. Under the agreement, which was approved by the Bankruptcy Court, striking pilots were offered the options of (1) settling all outstanding claims with the airline and participating with nonstriking pilots in the allocation of certain positions, (2) electing not to return to work and receiving severance pay, or (3) retaining their individual claims against the airline and becoming eligible to work only after the reinstatement of all the settling pilots. Pursuant to the settlement, some positions were awarded to returning strikers who chose the first option, while almost a third of the former striking pilots chose the lump-sum severance payment rather than reinstatement. However, several former striking pilots brought a class action in Federal District Court against the union. These pilots alleged, among other things, that the union had breached its duty of fair representation in negotiating and accepting the settlement, in that the settlement arbitrarily discriminated against striking pilots. The District Court granted the union's motion for summary judgment on the alternative grounds that (1) the Bankruptcy Court had approved the settlement, and (2) even if the settlement was merely a private agreement, the union had not breached its duty of fair representation. The United States Court of Appeals for the Fifth Circuit, reversing and remanding on appeal, said that (1) the rule that a union breaches its duty of fair representation if the

R000143

499 U.S. 65, *; 111 S. Ct. 1127, **;
113 L. Ed. 2d 51, ***; 1991 U.S. LEXIS 1711

union's actions are either arbitrary, discriminatory, or in bad faith, applies to a union in its negotiating capacity, and (2) a jury could have found that the union had acted arbitrarily and had thus breached its duty of fair representation, because the jury could have found that the settlement had left the striking pilots in a substantially worse position than would have been the case if the union had surrendered to the airline without a settlement (886 F2d 1438).

On certiorari, the United States Supreme Court reversed. In an opinion by Stevens, J., expressing the unanimous view of the court, it was held that (1) the rule that a union breaches its duty of fair representation if the union's actions are either arbitrary, discriminatory, or in bad faith, applies to all union activity, including not only contract administration and enforcement but also contract negotiation; (2) a union's actions are arbitrary, so as to constitute a breach of the duty of fair representation, only if--in light of the factual and legal landscape at the time of the union's actions--the union's behavior is so far outside a wide range of reasonableness as to be irrational; (3) under the circumstances, the union's agreement to settle the strike was not arbitrary, so as to constitute a breach of the duty of fair representation--even if it were to be assumed that the settlement was worse than the result that the union would have obtained by unilateral termination of the strike--because (a) the law existing at the time of the settlement was not clear that the positions in question were vacancies, or that the striking pilots had a right to such positions by virtue of having greater seniority than the nonstriking pilots, (b) it was rational for the union to recognize the possibility that an attempted voluntary return to work would merely precipitate litigation over the right to the positions in question, and that the airline might not abandon its bargaining position without a complete settlement, (c) the settlement at least produced certain and prompt access to a share of the new jobs and avoided the costs and risks associated with major litigation, and (d) the settlement was presumably viewed by a significant number of striking pilots as more advantageous than a surrender; and (4) the agreement to settle did not invidiously discriminate between striking and nonstriking pilots so as to constitute a breach of the union's duty of fair representation, since (a) it was rational, under the circumstances, for the union to accept a compromise between the claims of the two groups of pilots, and (b) the agreement did not permanently alter the seniority system.

## LAWYERS' EDITION HEADNOTES:

[***LEdHN1]

LABOR §39

union's duty of fair representation --

Headnote:[1A][1B][1C]

The rule that a union breaches its duty of fair representation if the union's actions are either arbitrary, discriminatory, or in bad faith, applies to all union activity, including not only contract administration and enforcement but also contract negotiation.

[***LEdHN2]

LABOR §39

union's duty of fair representation -- arbitrary action --

Headnote:[2A][2B]

With respect to a union's treatment of its members, the union's actions are arbitrary, so as to constitute a breach of the duty of fair representation, only if--in light of the factual and legal landscape at the time of the union's actions--the union's behavior is so far outside a wide range of reasonableness as to be irrational.

