three components of the duty, including a prohibition against "arbitrary" conduct. Writing for the Court in the leading case in this area of the law, Justice White explained:

"The statutory duty of fair representation was developed over 20 years ago in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act, see *Steele v. Louisville & N.R. Co., 323 U.S. 192*; *Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210*, and was soon extended to unions certified under the N. L. R. A., see *Ford Motor Co. v. Huffman, supra*. Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion [**1135] with complete good faith and honesty, and to avoid arbitrary conduct. *Humphrey v. Moore, 375 U.S., at 342*. It is obvious that Owens' complaint alleged a breach by the Union of a duty grounded in federal statutes, and that federal law therefore governs his cause of action." [***64] *Vaca v. Sipes, 386 U.S., at 177*.

This description of the "duty grounded in federal statutes" has been accepted without question by Congress and in a line of our decisions spanning almost a quarter of a century. [8]

8   See, *e. g., Teamsters v. Terry, 494 U.S. 558, 563 (1990); Electrical Workers v. Foust, 442 U.S. 42, 47 (1979); Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 564 (1976)*.

[*77]   [***LEdHR1B]   [1B]The union correctly points out, however, that virtually all of those cases can be distinguished because they involved contract administration or enforcement rather than contract negotiation. ALPA argues that the policy against substantive review of contract terms applies directly only in the negotiation area. Although this is a possible basis for distinction, none of our opinions has suggested that

the duty is governed by a double standard. Indeed, we have repeatedly noted that the *Vaca* v. *Sipes* standard applies to "challenges leveled not only at a union's contract administration and enforcement efforts but at its negotiation activities as well." *Communications Workers v. Beck, 487 U.S. 735, 743 (1988)* (internal citation omitted); see also *Electrical Workers v. Foust, 442 U.S. 42, 47 (1979); Vaca v. Sipes, 386 U.S., at 177*. We have also held that the duty applies in other instances in which a union is acting in its representative role, such as when the union operates a hiring hall. See *Breininger v. Sheet Metal Workers, 493 U.S. 67, 87-89 (1989)*.

We doubt, moreover, that a bright line could be drawn between contract administration and contract negotiation. Industrial grievances may precipitate settlement negotiations leading to contract amendments, and some strikes and strike settlement agreements may focus entirely on questions of contract interpretation. See *Conley v. Gibson, 355 U.S. 41, 46 (1957); Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581 (1960)*. Finally, some union activities subject to the duty of fair representation fall into neither category. See *Breininger, 493 U.S., at 87-89*.

[***LEdHR1C]   [1C]   [***LEdHR2B]   [2B]We are, therefore, satisfied that the Court of Appeals correctly concluded that the tripartite standard announced in *Vaca* v. *Sipes* applies to a union in its negotiating capacity. We are persuaded, however, that the Court of Appeals' further refinement of the arbitrariness component of the standard authorizes more judicial review of the substance of negotiated agreements than is consistent with national labor policy.

[*78]   [***LEdHR3B]   [3B]As we acknowledged above, Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union. Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature. Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining [***65] responsibilities. Cf.  *Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 423 (1952)* (court does "not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare"); *United*

*States v. Carolene Products, 304 U.S., at 154* [**1136] (where "question is at least debatable," "decision was for Congress"). For that reason, the final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a "wide range of reasonableness," *Ford Motor Co. v. Huffman, 345 U.S., at 338,* that it is wholly "irrational" or "arbitrary."

[***LEdHR7A] [7A]The approach of the Court of Appeals is particularly flawed because it fails to take into account either the strong policy favoring the peaceful settlement of labor disputes, see, *e. g., Groves v. Ring Screw Works, Ferndale Fastener Div., 498 U.S. 168, 174 (1990),* or the importance of evaluating the rationality of a union's decision in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made. As we shall explain, these factors convince us that ALPA's agreement to settle the strike was not arbitrary for either of the reasons posited by the Court of Appeals.

IV

The Court of Appeals placed great stress on the fact that the deal struck by ALPA was worse than the result the union would have obtained by unilateral termination of the strike. Indeed, the court held that a jury finding that the settlement [*79] was worse than surrender could alone support a judgment that the union had acted arbitrarily and irrationally. See *886 F. 2d, at 1445-1446.* This holding unduly constrains the "wide range of reasonableness," *345 U.S., at 338,* within which unions may act without breaching their fair representation duty.

For purposes of decision, we may assume that the Court of Appeals was correct in its conclusion that, if ALPA had simply surrendered and voluntarily terminated the strike, the striking pilots would have been entitled to reemployment in the order of seniority. Moreover, we may assume that Continental would have responded to such action by rescinding its assignment of all of the 85-5 bid positions to working pilots. After all, it did rescind about half of those assignments pursuant to the terms of the settlement. Thus, we assume that the union made a bad settlement -- one that was even worse than a unilateral termination of the strike.

Nevertheless, the settlement was by no means irrational. A settlement is not irrational simply because it turns out *in retrospect* to have been a bad settlement.

Viewed in light of the legal landscape at the time of the settlement, ALPA's decision to settle rather than give up was certainly not illogical. At the time of the settlement, Continental had notified the union that all of the 85-5 positions had been awarded to working pilots and was maintaining that none of the strikers had any claim on any of those jobs.

[***LEdHR7B] [7B] [***LEdHR8A] [8A]A comparable position had been asserted by United Air Lines in litigation in the Northern District of [***66] Illinois. [9] Because the District Court in that case had decided that such vacancies were not filled until pilots were trained and actually working in their new assignments, the Court of Appeals here concluded that the issue had been resolved in ALPA's favor when it agreed to the settlement with Continental. See *886 F. 2d, at 1446.* But this reasoning overlooks the fact [*80] that the validity of the District Court's ruling in the other case was then being challenged on appeal. [10]

9  *Air Line Pilots Assn. Int'l v. United Air Lines, Inc., 614 F. Supp. 1020 (ND Ill. 1985).*
10  [***LEdHR8B] [8B]

Even if the Seventh Circuit had already affirmed the District Court's holding in the *United Air Lines* case, the Court of Appeals would have erred in its conclusion that the law was so assuredly in ALPA's favor that the settlement was irrational. First, a Seventh Circuit case would not have controlled the outcome in this dispute, which arose in the Fifth Circuit. Second, even if the *United Air Lines* decision had been a Fifth Circuit case, it was factually distinguishable and therefore might not have dictated the outcome regarding the 85-5 bid positions. In *United Air Lines,* the Seventh Circuit affirmed on the basis of the District Court's finding that the carrier's action was taken in bad faith, motivated by antiunion animus. *802 F. 2d, at 898; 614 F. Supp., at 1046.* An equivalent finding was by no means certain in this case.

[**1137] [***LEdHR7C] [7C] [***LEdHR9] [9]Moreover, even if the law had been clear that the 85-5 bid positions were vacancies, the Court of Appeals erroneously assumed that the existing law was also clarion that the striking pilots had a right to those vacancies because they had more seniority than the crossover and replacement workers. The court relied for

R000153

the latter proposition solely on our cases interpreting the National Labor Relations Act. See *886 F. 2d, at 1445.* We have made clear, however, that National Labor Relations Act cases are not necessarily controlling in situations, such as this one, which are governed by the Railway Labor Act. See *Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 383 (1969).*

[***LEdHR7D] [7D]Given the background of determined resistance by Continental at all stages of this strike, it would certainly have been rational for ALPA to recognize the possibility that an attempted voluntary return to work would merely precipitate litigation over the right to the 85-5 bid positions. Because such a return would not have disposed of any of the individual claims of the pilots who ultimately elected option one or option two of the settlement, there was certainly a realistic possibility that Continental would not abandon its bargaining position without a complete settlement.

[*81] At the very least, the settlement produced certain and prompt access to a share of the new jobs and avoided the costs and risks associated with major litigation. Moreover, since almost a third of the striking pilots chose the lump-sum severance payment rather than reinstatement, see n. 1, *supra,* the settlement was presumably more advantageous than a surrender to a significant number of striking pilots. In labor disputes, as in other kinds of litigation, even a bad settlement may be more advantageous in the long run than a good lawsuit. In all events, the resolution of the dispute over the 85-5 bid vacancies was well within the "wide range of reasonableness," *345 U.S., at 338,* that a union is allowed in its bargaining.

[***LEdHR10] [10]The suggestion that the "discrimination" [***67] between striking and working pilots represented a breach of the duty of fair representation also fails. If we are correct in our conclusion that it was rational for ALPA to accept a compromise between the claims of the two groups of pilots to the 85-5 bid positions, some form of allocation was inevitable. A rational compromise on the initial allocation of the positions was not invidious "discrimination" of the kind prohibited by the duty of fair representation. Unlike the grant of "super-seniority" to the crossover and replacement workers in *NLRB v. Erie Resistor Corp., 373 U.S. 221 (1963),* this agreement preserved the seniority of the striking pilots after their initial reinstatement. In *Erie,* the grant of extra seniority

enabled the replacement workers to keep their jobs while more senior strikers lost theirs during a layoff subsequent to the strike. See *id., at 223-224.* The agreement here only provided the order and mechanism for the reintegration of the returning strikers but did not permanently alter the seniority system. This case therefore more closely resembles our decision in *Trans World Airlines, Inc. v. Flight Attendants, 489 U.S. 426 (1989),* in which we held that an airline's refusal, after a strike, to displace crossover workers with more senior strikers was not unlawful discrimination.

[*82] The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

## REFERENCES

*48 Am Jur 2d, Labor and Labor Relations 398- 400, 407, 1151, 1152*

23 Federal Procedure, L Ed, Labor and Labor Relations 52:2013-52:2019

15 Am Jur Proof of Facts 2d 65, Union's Breach of Duty of Fair Representation

*29 USCS 141 et seq.; 45 USCS 151 et seq.*

RIA Employment Coordinator LR-44,841--LR-44,843, LR-44,859

L Ed Digest, Labor 39

L Ed Index, Arbitrary Acts or Matters; Labor and Employment

Index to Annotations, Arbitrariness; Labor and Employment

Annotation References:

Union's duty of fair representation in merging seniority lists. *42 ALR Fed 69.*

Preferential treatment as respects seniority of replacement or non-striking employees ,or returning strikers, as unfair labor practice. *94 ALR2d 1161.*

499 U.S. 65, *82; 111 S. Ct. 1127, **1137;
113 L. Ed. 2d 51, ***67; 1991 U.S. LEXIS 1711

Validity and construction of labor contract provision modifying or destroying seniority rights under prior contract. *90 ALR2d 1003*.

R000155



1 of 100 DOCUMENTS

In the Matter of HUGHES TOOL COMPANY and UNITED STEELWORKERS OF
AMERICA LOCALS NOS. 1742 AND 2457, C. I. O.

Case No. 16-C-1018.

NATIONAL LABOR RELATIONS BOARD

*56 N.L.R.B. 981; 1944 NLRB LEXIS 2457; 14 L.R.R.M. 165; 56 NLRB No. 174*

May 27, 1944

**JUDGES:** Chairman Millis took no part in the consideration of the above Decision and Order.

**OPINION:**
[**1]  DECISION AND ORDER n1

n1 On August 8, 1944, the Board issued an Order Amending Decision which is incorporated herein.

[*981]  On April 15, 1944, the Trial Examiner issued his Intermediate Report in the above-entitled proceeding, finding that the respondent had engaged in certain unfair labor practices, and recommending that it cease and desist from the unfair labor practices found and take certain affirmative action, as set out in the copy of the Intermediate Report attached hereto. Thereafter, the respondent filed exceptions to the Intermediate Report; the Independent filed exceptions and a supporting brief; and the Union filed an answering brief. Oral argument, in which only the Union participated, was held before the Board in Washington, D. C., on May 18, 1944. The Board has considered the rulings of the Trial Examiner at the hearing and finds that no prejudicial error was committed. The rulings are hereby affirmed. The Board has considered the Intermediate Report, the respondent's exceptions, the Independent's brief and exceptions, the Union's answering brief, and the entire record in the  [**2]  case, and hereby adopts the findings, conclusions, and recommendations of the Trial Examiner, with the exceptions and qualifications set forth below.

1. We agree with the conclusion of the Trial Examiner that the respondent, under the facts shown by the record and set forth in the Intermediate Report, has refused to bargain with the Union as the exclusive representative of its employees within the appropriate units by the following acts, considered separately and collectively: (1) by according minority unions the right to present and negotiate the adjustment of grievances for their members, (2) by adjusting grievances of individual employees without affording the Union as the exclusive bargaining representative the opportunity to negotiate respecting their disposition, and (3) by granting check-off privileges to the Independent. We do not believe, however, that the Trial  [*982]  Examiner has stated with sufficient clarity the respective rights of the individual employee and groups of employees and of the exclusive bargaining representative with respect to the presentation and adjustment of grievances.

The Act confers on the representative selected by a majority of the employees in [**3]  an appropriate unit the exclusive right to negotiate and contract in behalf of *all* employees in the unit concerning rates of pay, wages, hours of employment, and other conditions of employment. It thus grants to the exclusive representative the right to contract in behalf of *all* employees respecting the procedure by which grievances are to be presented and adjusted. n2 Prior to the execution of a collective bargaining contract between the statutory representative and the employer, any adjustment of a "grievance" constitutes both the establishment of a mode of handling grievances and bargaining respecting a condition

of employment. The Act makes it clear that the right to bargain collectively concerning the establishment of a grievance procedure and to conduct all bargaining for each and every employee in the unit is vested solely in the statutory representative. After the execution of a contract, any adjustment of a grievance constitutes, if the subject matter involved is dealt with in the contract, an interpretation and application of the contract, or, if the subject matter is not dealt with in the contract, bargaining respecting a condiction of employment. Again it is clear [**4] that these rights are vested exclusively in the statutory representative. The interpretation and application of the terms of a contract and the establishment of precedents involved in the adjustment of grievances are often as important, or more important, than the original collective bargaining which led to the signing of the contract. The statutory representative is exclusively entitled to negotiate concerning such interpretation, application, and precedents. No labor organization other than the representative designated by the majority is entitled to deal with the employer concerning any of these matters respecting employees within the unit.

n2 Cf. *Atlantic Coast Line R. Co. v. Pope, 119 F. (2d) 39* (C. C. A. 4), so construing the analogous provisions of the Railway Labor Act.

We interpret the proviso to Section 9 (a) of the Act to mean that individual employees and groups of employees are permitted "to present grievances to their employer" by appearing in behalf of themselves--although [**5] not through any labor organization other than the exclusive representative--at every stage of the grievance procedure, but that the exclusive representative is entitled to be present and negotiate at each such stage concerning the disposition to be made of the grievance. If, at any level of the established grievance procedure, there is an agreement between the employer, the exclusive representative, and the individual or group, disposition of the grievance is thereby [*983] achieved. Failing agreement of all three parties, any dissatisfied party may carry the grievance through subsequent machinery until the established grievance procedure is exhausted.

The individual employee or group of employees cannot present grievances under any procedure except that provided in the contract, where there exists a collective agreement. At each step in the grievance procedure, where the contract provides for presentation by a union representative, as does the Union's contract in this case above the foreman level, the individual employee or group of employees has the right to present his or its grievance in person, with the union representative being present to negotiate with the employer representative [**6] concerning the disposition to be made of the grievance. Where there has been no grievance machinery provided by agreement between the employer and the statutory representative, the employer must bargain in good faith with the representative respecting the procedure to be followed. Only where the exclusive representative refuses to attend meetings, as prescribed in the grievance procedures established, for the purpose of negotiating in regard to the disposition of grievances presented by individuals or groups of employees, or otherwise refuses to participate in the disposition of such grievances, may the employer meet with the individuals or groups of employees alone and adjust the grievances. And any adjustment so effectuated must be consistent in its substantive aspects with the terms of any agreement which the employer may have made with the exclusive representative. Where the steps provided in the contract have been exhausted and after good faith negotiations the employer and the exclusive representative reach an impasse concerning the disposition of any grievance for which the contract does not provide arbitration or other solution, the employer is free to dispose of the grievance, [**7] provided, of course, that any such adjustment of the grievance is consistent in its substantive aspects with the terms of any outstanding contract between the employer and the exclusive representative.

We find that within 2 weeks of its certification of December 26, 1942, for the Main Plant and Aircraft Strut Plant, the Union requested the respondent to cease treating with the Independent respecting grievances and asked that "no disposition be made of any grievance unless and until" the Union was "called in." The respondent by a letter dated January 6, 1943, refused to grant these requests. On April 6, 1943, the respondent and the Union entered into a contract setting forth a specific grievance procedure which provides for the presence of a representative of the Union at each stage of the grievance procedure above the foreman level and which provides even at this level that "whenever the [Union] so desires, it may have present any of its representatives." Despite the fact that the Union [*984] was certified

as the exclusive bargaining representative on December 26, 1942, the respondent, at all times thereafter, both prior and subsequent to the signing of the contract with the Union, [**8] has continued to accord to minority unions recognition as the representative of their members for the purpose of presenting and adjusting grievances; has bargained collectively with such minority unions; has paid representatives of minority unions for time spent with the respondent in handling grievances for their members; and at the hearing before the Board in February 1944, stated that it believed it had the right to engage in such conduct and was still doing so. In each of these respects the respondent violated its duty to accord exclusive recognition to the Union. Moreover, following the certification of December 26, 1942, the respondent, both prior and subsequent to the signing of the contract with the Union, persisted in negotiating and adjusting grievances of individual employees in disregard of the Union's request to be "called in." In so doing the respondent violated its duty to treat with the Union as the exclusive bargaining representative in that it unilaterally established a grievance procedure with respect to handling grievances of individuals; in that following the signing of the contract it ignored the grievance procedure therein contained; and in that it effected [**9] adjustments of grievances without affording the Union an opportunity to be present and negotiate in respect thereto.

On December 13, 1943, the Board certified the Union as the exclusive representative for the respondent's Dickson Gun plant. Although no written agreement between the respondent and the Union concerning this plant has been signed, respondent has, with respect to this plant, treated with minority unions and adjusted grievances of individuals in violation of its duty to the Union in the same manner as described above respecting the Main plan and Aircraft Strut plant.

2. The Trial Examiner properly rejected offers of proof made by the respondent and the Independent to the effect that the Union has refused to present grievances for employees who are not members of the Union. We believe that the proffered evidence is immaterial to the issues raised in this proceeding, but not for the reasons stated by the Trial Examiner. n3 Suffice it to say that the rights of the individual employees or groups of employees, as described above, to present grievances on their own behalf affords adequate protection for their interests. Accordingly, the failure or refusal of the Union to present [**10] grievances for an individual or group of individuals does not operate to deprive the Union of its rights under the Act as set forth herein.

n3 Footnote 6 of the Intermediate Report, and lines 14 and 15 page 7, being the last sentence of the third paragraph of Section III C, reading as follows: "The right to see that a grievance is presented by the recognized representative for the employer's consideration is not an empty right," are not adopted by the Board and are hereby deleted.

[*985]  3. We are convinced, upon a consideration of all the facts, that the appropriate remedy in the circumstances of this case is to order the respondent to bargain collectively with the Union. In reaching this conclusion, we have given careful consideration to the fact that the Independent, prior to the issuance of the complaint, had claimed to represent a majority of the employees in the Main and Aircraft Strut plant unit, as well as to the fact that when the Independent was the certified representative at the Main plant the respondent [**11] accorded the Union recognition as a minority representative in substantially the same manner as it has since recognized the Independent. In our view, however, neither of these circumstances warrants a departure from the normal remedy which we apply in cases where there has been a refusal to bargain. The respondent, having failed to fulfill its obligations, is in no position to object to an order requiring it to accord the Union its rightful status under Section 8 (5) of the Act. The employees, having been denied a fair test of the collective bargaining contemplated by the Act, are presently not in a position to exercise a free and untrammeled choice as to bargaining representatives. The conditions of a free choice will be restored when, but only when, the employees are given a practical assurance that the respondent will accord their representative its rightful place, as demonstrated by the respondent's ceasing to engage in the practices herein found to be violative of the Act and by good faith bargaining with the Union for a reasonable period, including treating with the Union respecting all grievances in the manner described herein. See *Franks Bros. Co.* v. *N. L. R. B.*, decided [**12] by the Supreme Court April 10, 1944. Any benefits which may accrue to the Union and any claimed deprivation to the Independent, as the

result of our bargaining order, are wholly incidental to the purpose of the order and arise solely from the circumstance that it was the Union, during its tenure as exclusive representative, rather than the Independent, during its tenure, which brought the matters considered in this case before us for adjudication.

ORDER

Upon the entire record in the case, and pursuant to Section 10 (c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Hughes Tool Company, Houston, Texas, and its officers, agents, successors, and assigns, shall:

1. Cease and desist from:

(a) Refusing to bargain collectively with United Steelworkers of America, Locals Nos. 1742 and 2457, affiliated with the Congress of Industrial Organizations, 1) as the exclusive representatives of all production and maintenance employees of Hughes Tool Company, Houston, Texas, at its Main plant and Aircraft Strut plant, including Class C colored employees in the maintenance department and those [*986] assigned to the general machine shop [**13] and inspection department; cafeteria employees; janitors, janitresses, and matrons; Class C colored common laborers working in the forge shop and in the heat-treat and foundry-shop departments; employees classified on the respondent's books as F and E employees; the colored employees working in the pattern shop; shipping-department employees; material control-department employees; shop clerks; machinists, mechanics, helpers, and laborers attached to the engineering department; the colored truck drivers in the maintenance department; and station wagon drivers; but excluding executives, supervisory, clerical, office, and professional employees; printing shop employees; personnel-department employees; sales-department employees other than those employed in the shipping department; accounting-department employees other than shop clerks; day office porters; garage employees; parking lot girls; production-department employees; and engineers, draftsmen, chemists, metallurgists, and clerical employees of the engineering department; and 2) as the exclusive representatives of all production and maintenance employees of Hughes Tool Company, Houston, Texas, at its Dickson Gun plant, including [**14] janitors and janitresses; shipping department employees; shop clerks; machinists, mechanics, helpers and laborers attached to the engineering department; truck drivers in the maintenance department, office porters, cafeteria employees; garage employees; but excluding executives, clerical, office and professional employees; printing shop employees; personnel department employees, sales department employees other than those employed in the shipping department; accounting department employees other than shop clerks; parking lot girls; production department employees; engineers and draftsmen; chemists; metallurgists; clerical employees of the engineering department; and any supervisory employees with authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees, or effectively recommend such action;

(b) Engaging in any like or related acts or conduct interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining [**15] or other mutual aid or protection, as guaranteed in Section 7 of the Act.

2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

(a) Upon request, bargain collectively with United Steelworkers of America, Locals Nos. 1742 and 2457, affiliated with the Congress of Industrial Organizations, as the exclusive representatives of all the respondent's employees included in the appropriate units described [*987] in paragraph 1 (a) of this Order, with respect to rates of pay, wages, hours of employment, and other terms and conditions of employment;

(b) Notify all its employees included in the appropriate units described in paragraph 1 (a) above, that its practice of adjusting and settling grievances through negotiations with individual employees, groups of employees, and through any representative other than the Union is discontinued and that individual employees or groups of employees may

continue personally to present grievances to the respondent but that such grievances will be adjusted only through negotiations with the Union; and further notify all its employees in said appropriate units that it has ceased deducting dues on behalf of [**16] any labor organization from the employees' wages except such deductions as are made pursuant to its contract with the Union;

(c) Post immediately in conspicuous places in its Main plant, its Aircraft Strut plant, and its Dickson Gun plant, and maintain for a period of at least sixty (60) consecutive days from the date of posting, notices to its employees stating: (1) that the respondent will not engage in the conduct from which it is ordered to cease and desist in paragraph 1 (a) and (b) of this Order, and (2) that the respondent will take the affirmative action set forth in paragraph 2 (a) and (b) of this Order;

(d) Notify the Regional Director for the Sixteenth Region in writing, within ten (10) days from the date of this Order, what steps the respondent has taken to comply herewith.

**APPENDIX:**

INTERMEDIATE REPORT

*Mr. Elmer Davis*, for the Board.

*Mr. W. M. Streetman*, of Houston, Texas, for the respondent.

*Mr. Bliss Daffan*, of Houston, Texas, for the Union.

*Mr. Tom Davis*, of Houston, Texas, for the Independent.

STATEMENT OF THE CASE

Upon a first amended charge duly filed on January 27, 1944, by United Steelworkers of America, Locals Nos. 1742 and 2457, affiliated with the Congress [**17] of Industrial Organizations, herein called the Union, the National Labor Relations Board, herein called the Board, by its Regional Director for the Sixteenth Region (Fort Worth, Texas), issued its complaint dated February 2, 1944, against Hughes Tool Company, Houston, Texas, herein called the respondent, alleging that the respondent had engaged in and was engaging in unfair labor practices within the meaning of Section 8 (1) and (5) and Section 2 (6) and (7) of the National Labor Relations Act, 49 Stat. 449, herein called the Act. Copies of the complaint and notice of hearing thereon were duly served upon the respondent and the Union.

With respect to the unfair labor practices, the complaint alleges in substance that on or about December 26, 1942 and December 13, 1943, the Union requested the respondent to bargain with it as the exclusive representative of all the respondent's employees in two separate appropriate units and that on those dates and at all times thereafter, the respondent refused and continues to refuse to do so.

Pursuant to notice, a hearing was held on February 28, 1944, at Houston, Texas, before William F. Guffey, Jr., the undersigned Trial Examiner, duly designated [**18] by the Chief Trial Examiner. At the beginning of the hearing, a motion to intervene dated February 19, 1944, which had been filed with the Regional Director on behalf of Independent Metal Workers Union, Locals Nos. 1 and 2, herein called the Independent, was referred to the Trial Examiner for ruling. The motion was granted over the objections of counsel for the Union and the Board. The Board, the respondent, the Union, and the Independent were represented by counsel and participated in the hearing. Full opportunity to be heard, to examine and cross-examine witnesses, and to introduce evidence bearing upon the issues was afforded all parties. The respondent, having filed no answer to the complaint, stated on the record its denial of the alleged unfair labor practices. After all the evidence was adduced, motions to conform the complaint and the petition to intervene to the proof were granted. At the conclusion of the hearing counsel for the parties presented oral argument on the record. All parties were advised that they might file briefs with the undersigned. The Union filed a brief.

Upon the entire record in the case and from his observation of the witnesses, the undersigned makes [**19] the following:

FINDINGS OF FACT

I. THE BUSINESS OF THE RESPONDENT

Hughes Tool Company, the respondent herein, is a Delaware Corporation, engaged normally in the manufacture, sale, and distribution of specialized oil well drilling equipment. It is presently also engaged in production for the United States Army and Navy. The respondent maintains at Houston, Texas, three separate plants. One, known as the Main plant, is engaged in the production of oil well equipment; the second, known as the Aircraft Strut plant, is used for the production of airplane parts; the third, known as the Dickson Gun plant, is engaged in the production of gun tubes.

During the year 1943, the respondent purchased and used more than $ 500,000 worth of raw materials. More than 50 percent of such raw materials was shipped to the respondent's Houston plants from points outside the State of Texas. During the same period, the respondent's sales of its products amounted to about $ 1,000,000, approximately 50 percent of which was shipped to points outside the State of Texas. The respondent has sales representatives in practically every State and its products are distributed to almost all parts of the world.

II. THE [**20] ORGANIZATIONS INVOLVED

United Steelworkers of America, Locals Nos. 1742 and 2457 are labor organizations affiliated with the Congress of Industrial Organizations admitting to membership employees of the respondent.