[***LEdHN3]

LABOR §22

collective bargaining -- court review of union's performance -- duty of fair representation --

Headnote:[3A][3B]

It is Congress' intent that the parties to a collective bargaining process should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences; any substantive examination by a court of a union's performance in the collective bargaining process must be highly deferential, in recognition of the wide latitude that negotiators need for the effective performance of their bargaining responsibilities, because (1) Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union, but rather (2) Congress

envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature; therefore, the final product of the bargaining process may constitute evidence of a breach of the union's duty of fair representation only if that product can be fairly characterized as so far outside a wide range of reasonableness that it is wholly irrational or arbitrary.

[***LEdHN4]

LABOR §39

representation by union --

Headnote:[4]

The exercise of a labor union's granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf.

[***LEdHN5]

ATTORNEYS §17

CORPORATIONS §101

LABOR §39

TRUSTS §34

union's duty of fair representation -- fiduciary duties --

Headnote:[5]

A union's duty of fair representation is akin to the duty owed by other fiduciaries to their beneficiaries; the fair representation duty parallels the responsibilities of corporate officers and directors toward shareholders; just as such fiduciaries as trustees, attorneys, and corporate officers and directors owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith.

[***LEdHN6]

LABOR §39

representation of employees -- range of reasonableness --

Headnote:[6]

The rule that a wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion, (1) does not limit review of a union's actions to a determination of the union's good faith and honesty of purpose, but rather (2) recognizes that a union's conduct must also be within a wide range of reasonableness.

[***LEdHN7]

LABOR §39

union's duty of fair representation -- strike settlement -- arbitrariness --

Headnote:[7A][7B][7C][7D]

An airline pilot union's agreement to settle a strike against an airline--under which agreement the striking pilots are offered the options of (1) settling all outstanding claims with the airline and participating with nonstriking pilots in the allocation of certain positions, (2) electing not to return to work and receiving severance pay, or (3) retaining their individual claims against the airline and becoming eligible to work only after the reinstatement of all the settling pilots--is not arbitrary, so as to constitute a breach of the union's duty of fair representation, even if it is assumed that the settlement is worse than the result that the union would have obtained by unilateral termination of the strike, where the airline has stated, prior to the time of the settlement, that all the positions in question have been awarded to nonstriking pilots and that none of the strikers have any claim on any of those jobs; viewed in light of the legal landscape at the time of the settlement, the union's decision to settle rather than surrender and voluntarily terminate the strike is by no means irrational, but rather is within the wide range of reasonableness that a union is allowed in its bargaining, where (1) the law existing at the time of the settlement is not clear that the positions in question are vacancies, or that the striking pilots have a right to such positions by virtue of having greater seniority than the nonstriking pilots, (2) given the background of determined resistance by the airline at all stages of the strike, it is rational for the union to recognize the possibility that an attempted voluntary return to work would merely precipitate litigation over the right to the positions in question, and

R000145

that the airline might not abandon its bargaining position without a complete settlement, (3) the settlement at least produces certain and prompt access to a share of the new jobs and avoids the costs and risks associated with major litigation, and (4) given that almost a third of the striking pilots have chosen the lump-sum severance payment rather than reinstatement, the settlement is presumably viewed by a significant number of striking pilots as more advantageous than a surrender.

[***LEdHN8]

COURTS §766

precedents --

Headnote:[8A][8B]

A case decided by the United States Court of Appeals for the Seventh Circuit does not control the outcome in a dispute in the United States Court of Appeals for the Fifth Circuit.

[***LEdHN9]

COURTS §767

rules of decision -- precedents -- limitation of authority -- labor cases --

Headnote:[9]

Cases decided under the National Labor Relations Act (NLRA) (*29 USCS 141 et seq.*) are not necessarily controlling in situations which are governed by the Railway Labor Act (RLA) (*45 USCS 151 et seq.*); thus, it is error for a United States Court of Appeals to assume that the law is clear that striking airline pilots have a right to certain positions by virtue of having greater seniority than crossover and replacement workers, where--although the case is governed by the RLA--the court relies solely on United States Supreme Court cases that interpret the NLRA.