Independent Metal Workers Union, Locals Nos. 1 and 2, are unaffiliated labor organizations admitting to membership only employees of the respondent.

III. THE UNFAIR LABOR PRACTICES

A. *The appropriate unit and the majority status of the Union*

On November 27, 1942, the Board issued a Decision and Direction of Election in which it found that the production and maintenance employees, with certain specified inclusions and exclusions, employed at the respondent's Main plant and Aircraft Strut plant, constituted an appropriate unit. n1 On December 26, 1942, the Board certified the Union as the exclusive bargaining representative of all such employees. On April 6, 1943, the respondent and the Union executed a collective bargaining agreement by the terms of which the respondent recognized the Union as the exclusive collective bargaining representative of all employees in the above-stated appropriate unit. Since then, the respondent has recognized the Union as the bargaining [**21] representative of its employees in the unit found appropriate by the Board.

n1 *Matter of Hughes Tool Company, 45 N. L. R. B. 821.*

On November 11, 1943, the Board issued a Decision and Direction of Election in which it found that the production and maintenance employees, with certain specified inclusions and exclusions, employed at the respondent's Dickson Gun plant, constituted an appropriate unit. n2 On December 13, 1943, the Board certified the Union as the exclusive bargaining representative of all such employees. Although no written agreement between the respondent and the Union covering the employees in the appropriate unit at the Dickson Gun plant has been executed, the respondent has recognized the Union as the exclusive collective bargaining representative of such employees and has engaged in collective bargaining with the Union as such representative.

R000161

56 N.L.R.B. 981, *987; 1944 NLRB LEXIS 2457, **21;
14 L.R.R.M. 165; 56 NLRB No. 174

n2 *Matter of Hughes Tool Company, 53 N. L. R. B. 547.*

[**22]

Neither the appropriateness of the two above-stated units nor the representative status of the Union among the employees in them is contested in this proceeding.

The undersigned therefore finds, as did the Board in the prior representation proceeding, that all production and maintenance employees of the respondent at its Main plant and Aircraft Strut plant, including Class C colored employees in the maintenance department and those assigned to the general machine shop and inspection department; cafeteria employees; janitors, janitresses, and matrons; Class C colored common laborers working in the forge shop and in the heat-treat and foundry-shop departments; employees classified on the respondent's books as F and E employees; the colored employees working in the pattern shop; shipping-department employees; material-control-department employees; shop clerks; machinists, mechanics, helpers, and laborers attached to the engineering department; the colored truck drivers in the maintenance department; and station wagon drivers; but excluding executives, supervisory, clerical, office and professional employees; printing-shop employees; personnel-department employees; sales-department employees [**23] other than those employed in the shipping department; accounting-department employees other than shop clerks; day office porters; garage employees; parking lot girls; production-department employees; and engineers, draftsmen, chemists, metallurgists, and clerical employees of the engineering department, constitute a unit appropriate for the purposes of collective bargaining, within the meaning of Section 9 (b) of the Act.

It is also found that at all times since December 26, 1942, the Union has been and now is the duly designated representative of a majority of the employees in the above-stated appropriate unit at the Main and Aircraft Strut plants and that, by virtue of Section 9 (a) of the Act, the Union since said date has been and now is the exclusive representative of all the employees in said unit for the purposes of collective bargaining with the respondent in respect to rates of pay, wages, hours of employment, and other terms and conditions of employment.

The undersigned further finds, as did the Board in the prior representation proceeding, that all production and maintenance employees of the respondent at its Dickson Gun plant, including janitors and janitresses, shipping [**24] department employees; shop clerks; machinists, mechanics, helpers and laborers attached to the engineering department; truck drivers in the maintenance department; office porters; cafeteria employees; garage employees; but excluding executives, clerical, office and professional employees; printing shop employees; personnel department employees; sales department employees other than those employed in the shipping department; accounting department employees other than shop clerks; parking lot girls; production department employees; engineers and draftsmen; chemists; metallurgists; clerical employees of the engineering department; and any supervisory employees with authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees, or effectively recommend such action constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9 (b) of the Act.

It is also found that at all times since December 13, 1943 the Union has been and now is the duly designated representative of a majority of the employees in the above-stated appropriate unit at the Dickson Gun plant and that, by virtue of Section 9 (a) of the Act, [**25] the Union since said date has been and now is the exclusive representative of all the employees in said unit for the purposes of collective bargaining with the respondent in respect to rates of pay, wages, hours of employment, and other terms and conditions of employment.

B. *Background; the respondent's conduct upon which the allegation of a refusal to bargain is grounded* n3

n3 All of the material facts are undisputed.

On November 13, 1941, the Board, acting upon the Independent's petition for investigation and certification,

certified the Independent as the exclusive bargaining representative of the respondent's employees in a unit substantially similar to the unit found above to be appropriate for the Main plant and Aircraft Strut plant, except that the unit included only employees of the Main plant. n4 On January 12, 1942, the respondent and the Independent executed a collective bargaining agreement by the terms of which the respondent recognized the Independent as the exclusive collective bargaining representative [**26] of the employees in the unit found by the Board to be appropriate.

> n4 At the time the Independent was certified, the respondent operated only the Main plant. See *Matter of Hughes Tool Company, 33 N. L. R. B. 1089, 36 N. L. R. B. 904.*

Subsequent to the certification of the Independent as the exclusive representative and prior to the certification of the Union on December 26, 1942, as the exclusive representative of the same employees, the respondent dealt with the Union concerning grievances presented by the Union on behalf of its members. The respondent, similarly, dealt with certain affiliates of the American Federation of Labor concerning grievances presented by them on behalf of their members who were included in the appropriate unit, and with individual employees and groups of employees concerning their own grievances.

During the course of the negotiations which culminated in the January 12, 1942, agreement between the respondent and the Independent, the respondent agreed [**27] to deduct the Independent's dues from the wages of the Independent's members upon individual written authorization of the employees. At about the same time, the respondent made a similar agreement with the Union, then a representative of only a minority of the employees in the appropriate unit.

The contract between the respondent and the Independent, which was executed on January 12, 1942, and which was effective for 1 year from that date, provided that the respondent would deduct the Independent's dues from the wages of the Independent's members who signed individual dues deduction authorizations and that the respondent would pay over the sums so deducted to the Independent. The agreement further provided that the Independent's members were free at any time to cancel the authorizations and that upon receipt of written cancellations the respondent would cease deducting the Independent's dues from the wages of those members who had cancelled the authorizations. Pursuant to the agreement some of the Independent's members authorized, and the respondent made, such deductions.

After the Union was certified and recognized as the exclusive bargaining representative, the respondent continued [**28] its practice of dealing with individual employees and groups of employees concerning their own grievances and with the Independent and the American Federation of Labor affiliates, at that time minority unions, concerning grievances presented by them on behalf of their members. Thomas M. Mobley, the respondent's public relations director, testified, and the undersigned finds, that the grievances so handled relate to such matters as delay in the posting of automatic wage increases, transfers from one shift to another, and promotions and failure to obtain promotions. The respondent also continued to deduct the Independent's dues from its members' wages. In accordance with the terms of the expired agreement between the respondent and the Independent, these dues deductions are made pursuant to an authorization signed by the employees whose dues are to be deducted. They are not necessarily made for all members of the Independent, but only for those who sign an authorization. They are discontinued upon written cancellation by the employee of the authorization. Mobley testified, and the undersigned finds, that the respondent does not presently "meet with the Independent on dues deductions", [**29] but that such deductions are merely a continuation of former practices.

After the Union was certified as the exclusive representative, it requested the respondent to cease making dues deductions on behalf of the Independent's members, and to refuse to dispose of grievances brought by the Independent on behalf of its members and to make no disposition of any grievance unless and until the Union was consulted.

On January 6, 1943, the respondent, by letter addressed to the Union, refused to cease making dues deductions on

R000163

behalf of the Independent's members and refused to change its practice with respect to the handling of grievances. In support of its position respecting the handling of grievances the respondent quoted the proviso of Section 9 (a) of the Act n5 and stated: ". . . we have always felt and still believe that an individual employee or a group of employees have the right either themselves or through a representative of their choosing to present grievances to their employer." n6

n5 This proviso states: ". . . any individual employee or a group of employees shall have the right at any time to present grievances to their employer."

[**30]

n6 The respondent and the Independent sought to adduce evidence to show that the Union refuses to handle grievances for employees who are not members of the Union. This evidence was excluded from the record and the parties made appropriate offers of proof. Whether or not the Union refuses to handle grievances for non-members is, in the undersigned's opinion, immaterial to the issues raised in this proceeding. The respondent's employees have designated the Union as their exclusive bargaining representative. The Act imposes upon the respondent the obligation to treat with that representative and no other. The Act gives the Board no authority to judge whether or not a labor organization properly discharges its duties as an exclusive representative. It gives an employer no license to refuse to deal with an exclusive representative or to deal with another merely because, in the employer's view, the exclusive representative fails to discharge its obligations. The employees and only the employees, may select their representative. The respondent's employees have done so. If they are dissatisfied with their present representative and desire to choose another, the Board's election machinery is available to them for the purpose of making that choice. But until a new choice is made, the respondent must deal exclusively with the Union whether or not the Union satisfies the respondent's standards concerning the Union's discharge of its burdens as an exclusive representative.

[**31]

It is now contended that by continuing the dues deductions on behalf of the Independent's members and by dealing with individual employees and groups of employees concerning their own grievances and with the minority unions concerning grievances of their members, the respondent has refused and is refusing to bargain with the Union as the exclusive representative of the employees in an appropriate unit.

C. *Conclusions with respect to the handling of grievances*

The respondent contends that its conduct in the settlement of grievances is protected by the proviso to Section 9 (a) of the Act, which states that "any individual employee or a group of employees shall have the right at any time to present grievances to their employer." The determination of the issue thus raised presents the problem of harmonizing the meaning and effect of the statutory provision of Section 9 (a) of the Act protecting the status of the exclusive bargaining representative, and the proviso to that section extending a specific right to individuals or group of individuals. The result must be consistent with the broad policy of the United States, expressed in the Act and other statutes, to foster and protect [**32] the process of collective bargaining as a means of preventing interruptions to commerce.

It is not questioned that the Union, having been designated by a majority of the employees in an appropriate unit, is the exclusive representative for the purposes of collective bargaining of all the employees in that unit. It is contended, however, that the grievances settled by the respondent without consulting the Union are something separate and apart from collective bargaining. This contention, in the undersigned's view, is without merit. There is no distinct cleavage between collective bargaining and the settlement of grievances whether individual or group. Grievances and grievance procedures are normal and proper subjects of collective bargaining. n7 Indeed, if that were not so, the proviso to Section

R000164

56 N.L.R.B. 981, *987; 1944 NLRB LEXIS 2457, **32;
14 L.R.R.M. 165; 56 NLRB No. 174

9 (a) the Act would have been wholly unnecessary, for the handling of individual or group grievances then would, by the definition of terms, fall outside the scope of collective bargaining which is vouchsafed by the Act exclusively to the representative chosen by a majority of the employees in an appropriate unit. By reason of the Board's certification of the Union as the exclusive representative [**33] of the respondent's employees, as well as by the terms of the respondent's contract granting the Union exclusive recognition as such representative, the respondent is precluded from settling grievances with anyone other than the Union.

    n7 *Matter of City Service Oil Company, 25 N. L. R. B. 36, 44* enf'd in part, *N. L. R. B. v. City Service Oil Co. 122 F. (2d) 149* (C. C. A. 2); *Matter of Mooresville Cotton Mills, 2 N. L. R. B. 952,* enf'd as mod. *110 F. (2d) 179* (C. C. A. 4); *Matter of The New York Times Company, a corporation, 26 N. L. R. B. 1094.*

    It is clear to the undersigned that the respondent has misconstrued the language of the proviso to Section 9 (a) of the Act. The proviso means exactly what it says and no more. That is, that an individual employee or a group of employees may *present* grievances to their employer. Having presented the grievances to the employer, [**34] the rights of the individual employee or group of employees respecting grievances cease and the settlement of those grievances must then be entrusted to negotiations between the employer and the employees' exclusive representative. It may seem at first blush that such a narrow construction of the proviso renders it meaningless on the plausible theory that the right to present a grievance is worthless unless accompanied by the right to prosecute and settle it. This, however, is not so. The proviso preserves to the individual employee or group of employees the opportunity to bring before the employer and the exclusive bargaining representative grievances which otherwise might be overlooked or for other reasons never presented to or considered by the employer. The right to see that a grievance is presented by the recognized representative for the employer's consideration is not an empty right.

    This interpretation of the proviso is consistent with the broad policy enunciated by the Act and with the provisions of the Act requiring collective bargaining exclusively with the representative chosen by a majority of the employees. This interpretation, moreover, is compelled by a long line of [**35] decisions by the United States Supreme Court and numerous Circuit Courts of Appeals. Thus, in the Virginian Railway case n8 the Supreme Court, in construing the exclusive bargaining provisions of the Railway Labor Act, stated that the provisions of that act for an exclusive collective bargaining representative ". . . imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other." In the *Jones & Laughlin* case n9 the Supreme Court in construing the National Labor Relations Act referred with approval to the above quoted language from the *Virginian Railway* case. In the *Highland Shoe* case n10 the Circuit Court of Appeals declared: "Clearly to bargain directly with one's employees is not to bargain with their designated exclusive representative." In *N. L. R. B. v. Knoxville Publishing Company* n11 the Circuit Court said, "The intent of the Act was to permit an employee to surrender to a collective agent his individual right to bargain with an employer, after which he no longer possesses this right during the life of the contract and the statute requires the employer to deal exclusively with the agent of his [**36] employees if one has been selected as provided." The type of grievances which the respondent admittedly settles with individual employees or groups of employees, either directly or through minority representatives--grievances concerning terms and conditions of employment--clearly are the proper subjects of collective bargaining. Since, as already noted, there is no real distinction between collective bargaining and the settlement of grievances, the respondent's practice of settling grievances with individual employees, groups of employees and the representatives of minority groups constitutes conduct proscribed by the language of the Act and the above-cited judicial pronouncements construing the Act. Strictly in point is the language of the Circuit Court in the *Humble Oil and Refining* case: n12 "So long as a majority of the employees in each plant freely choose to belong to or be represented by the Federations they are the bargaining representatives and the contracts they make can not be ignored. *Minority groups may separately present their grievances, but must submit to bargaining through the majority representatives.*" n13

    n8 *Virginian Railway Co. v. System Federation No. 40, et al., 300 U.S. 515.*

R000165

56 N.L.R.B. 981, *987; 1944 NLRB LEXIS 2457, **37;
14 L.R.R.M. 165; 56 NLRB No. 174

[**37]

n9 *National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1.*

n10 *N. L. R. B. v. Highland Shoe, Inc., 119 F. (2d) 218* (C. C. A. I).

n11 *124 F. (2d) 875* (C. C. A. 6).

n12 *Humble Oil and Refining Co. v. N. L. R. B. 113 F. (2d) 85* (C. C. A. 5).

n13 Emphasis supplied.

Any doubt remaining as to the proper construction of the proviso is dissipated by reference to the legislative history of the Act. During the hearings before the appropriate House and Senate Committees on the bill which eventually became the Act, the "majority rule" principle set forth in the bill was much discussed and criticized on the ground that it denied to minority groups the right of collective bargaining. During one such discussion the chairman of the Senate Committee on Education and Labor said: n14

I did not think it was the intent of the proponents of this legislation and I do not think it was the intent of the proponents of this language not to permit groups [**38] to present grievances, nor was it intended to debar the minority groups from sitting in if the employer and the majority were willing, but in any event of their not sitting in any negotiations that they be separately heard by the employers and their grievances or their suggestions received, and in turn presented by him to the majority group. I did not think there was anything in this bill that prevented any or all groups from getting in to the employer their views and opinions prior to the signing of the contract between the employer and the majority group of employees.

n14 Hearings, Senate Committee on Education and Labor, 74th Cong., 1st Sess. on S. 1958 pt. 3, p. 321. See also pp. 318-19.

During the testimony of Mr. William Green, president of the American Federation of Labor, before the House Committee on Labor, the chairman of the committee, explaining the intent of the proviso, suggested that perhaps the proviso should be clarified by adding:

*Provided, further*, that if such grievances are presented to [**39] the employer, these grievances will be taken up by the employer and the representatives of the majority and settled. n15

Of this suggestion Mr. Green said: "What we wish is that it might state clearly that the individual employee shall be accorded the right to present grievances to his employer for adjustment. That is about as far as it should go." n16 The chairman replied, "I agree with you." n17

n15 Hearings, House Committee on Labor, 74th Cong., 1st Sess., on H. R. 6288, p. 211.

n16 It should be noted that Mr. Green's suggestion was merely for the presentation of grievances to employers by individual employees. It did not provide for the adjustment of those grievances with the individuals.

R000166

n17 Ibid.

What has been said above is equally applicable to the respondent's practice of adjusting grievances directly with individual employees and groups of employees and with minority unions on behalf of their members. That its practice of adjusting grievances with minority unions is proscribed by the Act is additionally [**40] clear from the Act's legislative history. When the bill which became the Act was originally submitted to the appropriate Senate and House committees, the Section 9 (a) proviso expressly provided that "any individual employee or group of employees" should have the right to present grievances to the employer "through representatives of their own choosing." After criticism of the language of the proviso as appearing to permit the employer to "build up another company union" the words "through representatives of their own choosing" were stricken from the proviso before passage of the bill. n18

n18 During the hearings before the House Committee on Labor, the following colloquy between the chairman of the committee and Secretary Perkins occurred (Hearings, House of Representatives, Committee on Labor, 74th Cong., 1st Sess., H. R. 6288, p. 301):

The CHAIRMAN. On Page 10, line 1, it provides--

"That any individual employee or group of employees shall have the right at any time to present grievances to their employer through representatives of their own choosing."

That looks to me as if the employer could build up another company union.

Secretary PERKINS. I have proposed an amendment that would make that language read--

"That nothing in this section shall deprive any individual employee or group of employees of the right at any time to present grievances to their employer."

The CHAIRMAN. Do you think that your proposed amendment would take care of that?

Secretary PERKINS. Yes; that is our judgment.

The CHAIRMAN. In other words, your understanding is that if a majority of the plant employees decide to form a union and they were the ones to do the collective bargaining--suppose there was a minority of 40 percent and they went to the employer and presented their grievance, the collective-bargaining proposition would still have to be taken care of by the majority?

Secretary PERKINS. That is my understanding.

See also Hearings, Senate Committee on Education and Labor, 74th Cong., 1st Sess., S. 1958, p. 69.

[**41]

It is thus clear that the respondent's practice of adjusting grievances through negotiations with the Independent and the American Federation of Labor affiliates, minority unions in the instant case, on behalf of their members who are within the appropriate unit covered by the Board's certification of the Union, is directly contrary to the intention of Congress and constitutes in effect a denial of recognition of the Union as the exclusive representative. n19

n19 Counsel for the Independent, in his argument before the Trial Examiner, relied upon the holding in *N. L. R. B. v. North American Aviation, 136 F. (2d) 898* (C. C. A. 9) as establishing the propriety of the

R000167

respondent's conduct in the instant case. In that case, however, the employer merely set up machinery for the handling of grievances directly with the individual employees. The practice of settling grievances through negotiations with minority unions was not involved. The instant case, therefore, is distinguishable on its facts from the *North American Aviation* case. Moreover, the undersigned is of the view that the decision in the *North American Aviation* case is in direct conflict with the broad policies and clear language of the Act, several decisions of the United States Supreme Court construing the Act, and the intent of Congress as evidenced by the legislative history of the Act.

[**42]

Upon the foregoing considerations the undersigned concludes and finds that by adjusting grievances with individual employees and groups of employees and by adjusting grievances through negotiations with the Independent and the American Federation of Labor affiliates as the representatives of their members in the unit represented by the Union, the respondent, since December 26, 1942, has refused and is refusing to bargain collectively with the Union as the exclusive representative of its employees in an appropriate unit and that by such conduct the respondent has interfered with, restrained, and coerced and is interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act.

D. *Conclusions with respect to dues deductions*

The respondent's practice of deducting the Independent's dues from the wages of the employees who authorize such deduction amounts to a perpetuation of the pertinent provision of the contract between the respondent and the Independent beyond its expiration date. That it would be unlawful for the respondent and the Independent to execute a new contract providing for dues deductions at a time when another [**43] labor organization is the exclusive representative, is scarcely open to question. The undersigned can see no real distinction between a new contractual relationship and the respondent's unilateral extension of the old contract. To hold otherwise would permit a labor organization to continue to enjoy the fruits of its prior representative status notwithstanding the fact that the employees have seen fit to deprive it of that status. The deduction of dues is a proper subject for collective bargaining. It is a substantial benefit to any labor organization. To bestow such a substantial concession upon a minority union as a matter of grace when the majority union enjoys it as a matter of contract right is to deprive the majority union of a part of that which belongs to it as the exclusive representative and amounts to a refusal to recognize the majority union as the exclusive representative. Such an arrangement contributes immeasurably to the support of an organization which a majority of the employees have repudiated. It fosters an instability of labor relations which the Act was designed to eliminate or, at least, diminish.

At the hearing much was made of the fact that the deductions are [**44] made pursuant only to individual authorizations. But that is not a sufficient answer to the problem. The individual authorizations are made pursuant to the terms of a contract with a union which no longer represents the employees and are given effect after the contract has expired.

But wholly aside from the contractual relationship between the respondent and the Independent, the deductions are unlawful. While the deductions are made in accordance with the terms of the expired contract, they are made pursuant to individual agreements between the respondent and the employees. Since the matter of dues deductions is a proper subject of collective bargaining, the respondent cannot lawfully contract with its individual employees concerning such deductions at a time when the employees are exclusively represented except pursuant to and within the framework of the contractual arrangements between the respondent and the employees' exclusive representative.

The undersigned concludes and finds that by deducting the Independent's dues from the wages earned by certain members of the Independent upon individually executed dues deduction authorizations, the respondent, since December 26, 1942, has [**45] refused and is refusing to recognize and bargain collectively with the Union as the exclusive representative of its employees in an appropriate unit and by such conduct the respondent has interfered with, restrained,

R000168

and coerced and is interfering with, restraining, and coercing its employees in the exercise off the rights guaranteed in Section 7 of the Act.

## IV. THE EFFECT OF THE UNFAIR LABOR PRACTICES UPON COMMERCE

The activities of the respondent set forth in Section III B, C, and D above, occurring in connection with the operations of the respondent described in Section I above, have a close, intimate, and substantial relation to trade, traffic and commerce among the several States and tend to lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

## V. THE REMEDY

Having found that the respondent has engaged in and is engaging in certain unfair labor practices, it will be recommended that it cease and desist therefrom and that it take certain affirmative action which the undersigned finds will effectuate the policies of the Act.

It has been found that the respondent has refused and is refusing to bargain collectively with the Union as the exclusive [**46] representative of its employees in an appropriate unit. It will be recommended, therefore, that the respondent inform all of its employees in the units above found to be appropriate that its practice of adjusting grievances through negotiations with individual employees, groups of employees and through any representative other than the Union is discontinued and that individual employees or groups of employees may continue personally to present grievances to the respondent but that such grievances will be adjusted and settled only through negotiations with the Union. It will also be recommended that the respondent inform its employees that it has ceased deducting dues on behalf of any labor organization from the employees' wages except such deductions as are made pursuant to its contract with the Union. It will be further recommended that the respondent upon request recognize and bargain collectively with the Union as the exclusive representative of its employees within the above-found appropriate units.

Upon the basis of the foregoing findings of fact and upon the entire record in the case, the undersigned makes the following:

## CONCLUSIONS OF LAW

1. United Steelworkers of America, [**47] Locals Nos. 1742 and 2457, affiliated with the Congress of Industrial Organizations and Independent Metal Workers Union, Locals Nos. 1 and 2, unaffiliated, are labor organizations within the meaning of Section 2 (5) of the Act.

2. All the production and maintenance employees of Hughes Tool Company, Houston, Texas, at its Main plant and Aircraft Strut plant, including Class C colored employees in the maintenance department and those assigned to the general machine shop and inspection department; cafeteria employees; janitors, janitresses, and matrons; Class C colored common laborers working in the forge shop and in the heat-treat and foundry-shop departments; employees classified on the respondent's books as F and E employees; the colored employees working in the pattern shop; shipping-department employees; material-control department employees; shop clerks; machinists, mechanics, helpers, and laborers attached to the engineering department; the colored truck drivers in the maintenance department; and station wagon drivers, but excluding executives, supervisory, clerical, office, and professional employees; printing-shop employees; personal department employees; sales-department employees [**48] other than those employed in the shipping department; accounting-department employees other than shop clerks; day office porters; garage employees; parking lot girls; production-department employees; and engineers, draftsmen, chemists, metallurgists, and clerical employees of the engineering department constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9 (b) of the Act.

3. All production and maintenance employees of Hughes Tool Company, Houston, Texas, at its Dickson Gun plant, including janitors and janitresses; shipping department employees; shop clerks; machinists, mechanics, helpers and

laborers attached to the engineering department; truck drivers in the maintenance department; office porters; cafeteria employees; garage employees; but excluding executives; clerical; office and professional employees; printing shop employees; personnel department employees; sales department employees other than those employees employed in the shipping department; accounting department employees other than shop clerks; parking lot girls; production department employees; engineers and draftsmen; chemists; metallurgists; clerical employees of the [**49]  engineering department; and any supervisory employees with authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees, or effectively recommend such action, constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9 (b) of the Act.

4. United Steelworkers of America, Locals Nos. 1742 and 2457, affiliated with the Congress of Industrial Organizations, was on December 26, 1943, and at all material times thereafter has been. The exclusive representative of all the employees in the unit set out in paragraph 2 above for the purposes of collective bargaining within the meaning of Section 9 (a) of the Act and on December 13, 1943, and at all material times thereafter has been the exclusive representative of all the employees in the unit set out in paragraph 3 above for the purposes of collective bargaining within the meaning of Section 9 (a) of the Act.

5. By refusing to bargain collectively with the United Steelworkers of America, Locals Nos. 1742 and 2457 as the exclusive representatives of its employees in the said appropriate units, the respondent has engaged in and is engaging in unfair labor practices [**50]  within the meaning of Section 8 (5) of the Act.

6. By interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act, the respondent has engaged in and is engaging in unfair labor practices, within the meaning of Section 8 (1) of the Act.

7. The aforesaid unfair labor practices are unfair labor practices affecting commerce within the meaning of Section 2 (6) and (7) of the Act.