[***LEdHN10]

LABOR §39

union's duty of fair representation -- strike settlement -- discrimination --

Headnote:[10]

An airline pilot union's agreement to settle a strike against an airline--under which agreement the striking pilots are offered the options of (1) settling all outstanding claims with the airline and participating with nonstriking pilots in the allocation of certain positions, (2) electing not to return to work and receiving severance pay, or (3) retaining their individual claims against the airline and becoming eligible to work only after the reinstatement of all the settling pilots--does not invidiously discriminate between striking and nonstriking pilots so as to constitute a breach of the union's duty of fair representation, where (1) it is rational, under the circumstances, for the union to accept a compromise between the claims of the two groups of pilots, and (2) the agreement does not permanently alter the seniority system but rather (a) provides the order and mechanism for the reintegration of the returning strikers, and (b) preserves the seniority of the striking pilots after their initial reinstatement.

## SYLLABUS

After Continental Airlines, Inc., filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, it repudiated its collective-bargaining agreement with petitioner Air Line Pilots Association, International (ALPA). An acrimonious strike ensued, during which Continental hired replacement pilots and reemployed several hundred crossover strikers. Two years into the strike, Continental announced in its "Supplementary Base Vacancy Bid 1985-5" (85-5 bid) that it would fill a large number of anticipated vacancies using a system that allows pilots to bid for positions and that, in the past, had assigned positions by seniority. Although ALPA authorized strikers to submit bids, Continental announced that all of the positions had been awarded to working pilots. ALPA and Continental then agreed to end the strike, dispose of some related litigation, and reallocate the positions covered by the 85-5 bid. Striking pilots were offered the option of settling all outstanding claims with Continental and participating in the 85-5 bid positions' allocations, electing not to return to work and receiving severance pay, or retaining their individual claims against Continental and becoming eligible to return to work only after all the settling pilots had been reinstated. Thus, striking pilots received some of the positions previously awarded to the working pilots. After the settlement, respondents, former striking pilots, filed suit in the District Court against ALPA, charging, *inter alia*, that the union had breached its duty of fair

representation. The court granted ALPA's motion for summary judgment, but the Court of Appeals reversed. It rejected ALPA's argument that a union cannot breach the fair representation duty without intentional misconduct, applying, instead, the rule announced in *Vaca v. Sipes, 386 U.S. 171*, that a union violates the duty if its actions are "arbitrary, discriminatory, or in bad faith," *id., at 190*. With respect to the test's first component, the court found that a nonarbitrary decision must be (1) based upon relevant permissible union factors, (2) a rational result of the consideration of those factors, and (3) inclusive of a fair and impartial consideration of all employees' interests. Applying that test, the court concluded that a jury could find that ALPA acted arbitrarily by negotiating a settlement less favorable than the consequences of a complete surrender to Continental, which the court believed would have left intact the striking pilots' seniority rights with regard to the 85-5 bid positions. It also found the existence of a material issue of fact whether the favored treatment of working pilots in the allocation of the 85-5 bid positions constituted discrimination against the strikers.

*Held*:

1. The tripartite standard announced in *Vaca v. Sipes, supra*, applies to a union in its negotiating capacity. See, *e. g., Communications Workers v. Beck, 487 U.S. 735, 743*. Thus, when acting in that capacity, the union is not, as ALPA contends, required only to act in good faith and treat its members equally and in a nondiscriminatory fashion. Rather, it also has a duty to act in a rational, nonarbitrary fashion to provide its members fair and adequate representation. See, *e. g., Vaca v. Sipes, supra, at 177*; *Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 202*. Pp. 73-77.

2. The final product of the bargaining process may constitute evidence of a breach of the fair representation duty only if, in light of the factual and legal landscape, it can be fairly characterized as so far outside of a "wide range of reasonableness," *Ford Motor Co. v. Huffman, 345 U.S. 330, 338*, that it is wholly "irrational" or "arbitrary." The Court of Appeals' refinement of the arbitrariness component authorizes more judicial review of the substance of negotiated agreements than is consistent with national labor policy. Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union. See, *e. g., NLRB v.*

*Insurance Agents, 361 U.S. 477, 488*. Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature. See *Steele, supra, at 198*. Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities. Cf., *e. g., Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 423*. P. 78.