RECOMMENDATIONS

Upon the basis of the above findings of fact and conclusions of law, the undersigned recommends that the respondent, Hughes Tool Company, Houston, Texas, its officers, agents, successors and assigns shall:

1. Cease and desist from:

(a) Refusing to bargain collectively with United Steelworkers of America, Locals Nos. 1742 and 2457, affiliated with the Congress of Industrial Organizations as the exclusive representatives of all production and maintenance employees of Hughes Tool Company, Houston, Texas, at its Main plant and Aircraft Strut plant, including Class C colored employees in the maintenance department and those assigned to the general machine shop and inspection department; cafeteria employees; janitors, janitresses, and matrons;  [**51]  Class C colored common laborers working the forge shop and in the heat-treat and foundry-shop departments; employees classified on the respondent's books as F and E employees; the colored employees working in the pattern shop; shipping-department employees; material control-department employees; shop clerks; machinists, mechanics, helpers, and laborers attached to the engineering department; the colored truck drivers in the maintenance department; and station wagon drivers; but excluding executives, supervisory, clerical, office, and professional employees; printing shop employees; personnel-department employees; sales-department employees other than those employed in the shipping department; accounting-department employees other than shop clerks; day office porters; garage employees; parking lot girls; production-department employees; and engineers, draftsmen, chemists, metallurgists; and clerical employees of the engineering department and as the exclusive representatives of all production and maintenance employees of Hughes Tool Company, Houston, Texas, at its Dickson Gun plant, including janitors and janitresses; shipping department employees; shop clerks; machinists, mechanics,  [**52]  helpers and laborers attached to the engineering department; truck drivers in the maintenance departments; office porters; cafeteria employees; garage employees; but excluding executives, clerical,

R000170

office and professional employees; printing shop employees; personnel department employees; sales department other than those employed in the shipping department; accounting department employees other than shop clerks; parking lot girls; production department employees; engineers and draftsmen; chemists; metallurgists; clerical employees of the engineering department; and any supervisory employees with authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees, or effectively recommend such action;

(b) In any other manner interfering with, restraining or coercing its employees in the exercise of the rights to self-organization, to bargain collectively through representatives of their own choosing, or to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the Act.

2. Take the following affirmative action which the undersigned finds will effectuate the policies [**53] of the Act:

(a) Upon request bargain collectively with United Steelworkers of America, Locals Nos. 1742 and 2457, affiliated with the Congress of Industrial Organizations, as the exclusive representatives of all the respondent's employees included in the appropriate units described in paragraph 1 (a) of these recommendations, with respect to rates of pay, wages, hours of employment and other terms and conditions of employment;

(b) Notify all of its employees included in the appropriate units described in paragraph 1 (a) above, that its practice of adjusting and settling grievances through negotiations with individual employees, groups of employees and through any representative other than the Union is discontinued and that individual employees or groups of employees may continue personally to present grievances to the respondent but that such grievances will be adjusted only through negotiations with the Union; and further notify all of its employees in said appropriate unit that it has ceased deducting dues on behalf of any labor organization from the employees' wages except such deductions as are made pursuant to its contract with the Union;

(c) Post immediately in conspicious places [**54] in its Main plant, its Aircraft Strut plant and its Dickson Gun plant and maintain for a period of at least sixty (60) consecutive days from the date of posting, notices to its employees stating: (1) that the respondent will not engage in the conduct from which it has been recommended in paragraphs 1 (a) and (b) of these recommendations that it cease and desist; and (2) that the respondent will take the affirmative action set forth in paragraph 2 (a) and (b) of these recommendations;

(d) Notify the Regional Director for the Sixteenth Region within ten (10) days from the date of the receipt of this Intermediate Report what steps the respondent has taken to comply herewith.

It is further recommended that unless on or before ten (10) days from the receipt of this Intermediate Report the respondent notifies said Regional Director in writing that he has complied with the foregoing recommendations, the National Labor Relations Board issue and order requiring the respondent to take the action aforesaid.

As provided in Section 33 of Article II of the Rules and Regulations of the National Labor Relations Board, Series 3--effective November 26, 1943--any party or counsel for the Board may within [**55] fifteen (15) days from the date of the entry of the order transferring the case to the Board, pursuant to Section 32 of Article II of said Rules and Regulations, file with the Board, Rochambeau Building, Washington, D. C., an original and four copies of a statement in writing setting forth such exceptions to the Intermediate Report or to any other part of the record or proceeding (including rulings upon all motions or objections) as he relies upon, together with the original and four copies of a brief in support thereof. Immediately upon the filing of such statement of exceptions and/or brief, the party or counsel for the Board filing the same shall serve a copy thereof upon each of the other parties and shall file a copy with the Regional Director. As further provided in said Section 33, should any party desire permission to argue orally before the Board, request therefor must be made in writing within ten (10) days from the date of the order transferring the case to the Board.

WILLIAM F. GUFFEY, JR., *Trial Examiner*

56 N.L.R.B. 981, *987; 1944 NLRB LEXIS 2457, **55;
14 L.R.R.M. 165; 56 NLRB No. 174

Dated April 15, 1944.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Labor & Employment LawAffirmative ActionComplianceLabor & Employment LawCollective Bargaining & Labor RelationsUnfair Labor PracticesInterference With Protected Activities

R000172



LEXSEE 363 U.S. 564

# UNITED STEELWORKERS OF AMERICA v. AMERICAN MANUFACTURING CO.

## No. 360

## SUPREME COURT OF THE UNITED STATES

*363 U.S. 564; 80 S. Ct. 1343; 4 L. Ed. 2d 1403; 1960 U.S. LEXIS 1920; 40 Lab. Cas. (CCH) P66,628; 46 L.R.R.M. 2414*

**April 27, 1960, Argued**
**June 20, 1960, Decided**

**PRIOR HISTORY:**     CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

**DISPOSITION:**   *264 F.2d 624*, reversed.

**SUMMARY:**

A union which entered into a collective bargaining contract containing an agreement for arbitration of all grievances sought to compel arbitration of its contention that an employee who had left his job because of injury and while off work brought an action for compensation benefits which he settled on the basis that he was permanently partially disabled was entitled to return to his job by virtue of a seniority provision of the collective bargaining agreement. The United States District Court for the Eastern District of Tennessee, Southern Division, refused to compel arbitration, holding that the employee, having accepted the settlement, was estopped to claim seniority or employment rights. The Court of Appeals for the Sixth Circuit affirmed on the ground that the grievance of which arbitration was sought was frivolous and not subject to arbitration. (*264 F2d 624*.)

On certiorari, the United States Supreme Court reversed the judgment below. Douglas, J., speaking for six members of the Court, held that the courts below had erred in weighing the merits of the grievance and the equities of the employee's claim, in view of the fact that the arbitration clause called for submission of all grievances to arbitration, not merely those a court would deem meritorious.

Frankfurter and Whittaker, JJ., concurred in the result.

Brennan, J., joined by Harlan, J., concurred in an opinion which appears infra, p. 1432. Frankfurter, J., joined in the observations stated in this opinion.

Black, J., did not participate.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

LABOR §125

arbitration -- federal policy. --

Headnote:[1]

The policy of 203(d) of the Labor Management Relations Act (*29 USC 173(d)*), that final adjustment by the method agreed upon by the parties is the desirable method for settlement of grievance disputes regarding collective bargaining agreements, can be effectuated only if the means chosen by the parties for the settlements of their differences under a collective bargaining contract is given full play; decision that held to the contrary could only have a crippling effect on grievance arbitration.

[***LEdHN2]

LABOR §125

arbitration -- exceptions. --

Headnote:[2]

When, in the case of a collective bargaining agreement providing for arbitration of all grievances, the clause of the contract stating that there will be no strike unless the employer refuses to abide by an arbitrator's decision is subject to no exception, no exception should be read into the grievance-arbitration clause, one clause being the quid pro quo for the other.

[***LEdHN3]

LABOR §44

LABOR §125

agreements -- construction -- arbitration -- function of court. --

Headnote:[3]

The United States Supreme Court, in its role of developing a meaningful body of law to govern the interpretation and enforcement of collective bargaining agreements, gives special heed to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve; the function of the court, when the parties have agreed to submit all questions of contract interpretation to an arbitrator, is very limited, being confined to ascertaining whether the party seeking arbitration is making a claim which, on its face, is governed by the contract.

[***LEdHN4]

LABOR §125

arbitration -- function of court. --

Headnote:[4]

When a party to a collective bargaining agreement containing a provision for arbitration of all grievances seeks arbitration of a claim which on its face is governed by the contract, whether he is right or wrong in his position is a question of contract interpretation for the arbitrator; the courts have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there

is particular language in the written contract which will support the claim.

[***LEdHN5]

LABOR §125

arbitration -- frivolous claims. --

Headnote:[5]

Under a collective bargaining contract by which the parties agree to submit all grievances to arbitration, the right to arbitration is not limited to grievances which a court will deem meritorious, but extends to even frivolous claims, the processing of which may have therapeutic values which those who are not a part of the plant environment may be unaware of.

[***LEdHN6]

LABOR §125

arbitration -- individual grievance -- seniority rights -- judicial review. --

Headnote:[6]

A union which has entered into a collective bargaining contract containing an agreement for arbitration of all grievances is entitled to arbitrate the question whether the seniority provision contained in the contract accords the right to return to work to an employee who left his job because of injury and while off work brought an action for compensation benefits which he settled on the basis of permanent partial disability; hence, it is error for a Federal District Court to refuse to compel arbitration in this situation (on the ground that the employee, having accepted the settlement on the basis of permanent partial disability, was estopped to claim any seniority or employment rights), and for the Court of Appeals to affirm the District Court's decision (on the ground that the grievance was a frivolous, patently baseless one, not subject to arbitration under the collective bargaining contract).

[***LEdHN7]

LABOR §125

arbitration -- function of court. --

Headnote:[7]

R000174

363 U.S. 564, *; 80 S. Ct. 1343, **;
4 L. Ed. 2d 1403, ***; 1960 U.S. LEXIS 1920

When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal.

## SYLLABUS

In a suit under § 301 (a) of the Labor Management Relations Act, 1947, to compel arbitration of a dispute pursuant to a collective bargaining agreement providing for arbitration of all disputes between the parties "as to the meaning, interpretation and application of the provisions of this agreement," the function of the court is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract, and the court has no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. Pp. 564-569.

**COUNSEL:** David E. Feller argued the cause for petitioner. With him on the brief were Arthur J. Goldberg, Elliot Bredhoff, James P. Clowes and Carney M. Layne.

John S. Carriger argued the cause for respondent. With him on the brief were John S. Fletcher and Harold M. Humphreys.

**JUDGES:** Warren, Frankfurter, Douglas, Clark, Harlan, Brennan, Whittaker, Stewart; Black took no part in the consideration or decision of this case.

**OPINION BY:** DOUGLAS

## OPINION

[*564] [***1405] [**1344] Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BRENNAN.

This suit was brought by petitioner union in the District Court to compel arbitration of a "grievance" that petitioner, acting for one Sparks, a union member, had filed with the respondent, Sparks' employer. The employer defended on the ground (1) that Sparks is [**1345] estopped from making his claim because he had a few days previously settled a workmen's compensation claim against the company on the basis that he was permanently partially disabled, (2) that Sparks is not physically able to [*565] do the work, and (3) that this type of dispute is not arbitrable under the collective bargaining agreement in question.

The agreement provided that during its term there would be "no strike," unless the employer refused to abide by a decision of the arbitrator. The agreement sets out a detailed grievance procedure with a provision for arbitration (regarded as the standard form) of all disputes between the parties "as to the meaning, interpretation and application of the provisions of this agreement." [1]

1    The relevant arbitration provisions read as follows:

"Any disputes, misunderstandings, differences or grievances arising between the parties as to the meaning, interpretation and application of the provisions of this agreement, which are not adjusted as herein provided, may be submitted to the Board of Arbitration for decision. . . .

"The arbitrator may interpret this agreement and apply it to the particular case under consideration but shall, however, have no authority to add to, subtract from, or modify the terms of the agreement. Disputes relating to discharges or such matters as might involve a loss of pay for employees may carry an award of back pay in whole or in part as may be determined by the Board of Arbitration.

"The decision of the Board of Arbitration shall be final and conclusively binding upon both parties, and the parties agree to observe and abide by same. . . ."

The agreement reserves to the management power to suspend or discharge any employee "for cause." [2] It also contains a provision that the employer will employ and promote employees on the principle of seniority [*566] "where ability and efficiency are equal." [3] Sparks left his work due to an injury and while off work brought an action for compensation benefits. The case was [***1406] settled, Sparks' physician expressing the opinion that the injury had made him 25% "permanently partially disabled." That was on September 9. Two weeks later the union filed a grievance which charged

363 U.S. 564, *566; 80 S. Ct. 1343, **1345;
4 L. Ed. 2d 1403, ***1406; 1960 U.S. LEXIS 1920

that Sparks was entitled to return to his job by virtue of the seniority provision of the collective bargaining agreement. Respondent refused to arbitrate and this action was brought. The District Court held that Sparks, having accepted the settlement on the basis of permanent partial disability, was estopped to claim any seniority or employment rights and granted the motion for summary judgment. The Court of Appeals affirmed, *264 F.2d 624*, for different reasons. After reviewing the evidence it held that the grievance was "a frivolous, patently baseless one, not subject to arbitration under the collective bargaining agreement." *Id., at 628.* The case is here on a writ of certiorari, *361 U.S. 881.*

> 2 "The Management of the works, the direction of the working force, plant layout and routine of work, including the right to hire, suspend, transfer, discharge or otherwise discipline any employee for cause, such cause being: infraction of company rules, inefficiency, insubordination, contagious disease harmful to others, and any other ground or reason that would tend to reduce or impair the efficiency of plant operation; and to lay off employees because of lack of work, is reserved to the Company, provided it does not conflict with this agreement. . . ."
>
> 3 This provision provides in relevant part:
>
> "The Company and the Union fully recognize the principle of seniority as a factor in the selection of employees for promotion, transfer, lay-off, re-employment, and filling of vacancies, where ability and efficiency are equal. It is the policy of the Company to promote employees on that basis."

[***LEdHR1] [1]Section 203 (d) of the Labor Management Relations Act, 1947, 61 [**1346] Stat. 154, *29 U. S. C. § 173 (d)*, states, "Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. . . ." That policy can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play.

[***LEdHR2] [2]A state decision that held to the

contrary announced a principle that could only have a crippling effect on grievance [*567] arbitration. The case was *International Assn. of Machinists v. Cutler-Hammer, Inc., 271 App. Div. 917, 67 N. Y. S. 2d 317*, aff'd *297 N. Y. 519, 74 N. E. 2d 464.* It held that "If the meaning of the provision of the contract sought to be arbitrated is beyond dispute, there cannot be anything to arbitrate and the contract cannot be said to provide for arbitration." *271 App. Div., at 918, 67 N. Y. S. 2d, at 318.*The lower courts in the instant case had a like preoccupation with ordinary contract law. The collective agreement requires arbitration of claims that courts might be unwilling to entertain. In the context of the plant or industry the grievance may assume proportions of which judges are ignorant. Yet, the agreement is to submit all grievances to arbitration, not merely those that a court may deem to be meritorious. There is no exception in the "no strike" clause and none therefore should be read into the grievance clause, since one is the *quid pro quo* for the other. 4 The question is not whether in the mind of the court there is equity in the claim. Arbitration is a stabilizing influence only as it serves as a vehicle for handling any and all disputes that arise under the agreement.

> 4 Cf. *Structural Steel & Ornamental Iron Assn. v. Shopmens Local Union, 172 F.Supp. 354*, where the employer sued for breach of the "no strike" agreement.

[***LEdHR3] [3] [***LEdHR4] [4]The collective agreement calls for the submission of grievances in the categories which it describes, irrespective of whether a court may deem them to be meritorious. In our role of developing a meaningful body of law to govern the interpretation and enforcement of collective bargaining agreements, we think special heed should be given to the context in which collective bargaining [***1407] agreements are negotiated and the purpose which they are intended to serve. See *Lewis v. Benedict Coal Corp., 361 U.S. 459, 468.*The function of the court is very limited when the parties have agreed to submit all [*568] questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party

R000176

should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

[***LEdHR5] [5]The courts, therefore, have no business weighing the merits of the grievance, [5] considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part [**1347] of the plant environment may be quite unaware. [6]

> [5] See *New Bedford Defense Products Division v. Local No. 1113, 258 F.2d 522, 526* (C. A. 1st Cir.).
>
> [6] Cox, Current Problems in the Law of Grievance Arbitration, 30 Rocky Mt. L. Rev. 247, 261 (1958), writes:
>
> "The typical arbitration clause is written in words which cover, without limitation, all disputes concerning the interpretation or application of a collective bargaining agreement. Its words do not restrict its scope to meritorious disputes or two-sided disputes, still less are they limited to disputes which a judge will consider two-sided. Frivolous cases are often taken, and are expected to be taken, to arbitration. What one man considers frivolous another may find meritorious, and it is common knowledge in industrial relations circles that grievance arbitration often serves as a safety valve for troublesome complaints. Under these circumstances it seems proper to read the typical arbitration clause as a promise to arbitrate every claim, meritorious or frivolous, which the complainant bases upon the contract. The objection that equity will not order a party to do a useless act is outweighed by the cathartic value of arbitrating even a frivolous grievance and by the dangers of excessive judicial intervention."

[*569] [***LEdHR6] [6] [***LEdHR7] [7]The union claimed in this case that the company had violated a specific provision of the contract. The company took the position that it had not violated that clause. There

was, therefore, a dispute between the parties as to "the meaning, interpretation and application" of the collective bargaining agreement. Arbitration should have been ordered. When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal.

*Reversed.*

MR. JUSTICE FRANKFURTER concurs in the result.

MR. JUSTICE WHITTAKER, believing that the District Court lacked jurisdiction to determine the merits of the claim which the parties had validly agreed to submit to the exclusive jurisdiction of a Board of Arbitrators ( *Textile Workers v. Lincoln Mills,* [***1408] *353 U.S. 448*), concurs in the result of this opinion.

MR. JUSTICE BLACK took no part in the consideration or decision of this case.

**CONCUR BY:** BRENNAN

**CONCUR**

MR. JUSTICE BRENNAN, with whom MR. JUSTICE HARLAN joins, concurring. [*]

> [*] [This opinion applies also to No. 443, *United Steelworkers of America* v. *Warrior & Gulf Navigation Co., post,* p. 574, and No. 538, *United Steelworkers of America* v. *Enterprise Wheel & Car Corp., post,* p. 593.]

While I join the Court's opinions in Nos. 443, 360 and 538, I add a word in Nos. 443 and 360.

In each of these two cases the issue concerns the enforcement of but one promise -- the promise to arbitrate in the context of an agreement dealing with a particular subject [*570] matter, the industrial relations between employers and employees. Other promises contained in the collective bargaining agreements are beside the point unless, by the very terms of the arbitration promise, they are made relevant to its interpretation. And I emphasize this, for the arbitration promise is itself a contract. The parties are free to make that promise as broad or as narrow as they wish, for there is no compulsion in law requiring them to include any

such promises in their agreement. The meaning of the arbitration promise is not to be found simply by reference to the dictionary definitions of the words the parties use, or by reference to the interpretation of commercial arbitration clauses. Words in a collective bargaining agreement, rightly viewed by the Court to be the charter instrument of a system of industrial self-government, like words in a statute, are to be understood only by reference to the background which gave rise to their inclusion. The Court therefore avoids the prescription of inflexible rules for the enforcement of arbitration promises. Guidance is given by identifying the various considerations which a court should take into account when construing a particular clause -- considerations of the milieu in which the clause is negotiated and of the national labor policy. It is particularly underscored that the arbitral process in collective bargaining presupposes that the parties wanted the informed judgment of an arbitrator, precisely for the reason that judges cannot provide it. Therefore, a court asked to enforce a promise to arbitrate should ordinarily refrain from involving itself in the interpretation of the substantive provisions of the contract.

To be sure, since arbitration is a creature of contract, a court must always inquire, when a party seeks to invoke its aid to force a reluctant party to the arbitration table, whether the parties have agreed to arbitrate the particular [*571] dispute. In this sense, the question of whether a dispute is "arbitrable" is inescapably for the court.

On examining the arbitration clause, the court may conclude that it commits to arbitration any "dispute, difference, disagreement, or controversy of any nature or character." With that finding the court will have exhausted its function, except to order the reluctant party to arbitration. Similarly, although the arbitrator may be empowered only to interpret and apply the contract, the parties may have provided that any dispute as to whether a particular claim is within the arbitration clause is itself for the arbitrator. Again the court, without more, must send any dispute to the arbitrator, for the parties have agreed that the construction of the arbitration promise itself is for the arbitrator, and the reluctant party has breached his promise by refusing to submit the dispute to arbitration.

In *American*, the Court deals with a request to enforce the "standard" form of arbitration clause, one that provides for the arbitration of "any disputes, misunderstandings, differences or grievances arising

between the parties as to the meaning, interpretation and application of this agreement . . . ." Since the arbitration clause itself is part of the agreement, it might be argued that a dispute as to the meaning of that clause is for the arbitrator. But the Court rejects this position, saying that the threshold question, the meaning of the arbitration clause itself, is for the judge unless the parties clearly state to the contrary. However, the Court finds that the meaning of that "standard" clause is simply that the parties have agreed to arbitrate any dispute which the moving party asserts to involve construction of the substantive provisions of the contract, because such a dispute necessarily does involve such a construction.

The issue in the *Warrior* case is essentially no different from that in *American*, that is, it is whether the company [*572] agreed to arbitrate a particular grievance. In contrast to *American*, however, the arbitration promise here excludes a particular area from arbitration -- "matters which are strictly a function of management." Because the arbitration promise is different, the scope of the court's inquiry may be broader. Here, a court may be required to examine the substantive provisions of the contract to ascertain whether the parties have provided that contracting out shall be a "function of management." If a court may delve into the merits to the extent of inquiring whether the parties have expressly agreed whether or not contracting out was a "function of management," why was it error for the lower court here to evaluate the evidence of bargaining history for the same purpose? Neat logical distinctions do not provide the answer. The Court rightly concludes that appropriate regard for the national labor policy and the special factors relevant to the labor arbitral process, admonish that judicial inquiry into the merits of this grievance should be limited to the search for an explicit provision which brings the grievance under the cover of the exclusion clause since "the exclusion clause is vague and arbitration clause quite broad." The hazard of going further into the merits is amply demonstrated by what the courts below did. On the basis of inconclusive evidence, those courts found that *Warrior* was in no way limited by any implied covenants of good faith and fair dealing from contracting out as it pleased -- which would necessarily mean that *Warrior* was free completely to destroy the collective bargaining agreement by contracting out all the work.

The very ambiguity of the *Warrior* exclusion clause suggests that the parties were generally more concerned with having an arbitrator render decisions as to the

R000178

363 U.S. 564, *572; 80 S. Ct. 1343, **1347;
4 L. Ed. 2d 1403, ***1408; 1960 U.S. LEXIS 1920

meaning of the contract than they were in restricting the arbitrator's jurisdiction. The case might of course be otherwise were the arbitration clause very narrow, or the [*573] exclusion clause quite specific, for the inference might then be permissible that the parties had manifested a greater interest in confining the arbitrator; the presumption of arbitrability would then not have the same force and the Court would be somewhat freer to examine into the merits.

The Court makes reference to an arbitration clause being the *quid pro quo* for a no-strike clause. I do not understand the Court to mean that the application of the principles announced today depends upon the presence of a no-strike clause in the agreement.

MR. JUSTICE FRANKFURTER joins these observations.

**REFERENCES**
Annotation References:

Matters arbitrable under arbitration provisions of collective labor contract, *24 ALR2d 752.*

R000179



LEXSEE 363 U.S. 574

## UNITED STEELWORKERS OF AMERICA v. WARRIOR & GULF NAVIGATION CO.

### No. 443

### SUPREME COURT OF THE UNITED STATES

*363 U.S. 574; 80 S. Ct. 1347; 4 L. Ed. 2d 1409; 1960 U.S. LEXIS 1921; 40 Lab. Cas. (CCH) P66,629; 46 L.R.R.M. 2416*

**April 27, 1960, Argued
June 20, 1960, Decided**

**PRIOR HISTORY:**     CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.

**DISPOSITION:**  *269 F.2d 633*, reversed.

**SUMMARY:**

Employees whose collective bargaining contract with the employer provided for arbitration of differences as to the meaning and application of the provisions of the contract, but excepted from arbitration matters which are strictly a function of management, protested the employer's practice of contracting out work formerly done by employees. Upon the employer's refusal to arbitrate this grievance, a suit to compel arbitration was brought in the United States District Court for the Southern District of Alabama; the District Court dismissed the complaint, holding that the collective bargaining contract did not permit arbitration of the employer's business judgment in contracting out work (*168 F Supp 702*). The Court of Appeals for the Fifth Circuit affirmed (*269 F2d 633*).

On certiorari, the United States Supreme Court reversed the judgment below. In an opinion reflecting the views of six members of the court, Douglas, J., held that the employees' grievance was not necessarily excluded from arbitration by the terms of the collective bargaining contract, and, since this grievance amounted to a difference as to the meaning and application of the

provisions of the contract, arbitration thereof was compellable.

Frankfurter, J., concurred in the result.

Brennan, J., joined by Harlan, J., concurred in an opinion which appears infra, page 1432. Frankfurter, J., joined in the observations stated in this opinion.

Whittaker, J., dissented, asserting that the grievance as to contracting out was not an arbitrable dispute under the terms of the collective bargaining contract and the practice of the parties thereunder.

Black, J., did not participate.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

LABOR §21

collective bargaining. --

Headnote:[1]

It is the federal policy to promote industrial stabilization through the collective bargaining agreement.

[***LEdHN2]

LABOR §125

arbitration. --

363 U.S. 574, *; 80 S. Ct. 1347, **;
4 L. Ed. 2d 1409, ***LEdHN2; 1960 U.S. LEXIS 1921

Headnote:[2]

The inclusion in a collective bargaining agreement of a provision for arbitration of grievances is a major factor in achieving industrial peace.

[***LEdHN3]

LABOR §125

arbitration -- strikes. --

Headnote:[3]

Complete effectuation of federal policy is achieved when a collective bargaining agreement contains both an arbitration provision for all unresolved grievances and an absolute prohibition of strikes, the arbitration provision being the quid pro quo for the agreement not to strike.

[***LEdHN4]

LABOR §125

arbitration -- attitude of courts. --

Headnote:[4]

In the commercial case, arbitration is the substitute for litigation, while in labor relations arbitration is the substitute for industrial strife; arbitration of labor disputes has different functions from arbitration under the ordinary commercial agreement, and the hostility evinced by the courts toward arbitration of commercial contracts has no place in the field of labor relations.

[***LEdHN5]

LABOR §125

arbitration. --

Headnote:[5]

Arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself.

[***LEdHN6]

LABOR §40

collective bargaining -- nature of contract. --

Headnote:[6]

A collective bargaining agreement states the rights and duties of the parties and is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.

[***LEdHN7]

LABOR §40

collective bargaining -- nature of contract. --

Headnote:[7]

A collective bargaining agreement covers the whole employment relationship; it calls into being a new common law--the common law of the particular industry or of a particular plant.

[***LEdHN8]

LABOR §44

collective bargaining -- construction of contract. --

Headnote:[8]

A collective bargaining agreement is not simply a document by which the union and the employees have imposed upon management limited, express restrictions of its otherwise absolute right to manage the enterprise, so that an employee's claim must fail unless he can point to a specific provision upon which the claim is founded; the words of the contract are not the exclusive source of rights and duties.

[***LEdHN9]

LABOR §44

collective bargaining -- construction of contract. --

Headnote:[9]

Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the bargaining process demand a common law of the shop which implements and furnishes the context of the agreement.

[***LEdHN10]

R000181

LABOR §40

collective bargaining. --

Headnote:[10]

A collective bargaining agreement is an effort to erect a system of industrial self-government.

[***LEdHN11]

LABOR §40

collective bargaining -- alternatives. --

Headnote:[11]

The choice of parties to a collective bargaining agreement is not between entering or refusing to enter into a relationship, but is between having that relationship governed by an agreed upon rule of law or leaving each and every matter subject to a temporary resolution dependent solely upon the relative strength, at any given moment, of the contending forces.

[***LEdHN12]

LABOR §40

collective bargaining -- contents of agreement. --

Headnote:[12]

Because of the compulsion to reach agreement and the breadth of the matters covered, as well as the need for a concise and readable instrument, the collective bargaining agreement which is the product of negotiation is a compilation of diverse provisions: some provide objective criteria almost automatically applicable; some provide more or less specific standards which require reason and judgment in their application; and some do little more than leave problems to future consideration with an expression of hope and good faith.