3. The resolution of the dispute as to the 85-5 bid positions was well within the "wide range of reasonableness" that a union is allowed in its bargaining. Assuming that the union made a bad settlement, it was by no means irrational when viewed in light of the legal landscape at the time of the settlement. Given Continental's resistance during the strike, it would have been rational for ALPA to recognize that a voluntary return to work might have precipitated litigation over the strikers' right to the positions, and that Continental might not have abandoned its bargaining position without a settlement disposing of the pilots' individual claims. Thus, it would have been rational to negotiate a settlement that produced certain and prompt access to a share of the new jobs, avoided the costs and risks associated with major litigation, and was more favorable than a return to work for the significant number of pilots who chose severance. Any discrimination between striking and working pilots in the allocation of the 85-5 bid positions does not represent a breach of the duty, because, if it is correct that ALPA's decision to accept a compromise was rational, some form of allocation was inevitable. Cf. *Trans World Airlines, Inc. v. Flight Attendants, 489 U.S. 426*; *NLRB v. Erie Resistor Corp., 373 U.S. 221*, distinguished. Pp. 78-81.

**COUNSEL:** Laurence Gold argued the cause for petitioner. With him on the briefs were Harold G. Levison, Jed S. Rakoff, David Silberman, Gary Green, and John A. Irvine.

Marty Harper argued the cause for respondents. With him on the brief were John P. Frank, Allen R. Clarke, and Janet Napolitano. *

> * Briefs of amici curiae urging reversal were filed for the United States by Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Shapiro, and James A. Feldman; and for Continental Airlines, Inc., by John J.

R000147

499 U.S. 65, *; 111 S. Ct. 1127, **;
113 L. Ed. 2d 51, ***; 1991 U.S. LEXIS 1711

Gallagher and Charles L. Warren.

**JUDGES:** Stevens, J., delivered the opinion for a unanimous Court.

**OPINION BY:** STEVENS

**OPINION**

[*67] [***58] [**1130] JUSTICE STEVENS delivered the opinion of the Court.

[***LEdHR1A] [1A] [***LEdHR2A] [2A]We granted certiorari to clarify the standard that governs a claim that a union has breached its duty of fair representation in its negotiation of a back-to-work agreement terminating a strike. We hold that the rule announced in *Vaca v. Sipes, 386 U.S. 171, 190 (1967)* -- that a union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith" -- applies to all union activity, including contract negotiation. We further hold that a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness," *Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953)*, as to be irrational.

[*68] I

This case arose out of a bitter confrontation between Continental Airlines, Inc. (Continental), and the union representing its pilots, the Air Line Pilots Association, International (ALPA). On September 24, 1983, Continental filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Immediately thereafter, with the approval of the Bankruptcy Court, Continental repudiated its collective-bargaining agreement with ALPA and unilaterally reduced its pilots' salaries and benefits by more than half. ALPA responded by calling a strike that lasted for over two years. See *886 F. 2d 1438, 1440 (CA5 1989)*.

Of the approximately 2,000 pilots employed by Continental, all but about 200 supported the strike. By the time the strike ended, about 400 strikers had "crossed over" and been accepted for reemployment in order of reapplication. App. to Brief for Continental Airlines, Inc., as *Amicus Curiae* A11, and n. 8. By trimming its operations and hiring about 1,000 replacements, Continental was able to continue in business. By August

1985, there were 1,600 working pilots and only 1,000 strikers. *886 F. 2d, at 1440.*

The strike was acrimonious, punctuated by incidents of violence and the filing of a variety of law suits, charges, and countercharges. In August 1985, Continental notified ALPA that it was withdrawing recognition of ALPA as the collective-bargaining agent for its pilots. ALPA responded with a federal lawsuit alleging that Continental was unlawfully refusing to continue negotiations for a new collective-bargaining agreement. In this adversary context, on September 9, 1985, Continental posted its "Supplementary Base Vacancy Bid 1985-5" (85-5 bid) -- an act that precipitated not only an end to the strike, but also the litigation that is now before us. *Ibid.*