[***LEdHN13]

LABOR §125

arbitration -- importance. --

Headnote:[13]

Whereas courts and arbitration in the context of most commercial contracts are resorted to because there has been a breakdown in the working relationship of the parties, such resort being the unwanted exception, the machinery for arbitration of grievances under a collective bargaining agreement is at the very heart of a system of industrial self-government.

[***LEdHN14]

LABOR §125

arbitration -- scope. --

Headnote:[14]

Arbitration pursuant to a provision in a collective bargaining contract for arbitration of grievances is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and providing for their solution in a way which will generally accord with the variant needs and desires of the parties; the processing of disputes through the grievance machinery is a vehicle by which meaning and content is given the collective bargaining contract.

[***LEdHN15]

LABOR §125

arbitration -- scope. --

Headnote:[15]

The grievance and arbitration provision of a collective bargaining agreement embraces all of the questions on which the parties disagree except the matters which the parties specifically exclude; the grievance procedure is a part of the continuous collective bargaining process, and it, rather than a strike, is the terminal point of a disagreement.

[***LEdHN16]

LABOR §125

arbitration -- functions of arbitrator. --

Headnote:[16]

The labor arbitrator, acting under the arbitration provision of a collective bargaining contract, performs functions which are not normal to the courts, and the considerations which help him fashion judgments may be

R000182

foreign to the competence of courts; the arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law--the practice of the industry and the shop -- is equally a part of the collective bargaining contract, although not expressed in it.

[***LEdHN17]

ARBITRATION §8

arbitrator -- status. --

Headnote:[17]

An arbitrator is not a public tribunal imposed upon the parties by superior authority which the parties are obliged to accept; he has no general charter to administer justice for a community which transcends the parties, but is a part of a system of self-government created by and confined to the parties.

[***LEdHN18]

ARBITRATION §2

based on contract. --

Headnote:[18]

Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.

[***LEdHN19]

LABOR §125

arbitration -- scope -- function of courts. --

Headnote:[19]

Under 301 of the Labor Management Relations Act of 1947 (29 USC 185(a)), by which Congress has assigned to the courts the duty of determining whether the reluctant party to a collective bargaining agreement containing an arbitration provision has breached his agreement to arbitrate, the judicial inquiry must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or to give the arbitrator the power to make the award he made; an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute, doubts being resolved in favor of coverage.

[***LEdHN20]

LABOR §125

arbitration -- function of courts. --

Headnote:[20]

Under a collective bargaining contract's provision for arbitration of differences as to the meaning and application of the provisions of the contract, the question of arbitrability is for the courts to decide.

[***LEdHN21]

EVIDENCE §385

LABOR §125

arbitration -- burden of proof -- arbitrability. --

Headnote:[21]

A party to a collective bargaining contract containing a grievance- arbitration clause who, in seeking to compel arbitration over the objection of the other contracting party, asserts that the parties, by their contract, excluded from court determination not merely the decision of the merits of the grievance but also the question of its arbitrability, and vested power to make both determinations in the arbitrator, must bear the burden of a clear demonstration that the contract had that purpose.

[***LEdHN22]

LABOR §125

arbitration -- scope -- contracting out work. --

Headnote:[22]

A collective bargaining contract provision for arbitration of grievances which excepts from arbitration matters which are strictly a function of management but makes the grievance procedure applicable to differences or local trouble of any kind which may arise, does not necessarily except from the grievance procedure a dispute regarding the employer's practice of contracting out work previously performed by employees.

R000183

[***LEdHN23]

LABOR §40

collective bargaining -- effect. --

Headnote:[23]

Collective bargaining agreements regulate or restrain the exercise of management functions; they do not oust management from the performance of these functions.

[***LEdHN24]

LABOR §1

management functions. --

Headnote:[24]

Hiring and firing, pay and promotion, supervision and planning, are a part of the management's function, and, absent a collective bargaining agreement, this function may be exercised freely except as limited by public law and by the willingness of employees to work under particular, unilaterally imposed conditions.

[***LEdHN25]

LABOR §125

arbitration -- no-strike clause. --

Headnote:[25]

When a collective bargaining contract containing a provision for arbitration of grievances also contains a no-strike clause, everything that management does is subject to the agreement, for either management is prohibited or limited in the action it takes, or if not, it is protected from interference by strikes.

[***LEdHN26]

LABOR §125

arbitration -- functions of management. --

Headnote:[26]

The phrase "strictly a function of management," as used in the provision of a collective bargaining agreement excepting from arbitration grievances as to matters which are strictly a function of management, has reference only to that over which the contract gives management complete control and unfettered discretion and does not refer to any practice in which, under particular circumstances prescribed by the contract, management is permitted to indulge.

[***LEdHN27]

LABOR §125

arbitration -- contracting out work. --

Headnote:[27]

If the provision of a collective bargaining agreement regarding arbitration of grievances excludes from the grievance procedure the contracting out of work by the employer, or a written collateral agreement makes it clear that contracting out of work is not a matter for arbitration, a grievance based solely on contracting out is not arbitrable.

[***LEdHN28]

LABOR §125

arbitration -- exclusion -- function of courts. --

Headnote:[28]

In the absence from a collective bargaining agreement's provision for arbitration of grievances of any express exclusion from arbitration of a particular grievance, only the most forceful evidence of a purpose to exclude that grievance from arbitration can prevail, especially where the exclusionary clause is vague and the arbitration clause is broad; and, since any attempt by a court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement when the alternative is to use the services of an arbitrator.

[***LEdHN29]

LABOR §125

arbitration -- contracting out work. --

Headnote:[29]

An employee grievance alleging that the employer violated the terms of a collective bargaining agreement in

363 U.S. 574, *; 80 S. Ct. 1347, **;
4 L. Ed. 2d 1409, ***LEdHN29; 1960 U.S. LEXIS 1921

contracting out work formerly done by employees is subject to arbitration under a provision of the contract calling for arbitration of disputes "as to the meaning and application of the provisions of this Agreement."

[***LEdHN30]

LABOR §125

arbitration -- policy. --

Headnote:[30]

In cases involving the arbitrability, under a collective bargaining contract, of a particular labor dispute, the judiciary sits to bring into operation an arbitral process which substitutes a regime of peaceful settlement for the old regime of industrial conflict.

**SYLLABUS**

This suit under § 301 (a) of the Labor Management Relations Act, 1947, was brought by a labor union to compel arbitration of a grievance based upon the employer's practice of contracting out work while laying off employees who could have performed such work. The collective bargaining agreement between the parties contained "no strike" and "no lock-out" provisions and set up a grievance procedure culminating in arbitration. It provided that "matters which are strictly a function of management shall not be subject to arbitration"; but it also provided that "Should differences arise . . . as to the meaning and application of the provisions of this Agreement, or should any local trouble of any kind arise," the grievance procedure should be followed. The Court of Appeals ruled that deciding whether to contract out work was "strictly a function of management" within the meaning of the agreement, and it sustained a judgment of the District Court dismissing the complaint. *Held*: It erred in doing so, and the judgment is reversed. Pp. 575-585.

(a) In a suit under § 301 (a), judicial inquiry must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or to give the arbitrator power to make the award he made; an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute; and doubts should be resolved in favor of coverage. Pp. 582-583.

(b) In the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. Pp. 583-585.

(c) Since, in this case, the parties had agreed that any dispute "as to the meaning of this Agreement" would be determined by arbitration, it was for the arbitrator, not the courts, to decide whether the contracting out here involved violated the agreement. P. 585.

COUNSEL: David E. Feller argued the cause for petitioner. With him on the brief were Arthur J. Goldberg, Elliot Bredhoff, James P. Clowes and Carney M. Layne.

Samuel Lang argued the cause for respondent. With him on the brief were Richard C. Keenan and T. K. Jackson, Jr.

JUDGES: Warren, Frankfurter, Douglas, Clark, Harlan, Brennan, Whittaker, Stewart; Black took no part in the consideration or decision of this case.

OPINION BY: DOUGLAS

OPINION

[*575] [***1413] [**1349] Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BRENNAN.

Respondent transports steel and steel products by barge and maintains a terminal at Chickasaw, Alabama, where it performs maintenance and repair work on its barges. The employees at that terminal constitute a bargaining unit covered by a collective bargaining agreement negotiated by petitioner union. Respondent between 1956 and 1958 laid off some employees, reducing the bargaining unit from 42 to 23 men. This reduction was due in part to respondent contracting maintenance work, previously done by its employees, to other companies. The latter used respondent's supervisors to lay out the work and hired some of the laid-off employees of respondent (at reduced wages). Some were in fact assigned to work on respondent's barges. A number of employees signed a grievance which petitioner presented to respondent, the grievance reading:

R000185

363 U.S. 574, *575; 80 S. Ct. 1347, **1349;
4 L. Ed. 2d 1409, ***1413; 1960 U.S. LEXIS 1921

"We are hereby protesting the Company's actions, of arbitrarily and unreasonably contracting out work to other concerns, that could and previously has been performed by Company employees.

"This practice becomes unreasonable, unjust and discriminatory in lieu [*sic*] of the fact that at present [*576] there are a number of employees that have been laid off for about 1 and 1/2 years or more for allegedly lack of work.

"Confronted with these facts we charge that the Company is in violation of the contract by inducing a partial lock-out, of a number of the employees who would otherwise be working were it not for this unfair practice."

The collective agreement had both a "no strike" and a "no lockout" provision. [***1414] It also had a grievance procedure which provided in relevant part as follows:

"Issues which conflict with any Federal statute in its application as established by Court procedure or matters which are strictly a function of management shall not be subject to arbitration under this section.

"Should differences arise between the Company and the Union or its members employed by the Company as to the meaning and application of the provisions of this Agreement, or should any local trouble of any kind arise, there shall be no suspension of work on account of such differences but an earnest effort shall be made to settle such differences immediately in the following manner:

[**1350] "A. For Maintenance Employees:

"First, between the aggrieved employees, and the Foreman involved;

"Second, between a member or members of the Grievance Committee designated by the Union, and the Foreman and Master Mechanic.

. . . .

"Fifth, if agreement has not been reached the matter shall be referred to an impartial umpire for decision. The parties shall meet to decide on an umpire acceptable to both. If no agreement on selection of an umpire is reached, the parties shall jointly petition [*577] the United States Conciliation Service for suggestion of a list

of umpires from which selection will be made. The decision of the umpire shall be final."

Settlement of this grievance was not had and respondent refused arbitration. This suit was then commenced by the union to compel it. [1]

> 1    Section 301 (a) of the Labor Management Relations Act, 1947, 61 Stat. 156, *29 U. S. C. § 185 (a)*, provides:
>
>    "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." See *Textile Workers v. Lincoln Mills, 353 U.S. 448.*

The District Court granted respondent's motion to dismiss the complaint. *168 F.Supp. 702.* It held after hearing evidence, much of which went to the merits of the grievance, that the agreement did not "confide in an arbitrator the right to review the defendant's business judgment in contracting out work." *Id., at 705.* It further held that "the contracting out of repair and maintenance work, as well as construction work, is strictly a function of management not limited in any respect by the labor agreement involved here." *Ibid.* The Court of Appeals affirmed by a divided vote, *269 F.2d 633*, the majority holding that the collective agreement had withdrawn from the grievance procedure "matters which are strictly a function of management" and that contracting out fell in that exception. The case is here on a writ of certiorari. *361 U.S. 912.*

[***LEdHR1] [1] [***LEdHR2] [2]We held in *Textile Workers v. Lincoln Mills, 353 U.S. 448*, that a grievance arbitration provision in a collective agreement could be enforced by reason of § 301 (a) of the Labor Management Relations Act [2] and that the policy to be applied in enforcing this type of arbitration [*578] was that reflected in our national labor laws. *Id., at 456-457.*The present [***1415] federal policy is to promote industrial stabilization through the collective bargaining agreement. [3] *Id., at 453-454.* A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement. [4]

363 U.S. 574, *578; 80 S. Ct. 1347, **1350;
4 L. Ed. 2d 1409, ***1415; 1960 U.S. LEXIS 1921

2  Note 1, *supra.*

3  In § 8 (d) of the National Labor Relations Act, as amended by the 1947 Act, *29 U. S. C. § 158 (d)*, Congress indeed provided that where there was a collective agreement for a fixed term the duty to bargain did not require either party "to discuss or agree to any modification of the terms and conditions contained in" the contract. And see *Labor Board v. Sands Mfg. Co., 306 U.S. 332.*

[***LEdHR3] [3]

4  Complete effectuation of the federal policy is achieved when the agreement contains both an arbitration provision for all unresolved grievances and an absolute prohibition of strikes, the arbitration agreement being the "*quid pro quo*" for the agreement not to strike. *Textile Workers v. Lincoln Mills, 353 U.S. 448, 455.*

[***LEdHR4]  [4]  [***LEdHR5]  [5]Thus  [**1351] the run of arbitration cases, illustrated by *Wilko v. Swan, 346 U.S. 427*, becomes irrelevant to our problem. There the choice is between the adjudication of cases or controversies in courts with established procedures or even special statutory safeguards on the one hand and the settlement of them in the more informal arbitration tribunal on the other. In the commercial case, arbitration is the substitute for litigation. Here arbitration is the substitute for industrial strife. Since arbitration of labor disputes has quite different functions from arbitration under an ordinary commercial agreement, the hostility evinced by courts toward arbitration of commercial agreements has no place here. For arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself.

[***LEdHR6]  [6]  [***LEdHR7]  [7]The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. See Shulman, Reason, Contract, and Law in Labor Relations, 68 Harv. L. Rev. 999, 1004-1005. [*579] The collective agreement covers the whole employment relationship. [5] It calls into being a new common law -- the common law of a particular industry or of a particular plant. As one observer has put it: [6]

" . . .

[***LEdHR8]  [8]  [***LEdHR9]  [9]It is not unqualifiedly true that a collective-bargaining [***1416] agreement is simply a document by which the union and employees have imposed upon management limited, express restrictions of its otherwise absolute right to manage the enterprise, so that an employee's claim must fail unless he can point to a specific contract provision upon which the claim is founded. There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages. Within the sphere of collective bargaining, the institutional characteristics [*580] and the governmental nature of the collective-bargaining process demand a common law of the shop which implements and furnishes the context of the agreement. We must assume that intelligent negotiators acknowledged so plain a need unless they stated a contrary rule in plain words."

5  "Contracts which ban strikes often provide for lifting the ban under certain conditions. Unconditional pledges against strikes are, however, somewhat more frequent than conditional ones. Where conditions are attached to no-strike pledges, one or both of two approaches may be used: certain *subjects* may be exempted from the scope of the pledge, or the pledge may be lifted after certain *procedures* are followed by the union. (Similar qualifications may be made in pledges against lockouts.)

"Most frequent conditions for lifting no-strike pledges are: (1) The occurrence of a deadlock in wage reopening negotiations; and (2) violation of the contract, especially non-compliance with the grievance procedure and failure to abide by an arbitration award.

"No-strike pledges may also be lifted after compliance with specified procedures. Some contracts permit the union to strike after the grievance procedure has been exhausted without a settlement, and where arbitration is not prescribed as the final recourse. Other contracts permit a strike if mediation efforts fail, or after a specified cooling-off period." Collective Bargaining, Negotiations and Contracts, Bureau of National

Affairs, Inc., 77:101.

6   Cox, Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482, 1498-1499 (1959).

[***LEdHR10]   [10]   [***LEdHR11]   [11] [***LEdHR12]   [12]   [***LEdHR13]   [13] [***LEdHR14] [14]A collective bargaining agreement is an effort to erect a system of industrial self-government. When most parties enter [**1352] into contractual relationship they do so voluntarily, in the sense that there is no real compulsion to deal with one another, as opposed to dealing with other parties. This is not true of the labor agreement. The choice is generally not between entering or refusing to enter into a relationship, for that in all probability preexists the negotiations. Rather it is between having that relationship governed by an agreed-upon rule of law or leaving each and every matter subject to a temporary resolution dependent solely upon the relative strength, at any given moment, of the contending forces. The mature labor agreement may attempt to regulate all aspects of the complicated relationship, from the most crucial to the most minute over an extended period of time. Because of the compulsion to reach agreement and the breadth of the matters covered, as well as the need for a fairly concise and readable instrument, the product of negotiations (the written document) is, in the words of the late Dean Shulman, "a compilation of diverse provisions: some provide objective criteria almost automatically applicable; some provide more or less specific standards which require reason and judgment in their application; and some do little more than leave problems to future consideration with an expression of hope and good faith." Shulman, *supra*, at 1005. Gaps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement. Many of the specific practices [*581] which underlie the agreement may be unknown, except in hazy form, even to the negotiators. Courts and arbitration in the context of most commercial contracts are resorted to because there has been a breakdown in the working relationship of the parties; such resort is the unwanted exception. But the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through [***1417] the grievance machinery

is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

[***LEdHR15] [15]Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement. The grievance procedure is, in other words, a part of the continuous collective bargaining process. It, rather than a strike, is the terminal point of a disagreement.

[***LEdHR16]   [16] [***LEdHR17]   [17]The labor arbitrator performs functions which are not normal to the courts; the considerations which help him fashion judgments may indeed be foreign to the competence of courts.

"A proper conception of the arbitrator's function is basic. He is not a public tribunal imposed upon the parties by superior authority which the parties are obliged to accept. He has no general charter to administer justice for a community which transcends the parties. He is rather part of a system of self-government created by and confined to the parties. . . ." Shulman, *supra*, at 1016.

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial [*582] common law -- the practices of the industry and the shop -- is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not [**1353] only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

[***LEdHR18]   [18] [***LEdHR19]   [19]The

Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation [*583] that covers the asserted dispute. [***1418] Doubts should be resolved in favor of coverage. [7]

[***LEdHR20] [20] [***LEdHR21] [21]

7  It is clear that under both the agreement in this case and that involved in *American Manufacturing Co., ante,* p. 564, the question of arbitrability is for the courts to decide. Cf. Cox, Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482, 1508-1509. Where the assertion by the claimant is that the parties excluded from court determination not merely the decision of the merits of the grievance but also the question of its arbitrability, vesting power to make both decisions in the arbitrator, the claimant must bear the burden of a clear demonstration of that purpose.

[***LEdHR22] [22]We do not agree with the lower courts that contracting-out grievances were necessarily excepted from the grievance procedure of this agreement. To be sure, the agreement provides that "matters which are strictly a function of management shall not be subject to arbitration." But it goes on to say that if "differences" arise or if "any local trouble of any kind" arises, the grievance procedure shall be applicable.

[***LEdHR23] [23] [***LEdHR24] [24] [***LEdHR25] [25]Collective bargaining agreements regulate or restrict the exercise of management functions; they do not oust management from the performance of them. Management hires and fires, pays and promotes, supervises and plans. All these are part of its function, and absent a collective bargaining agreement, it may be

exercised freely except as limited by public law and by the willingness of employees to work under the particular, unilaterally imposed conditions. A collective bargaining agreement may treat only with certain specific practices, leaving the rest to management but subject to the possibility of work stoppages. When, however, an absolute no-strike clause is included in the agreement, then in a very real sense everything that management does is subject to the agreement, for either management is prohibited or limited in the action it takes, or if not, it is protected from interference by strikes. This comprehensive reach of the collective bargaining agreement does not mean, [*584] however, that the language, "strictly a function of management," has no meaning.

"Strictly a function of management" might be thought to refer to any practice of management in which, under particular [**1354] circumstances prescribed by the agreement, it is permitted to indulge. But if courts, in order to determine arbitrability, were allowed to determine what is permitted and what is not, the arbitration clause would be swallowed up by the exception. Every grievance in a sense involves a claim that management has violated some provision of the agreement.

[***LEdHR26] [26] [***LEdHR27] [27] [***LEdHR28] [28]Accordingly, "strictly a function of management" must be interpreted as referring only to that over which the contract gives management complete control and unfettered discretion. Respondent claims that the contracting out of work falls within this category. Contracting out work is the basis of many grievances; and that type of claim is grist in the mills of the arbitrators. [8] A specific [***1419] collective bargaining agreement may exclude contracting out from the grievance procedure. Or a written collateral agreement may make clear that contracting out was not a matter for arbitration. In such a case a grievance based solely on contracting out would not be arbitrable. Here, however, there is no such provision. Nor is there any showing that the parties designed the phrase "strictly a function of management" to encompass any and all forms of contracting out. In the absence of any [*585] express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. Since any attempt

R000189

by a court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator.

> 8   See *Celanese Corp. of America*, 33 Lab. Arb. Rep. 925, 941 (1959), where the arbiter in a grievance growing out of contracting out work said:
>
>> "In my research I have located 64 published decisions which have been concerned with this issue covering a wide range of factual situations but all of them with the common characteristic -- i. e., the contracting-out of work involved occurred under an Agreement that contained no provision that specifically mentioned contracting-out of work."

[***LEdHR29] [29]The grievance alleged that the contracting out was a violation of the collective bargaining agreement. There was, therefore, a dispute "as to the meaning and application of the provisions of this Agreement" which the parties had agreed would be determined by arbitration.

[***LEdHR30] [30]The judiciary sits in these cases to bring into operation an arbitral process which substitutes a regime of peaceful settlement for the older regime of industrial conflict. Whether contracting out in the present case violated the agreement is the question. It is a question for the arbiter, not for the courts.

*Reversed.*

MR. JUSTICE FRANKFURTER concurs in the result.

MR. JUSTICE BLACK took no part in the consideration or decision of this case.

[For opinion of MR. JUSTICE BRENNAN, joined by MR. JUSTICE FRANKFURTER and MR. JUSTICE HARLAN, see *ante*, p. 569.]

**DISSENT BY:** WHITTAKER

**DISSENT**

MR. JUSTICE WHITTAKER, dissenting.

Until today, I have understood it to be the unquestioned law, as this Court has consistently held, that arbitrators are private judges chosen by the parties to decide [*586] particular matters specifically submitted; 1 that the contract under which [**1355] matters are submitted to arbitrators is at once the source and limit of their authority and power; 2 and that their power to decide issues with finality, thus ousting the normal functions of the courts, must rest upon a clear, definitive agreement of the parties, as such powers can never be implied. *United States v. Moorman*, 338 U.S. 457, 462; [***1420] 3 *Mercantile Trust Co.* v. *Hensey*, 205 U.S. 298, 309. 4 See also *Fernandez & Hnos.* v. *Rickert Rice Mills*, 119 F.2d 809, 815 (C. A. 1st Cir.); 5 *Marchant v. Mead-Morrison Mfg. Co.*, 252 N. Y. 284, 299, 169 N. E. 386, 391; 6 *Continental Milling & Feed Co.* [*587] v. *Doughnut Corp.*, 186 Md. 669, 676, 48 A. 2d 447, 450; 7 *Jacob v. Weisser*, 207 Pa. 484, 489, 56 A. 1065, 1067. 8 I believe that the Court today departs from the established principles announced in these decisions.

> 1   "Arbitrators are judges chosen by the parties to decide the matters submitted to them." *Burchell v. Marsh*, 17 How. 344, 349.
> 2   "The agreement under which [the arbitrators] were selected *was at once the source and limit of their authority*, and the award, to be binding, must, in substance and form, conform to the submission." (Emphasis added.) *Continental Ins. Co.* v. *Garrett*, 125 F. 589, 590 (C. A. 6th Cir.) -- Opinion by Judge, later Mr. Justice, Lurton.
> 3   "It is true that *the intention of parties to submit their contractual disputes to final determination outside the courts should be made manifest by plain language*." (Emphasis added.) *United States v. Moorman*, 338 U.S. 457, 462.
> 4   "To make such [an arbitrator's] certificate conclusive *requires plain language in the contract*. It is not to be implied." (Emphasis added.) *Mercantile Trust Co.* v. *Hensey*, 205 U.S. 298, 309.
> 5   "A party is never required to submit to arbitration any question which he has not agreed so to submit, and contracts providing for arbitration *will be carefully construed in order not to force a party to submit to arbitration a question which he did not intend to be submitted*." (Emphasis added.) *Fernandez & Hnos.* v. *Rickert*

*Rice Mills*, 119 F.2d 809, 815 (C. A. 1st Cir.).

6   In this leading case, Judge, later Mr. Justice, Cardozo said:

"The question is one of intention, to be ascertained by the same tests that are applied to contracts generally. . . . No one is under a duty to resort to these conventional tribunals, however helpful their processes, *except to the extent that he has signified his willingness*. Our own favor or disfavor of the cause of arbitration is not to count as a factor in the appraisal of the thought of others." (Emphasis added.)  *Marchant v. Mead-Morrison Mfg. Co.*, 252 N. Y. 284, 299, 169 N. E. 386, 391.

7   In this case, the Court, after quoting Judge Cardozo's language in *Marchant, supra*, saying that "the question is one of intention," said:

"Sound policy demands that the terms of an arbitration agreement *must not be strained to discover power to pass upon matters in dispute, but the terms must be clear and unmistakable to oust the jurisdiction of the Court, for trial by jury cannot be taken away in any case merely by implication*." (Emphasis added.)  *Continental Milling & Feed Co.* v. *Doughnut Corp.*, 186 Md. 669, 676, 48 A. 447, 450.

8   "But, under any circumstances, before the decision of an arbitrator can be held final and conclusive, it must appear, as was said in *Chandley Bros.* v. *Cambridge Springs*, 200 Pa. 230, 49 Atl. 772, that power to pass upon the subject-matter, is clearly given to him. 'The terms of the agreement are not to be strained to discover it. They must be clear and unmistakable to oust the jurisdiction of the courts; for trial by jury cannot be taken away by implication merely in any case.'" (Emphasis added.)  *Jacob v. Weisser*, 207 Pa. 484, 489, 56 A. 1065, 1067.

Here, the employer operates a shop for the normal maintenance of its barges, but it is not equipped to make major repairs, and accordingly the employer has, from the beginning of its operations more than 19 years ago, contracted out its major repair work. During most, if not all, of this time the union has represented [**1356] the employees in that unit. The District Court found that "throughout the successive labor agreements between these parties, including the present one, . . . [the union]

has unsuccessfully sought to negotiate changes in the labor contracts, and particularly during the negotiation of the present labor agreement, . . . which would have limited [*588] the right of the [employer] to continue the practice of contracting out such work." *168 F.Supp. 702, 704-705.*

The labor agreement involved here provides for arbitration of disputes respecting the interpretation and application of the agreement and, arguably, also some other things. But the first paragraph of the arbitration section says: " [***1421] Matters which are strictly a function of management shall not be subject to arbitration under this section." Although acquiescing for 19 years in the employer's interpretation that contracting out work was "strictly a function of management," and having repeatedly tried -- particularly in the negotiation of the agreement involved here -- but unsuccessfully, to induce the employer to agree to a covenant that would prohibit it from contracting out work, the union, after having agreed to and signed the contract involved, presented a "grievance" on the ground that the employer's contracting out work, at a time when some employees in the unit were laid off for lack of work, constituted a partial "lockout" of employees in violation of the antilockout provision of the agreement.