For many years Continental had used a "system bid" procedure for assigning pilots to new positions. [***59] Bids were typically [*69] posted well in advance in order to allow time [**1131] for necessary training without interfering with current service. When a group of vacancies was posted, any pilot could submit a bid specifying his or her preferred position (captain, first officer, or second officer), base of operations, and aircraft type. *Ibid.* In the past, vacant positions had been awarded on the basis of seniority, determined by the date the pilot first flew for Continental. The 85-5 bid covered an unusually large number of anticipated vacancies -- 441 future captain and first officer positions and an undetermined number of second officer vacancies. Pilots were given nine days -- until September 18, 1985 -- to submit their bids. *Id., at 1441.*

Fearing that this bid might effectively lock the striking pilots out of jobs for the indefinite future, ALPA authorized the strikers to submit bids. Several hundred did so, as did several hundred working pilots. Although Continental initially accepted bids from both groups, it soon became concerned about the bona fides of the striking pilots' offers to return to work at a future date. It therefore challenged the strikers' bids in court and announced that all of the 85-5 bid positions had been awarded to working pilots. *Ibid.*

At this juncture, ALPA intensified its negotiations for a complete settlement. ALPA's negotiating committee and Continental reached an agreement, which was entered as an order by the Bankruptcy Court on October 31, 1985. See App. 7-41. The agreement provided for an end to the strike, the disposition of all pending litigation,

R000148

and reallocation of the positions covered by the 85-5 bid. See *id.*, at 10-34.

The agreement offered the striking pilots three options. Under the first, pilots who settled all outstanding claims with Continental were eligible to participate in the allocation of the 85-5 bid positions. Under the second option, pilots who elected not to return to work received severance pay of $ 4,000 per year of service (or $ 2,000 if they had been furloughed [*70] before the strike began). [1] Under the third option, striking pilots retained their individual claims against Continental and were eligible to return to work only after all the first option pilots had been reinstated. See *886 F. 2d., at 1441-1442.*

> [1] In its *amicus curiae* brief, Continental states that the 366 pilots who elected option 2 received $ 17.3 million, an average of over $ 47,000 per pilot. See Brief for Continental Airlines, Inc., as *Amicus Curiae* 9.

Pilots who chose the first option were thus entitled to some of the 85-5 bid positions that, according to Continental, had previously been awarded to working pilots. The first 100 captain positions were allocated to working pilots and the next 70 captain positions were awarded, in order of seniority, to returning strikers who chose option one. App. 13. Thereafter, striking and nonstriking pilots were eligible for captain positions on a 1-to-1 ratio. *Id.*, at 13-14. The initial base and aircraft type for a returning striker was assigned by Continental, but the assignments for working pilots were determined by their bids. *886 F. 2d, at 1441.* After the initial assignment, future changes in bases and equipment were determined by seniority, and striking pilots who were in active service when the strike began received  [***60] seniority credit for the period of the strike. See App. 22.

II

Several months after the settlement, respondents, as representatives of a class of former striking pilots, brought this action against ALPA. See App. 1. In addition to raising other charges not before us, respondents alleged that the union had breached its duty of fair representation in negotiating and accepting the settlement. [2] [**1132] After extensive discovery, [*71] ALPA filed a motion for summary judgment. See *id.*, at 3. Opposing that motion, respondents identified four alleged breaches of duty, including the claim that "ALPA

negotiated an agreement that arbitrarily discriminated against striking pilots." [3]

> 2   The complaint included four counts: breach of the duty of fair representation, violation of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), *29 U. S. C. § 411 et seq.*, breach of fiduciary duty in violation of the LMRDA, and breach of contract. See App. 47-56. The District Court granted summary judgment for petitioners on all counts, *id.*, at 72-77, but respondents appealed only on the first two counts, see *886 F.2d 1438, 1442 (CA5 1989).* The Court of Appeals affirmed the summary judgment on the LMRDA count, *id., at 1448,* and respondents did not seek our review of this decision. Therefore, only the fair representation claim is before us.
>
> 3   The Court of Appeals described respondents' claims as follows:
>
> "The O'Neill Group asserted that the duty of fair representation had been breached by ALPA and various ALPA officers because (1) ALPA failed to allow ratification of the agreement and misrepresented the facts surrounding the negotiations to avoid a ratification vote; (2) ALPA negotiated an agreement that arbitrarily discriminated against striking pilots, including the O'Neill Group; (3) ALPA and various ALPA officers misrepresented to retired and resigned pilots that they would be included in any settlement; and (4) defendants were compelled by motives of personal gain, namely self-interest and political motivations." *Id., at 1442.*

The District Court granted the motion, relying alternatively on the fact that the Bankruptcy Court had approved the settlement and on its own finding that, even if the October 31 settlement was merely a private agreement, ALPA did not breach its duty of fair representation. In his oral explanation of his ruling, the District Judge opined that "the agreement that was achieved looks atrocious in retrospect, but it is not a breach of fiduciary duty badly to settle the strike." App. 75.