Being unable to persuade the employer to agree to cease contracting out work or to agree to arbitrate the "grievance," the union brought this action in the District Court, under § 301 of the Labor Management Relations Act, *29 U. S. C. § 185*, for a decree compelling the employer to submit the "grievance" to arbitration. The District Court, holding that the contracting out of work was, and over a long course of dealings had been interpreted and understood by the parties to be, "strictly a function of management," and was therefore specifically excluded from arbitration by the terms of the contract, denied the relief prayed, *168 F.Supp. 702.* The Court of Appeals affirmed, *269 F.2d 633*, and we granted certiorari. *361 U.S. 912.*

[*589] The Court now reverses the judgment of the Court of Appeals. It holds that the arbitrator's source of law is "not confined to the express provisions of the contract," that arbitration should be ordered "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," that "doubts [of arbitrability] should be resolved in favor of coverage," and that when, as here,

363 U.S. 574, *589; 80 S. Ct. 1347, **1356;
4 L. Ed. 2d 1409, ***1421; 1960 U.S. LEXIS 1921

"an absolute no-strike clause is included in the agreement, then . . . everything that management does is subject to [arbitration]." I understand the Court thus to hold that the arbitrators are not confined to the express provisions of the contract, that arbitration is to be ordered unless it may be said with positive assurance that arbitration of a particular dispute is excluded by the contract, that doubts of arbitrability are to be resolved in favor of arbitration, and that when, as here, the contract contains a no-strike clause, everything that management does is subject to arbitration.

This is an entirely new and strange doctrine to me. I suggest, with deference, that it departs from both the contract of the parties and the controlling decisions of this Court. I find nothing in the contract that purports to confer upon arbitrators any such general breadth of private judicial power. The Court cites no legislative or judicial authority that creates for or gives to arbitrators such broad general powers. And I respectfully submit that today's decision cannot be squared with the statement of Judge, later Mr. Justice, Cardozo in *Marchant* [**1357] that "No one is under a duty to resort to these conventional tribunals, however helpful their processes, *except to the extent that he has signified his willingness.* Our own favor or disfavor of the cause of arbitration is not to count as a factor in the appraisal of the thought of others" (emphasis added), *252 N. Y., at 299, 169 N. E., at 391;* nor with his statement [*590] in that case that "the question [***1422] is one of intention, to be ascertained by the same tests that are applied to contracts generally," *id.;* nor with this Court's statement in *Moorman,* "that the intention of the parties to submit their contractual disputes to final determination outside the courts *should be made manifest by plain language*" (emphasis added), *338 U.S., at 462;* nor with this Court's statement in *Hensey* that: "To make such [an arbitrator's] certificate conclusive *requires plain language in the contract.* It is not to be implied." (Emphasis added.) *205 U.S., at 309.* "A party is never required to submit to arbitration any question which he has not agreed so to submit, and *contracts providing for arbitration will be carefully construed in order not to force a party to submit to arbitration a question which he did not intend to be submitted.*" (Emphasis added.) *Fernandez & Hnos.* v. *Rickert Rice Mills, supra, 119 F.2d, at 815* (C. A. 1st Cir.).

With respect, I submit that there is nothing in the contract here to indicate that the employer "signified [its]

willingness" ( *Marchant, supra, at 299*) to submit to arbitrators whether it must cease contracting out work. Certainly no such intention is "made manifest by plain language" ( *Moorman, supra, at 462*), as the law "requires," because such consent "is not to be implied." *Hensey, supra, at 309.*) To the contrary, the parties by their conduct over many years interpreted the contracting out of major repair work to be "strictly a function of management," and if, as the concurring opinion suggests, the words of the contract can "be understood only by reference to the background which gave rise to their inclusion," then the interpretation given by the parties over 19 years to the phrase "matters which are strictly a function of management" should logically have some significance here. By their contract, the parties agreed that "matters [*591] which are strictly a function of management shall not be subject to arbitration." The union over the course of many years repeatedly tried to induce the employer to agree to a covenant prohibiting the contracting out of work, but was never successful. The union again made such an effort in negotiating the very contract involved here, and, failing of success, signed the contract, knowing, of course, that it did not contain any such covenant, but that, to the contrary, it contained, just as had the former contracts, a covenant that "matters which are strictly a function of management shall not be subject to arbitration." Does not this show that, instead of signifying a willingness to submit to arbitration the matter of whether the employer might continue to contract out work, the parties fairly agreed to exclude at least that matter from arbitration? Surely it cannot be said that the parties agreed to such a submission by any "plain language." *Moorman, supra, at 462,* and *Hensey, supra, at 309.* Does not then the Court's opinion compel the employer "to submit to arbitration [a] question which [it] has not agreed so to submit"? ( *Fernandez & Hnos., supra,* at 815.)

Surely the question whether a particular subject or class of subjects is or is not made arbitrable by a contract is a judicial question, and if, as the concurring [**1358] opinion suggests, "the court may conclude that [the contract] commits to arbitration any [subject or class of subjects]," it may likewise conclude that the contract does not commit such subject or class of subjects to arbitration, and "with that finding [***1423] the court will have exhausted its function" no more nor less by denying arbitration than by ordering it. Here the District Court found, and the Court of Appeals approved its finding, that by the terms of the contract, as interpreted

R000192

by the parties over 19 years, the contracting out of work was "strictly a function [*592] of management" and "not subject to arbitration." That finding, I think, should be accepted here. Acceptance of it requires affirmance of the judgment.

I agree with the Court that courts have no proper concern with the "merits" of claims which by contract the parties have agreed to submit to the exclusive jurisdiction of arbitrators. But the question is one of jurisdiction. Neither may entrench upon the jurisdiction of the other. The test is: Did the parties in their contract "manifest by plain language" ( *Moorman, supra, at 462*) their willingness to submit the issue in controversy to arbitrators? If they did, then the arbitrators have exclusive jurisdiction of it, and the courts, absent fraud or the like, must respect that exclusive jurisdiction and cannot interfere. But if they did not, then the courts must exercise their jurisdiction, when properly invoked, to protect the citizen against the attempted use by arbitrators of pretended powers actually never conferred. That

question always is, and from its very nature must be, a judicial one. Such was the question presented to the District Court and the Court of Appeals here. They found the jurisdictional facts, properly applied the settled law to those facts, and correctly decided the case. I would therefore affirm the judgment.

## REFERENCES

Annotation References:

1. Matters arbitrable under arbitration provisions of collective labor contract, *24 ALR2d 752*.

2. Right of arbitrators to act on their own knowledge of facts, or factors relevant to questions submitted to them, in absence of evidence in that regard, 154 ALR 1210.

3. Right of arbitrator to consider or to base his decision upon matters other than those involved in the legal principles applicable to the questions at issue between the parties, 112 ALR 873.

R000193



LEXSEE 491 F.3D 685

## INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 21, Plaintiff-Appellee, v. ILLINOIS BELL TELEPHONE COMPANY, Defendant-Appellant.

### No. 06-2335

### UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

*491 F.3d 685; 2007 U.S. App. LEXIS 15740; 182 L.R.R.M. 2161; 154 Lab. Cas. (CCH) P10,867*

### November 8, 2006, Argued
### July 2, 2007, Decided

**SUBSEQUENT HISTORY:** Rehearing denied by, Rehearing, en banc, denied by *IBEW, Local 21 v. Ill. Bell Tel. Co., 2007 U.S. App. LEXIS 21240 (7th Cir. Ill., Aug. 28, 2007)*

US Supreme Court certiorari denied by *Il Bell Tel. Co. v. Int'l Bhd. of Elec. Wkrs, 2008 U.S. LEXIS 2405 (U.S., Mar. 17, 2008)*

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 06 C 705. George W. Lindberg, Judge.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 21, Plaintiff - Appellee: Barry M. Bennett, Justin J. Lannoye, DOWD, BLOCH & BENNETT, Chicago, IL USA.

For ILLINOIS BELL TELEPHONE COMPANY, Defendant - Appellant: Jeffrey W. Sarles, MAYER, BROWN, ROWE & MAW, Chicago, IL USA.

**JUDGES:** Before CUDAHY, KANNE, and SYKES, Circuit Judges. SYKES, Circuit Judge, dissenting.

**OPINION BY:** KANNE

**OPINION**

[*686] KANNE, *Circuit Judge*. After Illinois Bell Telephone Company ("Company") refused to arbitrate a grievance, the International Brotherhood of Electrical Workers, Local 21 ("Union") filed a motion to compel arbitration in federal district court. Under the terms of the parties' collective bargaining agreement ("CBA"), the district court found the grievance arbitrable and granted the motion. We affirm.

### I. BACKGROUND

The parties' CBA has been in effect since June 27, 2004. In late 2005, the Company informed the Union that it planned to implement new "consumer performance management guidelines." In the past, employees were evaluated on a "work flow" system. Essentially, employees were [**2] required to perform specific tasks in response to actions taken by the customers with whom they dealt. The new guidelines [*687] would replace the work flow system with a sales evaluation system, wherein employees would be evaluated based on actual sales made. If an employee should fail to meet his sales requirements, he could be disciplined and eventually fired.

Upon notice of the Company's plans, the Union filed a grievance challenging the implementation of the guidelines. The parties engaged in a series of discussions regarding the guidelines, and the Company made some changes to the program. In the end, however, the parties could not resolve their dispute. The Union requested that

R000194

the grievance be submitted to arbitration, but the Company refused, asserting that the grievance was not arbitrable under the terms of the CBA. The Union then filed its motion to compel arbitration in federal court pursuant to the Federal Arbitration Act, 9 U.S.C. § 4.

The arbitration clause, § 13.16 of the CBA, defines what topics are arbitrable:

> The right to invoke arbitration shall extend only to matters which involve:
>
> > (A) The interpretation or application of any of the terms or provisions of this Agreement, [**3] unless excluded by specific provisions of this Agreement.
> >
> > (B) The discipline of an employee with six (6) or more months of Net Credited Service.

To invoke the arbitration clause, the Union points to several provisions of the CBA, the interpretation or application of which may be involved in this dispute. First, the recognition clause, § 1.01 of the CBA, states: "The Company recognizes the Union as the exclusive bargaining agent for [the] employees of the Company. . . ." Second, § 4.01 requires "mutual responsibility and respect" and a fair application of the CBA "in accord with its intent and meaning and consistent with the Union's status as exclusive bargaining representative." Third, the CBA includes a "no strike" provision, strictly prohibiting the Union from striking under any circumstance. None of the above provisions have been explicitly excluded from arbitration, and nothing in the CBA specifically pertains to the implementation of performance guidelines.

## II. ANALYSIS

"We review the district court's ruling to compel arbitration de novo." *American United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 929 (7th Cir. 2003) (citing *Harter v. Iowa Grain Co.*, 220 F.3d 544, 549-50 (7th Cir. 2000)). [**4] "[A]rbitration is a matter of

contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960)); *Int'l Med. Group, Inc. v. Am. Arbitration Ass'n, Inc.*, 312 F.3d 833, 842 (7th Cir. 2002). The arbitrator derives his authority to resolve the parties' dispute from their agreement to allow him to do so. *Int'l Med. Group*, 312 F.3d at 842. Unless the parties clearly provide otherwise, the question of arbitrability is properly decided by a court, not the arbitrator. *Id.*

When resolving arbitrability disputes, a court must bear in mind the liberal federal policy in favor of arbitration agreements. *James v. McDonald's Corp.*, 417 F.3d 672, 676-77 (7th Cir. 2005); *see* 9 U.S.C. §§ 2, 3. "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that [*688] the arbitration clause is not susceptible of an interpretation [**5] that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT&T Techs.*, 475 U.S. at 650 (quoting *Warrior & Gulf*, 363 U.S. at 582-83); *see Continental Cas. Co. v. American Nat. Ins. Co.*, 417 F.3d 727, 730-31 (7th Cir. 2005).

When determining whether the parties have agreed to arbitration, a court must be careful not to consider the merits of the underlying claim. *AT&T Techs.*, 475 U.S. at 650. If the dispute falls within the scope of the parties' arbitration agreement, even a seemingly frivolous claim must be submitted to arbitration. *Id.; see Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d 577, 581 (7th Cir. 2006). However, the arbitrator's jurisdiction remains limited by the terms of the CBA. *Am. Postal Workers Union, AFL-CIO, Milwaukee Local v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999). Thus, under the terms of § 13.16(A) of the CBA, an arbitrator's authority is limited to resolving disputes that involve the interpretation or application of a term of the CBA.

The parties have spent much time debating whether the arbitration clause in the CBA is "broad" or "narrow." While the utility of such categorization, without context, is dubious at best, the clause [**6] does appear to be in line with those that have been considered "broad." *See*

491 F.3d 685, *688; 2007 U.S. App. LEXIS 15740, **6;
182 L.R.R.M. 2161; 154 Lab. Cas. (CCH) P10,867

*AT&T Techs.*, 475 U.S. at 650 (finding arbitration clause broad where applied to "differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder"); *Int'l Union of Operating Eng'rs, Local Union 103 v. Indiana Constr. Corp.*, 13 F.3d 253, 254, 257 (7th Cir. 1994) (finding arbitration clause broad where applied to "any dispute. . . concerning the interpretation or application of the terms of this contract," plus a specific exclusion for jurisdictional disputes); *Certified Grocers of Illinois, Inc. v. Produce, Fresh & Frozen Fruits & Vegetables, Fish, Butter, Eggs, Cheese, Poultry, Florist, Nursery, Landscape & Allied Employees, Drivers, Chauffeurs, Warehousemen & Helpers Union, Chicago and Vicinity, Illinois, Local 703*, 816 F.2d 329, 329-30 (7th Cir. 1987) (finding arbitration clause broad where applied to "any difference. . . between the Employer and the Union concerning any interpretation or application of any of the provisions of this Agreement").

In order to determine whether the parties have agreed to submit this particular dispute to arbitration, we must [**7] turn to the specific language of the arbitration clause. When interpreting a contract, we look first to the plain meaning of the provision, and strive to avoid absurd results. *See County of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 822 (7th Cir. 2006). On its face, the arbitration clause in this case applies to any dispute that would require the adjudicator to interpret or apply any term or provision of the CBA, so long as another provision of the CBA does not specifically exclude that topic from arbitration.

The district court based its finding of arbitrability upon § 4.01, the mutual respect and responsibility clause. The Union has also argued that this dispute involves the interpretation and application of the recognition clause, § 1.01, and thus requires the Company to submit the dispute to arbitration. We prefer to begin our analysis with the recognition clause.

An arbitrator could interpret the recognition clause, which obligates the Company to recognize the Union as the employees' sole bargaining representative, to require only that the Company refrain from dealing with other labor organizations. Alternatively, an arbitrator could interpret the recognition clause to prohibit [**8] the Company [*689] from making significant changes in the terms and conditions of employment without the consent of the Union. The recognition clause is susceptible to any

number of interpretations that may impose duties of notice and negotiation upon the Company. The point is that such interpretation is the province of the arbitrator -- not of this court. So long as the recognition clause is susceptible to an interpretation wherein the Company's actions have breached its duties, and the recognition clause is encompassed by the arbitration provision, we must compel arbitration. *See AT&T Techs.*, 475 U.S. at 650 (citing *Warrior & Gulf*, 363 U.S. at 582-83).

The Company has argued that the recognition clause cannot support arbitrability, and points to this court's 1963 opinion in *Indep. Petroleum Workers of Am., Inc. v. American Oil Co.*, in support. 324 F.2d 903 (7th Cir. 1963), aff'd mem. by an equally divided Court, 379 U.S. 130, 85 S. Ct. 271, 13 L. Ed. 2d 333 (1964). *Independent Petroleum Workers* involved a labor dispute that arose when a company subcontracted work that was formerly performed by union workers. *Id. at* 904. The Union attempted to support arbitrability with the recognition clause, where the arbitration clause [**9] provided for mandatory arbitration of "[q]uestions directly involving or arising from applications, interpretations or alleged violations of the terms of this agreement." *Id. at* 905.

In response to the union's argument in *Indep. Petroleum Workers*, this court stated: "This position, if accepted, means that either party by alleging a refusal of the other to bargain with respect to any conceivable issue or controversy would become subject to arbitration. Plaintiff's position is devoid of logic." *Id. at* 906-07. The circumstances of the *Indep. Petroleum Workers* case, however, were very different than the case at hand. First, the union in that case "for many years had sought the inclusion of a clause in the collective bargaining agreement specifically prohibiting or limiting" the right at issue. *Id. at* 907. Thus, the issue of subcontracting had already been negotiated during the regular course of labor-management bargaining. This court found that point both relevant and significant. *Id.*

Second, the CBA in *Indep. Petroleum Workers* contained a rather unique provision which suspended the no-strike clause when the company refused to arbitrate a grievance. *Id. at* 905. Arbitration provisions are [**10] generally considered reciprocity for no-strike provisions. *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., Local Union No. 371 v. Logistics Support Group*, 999 F.2d 227, 230-31 (7th Cir. 1993). A recognition clause very well might take on a different

meaning in a CBA that contains a strict no-strike provision, because a refusal of the company to arbitrate would otherwise leave the union without options. If the Company can unilaterally change the conditions of employment, refuse to arbitrate, and still prohibit the Union from striking, then the purposes of the recognition clause and the Union itself are significantly undermined. This makes the case before us readily distinguishable from *Indep. Petroleum Workers*.

Finally, our decision in *Indep. Petroleum Workers* was not based solely on the merits. We also held that, because the union had already attempted to compel arbitration of the same issue in a previous suit, collateral estoppel precluded relitigation of the issue. *324 F.2d at 909*. Thus, a determination on the merits was not essential to the disposition of the case.

*Indep. Petroleum Workers* predates the Supreme Court's opinion in *AT&T Techs.*, which reaffirmed [**11] the strong presumption [*690] in favor of arbitration set forth in the *Steelworkers Trilogy. 475 U.S. 643 (1986); see United Steelworkers of Am. v. American Mfg. Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L. Ed. 2d 1403 (1960); United Steelworkers of Am. v. Warrior & Gulf Navigation Co. 363 U.S. 574, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960); United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960)*. Supreme Court precedent constrains a broad reading of *Indep. Petroleum Workers*, which centered around parties with a unique bargaining history and CBA. *See Mobil Oil Corp. v. Local 8-766, Oil, Chemical & Atomic Workers Int'l Union, 600 F.2d 322, 328-29 (1st Cir. 1979)* ("The court's reasoning on the first issue, even if treated as more than dicta to its collateral estoppel holding, is not pertinent to this case. The arbitration clause in the instant dispute does not involve a voluntary arbitration provision. . . ."); *Humble Oil & Refining Co. v. Indep. Indus. Workers' Union, 337 F.2d 321, 324 (5th Cir. 1964)*. Indeed, a number of our sister circuits have found that allegations that a CBA's recognition clause has been violated can validly support arbitrability. *E.g. Oil, Chemical & Atomic Workers Int'l Union v. Phillips 66 Co., 976 F.2d 277, 278-79 (5th Cir. 1992); [**12] E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., 812 F.2d 91, 96 (3d Cir. 1987); Local 1912, Int'l Ass'n of Machinists v. United States Potash Co., 270 F.2d 496, 499 (10th Cir. 1959)*.

While an equally divided Supreme Court affirmed *Indep. Petroleum Workers* without discussion, the Supreme Court has instructed that "summary affirmances have considerably less precedential value than an opinion on the merits," and such value "can extend no farther than the precise issues presented and necessarily decided by those actions." *Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 180, 182, 99 S. Ct. 983, 59 L. Ed. 2d 230 (1979); see also Boggs v. Boggs, 520 U.S. 833, 849, 117 S. Ct. 1754, 138 L. Ed. 2d 45 (1997); Washington v. Confederated Bands and Tribes of Yakima Indian Nation, 439 U.S. 463, 478 n.20, 99 S. Ct. 740, 58 L. Ed. 2d 740 (1979)*. From the Supreme Court's equally divided summary affirmance in *Indep. Petroleum Workers*, we can infer no comment on its approval or disapproval of the use of recognition clauses to support arbitrability.

Given the significant differences between the CBA and bargaining history in this case and that in *Indep. Petroleum Workers*, we conclude that *Indep. Petroleum Workers* is [**13] not controlling in this case. Additionally, the Supreme Court's summary affirmance sheds no light on the viability of the Union's arguments because the decision may very well have rested upon the collateral estoppel holding.

The Union in this case alleges that the Company's actions constitute a breach of the recognition clause of the CBA, § 1.01. Up until the proposed implementation of the new performance guidelines, employees were evaluated based upon the tasks they performed. If they performed the tasks that the Company told them to at the appropriate times, they received a favorable evaluation and no discipline resulted. The proposed guidelines would require the employees to deliver results. If the employees do not meet their sales quotas, they will be disciplined and possibly discharged. At the time that the current CBA was bargained over, the Union had no indication that such a change was on the horizon. Attempts at bargaining between the Company and the Union prior to implementation of the guidelines reached impasse, and the Union has alleged that this bargaining was not in good [*691] faith. Without the ability to strike or compel arbitration, the Union has no recourse.

We cannot say [**14] with positive assurance that the arbitration clause is not susceptible of an interpretation wherein a good faith allegation that the recognition clause of the CBA has been violated binds

R000197

the Company to mandatory arbitration. *See AT&T Techs., 475 U.S. at 650.* The parties could have exempted the recognition clause from arbitration, but chose not to. The Union has alleged that the Company did not bargain in good faith prior to implementation of the guidelines and has submitted employee statements alleging that unilateral implementation of the performance guidelines threatens the continued relationship between the parties. R. 14-4. Given the presumption in favor of arbitrability, the Union has met its burden. We hold that the recognition clause is an adequate basis for arbitration in this case, and therefore need not address the Union's other arguments.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

**DISSENT BY:** SYKES

### DISSENT

SYKES, *Circuit Judge,* dissenting. I respectfully dissent. The presence of an arbitration clause in a contract creates a presumption in favor of arbitration, but this means only that doubts about whether a particular dispute is covered are resolved [**15] in favor of coverage; "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960); AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648-50 (1986); Int'l Ass'n of Machinists & Aerospace Workers, Progressive Lodge No. 1000 v. Gen. Elec. Co., 865 F.2d 902, 904 (7th Cir. 1989).* The presumption of arbitrability is overcome when "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf Navigation Co., 363 U.S. at 582-83; AT&T Techs., 475 U.S. at 650.*

The arbitration clause in the parties' collective bargaining agreement ("CBA") provides: "The right to invoke arbitration shall extend *only* to matters which involve: (A) The interpretation or application of any of the terms or provisions of this Agreement, unless excluded by specific provisions of this Agreement. (B) The discipline of an employee with six (6) or more months of Net Credited Service." (Emphasis added.) The

use of the term "only" -- obviously a term of [**16] limitation -- suggests a somewhat less expansive interpretation than that urged by the Union and adopted by my colleagues. The dispute at issue here is about performance guidelines, and it is arbitrable *only* if it involves the interpretation or application of a term or provision in the CBA, or the discipline of an employee.

The CBA contains no terms or provisions whatsoever relating to performance guidelines or standards, and this dispute concerns the performance guidelines policy itself, not the discipline of a employee pursuant to it. Nonetheless, the majority concludes that the dispute is arbitrable because it "could" involve the interpretation of the so-called "recognition" clause of the CBA. Majority op. at 6. That provision, § 1.01 of the CBA, states as follows: "The Company recognizes the Union [Local 21] as the exclusive bargaining agent for those employees of the Company in the State of Illinois. . . and Lake and Porter County [sic], Indiana."

[*692] On its face, the recognition clause merely specifies *who* -- that is, which union -- shall be recognized as the employees' bargaining agent; it does not address any substantive topics pertaining to employment terms and conditions as a [**17] general matter, much less performance guidelines in particular. Nor does it articulate any duties beyond recognition or describe the scope of bargaining. Scope of bargaining issues, and the rights and obligations arising from bargaining impasses or violations, are governed by the National Labor Relations Act, *29 U.S.C. § 158 et seq.,* and a well-developed body of judicial and NLRB decisional law interpreting the statutory duty to bargain collectively and in good faith. *See generally NLRB v. Katz, 369 U.S. 736, 82 S. Ct. 1107, 8 L. Ed. 2d 230 (1962); NLRB v. Ins. Agents' Int'l Union, 361 U.S. 477, 498, 80 S. Ct. 419, 4 L. Ed. 2d 454 (1960); NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S. Ct. 718, 2 L. Ed. 2d 823 (1958); Inland Tugs v. NLRB, 918 F.2d 1299, 1307-08 (7th Cir. 1990); Kankakee-Iroquois Co. Employers' Ass'n v. NLRB, 825 F.2d 1091, 1094 (7th Cir. 1987); Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB, 246 U.S. App. D.C. 306, 765 F.2d 175, 179-80 (D.C. Cir. 1985).* There is nothing in this generic recognition clause that could be interpreted to expand the parties' statutory bargaining duties or the derivative rights and obligations flowing from bargaining impasses or illegal bargaining behavior.

R000198

In any event, the Union does not assert that the Company [**18] failed or refused to bargain in good faith over the performance guidelines. Indeed, the record reflects that the Company gave notice of the new policy and offered to meet with Union representatives to bargain over it. The Union has historically taken the position that it will not formally "bargain" over policies of this sort but agreed to meet for informal discussions with the Company. Accordingly, meetings were held and changes made to the guidelines as a result of the Union's input and objections to specific aspects of the policy.

So it is not surprising that the Union does not argue that the Company failed or refused to bargain in good faith, beyond suggesting that what occurred was "not bargaining in any real sense," whatever that means. The Union has not alleged, for example, that bargaining had not reached impasse before the Company imposed the performance guidelines. *See Inland Tugs, 918 F.2d at 1307* ("In the event of impasse, the employer is permitted to make unilateral changes in conditions of employment, but only as to matters that have been previously offered to the union."); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., 765 F.2d at 179* ("Where a [**19] mandatory subject [of bargaining] is not contained in the contract, an employer must bargain in good faith to impasse with union representatives; if no agreement is reached, the employer may unilaterally implement its bargaining proposal with respect to the matter not contained in the agreement."). The Union's grievance challenges the performance guidelines themselves, not the bargaining conduct of the Company.

The majority concludes that the dispute is arbitrable because the recognition clause "could" be interpreted "to prohibit the Company from making significant changes in the terms and conditions of employment without the consent of the Union." Majority op. at 6. Such an interpretation is impossible; it would require the arbitrator to completely rewrite the recognition clause, engrafting a duty that is not there. Indeed, such an interpretation would contradict well-settled principles in the case law pertaining to the statutory duty to bargain collectively and establishing the [*693] rights and obligations that arise from good-faith bargaining impasses and illegal bargaining demands. While a mandatory subject of bargaining contained in a pre-existing collective bargaining agreement may [**20] not be altered without consent, an employer is permitted to unilaterally implement new employment conditions

*not* contained in the agreement after bargaining in good faith to impasse. *See Inland Tugs, 918 F.2d at 1307-08; Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., 765 F.2d at 179.* Also, an unfair labor practice on the part of a union suspends the duty to bargain and permits the employer to unilaterally implement new conditions of employment. *Inland Tugs, 918 F.2d at 1308.*

Because the performance guidelines are not contained in the current CBA, the Company has a good-faith bargaining duty under the NLRA but no duty to obtain consent from the Union before implementing the policy. The "no strike" provision in the CBA does not leave the Union without recourse; its remedies are in the collective bargaining process and the NLRA. The recognition clause simply is not susceptible of an interpretation that would vest the Union with the sort of veto power suggested by the majority.

The out-of-circuit case law cited by my colleagues is either distinguishable or badly reasoned. In *Oil, Chemical & Atomic Workers International Union v. Phillips 66 Co., 976 F.2d 277, 278-79 (5th Cir. 1992),* [**21] the court held that a labor/management dispute about an employee drug testing policy was arbitrable because it arguably violated the collective bargaining agreement's recognition, just cause, and health-and-safety clauses. The court's decision did not specifically or solely rely on the agreement's recognition clause, as the majority opinion does here.