The Court of Appeals reversed. *886 F. 2d 1438 (CA5 1989).* It first rejected ALPA's argument that a union cannot breach its duty of fair representation without intentional misconduct. The court held that the

duty includes "'three distinct'" components. *Id., at 1444* (quoting *Tedford v. Peabody Coal Co., 533 F. 2d 952, 957, n. 6 (CA5 1976))*. A union breaches the duty if its conduct is "'arbitrary, discriminatory, or in bad faith.'" *886 F. 2d, at 1444* (quoting *Vaca v. Sipes, 386 U.S., at 190*). With respect to the arbitrariness [*72] component, the Court of Appeals followed Fifth Circuit precedent, stating:

> "'We think a decision to be non-arbitrary must be (1) based upon relevant, permissible union factors which excludes the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) *a rational result of the consideration of these factors*; and (3) inclusive of a fair and [***61] impartial consideration of the interests of all employees.'" *886 F. 2d, at 1444* (quoting *Tedford, 533 F. 2d, at 957*) (footnotes omitted and emphasis added by the Court of Appeals).

Applying this arbitrariness test to the facts of this case, the Court of Appeals concluded that a jury could find that ALPA acted arbitrarily because the jury could find that the settlement "left the striking pilots worse off in a number of respects than complete surrender to [Continental]." *886 F. 2d, at 1445*. That conclusion rested on the court's opinion that the evidence suggested that, if ALPA had simply surrendered and made an unconditional offer to return to work, the strikers would have been entitled to complete priority on all the positions covered by the 85-5 bid. [4] Relying on a District Court decision in litigation between ALPA and another airline, [5] the court rejected ALPA's argument that the 85-5 bid positions were arguably not vacancies because they had already been assigned to working pilots. *Id., at 1446*. In [**1133] addition, the Court of Appeals ruled that the evidence raised [*73] a genuine issue of material fact whether the favored treatment of working pilots in the allocation of 85-5 bid positions constituted discrimination against those pilots who had chosen to strike. *Id., at 1446-1447*.

[4] "Accepting the pilots' evidence as true as we are required to do, a jury could reasonably

conclude that if ALPA had unconditionally offered to return the pilots to duty, [Continental] likely would have returned striking pilots to work according to seniority, and would have permitted strikers to bid for vacancies according to Continental's seniority-based assignment procedures." *Id., at 1446*.

[5] *Air Line Pilots Assn. Int'l v. United Air Lines, Inc., 614 F. Supp. 1020 (ND Ill. 1985)*, aff'd in relevant part, *Air Line Pilots Assn., Int'l v. United Air Lines, Inc., 802 F. 2d 886 (CA7 1986)*, cert. denied, *480 U.S. 946 (1987)*.

The court held that respondents had raised a jury question whether ALPA had violated its duty to refrain from "arbitrary" conduct, and the court therefore remanded the case for trial. *Id., at 1448-1449*. Because it reversed the District Court's grant of summary judgment on the arbitrariness component, the Court of Appeals did not decide whether summary judgment on the fair representation claim might be precluded by the existence of other issues of fact. [6]

[6] Respondents also argued that a jury could find that ALPA acted in bad faith. See n. 3, *supra*. Although we conclude below that the Court of Appeals erred in reversing summary judgment on the arbitrariness component, see Part IV, *infra*, we express no opinion on whether respondents have put forth a triable issue concerning whether ALPA acted in bad faith.

We granted certiorari to review the Court of Appeals' statement of the standard governing an alleged breach of a union's duty of fair representation and the court's application of the standard in this case. *498 U.S. 806 (1990)*.