*E.M. Diagnostic Systems, Inc. v. Local 169, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 812 F.2d 91, 96 (3d Cir. 1987),* involved a dispute about the employer's right to subcontract work outside the bargaining unit. The collective bargaining agreement provided for arbitration of disputes "arising out of a claimed violation of this agreement" but also contained a management rights clause explicitly reserving to the employer the right to subcontract work without interference from the union. A divided Third Circuit held the dispute was arbitrable. It was enough, the majority said, if the subject matter of the grievance fell within the "zone of interests" protected by the collective bargaining agreement. *Id.* An unfettered right to subcontract, the majority concluded, "would include the right to [**22] subcontract all work of the bargaining unit and would be inconsistent with the agreement's recognition of the Union as the bargaining

agent for the Company's employees." *Id.* The dissenting judge objected that the "majority [has] redrawn the parties' Agreement," nullifying the management reservation of rights clause by way of an unbounded interpretation of the recognition clause. *Id. at 97-98* (Garth, J., dissenting). The majority in *E.M. Diagnostics* cited no authority for its "zone of interests" approach to arbitrability questions.

Finally, *Local 1912, International Ass'n of Machinists v. United States Potash Co., 270 F.2d 496, 499 (10th Cir. 1959),* also addressed the arbitrability of a dispute about subcontracting, although in this case the parties' agreement was silent on the subject. The Tenth Circuit held that because subcontracting could have the effect of "injuring the union as an effective bargaining unit," the dispute implicated the recognition clause of the contract and was therefore arbitrable. This holding was [*694] based on the court's rather expansive view of its interpretive task: "It would stifle the underlying purposes of the whole agreement to construe it according to its [**23] dry words. It is for us to put meat on the skeleton rather than tear the flesh from the bones." *Id. at 498.* This is hyperbole, not reasoning. I find none of these cases persuasive.

The Union argues in the alternative that § 4.01 of the CBA, the "mutual responsibility and respect" clause, is implicated in this dispute. In that clause, the parties "recognize" that "all dealings between them be, and continue to be, characterized by mutual responsibility and respect" and that the terms of the CBA shall be applied "fairly in accord with its intent and meaning and consistent with the Union's status as exclusive bargaining representative." Because the CBA is silent about

performance guidelines or standards, the Company cannot be guilty of "unfairly" applying a term of the CBA by adopting the guidelines. The Union has made no effort to identify how the performance guidelines policy itself might reflect a lack of "mutual responsibility and respect."

Accordingly, the arbitration clause -- which covers only those disputes that involve an interpretation of a term or provision of the CBA or the discipline of an employee -- is not reasonably susceptible of an interpretation that covers this dispute. [**24] The parties' dispute over the performance guidelines is not arbitrable.

In closing, I have serious concerns about the essentially limitless reach of today's decision. If this dispute is arbitrable as an arguable violation of the recognition clause, then almost any dispute is; any Company action that can be characterized as contrary to the Union's interests "could" violate the recognition clause if its scope is as boundless as the majority believes. Recognition clauses of this sort are routine in collective bargaining agreements, as are arbitration clauses that limit arbitration to disputes involving an interpretation or application of the terms of the parties' agreement. Henceforward, recognition clauses will be invoked as malleable enough to compel arbitration of disputes that do not squarely implicate any other term or provision of the contract. In my judgment, this violates the fundamentally contractual nature of arbitration and the axiom that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Warrior & Gulf Navigation Co., 363 U.S. at 582*; *AT&T Techs., 475 U.S. at 648-50.*



LEXSEE 475 U.S. 643

## AT&T TECHNOLOGIES, INC. v. COMMUNICATIONS WORKERS OF AMERICA ET AL.

### No. 84-1913

### SUPREME COURT OF THE UNITED STATES

*475 U.S. 643; 106 S. Ct. 1415; 89 L. Ed. 2d 648; 1986 U.S. LEXIS 92; 54 U.S.L.W. 4339; 104 Lab. Cas. (CCH) P11,758; 121 L.R.R.M. 3329*

**January 22, 1986, Argued**
**April 7, 1986, Decided**

**PRIOR HISTORY:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

**DISPOSITION:** *751 F.2d 203*, vacated and remanded.

**DECISION:**

Arbitrability of grievance under collective bargaining agreement held to be matter for determination by court asked to order arbitration, rather than by arbitrator.

**SUMMARY:**

A communications company laid off telephone installation workers at one of its facilities and transferred the same number of such workers in from facilities in other states, despite the contention of the installers' union that a provision of their collective bargaining agreement barred layoffs except where necessitated by lack of work. The company contended that the provision in question only prescribed the order of layoffs, and refused to submit the dispute to arbitration on the theory that it was covered by another provision of the contract, which stated that the company's exercise of certain management functions, such as the hiring and placement of employees, was not subject to the contract's arbitration clause. The union filed suit to compel arbitration in the United States District Court for the Northern District of Illinois, which found that the union's interpretation of the layoff provision was at least arguable, held that it was for the arbitrator rather than the court to determine whether it had merit, and ordered the company to arbitrate. The United States Court of Appeals for the Seventh Circuit affirmed, interpreting the decision below as ordering arbitration of the threshold issue of arbitrability, and holding that, while this issue was ordinarily a matter for judicial determination, a court should submit it to arbitration where, as here, (1) the collective bargaining agreement contains a standard arbitration clause, (2) the parties have not clearly excluded the arbitrability issue from arbitration, and (3) deciding the issue would entangle the court in interpreting substantive provisions of the agreement and thereby involve consideration of the merits of the dispute (*751 F2d 203*).

On certiorari, the United States Supreme Court vacated the judgment of the Court of Appeals and remanded the case for further proceedings. In an opinion by White, J., expressing the unanimous view of the court, it was held that the question whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for determination by a court, and not by the arbitrator, unless the parties clearly and unmistakably provide otherwise.

Brennan, J., joined by Burger, Ch. J., and Marshall, J., concurred, expressing the view (1) that where a collective bargaining agreement contains a standard arbitration clause, a particular grievance may be excluded from arbitration only if the contract contains specific language stating that such disputes are not subject to arbitration, or if the party opposing arbitration adduces

475 U.S. 643, *; 106 S. Ct. 1415, **;
89 L. Ed. 2d 648, ***; 1986 U.S. LEXIS 92

the most forceful evidence to this effect from the bargaining history; (2) that determining arbitrability in this case therefore does not require the court even to consider which party is correct in its interpretation of the layoff provision; and (3) that the Supreme Court may construe a collective bargaining agreement in the first instance where its decision announces a new principle of law, but not where, as here, (a) it simply reaffirms established principles, (b) the determination left on remand is straightforward, and (c) the parties have submitted only fragments of the relevant bargaining history.

## LAWYERS' EDITION HEADNOTES:

[***LEdHN1]

LABOR §125

arbitrability of disputes -- judicial determination --

Headnote:[1A][1B][1C]

The question whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue to be decided by a court, not the arbitrator, unless the parties clearly and unmistakably provide otherwise; thus, in a dispute between a communications company and an employees' union as to whether the employees' collective bargaining agreement allows the company to lay off employees in the absence of a lack of work, where the company contends that the matter is excluded from arbitration under the agreement as a management function, it is improper for a court to order the parties to arbitrate the arbitrability question, as it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate such grievances.

[***LEdHN2]

LABOR §125

arbitration -- contractual basis --

Headnote:[2]

Arbitration of an industrial dispute is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit; arbitrators derive their authority to resolve disputes only because the parties have agreed in advance

to submit such grievances to arbitration.

[***LEdHN3]

LABOR §125

arbitrability of disputes -- judicial consideration of merits --

Headnote:[3A][3B]

In deciding whether the parties to a collective bargaining agreement have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims; thus, in a union's action to compel arbitration of its dispute with a communications company as to whether their collective bargaining agreement allows the company to lay off employees in the absence of a lack of work, if a court determines that the parties intended to arbitrate such grievances, then it is for the arbitrator to determine the relative merits of the parties' substantive interpretation of the agreement.

[***LEdHN4]

EVIDENCE §385

LABOR §125

arbitrability -- presumption --

Headnote:[4]

Where a collective bargaining contract contains an arbitration clause, there is a presumption of arbitrability, in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute, and doubts should be resolved in favor of coverage; such a presumption is particularly applicable in cases where the clause broadly provides for arbitration of any differences arising with respect to the interpretation of the contract or the performance of any obligation thereunder, and in such cases, in the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.

[***LEdHN5]

475 U.S. 643, *; 106 S. Ct. 1415, **;
89 L. Ed. 2d 648, ***LEdHN5; 1986 U.S. LEXIS 92

APPEAL §1267

LABOR §44

collective bargaining contract -- arbitration clause -- construction by Supreme Court in first instance --

Headnote:[5]

On certiorari, it is usually not the function of the United States Supreme Court in the first instance to construe collective bargaining contracts and arbitration clauses, or to consider any other evidence that might unmistakably demonstrate that a particular grievance is not to be subject to arbitration.

**SYLLABUS**

Petitioner employer and respondent Union are parties to a collective-bargaining agreement covering telephone equipment installation workers. Article 8 of the agreement provides for arbitration of differences arising over interpretation of the agreement. Article 9 provides that subject to certain limitations, but otherwise not subject to the arbitration clause, petitioner is free to exercise certain management functions, including the hiring, placement, and termination of employees. Article 20 prescribes the order in which employees will be laid off "[when] lack of work necessitates Layoff." The Union filed a grievance challenging petitioner's decision to lay off 79 installers from its Chicago location, claiming that there was no lack of work at that location and that therefore the layoffs would violate Article 20. But petitioner laid off the installers and refused to submit the grievance to arbitration on the ground that under Article 9 the layoffs were not arbitrable. The Union then sought to compel arbitration by filing suit in Federal District Court, which, after finding that the Union's interpretation of Article 20 was at least "arguable," held that it was for the arbitrator, not the court, to decide whether that interpretation had merit, and, accordingly, ordered petitioner to arbitrate. The Court of Appeals affirmed.

*Held*: The issue whether, because of express exclusion or other evidence, the dispute over interpretation of Article 20 was subject to the arbitration clause, should have been decided by the District Court and reviewed by the Court of Appeals, and should not have been referred to the arbitrator. Pp. 648-657.

(a) Under the principles set forth in the *Steelworkers*

*Trilogy ( Steelworkers v. American Mfg. Co., 363 U.S. 564; Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574;* and *Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593*), it was the District Court's duty to interpret the collective-bargaining agreement and to determine whether the parties intended to arbitrate grievances concerning layoffs predicated on a "lack of work" determination by petitioner. If the court should determine that the agreement so provides, then it would be for the arbitrator to determine the relative merits of the parties' substantive interpretations of the agreement. Pp. 648-651.

(b) This Court will not examine the collective-bargaining agreement for itself and affirm the Court of Appeals on the ground that the parties had agreed to arbitrate the dispute over the layoffs. It is not this Court's function in the first instance to construe collective-bargaining agreements and arbitration clauses, or to consider any other evidence that might demonstrate that a particular grievance was not subject to arbitration. Pp. 651-652.

COUNSEL: Rex E. Lee argued the cause for petitioner. With him on the briefs were David W. Carpenter, Gerald D. Skoning, Charles C. Jackson, Howard J. Trienens, Alfred A. Green, and Joseph Ramirez.

Laurence Gold argued the cause for respondents. With him on the brief were Irving M. Friedman, Stanley Eisenstein, Harold A. Katz, David Silberman, and James Coppess. *

   * Briefs of amici curiae urging reversal were filed for the Chamber of Commerce of the United States by John S. Irving, Carl L. Taylor, and Stephen A. Bokat; and for the National Association of Manufacturers by Jan S. Admundson and Gary D. Lipkin.

   David E. Feller filed a brief for the National Academy of Arbitrators as amicus curiae urging affirmance.

JUDGES: WHITE, J., delivered the opinion for a unanimous Court. BRENNAN, J., filed a concurring opinion, in which BURGER, C. J., and MARSHALL, J., joined, post, p. 652.

R000203

475 U.S. 643, *; 106 S. Ct. 1415, **;
89 L. Ed. 2d 648, ***; 1986 U.S. LEXIS 92

**OPINION BY:** WHITE

**OPINION**

[*644] [***653] [**1416] JUSTICE WHITE delivered the opinion of the Court.

[***LEdHR1A] [1A]The issue presented in this case is whether a court asked to order arbitration of a grievance filed under a collective-bargaining agreement must first determine that the parties intended to arbitrate the dispute, or whether that determination is properly left to the arbitrator.

I

AT&T Technologies, Inc. (AT&T or the Company), and the Communications Workers of America (the Union) are parties to a collective-bargaining agreement which covers telephone equipment installation workers. Article 8 of this agreement [*645] establishes that "differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder" must be referred to a mutually agreeable arbitrator upon the written demand of either party. This Article expressly does not cover disputes "excluded from arbitration by other provisions of this contract." [1] Article 9 provides that, "subject to the limitations contained in the provisions of this contract, but otherwise not subject to the provisions of the arbitration clause," AT&T is free to exercise certain management functions, including the hiring and placement of employees and the termination of employment. [2] "When lack of work necessitates Layoff," Article 20 prescribes the order in which employees are to be laid off. [3]

1  Article 8 provides, in pertinent part, as follows:

"If the National and the Company fail to settle by negotiation any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder, such differences shall (provided that such dispute is not excluded from arbitration by other provisions of this contract, and provided that the grievance procedures as to such dispute have been exhausted) be referred upon written demand of either party to an impartial arbitrator mutually agreeable to both parties." App. 21.

2  Article 9 states:

"The Union recognizes the right of the Company (subject to the limitations contained in the provisions of this contract, but otherwise not subject to the provisions of the arbitration clause) to exercise the functions of managing the business which involve, among other things, the hiring and placement of Employees, the termination of employment, the assignment of work, the determination of methods and equipment to be used, and the control of the conduct of work." Id., at 22.

3  Article 20 provides, in pertinent part, that "[when] lack of work necessitates Layoff, Employees shall be Laid-Off in accordance with Term of Employment and by Layoff groups as set forth in the following [subparagraphs stating the order of layoff]." Id., at 23. Article 1.11 defines the term "Layoff" to mean "a termination of employment arising out of a reduction in the force due to lack of work." Id., at 20.

[**1417] On September 17, 1981, the Union filed a grievance challenging AT&T's [***654] decision to lay off 79 installers from its Chicago base location. The Union claimed that, because there was no lack of work at the Chicago location, the [*646] planned layoffs would violate Article 20 of the agreement. Eight days later, however, AT&T laid off all 79 workers, and soon thereafter, the Company transferred approximately the same number of installers from base locations in Indiana and Wisconsin to the Chicago base. AT&T refused to submit the grievance to arbitration on the ground that under Article 9 the Company's decision to lay off workers when it determines that a lack of work exists in a facility is not arbitrable.

The Union then sought to compel arbitration by filing suit in federal court pursuant to § 301(a) of the Labor Management Relations Act, *29 U. S. C. § 185(a)*. [4] *Communications Workers of America* v. *Western Electric Co.*, No. 82 C 772 (ND Ill., Nov. 18, 1983). Ruling on cross-motions for summary judgment, the District Court reviewed the provisions of Articles 8, 9, and 20, and set forth the parties' arguments as follows:

"Plaintiffs interpret Article 20 to require that there be an actual lack of work prior to employee layoffs and argue that there was no such lack of work in this case. Under plaintiffs' interpretation, Article 20 would allow the union to take to arbitration the threshold issue of

whether the layoffs were justified by a lack of work. Defendant interprets Article 20 as merely providing a sequence for any layoffs which management, in its exclusive judgment, determines are necessary. Under defendant's interpretation, Article 20 would not allow for an arbitrator to decide whether the layoffs were warranted by a lack of work but only whether the company [*647] followed the proper order in laying off the employees." App. to Pet. for Cert. 10A.

Finding that "the union's interpretation of Article 20 was at least 'arguable,'" the court held that it was "for the arbitrator, not the court to decide whether the union's interpretation has merit," and accordingly, ordered the Company to arbitrate. *Id.*, at 11A.

> 4    Section 301(a), 61 Stat. 156, *29 U. S. C. § 185(a)* states:
>
> "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect of the amount in controversy or without regard to the citizenship of the parties."

The Court of Appeals for the Seventh Circuit affirmed. *Communications Workers of America v. Western Electric Co., 751 F.2d 203 (1984).* The Court of Appeals understood the District Court to have ordered arbitration of the threshold issue of arbitrability. *Id., at 205, n. 4.* The court acknowledged the "general rule" that the issue of arbitrability is for the courts to decide unless the parties stipulate otherwise, but noted that this Court's decisions in *Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960),* and *Steelworkers v. American Mfg. Co., 363 U.S. 564 (1960),* caution courts to avoid becoming entangled in the merits of a labor dispute under the guise of deciding arbitrability. From this observation, the court announced an "exception" [***655] to the general rule, under which "a court should compel arbitration of the arbitrability issue where the collective bargaining agreement contains a standard arbitration clause, the parties have not clearly excluded the arbitrability issue from arbitration, and deciding the issue would entangle the court in interpretation of substantive provisions of the collective bargaining agreement and thereby involve consideration of the merits of the dispute." *751 F.2d, at 206.*

[**1418] All of these factors were present in this case. Article 8 was a "standard arbitration clause," and there was "no clear, unambiguous exclusion from arbitration of terminations predicated by a lack of work determination." *Id., at 206-207.* Moreover, although there were "colorable arguments" on both sides of the exclusion issue, if the court were to decide this question it would have to interpret not only Article 8, but Articles 9 and 20 as well, both of which are "substantive [*648] provisions of the Agreement." The court thus "[declined] the invitation to decide arbitrability," and ordered AT&T "to arbitrate the arbitrability issue." *Id., at 207.*

The court admitted that its exception was "difficult to reconcile with the Supreme Court's discussion of a court's duty to decide arbitrability in [*John Wiley & Sons, Inc.* v. *Livingston, 376 U.S. 543 (1964)].*" The court asserted, however, that the discussion was "dicta," and that this Court had reopened the issue in *Nolde Brothers, Inc.* v. *Bakery Workers, 430 U.S. 243, 255, n. 8 (1977). 751 F.2d, at 206.*

We granted certiorari, *474 U.S. 814 (1985),* and now vacate the Seventh Circuit's decision and remand for a determination of whether the Company is required to arbitrate the Union's grievance.

II

The principles necessary to decide this case are not new. They were set out by this Court over 25 years ago in a series of cases known as the *Steelworkers Trilogy: Steelworkers v. American Mfg. Co., supra; Steelworkers v. Warrior & Gulf Navigation Co., supra;* and *Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593 (1960).* These precepts have served the industrial relations community well, and have led to continued reliance on arbitration, rather than strikes or lockouts, as the preferred method of resolving disputes arising during the term of a collective-bargaining agreement. We see no reason either to question their continuing validity, or to eviscerate their meaning by creating an exception to their general applicability.

[***LEdHR2] [2]The first principle gleaned from the *Trilogy* is that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Warrior & Gulf, supra, at 582;American Mfg. Co., supra, at 570-571*

R000205

475 U.S. 643, *648; 106 S. Ct. 1415, **1418;
89 L. Ed. 2d 648, ***LEdHR2; 1986 U.S. LEXIS 92

(BRENNAN, J., concurring). This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to [*649] arbitration. *Gateway Coal Co.* v. *Mine Workers, 414 U.S. 368, 374 (1974).*

[***656] [***LEdHR1B] [1B]The second rule, which follows inexorably from the first, is that the question of arbitrability -- whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance -- is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator. *Warrior & Gulf, supra, at 582-583.* See *Operating Engineers* v. *Flair Builders, Inc., 406 U.S. 487, 491 (1972); Atkinson* v. *Sinclair Refining Co., 370 U.S. 238, 241 (1962),* overruled in part on other grounds, *Boys Markets, Inc.* v. *Retail Clerks, 398 U.S. 235 (1970).* Accord, *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985).*

The Court expressly reaffirmed this principle in *John Wiley & Sons, Inc.* v. *Livingston, 376 U.S. 543 (1964).* The "threshold question" there was whether the court or an arbitrator [**1419] should decide if arbitration provisions in a collective-bargaining contract survived a corporate merger so as to bind the surviving corporation. *Id., at 546.* The Court answered that there was "no doubt" that this question was for the courts. "Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties.' . . . The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty." *Id., at 546-547* (citations omitted).

[***LEdHR3A] [3A]The third principle derived from our prior cases is that, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be [*650] frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious." *American Mfg. Co., 363 U.S., at 568* (footnote omitted).

[***LEdHR4] [4]Finally, it has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Warrior & Gulf, 363 U.S., at 582-583.* See also [***657] *Gateway Coal Co.* v. *Mine Workers, supra, at 377-378.* Such a presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder . . . ." In such cases, "[in] the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Warrior & Gulf, supra, at 584-585.*

This presumption of arbitrability for labor disputes recognizes the greater institutional competence of arbitrators in interpreting collective-bargaining agreements, "furthers the national labor policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objectives in pursuing collective bargaining." *Schneider Moving & Storage Co.* v. *Robbins, 466 U.S. 364, 371-372 (1984)* (citation [*651] omitted). See *Gateway Coal Co., supra,* at 378-379. The willingness of parties to enter into agreements that provide for arbitration of specified disputes would be "drastically reduced," however, if a labor arbitrator had the "power to determine his own jurisdiction . . . ." Cox, Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482, 1509 (1959). Were this the applicable rule, an arbitrator would not be constrained to resolve only those disputes that the parties have agreed in advance to settle by arbitration, but,

instead, would be empowered "to impose obligations outside the contract limited only by his understanding and conscience." *Ibid.* This result undercuts the longstanding federal policy of promoting industrial harmony through the use of collective-bargaining agreements, and is antithetical to the function of a collective-bargaining [**1420] agreement as setting out the rights and duties of the parties.

[***LEdHR1C] [1C] [***LEdHR3B] [3B]With these principles in mind, it is evident that the Seventh Circuit erred in ordering the parties to arbitrate the arbitrability question. It is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning layoffs predicated on a "lack of work" determination by the Company. If the court determines that the agreement so provides, then it is for the arbitrator to determine the relative merits of the parties' substantive interpretations of the agreement. It was for the court, not the arbitrator, to decide in the first instance whether the dispute was to be resolved through arbitration.

[***LEdHR5] [5]The Union does not contest the application of these principles to the present case. Instead, it urges the Court to examine the specific provisions of the agreement for itself and to affirm the Court of Appeals on the ground that the parties had agreed to arbitrate the dispute over the layoffs at issue here. But it is usually not our function in the first instance to construe collective-bargaining contracts and arbitration clauses, or to consider any other evidence that might unmistakably demonstrate that a particular grievance was not to [*652] be subject to arbitration. The issue in the case is whether, because of express exclusion [***658] or other forceful evidence, the dispute over the interpretation of Article 20 of the contract, the layoff provision, is not subject to the arbitration clause. That issue should have been decided by the District Court and reviewed by the Court of Appeals; it should not have been referred to the arbitrator.

The judgment of the Court of Appeals is vacated, and the case is remanded for proceedings in conformity with this opinion.

It is so ordered.

**CONCUR BY:** BRENNAN

**CONCUR**

JUSTICE BRENNAN, with whom THE CHIEF JUSTICE and JUSTICE MARSHALL join, concurring.

I join the Court's opinion and write separately only to supplement what has been said in order to avoid any misunderstanding on remand and in future cases.

The Seventh Circuit's erroneous conclusion that the arbitrator should decide whether this dispute is arbitrable resulted from that court's confusion respecting the "arbitrability" determination that we have held must be judicially made. Despite recognizing that Article 8 of the collective-bargaining agreement "is a standard arbitration clause, providing for arbitration of 'any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder,'" and that "there is no clear, unambiguous exclusion [of this dispute] from arbitration," the Court of Appeals thought that "there [were] colorable arguments both for and against exclusion." *Communications Workers of America v. Western Electric Co.,* 751 F.2d 203, 206-207 (1984). The "colorable arguments" referred to by the Court of Appeals were the parties' claims concerning the meaning of Articles 9 and 20 of the collective-bargaining agreement: the Court of Appeals thought that if the Union's interpretation of Article 20 was correct and management [*653] could not order layoffs for reasons other than lack of work, the dispute was arbitrable; but if AT&T's interpretation of Article 20 was correct and management was free to order layoffs for other reasons, the dispute was not arbitrable under Article 9. *Id., at* 207. Because these were the very issues that would be presented to the arbitrator if the dispute was held to be arbitrable, the court reasoned that "determining arbitrability would enmesh a court in the merits of [the] dispute," *ibid.,* and concluded that the arbitrability issue should be submitted to the arbitrator.

The Court of Appeals was mistaken insofar as it thought that determining arbitrability required resolution of the parties' dispute with respect to the meaning of Articles 9 and 20 of the collective-bargaining agreement. This is clear from our opinion in *Steelworkers v. Warrior & Gulf* [**1421] *Navigation Co.,* 363 U.S. 574 (1960). In *Warrior & Gulf,* the Union challenged management's contracting out of labor that had previously been performed by Company employees. The parties failed to resolve the dispute through grievance procedures, and the Union requested arbitration; the Company refused, and

the Union sued to compel arbitration [***659] under § 301 of the Labor Management Relations Act, 29 U. S. C. § 185. The collective-bargaining agreement contained a standard arbitration clause similar to Article 8 of the AT&T/CWA contract, i. e., providing for arbitration of all differences with respect to the meaning or application of the contract. We held that, in light of the congressional policy making arbitration the favored method of dispute resolution, such a provision requires arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Warrior & Gulf, supra, at 582-583 (footnote omitted).

The Company in Warrior & Gulf relied for its argument that the dispute was not arbitrable on a "Management Functions" clause which, like Article 9 of the AT&T/CWA agreement, [*654] excluded "matters which are strictly a function of management," 363 U.S., at 576, from the arbitration provision. We recognized that such a clause "might be thought to refer to any practice of management in which, under particular circumstances prescribed by the agreement, it is permitted to indulge." Id., at 584. However, we also recognized that to read the clause this way would make arbitrability in every case depend upon whether management could take the action challenged by the Union; the arbitrability of every dispute would turn upon a resolution of the merits, and "the arbitration clause would be swallowed up by the exception." Ibid. Therefore, we held that, where a collective-bargaining agreement contains a standard arbitration clause and the "exception" found in the Management Functions clause is general, "judicial inquiry . . . should be limited to the search for an explicit provision which brings the grievance under the cover of the [Management Functions] clause . . . ." Steelworkers v. American Mfg. Co., 363 U.S. 564, 572 (1960) (BRENNAN, J., concurring); Warrior & Gulf, supra, at 584. "In the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail . . . ." 363 U.S., at 584-585.

The Seventh Circuit misunderstood these rules of contract construction and did precisely what we disapproved of in Warrior & Gulf -- it read Article 20 a general Management Functions clause, to make arbitrability depend upon the merits of the parties'

dispute. As Warrior & Gulf makes clear, the judicial inquiry required to determine arbitrability is much simpler. The parties' dispute concerns whether Article 20 of the collective-bargaining agreement limits management's authority to order layoffs for reasons other than lack of work. The question for the court is "strictly confined," id., at 582, to whether the parties agreed to submit disputes over the meaning of Article 20 to arbitration. Because the collective-bargaining agreement contains a standard arbitration [*655] clause, the answer must be affirmative unless the contract contains explicit language stating that disputes [***660] respecting Article 20 are not subject to arbitration, or unless the party opposing arbitration -- here AT&T -- adduces "the most forceful evidence" to this effect from the bargaining history. Under Warrior & Gulf, determining arbitrability does not require the court even to consider which party is correct with respect to the meaning of Article 20.