III

ALPA's central argument is that the duty of fair representation requires only that a union act in good faith and treat its members equally and in a nondiscriminatory fashion. The duty, the union argues, does not impose any obligation to provide *adequate* representation. The District Court found that there was no evidence that ALPA acted other than in good faith and without discrimination. [7] [***62] Because of its view of the limited scope of the duty, ALPA contends that the District [*74] Court's finding, which the Court of Appeals did not question, is sufficient to support

summary judgment.

7 "There is nothing to indicate that the Union made any choices among the Union members or the strikers who were not Union members other than on the best deal that the Union thought it could construct; that the deal is somewhat less than not particularly satisfactory is not relevant to the issue of fair representation." App. 74.

[***LEdHR3A] [3A]The union maintains, not without some merit, that its view that courts are not authorized to review the rationality of good-faith, nondiscriminatory union decisions is consonant with federal labor policy. The Government has generally regulated only "the *process* of collective bargaining," *H. K. Porter Co. v. NLRB, 397 U.S. 99, 102 (1970)* (emphasis added), but relied on private negotiation between the parties to establish "their own charter for the ordering of industrial relations," *Teamsters v. Oliver, 358 U.S. 283, 295 (1959).* As we stated in *NLRB v. Insurance Agents, 361 U.S. 477, 488 (1960),* Congress "intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences." See also *Carbon Fuel Co. v. Mine Workers, 444 U.S. 212, 219 (1979).*

[***LEdHR4] [4]There is, however, a critical difference between governmental modification of the terms of a private agreement and an examination of those terms in search for evidence that a union did not fairly and adequately represent its constituency. Our decisions have long recognized that the need for such an examination proceeds directly from the union's statutory role as exclusive bargaining agent. "The exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf." *Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 202 (1944).*

[**1134] [***LEdHR5] [5]The duty of fair representation is thus akin to the duty owed by other fiduciaries to their beneficiaries. For example, some Members of the Court have analogized the duty a union owes to the employees it represents to the duty a trustee owes to trust beneficiaries. See *Teamsters v. Terry, 494 U.S. 558, 567-568 (1990); id., at 584-588* (Kennedy, J., dissenting). Others have likened the relationship between union and employee to that between attorney and client. [*75] See *id., at 582* (Stevens, J., concurring in part and

concurring in judgment). The fair representation duty also parallels the responsibilities of corporate officers and directors toward shareholders. Just as these fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith. See, *e. g., Restatement (Second) of Trusts § 174 (1959)* (trustee's duty of care); *Strickland v. Washington, 466 U.S. 668, 686 (1984)* (lawyer must render "adequate legal assistance"); *Hanson Trust PLC v. ML SCM Acquisition Inc., 781 F. 2d 264, 274 [***63] (CA2 1986)* (directors owe duty of care as well as loyalty).

ALPA suggests that a union need owe no enforceable duty of adequate representation because employees are protected from inadequate representation by the union political process. ALPA argues, as has the Seventh Circuit, that employees "do not need . . . protection against representation that is inept but not invidious" because if a "union does an incompetent job . . . its members can vote in new officers who will do a better job or they can vote in another union." *Dober v. Roadway Express, Inc., 707 F. 2d 292, 295 (CA7 1983).* In *Steele,* the case in which we first recognized the duty of fair representation, we also analogized a union's role to that of a legislature. See *323 U.S., at 198.* Even legislatures, however, are subject to *some* judicial review of the rationality of their actions. See, *e. g., United States v. Carolene Products Co., 304 U.S. 144 (1938); Department of Agriculture v. Moreno, 413 U.S. 528 (1973).*

[***LEdHR6] [6]ALPA relies heavily on language in *Ford Motor Co. v. Huffman, 345 U.S. 330 (1953),* which, according to the union, suggests that no review of the substantive terms of a settlement between labor and management is permissible. In particular, ALPA stresses our comment in the case that "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of [*76] purpose in the exercise of its discretion." *Id., at 338.* Unlike ALPA, we do not read this passage to limit review of a union's actions to "good faith and honesty of purpose," but rather to recognize that a union's conduct must also be within "[a] wide range of reasonableness."

Although there is admittedly some variation in the way in which our opinions have described the unions' duty of fair representation, we have repeatedly identified