The Court remands this case so that the court below may apply the proper standard to determine arbitrability. The Court [**1422] states that "it is usually not our function in the first instance to construe collective-bargaining contracts and arbitration clauses, or to consider any other evidence that might unmistakably demonstrate that a particular grievance was not to be subject to arbitration." Ante, at 651-652. Of course, we have on numerous occasions construed collective-bargaining agreements "in the first instance"; we did so, for example, in the three cases comprising the Steelworkers Trilogy. See also John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 552-555 (1964); Packinghouse Workers v. Needham Packing Co., 376 U.S. 247, 249-253 (1964). Nonetheless, I agree with the Court that we should interpret a collective-bargaining agreement only where there is some special reason to do so. Thus, it is appropriate for this Court to construe a collective-bargaining agreement where -- as in the Steelworkers Trilogy -- our decision announces a new principle of law, since applying this principle may help to clarify our meaning. There is no such need, however, where -- as here -- we simply reaffirm established principles. Moreover, since the determination left for the Court of Appeals on remand is straightforward and will require little time or effort, concerns for efficient judicial administration do not require us to interpret the agreement. Finally, because the parties have submitted to us only fragmentary pieces of the bargaining history, we are not in a position properly to evaluate whether there is "the most forceful evidence" that the parties [*656] did

475 U.S. 643, *656; 106 S. Ct. 1415, **1422;
89 L. Ed. 2d 648, ***660; 1986 U.S. LEXIS 92

not intend for this dispute to be arbitrable. Therefore, I join the Court's opinion and concur in the Court's judgment remanding to the Court of Appeals.

## REFERENCES

*48A Am Jur 2d, Labor and Labor Relations 1842, 1843, 1894;*

23 Federal Procedure, L Ed, Labor and Labor Relations 52:2088, 52:2092-52:2095

12 Federal Procedural Forms, L Ed, Labor and Labor Relations 46:122, 46:130

16 Am Jur Pl & Pr Forms (Rev), Labor and Labor Relations, Forms 152, 159

10 Am Jur Legal Forms 2d, Labor and Labor Relations 159:1201-159:1229

11 Am Jur Trials 327, Arbitration of a Labor Dispute--Management Representation

*29 USCS 185(a)*

RIA Employment Coordinator LR-40,606

US L Ed Digest, Labor 125

Index to Annotations, Arbitration and Award; Grievances

Annotation References:

Disposition by bankruptcy court of request for arbitration pursuant to arbitration agreement to which debtor in bankruptcy is a party. *72 ALR Fed 890.*

Appealability of federal court order granting or denying stay of arbitration. *31 ALR Fed 234.*

Arbitration agreement or other private contract as precluding filing of unfair labor practice charges with *National Labor Relations Board. 6 ALR Fed 272.*

Enforcement of contractual arbitration clause as affected by expiration of contract prior to demand for arbitration. *5 ALR3d 1008.*

R000209


LexisNexis

LEXSEE 512 F. 3D 807

**NCR CORPORATION, Plaintiff-Appellant, v. KORALA ASSOCIATES LTD., Defendant-Appellee.**

No. 06-3685

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

*08a0029p.06; 512 F.3d 807; 2008 U.S. App. LEXIS 915; 2008 FED App. 0029P (6th Cir.); 85 U.S.P.Q.2D (BNA) 1481*

**February 1, 2007, Argued**
**January 16, 2008, Decided**
**January 16, 2008, Filed**

**SUBSEQUENT HISTORY:** Motion denied by, Dismissed without prejudice by, Judgment entered by *NCR Corp. v. Korala Assocs., 2009 U.S. Dist. LEXIS 11848 (S.D. Ohio, Feb. 18, 2009)*

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the Southern District of Ohio at Dayton. No. 04-00407. Michael R. Merz, Magistrate Judge.
*NCR Corp. v. Korala Assocs., 2006 U.S. Dist. LEXIS 14941 (S.D. Ohio, Mar. 31, 2006)*

**COUNSEL:** ARGUED: Paul R. Gupta, ORRICK, HERRINGTON & SUTCLIFFE, New York, New York, for Appellant.

Paul M. Fakler, MOSES & SINGER, New York, New York, for Appellee.

ON BRIEF: Paul R. Gupta, ORRICK, HERRINGTON & SUTCLIFFE, New York, New York, John D. Luken, Joshua A. Lorentz, DINSMORE & SHOHL, Cincinnati, Ohio, Clifford R. Michel, MAYER BROWN, New York, New York, for Appellant.

Paul M. Fakler, MOSES & SINGER, New York, New York, William F. Patry, THELEN, REID & PRIEST, New York, New York, for Appellee.

**JUDGES:** Before: KENNEDY, BATCHELDER, and

CLAY, Circuit Judges.

**OPINION BY:** ALICE M. BATCHELDER

**OPINION**

[*810]  [***1] ALICE M. BATCHELDER, Circuit Judge. Plaintiff NCR Corporation ("NCR") appeals [*811] the order of the district court [1] compelling NCR and defendant Korala Associates Ltd. ("KAL") to arbitrate NCR's claims against KAL, pursuant to *9 U.S.C. § 206* [2], part of Chapter 2 of the Federal Arbitration Act, *see 9 U.S.C. § 201, et seq.*, which implements the United Nations Convention on [***2] the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517,330 U.N.T.S. 38.

1   The parties agreed [**2] to allow a United State Magistrate Judge to conduct any and all proceedings in this matter and enter the order of judgment, in accordance with *28 U.S.C. § 636(c)* and *Rule 73(b) of the Federal Rules of Civil Procedure.*
2   *Section 206* applies in this action because KAL is a foreign corporation, organized under the laws of the United Kingdom and located in Scotland.

**I. BACKGROUND**

NCR is one of the largest providers of Automatic Teller Machines ("ATM") equipment, integrated

512 F.3d 807, *811; 2008 U.S. App. LEXIS 915, **2;
2008 FED App. 0029P (6th Cir.), ***2; 85 U.S.P.Q.2D (BNA) 1481

hardware and software systems, and related maintenance and support services in the world. NCR's ATMs use either the Windows operating system or the OS/2 operating system. NCR installs its APTRA XFS software ("APTRA XFS") on those ATMs using the Windows operating system and its S4i software ("S4i") on those ATMs using the OS/2 operating system. NCR owns a registered copyright for its APTRA XFS software and had applied, on an expedited basis, to register a copyright for APTRA XFS's precursor software. NCR had also applied, on an expedited basis, to register copyrights for two versions of the S4i software.

Over 300,000 NCR ATMs are installed world-wide, and at the time NCR filed its Amended Complaint, approximately 150,000 [***3] of these ATMs required the installation of an upgraded software system so that the machines would be Triple-DES [3] compliant. NCR has developed a Triple-DES system upgrade to install on its ATMs. KAL, likewise, has developed a Triple-DES system upgrade, which can be installed on NCR ATMs. NCR asserts that KAL could not have developed its NCR-compatible system upgrade without illegally copying and analyzing NCR's APTRA XFS and S4i software.

> 3 Triple-DES is an encryption standard designed to make ATM transactions more secure.

On December 15, 1998, KAL and NCR entered into a Software License Agreement ("1998 Agreement") in which KAL agreed to develop and license to NCR three specific software components for NCR's ATMs -- Device Controls, Self Service Controls, and Service Providers -- which together form software known as Kalypso. KAL also agreed to "develop additional elements of Kalypso from time to time" under the terms of the Agreement. In order to facilitate KAL's development of NCR-friendly software, "NCR agreed to loan to KAL certain computer hardware and/or software items that were necessary to enable KAL to adapt and support the Kalypso Components." To that end, NCR loaned to KAL [**4] an NCR ATM which contained NCR's copyrighted APTRA XFS software.

In addition to this particular ATM, NCR alleged that KAL obtained and accessed other NCR ATMs on which APTRA XFS or S4i was installed from NCR bank licensees or from dealers of used or refurbished NCR ATMs. Any software still installed on these ATMs could not have been operated without authorization from NCR.

NCR alleged that KAL, without permission, "obtained access to, made unauthorized [*812] use of, and engaged in unauthorized copying" of the APTRA XFS and/or S4i software on NCR ATMs, including the ATM loaned to KAL. According to NCR, by unlawfully accessing and copying the APTRA XFS and S4i software, KAL was able to develop its Triple-DES upgrade -- Kalignite Upgrade Solutions -- which can be installed on NCR ATMs.

In 2004, NCR brought suit against KAL seeking damages and injunctive relief. In Counts I and II of its Amended Complaint, NCR alleged KAL's direct copyright infringement of NCR's APTRA XFS and S4i software. In Counts III and IV, NCR alleged KAL's contributory copyright infringement of the APTRA XFS and S4i software, asserting that KAL induced NCR licensees to breach confidentiality restrictions contained within [**5] NCR's licensing agreements by providing KAL access to the APTRA XFS and S4i software. In Count V, NCR alleged KAL's tortious interference with contract, asserting that KAL acted intentionally to induce NCR licensees to breach the confidentiality restrictions contained within NCR's licensing agreements by providing KAL access to [***3] the APTRA XFS and S4i software. In Count VI, NCR alleged that KAL illegally imported the infringing Kalignite Upgrade Solutions into the United States. And in Count VII, NCR alleged that KAL engaged in unethical business practices or common law unfair competition.

KAL moved to (1) dismiss NCR's Amended Complaint under *Rule 12(b)(1)* and *12(b)(6) of the Federal Rules of Civil Procedure*, (2) to compel the arbitration of all of NCR's claims pursuant to *9 U.S.C. § 206* and in compliance with the arbitration clause contained within the 1998 Agreement, and (3) to dismiss the matter under the doctrine of *forum non conveniens*. The district court first denied KAL's motion to dismiss under *Rule 12(b)(1)*, finding that it had subject matter jurisdiction under both diversity and federal question jurisdiction. But the district court granted KAL's motion to compel arbitration [**6] and dismissed NCR's complaint without prejudice. The court did not address KAL's motion to dismiss under *Rule 12(b)(6)* or on the basis of *forum non conveniens*. NCR timely appealed the order compelling arbitration.

## II. ANALYSIS

We review *de novo* a district court's decision

R000211

512 F.3d 807, *812; 2008 U.S. App. LEXIS 915, **6;
2008 FED App. 0029P (6th Cir.), ***3; 85 U.S.P.Q.2D (BNA) 1481

regarding the arbitrability of a particular dispute. *Walker v. Ryan's Family Steak Houses, Inc.,* 400 F.3d 370, 385 (6th Cir. 2005). "Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.,* 315 F.3d 619, 624 (6th Cir. 2003) (citing *AT&T Techs. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)).

The arbitration clause contained within the 1998 Agreement provides that:

> 22.2 Any controversy or claim arising out of or relating to this contract, or breach thereof, shall be settled by arbitration and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall be appointed upon the mutual [**7] agreement of both parties failing which both parties will agree to be subject to any arbitrator that shall be chosen by the President of the Law Society.

The parties do not dispute that a valid agreement to arbitrate exists; rather the issue of contention is whether NCR's [*813] claims fall within the substantive scope of the agreement.

"As a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Masco Corp. v. Zurich Am. Ins. Co.,* 382 F.3d 624, 627 (6th Cir. 2004) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)). Despite this strong presumption in favor of arbitration, "arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *Simon v. Pfizer Inc.,,* 398 F.3d 765, 775 (6th Cir. 2005) (quoting *United Steelworkers, Local No. 1617 v. Gen. Fireproofing Co.,* 464 F.2d 726, 729 (6th Cir. 1972)).

> When faced with a broad arbitration clause, such as one covering *any* dispute arising out of an agreement, a court should follow the presumption of arbitration and

resolve doubts in favor of arbitration. [**8] Indeed, in such a case, only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by the arbitrators.

*Solvay Pharms., Inc. v. Duramed Pharms., Inc.,* 442 F.3d 471, 482 n.10 (6th Cir. 2006) (internal punctuation and citations omitted).

[***4] Here the parties dispute not only the scope of the arbitration clause, but the standard by which to determine whether a particular claim is arbitrable. The district court, relying on language contained within *Fazio v. Lehman Bros., Inc.,* 340 F.3d 386 (6th Cir. 2003), concluded that the arbitration clause's language -- "any controversy or claim arising out of or relating to this contract" -- "encompasses all claims which *touch upon matters* covered by the agreement." (emphasis added). The court held that every allegation in NCR's Amended Complaint "relates to some part of the Agreement and will require examination and interpretation of the Agreement or an exhibit to the Agreement."

NCR argues that it was legal error for the court to apply the "touches upon matters" standard, while KAL argues that "touches upon matters" is the proper standard [**9] for this Circuit. We agree with NCR. While the *Fazio* court stated that "[e]ven real torts can be covered by arbitration clauses 'if the allegations underlying the claims "touch matters" covered by the [agreement],'" 340 F.3d at 395 (quoting *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 846 (2d Cir. 1987)), that court did not apply this standard to determine if the plaintiff's claims fell within the scope of the arbitration clause. Instead, the standard the court enunciated and applied was whether "an action could be maintained without reference to the contract or relationship at issue. If it could, it is likely outside the scope of the arbitration agreement." *Id.* at 395.

The Supreme Court has also referenced this "touch matters" language. In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985), the Court stated that "insofar as the allegations underlying the statutory claims *touch matters* covered by the enumerated articles, the Court of Appeals properly resolved any doubts in favor of

R000212

512 F.3d 807, *813; 2008 U.S. App. LEXIS 915, **9;
2008 FED App. 0029P (6th Cir.), ***4; 85 U.S.P.Q.2D (BNA) 1481

arbitrability." *473 U.S. at 625 n.13* (emphasis added). This Court, however, has explained that the "touch matters" language in *Mitsubishi Motors* should be considered in light [**10] of its narrow context:

> The issue the *Mitsubishi* Court addressed was whether the arbitration clause "should be read narrowly to exclude the statutory claims," *id.,* which [*814] were part of the respondent's counterclaim and included claims under the antitrust laws. *Id. at 619-20.* The "enumerated articles" were provisions of a distribution agreement to which the arbitration provision specifically referred. *Id. at 617.* [Defendant], in its brief, apparently treats the Court's statement as announcing the standard that a controversy is arbitrable if it "touches matters covered by" the arbitration clause. [Defendant] reads this passing comment out of context, and we do not believe the words have the broad impact [Defendant] would give them.

*Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 411 F.3d 669, 673 (6th Cir. 2005).* And more recently, we reiterated the standard we apply to determine whether a particular claim or dispute falls within the scope of an arbitration agreement: "if an action can be maintained without reference to the contract or relationship at issue, the action is likely outside the scope of the arbitration agreement -- along with the presumption in favor of arbitrability [**11] and the intent of the parties." *Nestle Waters N. Am., Inc. v. Bollman, 505 F.3d 498, 505 (6th Cir. 2007)* (citing *Fazio, 340 F.3d at 395*).

Under this Court's precedent, the following standard emerges for determining which of NCR's claims must be resolved in arbitration: while we must bear in mind the presumption of arbitrability, the cornerstone of our inquiry rests upon whether we can resolve the instant case without reference to the agreement containing the arbitration clause. *See Nestle Waters, 505 F.3d at 505.* If such a reference is not necessary to the resolution of a particular claim, then compelled arbitration is inappropriate, unless the intent of the parties indicates otherwise. *Id.* We now apply this standard to NCR's claims.

[***5] A. Copyright Infringement

"Liability for direct [copyright] infringement arises from the violation of any one of the exclusive rights of a copyright owner. The owner of copyright . . . has the exclusive right to, and to authorize others to, reproduce, distribute, perform, display, and prepare derivative works from the copyrighted [work]." *Bridgeport Music, Inc. v. Rhyme Syndicate Music, 376 F.3d 615, 621 (6th Cir. 2004)* (internal citations omitted). "To succeed [**12] in a copyright infringement action, a plaintiff must establish that he or she owns the copyrighted creation, and that the defendant copied it." *Kohus v. Mariol, 328 F.3d 848, 853 (6th Cir. 2003).* But "where there is no direct evidence of copying, a plaintiff may establish 'an inference of copying by showing (1) access to the allegedly-infringed work by the defendant[] and (2) a substantial similarity between the two works at issue.'" *Id. at 853-54* (quoting *Ellis v. Diffie, 177 F.3d 503, 506 (6th Cir. 1999)*).

1. APTRA XFS (Count I)

NCR could not maintain a copyright infringement claim against KAL without referencing the 1998 Agreement. While a court would not need to reference the 1998 Agreement to determine if NCR owns a copyright for APTRA XFS, a court would need to reference the Agreement to determine what, if any, authorization NCR provided to KAL with respect to the APTRA XFS software contained on the ATM that NCR loaned to KAL under the 1998 Agreement. In its Amended Complaint, NCR alleged that "in each such instance [of operating and accessing APTRA XFS software on an NCR ATM], KAL's copying [of the software] was not licensed or otherwise authorized by NCR or any other party." [**13] To determine whether KAL lawfully copied APTRA XFS, by for instance [*815] obtaining a license or NCR's authorization, a court must examine and possibly construe or interpret the terms of the 1998 Agreement and its exhibits.

NCR argues that in its Amended Complaint it also alleged that KAL had access to the APTRA XFS software through NCR's licensees and refurbished ATMs, matters whose resolution would not require examination of the 1998 Agreement. Enforcement of the arbitration agreement here might, NCR argues, result in piecemeal litigation. *See, e.g., Bratt Enters., Inc. v. Noble Int'l Ltd., 338 F.3d 609, 613 (6th Cir. 2003).* We do not believe, however, that we must parse out NCR's claims in such detail. It is sufficient that a court would have to reference

R000213

Case: 1:09-cv-01192-CAB Doc #: 31-7 Filed: 04/14/10 63 of 73. PageID #: 1992

Page 5
512 F.3d 807, *815; 2008 U.S. App. LEXIS 915, **13;
2008 FED App. 0029P (6th Cir.), ***5; 85 U.S.P.Q.2D (BNA) 1481

the 1998 Agreement for part of NCR's direct infringement claim. Under these circumstances, we find that the copyright infringement claim as to APTRA XFS falls within the scope of the arbitration agreement.

## 2. S4i (Count II)

We reach a different conclusion, however, with respect to NCR's claim that KAL directly infringed the S4i software copyright. No reference to the 1998 Agreement is necessary to determine whether (1) NCR owns a copyright [**14] in the S4i software or (2) KAL was licensed or authorized to access and/or copy the S4i software. While the 1998 Agreement is not limited to KAL's developing software only for ATMs running APTRA XFS software, neither the Agreement itself nor the circumstances surrounding its implementation implicate the S4i software.

KAL argues that any claim relating to the S4i software is in fact arbitrable. KAL points to several items in the Amended Complaint to support its argument. First, NCR agreed that KAL would develop and license components of its Kalypso software for all of NCR's ATMs -- not just those containing APTRA XFS software. Second, NCR agreed to loan KAL computer hardware and/or software items that were necessary to enable KAL to adapt and support the Kalypso Components, and the Agreement does not limit the loaned equipment to just those ATMs containing APTRA XFS software. Third, NCR does not allege that KAL engaged in any different course of conduct in order to infringe NCR's copyright in the S4i software. Fourth, KAL points out that NCR alleged that "KAL engaged in unauthorized copying of the APTRA XFS *and/or S4i software* when [***6] KAL operated NCR ATMs (*whether obtained from NCR pursuant* [**15] *to the Agreement*, from an NCR licensee, or from a second-hand ATM dealer)." (emphasis added).

In contrast to the APTRA XFS software, however, the S4i software has no obvious link to the 1998 Agreement and finding such a link would require us to draw too many inferences that are simply not warranted. We, therefore, conclude that the parties' 1998 Agreement did not contemplate arbitrating disputes relating to the S4i software.

KAL next argues that even if the S4i software was not installed on the ATM that NCR loaned to KAL under the 1998 Agreement, the claims are closely related and

we should therefore compel NCR to arbitrate the S4i claims as well. In *Simon v. Pfizer Inc., 398 F.3d 765 (6th Cir. 2005)*, we determined that:

> [w]here one claim is specifically covered by an arbitration agreement, and a second claim is not, the arbitrability of the second is governed by the extent to which the second claim is substantially identical to the first. On the one hand, a party cannot avoid arbitration simply by renaming its claims so that they appear facially outside the scope of the arbitration agreement. In order [*816] to determine whether such renaming has occurred, a court must examine the underlying [**16] facts -- when an otherwise arbitrable claim has simply been renamed or recast it will share the same factual basis as the arbitrable claim. However, a claim that is truly outside of an arbitration agreement likewise cannot be forced into arbitration, even though there may be factual allegations in common. In particular, the determination that a claim requires reference to an arbitrable issue or factual dispute is not determinative.

*398 F.3d at 776* (internal punctuation and citations omitted). We conclude that while the APTRAS XFS and S4i claims are similar, the claims are not identical. NCR's claims relating to S4i are "truly outside" the arbitration clause even though there are factual allegations common to both types of software.

## B. Contributory Copyright Infringement

> Liability for contributory infringement derives from the defendant's relationship to the direct infringement. Contributory infringement occurs when one, *with knowledge of the infringing activity,* induces, causes, or materially contributes to the *infringing conduct of another.*

*Bridgeport Music, Inc. v. WB Music Corp., 508 F.3d 394, 2007 U.S. App. LEXIS 26875, at *13 (6th Cir. 2007)* (internal punctuation and citations omitted) [**17] (emphasis added). That is, "a plaintiff must allege: (1) direct copyright infringement [by] a third-party; (2)

R000214

knowledge by the defendant that the third-party was directly infringing; and (3) [defendant's] material contribution to the infringement." *Parker v. Google, Inc., 242 F. App'x 833, 837 (3d Cir. 2007)*. And "[w]ith respect to the element of knowledge, contributory liability requires that the secondary infringer 'know or have reason to know' of the direct infringement." *Encore Entm't v. KIDdesigns, Inc., 2005 U.S. Dist. LEXIS 44386, *49 (M.D. Tenn. Sept. 14, 2005)* (quoting *A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1020 (9th Cir. 2001)*). "Secondary liability may be imposed on a defendant who does nothing more than encourage or induce another to engage in copyright infringement," *Warner Bros. Entertainment, Inc. v. Ideal World Direct, 516 F. Supp. 2d 261, 2007 U.S. Dist. LEXIS 71013, *12 (S.D.N.Y. Sept. 26, 2007)*, because secondary liability is predicated on "the common law doctrine that one who knowingly participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971)* [**18] (internal punctuation and citation omitted).

#### [***7] 1. APTRA XFS (Count III)

NCR could maintain a contributory copyright infringement claim without referencing the 1998 Agreement. To maintain this claim, NCR must establish that its licensees infringed its copyright in the APTRA XFS software when they provided KAL access to the software. NCR must also establish KAL's knowledge of the licensee's infringing activity and KAL's material contribution to the licensees' infringement.

In its Amended Complaint, NCR asserted that its licensing agreements "contain restrictions prohibiting third-party access to the licensed ATMs as well as the software that is resident on that ATM" and that "KAL was aware of such license agreements, as well as the third-party restrictions contained therein." NCR also alleged that because KAL had entered into the 1998 Agreement, "which contained strict provisions on confidentiality restrictions and authorized use, KAL was well aware of the confidentiality restrictions [*817] and use limitations employed by NCR with respect to its ATM system software. Thus, KAL knew or should have known that no NCR licensee could authorize KAL to use the APTRA XFS or S4i software installed on an [**19] NCR bank ATM, especially not for the purpose of developing a system software upgrade to directly

compete with that of NCR."

Taking these allegations together, KAL argues that NCR's contributory infringement claim is "based upon KAL's alleged knowledge of third-party use restrictions, which NCR specifically alleges KAL obtained through the [1998] Agreement," and, therefore, a court must reference the 1998 Agreement in order to determine the merits of this claim. We disagree. At best, NCR's Amended Complaint alleges that KAL was likely on notice of the confidentiality and use restrictions contained within NCR's licensing agreements because of similar provisions contained within the 1998 Agreement. And while KAL's knowledge of the confidentiality provisions within the 1998 Agreement may implicate what KAL "would have reason to know" about the contents of the licensees' agreements, we nevertheless conclude that NCR could maintain this claim without referencing the 1998 Agreement. First, while the 1998 Agreement may be implicated here, a court would not need to examine, construe or interpret the terms of the 1998 Agreement -- as it likely would for the direct infringement claim -- to determine [**20] whether KAL had knowledge of the licensees' infringing activity. Rather, a court could determine that KAL was aware of the alleged infringing activity by referencing some other source of knowledge. Second, a court would not need to reference the 1998 Agreement to determine whether KAL materially contributed to the licensees' infringement. Under the circumstances here, we cannot conclude that NCR agreed to arbitrate this claim. This claim is therefore not arbitrable.

#### 2. S4i (Count IV)

For the same reasons that the contributory copyright infringement claim with regard to the APTRA XFS software is not arbitrable, this claim is not arbitrable.

#### C. Tortious Interference with Contract (Count V)

To establish tortious interference with contract, NCR must show "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden, 85 Ohio St. 3d 171, 1999 Ohio 260, 707 N.E.2d 853, 858 (Ohio 1999)*.

NCR alleged that KAL was aware that NCR's

512 F.3d 807, *817; 2008 U.S. App. LEXIS 915, **20;
2008 FED App. 0029P (6th Cir.), ***7; 85 U.S.P.Q.2D (BNA) 1481

licensing agreements "contain restrictions prohibiting third-party access to the licensed ATM as well as the software [**21] that is resident on that ATM" and that "notwithstanding such knowledge, KAL acted intentionally to induce NCR licensees to breach said confidentiality restrictions by providing KAL access to the licensed ATMs, as well as the APTRA XFS and S4i software, and other software resident thereon."

[***8] KAL argues that NCR could not maintain this claim without reference to the 1998 Agreement because KAL's knowledge of the licensing agreements and their terms comes from its knowledge of the confidentiality and use restrictions contained within the 1998 Agreement. We disagree. NCR would not need to reference the 1998 Agreement to establish the elements of this cause of action, that is, that a particular licensee had a licensing agreement with NCR, that KAL knew of the existence of that agreement, that KAL acted to procure the breach of that agreement, [*818] whether KAL was justified in its actions, and the damages arising from the breach by the licensee. Because NCR can establish the elements of this cause of action without referencing the 1998 Agreement, this claim is not arbitrable.

### D. Illegal Importation of Infringing Copies (Count VI)

NCR asserts that KAL developed its Kalignite Upgrade Solutions by [**22] infringing NCR's copyrights in APTRA XFS and S4i and then imported Kalignite Upgrade Solutions, the infringing product, into the United States.

### 1. APTRA XFS (Count VI in part)

Because this claim turns on whether KAL is liable for infringing NCR's copyright in the APTRA XFS software, this claim is arbitrable for the same reasons that NCR's direct infringement claim is arbitrable.

### 2. S4i (Count VI in part)

Because the issue of whether KAL infringed a copyright in the S4i software is dispositive of this claim, this claim is not arbitrable for the same reasons that NCR's direct infringement claim is not arbitrable.

### E. Common Law Unfair Competition (Count VII)

Lastly, NCR alleges that KAL is liable for common law unfair competition because KAL has engaged in

unethical business practices. "Unfair competition ordinarily consists of representations by one person, for the purpose of deceiving the public, that his or her goods are those of another. It may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *Landskroner v. Landskroner, 154 Ohio App. 3d 471, 2003 Ohio 5077, 797 N.E.2d 1002, 1017 (Ohio Ct. App. 2003)* [**23] (internal punctuation and citations omitted).

"[W]hen an otherwise arbitrable claim has simply been renamed or recast it will share the same factual basis as the arbitrable claim." *Simon, 398 F.3d at 776.* While NCR styles its seventh count against KAL as a "common law unfair competition claim," the language of the Amended Complaint makes clear that NCR is merely asserting claims arising under its agreement with KAL through a common law rubric. For instance, NCR alleges, in part, that KAL "disregard[ed] confidentiality provisions in its own Agreement with NCR" and "misappropriat[ed] trade secrets and other proprietary information of NCR." These allegations relate directly to the confidentiality provisions and Mutual Non-Disclosure Agreement incorporated into the 1998 Agreement, and their resolution will require a court to examine and interpret the terms of the 1998 Agreement. We therefore conclude that the claim is arbitrable.

### III. CONCLUSION

4

    4    Although the parties on appeal presented argument as to *Rule 12(b)(6)* and *forum non conveniens,* we decline to reach the merits of these issues for the first time on appeal.

For the foregoing reasons, we **AFFIRM** the judgment of the district court [**24] as to NCR's claims relating to the direct infringement of the APTRA XFS software (Counts I and VI [*819] insofar as Count VI relates to APTRA XFS) and the claim of common law unfair competition (Count VII). NCR must arbitrate these claims. We **REVERSE** and **REMAND** for further proceedings not inconsistent with this opinion as to all of NCR's claims relating to the S4i software (Counts II, IV, and VI insofar as Count VI relates to S4i), the contributory infringement claim relating to the APTRA XFS software (Count III), and the claim of tortious

512 F.3d 807, *819; 2008 U.S. App. LEXIS 915, **24;
2008 FED App. 0029P (6th Cir.), ***8; 85 U.S.P.Q.2D (BNA) 1481

interference (Count V). NCR may pursue these claims in
federal court.



LEXSEE 532 U.S. 504

## MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION v. STEVE GARVEY

### No. 00-1210

### SUPREME COURT OF THE UNITED STATES

*532 U.S. 504; 121 S. Ct. 1724; 149 L. Ed. 2d 740; 2001 U.S. LEXIS 3811; 69 U.S.L.W. 3725; 143 Lab. Cas. (CCH) P10,969; 167 L.R.R.M. 2134; 2001 Cal. Daily Op. Service 3826; 2001 Daily Journal DAR 4697; 14 Fla. L. Weekly S 236; 2001 Colo. J. C.A.R. 2401; 14 Fla. L. Weekly Fed. S 236*

### May 14, 2001, Decided

**PRIOR HISTORY:** ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**DECISION:**

Federal Court of Appeals held to have usurped arbitrator's role in baseball labor dispute by rejecting arbitrator's factual findings and then resolving merits of dispute, instead of remanding case for further arbitration proceedings.

**SUMMARY:**

In the late 1980's, the Major League Baseball Players Association filed grievances against the Major League Baseball Clubs, in which grievances it was alleged that the clubs had violated a collective bargaining agreement between the clubs and the association by engaging in collusion in the market for the services of free agents--players whose right to contract was not restricted to a particular club--after the 1985, 1986, and 1987 baseball seasons. In 1990, after arbitration decisions finding that the clubs had engaged in collusion and caused extensive damage to numerous players, the association and the clubs entered into a settlement agreement, under which the clubs established a fund of $ 280 million to be distributed to damaged players. In addition, the association designed a "Framework" to establish an appropriate process for evaluation and

determination of individual players' claims for money from the fund. A retired player, alleging that the failure of one of the clubs to extend his contract to the 1988 and 1989 seasons was due to collusion, submitted a claim for $ 3 million in damages. The association rejected the player's claim, on the ground that he had presented no evidence that the club had ever offered to extend his contract. At an arbitration hearing, the player presented a June 1996 letter from the club's former president which stated that the president had offered to extend the player's contract through the 1989 season, but that the club had subsequently refused to negotiate with the player due to collusion. The arbitrator, in denying the player's claim, concluded that there was (1) substantial doubt as to the credibility of the president's letter, and (2) no other corroboration of the claim. The player filed a motion in the United States District Court for the Central District of California to vacate the arbitration award. The District Court denied the motion, but the United States Court of Appeals for the Ninth Circuit--in reversing the District Court's judgment and in remanding the case with directions to vacate the award--reasoned that (1) review of the merits of the arbitrator's award was warranted, because the arbitrator had "dispensed his own brand of industrial justice," and (2) the arbitrator's refusal to credit the president's letter was "inexplicable" and "border[ed] on the irrational" (*203 F3d 580*). On remand, the District Court ordered the case to be remanded to an arbitration panel for further hearings. On appeal, the Court of Appeals (1) reversed the District Court's remand order,

532 U.S. 504, *; 121 S. Ct. 1724, **;
149 L. Ed. 2d 740, ***; 2001 U.S. LEXIS 3811

and (2) directed the District Court to remand the cases to the arbitration panel with instructions to enter an award in favor of the player in the amounts claimed by him (*243 F3d 547*, reported in full *2000 US App LEXIS 31918*).

The United States Supreme Court (1) granted the association's petition for certiorari, (2) reversed the Court of Appeals' judgment, and (3) remanded the case for further proceedings. In a per curiam opinion expressing the view of Rehnquist, Ch. J., and O'Connor, Scalia, Kennedy, Souter, Thomas, and Breyer, JJ., it was held that (1) the Court of Appeals usurped the arbitrator's role by rejecting the arbitrator's factual findings and then resolving the merits of the dispute, instead of remanding the case for further arbitration proceedings, and (2) no serious error on the arbitrator's part was apparent under the circumstances presented.

Ginsburg, J., concurring in part and concurring in the judgment, (1) agreed that the Court of Appeals ought not to have disturbed the arbitrator's award; and (2) expressed the view that (a) correction of that error set the case straight, and (b) there was no need to say more.

Stevens, J., dissenting, expressed the view that (1) the Supreme Court's case law was not sufficiently clear to allow the conclusion that the case at hand had been wrongly decided below on the merits; and (2) the Supreme Court ought not to have summarily reversed the Court of Appeals' factbound determination.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

   APPEAL §910.6

   LABOR §125

   -- grant of certiorari -- reversal -- remand -- arbitration -- judicial review

   Headnote:[1A][1B][1C][1D]

   With respect to an arbitrator's award denying a baseball player's damages claim against a players' association, a Federal Court of Appeals usurps the arbitrator's role by rejecting the arbitrator's factual findings and then resolving the merits of the dispute, instead of remanding the case for further arbitration proceedings, where (1) the player alleged, at an arbitration hearing, that (a) the failure of a baseball club

to extend the player's contract was due to collusion with other clubs in violation of a collective bargaining agreement with the association, and (b) the player is thus entitled to a share of a fund that was to be distributed to players who were injured by such collusion, (2) the player presented as evidence a letter from the club's former president which stated that (a) the president had offered to extend the player's contract, but (b) the club had subsequently refused to negotiate with the player due to collusion, (3) the arbitrator denied the player's claim on the grounds that (a) there was substantial doubt as to the credibility of the president's letter, and (b) there was no other corroboration of the claim, and (4) the Court of Appeals, in reviewing the case, (a) concludes that the arbitrator's refusal to credit the president's letter was "inexplicable" and "border[ed] on the irrational," and (b) reverses a Federal District Court's order denying a motion to vacate the arbitrator's award and directs that judgment be entered in the player's favor; under such circumstances, even serious error on the arbitrator's part does not justify overturning the arbitrator's decision, as the arbitrator was construing a collective bargaining agreement and acting within the scope of the arbitrator's authority; accordingly, the United States Supreme Court will grant the association's petition for certiorari, reverse the Court of Appeals' judgment, and remand the case for further proceedings. (Stevens, J., dissented from this holding.)

[***LEdHN2]

   APPEAL §874.5

   -- timeliness -- issue raised in earlier proceeding

   Headnote:[2A][2B]

   In a case in which a Federal Court of Appeals, having rendered an initial judgment, subsequently renders additional judgments in later proceedings, the United States Supreme Court has authority to consider questions determined in earlier stages of the litigation where certiorari is sought from the most recent of the Court of Appeals' judgments; in a case in which a Court of Appeals has rendered two judgments, the Supreme Court--in granting certiorari from the second judgment--may properly consider a challenge that raises issues resolved in the first judgment, notwithstanding that the petition for certiorari was filed more than 90 days after the first judgment, where the petition was filed in sufficient time for the Supreme Court to review the

532 U.S. 504, *; 121 S. Ct. 1724, **;
149 L. Ed. 2d 740, ***LEdHN2; 2001 U.S. LEXIS 3811

second judgment.

[***LEdHN3]

LABOR §125

-- arbitration -- judicial review

Headnote:[3A][3B]

With respect to a baseball player whose damages claim against a players' association has been denied by a labor arbitrator, the controversy involves an assertion of rights under an agreement between an employer and a labor organization--and thus (1) the case arises under 301(a) of the Labor Management Relations Act (*29 USCS 185(a)*), and (2) judicial review of the arbitrator's decision is very limited in scope--where (1) the player's claim alleges that (a) the failure of a baseball club to extend the player's contract was due to collusion with other clubs in violation of a collective bargaining agreement with the association, and (b) the player is thus entitled to a share of a fund that was to be distributed to players who were injured by such collusion; and (2) although the player's specific allegation on judicial review is that the arbitrator violated a "Framework" designed by the association for resolving players' damages claims, the player's right to be made whole is founded on the collective bargaining agreement.

[***LEdHN4]

LABOR §125

-- arbitration -- judicial review

Headnote:[4A][4B][4C]

Judicial review of a labor-arbitration decision pursuant to a collective bargaining agreement is very limited, as (1) courts are not authorized to review the arbitrator's decision on the merits, despite allegations that the decision rests on factual errors or misinterprets the parties' agreement; (2) it is only when the arbitrator strays from interpretation and application of the agreement and effectively dispenses the arbitrator's own brand of industrial justice that the decision may be unenforceable; (3) when an arbitrator resolves disputes regarding the application of a contract and no dishonesty is alleged, the arbitrator's improvident--even silly--factfinding does not provide a basis for a reviewing court to refuse to enforce the award; (4) when the judiciary weighs the merits of the

grievance or considers whether there is equity in a particular claim, the judiciary usurps a function which is entrusted to the arbitration tribunal; and (5) even when the arbitrator's award may properly be vacated, the appropriate remedy is to remand the case for further arbitration proceedings.

[***LEdHN5]

LABOR §125

-- arbitration -- absence of serious error

Headnote:[5A][5B]

With respect to an arbitrator's award denying a baseball player's damages claim against a players' association, no serious error on the arbitrator's part is apparent, where (1) the player's claim alleges that (a) the failure of a baseball club to extend the player's contract was due to collusion with other clubs in violation of a collective bargaining agreement with the association, and (b) the player is thus entitled to a share of a fund that was to be distributed to players who were injured by such collusion; (2) during the arbitration hearing, the player presents as evidence a letter from the club's former president which states that (a) the president offered to extend the player's contract, but (b) the club subsequently refused to negotiate with the player due to collusion; (3) the arbitrator, in denying the player's claim, notes that there are stark contradictions between the letter and the president's testimony in earlier arbitration proceedings in which the president and other club owners denied collusion; (4) the fact that a panel of arbitrators in the earlier proceedings rejected the owners' testimony as a whole does not compel the conclusion that the panel found the president's specific statements with respect to the player in question to be false; and (5) the arbitrator's explanation for his decision indicates that the arbitrator (a) simply found the president to be an unreliable witness, and (b) could only conclude, in the absence of corroborating evidence, that the player failed to show that the club had offered to extend the player's contract. (Stevens, J., dissented from this holding.)

**OPINION**

[**1726]  [***744]  [*505] PER CURIAM.

[***LEdHR1A]  [1A]The Court of Appeals for the Ninth Circuit here rejected an arbitrator's factual findings

532 U.S. 504, *505; 121 S. Ct. 1724, **1726;
149 L. Ed. 2d 740, ***LEdHR1A; 2001 U.S. LEXIS 3811

and then resolved the merits of the parties' dispute instead of remanding the case for further arbitration proceedings. Because the Court's determination conflicts with our cases limiting review of an arbitrator's award entered pursuant to an agreement between an employer and a labor organization and prescribing the appropriate remedy where vacation of the award is warranted, we grant the petition for a writ of certiorari and reverse. The motions for leave to file briefs *amicus curiae* of the National Academy of Arbitrators and the Office of the Commissioner of Baseball are granted.

In the late 1980's, petitioner Major League Baseball Players Association (Association) filed grievances against the Major League Baseball Clubs (Clubs), claiming the Clubs had colluded in the market for free-agent services after the 1985, 1986 and 1987 baseball seasons, in violation of the industry's collective-bargaining agreement. A free agent is a player who may contract with any Club, rather than one whose right to contract is restricted to a particular Club. In a [*506] series of decisions, arbitrators found collusion by the Clubs and damage to the players. The Association and Clubs subsequently entered into a Global Settlement Agreement (Agreement), pursuant to which the Clubs established a $ 280 million fund to be distributed to injured players. The Association also designed a "Framework" to evaluate the individual player's claims, and, applying that Framework, recommended distribution plans for claims relating to a particular season or seasons.

The Framework provided that players could seek an arbitrator's review of the distribution plan. The arbitrator would determine "only whether the approved Framework and the criteria set forth therein have been properly applied in the proposed Distribution Plan." *Garvey v. Roberts, 203 F.3d 580, 583 (CA9 2000) (Garvey I).* The Framework set forth factors to be considered in evaluating players' claims, as well as specific requirements for lost [***745] contract-extension claims. Such claims were cognizable "'only in those cases where evidence exists that a specific offer of an extension was made by a club prior to collusion to only thereafter be withdrawn when the collusion scheme was initiated.'" *Id. at 584.*

Respondent Steve Garvey, a retired, highly regarded first baseman, submitted a claim for damages of approximately $ 3 million. He alleged that his contract with the San Diego Padres was not extended to the 1988

and 1989 seasons due to collusion. The Association rejected Garvey's claim in February 1996, because he presented no evidence that the Padres actually offered to extend his contract. Garvey objected, and an arbitration hearing was held. He testified that the Padres offered to extend his contract for the 1988 and 1989 seasons and then withdrew the offer after they began colluding with other teams. He presented a June 1996 letter from Ballard Smith, Padres' President and CEO from 1979 to 1987, stating that, before the end [**1727] of the 1985 season, Smith offered to extend Garvey's contract through [*507] the 1989 season, but that the Padres refused to negotiate with Garvey thereafter due to collusion.

The arbitrator denied Garvey's claim, after seeking additional documentation from the parties. In his award, he explained that "'there exists . . . substantial doubt as to the credibility of the statements in the Smith letter.'" *Id. at 586.* He noted the "stark contradictions" between the 1996 letter and Smith's testimony in the earlier arbitration proceedings regarding collusion, where Smith, like other owners, denied collusion and stated that the Padres simply were not interested in extending Garvey's contract. *Ibid.* The arbitrator determined that, due to these contradictions, he "'must reject [Smith's] more recent assertion that Garvey did not receive [a contract] extension'" due to collusion, and found that Garvey had not shown a specific offer of extension. *Ibid.* He concluded that:

"'the shadow cast over the credibility of the Smith testimony coupled with the absence of any other corroboration of the claim submitted by Garvey compels a finding that the Padres declined to extend his contract not because of the constraints of the collusion effort of the clubs but rather as a baseball judgment founded upon [Garvey's] age and recent injury history.'" *Ibid.*

Garvey moved in Federal District Court to vacate the arbitrator's award, alleging that the arbitrator violated the Framework by denying his claim. The District Court denied the motion. The Court of Appeals for the Ninth Circuit reversed by a divided vote. The court acknowledged that judicial review of an arbitrator's decision in a labor dispute is extremely limited. But it held that review of the merits of the arbitrator's award was warranted in this case, because the arbitrator "'dispensed his own brand of industrial justice.'" *Id. at 589.* The court recognized that Smith's prior testimony with respect to collusion conflicted with the statements in

his 1996 letter. But in the court's view, the arbitrator's [*508] refusal to credit Smith's letter was "inexplicable" and "bordered on the irrational," because a panel of arbitrators, chaired by the arbitrator involved here, had previously concluded that the owners' prior testimony was false. *Id. at [***746] 590.* The court rejected the arbitrator's reliance on the absence of other corroborating evidence, attributing that fact to Smith and Garvey's direct negotiations. The court also found that the record provided "strong support" for the truthfulness of Smith's 1996 letter. *Id. at 591-592.* The Court of Appeals reversed and remanded with directions to vacate the award.

[***LEdHR2A] [2A]The District Court then remanded the case to the arbitration panel for further hearings, and Garvey appealed. The Court of Appeals, again by a divided vote, explained that *Garvey I* established that "the conclusion that Smith made Garvey an offer and subsequently withdrew it because of the collusion scheme was the only conclusion that the arbitrator could draw from the record in the proceedings." No. 00-56080, 2000 WL 1801383, at *1 (Dec. 7, 2000), judgt. order to be reported at 243 F.3d 547.*(Garvey II).* Noting that its prior instructions might have been unclear, the Court clarified that *Garvey I* "left only one possible result -- the result our holding contemplated -- an award in Garvey's favor." *Ibid.* The Court of Appeals reversed the District Court and directed that it remand the case to the arbitration panel with instructions to enter an award for Garvey in the amount he claimed. [1]

[***LEdHR2B] [2B]

1  Garvey contends that, because the Association's petition was filed more than 90 days after *Garvey I*, we cannot consider a challenge raising issues resolved in that decision. But there is no question that the Association's petition was filed in sufficient time for us to review *Garvey II*, and we have authority to consider questions determined in earlier stages of the litigation where certiorari is sought from the most recent of the judgments of the Court of Appeals. *Mercer v. Theriot, 377 U.S. 152, 12 L. Ed. 2d 206, 84 S. Ct. 1157 (1964) (per curiam); Hamilton-Brown Shoe Co. v. Wolf Brothers & Co., 240 U.S. 251, 258, 60 L. Ed. 629, 36 S. Ct. 269, 1916 Dec. Comm'r Pat. 281 (1916).*

[**1728]  [*509]  [***LEdHR3A]  [3A]The parties do not dispute that this case arises under § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, *29 U.S.C. § 185(a),* as the controversy involves an assertion of rights under an agreement between an employer and a labor organization. Although Garvey's specific allegation is that the arbitrator violated the Framework for resolving players' claims for damages, that Framework was designed to facilitate payments to remedy the Clubs' breach of the collective-bargaining agreement. Garvey's right to be made whole is founded on that agreement.

[***LEdHR3B]  [3B]  [***LEdHR4A]  [4A]Judicial review of a labor-arbitration decision pursuant to such an agreement is very limited. Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. *Paperworkers v. Misco, Inc., 484 U.S. 29, 36, 98 L. Ed. 2d 286, 108 S. Ct. 364 (1987).* We recently reiterated that if an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *Eastern Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 62, 148 L. Ed. 2d 354, 121 S. Ct. 462 (2000)* (quoting *Misco, supra, at 38*). It is only when the arbitrator strays from interpretation and application of the agreement and effectively "dispenses his own brand of industrial justice" that his decision may be unenforceable. *Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 4 L. Ed. 2d [***747] 1424, 80 S. Ct. 1358 (1960).* When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, factfinding" does not provide a basis for a reviewing court to refuse to enforce the award. *Misco, 484 U.S. at 39.*

[***LEdHR4B]  [4B]In discussing the courts' limited role in reviewing the merits of arbitration awards, we have stated that "'courts . . . have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim.'" [*510] *Id. at 37* (quoting *Steelworkers v. American Mfg. Co., 363 U.S. 564, 568, 4 L. Ed. 2d 1403, 80 S. Ct. 1343 (1960)).* When the judiciary does so, "it usurps a function which . . . is entrusted to the arbitration tribunal." *Id. at 569;* see also *Enterprise Wheel & Car Corp., supra, at 599* ("It is the arbitrator's construction [of the agreement] which was

R000222

bargained for . . . "). Consistent with this limited role, we said in *Misco* that "even in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result." *484 U.S. at 40-41, n. 10.* That step, we explained, "would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for" in their agreement. *Ibid.* Instead, the court should "simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement." *Ibid.*

[***LEdHR1B] [1B]To be sure, the Court of Appeals here recited these principles, but its application of them is nothing short of baffling. The substance of the Court's discussion reveals that it overturned the arbitrator's decision because it disagreed with the arbitrator's factual findings, particularly those with respect to credibility. The Court of Appeals, it appears, would have credited Smith's 1996 letter, and found the arbitrator's refusal to do so at worst "irrational" and at best "bizarre." *Garvey I, 203 F.3d* [**1729] *at 590-591.*But even "serious error" on the arbitrator's part does not justify overturning his decision, where, as here, he is construing a contract and acting within the scope of his authority. *Misco, supra, at 38.*

[***LEdHR1C] [1C] [***LEdHR4C] [4C] [***LEdHR5A] [5A]In *Garvey II,* the court clarified that *Garvey I* both rejected the arbitrator's findings and went further, resolving the merits of the parties' dispute based on the court's assessment of the record before the arbitrator. For that reason, the court found further arbitration proceedings inappropriate. [*511] But again, established law ordinarily precludes a court from resolving the merits of the parties' dispute on the basis of its own factual determinations, no matter how erroneous the arbitrator's decision. *Misco, supra, at 40, n. 10;* see also *American Mfg. Co., 363 U.S. at 568.* Even when the arbitrator's award may properly be vacated, the appropriate remedy is to remand the case for further arbitration proceedings. *Misco, supra, at 40, n. 10.* The dissent suggests that the remedy described in *Misco* is limited [***748] to cases where the arbitrator's errors are procedural. *Post,* at 1 (opinion of STEVENS, J.) *Misco* did involve procedural issues, but our discussion regarding the appropriate remedy was not so limited. If a remand is appropriate *even* when the arbitrator's award

has been set aside for "procedural aberrations" that constitute "affirmative misconduct," it follows that a remand ordinarily will be appropriate when the arbitrator simply made factual findings that the reviewing court perceives as "irrational." The Court of Appeals usurped the arbitrator's role by resolving the dispute and barring further proceedings, a result at odds with this governing law. [2]

[***LEdHR5B] [5B]

> 2   In any event, no serious error on the arbitrator's part is apparent in this case. The fact that an earlier panel of arbitrators rejected the owners' testimony as a whole does not compel the conclusion that the panel found Smith's specific statements with respect to Garvey to be false. The arbitrator's explanation for his decision indicates that he simply found Smith an unreliable witness and that, in the absence of corroborating evidence, he could only conclude that Garvey failed to show that the Padres had offered to extend his contract. The arbitrator's analysis may have been unpersuasive to the Court of Appeals, but his decision hardly qualifies as serious error, let alone irrational or inexplicable error. And, as we have said, any such error would not justify the actions taken by the court.

[***LEdHR1D] [1D]For the foregoing reasons, the Court of Appeals erred in reversing the order of the District Court denying the motion to vacate the arbitrator's award, and it erred further in directing that judgment be entered in Garvey's favor. The judgment of [*512] the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

**CONCUR BY:** GINSBURG, J., concurring

**CONCUR**

JUSTICE GINSBURG, concurring in part and concurring in the judgment.

I agree with the Court that in *Garvey v. Roberts, 203 F.3d 580 (CA9 2000)* (*Garvey I*), the Ninth Circuit should not have disturbed the arbitrator's award. Correction of that error sets this case straight. I see no need to say more.

532 U.S. 504, *512; 121 S. Ct. 1724, **1729;
149 L. Ed. 2d 740, ***LEdHR1D; 2001 U.S. LEXIS 3811

**DISSENT BY:** STEVENS, J., dissenting

**DISSENT**

JUSTICE STEVENS, dissenting.

It is well settled that an arbitrator "does not sit to dispense his own brand of industrial justice." *Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 4 L. Ed. 2d 1424, 80 S. Ct. 1358 (1960)*. We have also said fairly definitively, albeit in dicta, that a court should remedy an arbitrator's "procedural aberrations" by vacating the award and remanding for further proceedings. *Paperworkers v. Misco, Inc., 484 U.S. 29, 40-41, n. 10, 98 L. Ed. 2d 286, 108 S. Ct. 364 (1987)*. Our cases, however, do not provide significant guidance as to what standards a federal court should use in assessing whether an arbitrator's behavior is so untethered to either the agreement of the parties or the factual record so [**1730] as to constitute an attempt to "dispense his own brand of industrial justice." Nor, more importantly, do they tell us how, having made such a finding, courts should deal with "the extraordinary circumstance in which the arbitrator's own rulings make clear that, more than being simply erroneous, his finding is completely inexplicable and borders on the irrational." *Garvey v. Roberts, 203 F.3d 580, 590 (CA9 2000)* (case below). Because our [***749] caselaw is not sufficiently clear to allow me to conclude that the case below was wrongly decided -- let alone to conclude that the decision was so wrong as to require the extraordinary remedy of a summary [*513] reversal -- I dissent from the Court's disposition of this petition.

Without the benefit of briefing or argument, today the Court resolves two difficult questions. First, it decides that even if the Court of Appeals' appraisal of the merits is correct -- that is to say, even if the arbitrator did dispense his own brand of justice untethered to the agreement of the parties, and even if the correct disposition of the matter is perfectly clear -- the only course open to a reviewing court is to remand the matter for another arbitration. That conclusion is not compelled by any of our cases, nor by any analysis offered by the Court. As the issue is subject to serious arguments on both sides, the Court should have set this case for argument if it wanted to answer this remedial question.

Second, without reviewing the record or soliciting briefing, the Court concludes that, in any event, "no serious error on the arbitrator's part is apparent in this case." *Ante*, at 7, n. 3. At this stage in the proceedings, I simply cannot endorse that conclusion. After examining the record, obtaining briefing, and hearing oral argument, the Court of Appeals offered a reasoned explanation of its conclusion. See *203 F.3d at 589-592*; see also *id. at 593-594* (Hawkins, J., concurring). Whether or not I would ultimately agree with the Ninth Circuit's analysis, I find the Court's willingness to reverse a factbound determination of the Court of Appeals without engaging that court's reasoning a troubling departure from our normal practice. [1]

> 1 The Court's opinion is somewhat ambiguous as to its reasons for overturning the portion of the Court of Appeals' decision setting aside the arbitration. It is unclear whether the majority is saying that a court may never set aside an arbitration because of a factual error, no matter how perverse, or whether the Court merely holds that the error in this case was not sufficiently severe to allow a court to take that step. If it is the latter, the Court offers no explanation of what standards it is using or of its reasons for reaching that conclusion.

Accordingly, I respectfully dissent.

**REFERENCES**

*4 Am Jur 2d, Alternative Dispute Resolution 234; 48A Am Jur 2d, Labor and Labor Relations 3474*

*29 USCS 185 (a)*

L Ed Digest, Labor 125

L Ed Index, Arbitration and Award; Baseball

Annotation References:

Constitutionality and construction of 301(a) of Labor Management Relations Act (*29 USCS 185(a)*) conferring jurisdiction on Federal District Courts in actions for violation of contract between employer and labor organization--federal cases. *99 L Ed 529, 7 L Ed 2d 959, 16 L Ed 2d 1143*.