# Appendix Exhibit 6

# Arbitration Transcript 6/9/09 with exhibits

## R000381-R000758

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

- - -

In the matter of the          )

arbitration involving:        )

                              )

BUILDING AND CONSTRUCTION      )

LABORERS LOCAL UNION NO. 310,)

                              ) Case Number:

          Claimant,           ) 53 300 E 00098 09

and                           )

UNIVERSITY HOSPITALS HEALTH    ) Volume II

SYSTEMS, INC., et al.,         )

          Respondents.

- - -

BE IT REMEMBERED, that upon the hearing of
the above-entitled matter, held at Doubletree
Hotel, 1111 Lakeside Avenue, Cleveland, Ohio,
before Marvin J. Feldman, Impartial Arbitrator,
and commencing on Tuesday, the 9th day of June,
2009, at 10:00 o'clock a.m., at which time the
following proceedings were had.

- - -

49

1    **APPEARANCES:**

2

3        On Behalf of the Claimant:

4            GOLDSTEIN GRAGEL, LLC

5    BY:    Susan L. Gragel, Attorney at Law

6            Ami Banderyt, Attorney at Law

7            1040 The Leader Building

8            526 Superior Avenue, East

9            Cleveland, Ohio 44114-1401

10           216/771-6633

11

12       On Behalf of the Respondents:

13           VORYS, SATER, SEYMOUR AND PEASE, LLP

14   BY:    David A. Campbell, Attorney at Law

15           Charles F. Billington, III

16           Attorney at Law

17           2100 One Cleveland Center

18           1375 East Ninth Street

19           Cleveland, Ohio 44114-1724

20           216/479-6179

21

22       Also Present:  Sue Peplowski

23                       Mike Harting

24                       Sebastian Trusso

25

50

1                          I N D E X

2

3      **ON BEHALF OF THE EMPLOYER:**

4      **WITNESSES:**          DIR CROSS RED. REC. FRD FRC

5

6      TODD GERBER          74    92  111  115  117

7      MIKE HARTING               119

8      LATTISIA HANSON      137   150 187  190

9      DAVID HAWK           196   214

10     HEATHER McDONNELL    221   232

11     SUSAN PEPLOWSKI      240   257 267  269  270

12     MARGARET HEWITT      271   286 303  309

13

14                     JOINT EXHIBITS

15                                              PAGE

16     Number 2                                  60

17

18                   RESPONDENT EXHIBITS

19                                              PAGE

20     Number 1                                  79

21     Number 2                                 142

22     Number 3                                 223

23     Number 4                                 244

24     Number 5                                 248

25     Number 6                                 249

51

1                         I N D E X (Continued)

2

3                            UNION EXHIBITS

4                                                      PAGE

5       Number 1                                         54

6       Number 2                                        203

7       Number 3                                        203

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

52

1          **MS. GRAGEL:**      I have a motion

2    before we get started.

3          **MR. FELDMAN:**      What is your

4    motion?

5          **MS. GRAGEL:**      I would move to

6    amend our grievance to include the Cleveland

7    Building Trades Council as an additional party

8    to the grievance.  Mr. Terry Joyce is here with

9    me.  He is the president of the Cleveland

10   Building Trades Council, and he would concur and

11   so advise the arbitrator of that joinder.  The

12   purpose of this is to clear up any ambiguity,

13   because the hospital has contended recently that

14   the Project Labor Agreement does not apply to

15   this grievance inasmuch as it was filed by Local

16   310 and not the Cleveland Building Trades

17   Council.  If the Cleveland Building Trades

18   Council joins in the grievance, it doesn't

19   change any of the issues here today, and there's

20   no prejudice to University Hospitals if this

21   occurs at this time.

22          **MR. CAMPBELL:**      What is our

23   position?  Our position is first and foremost

24   that University Hospitals and Gilbane have

25   raised the issue of arbitrability from the

53

1   outset of this.  We have pointed to the fact

2   that their lack of parties to bringing this

3   grievance.  So this is one where after we've

4   been through one set of -- an answer, a Motion

5   to Dismiss, one day of hearing to address our

6   Motion to Dismiss, a Federal Court process which

7   involved me filing a complaint, a Motion to Stay

8   and Motion For Temporary Restraining Order, and

9   in opposition to that, it is far too late in the

10  process for us to be here at this hearing today

11  adding a new party to this matter, so we

12  strongly object to it.

13          Number 2, this is not an employee of

14  the Building Trades Council.  The Building

15  Trades Council have absolutely no relation to

16  this, and how they can file a Demand For

17  Arbitration at this point and amend, I don't see

18  how under the AAA process it could be on the day

19  of the hearing that we're going to have a new

20  party that the union believes is necessary and

21  critical to this.

22          So I think it necessarily means that

23  this matter should be dismissed by the mere fact

24  that they are moving to amend the complaints

25  after all of the process we've been through.

54

1          **MS. GRAGEL:**      If I may respond

2     briefly, it is not the position of Local 310

3     that the Cleveland Building Trades Council is

4     necessary.  Throughout these proceedings the

5     union has come forward saying that the Project

6     Labor Agreement is binding on University

7     Hospitals at each of the 17 unions that

8     comprised the Cleveland Building Trades Council.

9     But in the event that there is viewed by anybody

10    that there's some legal impediment to

11    proceeding -- to having this arbitration decided

12    on the merits because some organization isn't

13    named, they're here to be named.

14          **MR. FELDMAN:**      Let me take a look

15    at the grievance in this case.  Do you have it

16    with you?

17          **MS. GRAGEL:**      I do.

18          **MR. CAMPBELL:**      Can we mark this as

19    an exhibit so the record is clear?

20          **MR. FELDMAN:**      Sure.  Mark it.

21          (Thereupon, Union Exhibit 1 was

22          marked for purposes of

23          identification.)

24          **MS. GRAGEL:**      We had intended to

25    offer it as Union 1.  If you'd like to mark it

55

1    some other way, that's fine, too.

2                MR. FELDMAN:      Union 1.  That's

3    fine.  This is the form of union?

4                MS. GRAGEL:      Yes.

5                MR. FELDMAN:      Did you prepare

6    these comments on this document?

7                MS. GRAGEL:      Yes.

8                MR. FELDMAN:      The reason I ask

9    is -- well, it may be that from the top of it it

10   says your claim confirmation number,

11   002-U9N-J5O, and the notation of AAA.  Is that

12   not right?

13               MS. GRAGEL:      This is the

14   document that is generated after an online

15   filing.  So as to the indication there, "claim

16   description," starting there, on December 1st,

17   2007 --

18               MR. FELDMAN:      That is your

19   writing?

20               MS. GRAGEL:      -- that is my

21   drafting.  And the data that I inserted stopped

22   after the quotation from the arbitration clause.

23               MR. FELDMAN:      Let me read this

24   for a moment.

25               Is there any prejudice that Cleveland

56

1    Building Trades is now --

2              **MR. CAMPBELL:**     Absolutely.

3              **MR. FELDMAN:**     What is it?

4              **MR. CAMPBELL:**     The prejudice is

5    that we've been going through many motions and

6    arguments to the court with substantial costs

7    and time due to the lack of proper parties, and

8    that is not the only issue as to arbitrability.

9    And I might say that after this motion, I need

10   to make a statement as to arbitrability to make

11   the record clear.  But to at this point, after

12   we've already been through arbitrability, after

13   we've already been through Federal Court

14   litigation, we've already had an argument with

15   the court, to now come in with the Building

16   Trades Council, it's not proper.  It's

17   absolutely prejudicial to us.  We already have a

18   complaint to vacate.  You've already issued your

19   decision on arbitrability and we believe it

20   would be highly prejudicial to UH to now change

21   this record to bring in essentially a party with

22   no relevance to this except for to try to cure a

23   deficiency that they've known of since day one.

24

25             **MR. FELDMAN:**     Several things.

57

1    The arbitrator does not know of any deficiency

2    in the writing before me.

3              **MR. CAMPBELL:**     Then why include

4    them?

5              **MR. FELDMAN:**     Secondly, I know of

6    no court proceedings in this matter because I've

7    not been privy to them nor a recipient of them.

8    So while I hear you, I'm not cognizant of it.

9              **MR. CAMPBELL:**     Okay, understood.

10   I respect that position.  All I'm saying if

11   there's not a reason to join them, then we are

12   just doing a meaningless act.

13             **MR. FELDMAN:**     It doesn't really

14   make much difference because the Cleveland

15   Building Trades and Construction Trades Council

16   and various unions are stated in clear language

17   in the writing of the claim description.  It is

18   true that the complainant's name is Building and

19   Construction Laborers Local Union 310 and the

20   council is not mentioned as part of the

21   claimants in this matter, but --

22             **MR. CAMPBELL:**     Which is also

23   clear.

24             **MR. FELDMAN:**     Yeah.  I think it

25   may be too late to correct this by

58

1   inter-lineation in this matter.  It should have

2   been thought of when you filed it and not now,

3   so I'm going to overrule your motion.

4           MR. CAMPBELL:    Thank you.

5           MR. FELDMAN:    If you think you

6   have another claim, then you file it.  I don't

7   know if your time has lapsed.

8           MS. GRAGEL:    We're prepared to

9   proceed on the arguments that we have advanced

10  throughout the arbitrability phase of this case.

11          MR. FELDMAN:    The arbitrability

12  order is on the record.

13          MS. GRAGEL:    We're ready to

14  proceed on the merits, and we believe that the

15  proper parties are here to proceed.

16          MR. CAMPBELL:    If I can just make

17  a statement.

18          MR. FELDMAN:    Hold on a minute.

19          Did you want to make a statement?

20          MR. CAMPBELL:    Yes.

21          MR. FELDMAN:    With regard to the

22  case?

23          MR. CAMPBELL:    No, I just want to

24  make a statement because as the arbitrator

25  knows, and based on this motion it's quite

59

1    evident that one of the primary issues from the

2    outset of this Demand For Arbitration once it

3    was filed has been the respondents raising the

4    issue of arbitrability.

5              MR. FELDMAN:      That's over with.

6    We're past that.

7              MR. CAMPBELL:      Just for the

8    record, if I could, I just need to have a

9    statement that makes it clear, under the case

10   law we need to make clear that we are moving

11   forward with reservation, that we are still

12   challenging the arbitrability of this.  We've

13   taken this not only to a Motion to Dismiss and

14   argued it to this arbitrator, but we've also

15   filed a complaint, which is still pending in the

16   Federal District Court for the Northern District

17   of Ohio.  We've filed a Motion to Stay, which is

18   still pending, and we have a Temporary

19   Restraining Order, which was fully briefed and

20   denied last night orally and denied in writing

21   today without opinion.

22             MR. FELDMAN:      Who is the court?

23             MR. CAMPBELL:      It is Judge Boyko

24   from the Federal District Court, Northern

25   District of Ohio.  I would be happy to provide

60

1    you with the filings after today's hearing.

2              MR. FELDMAN:      I just want to see

3    the denial.

4              MR. CAMPBELL:     It is just simply a

5    minute order which is denied.  It just simply

6    says, "TRO denied."

7              MR. FELDMAN:      Put it in the

8    record when you get to it.

9              MR. CAMPBELL:     I think Ms. Gragel

10   has a copy and we would be happy to put it in

11   the record.   We can put that in as Joint

12   Exhibit.  Let me ask you one question.  We

13   already had the PLA as a Joint Exhibit, I

14   believe.

15             MS. GRAGEL:      That's correct.

16             MR. CAMPBELL:     I'm assuming this

17   proceeding is a continuous record and we're now

18   on Joint Exhibit 2.

19             MS. GRAGEL:      I think that makes

20   sense.

21             (Thereupon, Joint Exhibit 2 was

22             marked for purposes of

23             identification.)

24             MR. CAMPBELL:     So Joint Exhibit 2,

25   Mr. Arbitrator, is the record from the Federal

61

```
 1    District Court.  It has denied the TRO without
 2    the decision.  And we are just simply stating
 3    for the record that pursuant to the Sixth
 4    Circuit decision in the Cleveland Electric
 5    Illuminating Company, Utility Workers Union of
 6    America, 440 F.3d 809 Sixth Circuit 2006, that
 7    we are moving forward with reservations, that
 8    the respondents continue to believe that
 9    arbitrability should be reviewed by the Federal
10    District Court.  We deny that this issue, this
11    Demand For Arbitration, Union Exhibit 1, is
12    properly arbitrated under the Project Labor
13    Agreement; and I just want to make clear for the
14    record that pursuant to the Sixth Circuit
15    authority, we're moving forward pursuant to the
16    court's direction as to the TRO with reservation
17    and we are maintaining our arbitrability
18    objections and arguments.
19              MR. FELDMAN:     So ordered.
20              MS. GRAGEL:      If I may --
21              MR. FELDMAN:     What's Joint 1?
22              MS. GRAGEL:      Joint 1,
23    Mr. Arbitrator, from the prior hearing was the
24    Project Labor Agreement with its appended
25    attachments.  One, 2, 3, 4 are attached to Joint
```

62

1   1 as part of the Project Labor Agreement.

2          MR. FELDMAN:     Let me just glance

3   at this for a moment, please.  This is a

4   continuation of the hearing.

5          You wanted to make a statement.

6          MR. CAMPBELL:     Yes.  Thank you for

7   the time.  I just wanted to make clear about our

8   position.

9          MS. GRAGEL:     Very briefly, Local

10  310 disagrees with opposing counsel's

11  interpretation of the CEI case of the Sixth

12  Circuit.

13         MR. FELDMAN:     That's going to be

14  argued in another forum.

15         MS. GRAGEL:     And we do not

16  believe that this reservation of rights to

17  challenge jurisdiction is appropriate.  The

18  facts of this case resemble those of CEI where

19  the court held that there had been a waiver of

20  the right to contest arbitrability in a court

21  tribunal by going through the process as we

22  have.

23         MR. FELDMAN:     Ms. Gragel, there's

24  been no waiver here.  The employer has presented

25  the issue of arbitrability ever since we sat

63

1    down the first time.  He's presented it again

2    today, and as far as I'm concerned, they've not

3    waived anything in that regard by going forward.

4    I'm spreading that on the record.  So I'm

5    overruling your commentary by virtue of what the

6    clear facts reveal.

7              Is there anything else?

8              **MS. GRAGEL:**     The issue of CEI,

9    Your Honor, does require --

10             **MR. FELDMAN:**     But that's --

11             **MS. GRAGEL:**     -- the parties to

12   present --

13             **MR. FELDMAN:**     That's going to be

14   argued in another forum.  I'm not going to

15   comment on Federal Law unless I have to in

16   some -- I can't think of a fact in this case

17   that I'm talking about Federal Law.

18             **MS. GRAGEL:**     Nor is the

19   arbitrator required to interpret Federal Law,

20   but the issue of CEI was fully briefed to Judge

21   Boyko.  We don't accept the fact that there has

22   been any reservation of rights in an appropriate

23   way prior to this proceeding, and we simply

24   don't want the record to stand without that

25   response from us.

64

1         **MR. FELDMAN:**       Anything else?

2         **MS. GRAGEL:**       That's all on

3    behalf of union.

4         **MR. CAMPBELL:**     I have one issue.

5    I don't know if we've decided it, but I do think

6    that based on the Demand for Arbitration, Union

7    1, it's evident that their argument is a matter

8    of contract interpretation.  It's my

9    understanding in contract interpretation cases

10   that the union goes first.

11        **MR. FELDMAN:**       Well, this is a

12   termination case, and you have to prove the

13   reason for the termination of the seniority and

14   I want you to go first.  I don't think this is a

15   contract interpretation case.  As far as I'm

16   concerned, this grievant was terminated from his

17   seniority by the attorney's client and I do want

18   you to go first.

19        **MR. CAMPBELL:**     Okay.  I just

20   wanted to note our objection for the record.

21   Can I do a brief opening statement?

22        **MR. FELDMAN:**        Absolutely.

23        **MR. CAMPBELL:**      Thank you.

24        The respondents in this case are

25   University Hospitals Health System and Gilbane

65

1    Construction Manager, Gilbane Construction.  You

2    will hear witnesses from both University

3    Hospitals as well as Gilbane.  In addition,

4    there's a third party that is relevant to the

5    respondent's position and that is Sodexho,

6    S-o-d-e-x-h-o.  University Hospitals contracts

7    with Sodexho in order to run its cafeteria

8    services.  In this case, the cafeteria in

9    question is on the main campus of University

10   Hospitals Health System, and I'm going to refer

11   to it as UH.  The main campus is located on

12   Euclid Avenue in Cleveland, Ohio.  The cafeteria

13   is quite large, and at the center of a number of

14   hospitals, including Rainbow Children's Hospital

15   and several of the other main hospitals as part

16   of the University Hospitals Health System.

17             Sodexho operates the cafeteria, and

18   in addition, supervises pursuant to contract

19   with UH certain UH employees.  One of those UH

20   employees is Lattisia Hanson, who is employed as

21   a cashier in the cafeteria.  She is a UH

22   employee employed pursuant to the policies and

23   procedures of UH.

24             **MR. FELDMAN:**     She's a UH

25   employee?

66

1           **MR. CAMPBELL:**     Yes.  You will hear

2    Ms. Hanson testify, as well as a number of

3    Sodexho employees.  A very large construction

4    project, as you know, Vision 2010, is ongoing

5    and has been ongoing for several years.  Gilbane

6    manages the construction project, and the

7    contractors bid on and are granted -- their bids

8    are accepted pursuant to the Project Labor

9    Agreement between UH and Cleveland Building and

10   Construction Trades Council.  The council is a

11   laborer organization, but not a party to this

12   Demand for Arbitration.

13           The PLA has many attributes to it,

14   including diversity, regionalism as to hiring

15   requirements that the union has agreed to assist

16   as to the City of Cleveland residents, MBE,

17   minority business enterprises, female business

18   enterprises, many other things.  In addition,

19   the Project Labor Agreement includes that the

20   unions will comply with UH's code of conduct and

21   UH's policies and procedures pursuant to

22   paragraph 7 of the PLA.

23           On the night in question,

24   Mr. Harting, who is employed by Rivera

25   Construction Company -- again, Rivera is not a

67

1    party to this Demand for Arbitration and is not

2    here at this arbitration.  Rivera was

3    Mr. Harting's employer.  Rivera was working on

4    the UH project pursuant to the Project Labor

5    Agreements and pursuant to a bid.  Mr. Harting

6    was never employed by UH or Gilbane, either of

7    the two respondents in this matter.

8              What transpired is, first of all,

9    when Mr. Harting and other union employees come

10   on, and I'm certain we'll hear the union

11   representatives testify to it, that they are

12   advised by Gilbane as to certain safety

13   procedures as well as the code of conduct that

14   they are to follow when on UH property.  As with

15   any visitor, whether it's Dave Campbell visiting

16   the cafeteria, visits a patient or do legal

17   work, construction workers are granted employee

18   badges, are given directions as to areas that

19   they cannot go into and given directions as to

20   certain conduct they cannot partake in.

21             One of the areas that they cannot go

22   into in addition to patient areas without direct

23   authority is the cafeteria.  Construction

24   workers have been advised and the Building

25   Trades Council have agreed that the construction

68

```
 1    workers are to bring their own lunch or do

 2    different things other than going into the

 3    cafeteria that is on site UH property.  You'll

 4    hear Mr. Harting admit he and some of his

 5    co-workers, some of his fellow union brothers

 6    and sisters went into the cafeteria, and on the

 7    night in question he believed he was

 8    shortchanged when he went through the cash

 9    register line by Lattisia Hanson, a UH employee

10    and cashier.

11             The Sodexho managers reviewed this

12    allegation on the film, reviewed the amount of

13    cash that was provided, and verified that there

14    was no shortchanging based on the video.

15    Whether or not there was a shortchanging,

16    Mr. Harting's response was highly inappropriate.

17    You'll hear Ms. Hanson say -- and for purposes

18    of this I'm going to have to use some language

19    that we would normally not use -- that he called

20    her a nigger, he called her a thief, and he did

21    this with a long line of both other union

22    employees and other visitors to UH.

23             Ms. Hanson -- in fact, it got to be

24    so loud and argumentative that Sodexho managers

25    had to come over and separate Mr. Harting from
```

69

1    the scene and asked him to leave the cafeteria.

2    The next day he came in and at this point

3    Ms. Hanson did not raise the racial comments,

4    just simply that Sodexho understood that this

5    gentleman was upset, believed he was

6    shortchanged.  They reviewed the film,

7    determined that he wasn't shortchanged, but,

8    nonetheless, Sodexho, pursuant to their customer

9    relations mantra, not knowing that he was a

10   construction worker who shouldn't have been

11   there, not knowing about the racial comments,

12   tried to resolve the situation by giving him a

13   meal coupon that would remedy it as they would

14   with any customer that had a dispute.

15            Again, you'll hear Mr. Harting was

16   threatening, was cussing, again, called

17   Ms. Hanson a thief despite getting this.  You'll

18   hear from a number of Sodexho managers that even

19   the following day he was calling her a "fucking

20   thief" and asking for her to be let go.

21            Ms. Hanson when she saw this came

22   forward and gave the complete story to Sodexho.

23   Sodexho recommended to UH that Mr. Harting not

24   be permitted to return to the cafeteria.  UH,

25   and you'll hear Ms. Peplowski testify as an HR

70

1    manager fully investigated this, interviewed all

2    the relevant players, and determined that

3    Mr. Harting violated UH's policies, procedures

4    and code of conduct.

5              He stated in front of many other

6    people that Ms. Hanson was a thief, he was

7    threatening, he was loud, he was argumentative

8    and he used a racial slur.  Anybody, whether a

9    construction worker, Dave Campbell or any other

10   visitor to UH or any employee would have been

11   excluded.

12             Based on that, you'll hear Gilbane's

13   representative come in and say that, yes, they

14   were directed to remove him.  Before removing

15   him, they questioned him about whether he was in

16   the cafeteria on the night in question and

17   whether there was an incident.  He freely

18   admitted that there was an argument and freely

19   admitted that he was upset.

20             At that point they excluded him from

21   the work site, as they continue to do when

22   somebody violates the policy.  In fact, there's

23   another Laborer 310 representative who was

24   removed recently due to workplace violence.  At

25   this point we have not had a grievance.  We

71

1   fully expect that based on the arbitrability

2   decision we will get another one because

3   Laborers 310, it's their position that UH does

4   not have the right to exclude contractors or

5   employees from the work site if they violate our

6   policies and procedures.

7            We believe that the facts in this

8   case clearly show this is not a just cause

9   decision; there is nothing in the Project Labor

10  Agreement that says just cause, it's just simply

11  a matter of you will comply with our policies

12  and procedures.  You will hear the evidence

13  clearly state that he violated our policies and

14  procedures and code of conduct, and it's UH's

15  position that he was properly excused from the

16  project.  His seniority was not terminated by

17  UH.  He was free to go work on any other project

18  in the community or any other project within

19  Laborers 310 jurisdiction.

20           He could have continued to work for

21  Rivera, and we'll hear if he did.  He could have

22  went out to any non-UH project.  Rivera or

23  whatever conduct they did, if they discharged

24  him pursuant to seniority, that was not at our

25  request.  We simply said, Rivera, as long as

72

1    you're working here, Laborers 310, as long as

2    you're sending out laborers, you cannot send

3    Mr. Harting to our work site.

4              So it's our position, and although we

5    have strongly objected as the arbitrator has

6    pointed out on arbitrability from the get-go on

7    the merits of this case, there is no question

8    that Mr. Harting was properly excluded from the

9    work site; and it is common in any work site

10   across America that the owner is going to have

11   the ability to exclude individuals who do this.

12             UH has zero tolerance for racial

13   epithets, racial slurs, racial harassment, and

14   this conduct is simply unacceptable as in the

15   Project Labor Agreement, and all of the efforts

16   the union and the Building Trades Council and UH

17   have taken in order to improve diversity and

18   make this project something that the City of

19   Cleveland and Northeast Ohio can be proud of.

20   So it's our position that the grievance should

21   be denied in its entirety and Mr. Harting should

22   be directed to be assigned to work outside of

23   the UH project.  Thank you for your time.

24             **MR. FELDMAN:**    You see I have

25   Joint Exhibit 1.

73

```
 1            MR. CAMPBELL:    We can get you a
 2   copy of it.  Let me step out to get a witness.
 3            MR. FELDMAN:     What part of this
 4   do you say was -- you have a reference in your
 5   opening statement to Joint Exhibit 1.
 6            MR. CAMPBELL:    Paragraph 7, page
 7   3.
 8            MR. FELDMAN:     Thank you.
 9                  TODD GERBER
10   of lawful age, a witness herein, was examined
11   and testified as follows:
12            MR. FELDMAN:     For the record, may
13   I have your name?
14            MR. GERBER:      Todd Gerber.
15            MR. FELDMAN:     T-o-d-d?
16            MR. GERBER:      Correct.
17            MR. FELDMAN:     G-e-r-b-e-r?
18            MR. GERBER:      Correct.
19            MR. FELDMAN:     Do you understand,
20   sir, that you're under oath?
21            MR. GERBER:      Yes.
22            MR. FELDMAN:     You may inquire.
23            MS. GRAGEL:      Mr. Arbitrator, I'm
24   sorry, with the fan, is it Gerber?
25            MR. GERBER:      G-e-r-b-e-r.
```

74

1          **MS. GRAGEL:**      Thank you.

2                  DIRECT EXAMINATION

3    **BY MR. CAMPBELL:**

4    **Q.**   Could you please state your name?

5    **A.**   Todd Gerber.

6    **Q.**   Would you please spell Gerber?

7    **A.**   G-e-r-b-e-r.

8    **Q.**   Are you employed?

9    **A.**   Yes.

10   **Q.**   And who is your employer?

11   **A.**   Gilbane Building Company.

12   **Q.**   And how long have you been employed, I'm

13   going to refer to them as Gilbane.  How long

14   have been employed by Gilbane?

15   **A.**   Three and a half years.

16   **Q.**   And what is your title?

17   **A.**   Title is project engineer.

18   **Q.**   And if you could briefly, what are your

19   duties?  State your duties and responsibilities

20   as project engineer.

21   **A.**   Actually I worked as the project manager on

22   the neonatal intensive care project.

23          **MR. FELDMAN:**      On what project?

24          **MR. GERBER:**       The NICU project,

25   University Hospitals NICU project.

75

**BY MR. CAMPBELL:**

Q.   Okay.  And so you worked as a project

manager on the NICU project.  Is NICU N-I-C-U?

A.   Correct.

Q.   And what do you do as project engineer?

A.   Responsible for the day-to-day activities

of the project, everything from, you know,

scheduling, to budget, those types of

activities.

Q.   And when you say "project," is it for all

of Vision 2010 or certain portions of it?

A.   Certain portions.  Just the NICU project

was my responsibility.

Q.   Tell us, how large is the Vision 2010

project.

A.   The entire project for Gilbane consisted of

four projects, which was the Ahuja project, the

cancer project, the NICU project and the CEM

project.

Q.   And if we're talking about construction

dollars, how many millions of dollars?

A.   I think it's -- I think our contract is

approximately $350 million.

Q.   Is Vision 2010 larger than Gilbane's

portion of the construction?

76

1    **A.**    Yes.

2    **Q.**    Do you have an approximate amount?

3    **A.**    I don't know anything beyond our portion.

4    **Q.**    Are there other hospitals being

5    constructed?

6    **A.**    In terms of --

7    **Q.**    Outside of the Gilbane contract.

8    **A.**    Are there other hospitals?

9    **Q.**    Yes.  Is there other construction projects

10    in Vision 2010?

11    **A.**    Yes.  If I'm not mistaken, there are.

12    There's other components such as -- like there

13    was a parking garage, a service building, there

14    were other components outside of our contract

15    for Vision 2010.

16    **Q.**    What is Gilbane?  As part of Gilbane's

17    portion of Vision 2010, what is Gilbane's title

18    on the project?

19    **A.**    We are the construction manager for the

20    owner.

21    **Q.**    Does Gilbane employ any of the actual

22    construction workers on the Vision 2010

23    projects?

24    **A.**    In terms of labor force, workers, actually

25    performing a trade, no, Gilbane does not.

77

1    **Q.**   Let's take it one step back.  Let the

2    record reflect that I'm handing you, Mr. Gerber,

3    what's been marked as Joint Exhibit 1 and I want

4    to ask you, do you recognize that document?

5    **A.**   Yes.  This is the Project Labor Agreement.

6    **Q.**   And tell us a little bit.  What does the

7    Project Labor Agreement mean to Gilbane's duties

8    at UH?

9    **A.**   Sure.  The Project Labor Agreement means

10   that the owner has elected that the project be

11   performed with union labor; and this is the

12   agreement between the hospital or the owner and

13   the trade unions that formalized the agreement

14   that they're entering into.

15   **Q.**   If you could turn to page 14 of that

16   document, and if you could look just so we're

17   clear as to the parties, it says, "In witness

18   hereof, the parties have hereunto set their hand

19   as of the date first above written," what are

20   the two parties on the right-hand side of page

21   14?

22   **A.**   Sure.  It's between University Hospitals,

23   Steve Stanley signed it, and Loree Soggs,

24   executive secretary is the title, and if I'm not

25   mistaken, he's part of the -- I don't know the

78

1   exact organization.

2   **Q.**   What is the -- above Loree Soggs'

3   signature, what is the entity above it?

4   **A.**   There it is, Cleveland Building and

5   Construction Trades Council.

6   **Q.**   Is Gilbane a party to this Project Labor

7   Agreement?

8   **A.**   No, we're not.

9   **Q.**   Now, Gilbane has been asked by UH to

10  enforce the Project Labor Agreement on the

11  construction project?

12  **A.**   Yes, that is our responsibility.

13  **Q.**   Who actually employs the construction

14  workers?  What type of entities?  How is that

15  done?  If Gilbane doesn't employ --

16  **A.**   Sure.  What we do is we go out and we will

17  hire what we refer to as a prime contractor, who

18  is a trade contractor that would actually

19  either, A, have agreements with the unions to

20  perform the work, or, B, their contracts would

21  be packaged and they would have subcontracts

22  underneath them with different companies that

23  provide the trade work for us.

24  **Q.**   Now, let me ask you about Gilbane's rules.

25  Let me show you another group of exhibits.

79

```
 1              (Thereupon, Respondent's Exhibit 1
 2              was marked for purposes of
 3              identification.)
 4    BY MR. CAMPBELL:
 5    Q.    Todd, I've handed you what's been marked as
 6    Respondent's 1.  If you could, on your right
 7    look at that group of documents.  Do you
 8    recognize Respondent's 1?
 9    A.    Yes.
10    Q.    And what is Respondent's 1?
11    A.    Respondent 1 is a series of documents from
12    the Gilbane Safety Plan.  The top document is --
13    and as part of our safety plan all individuals
14    entering the project have to go through a safety
15    orientation, so the top three pages are actually
16    the safety orientation quiz that the individuals
17    take.  They watch a video on safety and
18    infection control as part of that.
19         The third document as part of the safety
20    plan is a code of safe practices that we ask
21    everybody to sign off on.
22    Q.    I want to refer you to number 11.  Could
23    you read number 11?
24    A.    Sure.  "I will conduct myself in a
25    professional manner and not engage in any
```

R000412

80

1    violence, horseplay, practical jokes or other

2    behavior obnoxious to the general public.  I

3    will not harass anyone else on site or any

4    member of the public, sexually or otherwise.  I

5    will not bring onsite or write or draw any

6    sexually explicit materials."

7    Q.   Okay.  And are these provided to the union

8    employees when they come on site?

9    A.   Sure.  It's part of our safety orientation

10   process.  And then actually the last page is

11   when all individuals complete the safety

12   orientation, they go to the hospital and

13   actually get a badge from the hospital as part

14   of the --

15   Q.   And what is that badge?  What does the

16   badge signify or what does it signify?

17   A.   The badge signifies I guess a couple

18   things.  Everybody saw the safety video,

19   everybody provided evidence of a negative drug

20   test, everybody provided a criminal background

21   check, and they completed all the orientation

22   requirements, and that badge allowed them access

23   into the hospital.

24   Q.   Okay.  And so the employee badge would have

25   been required of Mr. Harting, the Laborers 310

81

1    employee in question in this grievance?

2    **A.**    Correct.

3    **Q.**    Now, you were looking at the Project Labor

4    Agreement, Joint Exhibit 1, the larger document.

5    If you could turn to attachment D in that

6    document.

7                   **MR. FELDMAN:**       "D" as in dog?

8                   **MR. CAMPBELL:**      "D" as in dog, yes.

9                   **MR. GERBER:**       Yes.

10   **BY MR. CAMPBELL:**

11   **Q.**    That is entitled Attachment D, Safety Plan.

12   What is that document?

13   **A.**    This is the Gilbane Vision 2010 Safety

14   Plan.

15   **Q.**    And if you could turn to page 8 of 67 of

16   Attachment "D" as in dog?

17   **A.**    Yes.

18   **Q.**    And do you see the responsibilities there

19   as to courtesy and personal conduct?

20   **A.**    Yes.

21   **Q.**    And "Courtesy:  Employees shall observe

22   standards of behavior and conduct their work in

23   a manner to avoid offending any owner, employees

24   or visitors.  Each individual on this project

25   must be given the courtesy that would be

82

1    extended to one's family or best friend."  Do

2    you see that?

3    **A.**    Yes.

4    **Q.**    And then the personal conduct, it's

5    practical jokes, horseplay, scuffling or

6    wrestling or fighting is prohibited?

7    **A.**    Yes.

8              **MR. FELDMAN:**      I finally got to

9    page 67.

10             **MR. CAMPBELL:**      I'm looking at two

11   portions of that, Courtesy, under all employees

12   shall observe the following rules of conduct,

13   and that is what Mr. Gerber read from as to the

14   family or best friend, and then the personal

15   conduct below.

16   **BY MR. CAMPBELL:**

17   **Q.**    Todd, is Attachment D applicable to union

18   employees working in Vision 2010?

19   **A.**    Yes.

20   **Q.**    Now, let's talk about Mr. Harting.  Have

21   you been involved in the issues that comprise

22   this grievance?  Have you been involved with

23   Mr. Harting before today?

24   **A.**    Yes.

25   **Q.**    Tell the arbitrator how you've been

83

1    involved.

2    **A.**    Sure.  We had notice of an incident in the

3    cafeteria.

4              **MR. FELDMAN:**    Can you tell me

5    when that occurred?

6              **MR. GERBER:**    I can tell you it

7    was approximately January.  The specific date, I

8    would have to go back --

9              **MR. FELDMAN:**    I'm interested in

10   facts from the witness, not an opinion.  Tell me

11   when it occurred.

12             **MR. CAMPBELL:**    If you know.

13             **MR. FELDMAN:**    He's got to tell me

14   what he knows about it.

15             **MR. CAMPBELL:**    Absolutely.

16             **MR. GERBER:**    I don't know the

17   specific date it occurred.

18             **MR. FELDMAN:**    When did you first

19   get involved?

20             **MR. GERBER:**    I received an

21   e-mail notice from my manager that there was an

22   incident in the cafeteria.

23             **MR. FELDMAN:**    What date?

24             **MR. GERBER:**    I don't know the

25   date off the top of my head.  And from there we

84

```
 1    contacted Ozanne Construction Company.
 2    BY MR. CAMPBELL:
 3    Q.    And what is Ozanne, if you can tell us?
 4    A.    Ozanne was the prime contractor that
 5    Gilbane was in contract with.  We knew the
 6    individual was a laborer.  We had Mr. Harting's
 7    last name.  We gave that information to Ozanne
 8    and requested them to come down to our offices
 9    to discuss the incident.
10    Q.    Did he come down?
11    A.    Yes, he did, he came down.
12    Q.    Do you recognize Mr. Harting?
13    A.    Yes, I do.
14    Q.    Is he sitting at the end of the table?
15    A.    Yes, to my right.
16    Q.    Tell us what happened in that meeting.
17            MR. FELDMAN:     First tell me when
18    the meeting was.
19            MR. GERBER:      The meeting was in
20    the evening at the end of the day.
21            MR. FELDMAN:     You've got a date?
22            MR. GERBER:      The date of the
23    meeting was the same date -- I don't know the
24    date off the top of my head.  Mr. Harting was
25    working second shift.  The meeting was
```

85

1    approximately 5:00 in the evening.  He came down

2    to our offices with the supervisor from Ozanne

3    Construction and the project manager from Ozanne

4    Construction.  We went into our conference room

5    with myself, Gilbane's general superintendent,

6    Mr. Harting and the two gentlemen from Ozanne.

7    **BY MR. CAMPBELL:**

8    **Q.**   Let me ask you, did Gilbane independently

9    investigate this issue?

10   **A.**   No.  This was our investigation.

11   **Q.**   But UH -- when you saw the e-mail, Gilbane

12   had been directed to exclude Mr. Harting from

13   the work site; is that correct?

14   **A.**   Correct.

15   **Q.**   And at that point your investigation was

16   limited to what you were --

17        **MR. FELDMAN:**      Tell me when this

18   occurred.

19        **MR. CAMPBELL:**    This occurred, I

20   believe based on our Demand for Arbitration,

21   we'll hear -- it says early February 2009.  We

22   have the notes that the UH representatives will

23   testify as to the exact date.  With that,

24   Mr. Gerber is here about this meeting and the UH

25   employees.

86

1          **MR. FELDMAN:**     Could I have a date
2    of the meeting?  Do you know that?
3          **MR. CAMPBELL:**     Based on the Demand
4    for Arbitration it simply says early February
5    2009.
6          **MS. GRAGEL:**     Do you know the
7    date and we can stipulate to it?
8          **MR. GERBER:**     Is there a calendar
9    I can look at?  I might be able to pinpoint a
10   date?
11         **MR. CAMPBELL:**     Yes, I have my
12   written calendar.  I'm handing him February
13   2009.
14         **MS. GRAGEL:**     You might need to
15   go back to January.
16         **MR. CAMPBELL:**     It looks like
17   January -- it happened in January and it looks
18   like early February, February 2nd or 3rd, I
19   believe.
20         **MR. GERBER:**     I think the date we
21   met was February 2nd.  We took the badge back
22   and we turned it over to the owner on February
23   3rd.
24         **MR. FELDMAN:**     This meeting you're
25   talking about -- have a seat, sir.

87

1        **MR. GERBER:**      Sure.

2        **MR. FELDMAN:**      This meeting you're

3    talking about occurred on February 2nd?

4        **MR. GERBER:**      Yes, I believe.

5        **MR. FELDMAN:**      And does that

6    refresh the date that you received the e-mail?

7        **MR. GERBER:**      Yes.

8        **MR. FELDMAN:**      What was that date?

9        **MR. GERBER:**      February 2nd.

10       **MR. FELDMAN:**      So you got an

11   e-mail on February 2nd and subsequent to that

12   e-mail you had a meeting somewhere around --

13       **MR. GERBER:**      5:00 in the

14   evening.

15       **MR. FELDMAN:**      7:00 p.m.?

16       **MR. GERBER:**      5:00 p.m. was the

17   meeting.

18       **MR. FELDMAN:**      That was

19   February 2nd, 2009?

20       **MR. GERBER:**      Correct.

21       **MR. CAMPBELL:**      If you could tell

22   us what happened at that meeting to the best of

23   your recollection.

24       **MR. GERBER:**      Sure.  At the

25   meeting Mr. Harting came in.  We inquired if

88

```
 1    there was an incident in the cafeteria.  He
 2    explained he had purchased some food and there
 3    was an issue with some change.  We asked him if
 4    he knew he wasn't supposed to be in the
 5    cafeteria.  He said he was.  We said for that
 6    reason we have to take his badge back, which we
 7    did.  He turned over his badge to us, and we
 8    informed him that he was no longer to go into
 9    the facility and he had to leave the project
10    site.
11    BY MR. CAMPBELL:
12    Q.    Two questions.  First of all, as to the
13    cafeteria ban, tell the arbitrator about that.
14    A.    Part of the UH rules is that they did not
15    want us to -- they didn't want any of the
16    contractors to use their facilities for their --
17    their facilities were for the patients, so that
18    was a rule we passed on to all the contractors.
19    Q.    So it was not just the cafeteria, it was
20    other areas of the hospital that patients were
21    normally using?
22    A.    The rule is specific to the cafeteria.
23    They did not want them using the cafeteria.
24    Q.    Did Mr. Harting describe to you any of the
25    incident involving the shortchanging in his
```

89

1  view?

2  **A.**  Yes.  He explained that he was waiting in

3  line for a period of time.  When he got to the

4  register, he gave them some money.  He either

5  gave them a 10 or a 20, and they gave back

6  change that wasn't consistent with the money he

7  gave them.  My understanding is there was a

8  verbal altercation.

9           **MS. GRAGEL:**     Objection.

10  **BY MR. CAMPBELL:**

11  **Q.**  Did he tell you that there was a verbal

12  altercation?

13  **A.**  Yes.  My understanding is there was a --

14           **MR. FELDMAN:**     Understanding isn't

15  sufficient.

16  **BY MR. CAMPBELL:**

17  **Q.**  You need to testify what he told you at

18  that meeting.  Instead of "my understanding," if

19  you could say what he told you at the meeting.

20       When you sat down with Mr. Harting, if you

21  could -- instead of saying "my understanding,"

22  say Mr. Harting informed me --

23  **A.**  Sure.  Mr. Harting informed me that an

24  argument ensued over the change, that a manager

25  came out, and I think he got a coupon, and then

90

1    I think he left.

2    **Q.**    Were you involved in any of the subsequent

3    meetings between his union and UH requesting him

4    to be returned to the work site?

5    **A.**    I was not involved in any meetings.

6    **Q.**    Have other union employees been excluded

7    from the UH work site, to your knowledge, for

8    any period of time whether permanently or for a

9    short period of time?

10   **A.**    Yes.

11   **Q.**    How many, to your knowledge?

12   **A.**    I'm aware of an individual being removed on

13   the CEM project and an individual being removed

14   on the cancer project.

15            **MS. GRAGEL:**      Can we have time?

16   Can we have a function of time.

17            **MR. CAMPBELL:**      I'm going to ask

18   him that.

19   **BY MR. CAMPBELL:**

20   **Q.**    When was the CEM project completed

21   approximately?

22   **A.**    Approximately in the fall.

23   **Q.**    Of 2008?

24   **A.**    Of 2008.

25   **Q.**    To your knowledge, was there any grievances

91

1   or arbitrations under the Project Labor

2   Agreement arising out of that?

3   **A.**   Not that I'm aware of.

4   **Q.**   And you mentioned a second.  What happened

5   on the second exclusion, to your knowledge?

6   **A.**   It was on the cancer project, and in terms

7   of timing, it was just recently.

8              **MR. FELDMAN:**     It was what?

9              **MR. GERBER:**     Just recently.

10  **BY MR. CAMPBELL:**

11  **Q.**   Within days of today?

12  **A.**   I don't know.

13  **Q.**   Certainly within weeks?

14  **A.**   Yes, within weeks of today.

15             **MR. FELDMAN:**     Subsequent activity

16  can hardly prove prior.

17             **MR. CAMPBELL:**    I just wanted to --

18  you can take it as you may.

19             Give me a moment to see if there's

20  any other questions I have for Todd.  I don't

21  have any further questions for Mr. Gerbert at

22  this time subject to the cross.

23             **MS. GRAGEL:**     Could I request a

24  five-minute recess?

25             **MR. FELDMAN:**     Make it a

92

1  ten-minute.

2          **MR. CAMPBELL:**     Let the record

3  reflect I will not talk to Todd while he's on

4  the stand.

5          (Thereupon, a recess was taken.)

6          **MR. FELDMAN:**     Are you ready for

7  cross-examination?

8          **MS. GRAGEL:**     I am.

9              CROSS-EXAMINATION

10  **BY MS. GRAGEL:**

11  **Q.**   Mr. Gerber, during the time that you were

12  project engineer for University Hospitals, was

13  all of your work at the NICU project?

14  **A.**   Yes.

15  **Q.**   And that's on the main campus, correct?

16  **A.**   Correct.

17  **Q.**   Was that where you maintained your business

18  office?

19  **A.**   Yes.

20  **Q.**   Did you have an office or a trailer?

21  **A.**   We have an office complex, which consists

22  of seven trailers approximately, down by the

23  corner of University Hospital Drive and Euclid

24  Avenue.

25  **Q.**   And how far away from that -- from the main

93

1    cafeteria is that complex of trailers?

2    **A.**    A couple hundred yards.

3    **Q.**    During the three and a half year time that

4    you worked on site, did you go in the cafeteria?

5    **A.**    I'd like to make a correction.  I was only

6    on site a little over a year and a half, and I

7    never purchased anything from the cafeteria.

8    **Q.**    Did you go in the cafeteria?

9    **A.**    I've walked through the atrium space which

10    is adjacent to the cafeteria, but I never went

11    into the cafeteria proper.

12    **Q.**    So you don't know if there were

13    construction workers eating or buying things in

14    the cafeteria?

15    **A.**    No, I don't.

16    **Q.**    Did you ever, yourself, or have anyone from

17    Gilbane do a walk-thru to check on that?

18    **A.**    No, other than at our weekly progress

19    meetings we advised the contractors and reminded

20    them not to use the facilities.

21    **Q.**    And those weekly progress meetings would be

22    attended by contractors?

23    **A.**    By our prime contractors, yes.

24    **Q.**    And Ozanne was a prime contractor?

25    **A.**    Correct.

94

1  **Q.**   And did you have any knowledge as to how,

2  if at all, Ozanne communicated that to its

3  subcontractors?

4  **A.**   I do not.

5  **Q.**   And do you know how, if at all, Ozanne

6  communicated it to its construction workers?

7  **A.**   I'm not aware of how they communicated with

8  their trades.

9  **Q.**   And do you know, sir, whether there was any

10  posted notice at or around the cafeteria at

11  University Hospitals regarding the rule you've

12  described here at this hearing today?

13  **A.**   I'm not aware of a posted notice.

14  **Q.**   You have, sir -- can you get in front of

15  you Respondent's Exhibit 1, which is the

16  Comprehension Quiz?

17  **A.**   Okay.

18  **Q.**   First of all, was this video -- was this

19  done by video, or on the computer, or how was

20  this done?

21  **A.**   Safety orientation consisted of two videos,

22  if I'm not mistaken.

23  **Q.**   And were those done in the Gilbane trailer

24  or somewhere else?

25  **A.**   Yes, the Gilbane trailer.

95

1    **Q.**    When you worked during that one and a half

2    year period on site, what was the last day that

3    you worked on site, or are you still there?

4    **A.**    I'm still on site.

5    **Q.**    So we go back about 18 months to, what,

6    January of '08 is about when you started?

7    **A.**    Correct.

8    **Q.**    So between January of '08 and now, what was

9    your usual work schedule?

10   **A.**    I pretty much work starting approximately

11   at 7:00 in the morning to 6:30 in the evening

12   would be a typical day.

13   **Q.**    And for construction workers who were

14   coming in to work the second shift, do you know

15   when and how they received the videos that were

16   part of the orientation?

17   **A.**    Orientation times were provided for the

18   first and the second shift.

19   **Q.**    You said that the Gilbane part of the 2010

20   project covered NICU?

21   **A.**    Correct.

22           **MR. FELDMAN:**    Let's go back a

23   minute.  Was your answer that orientation times

24   were for the first and second shift?

25           **MR. GERBER:**    Correct.  We did

R000428

96

1   multiple orientations.  We would do an

2   orientation for the morning group of individuals

3   and for the second shift group of individuals.

4          MR. FELDMAN:     And this was

5   supposed to cover every trade on the block?

6          MR. GERBER:     Every individual

7   that steps foot on the project is to go through

8   the Gilbane safety orientation.

9          MR. FELDMAN:     And do you have

10  knowledge that the grievant attended the

11  orientation?

12         MR. GERBER:     I would have to go

13  back and check our records to confirm when he

14  was oriented.

15         MR. FELDMAN:     Do you think that's

16  an important facet?

17         MR. GERBER:     Yes.

18         MR. FELDMAN:     Then why don't you

19  have it with you?

20         MR. GERBER:     I don't have an

21  answer for that.  The only answer I could

22  provide you is the individual did have a badge,

23  which would indicate he was oriented because the

24  orientation is part of the badging process,

25  which is the last sheet -- the badge

97

1    requirements are the last sheet of the handout.

2              MR. CAMPBELL:    He's referring to

3    Respondent 1, the last page of Respondent 1.

4              MR. FELDMAN:    I understand.

5    Continue, please.

6    BY MS. GRAGEL:

7    Q.   Following up on one of the arbitrator's

8    questions, and I'll go back to the job site

9    question, were you asked by University Hospitals

10   to provide to the investigator who was looking

11   into the incident about Mr. Harting verification

12   that he had gone through the orientation

13   process?

14   A.   At what time are you referring to?

15   Q.   Back in January or February of 2009.

16   A.   No, we were never asked to provide evidence

17   of the orientation.  We were requested to get

18   his badge and turn it back in to the hospital.

19   Q.   Now, I had started to ask you, sir,

20   Gilbane's role as construction manager covered

21   the NICU project plus three other projects I

22   think you said?

23   A.   If you go to Exhibit A, the PLA, I noticed

24   Exhibit A identifies all of the projects covered

25   by the -- page 15 on the --

98

1    **Q.**    Page 15 of Joint Exhibit 1.

2    **A.**    Yes.  So Gilbane's -- our contract with

3    University Hospitals covers the Cancer Hospital,

4    the Center for Emergency Medicine, the Neonatal

5    Intensive Care Unit, and our other project is

6    the Ahuja Medical Center, which is not on

7    campus, which potentially may not be part of

8    this PLA.  I'm not certain of that.  It is not

9    listed as one of the covered projects.

10   **Q.**    Ahuja is out in Beachwood or Pepper Pike.

11             **MR. CAMPBELL:**      Ahuja is part of a

12   second PLA that is outside the City of

13   Cleveland.  Mr. Arbitrator, we have two PLAs,

14   one for the City of Cleveland which includes the

15   main campus, and the second that includes

16   projects outside the City of Cleveland.

17             **MR. FELDMAN:**      Let's stay in the

18   town where the grievant was involved.

19   **BY MS. GRAGEL:**

20   **Q.**    The three projects that are listed here on

21   Exhibit A, cancer, emergency medicine and

22   neonatal intensive care, they are all in

23   downtown Cleveland around University Hospitals'

24   main campus, correct?

25   **A.**    Main campus.

99

1   **Q.**   Would you look with me back to Respondent's

2   Exhibit 1 of the orientation quiz?  And all this

3   was done at the trailer down the street from

4   University Hospitals' cafeteria area?

5   **A.**   Correct, at main campus.

6   **Q.**   The third page of this is the project code

7   of safe practices, correct?

8   **A.**   Correct, which as a side note is part of

9   the safety plan, which actually is this page of

10  the safety plan.

11          **MR. CAMPBELL:**   Let the record

12  reflect he's pointing to Attachment D of Joint

13  Exhibit 1.

14          **MR. GERBER:**   I think it's

15  page -- it's hard to read.  It looks like

16  page 52 of 67 of the safety plan.

17          **MR. CAMPBELL:**   Of Joint Exhibit 1,

18  Attachment D.  I want the record to be clear.

19  **BY MS. GRAGEL:**

20  **Q.**   My question, sir, is back to the project

21  safety code page that's in Respondent's Exhibit

22  1.  Is there anyplace in points 1 to 13 that

23  tells the construction workers that were working

24  on the main campus that they were not allowed to

25  eat in the cafeteria of University Hospitals?

100

1    **A.**    Item 7 says, "I will eat in designated

2    areas and dispose of trash in proper

3    containers."  There is a list of University

4    Hospitals' rules that is incorporated in

5    everybody's contract, and one of the rules was

6    to not use the cafeteria.

7    **Q.**    My question is, is it on this sheet of

8    paper?

9            **MR. CAMPBELL:**    Object.  Asked and

10    answered.

11            **MR. GERBER:**    I answered yes,

12    that they are to eat in designated areas, and

13    the cafeteria was a non-designated area.

14    **BY MS. GRAGEL:**

15    **Q.**    And if I'm looking at this page, how do I

16    know that from looking at this page?

17    **A.**    There is other information covered at the

18    safety orientation meeting.

19            **MR. FELDMAN:**    Answer the

20    question.

21            **MR. GERBER:**    It is not on this

22    page, other than --

23            **MR. FELDMAN:**    Next question.

24    **BY MS. GRAGEL:**

25    **Q.**    Now, then, you started talking to me a bit

101

1    about the actual project safety plan, which is
2    part of -- which is Attachment D to Joint
3    Exhibit 1.  And Mr. Campbell asked you some
4    questions about page 8, do you see that?  Can
5    you get to that with me?
6              MR. FELDMAN:      Page 8 of 67?
7              MR. CAMPBELL:     Yes, of Attachment
8    D.
9              MR. GERBER:      Yes.
10   BY MS. GRAGEL:
11   Q.   And under that section, sir, for courtesy,
12   it reads:  "Employee shall observe standards of
13   behavior and conduct their work in a manner to
14   avoid offending any owner, employees or
15   visitors.  Each individual on this project must
16   be given the courtesy that would be extended to
17   one's family or best friend."
18        Do you know, because I haven't seen the
19   training video, whether there's any explanation
20   on the training video beyond this statement
21   that's here in the project safety plan?
22   A.   I don't know if there's any other
23   additional information in the safety video
24   regarding courtesy.
25   Q.   Would you turn with me then, sir, to page

102

1   15 of 67?  About in the middle of the page, do

2   you see in bold-face the "1st Citation" and "2nd

3   Citation"?

4   **A.**   Yes.

5   **Q.**   And two paragraphs up above first citation

6   there's a line that says -- and tell me if I'm

7   reading it correctly:  "Repeated violations or

8   lack of cooperation with regard to the project

9   safety plan by employees of a contractor will

10  indicate non-compliance with provisions included

11  in the contract and may be reason for the

12  employee being barred from the project site

13  and/or termination of the contractor's

14  contract."  Do you see that?

15  **A.**   No.  Where are you again?

16  **Q.**   Two paragraphs up above the bold-face 1st

17  citation?

18  **A.**   Yes.

19  **Q.**   See that phrase starting "Repeated"?

20  **A.**   Yes.

21  **Q.**   Earlier today you testified that on or

22  around February 2nd you and Ozanne

23  representatives met with Mr. Harting.

24  **A.**   Yes.

25  **Q.**   Had you at any time prior to February 2nd

103

1  had occasion to have any interaction with

2  Mr. Harting about violations of the project

3  safety plan?

4  **A.**   No.

5  **Q.**   And then, sir, after the -- there's

6  references to the 1st citation.  Did you have

7  occasion before February 2nd, 2009 to issue a

8  1st citation to Rivera based on conduct of

9  Mr. Harting?

10  **A.**   Mr. Harting was in the cafeteria.  There

11  was a rule by University Hospitals that we were

12  not to use their cafeteria.  He was removed for

13  being in the cafeteria in violation of that

14  rule.

15  **Q.**   Now, can you answer my question?

16          **MR. FELDMAN:**      Excuse me.  Was

17  that the only reason for his removal?

18          **MR. GERBER:**      Yes, because he was

19  in the facility he was not supposed to be in.

20  **BY MS. GRAGEL:**

21  **Q.**   Now, to answer my question, before that

22  date had Gilbane issued a 1st citation to Rivera

23  construction based on activity of Mr. Harting?

24  **A.**   No.

25  **Q.**   So being that a 1st citation was never

104

1    issued, I take it that Rivera Construction was

2    not issued a 2nd citation, correct?

3    **A.**   Correct.

4    **Q.**   Down, then, sir, at the bottom of this page

5    there's a bold-faced "Immediate removal from the

6    property citations."

7    **A.**   Yes.

8    **Q.**   And the first one talks about exposing

9    employees to imminent loss of life, correct?

10   **A.**   Yes.

11   **Q.**   I take it that didn't happen based on

12   anything you heard in the cafeteria -- about the

13   cafeteria incident prior to February 2, 2009?

14   **A.**   Correct.

15   **Q.**   Which of these eight immediate removal

16   areas did you consider to be applicable when you

17   acted upon the instructions to remove

18   Mr. Harting?

19   **A.**   I would say it would fall under the

20   "violent physical encounter."

21   **Q.**   And did you have information, sir, at --

22   first of all, violent physical encounter refers

23   to fighting, correct?

24   **A.**   Well, violent physical encounters defines

25   fighting as one of the encounters.

105

1 **Q.** Do you, as you sit here today, have any

2 information indicating that Mr. Harting engaged

3 in a physical fight with Lattisia Hanson or with

4 any employee at the hospital or Sodexho?

5 **A.** A physical fight, no; but a verbal

6 altercation, they expressed that they were

7 intimidated by Mr. Harting.

8 **Q.** Where, sir, in this list of eight does it

9 take about verbal altercation as being a grounds

10 for immediate removal from the property?  It's

11 not there, is it?

12 **A.** He was immediately removed from the

13 property for being in the facility as I've

14 explained, which is another rule, another

15 contractual rule that all the contractors were

16 to follow and that all the contractors were

17 advised of.

18 **Q.** Is that rule part of the Project Labor

19 Agreement or any of attachments in front of you,

20 sir?

21 **A.** No, but that rule is part of our contract

22 with our contractors.

23 **Q.** Moving to a different subject here, in the

24 months before February 2, 2009, did you have

25 occasion to directly supervise Mr. Harting at

**COURT REPORTERS OF AKRON CANTON AND CLEVELAND**
**330-666-9800**  **330-452-2400**  **216-621-6969**

R000438

106

1   any of the work that he did?

2   **A.**   I am not a field supervisor, so, no.

3   **Q.**   Do you know where he was assigned to work

4   within the neonatal project?

5   **A.**   He was on the second shift, he was a

6   laborer doing laboring activities.

7   **Q.**   Do you know, sir, whether -- first of all,

8   do you know Pat Tony?

9   **A.**   Yes.  Pat Tony was Gilbane's general

10  superintendent.

11  **Q.**   Did you on February 2nd or at any other

12  time have occasion to discuss Mr. Harting's

13  performance with Mr. Tony?

14  **A.**   I never discussed Mr. Harting's

15  performance.

16  **Q.**   So on February 2nd, 2009 when you caused

17  his removal from the job site, you didn't know

18  whether he was doing a good job as a laborer or

19  a bad job?

20  **A.**   No, I knew he was a good employee.

21  **Q.**   And, finally, or close to finally, on

22  February 2nd, 2009 you said you received an

23  e-mail from somebody about this incident.

24  **A.**   Yes.  I was informed about the incident by

25  my manager at Gilbane.

107

1    **Q.**    And who was your manager?

2    **A.**    John Sosnowski.

3    **Q.**    And the e-mail you received, do you have a

4    copy of it here today?

5    **A.**    No.

6                **MS. GRAGEL:**       Do you have a copy

7    of it, Mr. Campbell?

8                **MR. CAMPBELL:**    No.

9                **MR. GERBER:**       And I would like to

10   clarify, it could have been a phone

11   conversation.  I would have to go back to see

12   how he communicated to me.  It was either a

13   phone conversation or an e-mail.

14   **BY MS. GRAGEL:**

15   **Q.**    Did you receive any description of what

16   anybody was saying had happened?

17   **A.**    Yeah.  My understanding is there was an

18   incident in the cafeteria which led to a verbal

19   altercation, and the employee needed to be

20   removed.

21   **Q.**    And the directive to remove Mr. Harting was

22   related to you by Mr. Sosnowski saying, "I want

23   him removed," or was it --

24   **A.**    My understanding is it was -- in talking

25   with Mr. Sosnowski, that the request was from

108

1    the hospital.

2    Q.    So after that then you called Ozanne --

3    A.    Correct.

4    Q.    -- to bring Mr. Harting to a conference

5    room, correct?

6    A.    Correct.

7    Q.    Who came from Ozanne?

8    A.    Tony Gallata, who is their superintendent;

9    Fred Kruse, their project manager.

10   Q.    And just so that I'm clear, Ozanne was what

11   kind of contractor on the job?

12   A.    Their contract was for general trades.

13   Q.    And you did not call anyone from Rivera

14   Construction into the meeting, correct?

15   A.    Well, we were not in contract with Rivera.

16   Our contract was with Ozanne.  We knew that the

17   individual was within the Ozanne contract.

18   Q.    And you also know that Rivera Construction

19   was supplying laborers, but that Ozanne was

20   directing the work, day-to-day work of them,

21   correct?

22   A.    Correct.

23   Q.    Rivera was not on site?

24   A.    When you refer to Rivera, are you referring

25   to a company representative or --

109

1   **Q.**   Mr. Rivera.

2   **A.**   Mr. Rivera was not on site.

3   **Q.**   And no Rivera supervision was on site?

4   **A.**   Not that I'm aware of.

5   **Q.**   And you understood Rivera is an MBE

6   contractor, correct?

7   **A.**   Correct.

8   **Q.**   And as part of the purposes of the Project

9   Labor Agreement, having MBE contractors

10  participate in the way that Rivera did was part

11  of the overall project?

12  **A.**   MBE participation was a component of the

13  project.

14  **Q.**   Just a couple further questions, sir.  You

15  have in front of you Joint Exhibit 1, Project

16  Labor Agreement.  Paragraph 6 of this Project

17  Labor Agreement, sir, refers to construction

18  managers, does it not?  That's on page 3.

19  **A.**   Correct.

20  **Q.**   And according to paragraph 6, such

21  construction managers shall be required to

22  acknowledge and execute this agreement.

23       Do you know whether Gilbane Construction

24  Company has ever actually signed a copy of the

25  Project Labor Agreement?

110

1   **A.**   No, we haven't that I'm aware of.

2   **Q.**   I take it by virtue of the fact that you

3   worked for a year and a half in making sure the

4   Project Labor Agreement went forth, Gilbane

5   acknowledged the Project Labor Agreement?

6   **A.**   Yes, we acknowledged the Project Labor

7   Agreement.

8   **Q.**   And you've seen it before today?

9   **A.**   Yes.

10  **Q.**   And you know that throughout the Project

11  Labor Agreement there are many, many references

12  to unions?

13              **MR. FELDMAN:**     To what?

14              **MS. GRAGEL:**      To unions.

15              **MR. GERBER:**      Yes.

16  **BY MS. GRAGEL:**

17  **Q.**   Would you look specifically with me, sir,

18  at page 4, paragraph 8?  And do you see

19  paragraph 8, about six lines up from the bottom

20  of it it says, "The terms and conditions of this

21  agreement shall define and govern the

22  relationship among UH and the unions."

23  **A.**   Okay.

24  **Q.**   That's in the agreement, is it not?

25  **A.**   Yes.

111

1   **Q.**   And without going through every line and

2   every paragraph of this agreement, you'd

3   acknowledge, would you not, that that kind of

4   sentiment, that unions and UH are governed by

5   this agreement, appears throughout the Project

6   Labor Agreement?

7             **MR. CAMPBELL:**   I'd object.  The

8   agreement speaks for itself.

9             **MS. GRAGEL:**   Fair enough.  I'll

10  withdraw it.

11            **MR. FELDMAN:**   Anything further?

12            **MS. GRAGEL:**   I have nothing

13  further for this witness right now.

14            **MR. FELDMAN:**   Any redirect?

15            **MR. CAMPBELL:**   Yes, a couple quick

16  questions for Mr. Gerber.

17                    REDIRECT EXAMINATION

18  **BY MR. CAMPBELL:**

19  **Q.**   You were asked a lot of questions about the

20  cafeteria.  Did Mr. Harting acknowledge the

21  cafeteria rule in your meeting with him?

22  **A.**   Yes.  Yes, I believe he did.

23  **Q.**   And you went through the Gilbane safety

24  rules as to how the employees are advised of

25  some of the rules and regulations applicable to

1  them.  In this case, did UH make the decision to

2  exclude Mr. Harting?

3  **A.**   Yes.

4  **Q.**   And UH did all of the investigation but for

5  you sitting down with Mr. Harting as you've

6  described?

7  **A.**   Yes.

8  **Q.**   And I want to refer you to paragraph 7 of

9  the Project Labor Agreement, page 3.  If you

10  could read paragraph 7 to yourself and then let

11  me know once you've read through it.

12  **A.**   Paragraph 7, page 3?

13  **Q.**   Yes.

14  **A.**   Okay.

15  **Q.**   And this is one of those mentions of

16  unions, you see that in the middle there of

17  paragraph 7, that Ms. Gragel referred you to?

18  See "unions," line 4?

19  **A.**   Yes.

20  **Q.**   And paragraph 7 is stating that the unions

21  and these covered projects are going to be --

22  the covered projects will be completed pursuant

23  to UH's policies and procedures as may be

24  amended from time to time and UH's code of

25  conduct, do you see that?

113

1    **A.**    Yes.

2    **Q.**    Were you involved in UH's investigation as

3    to the violation of its policies and procedures

4    and code of conduct as to Mr. Harting?

5    **A.**    No.  No, I was not.

6    **Q.**    So you're not privy to all the facts and

7    circumstances relating to the cafeteria incident

8    in question?

9    **A.**    No, I'm not.

10   **Q.**    And just as a final point, just to verify,

11   the Gilbane Safety Plan and the policies and

12   procedures that you went through with Gilbane,

13   those are all prerequisites to being able to

14   obtain an employee badge?

15   **A.**    Correct.

16   **Q.**    Did Mr. Harting, to your knowledge, have an

17   employee badge?

18   **A.**    Yes, he did.  He returned it back to us at

19   our meeting in the conference room.

20   **Q.**    So if Mr. Harting and his employer followed

21   the requirements of the Project Labor Agreement,

22   he would have gone through the Gilbane safety

23   seminar that you've discussed here today?

24   **A.**    Correct.

25   **Q.**    Now, when you referred to the Gilbane

114

1    safety program as to exclusion by Gilbane,

2    Gilbane has the right to exclude tradesmen from

3    the project in and of itself, correct?

4              **MS. GRAGEL:**        Objection.

5              **MR. FELDMAN:**        What's the reason

6    for your objection?

7              **MS. GRAGEL:**        The project safety

8    plan speaks to what can be an exclusion or not

9    an exclusion, and that document speaks for

10   itself, too.

11             **MR. FELDMAN:**        He may answer.

12   **BY MR. CAMPBELL:**

13   **Q.**    You can answer.

14   **A.**    A safety plan is not the only reason of

15   exclusion of companies and individuals from the

16   project.

17   **Q.**    And, to your knowledge, did UH rely on the

18   Gilbane Safety Plan in investigating

19   Mr. Harting's issues?

20   **A.**    I don't know.

21   **Q.**    And as to -- you were asked whether there

22   was more elaboration as to the code of conduct

23   in the Gilbane Safety Plan as to treating

24   employees and visitors on the project like you

25   would treat your family members or best friends.

1    Do you think there needs to be an explanation as

2    to that statement beyond the words?

3    **A.**    Can you repeat the question?

4    **Q.**    Ms. Gragel referred you to page 8 of safety

5    plan Attachment D as to courtesy where it

6    stated, "Each individual on this project must be

7    given the courtesy that would be extended to

8    one's family or best friend."  She asked you

9    whether the video further elaborated on that.

10   Do you think there needs to be any elaboration

11   as to that statement?

12   **A.**    No, I do not.

13            **MR. CAMPBELL:**    I don't have

14   further questions.

15            **MR. FELDMAN:**    Anything further of

16   this witness?

17            **MS. GRAGEL:**    Yes.

18            RECROSS-EXAMINATION

19   **BY MS. GRAGEL:**

20   **Q.**    Did you have a best friend during your

21   life?

22   **A.**    Yes.

23   **Q.**    Did you ever have an argument with your

24   best friend?

25   **A.**    Yes.

116

1    **Q.**    I take it you have family.

2    **A.**    Yes.

3    **Q.**    Did you ever have an argument with your

4    family?

5    **A.**    Yes.

6    **Q.**    It's not unusual in the course of

7    friendships, family or workplaces to have

8    disagreements with people, is it?

9    **A.**    Okay.

10   **Q.**    And that happens on construction sites all

11   the time, correct?  People disagree?

12   **A.**    I don't know if I can answer the question.

13            **MR. FELDMAN:**    Next question.

14   **BY MS. GRAGEL:**

15   **Q.**    You were asked some questions about the

16   investigation that led to Mr. Harting's removal.

17            Did University Hospitals ever inquire of

18   you as part of that investigation about

19   Mr. Harting's overall performance as a laborer

20   at the workplace?

21   **A.**    No, they did not.

22   **Q.**    Did anyone ask you that question prior to

23   this arbitration?

24   **A.**    No.

25            **MS. GRAGEL:**    Nothing further.

117

1          **MR. CAMPBELL:**    May I?

2          **MR. FELDMAN:**     Go ahead.

3              FURTHER REDIRECT EXAMINATION

4    **BY MR. CAMPBELL:**

5    **Q.**    Ever in your arguments with your best

6    friend, ever call your best friend a "nigger" in

7    front of others as a derogatory term?

8    **A.**    I have not.

9    **Q.**    Do you think that's appropriate in the

10   workplace to call one of the owner's employees a

11   "nigger"?

12   **A.**    I do not think it's appropriate.

13   **Q.**    Do you think it's appropriate for one of

14   the tradesmen to call a UH employee, one of the

15   owner's employees a thief in front of others?

16   **A.**    No.

17   **Q.**    Is there a means for these union tradesmen

18   to bring disputes to your attention if they have

19   issues?

20   **A.**    Yes.

21          **MR. CAMPBELL:**    I don't have any

22   further questions.

23          **MR. FELDMAN:**     Next witness.

24          **MR. CAMPBELL:**    I just want to

25   verify, I'd like to call Mr. Harting on cross.

R000450

118

1   I'm assuming if he's called in his case, I can

2   cross-examine him based on direct testimony.  I

3   just have a couple quick questions for him in

4   our case.

5           MR. FELDMAN:     You may call him on

6   cross.

7           MR. CAMPBELL:    I just want to

8   verify if he's called in the union's case, that

9   I'm permitted to cross him on the direct

10  examination from the union.

11          MR. FELDMAN:     Do you have any

12  objection?

13          MS. GRAGEL:      I'm sorry, I still

14  didn't hear.

15          MR. FELDMAN:     He wants to call

16  the grievant now.

17          MR. CAMPBELL:    I have a few facts.

18  I just want to verify the process is not going

19  to preclude me from cross-examining him in your

20  case.

21          MS. GRAGEL:      Now I understand

22  the question.

23          MR. CAMPBELL:    I just a few

24  questions for Mr. Harting.

25          MR. FELDMAN:     Let me just ask you

119

1    something.  This could lead to a couple of

2    hours.

3            MR. CAMPBELL:    No.  I really only

4    have a few questions for him at this time.  I'm

5    not going to go long with this, I just want to

6    verify --

7                    MIKE HARTING

8    of lawful age, a witness herein, was examined

9    and testified as follows:

10           MR. FELDMAN:    For the record,

11   state your name.

12           MR. HARTING:    Mike Harting.

13           MR. FELDMAN:    M-i-k-e?

14           MR. HARTING:    M-i-k-e.  I'm

15   getting all nervous here.

16           MR. FELDMAN:    Just sit back and

17   relax.  I don't bite.  How do you spell your

18   last name?

19           MR. HARTING:    H-a-r-t-i-n-g.

20           MR. FELDMAN:    Do you understand,

21   Mr. Harting, you're under oath?

22           MR. HARTING:    Yes, I do.

23           MR. FELDMAN:    You may inquire.

24                  CROSS-EXAMINATION

25   BY MR. CAMPBELL:

120

1   **Q.**   I have a few questions for Mr. Harting at

2 this time.

3       Mr. Harting, just to verify, I think we've

4 heard Rivera Construction was your employer.

5   **A.**   Yes, he was.

6   **Q.**   Are you still a laborer today?

7   **A.**   Yes, I am.

8   **Q.**   I'm assuming that you still maintain your

9 seniority within the laborer union?

10   **A.**   Yes, I do.

11   **Q.**   Are you working on a construction site

12 today?

13   **A.**   Yes, I am.

14   **Q.**   And when did you begin working on a

15 construction site after -- let me ask you this

16 just so the record is clear.  I believe we've

17 said February 2nd, 2009 is when you were

18 excluded from the UH site.

19   **A.**   Yes.

20   **Q.**   Is that -- let me finish the question.  I

21 know that you're nervous, but I want the record

22 to be clean.

23       Is that, to the best of your recollection,

24 the date you were excluded?

25   **A.**   Yes, it was.

121

1   **Q.**   Now, at that point you were always free to

2   continue working for Laborers Local 310 on any

3   site outside of UH property, correct?

4   **A.**   Yes, I was.

5   **Q.**   And when did you get assigned to the next

6   work site?

7   **A.**   Probably about a month.

8   **Q.**   So it would be about March 2009?

9   **A.**   Yes.

10  **Q.**   And I'm assuming your union representative

11  who's here today could verify when you actually

12  went to a work site?

13  **A.**   Yes.

14  **Q.**   Your wages regardless whether you're on the

15  UH site or another site with a different owner

16  are governed by your union contract with Local

17  310, correct?

18  **A.**   Yes.

19  **Q.**   So you got paid the same rate of pay as you

20  would have been paid if you were working at UH?

21  **A.**   Yes.

22  **Q.**   What site have you been working on -- have

23  you been continuously since you obtained

24  additional work?

25  **A.**   No, I haven't.  I worked at the Perry

122

1    Nuclear Power Plant for four weeks or five

2    weeks, something like that, and then I just

3    started Monday at the Cleveland Institute of

4    Art.

5    **Q.**   And, again, both of those two projects

6    you've been working as a laborer for Local 310?

7    **A.**   Yes, I have.

8    **Q.**   Same rate of pay you would have been

9    earning with UH?

10   **A.**   Yes.

11   **Q.**   On the UH projects?

12   **A.**   Yes.

13   **Q.**   So you don't know the exact date that you

14   started with the Perry Nuclear Power Plant?

15   **A.**   No, I don't.

16   **Q.**   How long of a break was there between your

17   Perry Nuclear Power Plant work and the Cleveland

18   Institute of, is it Art?

19   **A.**   Cleveland Institute of Art, yeah.  I would

20   say six weeks.

21   **Q.**   Six weeks?

22   **A.**   Yes.

23   **Q.**   Now, how are the laborers from Local 310

24   assigned to projects, if you know?

25   **A.**   We have a hiring list that once you get

123

1   laid off you go at the bottom of the list.

2   **Q.**   Is it based on seniority?

3   **A.**   It goes on wherever you show up on the

4   list.  I think you have to work 15 days on a job

5   to be taken off the list, so you have to work

6   three weeks before going to back to the bottom

7   again.

8   **Q.**   Did your local, Laborers 310, the grievant

9   in this matter, did they take any special steps

10  in order to get you a work assignment after

11  being excluded from UH?

12  **A.**   No.

13  **Q.**   So they just followed their same policies

14  and procedure?

15  **A.**   Yes.

16  **Q.**   Is that right?

17  **A.**   Yes.

18  **Q.**   Now, you never filed a grievance against

19  Rivera Construction?

20  **A.**   No, I didn't.

21  **Q.**   You did have a Collective Bargaining

22  Agreement that governed your employment with

23  Rivera, correct?

24  **A.**   What was that?

25  **Q.**   You had a Collective Bargaining Agreement

124

1    and union contract that governed between Local

2    310, the laborers and Rivera Construction?

3    **A.**    I guess so.

4    **Q.**    And it's your understanding, and we went

5    through at the last hearing, you did have a

6    grievance and arbitration procedure under that

7    contract?

8    **A.**    Yes.

9    **Q.**    Now, there's been a lot of questions about

10   the cafeteria, and I asked you at the last

11   arbitration, and you confirmed that you

12   understood, when you were on UH property you

13   were subject to the same rules and regulations

14   as any other visitor to the property, correct?

15   **A.**    Yes.

16   **Q.**    That meant if UH prohibited racial

17   comments, you understood that you should not be

18   using racial comments on the property?

19   **A.**    Yes, without a doubt.

20   **Q.**    And you understand that the use of the term

21   "nigger" would be inappropriate?

22   **A.**    Very inappropriate, I know that.

23   **Q.**    You understood that fighting would be

24   inappropriate?

25   **A.**    Uh-huh.

125

1  **Q.**  Right?

2  **A.**  Yes.

3  **Q.**  And that's any work site.

4  **A.**  Yes.

5  **Q.**  These things aren't specific to UH, this is

6  what Local 310 teaches you, right?

7  **A.**  What, that --

8  **Q.**  Your union teaches you when you go on the

9  work site to be courteous, be professional?

10  **A.**  You're to act like a gentleman.

11  **Q.**  And there's no difference between acting

12  like a gentleman and treating the owners,

13  employees and others on the work site like your

14  best friend or family, correct?

15  **A.**  Yes.  But when -- when people steal from

16  you, that crosses the line.

17  **Q.**  I'm not asking you about that now.  I just

18  want to verify that, we were asked a lot of

19  questions, Mr. Gerber, about whether you were

20  aware of these policies and procedures.  Your

21  union who is here today told you to act like a

22  gentleman at all work sites.

23  **A.**  Yeah --

24  **Q.**  Just answer the question.  Your union told

25  you to act like a gentleman on all work sites.

126

1    **A.**    Yes.

2    **Q.**    You understood you were to act like a

3    gentleman on the UH work sites, right?

4    **A.**    Yes.

5    **Q.**    And you understand that if your union

6    believed that you weren't acting like a

7    gentleman on that work site that they could have

8    excluded you themselves, correct?

9               **MS. GRAGEL:**       Objection.

10              **MR. FELDMAN:**       What's the

11   objection?

12              **MS. GRAGEL:**        I don't know of any

13   labor law or contract that says the union can

14   exclude anybody from work.  That's a legal and

15   contractual --

16              **MR. FELDMAN:**       If the grievant

17   knows, he may answer.  If he doesn't know, he

18   may say so.

19   **BY MR. CAMPBELL:**

20   **Q.**    My question is, if your union -- you have

21   your union representatives here, one of your

22   reps.  If Terry Joyce or John Gilbane, John is

23   the president of the local, correct?

24   **A.**    Business agent.

25   **Q.**    If John believed you were not acting like a

127

1    gentleman on the project, he could have told you

2    we're going to reassign you?

3    **A.**    Yes.

4    **Q.**    You knew full well, regardless of any

5    Gilbane Safety Plan or UH policy and procedure

6    that you had a code of conduct when you were on

7    the work site?

8    **A.**    Yes.

9    **Q.**    That was applicable to the Perry Nuclear

10   Power Plant, the Cleveland Institute of Art or

11   UH, right?

12   **A.**    Right.

13   **Q.**    And you agree and acknowledge that if UH

14   believed you used racial terms towards an

15   employee, that that's appropriate to exclude you

16   from the site?

17              **MS. GRAGEL:**       Objection.

18   **BY MR. CAMPBELL:**

19   **Q.**    I'm not asking you to concede you did it,

20   but if UH believed you did it, that would be

21   appropriate to say, "Hey, we're going to exclude

22   him."

23              **MS. GRAGEL:**       Objection.  And the

24   basis of the objection, and this gets to the

25   heart of the grievance, it's a question for the

128

1    arbitrator to interpret the Project Labor

2    Agreement and the attachments to it, and asking

3    the individual to draw a question of contract

4    interpretation is inappropriate.

5            MR. FELDMAN:     All right.  Go to

6    the next question.

7    BY MR. CAMPBELL:

8    Q.   And you would agree that calling an owner's

9    employee a thief in front of others would be

10   inappropriate?

11   A.   No.

12   Q.   You don't think so?

13   A.   No.  When it happens to you, it's not

14   inappropriate, you call the shot --

15   Q.   There were others in the cafeteria with

16   you, right?

17   A.   Yes.

18   Q.   There were people that were both union

19   brothers as well as nonunion brothers?

20   A.   Yes.

21   Q.   It was busy?

22   A.   A little, yeah.

23   Q.   There was a line, right?

24   A.   Yes.

25   Q.   You freely called her a thief in front of

129

1    all those people?

2    **A.**    Yes.

3    **Q.**    You cussed?

4    **A.**    Yes.

5    **Q.**    And you got angry?

6    **A.**    Not really.  You don't know me angry.

7    Because of my size, if I say something,

8    everybody says he's angry.  I'm a gentleman.

9    **Q.**    You're a large man?

10   **A.**    Yes.

11   **Q.**    And you can be intimidating?

12   **A.**    Yes.

13   **Q.**    And you wouldn't doubt that if we hear

14   Ms. Hanson come in and say she was intimidated

15   by you and others said that, you wouldn't have

16   any reason to disagree with that?

17           **MS. GRAGEL:**        Objection.

18           **MR. HARTING:**       I did not make an

19   aggressive move or anything.

20   **BY MR. CAMPBELL:**

21   **Q.**    Let's just verify what you did.  You raised

22   your voice?

23   **A.**    Okay.

24   **Q.**    Right?

25   **A.**    Yes.

130

1    **Q.**    You cussed?

2    **A.**    Yes.

3    **Q.**    You called her a thief in front of others?

4    **A.**    Yes.

5    **Q.**    You deny you called her a nigger?

6    **A.**    Yes.

7    **Q.**    And you continued to call her a thief even

8    after they gave you a --

9    **A.**    As I was talking to the manager, I said,

10   "She's a thief and she's stealing from me."

11   **Q.**    You told him that she was a "fucking

12   thief," right?

13   **A.**    No, I didn't.

14   **Q.**    You deny "fucking" but you said "thief"?

15   **A.**    I don't quite remember, but, you know, I

16   really don't talk like that.  So if I said it, I

17   had to really be aggravated or it just slipped

18   because I -- like I said, I'm --

19   **Q.**    You understood that if you thought that she

20   had taken money, there were ways to handle that

21   issue, right?

22   **A.**    No, not really.

23   **Q.**    Do you think it would be appropriate if

24   Rivera manager or Gilbane employee came over and

25   watched you do your work and they called you a

1   thief in front of your co-workers without having

2   a basis for it?

3   **A.**   The thing is when you're in a situation

4   where I am like you could come look at me any

5   time you want and you're going to find out that

6   I'm not.

7   **Q.**   Would you appreciate it if a Gilbane

8   employee came over and called you a thief in

9   front of all your union brothers?

10  **A.**   They have.

11  **Q.**   You didn't like it?

12  **A.**   No.

13  **Q.**   Did you file a grievance?

14  **A.**   No.

15  **Q.**   You told your union about it, right?

16  **A.**   No.  Usually just -- that's life in the

17  construction trade.

18  **Q.**   But you think it's appropriate and

19  gentlemanly to call somebody a thief in front of

20  others?

21  **A.**   When it happens to you, yes.

22  **Q.**   So you're standing by that you think your

23  conduct was gentlemanly when you called her a

24  thief?

25  **A.**   I did not -- I said what I had to say; I

132

1    turned and I went and ate.

2    Q.    You said what you had to say.  You called

3    her a thief numerous times in front of others,

4    right?

5    A.    I don't know if -- I know I said it at

6    least once, but I don't --

7    Q.    You told her supervisor she was a thief?

8    A.    Yes, when we were sitting down at a table.

9    Q.    Not just one supervisor, many supervisors?

10   A.    Yes.

11   Q.    Told her employer that she was a thief?

12   A.    Yes.

13   Q.    And you told people that you had no idea

14   who they were, whether they were UH employees or

15   visitors or patients?

16   A.    Well, people asked me what was going on and

17   I would tell them.  I said, "She's stealing

18   money from me."  Down there, they steal money

19   from everybody.

20   Q.    So you're saying you've been there a number

21   of times in the cafeteria?

22   A.    Yes.

23   Q.    And you think there was a number of thefts?

24   A.    There's certain ways to do it, but, yeah.

25   Q.    Why did you go back?  You think there's a

133

1    theft, so why go back to the cafeteria over and

2    over?

3    **A.**    Because it's the only place around there to

4    eat that's clean.

5    **Q.**    You obviously knew that there were

6    supervisors on duty, right?

7    **A.**    Cafeteria supervisors?

8    **Q.**    Yes.

9    **A.**    Yeah.

10   **Q.**    Why not step over and say, "Sir, ma'am, I

11   think I've been shortchanged"?

12   **A.**    I didn't think anything would have been

13   accomplished by that.

14   **Q.**    Why not do it instead of calling somebody

15   out in front of the public?

16   **A.**    Because she stole money from me right then.

17   If I steal money from you right then, what are

18   you going to say?

19   **Q.**    You understood that there were processes,

20   you could have told Gilbane, you could have told

21   Rivera, you could have told your union, correct?

22   **A.**    My union has nothing to do with it.

23   Gilbane has nothing to do with it.  It was an

24   isolated incident between two people.

25   **Q.**    Now, if the UH representatives and the

134

1   cafeteria representatives testify they will

2   exclude anybody regardless whether a union

3   employee or not, based on your conduct, you

4   would agree that those same rules are applicable

5   to you, correct?

6           **MS. GRAGEL:**      Objection.

7           **MR. FELDMAN:**      That's a

8   determination I'll make.

9           **MR. CAMPBELL:**      He's already

10  testified the same rules are applicable to him.

11          **MR. FELDMAN:**      Then why ask it

12  again?

13  **BY MR. CAMPBELL:**

14  **Q.**   You had an employee badge?

15  **A.**   Yes, I did, sir.

16  **Q.**   And you, I'm assuming, followed all the

17  procedure to get that employee badge?

18  **A.**   Yes.  But in our meeting there was no --

19          **MR. FELDMAN:**      There's nothing

20  before you.

21          **MR. CAMPBELL:**      Just one second.

22  Subject to cross-examination in the union's case

23  if he's called on direct, I don't have any

24  questions at this time.

25          **MS. GRAGEL:**      And I'll defer

**COURT REPORTERS OF AKRON CANTON AND CLEVELAND**
330-666-9800                330-452-2400                216-621-6969

R000467

135

1    my --

2          MR. FELDMAN:      Your direct

3    testimony?

4          MS. GRAGEL:      Cross on this

5    subject or recross until I put him on my case.

6          MR. FELDMAN:      You may have a

7    seat.  It's now five to 12:00.  Do you want to

8    take time off for lunch?  This case is going to

9    go on for a long time.

10          MR. CAMPBELL:      Here's my only

11    issues.  Lattisia Hanson is here.  She is on

12    vacation and she is coming out of vacation in

13    order to testify.

14          MR. FELDMAN:      We're going to take

15    lunch.  I used to work like a horse when I was

16    young.

17          MR. CAMPBELL:      I just want to be

18    able to tell her that I did my best to get her

19    up to testify.

20          MR. FELDMAN:      You tell her that

21    I'm the bad guy.

22          MS. GRAGEL:      Can we talk a

23    little bit about how you think the day is going

24    to go after lunch?

25          MR. FELDMAN:      You're going to

136

1  work until 4:00 or 5:00 and that's going to be
2  the end of it.
3          MS. GRAGEL:        And then if we
4  don't finish, which is sort of --
5          MR. FELDMAN:        We'll figure out
6  another day.
7          MS. GRAGEL:        If we need to --
8  does tomorrow make sense?
9          MR. CAMPBELL:        I have to fly to
10  Boston at 6:00 a.m. tomorrow, Providence, Rhode
11  Island.  I would expect that unless
12  cross-examination goes long, I think at this
13  point I have witnesses who are discreet and
14  don't think they're going to be long.
15          MR. FELDMAN:        Okay.  Whatever
16  they take, they take.  We'll have to decide on
17  future time when it arises.  Right now we'll
18  adjourn for one hour and start working this
19  afternoon.
20                (Thereupon, a luncheon recess was
21                taken at 12:00 p.m., with the
22                proceedings to be continued at 1:00
23                p.m.)
24
25

137

1                    AFTERNOON SESSION

2                              1:05 p.m.

3                    LATTISIA HANSON

4    of lawful age, a witness herein, was examined

5    and testified as follows:

6          **MR. FELDMAN:**      May I have your

7    name, please?

8          **MS. HANSON:**       Lattisia Hanson.

9          **MR. FELDMAN:**      Spell that.

10         **MS. HANSON:**       L-a-t-t-i-s-i-a

11   H-a-n-s-o-n.

12         **MR. FELDMAN:**      Do you understand

13   that you're under oath?

14         **MS. HANSON:**       Yes, I do.

15                    DIRECT EXAMINATION

16   **BY MR. CAMPBELL:**

17   **Q.**   Ms. Hanson, thank you for coming today.

18   Are you currently employed?

19   **A.**   Yes, I am.

20   **Q.**   Who is your employer?

21   **A.**   University Hospitals.

22   **Q.**   And what is your position?

23   **A.**   Cashier.

24   **Q.**   And how long have you held that position?

25   **A.**   About eight months probably, something like

138

1    that.

2    **Q.**    How long have you been employed by

3    University Hospitals?

4    **A.**    I've been employed a year, and I was a temp

5    for about a year, so two years total.

6    **Q.**    And have you worked in the same location of

7    University Hospitals throughout your temporary

8    status and employment?

9    **A.**    Yes, sir.

10              **MR. FELDMAN:**        Excuse me.  I'm

11   confused.  You've been a cashier for eight

12   months?

13              **MS. HANSON:**        About eight months,

14   yes, sir.

15              **MR. FELDMAN:**        And you have two

16   years longevity or seniority at the hospital?

17              **MS. HANSON:**        Yes.  I worked as a

18   temp for six months and the rest was my

19   employment, but I've only been a cashier for

20   eight months.

21              **MR. FELDMAN:**        The question was

22   asked, as I understand it, how long have you

23   worked at the same area.

24              **MR. CAMPBELL:**        Yes.  My question

25   was, and I'll get into the positions she held

139

1    before cashier, but my question was as a temp

2    and as an employee, what area of University

3    Hospitals have you been assigned, and she said

4    in the cafeteria of the main campus.

5              **MR. FELDMAN:**      Okay.

6    **BY MR. CAMPBELL:**

7    **Q.**   What position did you hold before cashier?

8    **A.**   Nutrition assistant.

9    **Q.**   And nutrition assistant was also in the

10   cafeteria at the main campus?

11   **A.**   Yes.

12   **Q.**   Just so the record is clear, the main

13   campus, where is that located?

14   **A.**   On Euclid.

15   **Q.**   In Cleveland, Ohio?

16   **A.**   Yeah, Cleveland, Ohio inside University

17   Hospitals.

18   **Q.**   And the main cafeteria there next to

19   Rainbow and all the other hospitals?

20   **A.**   Yes.

21   **Q.**   Just so it's easier for the court reporter,

22   let me just finish the question and then you

23   answer so she can get the question.

24             **MR. FELDMAN:**     She takes down

25   everything you say on her little machine.  So

140

1   shaking heads and talking while somebody else is

2   talking isn't going to cut it.  You follow me?

3              **MS. HANSON:**      I got you.

4              **MR. CAMPBELL:**      Thank you.

5   BY MR. CAMPBELL:

6   **Q.**   Now, were you supposed to be on vacation

7   today?

8   **A.**   Yes.

9   **Q.**   And you've come here to testify and left

10  your grandchildren today to testify?

11  **A.**   Yes.

12  **Q.**   Now, let me just ask you about University

13  Hospitals.  Is the cafeteria quite large where

14  you work?

15  **A.**   Yes.

16  **Q.**   And what shift were you working in January

17  2009?

18  **A.**   Third shift.

19  **Q.**   How long have you been on the third shift?

20  **A.**   A year.

21  **Q.**   One year?

22  **A.**   Yes.

23  **Q.**   And just so the record is clear, what time

24  does third shift begin and end?

25  **A.**   6:00 p.m.

141

1   **Q.**   What time does it end?

2   **A.**   2:00 a.m.

3   **Q.**   Now, in the cafeteria do you have patients

4   sometimes come down?

5   **A.**   Yes.

6   **Q.**   Do you have employees of University

7   Hospitals come through?

8   **A.**   Yes.

9   **Q.**   And you have visitors?

10  **A.**   Yes.

11  **Q.**   And your shift when you're working the

12  third shift beginning at 6:00, are there times

13  when it's very busy?

14  **A.**   Yes.

15  **Q.**   Let me ask you before we move on from the

16  general, who is your supervisor?

17  **A.**   Andrew Powel.

18          **MS. GRAGEL:**      Andrew --

19          **MR. CAMPBELL:**      Powel, P-o-w-e-l, I

20  believe.

21  **BY MR. CAMPBELL:**

22  **Q.**   Is Andrew an employee of University

23  Hospitals or Sodexho?

24  **A.**   Sodexho.

25  **Q.**   What is your understanding of Sodexho's

142

1   role, if you know, at the hospital?

2   **A.**   Would you repeat that for me?

3   **Q.**   What is your understanding, if you know, of

4   Sodexho's role at University Hospitals?  What

5   does Sodexho do?

6   **A.**   I think they do a lot of management.

7   That's about all I know.

8   **Q.**   Does Sodexho run the cafeteria at the main

9   campus?

10  **A.**   I think so.

11  **Q.**   But you're a University Hospitals employee?

12  **A.**   Yes, I am.

13              (Thereupon, Respondent's Exhibit 2

14              was marked for purposes of

15              identification.)

16  **BY MR. CAMPBELL:**

17  **Q.**   Ms. Hanson, I've handed you what's been

18  marked as Respondent's Exhibit 2.  Have you seen

19  this document before today?

20  **A.**   Yes.

21  **Q.**   And what is it?

22  **A.**   It's a statement that I wrote.

23  **Q.**   This is your handwriting?

24  **A.**   Yes, it is.

25  **Q.**   And did you have a chance to read through

143

1  it recently?

2  **A.**  Yes.

3  **Q.**  Is it true and correct to the best of your

4  knowledge?

5  **A.**  Uh-huh.

6  **Q.**  Who asked you to write that statement?

7  **A.**  One of the managers, Heather, asked me to

8  write it.

9  **Q.**  One of your managers?

10 **A.**  Yes.

11 **Q.**  And did this take place after the incident

12 that I'm going to ask you about between you and

13 the construction worker?

14 **A.**  It took place after, yes.

15 **Q.**  Now, just to verify the time, I see on here

16 that -- do you know the date that this incident

17 took place based on your written statements,

18 when the incident at the cash register took

19 place?

20 **A.**  On the 27th, January 27th.

21 **Q.**  2009?

22 **A.**  2009.

23 **Q.**  I just want to ask you, to the best of your

24 ability, and if you need to refer to your

25 statement, that's fine, but I want to ask you,

144

1    can you tell us what happened in your own words

2    that night as to the construction worker and

3    what happened?

4    **A.**   The gentlemen came through the line, and I

5    rang up his transaction and he handed me six

6    dollars, one dollar and a five dollar bill.  And

7    I cashed him out and gave him back 20 cents in

8    change.  And he said to me, "I gave you ten

9    dollars."

10          And I went, "No, sir, you gave me six

11   dollars."

12          He went, "I gave you f-ing ten."

13          I said, "No, sir."

14          He was like, "You're going to give me my

15   f-ing money."

16   **Q.**   When you say "f-ing," just so I

17   understand -- and I understand that you may not

18   usually use these terms.  Are you using the term

19   "fucking"?

20   **A.**   Yes.

21   **Q.**   I know it might be difficult, but if you

22   could use as best as you can his words because

23   those are what the arbitrator is going to be

24   looking at.

25              **MR. FELDMAN:**     He's implying I'm a

R000477

145

1    bad guy.

2              **MS. HANSON:**        Excuse me?

3    **BY MR. CAMPBELL:**

4    **Q.**   And I'll point it out if you don't.  If you

5    don't want to use the language, that's fine, but

6    I'll point it out.  I just need to do that for

7    the record.  That's what the issue is.  I'm

8    sorry to cut you off.

9    **A.**   So because he was kind of leaning and he

10   looked very angry, I said to him, "I see I'm

11   going to have to get my manager."

12         And he said, "That's right, you go get your

13   fucking manager."

14         So as I got ready to go to get my manager,

15   my manager was already coming across the

16   cafeteria anyway.

17   **Q.**   Let me stop you there and ask you a

18   question.  Were there others in the area aside

19   from you and the construction worker?

20   **A.**   Yes.  The line was very long.

21   **Q.**   Could others overhear what the two of you

22   were saying?

23             **MS. GRAGEL:**       Objection.

24             **MS. HANSON:**       Yes.

25

146

1    **BY MR. CAMPBELL:**

2    **Q.**   Do you think others could overhear what was

3    being said?

4    **A.**   Yes.

5    **Q.**   Was it loud or --

6    **A.**   It was very loud.

7    **Q.**   And do you recall specifically telling the

8    gentleman that you were going to get your

9    manager?

10   **A.**   Yes.

11   **Q.**   So he knew that you were taking it to the

12   next step?

13   **A.**   Yes.

14   **Q.**   I'm sorry to cut you off.  Go on.

15   **A.**   So he told me, "That's what you do, you go

16   get your fucking manager," but Andrew was

17   already coming towards us.

18   **Q.**   Just so the record -- Andrew, what's his

19   last name?

20   **A.**   Powel.

21   **Q.**   Your manager?

22   **A.**   My manager.  So when he gets to my

23   register, I started out going to explain to

24   Andrew what happened, but the guy, he was

25   ranting and raving so I just stopped and I

147

1  figure I'll let him go ahead on and say what he

2  had to say.  So he was saying to Andrew, "I gave

3  her a ten dollar bill; she gave me 20 cents.

4  She's not going to take my fucking money."

5  **Q.**   He was talking to Andrew.  Was it loud

6  enough that others could hear?

7            **MS. GRAGEL:**        Objection.

8            **MS. HANSON:**        Yes.

9            **MR. FELDMAN:**       If she knows.

10  **BY MR. CAMPBELL:**

11  **Q.**   Were you part of the conversation between

12  him and Andrew?

13  **A.**   Yes, I was.  They were still standing at my

14  register.

15  **Q.**   Was the gentleman angry?

16  **A.**   Very angry.  So he says, "You going to give

17  me my fucking money."  So I'm not -- with my

18  manager standing there, I'm not dealing with him

19  at all right now, I'm just kind of just sitting

20  there.  So Andrew is trying to tell him, you

21  know, to just calm down, quiet down.

22       He was like, "No, she's a fucking thief and

23  she's not going to take my fucking money."

24  **Q.**   Was that loud enough others you think could

25  hear?

148

1   **A.**   Most definitely.  And then he was like,

2   "Well, sir, we're going to look at the cameras,

3   and if the cameras show that she was wrong, I'll

4   most gladly give it back."

5         He was like, "No, you're going to give me

6   my mother-fucking money now.  She's not going to

7   take my fucking money, fucking thief.  That

8   nigger ain't going to get my money."

9   **Q.**   Just so the record is clear, did he

10  actually use the term "nigger"?

11  **A.**   "Nigger.  A fucking thief.  That nigger

12  ain't going to take my money."

13        And Andrew said, "Come on, sir, I think we

14  should step out of the line," and at that point

15  they walked away.  I don't know what happened

16  once they left my line, and I just went on to

17  take care of the rest of my customers.

18  **Q.**   Did you see this individual come back in to

19  the cafeteria again after that?

20  **A.**   He came back I think it was a couple days

21  later; something like that and he came back

22  through the line, but he didn't say anything to

23  me, I didn't say anything to him, he dealt with

24  my manager.

25  **Q.**   Did you ever tell your manager about the

149

1   use of the term "nigger" and the cussing?

2   **A.**    After it happened?

3   **Q.**    Yes.

4   **A.**    Yes, we discussed it.

5   **Q.**    And do you know Ms. Peplowski sitting next

6   to me?

7   **A.**    Yes, I do.

8   **Q.**    Did she ever talk to you about that?

9   **A.**    At that time it happened, I did not report

10  it, no.

11  **Q.**    Did you report it after that night?

12  **A.**    Yes, I did.

13  **Q.**    And who did you report it to?

14  **A.**    I wrote this statement and gave it to

15  Heather.

16  **Q.**    Is Heather one of your supervisors?

17  **A.**    One of the other managers.

18  **Q.**    And that statement is true and correct?

19  **A.**    Yes.

20  **Q.**    And everything you've told the arbitrator

21  here today to the best of your recollection is

22  true?

23  **A.**    Yes.

24  **Q.**    And during the investigation, you wrote

25  this -- these notes and you told University

150

1    Hospitals what you've told us here today?

2    **A.**    Yes.

3            **MR. CAMPBELL:**    I don't have any

4    further questions at this time.  You will get

5    asked some questions by the union.

6            **MS. HANSON:**    All right.

7            **MR. FELDMAN:**    You may inquire.

8                CROSS-EXAMINATION

9    **BY MS. GRAGEL:**

10   **Q.**   Ms. Hanson, my name is Susan Gragel, and I

11   represent Building and Construction Laborers

12   Local 310 and I have some questions for you.

13       Ma'am, you said that you've been working

14   for University Hospitals for is it a total of

15   about two years?

16   **A.**   Yes, ma'am.

17   **Q.**   And I wasn't clear.  How much of that two

18   years was as a temporary employee?

19   **A.**   Six months I believe it was.  I had to do

20   six months temp.

21           **MR. FELDMAN:**    It's what you know,

22   ma'am.

23           **MS. HANSON:**    Six, seven months,

24   something like that.

25           **MR. FELDMAN:**    You have to speak

151

1    up because we have a court reporter here that

2    has to listen to you.  And the question is how

3    long have you served on a temporary basis, and

4    your answer is six or seven months?

5              **MS. HANSON:**      Six or seven

6    months.

7    **BY MS. GRAGEL:**

8    **Q.**   So we're in June of 2009, so you would have

9    started in about June of 2007 working for

10   University Hospitals?  Does that sound about

11   right?

12   **A.**   No.  I think I started in November, so

13   would that have been eight months maybe?

14   **Q.**   November 2007?

15   **A.**   Yes.

16   **Q.**   So about a year and a half you've worked

17   there?

18   **A.**   Where?  As a temp, as an employee?

19   **Q.**   In total.

20   **A.**   Two years.

21   **Q.**   So you started temping in about June of

22   2007?

23   **A.**   Okay.

24   **Q.**   Does that make sense?

25   **A.**   That makes sense.

152

1    **Q.**    And when you worked as a temp, did you work

2    for the hospital or another agency?

3    **A.**    For another agency.

4    **Q.**    What agency was that?

5    **A.**    Reserve Network.

6    **Q.**    Reserve?

7    **A.**    Network.

8    **Q.**    When you were hired by Reserve Network as a

9    temporary employee for University Hospitals, was

10   that a full-time hire or part-time?

11   **A.**    Full-time.

12   **Q.**    About 40 hours a week then?

13   **A.**    Forty hours a week, yes.

14   **Q.**    And what was your assignment during the six

15   months that you were temping?

16   **A.**    I worked in what we call Freshens.

17   **Q.**    What is Freshens?

18   **A.**    We make smoothies and serve ice cream.

19   **Q.**    Is that like a little stand around the

20   atrium area of the hospital?

21   **A.**    Yeah, it's inside of the cafeteria.

22           **MR. FELDMAN:**      Freshen?

23           **MS. HANSON:**       Freshens.

24           **MR. FELDMAN:**      Do you know how to

25   spell it?

153

1          **MS. HANSON:**      F-r-e-s-h-e-n.

2          **MR. CAMPBELL:**     It's the name of a

3    smoothie company.  They make like milkshakes.

4          **MR. FELDMAN:**   Okay.

5    BY MS. GRAGEL:

6    **Q.**   And when you did that work at the Freshen

7    stand, was that a day shift job or a different

8    shift?

9    **A.**   That was day shift.

10   **Q.**   And what's day shift as you know it at the

11   hospital?

12   **A.**   6:00 a.m. to 2:00, six to two.

13   **Q.**   What kind of work had you done before you

14   became a temp at University Hospitals?

15   **A.**   I worked in Mentor as a machine operator.

16   **Q.**   When did you do that work, ma'am?

17   **A.**   I worked there for six years prior to the

18   agency, going to the agency.

19   **Q.**   And was there a gap between your work as a

20   machinist and starting at the agency, or did you

21   go right from one job to the other?

22   **A.**   No, it was a gap.  It was like maybe an

23   eight-month gap.

24   **Q.**   And an eight-month gap?

25   **A.**   Yeah, because I drew unemployment.

154

1    **Q.**    And you had been laid off from your work as

2    a machinist?

3    **A.**    Yes.

4    **Q.**    And so then after your six months as a

5    temp, then you became a regular employee of

6    University Hospitals, correct?

7    **A.**    Correct.

8    **Q.**    Do you know how it was that you went to

9    work for University Hospitals rather than

10   Sodexho?

11   **A.**    No, I don't.  Because I'm thinking that

12   Sodexho mostly are managers, they're management.

13   **Q.**    When you started to work then as a regular

14   full-time -- it was full-time when you went off

15   temp to go to University Hospitals?

16   **A.**    Yes.

17   **Q.**    Did you stay day shift or did you get a

18   different shift?

19   **A.**    I got a different shift.

20   **Q.**    And what was that shift?

21   **A.**    That was nights.

22   **Q.**    6:00 p.m. to 2:00 p.m. shift?

23   **A.**    Yes, ma'am.

24   **Q.**    And was that Monday to Friday?

25   **A.**    Monday to Friday because I couldn't work

155

1    weekends.

2    **Q.**   And once you got full-time work, did you

3    get benefits through University Hospitals?

4    **A.**   Yes.

5    **Q.**   And you are not in a union?

6    **A.**   No.

7    **Q.**   When you became a regular full-time

8    employee of University Hospitals, did you

9    immediately become a cashier, or did you do some

10   other kind of work in the food service area?

11   **A.**   I did some other kind of work.

12   **Q.**   And how did you come to be assigned to work

13   as a cashier?  Was that a promotion or just a

14   change of assignment.

15   **A.**   It was a change of assignment.

16   **Q.**   Did you receive any training when you moved

17   out of food prep into the cashier job?

18   **A.**   Yes, I did.

19   **Q.**   What kind of training did you get?

20   **A.**   They do like hands-on training, other

21   cashiers train us, managers train us.

22   **Q.**   And did you receive training in customer

23   service about how to deal with customers who

24   were making complaints?

25   **A.**   All of that come in the training.

156

1    **Q.**   And would it be fair to say that during

2    your training you were informed that you would

3    receive complaints from time to time because

4    that's part of being in customer service?

5    **A.**   Oh, yeah.

6    **Q.**   And were you trained with that old rule

7    that the customer is always right?

8    **A.**   Uh-huh.

9    **Q.**   That's true?

10   **A.**   That's true.

11   **Q.**   And were you also trained that accuracy is

12   important in doing the cashier's work?

13   **A.**   Exactly.

14   **Q.**   Was the job that you did the subject of the

15   kind of rules that I've seen at other food

16   service places, that if your drawer is off for a

17   certain number of times, you can be disciplined?

18   **A.**   That's right.

19   **Q.**   What's the rule where you work?

20   **A.**   If your drawer is off $25 over or under,

21   they take disciplinary action.

22   **Q.**   And do you get a warning before discipline,

23   or is there some process for that?

24   **A.**   You do get a write-up, and after so many

25   write-ups --

157

1          **MR. FELDMAN:**      What's the

2    second -- after you get a write-up, what's next?

3          **MS. HANSON:**      I believe.  I'm not

4    sure.  I believe it's termination.

5          **MR. FELDMAN:**      After a write-up

6    you get termination?

7          **MS. HANSON:**      I believe so.

8    **BY MS. GRAGEL:**

9    **Q.**   So step one is write-up and second

10   violation is termination?

11   **A.**   Well, there are some steps that are taken.

12   **Q.**   And had you received any warnings or

13   write-ups before this incident about your

14   handling of cash?

15   **A.**   No.

16   **Q.**   And you didn't want to get a write-up

17   either, correct?

18   **A.**   No.

19   **Q.**   And if your drawer is off, short, do you

20   have to come out-of-pocket to make up the

21   difference?

22   **A.**   No.

23   **Q.**   You have in your hand the notes that

24   Mr. Campbell asked you to look at marked as

25   Respondent's Exhibit 2.

158

1    **A.**    Yes.

2    **Q.**    And this is dated January 29, 2008 --

3    crossed out January 28, 2009.  You did what

4    everybody does in January, think of the wrong

5    year.

6         There's a note there about camera footage,

7    and what are those numbers?  First of all, what

8    numbers did you write down, "7 colon"?

9              **MR. CAMPBELL:**    If that's your

10   writing.

11             **MS. HANSON:**    It's not.

12   **BY MS. GRAGEL:**

13   **Q.**    I think you said, or it's in your notes

14   here, that somebody said that they would check a

15   camera and find out if you were right or if

16   Mr. Harting was right about the change.

17        What camera are we talking about?

18   **A.**    We have cameras in the cafeteria up over

19   each cash register, and they are able -- they

20   zoom right down on our drawers and all of our

21   transactions.

22   **Q.**    Have you seen the camera footage from

23   January 27, 2009?

24   **A.**    Yes.

25   **Q.**    And that camera footage, does it basically

159

1    just show your drawer or does it show anything

2    going on around you?

3    **A.**    It shows everything going on around you.

4    **Q.**    Does it show your face?

5    **A.**    It showed -- did it show my face?  I'm not

6    sure.

7    **Q.**    Is there sound?

8    **A.**    I'm not sure.

9    **Q.**    Did you ever hear any audiotape of this

10   incident?

11   **A.**    I've never heard the audiotape.

12   **Q.**    Now, in the cafeteria, changing gears a

13   little bit here, when you are working the cash

14   register, you are sitting behind a counter where

15   people bring their food up to the register,

16   correct?

17   **A.**    Yes.

18   **Q.**    And there's -- in the place where you work

19   is there also shelving as you move down the line

20   to get to the cash register where there are some

21   food items that you can pick up?

22   **A.**    Yes.

23   **Q.**    In fact, when you sit as a cashier, you're

24   completely surrounded, are you not?

25   **A.**    Yes.

160

1    **Q.**    There's a wall behind you so nobody can

2    walk up behind you --

3    **A.**    True.

4    **Q.**    -- and either get in the drawer or even

5    speak to you because it's got glass over it,

6    correct?

7    **A.**    Right.  There's two cashiers right next to

8    each other.

9    **Q.**    You said that you usually worked the

10   6:00 p.m. to 2:00 a.m. shift, and you also said

11   that there are times when the cafeteria at

12   University Hospitals is busy during your shift.

13   Is that business usually at around 6:00, which

14   would be when you get to work and it's the usual

15   dinner hour?

16   **A.**    Yeah, it can be.

17   **Q.**    So it's not unusual for you to have a rush

18   like at 6:00?

19   **A.**    It's not unusual.

20   **Q.**    Is it also fair to say that the traffic in

21   the cafeteria coming through the cashier's line

22   drops off as the evening gets later?

23   **A.**    Way later in the evening, yes.

24   **Q.**    Is there a time when the cafeteria cashiers

25   close altogether before your shift ends?

161

1   **A.**   No.

2   **Q.**   You stay open for some items throughout the

3   night?

4   **A.**   All night long.

5   **Q.**   Do you recognize Mr. Harting here in this

6   room today?

7   **A.**   Yes.

8   **Q.**   And where is he seated?

9   **A.**   Right there.  (Indicating.)

10         **MR. CAMPBELL:**   Let the record

11   reflect that she pointed to the grievant.

12         **MS. GRAGEL:**    Thank you.

13   **BY MS. GRAGEL:**

14   **Q.**   Before this incident on January 27th, 2009,

15   had you seen Mr. Harting in the cafeteria on

16   other days?

17   **A.**   Not that I paid him any attention, no.

18   **Q.**   And on the next day after the incident, did

19   Mr. Harting come through the line?

20   **A.**   No, he didn't come the next day.

21   **Q.**   Do you recall some day after this incident,

22   whether the next day or a later date, when he

23   came through the line, but you walked away so

24   that a manager could ring him out?

25   **A.**   Will you repeat that, please?

162

1   **Q.**   After the day that you later wrote up on

2   this piece of paper for the hospital, was there

3   a day when Mr. Harting came to the line, but you

4   walked out of your cashier area so that somebody

5   else could come in and ring him out?

6   **A.**   That's not how it happened.

7   **Q.**   So that's wrong?

8   **A.**   That's not quite how it happened.

9   **Q.**   How did it happen?

10  **A.**   He came through my line, and when he came

11  through my line I was prepared to -- I rang all

12  of his stuff up, and my manager walked up on the

13  outer side of me and handed him a meal ticket

14  and said, "I told you I would take care of you."

15       And I went, "How can you do that?  He'll

16  really feel like I actually stole his money.

17  He'll think that I'm guilty."  I said, "So what

18  are you saying, I really am a thief and nigger,

19  you're going along with him," and my feelings

20  was hurt so I left out because I was crying.

21          **MR. FELDMAN:**     So you left what?

22          **MS. HANSON:**     So I left out

23  because I was crying.

24          **MR. CAMPBELL:**     She left the cash

25  register.

1  **BY MS. GRAGEL:**

2  **Q.**   Let me back up again.  The day you did not

3  leave your cashier area, the manager came as you

4  testified, you took Mr. Harting away from your

5  counter and you continued to do your ringing up?

6           **MR. CAMPBELL:**   Talking about the

7  day of the first incident?

8           **MS. GRAGEL:**   On the day of the

9  incident.

10          **MS. HANSON:**   Of the first

11  incident, yes.

12  **BY MS. GRAGEL:**

13  **Q.**   So you kept ringing out?

14  **A.**   Yes, stayed and kept ringing out.

15  **Q.**   And didn't write up any complaints?

16  **A.**   I didn't write up any complaint.

17  **Q.**   And you talked to your manager there at the

18  counter?

19  **A.**   Well, it had slowed down, and I went in the

20  cafeteria where my manager was standing and I

21  was talking to him, yes.

22  **Q.**   On the 27th?

23  **A.**   On the 27th.

24  **Q.**   And would that have been the same -- in an

25  hour or much later in the shift?

164

1   **A.**   Much later in the shift.

2   **Q.**   Closer to 2:00 than 6:00?

3   **A.**   About 10:00, 10:30.

4   **Q.**   And he didn't tell you to write anything

5   up?

6   **A.**   No.

7   **Q.**   And then a day or so went by and you saw

8   that the manager gave some kind of coupon to

9   Mr. Harting?

10  **A.**   Rewarded him I felt.

11  **Q.**   And you felt then the company was taking

12  the customer's side against you?

13  **A.**   Yes.

14  **Q.**   And that upset you and you left your work

15  area?

16  **A.**   I was offended.  I felt offended.

17  **Q.**   And that's when you then wrote up your

18  complaint?

19  **A.**   I was asked to write it up.  I was so

20  upset.  They said, "Write it up" and I wrote it

21  up.

22          **MR. FELDMAN:**    That's not the

23  write-up on this sheet here?

24          **MS. HANSON:**    That's that.

25          **MR. FELDMAN:**    That is the

1   write-up.

2           **MS. HANSON:**        Yes, it is.

3   **BY MS. GRAGEL:**

4   **Q.**   And you said "they said to write it up."

5   Did you call somebody or ask somebody's advice?

6   **A.**   No.  It was another manager -- when I got

7   to the back, once leaving out of the initial

8   cafeteria, I went in the back because I was very

9   upset.  I was crying and the whole bit, so I was

10  just standing back there crying, and another

11  manager came in and wanted to know what was

12  wrong; and I was just telling her what had

13  happened, what had actually happened on the

14  27th, and then I told her what had just happened

15  a few minutes ago; and she said they had no

16  recollection of it, she was sorry and would I

17  write that up for her.

18  **Q.**   And the person that you spoke with, do you

19  remember her name?

20  **A.**   Heather.

21  **Q.**   Do you know Heather's last name?

22  **A.**   I don't know Heather's last name.

23  **Q.**   Does Heather work for Sodexho?

24  **A.**   She works for Sodexho, yes.

25  **Q.**   And when you were writing -- you were

166

1  writing this document because Heather told you

2  to?

3  **A.**   Yes.

4  **Q.**   Is Heather Andrew's boss?  Are they equals,

5  or don't you know?

6  **A.**   I don't know.  I think they're equals.

7  **Q.**   And was that the first time that Heather

8  knew about the incident on January 27th when you

9  talked to her on January 29th?

10 **A.**   I believe so, yes.

11 **Q.**   As you were writing this up, did you talk

12 to Heather about what you should put down on

13 paper?

14 **A.**   No.

15 **Q.**   As you were writing this up, who did you

16 think was getting this document?

17 **A.**   Heather.

18 **Q.**   After you finished writing it up, did she

19 ask you any questions about it?

20 **A.**   No.

21 **Q.**   Did you go back to your cashier area where

22 you were working on the date that you wrote this

23 up to keep checking people out, or did you take

24 the rest of the evening off or do something

25 else?

167

1  **A.**   I waited for a while and kind of consumed

2  myself, went in the bathroom and washed my face

3  and went back to work.

4  **Q.**   So about how long did it take you to write

5  up this document, Respondent's Exhibit 2?

6  **A.**   I'm not even sure.

7  **Q.**   And as you're writing it up, did you talk

8  to anybody on the phone, your family?

9  **A.**   No.

10         **MR. FELDMAN:**      It turned out to be

11  a bad day at the office.

12         **MS. HANSON:**      Very bad day at the

13  office, yes.

14  **BY MS. GRAGEL:**

15  **Q.**   And then there was a time when you talked

16  to Ms. Peplowski from the hospital?

17  **A.**   About?

18  **Q.**   About what you put on paper?

19  **A.**   No.

20  **Q.**   Did anybody from University Hospitals ever

21  talk to you about what you put on paper?

22  **A.**   Yes.  They called me I think.  I'm not

23  sure.

24  **Q.**   When did somebody from the hospital talk to

25  you?

168

1   **A.**   When the arbitration got called, they told

2   me.

3   **Q.**   About how long was it after January 29th,

4   2009 that you talked to someone from University

5   Hospitals?

6   **A.**   When was the last time we met down here?

7   **Q.**   That would have been sometime in April?

8   **A.**   Okay.  Sometime in April.

9   **Q.**   And before April had you talked to anybody

10  from University Hospitals?

11  **A.**   I don't think so.

12  **Q.**   Had you talked to anybody from --

13  **A.**   I had talked to some other managers because

14  I remembered saying to them that I felt a little

15  uncomfortable being at the cash register because

16  I was afraid he would come back.  And they were

17  saying that they had already dealt with the

18  situation and that he would not be coming back

19  into the cafeteria.  That was the conversation.

20  That was it.

21  **Q.**   And, first of all, when do you remember

22  that conversation taking place, right around

23  January 29 or much later?

24  **A.**   Right around that time, somewhere around

25  that time.

169

1   **Q.**   Within a few days or a week or so?

2   **A.**   Yeah.

3   **Q.**   And who did you talk with?

4   **A.**   I talked to David Hawk.

5   **Q.**   Can you spell that last name?

6   **A.**   H-a-w-k.

7        **MR. FELDMAN:**   He's from

8 University Hospitals?

9        **MS. HANSON:**   He's a Sodexho

10 manager.

11 **BY MS. GRAGEL:**

12   **Q.**   He's a Sodexho manager?

13   **A.**   Yes.

14   **Q.**   Do you remember talking to anyone else

15 besides Mr. Hawk?

16   **A.**   No.

17   **Q.**   And Mr. Hawk is the one that told you --

18   **A.**   I didn't have to worry.

19   **Q.**   Because the person wouldn't be coming back

20 into the cafeteria?

21   **A.**   Right.

22   **Q.**   In that large hospital area, do you know

23 that there are security cameras besides the one

24 that watches the transactions and the cash

25 drawer?

170

1  **A.**    No.   Those are the cameras, I think.

2  **Q.**   I'd like you to look with me, ma'am, at the

3  security camera tape that the hospital has

4  provided me.  I think it's the security camera

5  tape.  It's the tape.

6               **MR. CAMPBELL:**    Are we putting it

7  in as an exhibit, or what are we doing here?

8               **MS. GRAGEL:**    Yes.  I have it on

9  a jump drive or I could e-mail it to you.  It's

10  the film that you e-mailed me.

11               **MR. CAMPBELL:**    We'll see what it

12  is.

13               **MR. FELDMAN:**    Do you want to

14  review it first?

15               **MR. CAMPBELL:**    No.  The witness

16  will review it.  I'm going to assume -- she's

17  representing what I've given her.

18               **MR. FELDMAN:**    I'm giving you the

19  opportunity --

20               **MR. CAMPBELL:**    I'm going to

21  assume --

22               **MS. GRAGEL:**    It is exactly --

23               **MR. FELDMAN:**    Let the record show

24  that we were provided with a disk to reveal the

25  cafeteria area where the incident took place; is

171

```
 1   that correct?
 2              MS. GRAGEL:      That is correct.
 3              MR. CAMPBELL:    And I think we all
 4   agree there's no audio.
 5              MR. FELDMAN:     I want you to be
 6   able to see this because you're going to be
 7   asked questions.
 8              Counsel, why don't you come and join
 9   us?  I want this to be done so that due
10   process -- so ask your question and make sure
11   you understand.  It's not based only on the
12   question but on the video that you see, okay?
13              MS. HANSON:      Okay.
14              MR. FELDMAN:     First I'd like the
15   witness to identify the area as she sees and
16   then we'll go from there.
17              (Thereupon, the video was played.)
18   BY MS. GRAGEL:
19   Q.   Ms. Hanson, this is a video from January
20   27th, 2009 that shows 15:33, which I'm not sure
21   if that's time of day or simply a timer on the
22   tape.  It's something from January 27.  And
23   before I hit the play button, is this you with
24   your back here in the area of the cashier?
25   A.   Yes.
```

172

1   **Q.**   And you testified that there are two

2   cashier stations side by side and I've got a

3   taller person standing.  Is that your fellow

4   cashier?

5   **A.**   Co-worker, yes.

6   **Q.**   And when I asked you if there was a wall to

7   your back that had glass or some wood separating

8   you from the food area, I'm pointing here at a

9   glassed in area behind you.  Is that what you

10  were thinking of when I asked you these

11  questions?

12  **A.**   Yes.

13  **Q.**   I see next to that area where the cashier

14  is the gate is pulled down for the aisle.  Is

15  that usually the way it is in the evening shift,

16  it closes the walkway from one cashier area?

17  **A.**   Yes.

18  **Q.**   And only one, two, three -- only one is

19  open?

20  **A.**   Yes.

21  **Q.**   And then there are tables sitting on the

22  other side of this area?

23  **A.**   Uh-huh.

24  **Q.**   Do you know where the camera is?

25  **A.**   No.

173

1   **Q.**   This is different -- this is a different

2   kitchen than what you told me about?

3   **A.**   Yes.  Yes.

4   **Q.**   It's a little jerky.

5            **MR. CAMPBELL:**   I think the record

6   should reflect it's a time-lapsed video, it's

7   not real-time.  It's missing moments.  You

8   should describe that for the record.

9            **MS. GRAGEL:**   You will notice

10  here that we're seeing jerky spots, that this

11  individual, for example, the last picture we

12  saw, he was standing here and then a picture

13  standing here because the camera takes picture

14  every few seconds.  Is that a fair description?

15           **MR. CAMPBELL:**   Yes.  I wanted to

16  let the record reflect that we're not seeing

17  second by second, we are missing whatever amount

18  of time in between each photo.

19  **BY MS. GRAGEL:**

20  **Q.**   I paused this here because there's a good

21  two or three customers.  Do you recognize any of

22  these?

23  **A.**   Right here?  (Indicating.)

24  **Q.**   Yes, ma'am.

25  **A.**   No.

174

1  **Q.**   Here standing is an individual with a white

2  T-shirt.  I would represent to you at the time

3  of the picture that is Mr. Harting.

4  **A.**   Okay.

5  **Q.**   You testified, Mrs. Hanson, that there was

6  a line of people during the time that

7  Mr. Harting talked to you about the change.  Do

8  you see anybody immediately in the line behind

9  him here?

10  **A.**   I don't see anybody in this shot, no.

11  **Q.**   Someone just came on to the camera here.

12  Do you know, was this person in your area, or is

13  he someone going on to a table?

14  **A.**   I'm not sure.

15  **Q.**   After Mr. Harting was in the line and

16  started the discussion about the change, did

17  anybody -- did you check out anybody while he

18  was standing there?

19  **A.**   No.

20  **Q.**   Did you let somebody jump the line?

21  **A.**   I couldn't.

22  **Q.**   You had to finish?

23  **A.**   I had to make sure I dealt with him first.

24  **Q.**   There's an individual standing here in a

25  dark -- is this your manager?

1   **A.**   Let me see.

2           **MR. CAMPBELL:**   She's shaking her

3   head no.

4           **MS. HANSON:**   I can't see it.

5           **MR. FELDMAN:**   Ma'am, you're going

6   to have to speak up.

7           **MS. HANSON:**   Okay.

8   **BY MS. GRAGEL:**

9   **Q.**   Clearly Mr. Harting is here.  Do you see

10  him?

11  **A.**   No.

12  **Q.**   Mr. Harting is still there.  Do you see the

13  white T-shirt?

14  **A.**   No.  I see the white T-shirt.  I don't see

15  Mr. Harting, though.

16  **Q.**   Do you see that?

17  **A.**   I don't see Mr. Harting.

18  **Q.**   You see the same man?

19  **A.**   I see the same T-shirt.

20  **Q.**   Another man there?

21  **A.**   I don't see nobody.  You can't really see

22  the faces.  You can't see faces at all.

23          **MR. FELDMAN:**   The angle is bad

24  and the lights are bad.

25

176

1   **BY MS. GRAGEL:**

2   **Q.**   The individual there is standing?

3   **A.**   I see somebody standing there.  I see

4   somebody reached out like this, same person.

5   They're still reaching out like this at the

6   cashier, I see that.

7   **Q.**   Now, there's another individual standing

8   there.  Do you know if that's your manager?

9   **A.**   What date is this?

10   **Q.**   January 27th.

11   **A.**   Is this person now at the cash register?

12   **Q.**   I'm asking you that.  Is there someone?

13   **A.**   I really can't tell.

14   **Q.**   Before I start this up again, these

15   individuals, these customers are sitting?

16   **A.**   Exactly.

17   **Q.**   Do you see them acting --

18   **A.**   Huh-uh, but there was some people standing

19   here and I don't see them.  (Indicating.)

20         **MR. CAMPBELL:**   Let the record

21   reflect she's pointing behind the register.

22   **BY MS. GRAGEL:**

23   **Q.**   People standing in the area behind the

24   gated aisle?

25   **A.**   Right.  It was a manager standing there --

177

1   **Q.**   At the salad bar?

2   **A.**   -- and I don't see him.

3   **Q.**   We'll look again later.

4        This individual is here at the counter

5   having a discussion with you there or someone

6   else there.

7            **MR. CAMPBELL:**     She's shaking her

8   head no.

9   **BY MS. GRAGEL:**

10  **Q.**   You don't know what --

11  **A.**   I can't even see.

12  **Q.**   Do you recognize that person?

13  (Indicating.)

14  **A.**   See, that's when he was making the

15  statement, "That thieving nigger ain't going to

16  take my money."  He did, he reached back and

17  said, "That thieving nigger ain't going to take

18  my fucking money."  (Indicating.)

19            **MR. CAMPBELL:**     The witness is

20  stating that he pointed to her as the video is

21  showing.

22            **MS. HANSON:**      Yes, he did.

23  **BY MS. GRAGEL:**

24  **Q.**   This individual here, that's Andrew, see

25  him?

178

1   **A.**    That's Andrew.

2   **Q.**    I didn't quite get it.

3          Now, for the record, at the bottom corner

4   of this screen, and it will be available

5   electronically for the arbitrator, this

6   discussion that the witness started having about

7   when this was said appears around two minutes

8   and 36 seconds --

9              **MR. CAMPBELL:**     I'm going to

10  object.  The witness is sitting here saying she

11  doesn't know.  We have an attorney testifying

12  what it is.  If she wants to have her witness

13  get up there and testify when it started and

14  when it didn't -- she's not here to testify.

15             **MS. GRAGEL:**     I'm sorry.  The

16  witness when she said that's what happened,

17  that's what he said --

18             **MR. CAMPBELL:**     I think you should

19  have pointed it out and had her testify to it,

20  not for you to testify after the fact as to when

21  it started and when it didn't.

22  **BY MS. GRAGEL:**

23  **Q.**   Do you see here at the bottom there's some

24  green numbers?  What do those numbers mean?

25  **A.**   236.

179

1   **Q.**   And there is a picture here of Mr. -- do

2   you recognize that picture of Mr. Harting?

3   **A.**   Mr. Harting.

4   **Q.**   Mr. Harting is standing on the other side

5   of the wall by the cash register and what do the

6   green numbers show?

7   **A.**   Two minutes and 40 seconds.

8   **Q.**   Two minutes, 40, and, again, we are not

9   offering those as a time sequence, but as

10  numbers for point of reference on this tape.

11  That's the end of the tape.

12       Are there portions of this you would like

13  played back?

14  **A.**   Go all the way back to the time he actually

15  walked up to my counter.

16  **Q.**   White shirt, dark pants.

17  **A.**   That's what you said.  Did he just arrive?

18  **Q.**   We'll pause it.  I don't see dark pants and

19  white shirt there and it's at reference point

20  112.

21            **MR. FELDMAN:**      What is this being

22  offered for?

23            **MS. GRAGEL:**      I think there are a

24  number of things that can be offered.

25            **MR. FELDMAN:**      Why don't you tell

180

1    me?

2              **MS. GRAGEL:**      The first is

3    throughout this process none of these

4    individuals that are sitting here are reacting.

5    There was, in fact, a long conversation, and the

6    tape is an opportunity to review it later, which

7    shows no reaction by any by-standers.  To the

8    extent that Ms. Hanson has testified there was a

9    long line of people during this incident, the

10   tape shows otherwise.

11             **MS. HANSON:**      No, it doesn't.  It

12   doesn't show a long line of people when he first

13   arrived, but -- and this cashier here, if you

14   notice the cashier is standing here and the gate

15   is down.  Whenever you see something like that,

16   they're doing what we call payroll deduction,

17   and what they're doing is helping get the line

18   down.  That's the reason why the other cashier

19   is standing there.  There's no reason for him to

20   be there if the gate is there, so he was helping

21   get the line down.

22             **MS. GRAGEL:**      Hold on --

23             **MR. CAMPBELL:**      Let her answer.

24   You've raised this issue and she's answering and

25   you're trying to cut her off.

181

1          **MS. HANSON:**     So when he first

2    arrived, no, there was probably no one there

3    maybe.  But it went on for so long, if you

4    notice the cafeteria, people is moving around.

5    These people now are in my line, and this

6    manager is standing at the salad bar; and the

7    reason why I know so is because when I felt

8    threatened by him, I looked up, and they were

9    standing there; they had stopped making their

10   food and had turned all the way around to make

11   sure everything was okay.

12          So there's people standing at the

13   salad bar, but this does not show it.  And they

14   did react to it.  If you zoom that in, you'll

15   see them stop, turn around and watch us through

16   the whole thing.

17   **BY MS. GRAGEL:**

18   **Q.**  So just to get a point of reference at --

19   the tape starts at 000 and you tell me that this

20   other cashier came to help you move the line.

21   **A.**   He was there to help me move the line.

22   Now, if you notice he's going to walk off.  When

23   the gentleman comes, he walks off because my

24   line is in control.

25   **Q.**   White shirt, black pants, the other cashier

182

1    is still next to you?

2    **A.**   Yes, he is.

3    **Q.**   And we are at reference 21.

4    **A.**   He's gone.  Keep going.  He'll walk right

5    away.  He's gone.

6    **Q.**   Reference point 25.

7    **A.**   I don't know nothing about reference.  I

8    don't know.  All I know is what happened that

9    day.  I don't know about the numbers, I don't

10   know about the time.

11   **Q.**   And at this section the tape shows at

12   reference point 28.  Now, back here in this area

13   of the salad bar, do you recognize anyone?

14   **A.**   I can't even see that.  You can't even see

15   that unless you're going to bring that in much

16   plainer.

17   **Q.**   Is this the area where you would --

18   **A.**   The salad bar should be somewhere right in

19   front of my register.  If you want to see some

20   persons reacting, that's where we should have

21   zoomed, not here.

22   **Q.**   Do you recognize this person at the left

23   counter with the -- this is reference point 40.

24   Do you recognize a dark-skinned person wearing a

25   hospital uniform?

183

1    **A.**    No.  Can you bring that person closer to

2    me?

3    **Q.**    No.

4    **A.**    Then I do not know.

5    **Q.**    And we'll stop here.  This is reference

6    point 50.

7    **A.**    So this went on a long time.  A long time.

8    **Q.**    If this is a clock time, it went on

9    something in the range of two minutes, 30

10   seconds.

11   **A.**    That's a long time.

12   **Q.**    At this point, do you remember anything

13   that was being said between you and Mr. Harting

14   at 50 seconds?

15   **A.**    I cannot tell you what we said at 50

16   seconds to nothing on that laptop.

17   **Q.**    How far into the contact was it between you

18   and Mr. Harting where you felt that it had

19   gotten heated?

20   **A.**    The minute he said to me, "No, I gave you a

21   ten."

22        I said, "No, sir, you gave me six dollars."

23        He went, "I gave you a fucking ten."

24        I said, "I see now I have to go get my

25   manager."

184

1    **Q.**   And if I understand correctly, that was

2    around the time the manager came because he was

3    watching?

4    **A.**   I don't know whether he was watching or

5    not.  All I know is when I got up to go get my

6    manager, he was already on his way where we

7    were.  It was probably because my line was held

8    up.

9    **Q.**   And if your line was held up, would that be

10   people standing behind Mr. Harting?

11   **A.**   That would be people standing behind him,

12   but you can't see if nobody is standing behind

13   him on that tape.

14   **Q.**   And how many people were behind him?

15   **A.**   I cannot tell you.

16   **Q.**   Anybody after Mr. Harting passed through

17   your line speak to you about what they observed?

18   **A.**   Sure, they did.  Lots of people did.

19   **Q.**   How many?

20   **A.**   I can't tell you how many.

21   **Q.**   Males or females?

22   **A.**   I do not know.

23   **Q.**   Hospital clothes or outsiders?

24   **A.**   I do not know.

25   **Q.**   Did they talk to you over a few minutes or

185

1    over several hours?

2    **A.**    I don't have time to be held up through my

3    line.  It don't take long to say, "Did you hear

4    that," and they were out.  "That was rude," and

5    they were out.  "You should report that," and

6    they were out.  It don't take but a second.

7    They'd say that while I'm making the

8    transaction.

9    **Q.**    You heard that how many times?

10   **A.**    People that was in the line -- people

11   walked up to me and asked me, "Are you all

12   right?"  And I said "Yes," end of it.

13   **Q.**    Five, ten, fifteen?

14   **A.**    I do not know.  You asked me did people

15   discuss it with me.  My answer is yes.  How

16   many?  I do not know.

17   **Q.**    When people come through the line, those

18   individuals that work for University Hospitals

19   have a badge, correct?

20   **A.**    Yes, they do.

21   **Q.**    And those that work for University

22   Hospitals as regular hospital employees, they

23   also have a swipe card, correct?

24   **A.**    Yes, they do.

25            **MR. FELDMAN:**    A what?

186

1              **MS. GRAGEL:**      Swipe card.

2              **MS. HANSON:**      Wait a minute.  I

3    don't want to answer that wrong.  Say it again.

4    **BY MS. GRAGEL:**

5    **Q.**   Do University Hospital employees also have

6    a swipe card that they can use at the line to

7    buy food?

8    **A.**   Some of them.

9    **Q.**   Did Mr. Harting, if you remember, have a

10   badge?

11   **A.**   He did not give me a badge.

12   **Q.**   Did you know from the year or so that you

13   worked at the hospital that construction workers

14   had identification badges because they worked

15   within the building?

16   **A.**   Some of them do.

17   **Q.**   And did you have occasion as a cashier to

18   see construction workers who had their worker

19   badges coming through your line?

20   **A.**   Yes, I have.

21   **Q.**   And did Mr. Harting have a construction

22   worker's badge when he --

23   **A.**   No, he did not.

24   **Q.**   As far as you know he had no badge?

25   **A.**   He had no badge.

187

1   **Q.**   Would that have been significant to you one

2   way or the other?

3   **A.**   No, it wouldn't have.  I would have waited

4   on him regardless.

5   **Q.**   We just went through an exercise where you

6   looked at a film with me in the presence of the

7   arbitrator.  Had you ever seen this film before

8   today?

9   **A.**   No, I haven't.

10                **MS. GRAGEL:**      Nothing further.

11                **MR. CAMPBELL:**      I just have a few

12   questions and we'll let you go.

13                    REDIRECT EXAMINATION

14   **BY MR. CAMPBELL:**

15   **Q.**   Did you ever see the film that showed how

16   much change you gave to Mr. Harting?

17   **A.**   Yes, I did.

18   **Q.**   Did you give him the correct change?

19   **A.**   I did.

20   **Q.**   Did it upset you when you saw that he was

21   being rewarded for his conduct?

22   **A.**   Yes, it did.

23   **Q.**   Did you feel threatened by Mr. Harting?

24   **A.**   Yes, I do.

25   **Q.**   Were you embarrassed by his conduct?

188

1   **A.**   I was, yes.

2            **MR. FELDMAN:**        Threatened, you

3   mean physically threatened?

4            **MS. HANSON:**        Yeah, I felt

5   physically threatened, yeah.

6   **BY MR. CAMPBELL:**

7   **Q.**   Have you ever had somebody argue with you

8   for over two minutes in your line?

9   **A.**   No.

10  **Q.**   And it's your testimony that you asked your

11  manager to -- you raised an issue as to whether

12  you could continue to work as a cashier if

13  Mr. Harting may come back?

14  **A.**   Yes.

15  **Q.**   It they told you that Mr. Harting was free

16  to come back in the cafeteria, what would you

17  have done?

18  **A.**   My husband told me I had to quit.

19  **Q.**   You would have --

20  **A.**   I had to quit.

21  **Q.**   You like your job?

22  **A.**   Yeah.

23  **Q.**   You would have walked away from your job if

24  Mr. Harting was permitted to come back?

25  **A.**   I would have had to.  My husband told me I

189

1    had to quit.

2    **Q.**   Now, the union is here trying -- they

3    showed you that video and asked you the

4    questions trying to say that you're not telling

5    the truth.

6        Has anybody asked you to say anything other

7    than the truth here?

8    **A.**   No.

9    **Q.**   You've said everything truthful here?

10   **A.**   I have.

11   **Q.**   Have you changed your story at all

12   throughout the course of this?

13   **A.**   No.  I am a minister and I would not lie on

14   Mr. Harting.

15   **Q.**   When you say "minister," tell us a little

16   bit more about that.

17   **A.**   I'm an evangelistic minister.  I would not

18   lie.

19   **Q.**   Have you had to go through training or

20   certification to become an evangelistic

21   minister?

22   **A.**   Yes, I did.

23   **Q.**   How long have you been a minister?

24   **A.**   I've been a minister now for two and a half

25   years.

190

1  **Q.**   And for what church are you a minister?

2  **A.**   Springfield Missionary Baptist Church,

3  Cleveland, Ohio.

4          **MR. CAMPBELL:**   I don't have any

5  further questions for Ms. Hanson at this time.

6               RECROSS-EXAMINATION

7  **BY MS. GRAGEL:**

8  **Q.**   Ms. Hanson, you said that you spoke with

9  your spouse about the situation.

10  **A.**   Yes.

11  **Q.**   Did you speak to him before or after you

12  made the write-up marked as Respondent's

13  Exhibit 2?

14  **A.**   Both times.  When I went home, I told him

15  about the situation.  He asked me if I had

16  reported it and I told him, no, because Andrew

17  had really dealt with the guy, and I was just

18  describing his behavior and how intimidated, you

19  know, he made me feel and we forgot about it.

20          And then the day of the 29th I was going to

21  call him to come and get me because I was so

22  upset by it, but I never made it to the phone.

23  So I discussed it with him after I got home, and

24  I told him I had wrote up the write-up, and he

25  didn't say anything.  And then we came down for

1    the arbitration, and then my husband actually

2    seen Mr. Harting.  And he went, "You know, Tish,

3    if he's allowed to come back, you're going to

4    have to quit."

5    Q.   So that conversation about quitting the job

6    didn't happen on January 27th?

7    A.   No.

8    Q.   It didn't happen on January 29th?

9    A.   No.

10   Q.   It happened here in April --

11   A.   Right.

12   Q.   -- when this arbitration proceeding

13   started?

14   A.   Right, when we felt like he would be

15   allowed to come back into the cafeteria.

16            MS. GRAGEL:      I have nothing

17   further.

18            MR. FELDMAN:      Let me just get the

19   sequence of events, okay.  The situation

20   occurred on the 27th of January; is that right?

21            MS. HANSON:      Yes.

22            MR. FELDMAN:      While you were at

23   your position as a cashier in the cafeteria.

24            MS. HANSON:      Yes.

25            MR. FELDMAN:      What time of day?

192

1              MS. HANSON:      When I wrote the

2     statement, about 7:00 to -- somewhere between

3     7:00 and 8:00 p.m.  I'm not sure.

4              MR. FELDMAN:     7:00 to 8:00 p.m.?

5              MS. HANSON:      I think so.

6              MR. FELDMAN:     Now, on the 28th

7     nothing happened.

8              MS. HANSON:      No.

9              MR. FELDMAN:     Did you discuss it

10    with anybody on the 28th?

11             MS. HANSON:      No.

12             MR. FELDMAN:     January 29th came

13    around and Mr. Harting came back again on that

14    date?

15             MS. HANSON:      Yes.

16             MR. FELDMAN:     What time of day

17    was that?

18             MS. HANSON:      I can't say

19    exactly.

20             MR. FELDMAN:     Give me -- was it

21    supper menu, dinner menu, luncheon menu,

22    breakfast menu?

23             MS. HANSON:      Probably.  Let's

24    say about 7:00 to 8:00.

25             MR. FELDMAN:     7:00 to 8:00 the

1   27th?

2              MS. HANSON:      Maybe.

3              MR. FELDMAN:      And then you saw

4   him in your line again?

5              MS. HANSON:      Yes.

6              MR. FELDMAN:      And this is when

7   the refreshing incident occurred that the

8   manager gave Mr. Harting a meal ticket?

9              MS. HANSON:      Yes.

10             MR. FELDMAN:      And that set you

11  off again?

12             MS. HANSON:      I wasn't -- it

13  didn't set me off the first time.  It didn't

14  bother me.  It didn't annoy me.  It set me

15  off -- that set me off that time.

16             MR. FELDMAN:      The meal ticket?

17             MS. HANSON:      Yes.

18             MR. FELDMAN:      Because that in

19  your mind made you feel that you were guilty --

20             MS. HANSON:      Yes.

21             MR. FELDMAN:      -- because they

22  were trying to give back something to

23  Mr. Harting?

24             MS. HANSON:      And then it made me

25  feel like -- in my heart, I wanted so much for

1   him to know that I really had gave him the right

2   change, you know.  I wanted him to know that.

3              MR. FELDMAN:     No one has asked

4   the question, but have you been short or over in

5   your cash register at any other time?

6              MS. HANSON:     A few pennies

7   maybe.

8              MR. FELDMAN:     Few pennies.

9              MS. HANSON:     Most of the time

10  perfect draws.

11             MR. FELDMAN:     Never $25?

12             MS. HANSON:     Oh, no.

13             MR. FELDMAN:     Or any other large

14  sum?

15             MS. HANSON:     Oh, no.

16             MR. FELDMAN:     Now, did you fully

17  discuss this meal ticket activity with your boss

18  as to why he gave --

19             MS. HANSON:     Yes, I did.

20             MR. FELDMAN:     What was the answer

21  that he said?

22             MS. HANSON:     What did he tell

23  me?  He told me because he was just trying to

24  keep the peace, or he was just trying -- he said

25  he was just trying to show him that we weren't

195

1    all that bad or something like that.  I don't

2    know.

3              MR. FELDMAN:     Is there anything

4    else that you want to tell me about this?

5              MS. HANSON:     That's it.

6              MR. FELDMAN:     Okay.  Any further

7    questions?

8              MS. GRAGEL:     Just one, and it's

9    not quite in response to your question.

10   BY MS. GRAGEL:

11   Q.   In the year or so that you have worked at

12   the University Hospital cafeteria, at anyplace

13   are there signs posted that say to the effect

14   "Construction workers, don't eat here," or

15   "Construction workers, keep out"?

16             MS. HANSON:     None that I've

17   seen.  None that I've seen.

18             MR. FELDMAN:     Thank you very

19   much.  Next witness.

20                    DAVID HAWK

21   of lawful age, a witness herein, was examined

22   and testified as follows:

23             MR. FELDMAN:     For the record, may

24   I have your name?

25             MR. HAWK:     David Hawk.

196

1              **MR. FELDMAN:**      David Hawk, just

2    like the bird?

3              **MR. HAWK:**         Yes.

4              **MR. FELDMAN:**      Do you understand,

5    Mr. Hawk, you're under oath?

6              **MR. HAWK:**         Uh-huh.

7                   DIRECT EXAMINATION

8    **BY MR. CAMPBELL:**

9    **Q.**   Just so the record is clear, if you could

10   say "yes" or "no" audibly so the court reporter

11   can get down a good record, okay?

12   **A.**   Okay.

13   **Q.**   Who is your employer?

14   **A.**   Sodexho.

15   **Q.**   What is Sodexho's role at University

16   Hospitals' main campus?

17   **A.**   Well, in my area it's the retail -- it's

18   the retail for the food service, which includes

19   Einstein's and the cafeteria.

20   **Q.**   In simple terms, does Sodexho manage the

21   cafeteria?

22   **A.**   Yes.

23   **Q.**   Sodexho employees actually supervise UH

24   employees?

25   **A.**   Yes.

1   **Q.**   When I say "UH," University Hospitals'

2   employees?

3   **A.**   Uh-huh.

4   **Q.**   Just answer "yes" or "no."

5   **A.**   Yes.

6   **Q.**   And we just heard from Lattisia Hanson.

7       Do you know Ms. Hanson?

8   **A.**   Yes.

9   **Q.**   And is she a UH employee?

10   **A.**   Yes.

11   **Q.**   And what is your position?

12   **A.**   Her position is cashier.

13   **Q.**   And what is your title?

14   **A.**   My title is retail manager.

15   **Q.**   And in simple terms, what is a retail

16   manager?

17   **A.**   Retail manager, I oversee the daily

18   operations of the cafeteria, Einstein's Bagels

19   Brothers, maintain the employees and the food,

20   overall --

21   **Q.**   Who is the -- if we're talking about

22   Sodexho at the main campus, who is the top

23   Sodexho supervisor?

24   **A.**   Top Sodexho supervisor is Tom Schwendeman

25   and Dan Ballard.

198

1   **Q.**   And below Dan, are you at that next tier?

2   **A.**   I would say I'm the next tier.

3   **Q.**   Are you with Heather and Andrew?

4   **A.**   Yes.

5   **Q.**   And Heather is Heather Dougherty McDonnell?

6   **A.**   Yes.

7   **Q.**   And Andrew Powel?

8   **A.**   Yes.

9   **Q.**   Are you aware of Ms. Hanson's employment,

10  of whether she's a good employee or not?

11  **A.**   Yes.

12  **Q.**   How is her performance?

13              **MR. FELDMAN:**       Are you --

14  **BY MR. CAMPBELL:**

15  **Q.**   Are you familiar with Ms. Hanson's work

16  performance?

17  **A.**   Yes.

18  **Q.**   And what is it, good, bad?

19  **A.**   Good.

20  **Q.**   As a cashier, has she had problems?

21  **A.**   Oh, no.  No.

22  **Q.**   How about as to her drawer being accurate

23  or inaccurate, how has she been?

24  **A.**   She's very accurate.

25  **Q.**   Now, let me ask you about your role in the

199

1    incident with -- first of all, I'm going to ask

2    you, are you familiar with a Mr. Harting?  Has

3    that name ever come to you or just the

4    individual?

5    **A.**    I don't know Mr. Harting.

6    **Q.**    You don't know the name?

7    **A.**    I don't know the name.

8    **Q.**    Do you recognize the individual in here --

9    did you ever see him?

10   **A.**    Yeah.  Well, I mean, if we're talking about

11   the gentleman --

12   **Q.**    Why don't you turn to that side of the

13   table and let us know which gentleman --

14   **A.**    Right there.  (Indicating.)

15        **MS. GRAGEL:**       Identification

16   stipulated.

17        **MR. CAMPBELL:**     He's pointing to

18   the grievant.

19   **BY MR. CAMPBELL:**

20   **Q.**    And tell us about -- so you didn't know his

21   name at the time you did this?

22   **A.**    No.  In fact, I just found out his name.

23   **Q.**    I'm going to tell you his name is

24   Mr. Harting just so there's no confusion.  Tell

25   us what your involvement was in this Mr. Harting

200

1    incident?

2    **A.**   Okay.  On Friday morning I was consulted by

3    Heather Dougherty.

4           **MR. FELDMAN:**     Friday morning,

5    January 27th?

6           **MR. HAWK:**       No, Friday was the

7    30th, I think.

8           **MR. CAMPBELL:**    Let me show the

9    arbitrator the calendar.  The 29th she worked

10   six to six and then --

11          **MR. FELDMAN:**     Friday morning,

12   January 30th.

13   **BY MR. CAMPBELL:**

14   **Q.**   Just so the record is clear, what shift do

15   you typically work?

16   **A.**   I normally work 8:00 to 5:30 shift.

17   **Q.**   8:00 a.m.?

18   **A.**   8:00 a.m.

19   **Q.**   So if we're talking about Friday,

20   January 30th, 2009, you would have come in

21   around 8:00 a.m.?

22   **A.**   Yes.

23   **Q.**   Tell us what happened on that day.

24   **A.**   Heather came in, I think it was around 9:30

25   and --

201

1    **Q.**   And just so the record is clear, Heather

2    who?

3    **A.**   Heather Dougherty McDonnell.  She came in

4    and she was talking to me about the situation

5    that happened.  Do you want me to tell the

6    details that she told me?

7              **MR. FELDMAN:**      I want you to wait

8    for a question so you can answer it.

9              **MR. HAWK:**        Okay.  Sorry.

10   **BY MR. CAMPBELL:**

11   **Q.**   Did she give you any written statements?

12   **A.**   She did after we talked, after we talked

13   about it, yeah.

14   **Q.**   Tell us what you talked about with Heather

15   first.

16   **A.**   She said that a gentleman came in on

17   Tuesday night and claimed that Tish shorted him

18   money, and said that he -- now, this is what she

19   heard from what she was telling me from Andrew,

20   that he acted very aggressive, was accusing Tish

21   of shorting him money.  And then she went and

22   said on Thursday night he came in and when

23   Andrew told him that he didn't have the money --

24   that she wasn't short money on her register and

25   that her register came out perfect balance, that

202

1    he started to yell at Andrew and say, "Bullshit,

2    this is bullshit"; and it was also stated that

3    Tish said that he said "nigger" to her.

4    **Q.**   What happened next?

5    **A.**   Okay.  So I pulled -- I was talking to her

6    about it, so I pulled up the video.

7              **MR. FELDMAN:**    Which video?

8              **MR. HAWK:**       The video on the

9    computer.  I was able to see --

10             **MR. FELDMAN:**    Which video?

11   There's two covering the cashier.

12             **MR. HAWK:**       I pulled up the one

13   from Tuesday and the one --

14             **MR. FELDMAN:**    I'm not making

15   myself clear.  I understand we saw one video

16   here from the back of the area covering both

17   cashiers.

18             **MR. HAWK:**       Yeah.

19             **MR. FELDMAN:**    I understand

20   there's a second video covering one cashier at a

21   time.  Which video did you pull up?

22             **MR. HAWK:**       I pulled up the one

23   from the back, not the one that's over top of

24   the cashier.  Exactly.

25             **MR. CAMPBELL:**   Let the record

1   reflect that counsel showed him the video that

2   was shown to Ms. Hanson and he said that's the

3   one.

4            **MS. GRAGEL:**       I have showed him

5   just the cover -- the first frame of the video

6   that you looked at with us, Mr. Arbitrator, with

7   the prior witness.  And, for the record, it may

8   make sense if I can identify this as Union

9   Exhibit 3.  For purposes of the record, if we

10  could make the video of January 27th Union

11  Exhibit 2, and the video of January 29th, which

12  has not yet been displayed here, Union 3.

13           **MR. FELDMAN:**       Union 2 is

14  January 27th video?

15           **MS. GRAGEL:**       Yes, sir.

16           (Thereupon, Union Exhibits 2 and 3

17            were marked for purposes of

18            identification.)

19           **MR. CAMPBELL:**      And I think at this

20  point that's all I can agree to since we haven't

21  presented January 29th yet.

22           **MR. FELDMAN:**       Union 3 a video of

23  January 29th?

24           **MS. GRAGEL:**       Which has not been

25  shown.

204

1          MR. FELDMAN:      The one you're

2   showing me is January 27th?

3          MS. GRAGEL:      Yes, sir.

4          MR. FELDMAN:      You said you pulled

5   out the video, and now we got sidetracked and

6   we're back on track.  Which video did you pull

7   out?  What date?

8          MR. HAWK:        Within the same

9   sequence, I did pull the 27th and I did pull the

10  29th.

11         MR. FELDMAN:      Continue on.

12  BY MR. CAMPBELL:

13  Q.   What did you pull the videos for?

14  A.   I pulled it just to -- I wanted to see if I

15  could see anywhere where I could see that maybe

16  he was being loud, boisterous, maybe aggressive.

17  Q.   What did you determine based on your

18  review?

19  A.   I mean, you could see where there were

20  motions being made, and that he was verbally

21  looking back, and to me it looked like he was

22  saying something back.

23  Q.   There's no audio on the security video?

24  A.   Right, no audio.

25  Q.   What did you do after reviewing the

1   videotapes?

2   **A.**   After reviewing the videotape, I'm trying

3   to think of the sequence, but I think after I

4   viewed the videotapes I think I called Sue.

5   **Q.**   Sue Peplowski?

6   **A.**   Peplowski.  You know what, I didn't call

7   Sue Peplowski.  I actually called -- I had

8   Heather call Tish because I wanted to interview

9   Tish.

10  **Q.**   Tish is Ms. Hanson?

11  **A.**   Lattisia Hanson that was just in here.  I

12  wanted to get how she --

13  **Q.**   Did you interview Ms. Hanson?

14  **A.**   Yes.

15  **Q.**   Tell us what you recall from that

16  interview.

17  **A.**   From the interview, she stated that, you

18  know, she didn't short the gentleman, and that

19  she actually on Thursday just -- you could see

20  where on Thursday she moved herself off of the

21  register and let Andrew actually take him

22  because she didn't feel comfortable with him.

23  And she also stated to me that he did say

24  "nigger" to her.

25  **Q.**   Was she upset about the incident?

206

1   **A.**   Oh, yes.

2   **Q.**   Did she say anything to you about whether

3   she was willing to continue working with him

4   available -- with him being on the property?

5            **MS. GRAGEL:**      Objection, form.

6   It's getting a little leading here,

7   Mr. Arbitrator.

8            **MR. FELDMAN:**      Rephrase.

9   BY MR. CAMPBELL:

10  **Q.**   Did she say anything to you about

11  continuing her work?

12  **A.**   I think I actually asked her, I said -- one

13  of the questions I asked her, I said, "Tish" --

14  I call her "Tish."  I said, "Tish, did you feel

15  threatened?"

16       And she said, "Yes, I felt very threatened

17  and I feel very uncomfortable with this

18  gentleman."

19  **Q.**   Let me show you what's been marked as

20  Respondent's Exhibit 2 and ask you if you've

21  seen that document before today?

22  **A.**   Yes.

23  **Q.**   What is that?

24  **A.**   Lattisia's statement.

25  **Q.**   How did you get that?  Who gave it to you?

207

1   **A.**   Heather.

2   **Q.**   In your discussion with Tish, was she

3   consistent with the written statement?

4   **A.**   Uh-huh.

5   **Q.**   Just say "yes."

6   **A.**   Yes.

7   **Q.**   What did you do after interviewing

8   Ms. Hanson?

9   **A.**   After I interviewed Tish, I called up

10  Andrew.

11  **Q.**   Andrew who?

12  **A.**   Andrew Powel and I wanted to see, you know,

13  was this gentleman using cuss words and

14  everything towards him and how did he feel.  And

15  he stated that, "Yes," and that he felt, you

16  know, uncomfortable, and that the guy -- the

17  gentleman was yelling "bullshit" to him.

18            **MR. FELDMAN:**     The guy was what?

19            **MR. HAWK:**        The guy was yelling

20  "bullshit" at him, saying "bullshit" to him.

21  And he also stated to me that John Rivera was

22  there so I could interview John Rivera, too.

23  **BY MR. CAMPBELL:**

24  **Q.**   Did you interview John?

25  **A.**   Yes.

208

1   **Q.**   Who is John?  What position?

2   **A.**   He is the executive chef in the patient

3   service area.

4   **Q.**   And what did John tell you?

5   **A.**   I didn't have to call John.  John was -- I

6   think -- I saw John at work that day so I

7   interviewed him, and he said, "Yeah, I'm

8   standing there, and I was kind of like, wow, you

9   know, this guy is yelling 'bullshit' at Andrew,"

10   okay, so he confirmed.

11         **MR. FELDMAN:**     Confirmed the word

12   "bullshit"?

13         **MR. HAWK:**     Confirmed multiple

14   times of saying "bullshit," so --

15   **BY MR. CAMPBELL:**

16   **Q.**   What did you do next?

17   **A.**   To that point -- in my mind I felt that the

18   employee and the managers did not feel safe or

19   they didn't feel comfortable with this

20   gentleman, so I called to try to get

21   verification from Sue if it would be okay if we

22   could ban him from the cafeteria.

23   **Q.**   And so based on your investigation and your

24   interviews of the witnesses, both males and

25   females told you that they felt threatened?

209

1    **A.**    Yes.

2    **Q.**    Both males and females told you that his

3    conduct was inappropriate?

4    **A.**    Yes.

5    **Q.**    And it was your recommendation to Sue that

6    he be banned from the cafeteria?

7    **A.**    Yes.

8    **Q.**    Go on.

9    **A.**    Just to clarify.  John Rivera, he didn't

10   say to me about him feeling threatened, he just

11   verified the profanity.  I don't want to --

12   **Q.**    Thank you for that.  And what did Sue do?

13   **A.**    I think Sue -- when talking to Sue, Sue

14   said, "Do me a favor and save the video,"

15   Exhibit 3, the one from the 27th and 29th.  Now,

16   I didn't know how to do that, so I called

17   security and I had security come up and they

18   saved it for me.

19   **Q.**    Who did the still photos of the individual?

20   **A.**    The still?

21   **Q.**    Let me show you.  Have you seen these

22   stills before?

23   **A.**    I haven't seen the stills, but these are

24   part of the -- these are part of the video.

25   These are part of the video.  They look closer

210

1    to when he's walking away.

2    **Q.**    Were you involved in determining who the

3    individual was who was responsible for these

4    issues, determining his name?

5    **A.**    Naming him, no.  I had -- we went through

6    the time and then Heather pointed him out as the

7    gentleman.

8    **Q.**    To who?

9    **A.**    To me on the video camera.

10   **Q.**    Do you know who was able to determine that

11   he was Mr. Harting?  Were you involved in that

12   or was that UH?

13   **A.**    I think that was UH to verify it.

14   **Q.**    Did you talk to Sue about what was

15   ultimately done as to Mr. Harting?

16   **A.**    What was our --

17   **Q.**    Did Sue Peplowski report back to you as to

18   what UH decided to do?

19   **A.**    Yeah.  She stated that she felt that we

20   didn't want this gentleman to be in the

21   cafeteria and pose a -- you know, any time you

22   have someone that you feel might pose a threat

23   to your employees, you don't want to take that

24   chance.  If you let it go any further, it might

25   turn into something worse.  So we verified that

1  that is what we would -- the decision we would

2  like to make.

3  **Q.**  To your knowledge, has Mr. Harting returned

4  to the cafeteria after that?

5  **A.**  After I've told him?

6  **Q.**  After you talked to Sue.

7  Have you met him before in person?

8  **A.**  No.

9  **Q.**  You haven't met Mr. Harting in person?

10  **A.**  No.

11  **Q.**  Have you ever spoken with Mr. Harting?

12  **A.**  Not until -- no.

13  **Q.**  Do you know who communicated to him that he

14  was not to return to the property?

15  **A.**  I did.

16  **Q.**  So I thought you said you didn't speak to

17  him.

18  **A.**  I thought you meant after I spoke with Sue

19  right away.

20  **Q.**  Tell me about your conversation.

21  **A.**  After I spoke with Sue and she verified

22  that, our understanding was the next time he

23  comes in, he would be approached and asked not

24  to return.

25  **Q.**  Did you do that?

212

1    **A.**    Yes.

2    **Q.**    Tell us about that.

3    **A.**    I let the other managers know that, you

4    know -- up until now, from my understanding,

5    most of the time he visited after -- it seemed

6    like after I would be gone or sometimes I would

7    be in the office finishing up my work or getting

8    ready to leave.  He came back in around between

9    5:00 and 5:30 probably that day.

10   **Q.**    Let me just put a time frame on it.

11   **A.**    On Friday, the 30th.

12   **Q.**    Friday, the 30th.  So he came in again on

13   the 30th?

14   **A.**    Yes.

15   **Q.**    Tell us what happened.

16   **A.**    He went and got something to eat.  When I

17   noticed that he sat down and got something to

18   eat.

19   **Q.**    Was Ms. Hanson working at this point?

20   **A.**    No, not yet.  So I approached him, and I

21   sat down and I stated to him that -- I said,

22   "Sir, you had a little problem with one of my

23   employees," and he said, "Yeah, she's an f-ing

24   thief."

25   **Q.**    Did he use "f-ing"?

213

1  **A.**   "Fucking."  I said, "Well, sir, the
2  facts show from the procedures that we followed
3  that she did not take anything."
4       He said, "She's a thief."  And then I think
5  he said something about, "She's done this to six
6  or seven of my friends" or something like that
7  was his statement, okay.
8       I said, "Well, sir, we perform audits on
9  all the cashiers, we follow the appropriate
10  procedures.  This did not show any of her being
11  up on money or anything like that."  I said to
12  him, I said, "So my management and my employees
13  do not feel comfortable with you coming here
14  anymore so I'm going to ask you to no longer
15  come here."
16       He said something like, "You're willing to
17  give $12 a day for me not -- that's what I
18  spend?"
19       I said, "Yes, sir.  I think it's best for
20  all of us that you no longer come to the
21  cafeteria."  Basically that was the end of the
22  conversation.
23            **MR. CAMPBELL:**    I don't have any
24  further questions.  You'll have to be asked some
25  questions by the union.

214

1          **MR. FELDMAN:**      Are you ready?

2          **MS. GRAGEL:**      Yes.

3                   CROSS-EXAMINATION

4     **BY MS. GRAGEL:**

5     **Q.**   Mr. Hawk, you said you recognize

6     Mr. Harting here today.

7     **A.**   Yes.

8     **Q.**   Had you seen him in the University

9     Hospitals' cafeteria before January 27th, 29th,

10    30th of this year?

11         **MR. FELDMAN:**      Yes or no.

12         **MR. HAWK:**      No.

13         **MR. FELDMAN:**      Next question,

14    please.

15    **BY MS. GRAGEL:**

16    **Q.**   Does Sodexho run the food service area in

17    the Case Western Reserve Animal Health Building?

18    **A.**   Animal Health?

19    **Q.**   Yes.

20    **A.**   No.

21    **Q.**   Do you run a food service worker for Case

22    Western Reserve employees?

23    **A.**   No.

24    **Q.**   So the Case cafeteria is not a Sodexho

25    managed cafeteria?

215

1    **A.**    No.

2             **MR. FELDMAN:**        Where is the Case

3    cafeteria?

4    **BY MS. GRAGEL:**

5    **Q.**    Is there a Case Western cafeteria that is

6    basically on the other side of the wall of the

7    University Hospitals' cafeteria that Sodexho

8    manages?

9    **A.**    No.

10   **Q.**    Is there a Case cafeteria in the next

11   building from the cafeteria that you manage?

12   **A.**    I think there's one in the vicinity.

13   **Q.**    You've never been there?

14   **A.**    No.

15   **Q.**    I thought maybe there -- I'm sorry to take

16   a while -- thank you.

17   **A.**    No, that's okay.

18   **Q.**    Turning to things that you do know about,

19   in the cafeteria area at University Hospitals,

20   there are security cameras and you review the

21   tapes of them?

22   **A.**    Yes.

23   **Q.**    One of them is Exhibit 2 and I showed you

24   that screen.

25   **A.**    Right.

216

1   **Q.**   Who maintains those tapes?  Are those

2   Sodexho tapes, University Hospitals' police?

3   **A.**   From my understanding, they're digital and

4   they are -- I think they're maintained by the

5   Protective Services, but I have access to the

6   ones that are involved with the cafeteria.

7   **Q.**   And University Hospitals has Protective

8   Services, correct?

9   **A.**   Yes.

10  **Q.**   And the first time that anyone from your

11  company talked to Protective Services about this

12  incident was on January 30th?

13  **A.**   From my understanding, yeah.

14  **Q.**   And I take it your managers of Sodexho are

15  trained to call security if there is a safety

16  concern in the cafeteria.

17  **A.**   Yeah, if they feel -- yes.

18  **Q.**   And no one as far as you know called

19  security on January 27th or January 29th?

20  **A.**   Yeah, as far as I know.

21  **Q.**   And it's true, is it not, that Sodexho has

22  a company commitment to workplace safety and

23  security?

24  **A.**   I'm sure, yes.

25  **Q.**   Sodexho prides itself on having a

217

1    harassment-free workplace, does it not?

2    **A.**    Yes.

3    **Q.**    So when you heard from Heather or Andrew

4    Powel, the managers, that an incident had

5    happened two days earlier on January 27th, were

6    you concerned that neither Andrew nor anyone

7    else had brought it to your attention at an

8    earlier date?

9    **A.**    Yeah.   Yeah.

10   **Q.**    And did you talk with Andrew or Heather

11   about why they didn't report it earlier?

12   **A.**    No, I was too busy that day trying to

13   handle the situation of what I thought needed to

14   be done.

15   **Q.**    So you never talked to them about that

16   subject, about bringing it to your attention

17   earlier than two or three days later?

18   **A.**    No.   No.

19   **Q.**    And ultimately you've been talking here

20   about talking to a Sue Peplowski.  Can you spell

21   that?

22   **A.**    P-e-p-l-o-w-s-k-i.

23   **Q.**    And what is Ms. Peplowski's position?

24   **A.**    She's with Human Resources.

25   **Q.**    Of University or Sodexho?

218

1    **A.**    Of University.

2    **Q.**    And was it Ms. Peplowski's determination or

3    yours that Mr. Harting should be asked not to

4    return to the cafeteria when you had the

5    conversation on January 30th?

6    **A.**    I felt it was a -- hers was the final, but

7    it was a collaboration of both of us that --

8    **Q.**    And on January 30th when you had this

9    discussion with Mr. Harting and asked him not to

10   come back --

11   **A.**    Yes.

12   **Q.**    -- he finished his meal and left, did he

13   not?

14   **A.**    Yes.

15   **Q.**    And he did not return during the remainder

16   of that work shift?

17   **A.**    No.

18   **Q.**    And when you finished your dealing with

19   this situation on January 30th, as far as you

20   were concerned it was done?

21   **A.**    Yeah.

22   **Q.**    It was not your decision to fire

23   Mr. Harting from his employment, was it?

24   **A.**    I have no power for that.

25   **Q.**    Where in relation to the University

219

1    Hospitals' cafeteria is the Neonatal Intensive

2    Care Unit?

3    **A.**    I have no clue.

4    **Q.**    Do you know where the construction workers

5    were working in January of 2009?

6    **A.**    No.

7    **Q.**    You knew, did you not, that construction

8    workers were eating in the cafeteria?

9    **A.**    Yes.

10    **Q.**    They were frequent customers?

11    **A.**    Yes.

12    **Q.**    No signs were posted to tell construction

13    workers to eat elsewhere?

14    **A.**    No.

15    **Q.**    And when, sir, you reviewed the tape of

16    January 27th, do you recall one incident where

17    Mr. Harting appears to be pointing?

18    **A.**    Yes.

19    **Q.**    And that's the incident that you're

20    referring to when you could see him gesturing?

21    **A.**    Yes.

22              **MS. GRAGEL:**        I have nothing

23    further.

24              **MR. CAMPBELL:**        I don't have any

25    further questions.

220

1              **MR. FELDMAN:**      Thank you very

2    much.

3              **MR. CAMPBELL:**      Can we take a

4    break?

5              **MR. FELDMAN:**      How many witnesses

6    do you have?

7              **MR. CAMPBELL:**      I'm going to try to

8    gather my troops together now.  I know Sue is

9    going to testify.

10             **MR. FELDMAN:**      We'll try to get

11   your case in today.

12             **MR. CAMPBELL:**      Absolutely.

13             **MR. FELDMAN:**      We'll save another

14   day for you.

15             (Thereupon, a recess was taken.)

16             HEATHER DOUGHERTY McDONNELL

17   of lawful age, a witness herein, was examined

18   and testified as follows:

19             **MR. FELDMAN:**      For the record,

20   state your name.

21             **MS. McDONNELL:**      Heather Dougherty

22   McDonnell.  D-o-u-g-h-e-r-t-y.  McDonnell is

23   M-c-D-o-n-n-e-l-l.

24             **MR. FELDMAN:**      Do you understand

25   you're under oath?

221

1          **MS. McDONNELL:**   Yes.

2          **MR. FELDMAN:**     You may inquire.

3               DIRECT EXAMINATION

4    **BY MR. CAMPBELL:**

5    **Q.**   Heather, I just have a couple questions for

6    you, not a whole lot, just want to get you out.

7    I know you haven't had a lot of sleep.

8         Who is your employer?

9    **A.**   Sodexho.

10   **Q.**   And what is your title?

11   **A.**   Retail manager.

12   **Q.**   How long have you held that position?

13   **A.**   I started in October of last year, so nine

14   or ten months.

15   **Q.**   And what shift do you work?

16   **A.**   Typically I work eight -- 10:00 a.m. to

17   8:00 p.m.

18   **Q.**   And you worked last night?

19   **A.**   I did.  I worked night shift.

20   **Q.**   What time did you get off last night?

21   **A.**   3:00 a.m.

22   **Q.**   Thank you for coming today.

23   **A.**   Absolutely.

24   **Q.**   Are you familiar with Ms. Hanson?

25   **A.**   Yes.

222

1    **Q.**    And is she a UH or Sodexho employee?

2    **A.**    Tish is a University Hospitals employee.

3    **Q.**    What is her position?

4    **A.**    Well, she's a cashier in our cafeteria.

5    **Q.**    What was her position in January or

6    February of 2009?

7    **A.**    Same, cashier in the cafeteria.

8    **Q.**    Are you familiar with her work performance?

9    **A.**    Yes.

10   **Q.**    And how is it?

11   **A.**    Tish, since I've worked there, she's great.

12   She's got the customer service skills, she's one

13   of -- we have a small crew that works at night,

14   and she's one of the anchors that works with us.

15   It's kind of a hard shift to fill working until

16   2:30 in the morning; but she's got great

17   attendance, she gets along great with everybody

18   and she's kind of one of the team leaders of the

19   group.

20   **Q.**    Has she had any customer service issues

21   aside from the one we're here to talk about

22   today?

23   **A.**    None that I'm aware of.

24   **Q.**    How has her drawer been as to the end of

25   the shift, as to whether they're accurate or

223

1    not?

2    **A.**   I don't really check her out very much

3    because I work -- but to my knowledge, there's

4    been no issues.  I think I would know if there

5    were any chronic issues with any cashier, but

6    not to my knowledge.

7    **Q.**   Now I want to direct your attention to

8    January 2009, and the witnesses before you have

9    put the three dates in question:  January 27, a

10   Tuesday; January 29th, a Thursday; and January

11   30th, a Friday.

12        At that time, January 2009, what was your

13   shift then?

14   **A.**   The 10:00 a.m. to 8:00 p.m.

15   **Q.**   So you had a brief period of time where you

16   overlapped with Ms. Hanson?

17   **A.**   Yes.

18   **Q.**   Now, on the first night in question with --

19   let me show you the documents.

20             (Thereupon, Respondent's Exhibit 3

21              was marked for purposes of

22              identification.)

23   **BY MR. CAMPBELL:**

24   **Q.**   I'm showing you a two-page document.  Have

25   you seen those two pages before?

224

1   **A.**   Yes.

2   **Q.**   And what are they -- let me ask you this.

3   Did you participate in the creation of those

4   still photos?

5   **A.**   Yes.

6   **Q.**   And why did you do that?  Why did you

7   create these?

8   **A.**   Well, do you want me to start from the

9   27th?

10  **Q.**   Yes.

11  **A.**   Just kind of talk through --

12  **Q.**   Tell us what happened.

13  **A.**   Well, on the 27th, it was around 7:00, 7:15

14  I believe, I was in our office, so I was out of

15  the cafeteria area, and Andrew, our night

16  manager, had come back and asked me to -- asked

17  me if I would please come out to the dining room

18  because he was dealing with a customer who was

19  upset and he wanted kind of some extra support,

20  extra management support in the dining room.  He

21  was going back out to talk with him.  In case it

22  escalated any further, he wanted to have, you

23  know, another manager out in the dining room to

24  help with whatever might need to happen.

25  **Q.**   So you didn't hear anything that had

225

1    happened prior to Andrew coming to you?

2    **A.**    No.   I wasn't in the dining room.

3    **Q.**    Tell us what happened once you went with

4    Andrew.

5    **A.**    Well, Andrew went back out, and I just kind

6    of made myself -- I just went out in the dining

7    room.   I didn't walk out directly with Andrew

8    and have a conversation, but I was kind of in

9    the area.   And what was in question was whether

10   or not Tish had given the correct change to -- I

11   don't know his name.

12   **Q.**    You're turning to Mr. Harting?

13   **A.**    Yes, Mr. Harting.

14        And so Andrew had followed up, checked the

15   tape and went back and wanted to explain to him

16   that it appeared in the camera that Tish had

17   handed him the correct change, and that at this

18   point there's not much more we could do.

19        At the end of the night if Tish's draw was

20   over for any reason, then Andrew, they could

21   follow back up basically.

22   **Q.**    What was Mr. Harting's reaction?

23   **A.**    Well, again, I wasn't there so I'm kind of

24   generalizing what I --

25             **MR. FELDMAN:**     Just testify as to

226

1   what you know, not what you heard or surmised.

2          **MS. McDONNELL:**     Okay.

3          I heard him say that she was

4   stealing -- she stole his money and, you know,

5   that he wanted his money back.  I wasn't really

6   part of that conversation, but I did hear that.

7   **BY MR. CAMPBELL:**

8   **Q.**   Did you talk to Tish that evening before

9   you left at 8:00?

10  **A.**   No, I did not.  She was busy at the time.

11  **Q.**   So you left at your normal time at 8:00?

12  **A.**   Yes.

13  **Q.**   And that would have been January 27th?

14  **A.**   Yes.

15  **Q.**   And now when you came out of the office

16  area into the cafeteria public area, Tish was

17  not in the vicinity of Mr. Harting at that time?

18  By the time Andrew asked you to come out, Tish

19  was not standing there with him?

20  **A.**   Tish was ringing on the register.

21  **Q.**   And all I'm saying is Andrew and

22  Mr. Harting were away from the register?

23  **A.**   Correct.  They were in the table area in

24  the dining room.

25  **Q.**   In the dining room outside of the actual

227

1   cafeteria where you purchase the food?

2   **A.**   Yes.

3   **Q.**   Now, had Andrew asked you to come out?

4   **A.**   Yes.

5   **Q.**   Was Andrew upset?

6   **A.**   He wasn't upset.  I think he seemed a

7   little nervous and wanted to have -- you know,

8   wanted somebody else out there, another manager

9   out there.

10   **Q.**   You left on the 27th.  When is the next

11   time something came up as to Mr. Harting?  If

12   you go home at 8:00 on the 27th, what's your

13   recollection as to the next incident or next

14   piece of --

15   **A.**   Well, it was on Thursday, the 29th.  Again,

16   I'll tell you what I know.  I was in the back

17   office, I was not in the cafeteria area, and

18   Tish came back.  The door was open, Tish came

19   back into the kitchen, and she was crying, she

20   was very upset, and so I just pulled her into

21   the office and asked her to explain to me -- I

22   didn't know what had happened.  She was very,

23   very upset.

24   **Q.**   What did she explain to you?

25   **A.**   She explained to me that he had just gone

228

1    through her line.

2    **Q.**    Who is "he"?

3    **A.**    I'm sorry.

4    **Q.**    Mr. Harting?

5    **A.**    Mr. Harting.  I'm sorry.  He had just been

6    through her line, and she said Andrew had had an

7    exchange with him and he used a meal ticket, and

8    she was very upset.  She thought that it had

9    been handled.  She thought it was handled two

10   nights prior, and that he was back through.  And

11   then she told me that -- then she told me that,

12   you know, she was upset because two nights ago

13   he was swearing at her, calling her a thief, and

14   she didn't understand why he was back.

15   **Q.**    Did she discuss any racial comments?

16   **A.**    Yes.

17   **Q.**    Tell us about that.

18   **A.**    She said that he called her a thieving "N"

19   word.

20   **Q.**    You can say it.  We understand you wouldn't

21   normally use it, but you can say it.

22   **A.**    A "thieving nigger"; and that he had used

23   the "F" word, she was an "f-ing thief."

24   **Q.**    Let me show you what's been marked as

25   Respondent's 2.  You can take a look at that and

229

1    verify what it is.  Do you recognize that?

2    **A.**    Yes.

3    **Q.**    What is that?

4    **A.**    Tish wrote this.  I asked Tish to write --

5    we asked Tish to write this.

6    **Q.**    Why would you ask her to write something

7    like that?

8    **A.**    It's just standard.  It's what we do.  If

9    there's ever any kind of incident or something

10   that happens, we always ask our employees,

11   anyone involved to write down their recollection

12   obviously while it's fresh in their mind.

13   **Q.**    So you're following your company procedure?

14   **A.**    Yes.

15   **Q.**    Did you tell her what to write down?

16   **A.**    No.

17   **Q.**    Did she write it down herself?

18   **A.**    She did.

19   **Q.**    That's her handwriting?

20   **A.**    Yes.

21   **Q.**    Did she go off by herself to write it or

22   how did it take place?

23   **A.**    I believe she did.  I think she sat in our

24   office and wrote it down so she wouldn't be

25   distracted.

230

1   **Q.**   What did you do next?  After she wrote this

2   down at your request, what did you do next?

3   **A.**   Well, you know, Andrew was kind of pulled

4   in at that point because we were both managers

5   on duty at that time.  And, again, it was in the

6   evening when it was happening and I was getting

7   ready to leave; and the next day I contacted Sue

8   immediately.

9           **MR. FELDMAN:**    You contacted who?

10          **MS. McDONNELL:**   Sue Peplowski.

11  **BY MR. CAMPBELL:**

12   **Q.**   Sue here?

13   **A.**   Yes.

14   **Q.**   She's our company representative sitting

15   next to me?

16   **A.**   Yes.

17   **Q.**   Why did you contact Sue?

18   **A.**   She's HR, so all of a sudden it escalated

19   into a heightened issue and I know that Sue

20   needed to know.  It's just protocol.

21   **Q.**   Why did you consider it a heightened issue?

22   **A.**   Well, because I had just learned that

23  Mr. Harting was abusive -- using abusive

24  language towards one of our employees that I

25  didn't know until Thursday, until the 29th.  I

231

1  didn't know that had happened.

2  **Q.**  The Respondent's Exhibit 3, the two photos,

3  why were those created?

4  **A.**  Well, I think, one, we needed -- we wanted

5  to identify who he was and move forward.  We

6  weren't quite sure if he was working with

7  construction, we weren't certain; and, two, we

8  wanted obviously to identify who this was so we

9  could address it.

10  **Q.**  How were they created?  Who actually did it

11  for you?

12  **A.**  Well, we have a computer system.  I think

13  Dave was in the office with me, Dave Hawk, the

14  other manager, and a gentleman from Protective

15  Service came up to teach us how to pull it up

16  and freeze frame it and put it in a picture.

17  **Q.**  So the freeze frames were made in order to

18  help identify the person?

19  **A.**  Yes.

20  **Q.**  Who did you send them to?

21  **A.**  Sue Peplowski.

22  **Q.**  Were you involved after that?  After

23  handing it off to Sue, was that the end of your

24  involvement, or what happened, if anything?

25  **A.**  Well, I think Sue and I talked.  I told her

232

1    what I knew, and she asked me to get statements,

2    which I did, and I got them to Sue.  So just,

3    you know, as far as reaching out to Andrew and

4    John Rivera and asking them to get statements

5    and collecting that for Sue, I don't recall

6    anything too much further than having that

7    discussion on -- I'm sorry.  I'm sorry.  We did

8    talk that we didn't want to have Mr. Harting

9    back into the cafeteria.

10   **Q.**   Who is "we"?

11   **A.**   Sue, Dan Ballard, our operations manager,

12   was involved with conversations with that, the

13   management team, you know.  We're a team, so we

14   were talking about what happened and all

15   concerned.

16   **Q.**   Did you agree with the conclusion that

17   Mr. Harting should not be permitted to return?

18   **A.**   Yes.

19          **MR. CAMPBELL:**    I don't have any

20   further questions at this time.

21                  CROSS-EXAMINATION

22   **BY MS. GRAGEL:**

23   **Q.**   Ms. Dougherty McDonnell, I'm Susan Gragel

24   and I represent Local 310.

25   **A.**   Hi.

233

1    **Q.**   On January 27th, 2009 when you were in the

2    seating area of the cafeteria, would that be

3    fair?

4    **A.**   Uh-huh.

5    **Q.**   You went there at Andrew's request.  How

6    far away were you from the place in the

7    cafeteria that Andrew was talking with

8    Mr. Harting?

9    **A.**   I think eventually the closest that I was

10   was probably like at the corner of this table

11   to, in relation to maybe where you're sitting.

12              **MS. GRAGEL:**      It looks to be,

13   Mr. Campbell, about 15 feet?

14              **MR. CAMPBELL:**    That's fine.

15   **BY MS. GRAGEL:**

16   **Q.**   Does that sound about right to you, 15

17   feet?

18   **A.**   I would say so.

19              **MR. FELDMAN:**     The witness doesn't

20   know, so continue on.

21   **BY MS. GRAGEL:**

22   **Q.**   Was Mr. Harting seated at a cafeteria table

23   at that time?

24   **A.**   Yes.

25   **Q.**   Was he seated with others?

234

1    **A.**    Yes.

2    **Q.**    Do you know how many others were seated

3    with him?

4    **A.**    I don't know.

5    **Q.**    And you were not able to overhear

6    everything that was said between Andrew and

7    Mr. Harting?

8    **A.**    No.  I think their conversation had started

9    before I even got up there.

10   **Q.**    There was nothing about that conversation

11   that caused you to initiate the report writing

12   phase of the process, true?

13   **A.**    True.

14   **Q.**    So whatever happened on January 27th didn't

15   cause you any concern as a manager?

16          **MR. CAMPBELL:**    Whatever happened

17   that she saw?

18          **MS. McDONNELL:**    Well, he was

19   clearly upset.  Andrew was handling it, our

20   manager, and I knew there was going to be a

21   follow-up.  Andrew had said that he would follow

22   up with him after the end of the night.

23   **BY MS. GRAGEL:**

24   **Q.**    And did you as a fellow manager counsel

25   Andrew to write up something that day?

235

1  **A.**   No.

2  **Q.**   Did you as a fellow manager counsel Andrew

3  to have Ms. Hanson write up something on that

4  day?

5  **A.**   No.

6  **Q.**   Did you recognize Mr. Harting as a patron

7  of the cafeteria when you saw him on January

8  27th even though you might not have known his

9  name?

10  **A.**   You mean had I seen him before?

11  **Q.**   Yes.

12  **A.**   No, I didn't recognize him.

13  **Q.**   When you are working on the 10 to 8 -- 10

14  to 8 is your normal shift?

15  **A.**   Uh-huh.

16  **Q.**   Do you work that five days a week, four

17  days a week?

18  **A.**   Five days a week.

19  **Q.**   When you work that shift, do you spend most

20  of your workday out on the floor where food

21  service is being done for the customers, or do

22  you spend most of your shift working in the back

23  area of the office?

24  **A.**   Mostly in the dining room.

25  **Q.**   So from the work that you do in the dining

236

1    room, did you know at that time that

2    construction workers were eating in the

3    cafeteria?

4    A.    It had not -- I had not noticed any, no.  I

5    didn't take any special note to that.

6    Q.    Did you know from your work as a manager

7    that University Hospital employees wear badges?

8    A.    Yes.

9    Q.    Did you know that construction workers wear

10    badges?

11    A.    I'm sure I did.  I don't know that I really

12    ever thought about it.

13    Q.    Do you know whether the badges are the same

14    for University Hospitals and construction

15    workers or different?

16    A.    I don't know for a fact, but I would guess

17    that they were different.

18    Q.    And during the several months before

19    January 27th, 29th of 2009 that you worked

20    there, did you see individuals wearing badges

21    that identify them as something other than

22    University Hospital employees?

23    A.    I don't recall specifically seeing that,

24    no.

25    Q.    And are you able to describe here for us

237

1   where in relation to the cafeteria the Neonatal

2   Intensive Care Unit that is under construction

3   is located?

4   **A.**   From inside the building, can I get to the

5   neonatal?

6   **Q.**   Yes.

7   **A.**   Yes.

8   **Q.**   And is it a far walk or a close walk?

9   **A.**   It's -- you walk out the cafeteria to a

10  hallway and you kind of shimmy over a little

11  bit.  It's not too far.  It's up the Charlie

12  Brown elevators, I think.

13  **Q.**   Is it close to McDonald Hospital?

14  **A.**   It's in Rainbow Hospitals, so --

15  **Q.**   Did you at any time look at the cash

16  register camera that was over Tish Hanson's cash

17  register on January 27th?

18  **A.**   We looked at a lot of footage.  I'm sure

19  that we did.

20  **Q.**   Did you at any time hear any audio

21  recordings of any encounter between Ms. Hanson

22  and Mr. Harting?

23  **A.**   No.

24  **Q.**   Was there any device in the vicinity of the

25  cash register that maintained audio recordings?

238

1    **A.**    No.

2    **Q.**    Did you work at the University Hospitals

3    cafeteria on Wednesday, January 28th?

4    **A.**    I did.

5    **Q.**    And did you have any -- I take it you were

6    to see Ms. Hanson on that day?

7    **A.**    Sure, yes.

8    **Q.**    And did she, on the day after the incident

9    with Mr. Harting and Ms. Hanson, seem fine to

10   you?

11   **A.**    Nothing stands out.

12   **Q.**    And the first time that Ms. Hanson appeared

13   upset to you was on January 29th, correct?

14   **A.**    Yes.

15   **Q.**    And that's when she became concerned

16   because Andrew had given a coupon or voucher to

17   Mr. Harting?

18   **A.**    That he was back in the cafeteria, yes.

19   **Q.**    Do you know whether Mr. Harting was in the

20   cafeteria on January 28th?

21   **A.**    If he was, I didn't see him.

22              **MS. GRAGEL:**      I have nothing

23   further.  Thank you.

24              **MR. FELDMAN:**      I have a few

25   questions for you.

239

1          **MR. CAMPBELL:**     I don't have any

2    questions.

3          **MR. FELDMAN:**     You have a security

4    system at the hospital, don't you?

5          **MS. McDONNELL:**    We do.

6          **MR. FELDMAN:**     Was there anything

7    that occurred on January 27th, 28th, 29th that

8    would have caused you to call them?

9          **MR. CAMPBELL:**     That she was aware

10   of?

11         **MR. FELDMAN:**     That she was aware

12   of.  That caused you to call them.

13         **MS. McDONNELL:**    We did call on --

14   to me, no, because I was -- when most of the

15   light was shed on this was the 29th.  I was with

16   Tish in the back room.  She had removed herself.

17   She was so upset she removed herself from the

18   situation, and I was kind of talking with Tish,

19   so I didn't feel at that point that we needed to

20   do that.

21         **MR. FELDMAN:**     Was there any

22   situation on January 27th, 28th, 29th --

23         **MS. McDONNELL:**    No.

24         **MR. FELDMAN:**     Thank you.  Thank

25   you very much for your testimony.

240

1          Next witness.

2                    SUSAN PEPLOWSKI

3    of lawful age, a witness herein, was examined

4    and testified as follows:

5              MR. FELDMAN:     For the record,

6    state your name.

7              MS. PEPLOWSKI:   Susan Peplowski.

8              MR. FELDMAN:     S-u --

9              MS. PEPLOWSKI:   -- s-a-n.

10    P-e-p-l-o-w-s-k-i.

11             MR. FELDMAN:     Somebody spells it

12    with an "F" in it.

13             MS. PEPLOWSKI:    I get it spelled

14    wrong all the time.

15             MR. FELDMAN:     Do you understand,

16    ma'am, that you're under oath?

17             MS. PEPLOWSKI:   Yes.

18             MR. FELDMAN:     You may inquire.

19             MR. CAMPBELL:    Thank you.

20                  DIRECT EXAMINATION

21    BY MR. CAMPBELL:

22    Q.   Sue, could you tell us who your employer

23    is?

24    A.   University Hospitals.

25    Q.   How long have you been employed by

241

1    University Hospitals?

2    **A.**    A little over four years.

3    **Q.**    And what is your current position?

4    **A.**    I'm a human resources manager.

5    **Q.**    And how long have you held that position?

6    **A.**    I was originally hired in as a human

7    resources generalist and I was promoted to

8    manager a year ago January.

9    **Q.**    So January 2008?

10    **A.**    Yes.

11    **Q.**    Briefly describe what an HR manager does.

12    **A.**    I support the operational areas of the

13    hospital, 16 departments, and I work with them

14    on everything.  I'm considered their human

15    resources lead, so it could be employee

16    relations issues, succession planning, anything

17    along those lines.

18    **Q.**    Okay.  Is the cafeteria at the main campus,

19    is that under your HR duties?

20    **A.**    Yes.

21    **Q.**    And so you heard Ms. Hanson here, you saw

22    Ms. Hanson and heard her testify, is she one of

23    the employees that you're ultimately responsible

24    for as an HR function?

25    **A.**    Yes.

242

1    **Q.**    Where is your office located?

2    **A.**    My office is in the MCCO Services Building.

3    It is on the site of campus that's closest to

4    the rapid track.

5    **Q.**    When you say "campus," it's down on Euclid

6    Avenue, main campus?

7    **A.**    Yes.

8    **Q.**    Now, just so we fully understand the

9    cafeteria.  The cafeteria sort of connects a

10   whole bunch of different buildings, right?

11   **A.**    Yes.

12   **Q.**    And people walking either directly to the

13   cafeteria or just to get from building to

14   building, they walk through that area?

15   **A.**    Yes.

16   **Q.**    High traffic?

17   **A.**    Yes.

18   **Q.**    Lots of employees, visitors, all types of

19   people in there?

20   **A.**    Yes, lots of children, families, patients,

21   visitors.

22   **Q.**    And Children's Hospital there at UH, what's

23   the name of it?

24   **A.**    Rainbow Babies & Children's.

25   **Q.**    You can walk through Rainbow and it's a

243

1    short walk to get to the cafeteria?

2    **A.**    Yes.

3    **Q.**    And NICU is part of Rainbow?

4    **A.**    Yes.

5    **Q.**    And that construction is going on right

6    there at Rainbow connected to the cafeteria?

7    **A.**    Yes.  It's completed now.

8    **Q.**    I want to ask you about some of the

9    policies and procedures.  We've been talking

10   about UH's policies and procedures.

11         Are you generally familiar with UH's

12   policies and procedures?

13   **A.**    Yes.

14   **Q.**    And part of your responsibility is for you

15   to identify that your management employees are

16   complying with those policies, right?

17   **A.**    Yes.

18   **Q.**    You investigate issues?

19   **A.**    Uh-huh.

20   **Q.**    Just say "yes."

21   **A.**    Yes.

22   **Q.**    And you make determinations as to whether

23   violations of policies have been -- I guess

24   employee or outside individuals have violated

25   those policies.

244

1   **A.**   Yes, I work with the management team when

2   the issues come up and work with the employees

3   to make sure things are managed appropriately.

4   **Q.**   I want to direct your attention to some of

5   the policies.

6           (Thereupon, Respondent's Exhibit 4

7            was marked for purposes of

8            identification.)

9   **BY MR. CAMPBELL:**

10  **Q.**   I'm handing you what's been marked as

11  Respondent's 4, and ask you to tell me what is

12  that policy?

13  **A.**   It's the Anti-Harassment and

14  Non-Discrimination policy.  It talks about

15  making sure that we act appropriately at work,

16  that we don't say anything racial or

17  inappropriate comments to other individuals,

18  don't treat them the wrong way.

19  **Q.**   Okay.  Now, I want to look at number 3

20  under policy on page 1.  See there that it

21  states, "Actions, words, jokes or comments," and

22  it goes through all those categories, "will not

23  be tolerated."

24  **A.**   That's correct.

25  **Q.**   And what is UH's human resources

245

```
 1   department's view as to use of racial slurs by
 2   employees and visitors on campus?
 3   A.   It's absolutely inappropriate; and under
 4   the corrective action policy it's a reason for
 5   discharge.
 6           MR. FELDMAN:      It's what?  I'm
 7   sorry.
 8           MS. PEPLOWSKI:    A reason for
 9   discharge.
10           MR. FELDMAN:      You sort of faded
11   off.
12           MS. PEPLOWKSI:    Sorry.
13   BY MR. CAMPBELL:
14   Q.   So if an employee of UH were to be found to
15   use the term "nigger," would they be subject to
16   discharge?
17   A.   Absolutely.
18   Q.   Is there a written warning before
19   discharge, or is that grounds for immediate
20   termination?
21   A.   That's grounds for immediate termination.
22   Q.   Is it any different for visitors on campus?
23           MS. GRAGEL:       Objection.
24   BY MR. CAMPBELL:
25   Q.   Any difference as to the zero tolerance
```

246

1    policy for visitors on campus?

2              **MR. FELDMAN:**      If you know.

3    What's your objection?

4              **MS. GRAGEL:**      Just that, that

5    there's no --

6              **MR. FELDMAN:**      What, if she

7    doesn't know?  You'll get a chance to test her

8    by way of cross-examination.

9              **MS. GRAGEL:**      That, and the

10   question as I heard it was a compound question,

11   visitors and employees.

12   **BY MR. CAMPBELL:**

13   **Q.**   I'll rephrase it.

14        Is that zero tolerance policy also

15   applicable to visitors on campus?

16   **A.**   That is a zero tolerance policy regardless.

17   **Q.**   And you've heard us talk about PLA.  Let's

18   look at the key point under HR-20, the very

19   first bullet point there.  Does by its terms

20   HR-20 apply to non-employees?

21   **A.**   Yes.

22   **Q.**   And have you applied HR-20 consistently as

23   to UH's zero tolerance for racial comments?

24   **A.**   Yes.

25   **Q.**   Has there ever been a time where an

247

1    employee, based on your investigation, has used

2    the term "nigger" but has not been discharged?

3    **A.**    I have not had a time when someone used

4    that word.  I have had other racial slurs that

5    the person was terminated, but not specifically

6    that word.

7    **Q.**    Would you expect that if somebody used that

8    word they would be discharged?

9    **A.**    Yes.

10   **Q.**    Without any written warnings before

11   discharge?

12   **A.**    Yes.

13                **MS. GRAGEL:**      Objection.  That's

14   a matter for the arbitrator.

15                **MR. CAMPBELL:**     I think UH's

16   policies are for UH, not for the arbitrator.

17   We're here to talk about our policies and the

18   way we apply our policies.

19                **MR. FELDMAN:**      The objection is

20   overruled.  The answer stands.  Next question.

21   **BY MR. CAMPBELL:**

22   **Q.**    Now I want to now move on to another of the

23   UH policies.

24                (Thereupon, Respondent's Exhibit 5

25                was marked for purposes of

248

1              identification.)

2  **BY MR. CAMPBELL:**

3  **Q.**   I've handed you what's been marked as

4  Respondent's Exhibit 5.  Can you tell us what

5  that document is?

6  **A.**   Workplace Violence.

7  **Q.**   Is that a UH policy?

8  **A.**   Yes.

9  **Q.**   And what types of conduct does this policy

10  prohibit?

11  **A.**   Intimidation, threats, physical attacks,

12  violence, property damage, weapons.

13  **Q.**   Let's look again at key points on page 1,

14  the first bullet point.  Is this policy by its

15  terms applicable to non-employees?

16  **A.**   Yes.

17  **Q.**   Is there a tolerance for threats or

18  intimidation at UH?

19  **A.**   No.

20  **Q.**   So this is, again, a zero tolerance policy?

21  **A.**   Uh-huh.

22  **Q.**   You have to answer "yes."

23  **A.**   Yes.

24  **Q.**   Has there been a time when you have found

25  based on your investigation that an individual

249

1    has intimidated or threatened another individual

2    that you have not recommended discharge?

3    **A.**   No.

4              **MR. CAMPBELL:**      Let me mark one

5    more.

6              (Thereupon, Respondent's Exhibit 6

7              was marked for purposes of

8              identification.)

9    **BY MR. CAMPBELL:**

10   **Q.**   The PLA also refers to UH's Code of Conduct

11   in paragraph 7 of the PLA.

12        Do you recognize this document that's been

13   marked as Respondent's 6?

14   **A.**   Yes.

15   **Q.**   And what is it?

16   **A.**   It's a Code of Conduct.

17   **Q.**   And are all of the documents that I've

18   shown to you, Exhibits HR-20, HR-43 and Code of

19   Conduct, are all of those published policies

20   that UH enforces?

21   **A.**   They're actually published on the Intranet.

22   **Q.**   Tell us about that.

23   **A.**   The hospital, in order to be cognizant of

24   too much paper usage because policies change

25   frequently, we have a Intranet where employees

250

1    can go and look up policies.

2    **Q.**    Do your duties and responsibilities as HR

3    manager include enforcement of these three

4    policies?

5    **A.**    Yes.

6    **Q.**    And are these policies true and correct

7    copies of the policies that were in effect in

8    January of 2009 when this incident took place?

9    **A.**    Yes.

10   **Q.**    Now, tell us about how you learned of the

11   issues with Mr. Harting.

12   **A.**    I received a call from Heather Dougherty I

13   believe it was first, on the 30th letting me

14   know that a situation had happened, that she had

15   not been aware of the seriousness of the

16   situation when it happened, but that she was

17   quite concerned because of information that

18   Lattisia had shared with her in regards to the

19   situation that happened.

20   **Q.**    And Heather, we heard her testify today?

21   **A.**    Yes.

22   **Q.**    Is it unusual for a Sodexho manager to

23   contact you for a UH issue?

24   **A.**    No, absolutely not.  I work very closely

25   with them.

1   **Q.**   Tell us, with Sodexho actually managing UH

2   employees, what is your relationship to the

3   cafeteria at UH on the main campus?

4   **A.**   I work very closely with the management

5   staff in the cafeteria and the employees.  I'm

6   there to make sure that we hold people

7   accountable to policy, and that the management

8   staff reacts appropriately when a situation

9   happens.

10  **Q.**   And we heard Heather talk about written

11  statements.  Was that at your direction?

12  **A.**   Absolutely.

13  **Q.**   And did Heather follow your policies and

14  procedures in this case?

15  **A.**   Yes.  Yes.  As soon as she found out about

16  the situation, she contacted me, and she already

17  had a written statement.

18  **Q.**   Based on your review of that statement, did

19  you get other statements as well?

20  **A.**   Yes.

21  **Q.**   What did you conclude that Mr. Harting --

22  what policies did Mr. Harting violate?

23  **A.**   Well, there's the Professional Behavior

24  Policy, HR-63, and also these two policies that

25  you've given me, Workplace Violence and

252

1    Anti-Harassment.

2    **Q.**   And HR-63 is what policy?

3    **A.**   Professional Behavior.

4    **Q.**   And describe that policy.

5    **A.**   It talks about how you're expected to

6    behave in the workplace, that you shouldn't be

7    threatening, shouting, that you're always

8    expected to act in a professional manner.

9    **Q.**   Now I want to turn to in the Code of

10   Conduct page 14 and just refer you to some of

11   the paragraphs there.

12        First of all, "Diversity and Equal

13   Employment Opportunity."

14        What's UH's position as to diversity and

15   Equal Employment Opportunity?

16   **A.**   Well, we try to be a leader in that area.

17   We really try to embrace diversity because we

18   have a lot of diverse patients and family

19   members coming in, so we need to be respectful

20   of different cultures and different heritages so

21   no one is offended.

22   **Q.**   Is it a core value at UH?

23   **A.**   Yes.

24   **Q.**   Now, Sue, if you go down further on page 14

25   under "Harassment and Workplace Violence," I

253

1   want to refer you to the arrows underneath the

2   paragraph, "Each of us has the right to work in

3   an environment free of harassment, intimidation

4   and workplace violence."

5   **A.**   Yes.

6   **Q.**   And there if we look at this, we first of

7   all prohibit degrading or humiliating jokes,

8   disparaging language, slurs, intimidation or

9   other harassing conduct, do you see that?

10  **A.**   Yes.

11  **Q.**   Is the use of the term "nigger" towards an

12  employee of UH a violation?

13  **A.**   Yes.

14  **Q.**   Is it a violation of HR-20?

15  **A.**   Yes.

16  **Q.**   Is it zero tolerance for such conduct?

17  **A.**   Yes.

18  **Q.**   If an employee partook in the conduct that

19  you understood that Mr. Harting partook in,

20  would he be subject to discharge?

21  **A.**   Yes.

22  **Q.**   Look further down, page 14 and go to the

23  fifth arrow on the second column, "Workplace

24  violence, including physical assaults, threat of

25  violence, stalking, robbery and other crimes,

254

1   violence directed at the employer, terrorism and

2   hate crimes."

3        When we see "threat of violence," did you

4   find that there was a violation of the workplace

5   violence policy here?

6   **A.**   I thought it was threatening -- from the

7   way the situation was described to me, it was a

8   threatening situation, so I would feel, yes.

9   **Q.**   Again, if an employee of UH partook in such

10  conduct and intimidated others, would they be

11  subject to discharge?

12  **A.**   Yes.

13  **Q.**   Are there warnings beforehand, or is this

14  immediate, zero tolerance?

15  **A.**   It's a zero tolerance.

16  **Q.**   So based on your knowledge as an HR

17  manager, is it your conclusion that Mr. Harting

18  violated UH's policies and procedures, including

19  but not limited to the Code of Conduct?

20  **A.**   Yes.

21  **Q.**   And I want to refer you to Joint Exhibit 1,

22  the PLA, and ask you to turn to page 3,

23  paragraph 7.  Are you on page 3, paragraph 7?

24  **A.**   Yes.

25  **Q.**   It states that the unions are going to

255

1    cooperate and the covered projects will be

2    completed in accordance with UH's policies and

3    procedures as may be amended from time to time

4    in UH's Code of Conduct.

5        Did Mr. Harting violate UH's policies,

6    procedures and Code of Conduct?

7    A.    Yes.

8    Q.    Was Mr. Harting treated any differently

9    than anybody -- any other employee or visitor to

10   UH who would have partook in the same conduct?

11   A.    Not that I'm aware of, no.

12   Q.    You heard Ms. Hanson testify here today?

13   A.    Yes.

14   Q.    Have your conclusion as to his violations

15   of the policy, procedures and Code of Conduct

16   changed in any way based on her testimony?

17   A.    No.

18   Q.    And did she describe conduct that violated

19   the policies, procedures and Code of Conduct of

20   UH?

21   A.    Yes, in a written statement.

22   Q.    Did she describe that here today in her

23   verbal testimony?

24   A.    Yes.

25   Q.    Now, you saw the photos that Heather

256

1    reviewed.  What were the photos used for?

2    **A.**    Well, I asked Heather -- when she called me

3    about the situation, I asked Heather to see if

4    there was tape on the incident so that --

5    because she wasn't sure when she talked to me

6    who the gentleman was.  So I asked her to see if

7    she could get photos on the incident so I could

8    send them to our director of new construction,

9    Tom Goins, to see if he could identify if the

10   male was a construction worker or a visitor.

11   **Q.**    Was Mr. Goins able to identify Mr. Harting?

12   **A.**    Yes.

13   **Q.**    Did you give a recommendation to the

14   construction department as to Mr. Harting's

15   continued involvement with UH?

16   **A.**    No, I did not.  I had a conversation with

17   them, I collected statements and sent them to

18   them; and I did let them know that this kind of

19   action in the University Hospitals employ would

20   not be tolerated.

21   **Q.**    And then the construction department at UH

22   made the determination as to Mr. Harting's

23   continued involvement with UH?

24   **A.**    Yes.

25                **MR. CAMPBELL:**    I don't have any

257

1    further questions.  Sue may have some questions

2    for you.

3                    CROSS-EXAMINATION

4    **BY MS. GRAGEL:**

5    **Q.**   You've talked here today, Ms. Peplowski,

6    about HR-20, HR-40, HR-63.  How many HR rules

7    are there?

8    **A.**   There are several.  I would say probably 30

9    or more.

10   **Q.**   Well, if they're numbered at least up to

11   HR-63, does that mean there's at least 63 of

12   them, or are there gaps in the numbers?

13   **A.**   No.

14   **Q.**   Yes, there are gaps?

15   **A.**   Yes.

16   **Q.**   But there's a lot?

17   **A.**   Yes.

18   **Q.**   As you sit here today, do you know how, if

19   at all, Mr. Harting received copies of those HR

20   rules and policies?

21   **A.**   I don't know.

22   **Q.**   You talked about the Intranet.  That's

23   different than the Internet, right?

24   **A.**   Yes.

25   **Q.**   It's spelled different?

258

1   **A.**   Yes.

2   **Q.**   The UH Intranet site in order to get access

3   to policies requires the individual to log in

4   with a password and identification number,

5   correct?

6   **A.**   No.

7   **Q.**   Does an outsider like me sitting here with

8   a laptop, can I get on the Intranet?

9   **A.**   If you are on hospital property, yes, you

10  can get on the Intranet.

11  **Q.**   Mr. Harting from his home would not be able

12  to access the Intranet, correct?

13  **A.**   I don't believe so, no.  I'm not an IT

14  expert.

15  **Q.**   Do you know whether Mr. Harting, as a

16  construction worker assigned to this site, was

17  given access to the Intranet at any time during

18  his orientation process?

19  **A.**   I don't know.

20  **Q.**   You know he did not work for University

21  Hospitals, correct?

22  **A.**   Yes.

23  **Q.**   You know he was not under an independent

24  contractor agreement with University Hospitals?

25  **A.**   I don't know.

259

1   **Q.**   Do you know what an independent contractor

2 agreement is from your work as an HR person?

3   **A.**   Not from my work as an HR person.

4   **Q.**   Do you know what an independent contractor

5 agreement is?

6   **A.**   Yes.

7   **Q.**   What is it?

8   **A.**   It's an agreement where a person comes in

9 and works for the hospital but is not employed

10 directly by the hospital.

11   **Q.**   And is that defined in the HR policies of

12 University Hospitals?

13   **A.**   It's possible.

14   **Q.**   Do you know where in the policies it is

15 defined?

16   **A.**   No.

17   **Q.**   You have been asked during the course of

18 your testimony this afternoon about Respondent's

19 Exhibit 4, which is HR policy 20.  Do you have

20 it handy?

21   **A.**   Yes.

22   **Q.**   In the key points section, does it refer to

23 visitors?

24   **A.**   No.

25   **Q.**   Does it refer to patients?

260

1   **A.**   No.

2   **Q.**   And you referenced contractors.  Is that a

3   reference to the independent contractors that we

4   just discussed or don't you know?

5   **A.**   I would imagine that it is, but I'm not

6   going to say positively.

7   **Q.**   Did you look up the definition of

8   contractors when you made a recommendation to

9   your superiors as to the way the Mike Harting

10   incident should be handled?

11   **A.**   I did not make a recommendation to them.  I

12   informed them of how the situation would have

13   been handled had it been an employee.

14   **Q.**   And at the time you gave that information,

15   you did that knowing that Mr. Harting was not a

16   University Hospitals employee?

17   **A.**   Yes.

18   **Q.**   Did you at the time that you made your

19   review of the situation look at the Project

20   Labor Agreement?

21   **A.**   No.

22   **Q.**   Did you look at the work rules of Gilbane

23   that are attached to the Project Labor

24   Agreement?

25   **A.**   No.

261

1   **Q.**   Have you at any time prior to today looked

2   at the Project Labor Agreement and all of its

3   attachments?

4   **A.**   No.

5   **Q.**   Was it of significance to you to know what

6   the Project Labor Agreement and Gilbane Safety

7   Plan provided as you were reporting on this

8   incident to your superiors?

9   **A.**   No.  I was concerned with my employee and

10  the way she had been treated.

11  **Q.**   And as you looked into that concern of your

12  employee, was it important for you to get a true

13  sense of the facts?

14  **A.**   I had that from a written statement from

15  her.

16  **Q.**   Would it have been important for you to

17  talk directly with her?

18  **A.**   I didn't feel it was necessary, no.  I felt

19  that her statement was very clear and had

20  pertinent information in it.

21  **Q.**   So did you talk to her immediate

22  supervisor, Andrew Powel?

23  **A.**   I talked to Andrew briefly and I also

24  talked to Heather.

25  **Q.**   Did you talk in person to anyone else

262

1    before you forwarded this packet of information

2    to your supervisors?

3    **A.**   I had spoken -- before I forwarded what

4    packet of information?

5    **Q.**   The details as to what happened and how

6    Mr. Harting would be treated if he had been a UH

7    employee.  You gave that to somebody, right?

8    **A.**   I spoke with Mr. Goins in regards to the

9    situation, I sent him pictures so we could

10   determine who it was.  And I also spoke to

11   Mr. Ballard, who is the direct manager over the

12   retail services area.

13   **Q.**   You did not talk to anybody from Gilbane?

14   **A.**   No.

15   **Q.**   You didn't talk to anybody from Ozanne?

16   **A.**   No.

17   **Q.**   You didn't talk to anybody from Laborers

18   Local 310?

19   **A.**   No.

20   **Q.**   You didn't talk to anybody from Rivera

21   Construction?

22   **A.**   No.

23   **Q.**   You don't know anybody from Rivera

24   Construction?

25   **A.**   No.

263

1    Q.   You were asked some questions about
2    Respondent's Exhibit 6, the Code of Conduct.  Do
3    you have that handy?
4    A.   Yes.
5    Q.   Page 14, please.  The bottom paragraph,
6    Ms. Peplowski, on page 14 reads, "If you have
7    concerns that you or a fellow employee may be a
8    potential target of physical violence by a third
9    party," then it goes on to say, "or concerns
10   that a patient or visitor may act violently, you
11   must report these concerns to your supervisor or
12   to Protective Services."  Do you see that?
13   A.   Yes.
14   Q.   After you learned through the receipt of
15   the written report and your communications with
16   Heather on January 29th, did you counsel Andrew
17   Powel about his failure to make any report to
18   human resources or supervisors on January 27th?
19   A.   I actually spoke to his supervisor, Dan
20   Ballard, and let him know that I was not pleased
21   with the way he had handled the situation; and I
22   asked Dan to counsel him since he was a Sodexho
23   employee and an employee of Dan.
24   Q.   And you did that because you recognized
25   that no one on January 27th had come forward to

264

1    anybody about anything, correct?

2    **A.**    Correct.

3              **MS. GRAGEL:**      Thank you.  Nothing

4    further.

5              **MR. FELDMAN:**      I just have a

6    question or two.

7              Are all of the procedures that you've

8    caused to be placed in the record, which are in

9    your lap, was it your thought that these apply

10   to an employee as the grievant is here without

11   having had the opportunity of giving him the

12   published procedures?

13             **MS. PEPLOWSKI:**     I can only speak

14   about employees.  All employees are directed

15   that they need to review policies and procedures

16   that are on the Intranet.

17             **MR. FELDMAN:**      Ma'am, in order for

18   a rule to be broken, a person has to know about

19   the rule.  Rules have to be published, they have

20   to be reasonable and they have to be

21   evenhandedly applied.  And in this particular

22   case, what opportunity did the grievant have of

23   viewing all of these rules?

24             **MS. PEPLOWSKI:**    My thought is it's

25   common sense that you act professionally when

1   you're in a professional business.

2          MR. FELDMAN:    Now you're talking

3   common sense, but a moment ago you were talking

4   about a written rule.

5          What opportunity did the grievant

6   have in reviewing the rules of the workplace in

7   written form as you've published them here?

8          MS. PEPLOWSKI:    He wasn't a person

9   that I would work with.  I would think that is

10  up to the construction company to provide you

11  with that information.

12         MR. FELDMAN:    Well, the only

13  point I make is that the employer -- or the

14  hospital is complaining about conduct contrary

15  to rule when the individual wasn't given the

16  opportunity to review the rules prior to the

17  discipline being meted out.

18         MS. PEPLOWSKI:    I don't know that

19  he wasn't given the opportunity because I didn't

20  deal with him.  I don't know what opportunity he

21  was given.

22         MR. FELDMAN:    Let me approach it

23  a different way.  Maybe I'm not making myself

24  clear.

25         You expected the employer

266

1   construction workers to be cognizant of your

2   rules, written rules; is that a fair statement?

3            MS. PEPLOWSKI:   Yes.

4            MR. FELDMAN:      How do they get

5   knowledgeable?

6            MS. PEPLOWSKI:   Through their

7   contact with Gilbane and through that process

8   when they're hired into the property.

9            MR. FELDMAN:      They're given

10  copies of these?

11           MS. PEPLOWSKI:   I don't know if

12  they're given copies of those, but I know

13  that -- I have been told that they have

14  conversations as to the expectation of

15  professional behavior.

16           MR. FELDMAN:      But you have no

17  personal knowledge whether or not they --

18           MS. PEPLOWSKI:   No, I don't.

19           MR. FELDMAN:      Would it be a

20  surprise to you if you couldn't produce any

21  evidence to show publication to the employee?

22           MS. PEPLOWSKI:   I really don't -- I

23  can't say.  I don't know one way or another

24  because they are on the Intranet, and anyone on

25  the property has access to them, so I don't know

R000599

267

1    what kind of access he would have had.

2              **MR. FELDMAN:**     Thank you.

3              Any further questions?

4              **MR. CAMPBELL:**     Yes.  I have a few

5    follow-up to that.

6                   REDIRECT EXAMINATION

7    **BY MR. CAMPBELL:**

8    **Q.**   First of all, if you could turn to the

9    Project Labor Agreement, Joint Exhibit 1,

10   paragraph 7, page 3, paragraph 7.

11   **A.**   Okay.

12   **Q.**   Am I reading correctly that the unions are

13   to partake in the construction of this project

14   in accordance with UH's policies and procedures

15   and UH's Code of Conduct?

16   **A.**   Yes.

17   **Q.**   And I think you've said it.  The union has

18   told Mr. Harting to act as a gentleman.  From an

19   HR standpoint, is that consistent with acting as

20   a professional?

21   **A.**   Yes.

22   **Q.**   Treating people correctly --

23   **A.**   Respect them.

24   **Q.**   Gilbane telling him to treat others as the

25   way he would treat his family and best friends.

268

1   **A.**   Yes.

2   **Q.**   Is that in any way consistent with HR-20 or

3   the professionalism conduct or the Code of

4   Conduct --

5   **A.**   Yes.

6   **Q.**   -- or any of the policies we reviewed?

7   **A.**   Yes.

8   **Q.**   It's consistent with that?

9   **A.**   Uh-huh.

10   **Q.**   And if you're treating somebody as you'd

11   like to be treated, you're going to be complying

12   with the HR-20 and the Workplace Violence policy

13   and all the others; is that right?

14   **A.**   Yes.

15   **Q.**   If a visitor came on the campus who was

16   visiting a patient and partook in the same

17   conduct of Mr. Harting, would that visitor be

18   excluded in your view?

19   **A.**   Yes.

20   **Q.**   And that visitor may not have seen the

21   policies, did they?

22   **A.**   Right.

23   **Q.**   And you're an experienced HR professional.

24   If somebody visits the cafeteria, uses racial

25   epithets, threatens your employees, is there any

269

1    legal defense that says, "Hey, sorry, we can't

2    do anything about it; that person wasn't

3    familiar with our policies so we have to live

4    with it"?

5    **A.**   No, absolutely not.

6    **Q.**   So if this employee turned to UH and said

7    that you're putting me out there as the victim

8    of harassment and violence, UH could be subject

9    to a lawsuit?

10   **A.**   Yes.

11           **MR. CAMPBELL:**    I don't have any

12   further questions.

13           **MR. FELDMAN:**    Anything further of

14   this witness?

15                   RECROSS-EXAMINATION

16   **BY MS. GRAGEL:**

17   **Q.**   This Project Labor Agreement, Joint

18   Exhibit 1, contains, you know, 100 or so pages

19   with a lot of rules and policies, drug testing,

20   Workers' Compensation and elaborate rules about

21   safety, and you know, because you've been here

22   today, do you not, that there are disciplinary

23   procedures as part of this Project Labor

24   Agreement?

25   **A.**   Yes.

270

1   **Q.**   Wouldn't you expect as an HR person for an

2   individual like Mr. Harting or his union to say

3   this is the document we follow, Joint Exhibit 1?

4   **A.**   I would think that based on how the

5   document reads that they need to follow this

6   document and the other ones that are referenced.

7   **Q.**   And how, if you know, would Local 310,

8   which has its office down at 32nd and Euclid

9   Avenue, get access to your University Hospitals'

10  Intranet?

11  **A.**   You could come on site and access it.

12          **MS. GRAGEL:**       Nothing further.

13          FURTHER REDIRECT EXAMINATION

14  **BY MR. CAMPBELL:**

15  **Q.**   If Local 310 said, "We want to train our

16  employees on UH's policies, procedures and Code

17  of Conduct," would you refuse to give them those

18  policies?

19  **A.**   No.

20  **Q.**   If Local 310 asked you to come out and give

21  training to their employees that are going to be

22  on site, would you have refused such requests?

23  **A.**   No.

24  **Q.**   Do you think that if you're going to send

25  your union employee into a work site, it would

271

1   be reasonable to verify what that owner and what

2   that work site expects from your employees?

3   **A.**   Yes.

4           MR. CAMPBELL:    I don't have any

5   further questions.

6           MR. FELDMAN:    Next witness.

7   Thank you very much.

8           (Thereupon, a recess was taken.)

9              MARGARET HEWITT

10  of lawful age, a witness herein, was examined

11  and testified as follows:

12          MR. FELDMAN:    Your name is?

13          MS. HEWITT:    Margaret Hewitt?

14          MR. FELDMAN:    H-e-w --

15          MS. HEWITT:    -- i-t-t.

16          MR. FELDMAN:    And you understand

17  that you are under oath?

18          MS. HEWITT:    Yes, I do.

19          MR. FELDMAN:    You may inquire.

20          MR. CAMPBELL:    Thank you.

21             DIRECT EXAMINATION

22  BY MR. CAMPBELL:

23  **Q.**   Where are you employed?

24  **A.**   University Hospitals.

25  **Q.**   And how long have you been employed by

272

1    University Hospitals?

2    **A.**    Two years.

3    **Q.**    And what is your position?

4    **A.**    I'm vice president of construction

5    services.

6    **Q.**    And how long have you held that position?

7    **A.**    For two years.

8    **Q.**    And tell us in simple terms what are your

9    duties and responsibilities?

10   **A.**    I am responsible for all construction that

11   occurs at University Hospitals, that is, the

12   main campus, six community hospitals and all of

13   our ambulatory facilities.

14   **Q.**    Now, we've heard about Vision 2010.  Is

15   that part of your responsibilities?

16   **A.**    Yes, it is.

17   **Q.**    What is Vision 2010?

18   **A.**    Vision 2010 is a strategic program that has

19   been put together to build two new hospitals.

20   One is the Ahuja Medical Center in Beachwood,

21   the second is a cancer hospital.  We also

22   relocated our Neonatal Intensive Care Unit from

23   the second floor of Rainbow Babies and

24   Children's Hospital to the fourth floor, and we

25   are relocating our Center for Emergency Medicine

273

1    from the core of our facility to the front door

2    at Euclid.

3    **Q.**   Is this a large project?

4    **A.**   It is.  It's approximately $800 million in

5    construction.

6    **Q.**   Is it a high-profile project?

7    **A.**   Very much so, yes.

8    **Q.**   Have you been involved with city and county

9    political figures as to this construction

10   project?

11   **A.**   We have been involved in all levels of

12   government, Federal, state, county, city, as

13   well as local UCI district, University Circle.

14   **Q.**   I want to direct your attention to Joint

15   Exhibit 1.  Mr. Billington is going to hand it

16   to you.  I want to ask you a question.

17        Have you seen that document before today?

18   **A.**   Yes, I have.

19   **Q.**   And what is Joint Exhibit 1?

20   **A.**   It is our Project Labor Agreement.

21   **Q.**   Now, if we turn on this one to Attachment A

22   on page 15 --

23   **A.**   Yes.

24   **Q.**   -- is this the City of Cleveland Project

25   Labor Agreement?

274

1    **A.**    Yes, this is.

2    **Q.**    And the covered projects for this include

3    the projects that are being completed with

4    construction projects at the main campus at

5    Euclid Avenue?

6    **A.**    Yes.

7    **Q.**    Now, were you involved in the negotiation

8    of the Project Labor Agreement?

9    **A.**    Yes, I was.

10   **Q.**    If I could turn to the next attachment,

11   Attachment B on page 16, tell us a little bit

12   about -- I don't need to know the specifics, but

13   a little bit about Attachment B.

14   **A.**    Attachment B is what we've included as a

15   part of the three-party negotiations between the

16   City of Cleveland, University Hospitals and the

17   labor unions.  It addresses our community

18   effort, our diversity goals and our local hiring

19   in terms of helping to build the economy.

20   **Q.**    Are diversity and equal opportunities

21   important values at UH?

22   **A.**    Very much so.

23   **Q.**    Would they be considered core values?

24   **A.**    Yes.

25   **Q.**    Would diversity, is that a major reason for

275

1    the Project Labor Agreement, diversity issues?

2    **A.**    Yes, it was.

3    **Q.**    And Attachment B and some other paragraphs

4    of this Project Labor Agreement set forth

5    paragraphs that address diversity and issues

6    relating to diversity?

7    **A.**    Yes, they do.

8    **Q.**    Now, I want to refer you to page 3 of the

9    Project Labor Agreement, paragraph 7.  I want

10   you to read paragraph 7 to yourself and let me

11   know once you've read through it, paragraph 7 on

12   page 3.

13   **A.**    (Witness complies with request.)

14        Okay.

15   **Q.**    See the reference on page -- on line 5 that

16   the construction project is going to be

17   completed in accordance with UH's policies,

18   procedures and Code of Conduct?

19   **A.**    Yes.

20   **Q.**    And was that a term negotiated by

21   University Hospitals when negotiating this

22   Project Labor Agreement?

23   **A.**    Yes, it was.

24   **Q.**    Now, we're here today as to Mr. Harting,

25   and I want to ask you, how did you become

276

1   familiar with Mr. Harting?

2   **A.**   I was informed via e-mail that came to my

3   desk that said that there was an altercation

4   with an employee in our cafeteria, and attached

5   to that was the investigation and the report --

6             **MR. FELDMAN:**     Was the word

7   "altercation" used?

8             **MS. HEWITT:**     Sorry?

9             **MR. FELDMAN:**     Was the word

10  "altercation" used, or is that your phraseology?

11            **MS. HEWITT:**     I can't recall, so

12  I'll have to say that's my phraseology.

13  **BY MR. CAMPBELL:**

14  **Q.**   Was it your understanding that Mr. Harting

15  used any racial epithets?

16  **A.**   Yes.

17  **Q.**   Was Mr. Harting's altercation with a UH

18  employee?

19  **A.**   Yes.

20  **Q.**   Was it your understanding that Mr. Harting

21  used any other derogatory terms other than

22  racial slurs, like thief or anything else?

23  **A.**   Yes.  My understanding was that he used

24  curse words, he called her a thief, as well as

25  racial terms, yes.

277

1   **Q.**   And is it your understanding that

2   Mr. Harting was angry?

3   **A.**   Yes.

4   **Q.**   Is it your understanding that the UH

5   employee felt intimidated?

6   **A.**   Yes.

7   **Q.**   Now, Ms. Peplowski --

8           **MR. FELDMAN:**     I would be much

9   happier if we wouldn't have a bunch of "yes" and

10  "no" answers.

11          **MR. CAMPBELL:**     Okay.

12  **BY MR. CAMPBELL:**

13  **Q.**   Are you familiar with Sue Peplowski?

14  **A.**   Yes, I am.

15  **Q.**   Ms. Peplowski testified that she didn't

16  make the decision as to Mr.  Harting.

17         Who made the decision as to Mr. Harting's

18  continued association with UH?

19  **A.**   I did.

20  **Q.**   What was your decision?

21  **A.**   My decision was to have him removed from

22  any UH construction projects that were going on

23  at the main campus.

24  **Q.**   If you could tell the arbitrator why did

25  you make that decision?

278

1    **A.**    I made that decision because the

2    construction workers are guests to the UH

3    campus.  They come in to do work, to work on a

4    project, and anyone who comes to our campus

5    should be respectful of the employees who work

6    there and the patients and their families.  We

7    have given instructions to the construction

8    workers not to leave the job sites really; and

9    so we understand that sometimes people go to the

10   cafeteria, which is against the policy we've

11   issued; but you are to be respectful and to

12   behave in a respectful way to all employees and

13   to all patients and their families at University

14   Hospitals.

15   **Q.**    And what was your conclusion as to

16   Mr. Harting's conduct?

17   **A.**    That it was disrespectful; and the

18   impression I got is it was threatening to that

19   employee.  She felt intimidated and threatened.

20   **Q.**    As to University Hospitals, what is its

21   view as to the use of racial slurs?

22   **A.**    100 percent unacceptable.

23   **Q.**    Would it surprise you to hear that the

24   unions are saying that they were unaware of UH's

25   policies as to diversity and racial tolerance?

279

1              MS. GRAGEL:      Objection.  I don't

2      think that's been said.

3              MR. CAMPBELL:      I'll put some

4      background.

5      BY MR. CAMPBELL:

6      Q.    Are you familiar with John Gilbane?

7      A.    Yes.

8      Q.    Are you familiar with Terry Joyce?

9      A.    Yes.

10     Q.    Are they representatives, leaders of Local

11     310 Laborers?

12     A.    Yes.

13     Q.    Have you had meetings where you've

14     discussed diversity and UH's --

15     A.    I have not had a meeting with John Gilbane,

16     but I have had several meetings with Terry

17     Joyce.

18     Q.    Have you made clear to Terry Joyce UH's

19     views on discrimination?

20     A.    Yes.

21     Q.    Would it surprise you that Local 310 of the

22     Laborers did not understand UH's policy against

23     discrimination and intimidation and violence?

24              MS. GRAGEL:      Objection.  There's

25     been no testimony in the record as to 310

280

1  claiming that they don't understand that UH has

2  a policy.  That's not -- there's been no witness

3  who has testified on that subject.

4          MR. CAMPBELL:     Then she can answer

5  it then.  It will be consistent with your

6  position.

7          MS. HEWITT:      Do you want me to

8  answer the question?

9          MR. FELDMAN:     Answer the

10 question.  There's been testimony here that --

11 there's a bunch of manuals placed into the

12 record by your HR manager in this hearing that

13 the code of responsibility or --

14         MR. CAMPBELL:  Code of Conduct.

15         MR. FELDMAN:   -- Code of Conduct

16 that has all kinds of thoughts in it concerning

17 diversity and racial slurs and what have you,

18 but when asked if they've ever been disseminated

19 to the union, the answer was no.  Now, you're

20 going to tell us that you've had conversations,

21 but have you ever -- let's get those items,

22 those manuals in front of the witness.  Hand

23 them to the witness.  You're familiar with those

24 I'm sure, aren't you, ma'am?

25         MS. HEWITT:      Yes, I am.

R000613

281

1          **MR. FELDMAN:**      Were those

2     disseminated to union?

3          **MS. HEWITT:**      I don't know.

4          **MR. FELDMAN:**      Well, they talk

5     about the things that you're talking about.  And

6     one of the bases for discipline is knowledge of

7     a rule that you're breaking, and the rules

8     evidently are in those manuals, although I

9     haven't read them.  But without knowledge of

10    them, you can hardly be breaking them.

11          **MS. HEWITT:**      Well, one of the

12    things that we did as construction services is

13    we asked for the construction workers not to

14    leave the construction sites so they don't have

15    to know all of these rules.  If no one goes to

16    the cafeteria or you go anyplace other than your

17    job site, you don't interact with any UH

18    employees, you don't interact with any UH

19    patients.  So we felt that was a way to keep

20    everyone from having to memorize everything

21    about UH, that if you stayed restricted to your

22    construction site where we don't allow UH

23    employees, unless they're construction services

24    employees, to enter, then we wouldn't have that

25    interaction.  So we tried to limit that

282

1    interaction in that way.

2            MR. CAMPBELL:    Can I go on?

3            MR. FELDMAN:    Yes.  I just want

4    you to know that I'm paying close attention to

5    this issue of knowledge.

6            MR. CAMPBELL:    Well, I think the

7    Project Labor Agreement, it explicitly --

8            MR. FELDMAN:    I haven't had a

9    chance to read it, but I will.

10           MR. CAMPBELL:    -- applies them.

11   And if the unions are sending their members on

12   campus and they have doubts, then they should do

13   it and ask.

14   BY MR. CAMPBELL:

15   Q.   Let me ask you this:  Was Mr. Harting and

16   other Local 310 Laborers permitted to be in the

17   cafeteria to eat?

18   A.   According to our rules, no.

19   Q.   And that's part of the overall rule of

20   they're not to be interacting with patients and

21   visitors and employees?

22   A.   Correct.

23   Q.   If Terry Joyce and Local 310 had asked your

24   construction services department to review UH's

25   policies and procedures and Code of Conduct,

283

1   would you have objected to that request?

2            MS. GRAGEL:        Objection.  There's

3   no foundation on the record for that kind of

4   question.

5            MR. FELDMAN:       You may answer.

6            MS. HEWITT:        No, we would not

7   have objected to that.

8   BY MR. CAMPBELL:

9   Q.   Has Local 310 ever asked to review the

10  policies and procedures to your knowledge?

11  A.   No.

12  Q.   Has Local 310 ever informed you that they

13  were unaware that other employees were not to

14  use racial epithets on campus?

15  A.   No.

16  Q.   Has Local 310 or any of the unions ever

17  informed you that they were unaware that their

18  employees were not to intimidate UH employees,

19  visitors or patients?

20  A.   No.

21  Q.   Is it common sense that a construction site

22  would prohibit such conduct towards employees,

23  visitors and patients?

24            MS. GRAGEL:        Objection.  We've

25  got real leading here.

284

1    **BY MR. CAMPBELL:**

2    **Q.**   How long have you been involved in

3    construction?

4    **A.**   Twenty years.

5    **Q.**   Have you been involved as -- what forms,

6    owner of construction companies?

7    **A.**   I've been an owner and I worked at an

8    architectural firm.

9              **MR. FELDMAN:**     What, ma'am?

10             **MS. HEWITT:**      An architectural

11   firm.

12   **BY MR. CAMPBELL:**

13   **Q.**   Is it unusual that owners expect

14   construction workers to treat their employees

15   and customers with respect?

16   **A.**   No, it's not.

17             **MS. GRAGEL:**      Objection.

18             **MR. CAMPBELL:**    I don't know how

19   there's an objection.  Local 310 has advised its

20   own member who has testified here today of that

21   very same point, yet I heard Local 310 arguing

22   that somehow they are unaware of acting

23   professional.  So if they want to waive the

24   argument, then I'm happy --

25             **MS. GRAGEL:**      The basis for my

285

1   objection is form.  We've now led this witness

2   for about ten minutes, and what she knows and

3   what she knows about 310 I think is valid, but

4   if, if, if.  If Mickey Mouse walks in the room,

5   there may be an "if" there, too.

6          **MR. FELDMAN:**      We're all getting

7   tired.  Are there any further questions?

8   **BY MR. CAMPBELL:**

9   **Q.**   Based on your 20 years of experience in the

10   construction industry, would it be surprising to

11   you that a union would take the position that

12   its members were unaware that they needed to act

13   professionally when on an owner's site?

14   **A.**   It would surprise me.

15   **Q.**   Would it surprise you that in this day and

16   age that a union would take the position that

17   its members were unaware they should not be

18   using racial epithets while on the work site?

19   **A.**   That would surprise me.

20   **Q.**   If Local 310 is taking the position that

21   its employees may use racial epithets while on

22   site, does UH have a problem with permitting

23   Local 310 employees on the work site?

24          **MS. GRAGEL:**      Objection.

25          **MR. FELDMAN:**      Next question.

286

1          **MR. CAMPBELL:**    I don't have any
2   further questions.
3          **MR. FELDMAN:**    Anything of this
4   witness?
5          **MS. GRAGEL:**    Yes.  Thank you.
6              CROSS-EXAMINATION
7   BY MS. GRAGEL:
8   **Q.**   Vice President Hewitt, when you joined
9   University Hospitals, that would have been
10  sometime in June 2007?
11  **A.**   It was April 2007.
12  **Q.**   And when you got to your position, did your
13  duties include participating in the negotiations
14  over the terms of the Project Labor Agreement?
15  **A.**   Yes.
16  **Q.**   And did you attend various meetings about
17  that project?
18  **A.**   Yes, I did.
19  **Q.**   And ultimately the negotiations resulted in
20  the document that's been marked Joint Exhibit 1?
21  **A.**   Yes.
22  **Q.**   And do you know during those negotiations
23  that University Hospitals was represented by
24  Mr. Campbell and his law firm?
25  **A.**   Yes.

287

1    **Q.**   Do you know who prepared the typed version

2    of the document that ultimately was signed and

3    is now marked here as Joint Exhibit 1?

4    **A.**   The individual who prepared it?

5    **Q.**   Do you know who drafted it?

6    **A.**   No, I don't know the individual who drafted

7    it.

8    **Q.**   Did you play any role, Vice President

9    Hewitt, in reviewing the final document to make

10   sure that it matched what had been discussed and

11   was appropriate for signature?

12   **A.**   Yes, I did.

13   **Q.**   And as part of that review, Ms. Hewitt, did

14   you assure that all of the attachments that

15   needed to be part of the agreement were attached

16   to it?

17   **A.**   No, I did not.

18   **Q.**   In your role as the vice president of

19   construction for the University Hospitals

20   project, do you interact with Gilbane?

21   **A.**   I do.

22   **Q.**   Do you have a specific person or a group of

23   people that you interact with at Gilbane?

24   **A.**   I do.

25   **Q.**   Who are those?

288

1   **A.**    Mr. Tom Lair, Mr. John Sosnowski, Mr. Roger

2   Brown.

3   **Q.**    And are you familiar with what's attached

4   to the Project Labor Agreement as Exhibit D,

5   which is the Gilbane Project Safety Plan?

6   **A.**    Yes.  I know that that is attached.

7   **Q.**    It's dated August 27, 2007.

8        Did you review this document to be sure

9   that it was appropriate for use at the Vision

10  2010 construction projects before it was

11  implemented?

12  **A.**    I cannot recall the level of review I gave

13  this document.

14  **Q.**    You have reviewed?

15  **A.**    I cannot recall the level of review, but,

16  yes, I have seen it.  I'm familiar with it.

17  **Q.**    On page 15 of 67 of Exhibit D, Ms. Hewitt,

18  have you reviewed this page in connection with

19  any of your work as the vice president of

20  construction, this disciplinary page?

21  **A.**    I have not used this page, no.

22  **Q.**    Did you review it at any time before making

23  a decision regarding the removal of Mr. Harting

24  from UH job sites?

25  **A.**    No, I did not because I did not ask Gilbane

289

1   to execute the decision.  I made that decision.

2   **Q.**  Did you communicate that decision to

3   Mr. Harting?

4   **A.**  Not directly, no.  I communicated it to

5   Gilbane.

6   **Q.**  With the expectation that Gilbane would

7   then act upon it?

8   **A.**  Correct.

9       **MR. FELDMAN:**    Is Gilbane a

10   signatory to that agreement?

11       **MS. HEWITT:**    No, they are not.

12   **BY MS. GRAGEL:**

13   **Q.**  And Gilbane's role on the project as you

14   understand it is construction manager?

15   **A.**  Correct.

16   **Q.**  And in a short version, what does a

17   construction manager do for University Hospitals

18   on these projects?

19   **A.**  A construction manager is responsible for

20   negotiating and executing all of the contracts

21   for construction, and then they manage the work

22   that is delineated in those contracts.

23   **Q.**  When you contacted Gilbane with the

24   instructions that they remove Mr. Harting, did

25   you ask Gilbane to check to make sure that the

290

1    removal would be handled in accordance with the

2    safety plan?

3    **A.**    No, I did not.

4    **Q.**    The decision, according to the testimony,

5    to remove Mr. Harting from the job site was made

6    in very early February 2009.  Does that match

7    your memory as to about when that took place?

8    **A.**    Yes.

9    **Q.**    And you made that decision after you

10   reviewed an e-mail and some written materials?

11   **A.**    The attached investigation report, the

12   video that was attached, as well as the

13   complaint that was written by the cashier.

14   **Q.**    And in that packet of materials, was there

15   a statement from Mr. Harting regarding his

16   version of events?

17   **A.**    I don't recall if there was a statement

18   from Mr. Harting.

19   **Q.**    Did you have in your possession at the time

20   you made your decision to remove him information

21   from or on behalf of Mr. Harting that indicated

22   that he denied using any racial epithet to any

23   individual on the campus?

24   **A.**    I do have that understanding that he has

25   denied that.

291

1    **Q.**    Did you talk with him to find out what he

2    said happened?

3    **A.**    No, I did not.

4    **Q.**    Did you ask anyone associated with

5    University Hospitals to talk with Mr. Harting to

6    find out what he said happened?

7    **A.**    No, I did not.

8                **MR. FELDMAN:**        Excuse me.  Why?

9                **MS. HEWITT:**        Why?  Because I

10   felt between the video and the evidence that was

11   presented, it was overwhelming, regardless of

12   the racial epithet --

13               **MR. CAMPBELL:**     She's answering

14   your question, sir.

15               **MR. FELDMAN:**        Excuse me.

16               **MR. CAMPBELL:**     I just want to make

17   sure the record --

18               **MR. FELDMAN:**        I understand and I

19   hear, but this is very important to me.

20               **MR. CAMPBELL:**     I understand.  But

21   it is as well for the record.

22               **MR. FELDMAN:**        In this country we

23   have what is known as due process.  Due process

24   involves the investigation of an activity.  Is

25   it my understanding that you didn't investigate

292

1   this?

2           MS. HEWITT:       Well, Mr. Harting

3   was not supposed to be in the cafeteria

4   according to the rules that we have issued to

5   the construction workers.

6           MR. FELDMAN:      Is that a

7   dischargeable event in itself?

8           MS. HEWITT:       I can determine it

9   to be.

10          MR. FELDMAN:      Well, I'm asking

11  you why you didn't give the due process to

12  Mr. Harting.  After all, his employment was on

13  the line.

14          MS. HEWITT:       I did not realize

15  his employment was on the line.  I did not ask

16  for him to be fired.

17          MR. FELDMAN:      You didn't ask for

18  him to be fired?

19          MS. HEWITT:       No.

20          MR. FELDMAN:      What did you ask

21  when you told Gilbane?

22          MS. HEWITT:       I asked him to be

23  removed from the UH property, that's what I

24  asked him, not to be returned to a UH

25  construction project.  I did not ask for him to

293

1    be fired at all, ever.

2              MR. FELDMAN:     Didn't you think

3    that that was tantamount to his being fired,

4    ma'am?

5              MS. HEWITT:     No, not when you

6    are a union employee.  You are assigned to

7    another project.  When my project ends, he would

8    not be fired.  At some point my construction

9    project is going to be over, he would not be

10   fired.  The union is assigned to different

11   projects, so no --

12             MR. FELDMAN:     Next question.

13   BY MS. GRAGEL:

14   Q.   Within the same day or the next day of you

15   making the decision to ask for Mr. Harting to be

16   removed from the project, you met with Sebastian

17   Trusso, who is sitting here, did you not?

18   A.   Yes.

19   Q.   And Mr. Ray Clegg from the union also came?

20   A.   Yes.

21             MR. TRUSSO:     Kevin.

22   BY MS. GRAGEL:

23   Q.   I'm sorry, Kevin Clegg, who is Ray Clegg's

24   son, came to meet you at the project?

25        They asked you to reconsider your decision,

294

1    did they not?

2    **A.**    They did.

3    **Q.**    And they informed you that Mr. Harting

4    would be unemployed if your decision stood to

5    remove him from the property as a result of the

6    incident in the cafeteria?

7    **A.**    I don't recall them saying that he would be

8    unemployed.

9    **Q.**    They informed you, did they not, that he

10   denied engaging in racial or any kind of abusive

11   conduct in the cafeteria?

12   **A.**    Yes, they did.

13   **Q.**    But notwithstanding what they told you

14   about that position, you did not change your

15   decision?

16   **A.**    Correct.

17   **Q.**    And one more set of questions.

18         Your office, if I understand correctly, at

19   least your main office is at the University

20   Hospitals administrative center on Warrensville

21   Road?

22   **A.**    Yes.

23   **Q.**    I would also guess that you don't always

24   spend your full workday in that office and you

25   come down to the projects?

295

1   **A.**   I do.

2   **Q.**   When you are at the main campus at

3   University Hospitals, do you eat in the

4   cafeteria?

5   **A.**   Yes, I do.

6   **Q.**   Have you seen individuals that you know to

7   be associated with construction work in the

8   cafeteria?

9   **A.**   I have; and I've asked them to leave.

10  **Q.**   Did you check, for example, in any of the

11  workplace trailers or break rooms in the

12  hospital to see if Gilbane had posted notices to

13  the construction staff to stay out of the

14  cafeteria?

15  **A.**   I have checked some of their boards and it

16  was posted.

17  **Q.**   Where did you see it posted and when?

18  **A.**   If I recall correctly, it's posted in their

19  main trailer that sits at the corner of Euclid

20  and University Drive.

21  **Q.**   And when did you see that sign up?

22  **A.**   I see it every time I go.

23  **Q.**   When is the first time that you saw that

24  sign?

25  **A.**   I can't recall the first time I saw it

296

1    there.

2    **Q.**    Before or after this grievance?

3    **A.**    It would have been before because I've been

4    in that trailer many times.

5    **Q.**    You are wearing here today some type of

6    badge.  Is that your University Hospitals badge?

7    **A.**    It is.

8    **Q.**    The construction workers are issued badges,

9    are they not?

10   **A.**    They are.

11   **Q.**    Do they look the same as yours or

12   different?

13   **A.**    They look different in the sense they have

14   a white background instead of a yellow

15   background.

16   **Q.**    And if I understand the process,

17   construction workers get that badge after they

18   review some type of training video that Gilbane

19   provides.

20   **A.**    Yes.

21   **Q.**    Have you seen the video?

22   **A.**    Yes, I have.

23   **Q.**    Is there any place in the video that

24   informs the construction workers at the main

25   campus that they are not to go into the

297

1    cafeteria?

2    **A.**    No.

3    **Q.**    And is there any part of that training

4    video that instructs the construction workers

5    that they should go to the Intranet to find the

6    UH Code of Conduct and employment policies?

7    **A.**    I don't think so.

8    **Q.**    And when you made your decision to remove

9    Mr. Harting from the University Hospitals work

10   sites, did you know how long Mr. Harting had

11   been working at the project?

12   **A.**    No, I did not.

13   **Q.**    Did you know for whom he had been working?

14   **A.**    The specific contractor?

15   **Q.**    Yes.

16   **A.**    No.

17   **Q.**    Did you take any steps to determine by

18   talking to Gilbane or to anyone else in the

19   construction part of the project to find out

20   about Mr. Harting and the kind of worker that he

21   was?

22   **A.**    No.

23            **MR. FELDMAN:**      Ma'am, do you have

24   any mechanism for investigating matters of this

25   sort on file that you use?

298

1          **MS. HEWITT:**      We would ask our

2    security personnel to investigate.

3          **MR. FELDMAN:**      Did you ask them in

4    this case?

5          **MS. HEWITT:**      I believe the

6    information I got had data from our security

7    personnel.  I know they sent us videos because

8    that's where the videos are, in the security

9    department.

10          **MR. FELDMAN:**      Is that the only

11    investigative activity in this case, by the

12    security people?

13          **MS. HEWITT:**      I think HR also did

14    some investigation, our HR department.

15          **MR. FELDMAN:**      So you don't have

16    any protocol for such activity, do you?

17          **MS. HEWITT:**      Not in the

18    construction services department, no.

19          **MR. FELDMAN:**      Is there any reason

20    for that?

21          **MS. HEWITT:**      It's never happened

22    before, so it was the first incident since I've

23    been at UH that this has happened.

24          **MR. FELDMAN:**      Well, the thing

25    that is disturbing is that there seems to be

299

1    fraud on your part that you can arbitrarily,

2    capriciously, accomplish a removal of a --

3              MR. CAMPBELL:    Sir, I just want to

4    state for the record --

5              MR. FELDMAN:    The record will

6    speak for itself.

7              MR. CAMPBELL:    And I just want to

8    object to the use -- I mean, we have sat through

9    a day where this individual has admitted to

10   extreme misconduct.  We've heard the individuals

11   testify -- to say this is an arbitrary -- I

12   don't know how this could possibly be, with all

13   due respect.  You're here to hear all of the

14   evidence and make a decision --

15             MR. FELDMAN:    I'm here to hear

16   all the evidence, and I want to know exactly why

17   there was no investigation in this matter.

18             MR. CAMPBELL:    We have heard

19   Ms. Peplowski, we've heard Heather, we've heard

20   Mr. Hawk --

21             MR. FELDMAN:    There's no protocol

22   here --

23             MR. CAMPBELL:    -- all three have

24   testified to an investigation.

25             MR. FELDMAN:    You can write in

1  your brief as you see fit.

2            MR. CAMPBELL:     Absolutely.

3            MR. FELDMAN:     You have a case in

4  the Federal Court system and you can proceed

5  with that, too, should the decision here go

6  against you.

7            MR. CAMPBELL:     I would ask you to

8  hear the evidence before you make a decision.

9            MR. FELDMAN:     I want to know why

10  there was no investigation.  Maybe there was but

11  there's no protocol established.  Maybe there

12  was and maybe I should know if there's a

13  protocol of some sort that I'm missing here in

14  the evidence.  That's all.  You evidently --

15  your office doesn't have a protocol.

16            MS. HEWITT:     We do not.  My

17  office -- the department of construction

18  services is only two years old, so it only

19  started when I started.  We had never had an

20  incident like this before, so we did not foresee

21  we needed a protocol to address an issue like

22  this because we never anticipated --

23            MR. FELDMAN:     Perhaps this

24  opinion award and hearing will cause one to be

25  fostered.

301

1              At any rate, continue.  Do you have
2    anything further?
3              MR. CAMPBELL:    I'd just object
4    to that.  The arbitrator has explicitly stated
5    he's reached a decision without even hearing all
6    the evidence.
7              MR. FELDMAN:    I didn't say I've
8    already reached a decision.
9              MR. CAMPBELL:    I strongly object
10   to that.
11             MR. FELDMAN:    What decision did I
12   reach?
13             MR. CAMPBELL:    I think you've been
14   pretty clear as to how you've reached the
15   decision --
16             MR. FELDMAN:    I haven't even
17   heard one-half of the case.
18             MR. CAMPBELL:    Exactly.  And
19   that's my objection to you stating that you've
20   reached a conclusion.
21             MR. FELDMAN:    I didn't say I
22   reached a conclusion.
23             MR. CAMPBELL:    With all due
24   respect, the record will speak to that.
25             MR. FELDMAN:    Yes, it will.

302

1    **BY MS. GRAGEL:**

2    **Q.**    Ms. Hewitt, you testified a few minutes ago

3    that at times you've been in the cafeteria and

4    saw construction workers there and you asked

5    them to be removed.

6        Did you take any action on any of those

7    occasions to initiate discipline to the

8    construction workers that you found in the

9    cafeteria?

10   **A.**    I did contact John Sosnowski of Gilbane and

11   express that it should be emphasized that they

12   should not be in the cafeteria.  That is against

13   policy.

14   **Q.**    Did you instruct Mr. Sosnowski in those

15   situations to issue citations to the workers

16   that you found in the cafeteria?

17   **A.**    No.

18   **Q.**    And you know from the Project Labor

19   Agreement and the Gilbane policy that a citation

20   is the first process in progressive discipline

21   to get somebody out the door?

22   **A.**    Can I ask a question?  I don't consider

23   this a safety issue.  Your using a safety manual

24   for a process that I don't consider a safety

25   issue, so I'm having a little disconnect there.

303

1    **Q.**   So the incident as you understood it from

2    the papers that you reviewed about Mr. Harting

3    and his contact with the cafeteria employee, as

4    you understood it was not a safety issue?

5    **A.**   Not a construction safety issue.  It was

6    the safety of that employee, but if that, for

7    example, had been one of my employees and they

8    had treated another employee that way, they

9    would have been disciplined.  That issue would

10   have been addressed.  It is unacceptable to

11   treat a UH employee that way.

12   **Q.**   And you would have done that by addressing

13   it with your employees about interaction with

14   another UH employee?

15   **A.**   Yes.

16            **MS. GRAGEL:**      Thank you.

17            **MR. FELDMAN:**     Anything further?

18            **MS. GRAGEL:**      Nothing.

19            **MR. FELDMAN:**     Redirect?

20            **MR. CAMPBELL:**    Thank you.

21               REDIRECT EXAMINATION

22   **BY MR. CAMPBELL:**

23   **Q.**   You were asked about Mr. Harting and about

24   him giving due process.  Today he's testified,

25   Mr. Harting -- well, let's take a step back.

304

1     Did the union representative over here

2 inform you that Mr. Harting denied any sort of

3 abusive conduct when you spoke with him after

4 excluding Mr. Harting from the work site?

5 **A.**   I believe they did when they came to my

6 office.

7 **Q.**   And I think Ms. Gragel asked you

8 specifically to confirm that they denied that

9 Mr. Harting had partaken in any abusive conduct;

10 is that right?  Not just the racial epithet, but

11 any abusive conduct.

12 **A.**   When they came to my office, we all

13 understood an incident had occurred.  No one was

14 in denial that an incident had occurred.

15 **Q.**   I'm just asking you, it was their position

16 that Mr. Harting denied everything, right?

17 **A.**   Yes.

18 **Q.**   Now, Mr. Harting testified here today and

19 admitted, and the evidence from the union was

20 presented that this altercation took place for

21 over two and a half minutes.  Mr. Harting

22 admitted to calling her a thief, calling a UH

23 employee a thief in front of other employees and

24 visitors and other individuals who were on site

25 in the cafeteria.  He admitted to being loud.

305

1   He admitted to cussing.  He admitted to telling

2   other managers that she was a thief.

3        Based on those admissions from Mr. Harting,

4   was he appropriately excluded from the work site

5   based on his conduct?

6              MS. GRAGEL:      Objection.  That's

7   an ultimate decision from the arbitrator.

8              MR. FELDMAN:      She may answer.

9              MS. HEWITT:      I'm sorry.  Just

10  based on that information, he would have been

11  excluded from the work site.

12  BY MR. CAMPBELL:

13  Q.   Just based on --

14  A.   Just based on that.

15  Q.   -- two and a half minutes of cussing,

16  yelling and calling an employee a thief?

17  A.   Yes.

18  Q.   Is that consistent with the union telling

19  you that Mr. Harting had not partaken in any

20  abusive conduct?  Is Mr. Harting's position

21  consistent with the union's position that he

22  didn't partake in any abusive conduct?

23  A.   I'm sorry.  I'm learning every word means

24  something here.

25             MS. GRAGEL:      Objection.

306

1      **MS. HEWITT:**        That is not

2  consistent.

3  **BY MR. CAMPBELL:**

4  **Q.**   Do you find that to be abusive conduct?

5  **A.**   Yes.

6  **Q.**   Was the union truthful to you when they

7  came to you and said that Mr. Harting denied --

8      **MS. GRAGEL:**        Objection.

9      **MR. CAMPBELL:**      You brought it out.

10  You brought it out, and we're here about

11  credibility and about why there was no due

12  process.  The union has come to UH and said he's

13  denied everything.  He's come here in front of

14  this arbitrator and admitted under oath that he

15  cussed, called her a thief, two and a half

16  minutes worth of yelling and screaming and

17  calling her a thief in front of other people.

18  We certainly can call into question their

19  credibility.

20      **MS. GRAGEL:**        There is no

21  evidence that that kind of behavior lasted for

22  the two and a half minutes.  There's no evidence

23  at all of what was said during any part of the

24  two and a half minutes because there's no audio

25  on the tape.

307

1          MR. FELDMAN:     Next question.

2          MR. CAMPBELL:     Are you telling her

3     she can't answer that question?

4          MR. FELDMAN:     Repeat it.

5     BY MR. CAMPBELL:

6     Q.    Was Mr. Harting's conduct abusive?

7     A.    Yes.

8     Q.    Did union tell you he had partaken in

9     abusive conduct?

10    A.    Not in detail.

11    Q.    In order to get a UH badge as you were

12    asked by Ms. Gragel, I'm going to show you the

13    information it goes through as to what's been

14    marked as Respondent's Exhibit 1, and I want to

15    turn to the Code of Safe Practices.  Now, in

16    that Code of Safe Practices, I want to refer you

17    on that page to a couple of the provisions.

18    First of all, number 7, "I will eat only in

19    designated areas and dispose of trash in proper

20    containers."

21         Have the unions been advised that the union

22    employees are not to eat in the UH cafeteria?

23    A.    Yes.

24    Q.    So you would expect Local 310 to have

25    advised Mr. Harting that his designated area was

308

1   not the UH main campus cafeteria?

2   **A.**   Yes.

3   **Q.**   Now, if we go on here, number 11, "I will

4   conduct myself in a professional manner," do you

5   see that?

6   **A.**   Yes.

7   **Q.**   Is conducting yourself in a professional

8   manner consistent with Mr. Harting's admissions

9   that I have told you about today?

10  **A.**   No.

11  **Q.**   It goes on to state:  "I will not engage in

12  any violence, horseplay, practical jokes or

13  other behavior obnoxious to the general public."

14       Did you find Mr. Harting's conduct as I've

15  described here today conduct that is violent or

16  obnoxious to members of the general public?

17  **A.**   Yes.

18  **Q.**   It will go on further to state:  "I will

19  not harass anyone else on site or any member of

20  the public, sexually or otherwise."  Do you see

21  that statement?

22  **A.**   Yes.

23  **Q.**   Is the use of a racial epithet considered

24  harassment in your opinion?

25  **A.**   Yes.

1   **Q.**   Mr. Harting further testified today that he

2   has been informed by his union, and not only on

3   the UH work site but on all work sites that he

4   goes onto on behalf of Local 310, he is to act

5   as a gentleman.

6        Do you find that based on his admissions

7   that I've told you here today that he was acting

8   as a gentleman on the UH work site as to your UH

9   employee?

10  **A.**   No.

11            **MR. CAMPBELL:**    I don't have any

12  further questions.

13            **MR. FELDMAN:**    Anything further of

14  this witness?

15            **MS. GRAGEL:**    Yes.  Thank you.

16            RECROSS-EXAMINATION

17  **BY MS. GRAGEL:**

18  **Q.**   In caret number 7 of this Code of Conduct,

19  which you have in front of you, there's a

20  stipulation about designated areas.

21        For individuals that were working in the

22  NICU unit in January 2009, where was the

23  designated area?

24  **A.**   I'm sorry?

25  **Q.**   Where was the designated areas for

R000642

310

1    individuals working in the NICU unit?

2    **A.**    In the construction area on the fourth

3    floor.

4    **Q.**    And where did individuals who were working

5    in the NICU unit in June of 2009 purchase their

6    food?

7    **A.**    They are not allowed to purchase it in our

8    cafeteria.

9    **Q.**    Is there anywhere on site in the University

10   Hospitals property for individuals to purchase

11   food when working with what would be the second

12   shift?

13   **A.**    There is no place available that we supply.

14   As we call it, Roach Coach might show up that

15   they could go to off the site and purchase, but

16   no place that University Hospitals supplies.

17   **Q.**    And typically those portable kitchens are

18   there during the daytime shifts?

19   **A.**    Yes.

20   **Q.**    Not second shift?

21   **A.**    Correct.

22   **Q.**    And you've been asked a series of questions

23   here recently about what Mr. Campbell heard or

24   understood from information that Mr. Harting

25   gave briefly this morning.  But you've not had

311

1    an opportunity to fully discuss this matter with

2    Mr. Harting?

3    **A.**    No, I have not.

4    **Q.**    And you haven't formed a personal opinion

5    as to whether he is a believable or not

6    believable person because you've never met him?

7    **A.**    Correct.

8              **MS. GRAGEL:**      Nothing further.

9              **MR. CAMPBELL:**    I don't have

10   anything further.

11             **MR. FELDMAN:**     Next witness.

12             **MR. CAMPBELL:**    We have no further

13   witnesses.

14             **MR. FELDMAN:**     But reserve the

15   right to call --

16             **MR. CAMPBELL:**    We close subject to

17   rebuttal and impeachment.  We also close subject

18   to the same statements that I made initially as

19   to our objections as to arbitrability as this

20   arbitrator found --

21             **MR. FELDMAN:**     As far as I'm

22   concerned you can preserve that.

23             **MR. CAMPBELL:**    So with that, we

24   are done except for impeachment and rebuttal.

25             **MR. FELDMAN:**     I don't have my

312

```
1    appointment book with me.  Can you give me some
2    dates that you are available?  Do you have your
3    appointment book?
4              MR. CAMPBELL:    Right now I could
5    do -- right now we are at the 9th already.  The
6    earliest date I could do would be the 16th.
7    Would you be available on the 16th?
8              MS. GRAGEL:    Mr. Campbell and
9    Mr. Arbitrator, as of Thursday of this week,
10   Mr. Harting, whose wife recently is recovering
11   from a major surgery, is on a two-week vacation
12   to take a family trip to Florida.  He returns
13   June 30th, and he is an important witness, so
14   we're looking to schedule the first week of
15   July.
16             MR. FELDMAN:    When?
17             MS. GRAGEL:    First week of July.
18             MR. FELDMAN:    Give me a date.
19             MR. CAMPBELL:    I can do July 2nd.
20             MS. GRAGEL:    If that's open for
21   your calendar, that's fine.
22             MR. FELDMAN:    I'll check it and
23   be back to you tomorrow.  Is your secretary on
24   duty?
25             MR. CAMPBELL:    Let me give you my
```

313

1    cell phone, and I keep my calendar because I

2    have things that come up with clients.  My cell

3    phone number is 216-385-5347.

4              **MR. FELDMAN:**      Is there an

5    alternate date?

6              **MR. CAMPBELL:**      To tell you the

7    truth, I go on vacation the week of the 6th, and

8    I am in trial the week of the 20th; I believe

9    it's going to be moved to the week of the 27th.

10   Potentially the week of the 13th, but with a

11   trial, I can try for it, but it's tough.

12             **MR. FELDMAN:**      We'll try for July

13   2nd.  That's what day of the week?

14             **MS. GRAGEL:**      That's a Thursday.

15             **MR. FELDMAN:**      Thank you very

16   much.

17             **MS. GRAGEL:**      Do you want to move

18   your exhibits?

19             **MR. CAMPBELL:**      Do you want us to

20   move formally now or wait until the end?

21             **MR. FELDMAN:**      You can move for

22   your exhibits.  I'll grant it.  Do you have any

23   objection?

24             **MS. GRAGEL:**      None.  None as to

25   admissibility.

314

1              MR. CAMPBELL:      Respondent's

2    Exhibits 1 through 6.

3              MS. GRAGEL:        The issue that I

4    have is the video.  You had it in e-mailable

5    form and I have it in that form too.  We can

6    e-mail it to the court reporter to get

7    Exhibit 2.

8              MR. CAMPBELL:      I don't have a

9    problem with that.

10             MS. GRAGEL:        What's your

11   preference?

12             MR. FELDMAN:       Do whatever you

13   desire.

14             (Thereupon, the proceedings were

15             concluded at 5:00 o'clock p.m.)

16

17

18

19

20

21

22

23

24

25

315

1                C E R T I F I C A T E

2

STATE OF OHIO,     )
3                  )  SS:
SUMMIT COUNTY,     )

4

5

        I, Stephanie R. Dean, Court Reporter and
6   Notary Public within and for the State of Ohio,
    duly commissioned and qualified, do hereby
7   certify that these proceedings were taken by me
    and reduced to Stenotypy, afterwards prepared
8   and produced by means of Computer-Aided
    Transcription and that the foregoing is a true
9   and correct transcription of the proceedings so
    taken as aforesaid.
10       I do further certify that these proceedings
    were taken at the time and place in the
11  foregoing caption specified.
         I do further certify that I am not a
12  relative, employee of or attorney for any party
    or counsel, or otherwise financially interested
13  in this action.
         I do further certify that I am not, nor is
14  the court reporting firm with which I am
    affiliated, under a contract as defined in Civil
15  Rule 28(D).
         IN WITNESS WHEREOF, I have hereunto set my
16  hand and affixed my seal of office at Akron,
    Ohio on this 15th day of June, 2009.
17

18

19

20

21

22         _____
                 Stephanie R. Dean
23

        My commission expires August 30, 2010.
24                    - - -
25

**COURT REPORTERS OF AKRON CANTON AND CLEVELAND**
330-666-9800              330-452-2400              216-621-6969

R000648

**A**

**AAA (2)**
53:18 55:11
**ability (2)**
72:11 143:24
**able (11)**
86:9 113:13
135:18 158:19
171:6 202:9
210:10 234:5
236:25 256:11
258:11
**above-entitled...**
48:18
**absolutely (13)**
53:15 56:2,17
64:22 83:15
220:12 221:23
245:3,17
250:24 251:12
269:5 300:2
**abusive (11)**
230:23,23
294:10 304:3,9
304:11 305:20
305:22 306:4
307:6,9
**accept (1)**
63:21
**accepted (1)**
66:8
**access (9)**
80:22 216:5
258:2,12,17
266:25 267:1
270:9,11
**accomplish (1)**
299:2
**accomplished ...**
133:13
**accountable (1)**
251:7
**accuracy (1)**
156:11
**accurate (3)**
198:22,24
222:25

**accusing (1)**
201:20
**acknowledge (4)**
109:22 111:3,20
127:13
**acknowledged...**
110:5,6
**act (13)**
57:12 125:10,21
125:25 126:2
244:15 252:8
263:10 264:25
267:18 285:12
289:7 309:4
**acted (2)**
104:17 201:20
**acting (7)**
125:11 126:6,25
176:17 267:19
284:22 309:7
**action (5)**
156:21 245:4
256:19 302:6
315:13
**Actions (1)**
244:21
**activities (3)**
75:6,9 106:6
**activity (6)**
91:15 103:23
194:17 291:24
298:11,16
**actual (3)**
76:21 101:1
226:25
**adding (1)**
53:11
**addition (4)**
65:3,18 66:18
67:22
**additional (3)**
52:7 101:23
121:24
**address (4)**
53:5 231:9
275:5 300:21
**addressed (1)**

303:10
**addresses (1)**
274:17
**addressing (1)**
303:12
**adjacent (1)**
93:10
**adjourn (1)**
136:18
**administrative...**
294:20
**admissibility (1)**
313:25
**admissions (3)**
305:3 308:8
309:6
**admit (1)**
68:4
**admitted (9)**
70:18,19 299:9
304:19,22,25
305:1,1 306:14
**advanced (1)**
58:9
**advice (1)**
165:5
**advise (1)**
52:11
**advised (8)**
67:12,24 93:19
105:17 111:24
284:19 307:21
307:25
**affiliated (1)**
315:14
**affixed (1)**
315:16
**aforesaid (1)**
315:9
**afraid (1)**
168:16
**afternoon (3)**
136:19 137:1
259:18
**age (8)**
73:10 119:8
137:4 195:21

220:17 240:3
271:10 285:16
**agency (6)**
152:2,3,4 153:18
153:18,20
**agent (1)**
126:24
**aggravated (1)**
130:17
**aggressive (3)**
129:19 201:20
204:16
**ago (5)**
165:15 228:12
241:8 265:3
302:2
**agree (6)**
127:13 128:8
134:4 171:4
203:20 232:16
**agreed (2)**
66:15 67:25
**agreement (63)**
52:14 54:6
61:13,24 62:1
66:9,19 71:10
72:15 77:5,7,9
77:12,13 78:7
78:10 81:4
91:2 105:19
109:9,16,17,22
109:25 110:4,5
110:7,11,21,24
111:2,5,6,8
112:9 113:21
123:22,25
128:2 258:24
259:2,5,8
260:20,24
261:2,6 267:9
269:17,24
273:20,25
274:8 275:1,4
275:9,22 282:7
286:14 287:15
288:4 289:10
302:19

**agreements (2)**
67:5 78:19
**ahead (2)**
117:2 147:1
**Ahuja (5)**
75:17 98:6,10,11
272:20
**ain't (4)**
148:8,12 177:15
177:17
**aisle (2)**
172:14 176:24
**Akron (1)**
315:16
**al (1)**
48:12
**allegation (1)**
68:12
**allow (1)**
281:22
**allowed (5)**
80:22 99:24
191:3,15 310:7
**altercation (10)**
89:8,12 105:6,9
107:19 276:3,7
276:10,17
304:20
**alternate (1)**
313:5
**altogether (1)**
160:25
**ambiguity (1)**
52:12
**ambulatory (1)**
272:13
**amend (3)**
52:6 53:17,24
**amended (2)**
112:24 255:3
**America (2)**
61:6 72:10
**AMERICAN (...**
48:1
**Ami (1)**
49:6
**amount (3)**

68:12 76:2
173:17
**anchors (1)**
222:14
**Andrew (51)**
141:17,18,22
146:16,18,24
147:2,5,12,20
148:13 177:24
178:1 190:16
198:3,7 201:19
201:23 202:1
205:21 207:10
207:11,12
208:9 217:3,6
217:10 224:15
225:1,4,5,7,14
225:20 226:18
226:21 227:3,5
228:6 230:3
232:3 233:7
234:6,19,21,25
235:2 238:16
261:22,23
263:16
**Andrew's (2)**
166:4 233:5
**and/or (1)**
102:13
**angle (1)**
175:23
**angry (7)**
129:5,6,8 145:10
147:15,16
277:2
**Animal (2)**
214:17,18
**annoy (1)**
193:14
**answer (29)**
53:4 95:23
96:21,21
100:19 103:15
103:21 114:11
114:13 116:12
125:24 126:17
139:23 151:4

180:23 185:15
186:3 194:20
197:4 201:8
247:20 248:22
280:4,8,9,19
283:5 305:8
307:3
**answered (2)**
100:10,11
**answering (2)**
180:24 291:13
**answers (1)**
277:10
**anticipated (1)**
300:22
**Anti-Harassm...**
244:13 252:1
**anybody (23)**
54:9 70:8
107:16 126:14
134:2 167:8,20
168:9,12 174:8
174:10,17,17
184:16 189:6
192:10 255:9
262:13,15,17
262:20,23
264:1
**anymore (1)**
213:14
**anyplace (3)**
99:22 195:12
281:16
**anyway (1)**
145:16
**APPEARANC...**
49:1
**appeared (2)**
225:16 238:12
**appears (3)**
111:5 178:7
219:17
**appended (1)**
61:24
**applicable (8)**
82:17 104:16
111:25 127:9

134:4,10
246:15 248:15
**applied (2)**
246:22 264:21
**applies (1)**
282:10
**apply (4)**
52:14 246:20
247:18 264:9
**appointment (2)**
312:1,3
**appreciate (1)**
131:7
**approach (1)**
265:22
**approached (2)**
211:23 212:20
**appropriate (1...**
62:17 63:22
117:9,12,13
127:15,21
130:23 131:18
213:9 287:11
288:9
**appropriately ...**
244:3,15 251:8
305:4
**approximate (1)**
76:2
**approximately...**
75:23 83:7 85:1
90:21,22 92:22
95:10 273:4
**April (5)**
168:7,8,9 191:10
286:11
**arbitrability (...**
52:25 56:8,10,12
56:19 58:10,11
59:4,12 61:9
61:17 62:20,25
71:1 72:6
311:19
**arbitrarily (1)**
299:1
**arbitrary (1)**
299:11

**arbitrated (1)**
61:12
**arbitration (19)**
48:1,4 53:17
54:11 55:22
59:2 61:11
64:6 66:12
67:1,2 85:20
86:4 116:23
124:6,11 168:1
191:1,12
**arbitrations (1)**
91:1
**arbitrator (29)**
48:20 52:11
57:1 58:24
59:14 60:25
61:23 63:19
72:5 73:23
82:25 88:13
98:13 128:1
144:23 149:20
178:5 187:7
200:9 203:6
206:7 247:14
247:16 277:24
301:4 305:7
306:14 311:20
312:9
**arbitrator's (1)**
97:7
**architectural (2)**
284:8,10
**area (43)**
99:4 100:13
138:23 139:2
145:18 152:20
155:10 162:4
163:3 164:15
166:21 169:22
170:25 171:15
171:24 172:8,9
172:13,16,22
174:12 176:23
182:12,17
196:17 202:16
208:3 214:16

215:19 224:15
225:9 226:16
226:16,23
227:17 233:2
235:23 242:14
252:16 262:12
307:25 309:23
310:2
**areas (11)**
67:18,21,22
88:20 100:2,12
104:16 241:12
307:19 309:20
309:25
**argue (1)**
188:7
**argued (3)**
59:14 62:14
63:14
**arguing (1)**
284:21
**argument (7)**
56:14 64:7
70:18 89:24
115:23 116:3
284:24
**argumentative...**
68:24 70:7
**arguments (4)**
56:6 58:9 61:18
117:5
**arises (1)**
136:17
**arising (1)**
91:2
**arrive (1)**
179:17
**arrived (2)**
180:13 181:2
**arrow (1)**
253:23
**arrows (1)**
253:1
**Art (4)**
122:4,18,19
127:10
**aside (2)**

145:18 222:21
**asked (64)**
69:1 78:9 88:3
97:9,16 100:9
101:3 111:19
114:21 115:8
116:15 124:10
125:18 132:16
138:22 143:6,7
150:5 157:24
164:19 171:7
172:6,10
185:11,14
188:10 189:3,6
190:15 194:3
206:12,13
211:23 213:24
218:3,9 224:16
224:16 226:18
227:3,21 229:4
229:5 232:1
256:2,3,6
259:17 263:1
263:22 270:20
280:18 281:13
282:23 283:9
292:22,24
293:25 295:9
302:4 303:23
304:7 307:12
310:22
**asking (8)**
69:20 125:17
127:19 128:2
176:12 232:4
292:10 304:15
**assaults (1)**
253:24
**assigned (9)**
72:22 106:3
121:5 122:24
139:3 155:12
258:16 293:6
293:10
**assignment (4)**
123:10 152:14
155:14,15

**assist (1)**
66:15
**assistant (2)**
139:8,9
**associated (2)**
291:4 295:7
**association (2)**
48:1 277:18
**assume (2)**
170:16,21
**assuming (5)**
60:16 118:1
120:8 121:10
134:16
**assure (1)**
287:14
**ate (1)**
132:1
**atrium (2)**
93:9 152:20
**attached (8)**
61:25 260:23
276:4 287:15
288:3,6 290:11
290:12
**attachment (15)**
81:5,11,16 82:17
99:12,18 101:2
101:7 115:5
273:21 274:10
274:11,13,14
275:3
**attachments (5)**
61:25 105:19
128:2 261:3
287:14
**attacks (1)**
248:11
**attend (1)**
286:16
**attendance (1)**
222:17
**attended (2)**
93:22 96:10
**attention (8)**
117:18 161:17
217:7,16 223:7

244:4 273:14
282:4
**attorney (6)**
49:5,6,14,16
178:11 315:12
**attorney's (1)**
64:17
**attributes (1)**
66:13
**audibly (1)**
196:10
**audio (6)**
171:4 204:23,24
237:20,25
306:24
**audiotape (2)**
159:9,11
**audits (1)**
213:8
**August (2)**
288:7 315:23
**authority (2)**
61:15 67:23
**available (5)**
178:4 206:4
310:13 312:2,7
**Avenue (7)**
48:19 49:8
65:12 92:24
242:6 270:9
274:5
**avoid (2)**
81:23 101:14
**award (1)**
300:24
**aware (13)**
90:12 91:3 94:7
94:13 109:4
110:1 125:20
198:9 222:23
239:9,11
250:15 255:11
**a.m (11)**
48:22 136:10
141:2 153:12
160:10 200:17
200:18,21

221:16,21
223:14

---
**B**

**B (5)**
78:20 274:11,13
274:14 275:3
**Babies (2)**
242:24 272:23
**back (72)**
77:1 83:8 86:15
86:21 88:6
89:5 95:5,22
96:13 97:8,15
97:18 99:1,20
107:11 113:18
119:16 123:6
132:25 133:1
144:7 148:4,18
148:20,21
163:2 165:7,8
165:10 166:21
167:3 168:16
168:18 169:19
171:24 172:7
177:16 179:13
179:14 182:12
188:13,16,24
191:3,15
192:13 193:22
202:16,23
204:6,21,22
210:17 212:8
218:10 224:16
224:21 225:5
225:15,21
226:5 227:16
227:18,19
228:10,14
232:9 235:22
238:18 239:16
303:25 312:23
**background (4)**
80:20 279:4
296:14,15
**bad (9)**
106:19 135:21

145:1 167:11
167:12 175:23
175:24 195:1
198:18
**badge (26)**
80:13,15,16,17
80:22,24 86:21
88:6,7 96:22
96:25 97:18
113:14,17
134:14,17
185:19 186:10
186:11,22,24
186:25 296:6,6
296:17 307:11
**badges (8)**
67:18 186:14,19
236:7,10,13,20
296:8
**badging (1)**
96:24
**Bagels (1)**
197:18
**balance (1)**
201:25
**Ballard (4)**
197:25 232:11
262:11 263:20
**ban (2)**
88:13 208:22
**Banderyt (1)**
49:6
**banned (1)**
209:6
**Baptist (1)**
190:2
**bar (5)**
177:1 181:6,13
182:13,18
**Bargaining (2)**
123:21,25
**barred (1)**
102:12
**based (30)**
58:25 64:6
68:14 70:12
71:1 85:20

86:3 103:8,23
104:11 118:2
123:2 134:3
143:17 171:11
204:17 208:23
247:1 248:25
251:18 254:16
255:16 270:4
285:9 305:3,5
305:10,13,14
309:6
**bases (1)**
281:6
**basically (4)**
158:25 213:21
215:6 225:21
**basis (4)**
127:24 131:2
151:3 284:25
**bathroom (1)**
167:2
**Beachwood (2)**
98:10 272:20
**beginning (1)**
141:12
**behalf (6)**
49:3,12 50:3
64:3 290:21
309:4
**behave (2)**
252:6 278:12
**behavior (9)**
80:2 81:22
101:13 190:18
251:23 252:3
266:15 306:21
308:13
**believable (2)**
311:5,6
**believe (24)**
56:19 58:14
60:14 61:8
62:16 71:7
85:20 86:19
87:4 111:22
120:16 141:20
150:19 157:3,4

157:7 166:10
224:14 229:23
250:13 258:13
298:5 304:5
313:8
**believed (6)**
68:7 69:5 126:6
126:25 127:14
127:20
**believes (1)**
53:20
**benefits (1)**
155:3
**best (19)**
82:1,14 87:22
101:17 114:25
115:8,20,24
117:5,6 120:23
125:14 135:18
143:3,23
144:22 149:21
213:19 267:25
**beyond (3)**
76:3 101:20
115:2
**bid (2)**
66:7 67:5
**bids (1)**
66:7
**bill (2)**
144:6 147:3
**Billington (2)**
49:15 273:15
**binding (1)**
54:6
**bird (1)**
196:2
**bit (9)**
77:6 100:25
135:23 159:13
165:9 189:16
237:11 274:11
274:13
**bite (1)**
119:17
**black (1)**
181:25

**block (1)**
96:5
**boards (1)**
295:15
**boisterous (1)**
204:16
**bold-face (2)**
102:2,16
**bold-faced (1)**
104:5
**book (2)**
312:1,3
**boss (2)**
166:4 194:17
**Boston (1)**
136:10
**bother (1)**
193:14
**bottom (7)**
104:4 110:19
123:1,6 178:3
178:23 263:5
**Boyko (2)**
59:23 63:21
**break (3)**
122:16 220:4
295:11
**breakfast (1)**
192:22
**breaking (2)**
281:7,10
**brief (3)**
64:21 223:15
300:1
**briefed (2)**
59:19 63:20
**briefly (6)**
54:2 62:9 74:18
241:11 261:23
310:25
**bring (8)**
56:21 68:1 80:5
108:4 117:18
159:15 182:15
183:1
**bringing (2)**
53:2 217:16

**broken (1)**
264:18
**brothers (5)**
68:5 128:19,19
131:9 197:19
**brought (3)**
217:7 306:9,10
**Brown (2)**
237:12 288:2
**budget (1)**
75:8
**build (2)**
272:19 274:19
**building (28)**
48:6 49:7 52:7
52:10,16,17
53:14,14 54:3
54:8 56:1,15
57:15,18 66:9
67:24 72:16
74:11 76:13
78:4 150:11
186:15 214:17
215:11 237:4
242:2,13,14
**buildings (1)**
242:10
**bullet (2)**
246:19 248:14
**bullshit (8)**
202:1,2 207:17
207:20,20
208:9,12,14
**bunch (3)**
242:10 277:9
280:11
**business (6)**
66:17,17 92:17
126:24 160:13
265:1
**busy (5)**
128:21 141:13
160:12 217:12
226:10
**button (1)**
171:23
**buy (1)**

186:7
**buying (1)**
93:13
**by-standers (1)**
180:7

_____
C
_____
**C (2)**
315:1,1
**cafeteria (140)**
65:7,8,12,17,21
67:16,23 68:3
68:6 69:1,24
70:16 83:3,22
88:1,5,13,19
88:22,23 93:1
93:4,7,8,10,11
93:14 94:10
99:4,25 100:6
100:13 103:10
103:12,13
104:12,13
107:18 111:20
111:21 113:7
124:10 128:15
132:21 133:1,7
134:1 139:4,10
139:18 140:13
141:3 142:8
145:16 148:19
152:21 158:18
159:12 160:11
160:21,24
161:15 163:20
165:8 168:19
169:20 170:25
181:4 188:16
191:15,23
195:12 196:19
196:21 197:18
208:22 209:6
210:21 211:4
213:21 214:9
214:24,25
215:3,5,7,10
215:11,19
216:6,16 218:4

219:1,8 222:4
222:7 224:15
226:16 227:1
227:17 232:9
233:2,7,22
235:7 236:3
237:1,9 238:3
238:18,20
241:18 242:9,9
242:13 243:1,6
251:3,5 268:24
276:4 278:10
281:16 282:17
292:3 294:6,11
295:4,8,14
297:1 302:3,9
302:12,16
303:3 304:25
307:22 308:1
310:8
**calendar (5)**
86:8,12 200:9
312:21 313:1
**call (26)**
108:13 117:6,10
117:14,25
118:5,15
128:14 130:7
131:19 152:16
165:5 180:16
190:21 205:6,8
206:14 208:5
216:15 239:8
239:12,13
250:12 306:18
310:14 311:15
**called (26)**
68:19,20 69:16
108:2 118:1,8
128:25 130:3,5
130:25 131:8
131:23 132:2
134:23 167:22
168:1 205:4,7
207:9 208:20
209:16 216:18
228:18 256:2

276:24 306:15
**calling (8)**
69:19 128:8
133:14 228:13
304:22,22
305:16 306:17
**calm (1)**
147:21
**camera (13)**
158:6,15,17,22
158:25 170:3,4
172:24 173:13
174:11 210:9
225:16 237:16
**cameras (6)**
148:2,3 158:18
169:23 170:1
215:20
**Campbell (220)**
49:14 52:22
54:18 56:2,4
57:3,9,22 58:4
58:16,20,23
59:7,23 60:4,9
60:16,24 62:6
64:4,19,23
66:1 67:15
70:9 73:1,6
74:3 75:1 79:4
81:8,10 82:10
82:16 83:12,15
84:2 85:7,19
86:3,11,16
87:21 88:11
89:10,16 90:17
90:19 91:10,17
92:2 97:2
98:11 99:11,17
100:9 101:3,7
107:7,8 111:7
111:15,18
114:12 115:13
117:1,4,21,24
118:7,17,23
119:3,25
126:19 127:18
128:7 129:20

134:9,13,21
135:10,17
136:9 137:16
138:24 139:6
140:4,5 141:19
141:21 142:16
145:3 146:1
147:10 150:3
153:2 157:24
158:9 161:10
162:24 163:6
170:6,11,15,20
171:3 173:5,15
175:2 176:20
177:7,19 178:9
178:18 180:23
187:11,14
188:6 190:4
196:8 198:14
199:17,19
200:8,13
201:10 202:25
203:19 204:12
206:9 207:23
208:15 213:23
219:24 220:3,7
220:12 221:4
223:23 226:7
230:11 232:19
233:13,14
234:16 239:1,9
240:19,21
244:9 245:13
245:24 246:12
247:15,21
248:2 249:4,9
256:25 267:4,7
269:11 270:14
271:4,20,22
276:13 277:11
277:12 279:3,5
280:4,14 282:2
282:6,10,14
283:8 284:1,12
284:18 285:8
286:1,24
291:13,16,20

299:3,7,18,23
300:2,7 301:3
301:9,13,18,23
303:20,22
305:12 306:3,9
307:2,5 309:11
310:23 311:9
311:12,16,23
312:4,8,19,25
313:6,19 314:1
314:8
**campus (36)**
65:9,11 92:15
98:7,15,24,25
99:5,24 139:4
139:10,13
142:9 196:16
197:22 241:18
242:3,5,6
245:2,22 246:1
246:15 251:3
268:15 272:12
274:4 277:23
278:3,4 282:12
283:14 290:23
295:2 296:25
308:1
**cancer (6)**
75:18 90:14
91:6 98:3,21
272:21
**capriciously (1)**
299:2
**caption (1)**
315:11
**card (3)**
185:23 186:1,6
**care (8)**
74:22 98:5,22
148:17 162:14
219:2 237:2
272:22
**caret (1)**
309:18
**case (36)**
48:8 54:15
58:10,22 59:9

62:11,18 63:16
64:12,15,24
65:8 71:8 72:7
112:1 118:1,4
118:8,20
134:22 135:5,8
214:17,21,24
215:2,5,10
220:11 224:21
251:14 264:22
298:4,11 300:3
301:17
**cases (1)**
64:9
**cash (16)**
68:8,13 143:18
157:14 158:19
159:13,20
162:24 168:15
169:24 176:11
179:5 194:5
237:15,16,25
**cashed (1)**
144:7
**cashier (37)**
65:21 68:10
137:23 138:11
138:19 139:1,7
155:9,13,17
159:23 162:4
163:3 166:21
171:24 172:2,4
172:13,16
176:6 180:13
180:14,18
181:20,25
186:17 188:12
191:23 197:12
198:20 202:11
202:20,24
222:4,7 223:5
290:13
**cashiers (5)**
155:21 160:7,24
202:17 213:9
**cashier's (2)**
156:12 160:21

categories (1)
244:22
cause (4)
71:8,10 234:15
300:24
caused (5)
106:16 234:11
239:8,12 264:8
CEI (4)
62:11,18 63:8,20
cell (2)
313:1,2
CEM (3)
75:18 90:13,20
center (7)
49:17 65:13
98:4,6 272:20
272:25 294:20
cents (2)
144:7 147:3
certain (10)
65:19 67:10,12
67:20 75:11,12
98:8 132:24
156:17 231:7
certainly (2)
91:13 306:18
certification (1)
189:20
certify (4)
315:7,10,11,13
challenge (1)
62:17
challenging (1)
59:12
chance (4)
142:25 210:24
246:7 282:9
change (18)
52:19 56:20
88:3 89:6,24
144:8 155:14
155:15 158:16
174:7,16
187:16,18
194:2 225:10
225:17 249:24

294:14
changed (2)
189:11 255:16
changing (1)
159:12
Charles (1)
49:15
Charlie (1)
237:11
check (9)
80:21 93:17
96:13 158:14
174:17 223:2
289:25 295:10
312:22
checked (2)
225:14 295:15
checking (1)
166:23
chef (1)
208:2
children (1)
242:20
Children's (4)
65:14 242:22,24
272:24
chronic (1)
223:5
church (2)
190:1,2
Circle (1)
273:13
Circuit (4)
61:4,6,14 62:12
circumstances...
113:7
citation (10)
102:2,3,5,17
103:6,8,22,25
104:2 302:19
citations (2)
104:6 302:15
city (9)
66:16 72:18
98:12,14,16
273:8,12,24
274:16

Civil (1)
315:14
claim (4)
55:10,15 57:17
58:6
Claimant (2)
48:9 49:3
claimants (1)
57:21
claimed (1)
201:17
claiming (1)
280:1
clarify (2)
107:10 209:9
clause (1)
55:22
clean (2)
120:22 133:4
clear (26)
52:12 54:19
56:11 57:16,23
59:9,10 61:13
62:7 63:6
77:17 99:18
108:10 120:16
139:12 140:23
148:9 150:17
196:9 200:14
201:1 202:15
261:19 265:24
279:18 301:14
clearly (4)
71:8,13 175:9
234:19
Clegg (2)
293:19,23
Clegg's (1)
293:23
Cleveland (31)
48:19 49:9,17,19
52:6,9,16,17
54:3,8 55:25
57:14 61:4
65:12 66:9,16
72:19 78:4
98:13,14,16,23

122:3,17,19
127:10 139:15
139:16 190:3
273:24 274:16
client (1)
64:17
clients (1)
313:2
clock (1)
183:8
close (7)
106:21 160:25
237:8,13 282:4
311:16,17
closely (2)
250:24 251:4
closer (3)
164:2 183:1
209:25
closes (1)
172:16
closest (2)
233:9 242:3
clothes (1)
184:23
clue (1)
219:3
Coach (1)
310:14
code (33)
66:20 67:13
70:4 71:14
79:20 99:6,21
112:24 113:4
114:22 127:6
249:10,16,18
252:9 254:19
255:4,6,15,19
263:2 267:15
268:3 270:16
275:18 280:13
280:14,15
282:25 297:6
307:15,16
309:18
cognizant (3)
57:8 249:23

266:1
collaboration ...
218:7
collected (1)
256:17
collecting (1)
232:5
Collective (2)
123:21,25
colon (1)
158:8
column (1)
253:23
come (49)
54:5 56:15 67:9
68:25 70:13
80:8 84:8,10
129:14 131:4
140:9 141:4,7
148:13,18
155:12,25
157:20 161:19
161:20 162:5
168:16 171:8
185:17 188:13
188:16,24
190:21 191:3
191:15 199:3
200:20 209:17
213:15,20
218:10 224:16
224:17 226:18
227:3 244:2
263:25 270:11
270:20 278:3
294:25 306:12
306:13 313:2
comes (4)
181:23 211:23
259:8 278:4
comfortable (3)
205:22 208:19
213:13
coming (13)
95:14 135:12
137:17 145:15
146:17 160:21

168:18 169:19
186:19 213:13
221:22 225:1
252:19
**commencing (1)**
48:21
**comment (1)**
63:15
**commentary (1)**
63:5
**comments (9)**
55:6 69:3,11
124:17,18
228:15 244:17
244:21 246:23
**commission (1)**
315:23
**commissioned...**
315:6
**commitment (1)**
216:22
**common (4)**
72:9 264:25
265:3 283:21
**communicate ...**
289:2
**communicate...**
94:2,6,7 107:12
211:13 289:4
**communicatio...**
263:15
**community (3)**
71:18 272:12
274:17
**companies (3)**
78:22 114:15
284:6
**company (13)**
61:5 66:25
74:11 84:1
108:25 109:24
153:3 164:11
216:11,22
229:13 230:14
265:10
**Compensation...**
269:20

**complainant's...**
57:18
**complaining (1)**
265:14
**complaint (6)**
53:7 56:18
59:15 163:16
164:18 290:13
**complaints (4)**
53:24 155:24
156:3 163:15
**complete (2)**
69:22 80:11
**completed (7)**
80:21 90:20
112:22 243:7
255:2 274:3
275:17
**completely (1)**
159:24
**complex (2)**
92:21 93:1
**complies (1)**
275:13
**comply (2)**
66:20 71:11
**complying (2)**
243:16 268:11
**component (1)**
109:12
**components (2)**
76:12,14
**compound (1)**
246:10
**Comprehensio...**
94:16
**comprise (1)**
82:21
**comprised (1)**
54:8
**computer (3)**
94:19 202:9
231:12
**Computer-Ai...**
315:8
**concede (1)**
127:19

**concern (3)**
216:16 234:15
261:11
**concerned (9)**
63:2 64:16
217:6 218:20
232:15 238:15
250:17 261:9
311:22
**concerning (1)**
280:16
**concerns (3)**
263:7,9,11
**conclude (1)**
251:21
**concluded (1)**
314:15
**conclusion (6)**
232:16 254:17
255:14 278:15
301:20,22
**concur (1)**
52:10
**conditions (1)**
110:20
**conduct (68)**
66:20 67:13,20
70:4 71:14,23
72:14 79:24
81:19,22 82:4
82:12,15
101:13 103:8
112:25 113:4
114:22 127:6
131:23 134:3
187:21,25
209:3 248:9
249:10,16,19
252:10 253:9
253:16,18
254:10,19
255:4,6,10,15
255:18,19
263:2 265:14
267:15 268:3,4
268:17 270:17
275:18 278:16

280:14,15
282:25 283:22
294:11 297:6
304:3,9,11
305:5,20,22
306:4 307:6,9
308:4,14,15
309:18
**conducting (1)**
308:7
**conference (3)**
85:4 108:4
113:19
**confirm (2)**
96:13 304:8
**confirmation (1)**
55:10
**confirmed (4)**
124:11 208:10
208:11,13
**confused (1)**
138:11
**confusion (1)**
199:24
**connected (1)**
243:6
**connection (1)**
288:18
**connects (1)**
242:9
**consider (4)**
104:16 230:21
302:22,24
**considered (3)**
241:14 274:23
308:23
**consisted (2)**
75:16 94:21
**consistent (10)**
89:6 207:3
267:19 268:2,8
280:5 305:18
305:21 306:2
308:8
**consistently (1)**
246:22
**consists (1)**

92:21
**constructed (1)**
76:5
**construction (...**
48:6 57:15,19
65:1,1 66:3,6
66:10,25 67:17
67:23,25 69:10
70:9 75:20,25
76:9,19,22
78:5,11,13
84:1 85:3,4
93:13 94:6
95:13 97:20
99:23 103:23
104:1 108:14
108:18 109:17
109:21,23
116:10 120:4
120:11,15
123:19 124:2
131:17 143:13
144:2 145:19
150:11 186:13
186:18,21
195:14,15
219:4,7,12
231:7 236:2,9
236:14 237:2
243:5 256:8,10
256:14,21
258:16 262:21
262:24 265:10
266:1 267:13
272:4,10 273:5
273:9 274:4
275:16 277:22
278:2,7 281:12
281:13,14,22
281:23 282:24
283:21 284:3,6
284:14 285:10
287:19 288:10
288:20 289:14
289:17,19,21
292:5,25 293:8
295:7,13 296:8

296:17,24
297:4,19
298:18 300:17
302:4,8 303:5
310:2
**consulted (1)**
200:2
**consumed (1)**
167:1
**contact (6)**
183:17 230:17
250:23 266:7
302:10 303:3
**contacted (5)**
84:1 230:7,9
251:16 289:23
**containers (2)**
100:3 307:20
**contains (1)**
269:18
**contended (1)**
52:13
**contest (1)**
62:20
**continuation (1)**
62:4
**continue (9)**
61:8 70:21 97:5
121:2 188:12
204:11 206:3
233:20 301:1
**continued (8)**
51:1 71:20
130:7 136:22
163:5 256:15
256:23 277:18
**continuing (1)**
206:11
**continuous (1)**
60:17
**continuously (1)**
121:23
**contract (23)**
64:8,9,15 65:18
75:22 76:7,14
84:5 98:2
100:5 102:11

102:14 105:21
108:12,15,16
108:17 121:16
124:1,7 126:13
128:3 315:14
**contractor (11)**
78:17,18 84:4
93:24 102:9
108:11 109:6
258:24 259:1,4
297:14
**contractors (14)**
66:7 71:4 88:16
88:18 93:19,22
93:23 105:15
105:16,22
109:9 260:2,3
260:8
**contractor's (1)**
102:13
**contracts (4)**
65:6 78:20
289:20,22
**contractual (2)**
105:15 126:15
**contrary (1)**
265:14
**control (2)**
79:18 181:24
**conversation (...**
107:11,13
147:11 168:19
168:22 180:5
191:5 211:20
213:22 218:5
225:8 226:6
234:8,10
256:16
**conversations ...**
232:12 266:14
280:20
**cooperate (1)**
255:1
**cooperation (1)**
102:8
**copies (4)**
250:7 257:19

266:10,12
**copy (5)**
60:10 73:2
107:4,6 109:24
**core (3)**
252:22 273:1
274:23
**corner (4)**
92:23 178:3
233:10 295:19
**correct (77)**
57:25 60:15
73:16,18 75:4
81:2 85:13,14
87:20 92:15,16
93:25 95:7,21
95:25 98:24
99:5,7,8 104:2
104:3,9,14,23
108:3,5,6,14
108:21,22
109:6,7,19
113:15,24
114:3 116:11
121:3,17
123:23 124:14
125:14 126:8
126:23 133:21
134:5 143:3
149:18 154:6,7
157:17 159:16
160:6 171:1,2
185:19,23
187:18 216:8
225:10,17
226:23 238:13
244:24 250:6
258:5,12,21
264:1,2 282:22
289:8,15
294:16 310:21
311:7 315:9
**correction (1)**
93:5
**corrective (1)**
245:4
**correctly (6)**

102:7 184:1
267:12,22
294:18 295:18
**costs (1)**
56:6
**council (16)**
52:7,10,17,18
53:14,15 54:3
54:8 56:16
57:15,20 66:10
66:10 67:25
72:16 78:5
**counsel (7)**
171:8 203:1
234:24 235:2
263:16,22
315:12
**counsel's (1)**
62:10
**counter (6)**
159:14 163:5,18
177:4 179:15
182:23
**country (1)**
291:22
**county (3)**
273:8,12 315:3
**couple (9)**
80:17 93:2
109:14 111:15
118:3 119:1
148:20 221:5
307:17
**coupon (4)**
69:13 89:25
164:8 238:16
**course (3)**
116:6 189:12
259:17
**court (19)**
53:6 56:6,13,15
57:6 59:16,22
59:24 61:1,10
62:19,20
139:21 151:1
196:10 300:4
314:6 315:5,14

**courteous (1)**
125:9
**courtesy (9)**
81:19,21,25
82:11 101:11
101:16,24
115:5,7
**court's (1)**
61:16
**cover (2)**
96:5 203:5
**covered (9)**
95:20 97:20,24
98:9 100:17
112:21,22
255:1 274:2
**covering (3)**
202:11,16,20
**covers (1)**
98:3
**Co-worker (1)**
172:5
**co-workers (2)**
68:5 131:1
**cream (1)**
152:18
**create (1)**
224:7
**created (2)**
231:3,10
**creation (1)**
224:3
**credibility (2)**
306:11,19
**crew (1)**
222:13
**crimes (2)**
253:25 254:2
**criminal (1)**
80:20
**critical (1)**
53:21
**cross (6)**
50:4 91:22
117:25 118:6,9
135:4
**crossed (1)**

158:3
crosses (1)
125:16
cross-examina...
92:7,9 119:24
134:22 136:12
150:8 214:3
232:21 246:8
257:3 286:6
cross-examine...
118:2
cross-examini...
118:19
crying (5)
162:20,23 165:9
165:10 227:19
cultures (1)
252:20
cure (1)
56:22
current (1)
241:3
currently (1)
137:18
curse (1)
276:24
cuss (1)
207:13
cussed (3)
129:3 130:1
306:15
cussing (4)
69:16 149:1
305:1,15
customer (8)
69:8,14 155:22
156:4,7 222:12
222:20 224:18
customers (7)
148:17 155:23
173:21 176:15
219:10 235:21
284:15
customer's (1)
164:12
cut (4)
140:2 145:8

146:14 180:25
_____
**D**
D (15)
50:1 51:1 81:5,7
81:8,11,16
82:17 99:12,18
101:2,8 115:5
288:4,17
daily (1)
197:17
damage (1)
248:12
Dan (6)
197:25 198:1
232:11 263:19
263:22,23
dark (3)
174:25 179:16
179:18
dark-skinned ...
182:24
data (2)
55:21 298:6
date (29)
77:19 83:7,17,23
83:25 84:21,22
84:23,24 85:23
86:1,7,10,20
87:6,8 103:22
120:24 122:13
143:16 161:22
166:22 176:9
192:14 204:7
217:8 312:6,18
313:5
dated (2)
158:2 288:7
dates (2)
223:9 312:2
Dave (4)
67:15 70:9
231:13,13
David (6)
49:14 50:9
169:4 195:20
195:25 196:1

day (49)
48:21 53:5,18
56:23 69:2,19
84:20 95:2,12
135:23 136:6
153:7,9,10
154:17 161:18
161:20,21,22
162:1,3 163:2
163:7,8 164:7
167:11,12
171:21 182:9
190:20 191:25
192:16 200:23
208:6 212:9
213:17 217:12
220:14 230:7
234:25 235:4
238:6,8 285:15
293:14,14
299:9 313:13
315:16
days (10)
91:11 123:4
148:20 161:16
169:1 217:5,17
235:16,17,18
daytime (1)
310:18
day-to-day (2)
75:6 108:20
deal (2)
155:23 265:20
dealing (3)
147:18 218:18
224:18
dealt (4)
148:23 168:17
174:23 190:17
Dean (2)
315:5,22
December (1)
55:16
decide (1)
136:16
decided (3)
54:11 64:5

210:18
decision (34)
56:19 61:2,4
71:2,9 112:1
211:1 218:22
277:16,17,20
277:21,25
278:1 288:23
289:1,1,2
290:4,9,20
293:15,25
294:4,15 297:8
299:14 300:5,8
301:5,8,11,15
305:7
deduction (1)
180:16
defense (1)
269:1
defer (1)
134:25
deficiency (2)
56:23 57:1
define (1)
110:21
defined (3)
259:11,15
315:14
defines (1)
104:24
definitely (1)
148:1
definition (1)
260:7
degrading (1)
253:7
delineated (1)
289:22
Demand (8)
53:16 59:2
61:11 64:6
66:12 67:1
85:20 86:3
denial (1)
60:3 304:14
denied (14)
59:20,20 60:5,6

61:1 72:21
290:22,25
294:10 304:2,8
304:16 306:7
306:13
deny (3)
61:10 130:5,14
department (7)
256:14,21
282:24 298:9
298:14,18
300:17
departments (1)
241:13
department's ...
245:1
derogatory (2)
117:7 276:21
describe (7)
88:24 173:8
236:25 241:11
252:4 255:18
255:22
described (4)
94:12 112:6
254:7 308:15
describing (1)
190:18
description (4)
55:16 57:17
107:15 173:14
designated (7)
100:1,12 307:19
307:25 309:20
309:23,25
desire (1)
314:13
desk (1)
276:3
despite (1)
69:17
detail (1)
307:10
details (2)
201:6 262:5
determination...
134:8 218:2

256:22
**determination...**
243:22
**determine (5)**
204:17 210:10
262:10 292:8
297:17
**determined (2)**
69:7 70:2
**determining (2)**
210:2,4
**device (1)**
237:24
**difference (4)**
57:14 125:11
157:21 245:25
**different (21)**
68:2 78:22
105:23 121:15
153:7 154:18
154:19 173:1,1
236:15,17
242:10 245:22
252:20,20
257:23,25
265:23 293:10
296:12,13
**differently (1)**
255:8
**difficult (1)**
144:21
**digital (1)**
216:3
**dining (9)**
224:17,20,23
225:2,6 226:24
226:25 235:24
235:25
**dinner (2)**
160:15 192:21
**DIR (1)**
50:4
**direct (15)**
67:22 74:2
118:2,9 134:23
135:2 137:15
196:7 221:3

223:7 240:20
244:4 262:11
271:21 273:14
**directed (5)**
70:14 72:22
85:12 254:1
264:14
**directing (1)**
108:20
**direction (2)**
61:16 251:11
**directions (2)**
67:18,19
**directive (1)**
107:21
**directly (6)**
105:25 225:7
242:12 259:10
261:17 289:4
**director (1)**
256:8
**disagree (2)**
116:11 129:16
**disagreements...**
116:8
**disagrees (1)**
62:10
**discharge (8)**
245:5,9,16,19
247:11 249:2
253:20 254:11
**dischargeable ...**
292:7
**discharged (3)**
71:23 247:2,8
**disciplinary (3)**
156:21 269:22
288:20
**discipline (5)**
156:22 265:17
281:6 302:7,20
**disciplined (2)**
156:17 303:9
**disconnect (1)**
302:25
**discreet (1)**
136:13

**discrimination...**
279:19,23
**discuss (7)**
84:9 106:12
185:15 192:9
194:17 228:15
311:1
**discussed (7)**
106:14 113:23
149:4 190:23
260:4 279:14
287:10
**discussion (6)**
174:16 177:5
178:6 207:2
218:9 232:7
**disk (1)**
170:24
**Dismiss (3)**
53:5,6 59:13
**dismissed (1)**
53:23
**disparaging (1)**
253:8
**displayed (1)**
203:12
**dispose (2)**
100:2 307:19
**dispute (1)**
69:14
**disputes (1)**
117:18
**disrespectful (1)**
278:17
**disseminated (2)**
280:18 281:2
**distracted (1)**
229:25
**district (7)**
59:16,16,24,25
61:1,10 273:13
**disturbing (1)**
298:25
**diverse (1)**
252:18
**diversity (14)**
66:14 72:17

252:12,14,17
274:18,20,25
275:1,5,6
278:25 279:14
280:17
**document (27)**
55:6,14 77:4,16
79:12,19 81:4
81:6,12 114:9
142:19 166:1
166:16 167:5
206:21 223:24
248:5 249:12
270:3,5,6
273:17 286:20
287:2,9 288:8
288:13
**documents (4)**
79:7,11 223:19
249:17
**dog (3)**
81:7,8,16
**doing (7)**
57:12 106:6,18
156:12 170:7
180:16,17
**dollar (3)**
144:6,6 147:3
**dollars (6)**
75:21,21 144:6,9
144:11 183:22
**door (3)**
227:18 273:1
302:21
**Doubletree (1)**
48:18
**doubt (2)**
124:19 129:13
**doubts (1)**
282:12
**Dougherty (7)**
198:5 200:3
201:3 220:16
220:21 232:23
250:12
**downtown (1)**
98:23

**drafted (2)**
287:5,6
**drafting (1)**
55:21
**draw (3)**
80:5 128:3
225:19
**drawer (8)**
156:16,20
157:19 159:1
160:4 169:25
198:22 222:24
**drawers (1)**
158:20
**draws (1)**
194:10
**drew (1)**
153:25
**drive (3)**
92:23 170:9
295:20
**drops (1)**
160:22
**drug (2)**
80:19 269:19
**due (10)**
56:7 70:24
171:9 291:23
291:23 292:11
299:13 301:23
303:24 306:11
**duly (1)**
315:6
**duties (7)**
74:19,19 77:7
241:19 250:2
272:9 286:13
**duty (3)**
133:6 230:5
312:24
**D-o-u-g-h-e-r-...**
220:22

---
**E**
---
**E (5)**
48:9 50:1 51:1
315:1,1

**earlier (5)**
102:21 217:5,8
217:11,17
**earliest (1)**
312:6
**early (4)**
85:21 86:4,18
290:6
**earning (1)**
122:9
**easier (1)**
139:21
**East (2)**
49:8,18
**eat (12)**
99:25 100:1,12
133:4 195:14
212:16,18
219:13 282:17
295:3 307:18
307:22
**eating (3)**
93:13 219:8
236:2
**economy (1)**
274:19
**effect (2)**
195:13 250:7
**effort (1)**
274:18
**efforts (1)**
72:15
**eight (8)**
104:15 105:8
137:25 138:11
138:13,20
151:13 221:16
**eight-month (2)**
153:23,24
**Einstein's (2)**
196:19 197:18
**either (7)**
67:6 78:19 89:4
107:12 157:17
160:4 242:12
**elaborate (1)**
269:20

**elaborated (1)**
115:9
**elaboration (2)**
114:22 115:10
**elected (1)**
77:10
**Electric (1)**
61:4
**electronically ...**
178:5
**elevators (1)**
237:12
**embarrassed (1)**
187:25
**embrace (1)**
252:17
**emergency (3)**
98:4,21 272:25
**emphasized (1)**
302:11
**employ (3)**
76:21 78:15
256:19
**employed (14)**
65:20,22 66:24
67:6 74:8,12
74:14 137:18
138:2,4 240:25
259:9 271:23
271:25
**employee (70)**
53:13 65:22,25
67:17 68:9
70:10 80:24
81:1 101:12
102:12 105:4
106:20 107:19
113:14,17
117:14 127:15
128:9 130:24
131:8 134:3,14
134:17 139:2
141:22 142:11
150:18 151:18
152:9 154:5
155:8 197:9
198:10 208:18

222:1,2 241:15
243:24 245:14
247:1 253:12
253:18 254:9
255:9 260:13
260:16 261:9
261:12 262:7
263:7,23,23
264:10 266:21
269:6 270:25
276:4,18 277:5
278:19 293:6
303:3,6,8,11
303:14 304:23
305:16 309:9
315:12
**employees (69)**
65:19,20 66:3
67:9 68:22
71:5 80:8
81:21,23 82:11
82:18 85:25
90:6 101:14
102:9 104:9
111:24 114:24
117:10,15
125:13 132:14
141:6 185:22
186:5 196:23
196:24 197:2
197:19 210:23
212:23 213:12
214:22 229:10
230:24 236:7
236:22 241:23
242:18 243:15
244:2 245:2
246:11 249:25
251:2,5 264:14
264:14 268:25
270:16,21
271:2 278:5,12
281:18,23,24
282:21 283:13
283:18,18,22
284:14 285:21
285:23 303:7

303:13 304:23
307:22
**employer (14)**
50:3 62:24 67:3
74:10 113:20
120:4 132:11
137:20 196:13
221:8 240:22
254:1 265:13
265:25
**employment (...**
123:22 138:8,19
198:9 218:23
252:13,15
292:12,15
297:6
**employs (1)**
78:13
**encounter (3)**
104:20,22
237:21
**encounters (2)**
104:24,25
**ends (2)**
160:25 293:7
**enforce (1)**
78:10
**enforcement (1)**
250:3
**enforces (1)**
249:20
**engage (2)**
79:25 308:11
**engaged (1)**
105:2
**engaging (1)**
294:10
**engineer (4)**
74:17,20 75:5
92:12
**ensued (1)**
89:24
**enter (1)**
281:24
**entering (2)**
77:14 79:14
**enterprises (2)**

66:17,18
**entire (1)**
75:16
**entirety (1)**
72:21
**entities (1)**
78:14
**entitled (1)**
81:11
**entity (1)**
78:3
**environment (1)**
253:3
**epithet (4)**
290:22 291:12
304:10 308:23
**epithets (6)**
72:13 268:25
276:15 283:14
285:18,21
**equal (3)**
252:12,15
274:20
**equals (2)**
166:4,6
**escalated (2)**
224:22 230:18
**essentially (1)**
56:21
**established (1)**
300:11
**et (1)**
48:12
**Euclid (8)**
65:12 92:23
139:14 242:5
270:8 273:2
274:5 295:19
**evangelistic (2)**
189:17,20
**evenhandedly ...**
264:21
**evening (10)**
84:20 85:1
87:14 95:11
160:22,23
166:24 172:15

226:8 230:6
**event (2)**
54:9 292:7
**events (2)**
191:19 290:16
**eventually (1)**
233:9
**everybody (8)**
79:21 80:18,19
80:20 129:8
132:19 158:4
222:17
**everybody's (1)**
100:5
**evidence (13)**
71:12 80:19
97:16 266:21
291:10 299:14
299:16 300:8
300:14 301:6
304:19 306:21
306:22
**evident (2)**
59:1 64:7
**evidently (2)**
281:8 300:14
**exact (3)**
78:1 85:23
122:13
**exactly (7)**
156:13 170:22
176:16 192:19
202:24 299:16
301:18
**examination (...**
74:2 111:17
117:3 118:10
137:15 187:13
196:7 221:3
240:20 267:6
270:13 271:21
303:21
**examined (7)**
73:10 119:8
137:4 195:21
220:17 240:3
271:10

**example (3)**
173:11 295:10
303:7
**exchange (1)**
228:7
**exclude (9)**
71:4 72:11
85:12 112:2
114:2 126:14
127:15,21
134:2
**excluded (11)**
70:11,20 72:8
90:6 120:18,24
123:11 126:8
268:18 305:4
305:11
**excluding (1)**
304:4
**exclusion (5)**
91:5 114:1,8,9
114:15
**Excuse (5)**
103:16 138:10
145:2 291:8,15
**excused (1)**
71:15
**execute (2)**
109:22 289:1
**executing (1)**
289:20
**executive (2)**
77:24 208:2
**exercise (1)**
187:5
**exhibit (55)**
54:19,21 60:12
60:13,18,21,24
61:11 72:25
73:5 77:3 79:1
81:4 94:15
97:23,24 98:1
98:21 99:2,13
99:17,21 101:3
109:15 142:13
142:18 157:25
167:5 170:7

190:13 203:9
203:11 206:20
209:15 215:23
223:20 231:2
244:6 247:24
248:4 249:6
254:21 259:19
263:2 267:9
269:18 270:3
273:15,19
286:20 287:3
288:4,17
307:14 314:7
**exhibits (9)**
50:14,18 51:3
78:25 203:16
249:18 313:18
313:22 314:2
**expect (6)**
71:1 136:11
247:7 270:1
284:13 307:24
**expectation (2)**
266:14 289:6
**expected (3)**
252:5,8 265:25
**expects (1)**
271:2
**experience (1)**
285:9
**experienced (1)**
268:23
**expert (1)**
258:14
**expires (1)**
315:23
**explain (4)**
146:23 225:15
227:21,24
**explained (4)**
88:2 89:2
105:14 227:25
**explanation (2)**
101:19 115:1
**explicit (1)**
80:6
**explicitly (2)**

282:7 301:4
**exposing (1)**
104:8
**express (1)**
302:11
**expressed (1)**
105:6
**extended (3)**
82:1 101:16
115:7
**extent (1)**
180:8
**extra (2)**
224:19,20
**extreme (1)**
299:10
**e-mail (12)**
83:21 85:11
87:6,11,12
106:23 107:3
107:13 170:9
276:2 290:10
314:6
**e-mailable (1)**
314:4
**e-mailed (1)**
170:10

_____
**F**
**F (4)**
49:15 228:23
240:12 315:1
**face (3)**
159:4,5 167:2
**faces (2)**
175:22,22
**facet (1)**
96:16
**facilities (4)**
88:16,17 93:20
272:13
**facility (4)**
88:9 103:19
105:13 273:1
**fact (12)**
53:1,23 63:16,21
68:23 70:22

110:2 159:23
178:20 180:5
199:22 236:16
**facts (8)**
62:18 63:6 71:7
83:10 113:6
118:17 213:2
261:13
**faded (1)**
245:10
**failure (1)**
263:17
**fair (6)**
111:9 156:1
160:20 173:14
233:3 266:2
**fall (2)**
90:22 104:19
**familiar (13)**
198:15 199:2
221:24 222:8
243:11 269:3
276:1 277:13
279:6,8 280:23
288:3,16
**families (3)**
242:20 278:6,13
**family (13)**
82:1,14 101:17
114:25 115:8
116:1,4,7
125:14 167:8
252:18 267:25
312:12
**fan (1)**
73:24
**far (14)**
53:9 63:2 64:15
92:25 183:17
186:24 216:18
216:20 218:19
232:3 233:6
237:8,11
311:21
**favor (1)**
209:14
**February (23)**

85:21 86:4,12
86:18,18,21,22
87:3,9,11,19
97:15 102:22
102:25 103:7
104:13 105:24
106:11,16,22
120:17 222:6
290:6
**Federal (11)**
53:6 56:13
59:16,24 60:25
61:9 63:15,17
63:19 273:12
300:4
**feel (17)**
162:16 187:23
190:19 193:19
193:25 205:22
206:14,17
207:14 208:18
208:19 210:22
213:13 216:17
239:19 254:8
261:18
**feeling (1)**
209:10
**feelings (1)**
162:19
**feet (2)**
233:13,17
**Feldman (292)**
48:20 52:3
54:14,20 55:2
55:5,8,18,23
56:3,25 57:5
57:13,24 58:5
58:11,18,21
59:5,22 60:2,7
61:19,21 62:2
62:13,23 63:10
63:13 64:1,11
64:22 65:24
72:24 73:3,8
73:12,15,17,19
73:22 74:23
81:7 82:8 83:4

83:9,13,18,23
84:17,21 85:17
86:1,24 87:2,5
87:8,10,15,18
89:14 91:8,15
91:25 92:6
95:22 96:4,9
96:15,18 97:4
98:17 100:19
100:23 101:6
103:16 110:13
111:11,14
114:5,11
115:15 116:13
117:2,23 118:5
118:11,15,25
119:10,13,16
119:20,23
126:10,16
128:5 134:7,11
134:19 135:2,6
135:14,20,25
136:5,15 137:6
137:9,12
138:10,15,21
139:5,24
144:25 147:9
150:7,21,25
152:22,24
153:4 157:1,5
162:21 164:22
164:25 167:10
169:7 170:13
170:18,23
171:5,14 175:5
175:23 179:21
179:25 185:25
188:2 191:18
191:22,25
192:4,6,9,12
192:16,20,25
193:3,6,10,16
193:18,21
194:3,8,11,13
194:16,20
195:3,6,18,23
196:1,4 198:13

200:4,11 201:7
202:7,10,14,19
203:13,22
204:1,4,11
206:8 207:18
208:11 214:1
214:11,13
215:2 220:1,5
220:10,13,19
220:24 221:2
225:25 230:9
233:19 238:24
239:3,6,11,21
239:24 240:5,8
240:11,15,18
245:6,10 246:2
246:6 247:19
264:5,17 265:2
265:12,22
266:4,9,16,19
267:2 269:13
271:6,12,14,16
271:19 276:6,9
277:8 280:9,15
281:1,4 282:3
282:8 283:5
284:9 285:6,25
286:3 289:9
291:8,15,18,22
292:6,10,17,20
293:2,12
297:23 298:3
298:10,15,19
298:24 299:5
299:15,21,25
300:3,9,23
301:7,11,16,21
301:25 303:17
303:19 305:8
307:1,4 309:13
311:11,14,21
311:25 312:16
312:18,22
313:4,12,15,21
314:12
**fellow (5)**
68:5 172:3

234:24 235:2
263:7
**felt (19)**
164:10,11,16
168:14 181:7
183:18 188:4
191:14 206:16
207:15 208:17
208:25 210:19
218:6 261:18
277:5 278:19
281:19 291:10
**female (1)**
66:17
**females (3)**
184:21 208:25
209:2
**field (1)**
106:2
**fifteen (1)**
185:13
**fifth (1)**
253:23
**fight (2)**
105:3,5
**fighting (4)**
82:6 104:23,25
124:23
**figure (2)**
136:5 147:1
**figures (1)**
273:9
**file (4)**
53:16 58:6
131:13 297:25
**filed (6)**
52:15 58:2 59:3
59:15,17
123:18
**filing (2)**
53:7 55:15
**filings (1)**
60:1
**fill (1)**
222:15
**film (6)**
68:12 69:6

170:10 187:6,7
187:15
**final (3)**
113:10 218:6
287:9
**finally (3)**
82:8 106:21,21
**financially (1)**
315:12
**find (10)**
131:5 158:15
254:4 291:1,6
297:5,19 306:4
308:14 309:6
**fine (7)**
55:1,3 143:25
145:5 233:14
238:9 312:21
**finish (4)**
120:20 136:4
139:22 174:22
**finished (3)**
166:18 218:12
218:18
**finishing (1)**
212:7
**fire (1)**
218:22
**fired (6)**
292:16,18 293:1
293:3,8,10
**firm (4)**
284:8,11 286:24
315:14
**first (48)**
52:23 63:1
64:10,14,18
67:8 77:19
83:18 84:17
88:12 94:18
95:18,24 102:5
104:8,22 106:7
158:7 163:7,10
166:7 168:21
170:14 171:14
174:23 180:2
180:12 181:1

193:13 199:1
201:15 203:5
216:10 223:18
238:12 246:19
248:14 250:13
252:12 253:6
267:8 295:23
295:25 298:22
302:20 307:18
312:14,17
**fit (1)**
300:1
**five (6)**
122:1 135:7
144:6 185:13
235:16,18
**five-minute (1)**
91:24
**floor (4)**
235:20 272:23
272:24 310:3
**Florida (1)**
312:12
**fly (1)**
136:9
**follow (9)**
67:14 105:16
140:2 213:9
225:21 234:21
251:13 270:3,5
**followed (5)**
113:20 123:13
134:16 213:2
225:14
**following (5)**
48:23 69:19
82:12 97:7
229:13
**follows (7)**
73:11 119:9
137:5 195:22
220:18 240:4
271:11
**follow-up (2)**
234:21 267:5
**food (17)**
88:2 155:10,17

156:15 159:15
159:21 172:8
181:10 186:7
196:18 197:19
214:16,21
227:1 235:20
310:6,11
**foot (1)**
96:7
**footage (4)**
158:6,22,25
237:18
**force (1)**
76:24
**foregoing (2)**
315:8,11
**foremost (1)**
52:23
**foresee (1)**
300:20
**forgot (1)**
190:19
**form (6)**
55:3 206:5
265:7 285:1
314:5,5
**formalized (1)**
77:13
**formally (1)**
313:20
**formed (1)**
311:4
**forms (1)**
284:5
**forth (2)**
110:4 275:4
**Forty (1)**
152:13
**forum (2)**
62:14 63:14
**forward (8)**
54:5 59:11 61:7
61:15 63:3
69:22 231:5
263:25
**forwarded (2)**
262:1,3

**fostered (1)**
300:25
**found (7)**
199:22 245:14
248:24 251:15
302:8,16
311:20
**foundation (1)**
283:3
**four (4)**
75:17 122:1
235:16 241:2
**fourth (2)**
272:24 310:2
**frame (3)**
203:5 212:10
231:16
**frames (1)**
231:17
**fraud (1)**
299:1
**FRC (1)**
50:4
**FRD (1)**
50:4
**Fred (1)**
108:9
**free (4)**
71:17 121:1
188:15 253:3
**freely (3)**
70:17,18 128:25
**freeze (2)**
231:16,17
**frequent (1)**
219:10
**frequently (1)**
249:25
**fresh (1)**
229:12
**Freshen (2)**
152:22 153:6
**Freshens (3)**
152:16,17,23
**Friday (10)**
154:24,25 200:2
200:4,6,11,19

212:11,12
223:11
**friend (9)**
82:1,14 101:17
115:8,20,24
117:6,6 125:14
**friends (3)**
114:25 213:6
267:25
**friendships (1)**
116:7
**front (21)**
70:5 94:14
105:19 109:15
117:7,15 128:9
128:25 130:3
131:1,9,19
132:3 133:15
182:19 273:1
280:22 304:23
306:13,17
309:19
**fucking (16)**
69:19 130:11,14
144:19 145:13
146:16 147:4
147:17,22,23
148:7,7,11
177:18 183:23
213:1
**full (2)**
127:4 294:24
**fully (7)**
59:19 63:20
70:1 71:1
194:16 242:8
311:1
**full-time (6)**
152:10,11
154:14,14
155:2,7
**function (2)**
90:16 241:24
**further (47)**
91:21 109:14
111:11,13
115:9,14,15

116:25 117:3
117:22 150:4
187:10 190:5
191:17 195:6
210:24 213:24
219:23,25
224:22 232:6
232:20 238:23
252:24 253:22
257:1 264:4
267:3 269:12
269:13 270:12
270:13 271:5
285:7 286:2
301:2 303:17
308:18 309:1
309:12,13
311:8,10,12
315:10,11,13
**future (1)**
136:17
**f-ing (6)**
144:12,15,16
212:23,25
228:23
**F-r-e-s-h-e-n (1)**
153:1
**F.3d (1)**
61:6

_____

### G

**Gallata (1)**
108:8
**gap (4)**
153:19,22,23,24
**gaps (2)**
257:12,14
**garage (1)**
76:13
**gate (3)**
172:14 180:14
180:20
**gated (1)**
176:24
**gather (1)**
220:8
**gears (1)**

159:12
**general (7)**
80:2 85:5 106:9
108:12 141:16
308:13,16
**generalist (1)**
241:7
**generalizing (1)**
225:24
**generally (1)**
243:11
**generated (1)**
55:14
**gentleman (27)**
69:5 125:10,12
125:22,25
126:3,7 127:1
129:8 146:8
147:15 181:23
199:11,13
201:16 205:18
206:18 207:13
207:17 208:20
210:7,20
231:14 256:6
267:18 309:5,8
**gentlemanly (2)**
131:19,23
**gentlemen (2)**
85:6 144:4
**Gerber (48)**
50:6 73:9,14,14
73:16,18,21,24
73:25 74:5,6
74:24 77:2
81:9 82:13
83:6,16,20,24
84:19,22 85:24
86:8,20 87:1,4
87:7,9,13,16
87:20,24 91:9
92:11 95:25
96:6,12,17,20
99:14 100:11
100:21 101:9
103:18 107:9
110:15 111:16

125:19
**Gerbert (1)**
91:21
**gesturing (1)**
219:20
**getting (7)**
69:17 119:15
166:16 206:6
212:7 230:6
285:6
**get-go (1)**
72:6
**Gilbane (69)**
52:24 64:25
65:1,3 66:5
67:6,12 74:11
74:13,14 75:16
76:7,16,21,25
78:6,9,15
79:12 81:13
84:5 85:8,11
93:17 94:23,25
95:19 96:8
103:22 106:25
109:23 110:4
111:23 113:11
113:12,22,25
114:1,2,18,23
126:22 127:5
130:24 131:7
133:20,23
260:22 261:6
262:13 266:7
267:24 279:6
279:15 287:20
287:23 288:5
288:25 289:5,6
289:9,23,25
292:21 295:12
296:18 297:18
302:10,19
**Gilbane's (11)**
70:12 75:24
76:16,17 77:7
78:24 85:5
97:20 98:2
106:9 289:13

**give (18)**
91:19 144:14
147:16 148:4,5
186:11 187:18
192:20 193:22
201:11 213:17
256:13 270:17
270:20 292:11
312:1,18,25
**given (16)**
67:18,19 81:25
101:16 115:7
170:17 225:10
238:16 251:25
258:17 265:15
265:19,21
266:9,12 278:7
**giving (4)**
69:12 170:18
264:11 303:24
**gladly (1)**
148:4
**glance (1)**
62:2
**glass (2)**
160:5 172:7
**glassed (1)**
172:9
**go (62)**
64:14,18 67:19
67:21 69:20
71:17 78:16
79:14 80:12
83:8 86:15
88:8 93:4,8
95:5,22 96:7
96:12 97:8,23
107:11 117:2
119:5 123:1
125:8 128:5
132:25 133:1
135:9,24
145:12,14
146:14,15
147:1 153:21
154:15 166:21
171:16 179:14

183:24 184:5
187:12 189:19
209:8 210:24
227:12 229:21
250:1 252:24
253:22 278:9
281:16 282:2
295:22 296:25
297:5 300:5
308:3,18
310:15 313:7
**goals (1)**
274:18
**goes (9)**
64:10 123:3
136:12 244:22
263:9 281:15
307:13 308:11
309:4
**going (82)**
53:19 56:5 58:3
62:13,21 63:3
63:13,14 65:10
68:2,18 72:10
74:13 90:17
111:1 112:21
118:18 119:5
123:6 127:2,21
131:5 132:16
133:18 135:8
135:14,23,25
136:1,14 140:2
143:12 144:14
144:23 145:11
146:8,23 147:4
147:16,23
148:2,5,6,8,12
153:18 159:2,3
162:19 170:16
170:20 171:6
174:13 175:5
177:15,17
178:9 181:22
182:4,15
190:20 191:3
199:1,23
213:14 220:7,9

224:21 234:20
243:5 254:25
260:6 268:11
270:21,24
273:15 275:16
277:22 280:20
293:9 307:12
313:9
**Goins (3)**
256:9,11 262:8
**GOLDSTEIN ...**
49:4
**good (7)**
106:18,20
173:20 196:11
198:10,18,19
**gotten (1)**
183:19
**govern (1)**
110:21
**governed (4)**
111:4 121:16
123:22 124:1
**government (1)**
273:12
**Gragel (167)**
49:4,5 52:1,5
54:1,17,24
55:4,7,13,20
58:8,13 60:9
60:15,19 61:20
61:22 62:9,15
62:23 63:8,11
63:18 64:2
73:23 74:1
86:6,14 89:9
90:15 91:23
92:8,10 97:6
98:19 99:19
100:14,24
101:10 103:20
107:6,14
110:14,16
111:9,12
112:17 114:4,7
115:4,17,19
116:14,25

116:14,25
118:13,21
126:9,12
127:17,23
129:17 134:6
134:25 135:4
135:22 136:3,7
141:18 145:23
147:7 150:9,10
151:7 153:5
157:8 158:12
161:12,13
163:1,8,12
165:3 167:14
169:11 170:8
170:22 171:2
171:18 173:9
173:19 175:8
176:1,22 177:9
177:23 178:15
178:22 179:23
180:2,22
181:17 186:1,4
187:10 190:7
191:16 195:8
195:10 199:15
203:4,15,24
204:3 206:5
214:2,4,15
215:4 219:22
232:22,23
233:12,15,21
234:23 238:22
245:23 246:4,9
247:13 257:4
264:3 269:16
270:12 279:1
279:24 283:2
283:24 284:17
284:25 285:24
286:5,7 289:12
293:13,22
302:1 303:16
303:18 304:7
305:6,25 306:8
306:20 307:12
309:15,17

311:8 312:8,17
312:20 313:14
313:17,24
314:3,10
**grandchildren...**
140:10
**grant (1)**
313:22
**granted (2)**
66:7 67:17
**great (3)**
222:11,16,17
**green (2)**
178:24 179:6
**grievance (15)**
52:6,8,15,18
53:5 54:15
70:25 72:20
81:1 82:22
123:18 124:6
127:25 131:13
296:2
**grievances (1)**
90:25
**grievant (11)**
64:16 96:10
98:18 118:16
123:8 126:16
161:11 199:18
264:10,22
265:5
**grounds (3)**
105:9 245:19,21
**group (6)**
78:25 79:7 96:2
96:3 222:19
287:22
**guess (5)**
80:17 124:3
236:16 243:23
294:23
**guests (1)**
278:2
**guilty (2)**
162:17 193:19
**guy (8)**
135:21 145:1

146:24 190:17
207:16,18,19
208:9
**G-e-r-b-e-r (3)**
73:17,25 74:7

---

**H**

**half (12)**
74:15 93:3,6
95:1 110:3
151:16 189:24
304:21 305:15
306:15,22,24
**hallway (1)**
237:10
**hand (5)**
77:18 157:23
273:15 280:22
315:16
**handed (6)**
79:5 142:17
144:5 162:13
225:17 248:3
**handing (4)**
77:2 86:12
231:23 244:10
**handle (2)**
130:20 217:13
**handled (6)**
228:9,9 260:10
260:13 263:21
290:1
**handling (2)**
157:14 234:19
**handout (1)**
97:1
**hands-on (1)**
155:20
**handwriting (2)**
142:23 229:19
**handy (2)**
259:20 263:3
**Hanson (96)**
50:8 65:20 66:2
68:9,17,23
69:3,17,21
70:6 105:3

129:14 135:11
137:3,8,8,10
137:14,17
138:13,17
140:3 142:17
145:2,24 147:8
150:6,10,23
151:5 152:23
153:1 157:3,7
158:11 162:22
163:10 164:24
165:2 167:12
169:9 171:13
171:19 174:5
175:4,7 177:22
180:8,11 181:1
186:2 188:4
190:5,8 191:21
191:24 192:1,5
192:8,11,15,18
192:23 193:2,5
193:9,12,17,20
193:24 194:6,9
194:12,15,19
194:22 195:5
195:16 197:6,7
203:2 205:10
205:11,13
207:8 212:19
221:24 223:16
235:3 237:21
238:6,9,12
241:21,22
255:12
**Hanson's (3)**
198:9,15 237:16
**happen (5)**
104:11 162:9
191:6,8 224:24
**happened (42)**
84:16 86:17
87:22 91:4
107:16 144:1,3
146:24 148:15
149:2,9 162:6
162:8 165:13
165:13,14

178:16 182:8
191:10 192:7
200:23 201:5
202:4 212:15
217:5 224:12
225:1,3 227:22
231:1,24
232:14 234:14
234:16 250:14
250:16,19
262:5 291:2,6
298:21,23
**happening (1)**
230:6
**happens (5)**
116:10 128:13
131:21 229:10
251:9
**happier (1)**
277:9
**happy (3)**
59:25 60:10
284:24
**harass (2)**
80:3 308:19
**harassing (1)**
253:9
**harassment (5)**
72:13 252:25
253:3 269:8
308:24
**harassment-fr...**
217:1
**hard (2)**
99:15 222:15
**Harting (176)**
49:23 50:7
66:24 67:5,9
68:4,25 69:15
69:23 70:3
72:3,8,21
80:25 82:20,23
84:12,24 85:6
85:12 87:25
88:24 89:20,22
89:23 97:11
102:23 103:2,9

103:10,23
104:18 105:2,7
105:25 107:21
108:4 111:20
112:2,5 113:4
113:16,20
117:25 118:24
119:7,12,12,14
119:19,21,22
120:1,3 129:18
158:16 161:5
161:15,19
162:3 163:4
164:9 174:3,7
174:15 175:9
175:12,15,17
179:2,3,4
183:13,18
184:10,16
186:9,21
187:16,23
188:13,15,24
189:14 191:2
192:13 193:8
193:23 199:2,5
199:24,25
210:11,15
211:3,9,11
214:6 218:3,9
218:23 219:17
225:12,13
226:17,22
227:11 228:4,5
230:23 232:8
232:17 233:8
233:22 234:7
235:6 237:22
238:9,17,19
250:11 251:21
251:22 253:19
254:17 255:5,8
256:11 257:19
258:11,15
260:9,15 262:6
267:18 268:17
270:2 275:24
276:1,14,20

277:2,16
282:15 288:23
289:3,24 290:5
290:15,18,21
291:5 292:2,12
293:15 294:3
297:9,10,20
303:2,23,25
304:2,4,9,16
304:18,21
305:3,19 306:7
307:25 309:1
310:24 311:2
312:10
**Harting's (18)**
67:3 68:16 84:6
106:12,14
114:19 116:16
116:19 225:22
256:14,22
276:17 277:17
278:16 305:20
307:6 308:8,14
**hate (1)**
254:2
**Hawk (24)**
50:9 169:4,15,17
195:20,25,25
196:1,3,5,6
200:6 201:9
202:8,12,18,22
204:8 207:19
208:13 214:5
214:12 231:13
299:20
**head (4)**
83:25 84:24
175:3 177:8
**heads (1)**
140:1
**Health (6)**
48:11 64:25
65:10,16
214:17,18
**hear (27)**
57:8 65:2 66:1
67:10 68:4,17

69:15,18,25
70:12 71:12,21
85:21 118:14
129:13 147:6
147:25 159:9
185:3 224:25
226:6 237:20
278:23 291:19
299:13,15
300:8
**heard (24)**
104:12 120:4
159:11 185:9
197:6 201:19
217:3 226:1,3
241:21,22
246:10,17
250:20 251:10
255:12 272:14
284:21 299:10
299:18,19,19
301:17 310:23
**hearing (12)**
48:17 53:5,10,19
60:1 61:23
62:4 94:12
124:5 280:12
300:24 301:5
**heart (2)**
127:25 193:25
**heated (1)**
183:19
**Heather (37)**
50:10 143:7
149:15,16
165:20,23
166:1,4,7,12
166:17 198:3,5
198:5 200:3,24
201:1,3,14
205:8 207:1
210:6 217:3,10
220:16,21
221:5 250:12
250:20 251:10
251:13 255:25
256:2,3 261:24

263:16 299:19
**Heather's (2)**
165:21,22
**heightened (2)**
230:19,21
**held (10)**
48:18 62:19
137:24 138:25
184:7,9 185:2
221:12 241:5
272:6
**help (4)**
181:20,21
224:24 231:18
**helping (3)**
180:17,20
274:19
**hereof (1)**
77:18
**hereunto (2)**
77:18 315:15
**heritages (1)**
252:20
**Hewitt (35)**
50:12 271:9,13
271:13,15,18
276:8,11 280:7
280:25 281:3
281:11 283:6
284:10 286:8
287:9,13
288:17 289:11
291:9 292:2,8
292:14,19,22
293:5 298:1,5
298:13,17,21
300:16 302:2
305:9 306:1
**Hey (2)**
127:21 269:1
**He'll (3)**
162:15,17 182:4
**Hi (1)**
232:25
**High (1)**
242:16
**highly (2)**

56:20 68:16
**high-profile (1)**
273:6
**hire (2)**
78:17 152:10
**hired (3)**
152:8 241:6
266:8
**hiring (3)**
66:14 122:25
274:18
**hit (1)**
171:23
**hold (4)**
58:18 139:7
180:22 251:6
**home (4)**
190:14,23
227:12 258:11
**Honor (1)**
63:9
**horse (1)**
135:15
**horseplay (3)**
80:1 82:5
308:12
**hospital (42)**
52:13 65:14
77:12 80:12,13
80:23 88:20
92:23 97:18
98:3 105:4
108:1 138:16
142:1 152:2,20
153:11 162:2
167:16,24
169:22 170:3
182:25 184:23
185:22 186:5
186:13 195:12
236:7,22
237:13 239:4
241:13 242:22
249:23 258:9
259:9,10
265:14 272:21
272:24 295:12

**hospitals (93)**
48:11 52:20,24
54:7 64:25
65:3,6,10,14
65:15,16 74:25
76:4,8 77:22
92:12 94:11
97:9 98:3,23
99:4,25 100:4
103:11 116:17
137:21 138:3,7
139:3,17,19
140:13 141:7
141:23 142:4
142:11 150:1
150:14 151:10
152:9 153:14
154:6,9,15
155:3,8 160:12
167:20 168:5
168:10 169:8
185:18,22
196:16 197:1
214:9 215:7,19
216:2,7 219:1
222:2 236:14
237:14 238:2
240:24 241:1
256:19 258:21
258:24 259:12
260:16 270:9
271:24 272:1
272:11,12,19
274:16 275:21
278:14,20
286:9,23
287:19 289:17
291:5 294:20
295:3 296:6
297:9 310:10
310:16
**Hotel (1)**
48:19
**hour (3)**
136:18 160:15
163:25
**hours (4)**

119:2 152:12,13
185:1
**HR (19)**
69:25 230:18
241:11,19,24
250:2 254:16
257:6,19 259:2
259:3,11,19
267:19 268:23
270:1 280:12
298:13,14
**HR-20 (8)**
246:18,20,22
249:18 253:14
257:6 268:2,12
**HR-40 (1)**
257:6
**HR-43 (1)**
249:18
**HR-63 (4)**
251:24 252:2
257:6,11
**Huh-uh (1)**
176:18
**human (6)**
217:24 241:4,6
241:14 244:25
263:18
**humiliating (1)**
253:7
**hundred (1)**
93:2
**hurt (1)**
162:20
**husband (3)**
188:18,25 191:1
**H-a-n-s-o-n (1)**
137:11
**H-a-r-t-i-n-g (1)**
119:19
**H-a-w-k (1)**
169:6
**H-e-w (1)**
271:14

_____ I _____
**ice (1)**

152:18
**idea (1)**
132:13
**identification ...**
54:23 60:23
79:3 142:15
186:14 199:15
203:18 223:22
244:8 248:1
249:8 258:4
**identifies (1)**
97:24
**identify (9)**
171:15 203:8
231:5,8,18
236:21 243:15
256:9,11
**II (1)**
48:11
**III (1)**
49:15
**Illuminating (1)**
61:5
**imagine (1)**
260:5
**immediate (7)**
104:5,15 105:10
245:19,21
254:14 261:21
**immediately (4)**
105:12 155:9
174:8 230:8
**imminent (1)**
104:9
**Impartial (1)**
48:20
**impeachment ...**
311:17,24
**impediment (1)**
54:10
**implemented (1)**
288:11
**implying (1)**
144:25
**important (7)**
96:16 156:12
261:12,16

274:21 291:19
312:13
**impression (1)**
278:18
**improve (1)**
72:17
**inaccurate (1)**
198:23
**inappropriate ...**
68:16 124:21,22
124:24 128:4
128:10,14
209:3 244:17
245:3
**inasmuch (1)**
52:15
**incident (49)**
70:17 83:2,22
84:9 88:1,25
97:11 104:13
106:23,24
107:18 113:7
133:24 143:11
143:16,18
157:13 159:10
161:14,18,21
163:7,9,11
166:8 170:25
180:9 193:7
199:1 200:1
205:25 216:12
217:4 219:16
219:19 227:13
229:9 238:8
250:8 256:4,7
260:10 261:8
294:6 298:22
300:20 303:1
304:13,14
**include (5)**
52:6 57:3 250:3
274:2 286:13
**included (2)**
102:10 274:14
**includes (4)**
66:19 98:14,15
196:18

**including (4)**
65:14 66:14
253:24 254:18
**incorporated (1)**
100:4
**independent (4)**
258:23 259:1,4
260:3
**independently...**
85:8
**indicate (2)**
96:23 102:10
**indicated (1)**
290:21
**indicating (7)**
105:2 161:9
173:23 176:19
177:13,18
199:14
**indication (1)**
55:15
**individual (31)**
81:24 84:6
90:12,13 96:6
96:22 101:15
108:17 115:6
128:3 148:18
173:11 174:1
174:24 176:2,7
177:4,24 199:4
199:8 209:19
210:3 248:25
249:1 258:3
265:15 270:2
287:4,6 290:23
299:9
**individuals (20)**
72:11 79:13,16
80:11 96:2,3
114:15 176:15
180:4 185:18
236:20 243:24
244:17 295:6
299:10 304:24
309:21 310:1,4
310:10
**industry (1)**

285:10
**infection (1)**
79:18
**inform (1)**
304:2
**information (1...**
84:7 100:17
101:23 104:21
105:2 250:17
260:14 261:20
262:1,4 265:11
290:20 298:6
305:10 307:13
310:24
**informed (12)**
88:8 89:22,23
106:24 156:2
260:12 276:2
283:12,17
294:3,9 309:2
**informs (1)**
296:24
**initial (1)**
165:7
**initially (1)**
311:18
**initiate (2)**
234:11 302:7
**inquire (7)**
73:22 116:17
119:23 150:7
221:2 240:18
271:19
**inquired (1)**
87:25
**inserted (1)**
55:21
**inside (3)**
139:16 152:21
237:4
**Institute (4)**
122:3,18,19
127:10
**instruct (1)**
302:14
**instructions (3)**
104:17 278:7

289:24
**instructs (1)**
297:4
**intended (1)**
54:24
**intensive (6)**
74:22 98:5,22
219:1 237:2
272:22
**interact (4)**
281:17,18
287:20,23
**interacting (1)**
282:20
**interaction (4)**
103:1 281:25
282:1 303:13
**interested (2)**
83:9 315:12
**Internet (1)**
257:23
**interpret (2)**
63:19 128:1
**interpretation...**
62:11 64:8,9,15
128:4
**interview (6)**
205:8,13,16,17
207:22,24
**interviewed (3)**
70:1 207:9
208:7
**interviewing (1)**
207:7
**interviews (1)**
208:24
**inter-lineation...**
58:1
**intimidate (1)**
283:18
**intimidated (7)**
105:7 129:14
190:18 249:1
254:10 277:5
278:19
**intimidating (1)**
129:11

**intimidation (5)**
248:11,18 253:3
253:8 279:23
**Intranet (12)**
249:21,25
257:22 258:2,8
258:10,12,17
264:16 266:24
270:10 297:5
**investigate (4)**
85:9 243:18
291:25 298:2
**investigated (1)**
70:1
**investigating (2)**
114:18 297:24
**investigation (...**
85:10,15 112:4
113:2 116:16
116:18 149:24
208:23 247:1
248:25 276:5
290:11 291:24
298:14 299:17
299:24 300:10
**investigative (1)**
298:11
**investigator (1)**
97:10
**involved (20)**
53:7 82:21,22
83:1,19 90:2,5
98:18 113:2
210:2,11 216:6
229:11 231:22
232:12 273:8
273:11 274:7
284:2,5
**involvement (4)**
199:25 231:24
256:15,23
**involves (1)**
291:24
**involving (2)**
48:4 88:25
**Island (1)**
136:11

**isolated (1)**
133:24
**issue (27)**
52:25 56:8 59:4
61:10 62:25
63:8,20 64:4
85:9 88:3
103:7 130:21
145:7 180:24
188:11 230:19
230:21 250:23
282:5 300:21
302:15,23,25
303:4,5,9
314:3
**issued (7)**
56:18 103:22
104:1,2 278:11
292:4 296:8
**issues (16)**
52:19 59:1
82:21 114:19
117:19 135:11
210:4 222:20
223:4,5 241:16
243:18 244:2
250:11 275:1,5
**Item (1)**
100:1
**items (3)**
159:21 161:2
280:21
**i-t-t (1)**
271:15

___

**J**

**J (1)**
48:20
**January (68)**
83:7 86:15,17,17
95:6,8 97:15
140:16 143:20
158:2,3,4,23
161:14 166:8,9
168:3,23
171:19,22
176:10 191:6,8

191:20 192:12
200:5,12,20
203:10,11,14
203:21,23
204:2 214:9
216:12,19,19
217:5 218:5,8
218:19 219:5
219:16 222:5
223:8,9,10,10
223:12 226:13
233:1 234:14
235:7 236:19
237:17 238:3
238:13,20
239:7,22 241:8
241:9 250:8
263:16,18,25
309:22
**jerky (2)**
173:4,10
**job (17)**
97:8 106:17,18
106:19 108:11
123:4 153:7,21
155:17 156:14
188:21,23
191:5 278:8
281:17 288:24
290:5
**John (18)**
107:2 126:22,22
126:25 207:21
207:22,24
208:1,4,5,5,6
209:9 232:4
279:6,15 288:1
302:10
**join (2)**
57:11 171:8
**joinder (1)**
52:11
**joined (1)**
286:8
**joins (1)**
52:18
**Joint (26)**

50:14 60:11,13
60:18,21,24
61:21,22,25
72:25 73:5
77:3 81:4 98:1
99:12,17 101:2
109:15 254:21
267:9 269:17
270:3 273:14
273:19 286:20
287:3
**jokes (5)**
80:1 82:5
244:21 253:7
308:12
**Joyce (6)**
52:8 126:22
279:8,17,18
282:23
**Judge (2)**
59:23 63:20
**July (4)**
312:15,17,19
313:12
**jump (2)**
170:9 174:20
**June (8)**
48:21 151:8,9,21
286:10 310:5
312:13 315:16
**jurisdiction (2)**
62:17 71:19

— K —

**keep (6)**
166:23 182:4
194:24 195:15
281:19 313:1
**kept (2)**
163:13,14
**Kevin (2)**
293:21,23
**key (3)**
246:18 248:13
259:22
**kind (29)**
108:11 111:3

145:9 147:19
153:13 155:10
155:11,19
156:15 164:8
167:1 208:8
222:15,18
224:11,19
225:5,8,23
229:9 230:3
237:10 239:18
256:18 267:1
283:3 294:10
297:20 306:21
**kinds (1)**
280:16
**kitchen (2)**
173:2 227:19
**kitchens (1)**
310:17
**knew (11)**
84:5 88:4
106:20 108:16
127:4 133:5
146:11 166:8
219:7 232:1
234:20
**know (183)**
57:1,5 58:7 64:5
66:4 75:7 76:3
77:25 83:12,16
83:24 84:23
86:2,6 91:12
93:12 94:5,9
95:14 100:16
101:18,22
106:3,7,8,17
108:18 109:23
110:10 112:11
114:20 116:12
120:21 122:13
122:24 124:22
126:12,17
129:6 130:15
132:5,5 142:1
142:3,7 143:16
144:21 147:21
148:15 149:5

150:21 152:24
153:10 154:8
165:11,21,22
166:5,6 169:22
172:24 174:12
176:8 177:10
178:11 181:7
182:7,8,8,9,10
183:4 184:4,5
184:22,24
185:14,16
186:12,24
190:19 191:2
194:1,2,2
195:2 197:7
199:5,6,7,13
199:20 205:6
205:18 207:12
207:16 208:9
209:16 210:10
210:21 211:13
212:3,4 215:18
216:18,20
219:4 220:8
221:7 223:4
224:23 225:11
226:1,4 227:7
227:16,22
228:12 230:3
230:19,20,25
231:1 232:3,13
233:20 234:2,4
236:1,6,9,11
236:13,16
238:19 246:2,7
250:14 256:18
257:18,21
258:15,19,20
258:23,25
259:1,4,14
260:4 261:5
262:23 263:20
264:18 265:18
265:20 266:11
266:12,23,25
269:18,21
270:7 274:12

275:11 281:3
281:15 282:4
284:18 286:22
287:1,5,6
288:6 295:6
297:10,13
298:7 299:12
299:16 300:19
300:12 302:18
**knowing (3)**
69:9,11 260:15
**knowledge (18)**
90:7,11,25 91:5
94:1 96:10
113:16 114:17
143:4 211:3
223:3,6 254:16
266:17 281:6,9
282:5 283:10
**knowledgeabl...**
266:5
**known (3)**
56:23 235:8
291:23
**knows (6)**
58:25 83:14
126:17 147:9
285:2,3
**Kruse (1)**
108:9

— L —

**L (1)**
49:5
**labor (52)**
52:14 54:6
61:12,24 62:1
66:8,19 67:4
71:9 72:15
76:24 77:5,7,9
77:11 78:6,10
81:3 91:1
105:18 109:9
109:16,17,25
110:4,5,6,11
111:6 112:9
113:21 126:13

128:1 260:20
260:23 261:2,6
267:9 269:17
269:23 273:20
273:25 274:8
274:17 275:1,4
275:9,22 282:7
286:14 288:4
302:18
**laborer (9)**
66:11 70:23
84:6 106:6,18
116:19 120:6,9
122:6
**laborers (17)**
48:7 57:19 71:3
71:19 72:1,2
80:25 108:19
121:2 122:23
123:8 124:2
150:11 262:17
279:11,22
282:16
**laboring (1)**
106:6
**lack (3)**
53:2 56:7 102:8
**laid (2)**
123:1 154:1
**Lair (1)**
288:1
**Lakeside (1)**
48:19
**language (5)**
57:16 68:18
145:5 230:24
253:8
**lap (1)**
264:9
**lapsed (1)**
58:7
**laptop (2)**
183:16 258:8
**large (8)**
65:13 66:3
75:14 129:9
140:13 169:22

194:13 273:3
**larger (2)**
75:24 81:4
**lasted (1)**
306:21
**late (2)**
53:9 57:25
**Lattisia (10)**
50:8 65:20 68:9
105:3 135:11
137:3,8 197:6
205:11 250:18
**Lattisia's (1)**
206:24
**law (10)**
49:5,6,14,16
59:10 63:15,17
63:19 126:13
286:24
**lawful (7)**
73:10 119:8
137:4 195:21
220:17 240:3
271:10
**lawsuit (1)**
269:9
**lead (2)**
119:1 241:15
**leader (2)**
49:7 252:16
**leaders (2)**
222:18 279:10
**leading (2)**
206:6 283:25
**leaning (1)**
145:9
**learned (3)**
230:22 250:10
263:14
**learning (1)**
305:23
**leave (8)**
69:1 88:9 163:3
212:8 230:7
278:8 281:14
295:9
**leaving (1)**

165:7
**led (3)**
107:18 116:16
285:1
**left (13)**
90:1 140:9
148:16 162:20
162:21,22,24
164:14 182:22
218:12 226:9
226:11 227:10
**legal (4)**
54:10 67:16
126:14 269:1
**letting (1)**
250:13
**let's (10)**
77:1 82:20
95:22 98:17
129:21 192:23
246:17 248:13
280:21 303:25
**level (2)**
288:12,15
**levels (1)**
273:11
**lie (2)**
189:13,18
**life (3)**
104:9 115:21
131:16
**light (1)**
239:15
**lights (1)**
175:24
**limit (1)**
281:25
**limited (2)**
85:16 254:19
**line (47)**
68:9,21 89:3
102:6 111:1
112:18 125:16
128:23 144:4
145:20 148:14
148:16,22
159:19 160:21

161:19,23
162:3,10,11
174:6,8,15,20
180:9,12,17,21
181:5,20,21,24
184:7,9,17
185:3,10,17
186:6,19 188:8
193:4 228:1,6
275:15 292:13
292:15
**lines (2)**
110:19 241:17
**list (6)**
100:3 105:8
122:25 123:1,4
123:5
**listed (2)**
98:9,20
**listen (1)**
151:2
**litigation (1)**
56:14
**little (18)**
77:6 93:6
128:22 135:23
139:25 152:19
159:13 168:14
173:4 189:15
206:6 212:22
227:7 237:10
241:2 274:11
274:13 302:25
**live (1)**
269:3
**LLC (1)**
49:4
**LLP (1)**
49:13
**local (34)**
48:7 52:15 54:2
57:19 62:9
121:2,16 122:6
122:23 123:8
124:1 125:6
126:23 150:12
232:24 262:18

270:7,15,20
273:13 274:18
279:10,21
282:16,23
283:9,12,16
284:19,21
285:20,23
307:24 309:4
**located (4)**
65:11 139:13
237:3 242:1
**location (1)**
138:6
**log (1)**
258:3
**long (35)**
68:21 71:25
72:1 74:12,13
119:5 122:16
135:9 136:12
136:14 137:24
138:2,22
140:19 145:20
151:3 161:4
167:4 168:3
180:5,9,12
181:3 183:7,7
183:11 185:3
189:23 221:12
240:25 241:5
271:25 272:6
284:2 297:10
**longer (3)**
88:8 213:14,20
**longevity (1)**
138:16
**look (25)**
54:14 77:16
79:7 86:9 99:1
110:17 131:4
148:2 157:24
170:2 177:3
209:25 228:25
237:15 244:19
246:18 248:13
250:1 253:6,22
260:7,19,22

296:11,13
**looked (8)**
145:10 181:8
187:6 203:6
204:21 237:18
261:1,11
**looking (8)**
81:3 82:10
97:10 100:15
100:16 144:24
204:21 312:14
**looks (4)**
86:16,17 99:15
233:12
**Loree (2)**
77:23 78:2
**loss (1)**
104:9
**lot (10)**
111:19 124:9
125:18 142:6
221:6,7 237:18
252:18 257:16
269:19
**lots (3)**
184:18 242:18
242:20
**loud (8)**
68:24 70:7
146:5,6 147:5
147:24 204:16
304:25
**lunch (4)**
68:1 135:8,15,24
**luncheon (2)**
136:20 192:21
**L-a-t-t-i-s-i-a (...**
137:10

—————————
**M**
**machine (2)**
139:25 153:15
**machinist (2)**
153:20 154:2
**main (28)**
65:9,11,15 92:15
92:25 98:15,24

98:25 99:5,24
139:4,10,12,18
142:8 196:16
197:22 241:18
242:6 251:3
272:12 274:4
277:23 294:19
295:2,19
296:24 308:1
**maintain (2)**
120:8 197:19
**maintained (3)**
92:17 216:4
237:25
**maintaining (1)**
61:17
**maintains (1)**
216:1
**major (2)**
274:25 312:11
**making (10)**
110:3 155:24
177:14 181:9
185:7 202:14
244:15 265:23
288:22 293:15
**male (1)**
256:10
**males (3)**
184:21 208:24
209:2
**man (3)**
129:9 175:18,20
**manage (3)**
196:20 215:11
289:21
**managed (2)**
214:25 244:3
**management (9)**
142:6 154:12
213:12 224:20
232:13 243:15
244:1 251:4,7
**manager (69)**
65:1 70:1 74:21
75:3 76:19
83:21 85:3

89:24 97:20
106:25 107:1
108:9 130:9,24
145:11,13,14
145:15 146:9
146:16,21,22
147:18 148:24
148:25 161:24
162:12 163:3
163:17,20
164:8 165:6,11
169:10,12
174:25 176:8
176:25 181:6
183:25 184:2,6
188:11 193:8
197:14,16,17
221:11 224:16
224:23 227:8
231:14 232:11
234:15,20,24
235:2 236:6
241:4,8,11
250:3,22
254:17 262:11
280:12 289:14
289:17,19
**managers (17)**
68:11,24 69:18
109:18,21
143:7,9 149:17
154:12 155:21
168:13 208:18
212:3 216:14
217:4 230:4
305:2
**manages (2)**
66:6 215:8
**managing (1)**
251:1
**manner (6)**
79:25 81:23
101:13 252:8
308:4,8
**mantra (1)**
69:9
**manual (1)**

302:23
**manuals (3)**
280:11,22 281:8
**March (1)**
121:8
**Margaret (3)**
50:12 271:9,13
**mark (4)**
54:18,20,25
249:4
**marked (22)**
54:22 60:22
77:3 79:2,5
142:14,18
157:24 190:12
203:17 206:19
223:21 228:24
244:7,10
247:25 248:3
249:7,13
286:20 287:3
307:14
**Marvin (1)**
48:20
**match (1)**
290:6
**matched (1)**
287:10
**materials (3)**
80:6 290:10,14
**matter (14)**
48:3,18 53:11,23
57:6,21 58:1
64:7 67:7
71:11 123:9
247:14 299:17
311:1
**matters (1)**
297:24
**ma'am (15)**
133:10 150:13
150:16,22
153:16 154:23
170:2 173:24
175:5 240:16
264:17 280:24
284:9 293:4

297:23
**MBE (4)**
66:16 109:5,9,12
**MCCO (1)**
242:2
**McDonald (1)**
237:13
**McDONNEL...**
50:10 198:5
201:3 220:16
220:21,22,22
221:1 226:2
230:10 232:23
234:18 239:5
239:13,23
**meal (7)**
69:13 162:13
193:8,16
194:17 218:12
228:7
**mean (8)**
77:7 178:24
188:3 199:10
204:19 235:10
257:11 299:8
**meaningless (1)**
57:12
**means (5)**
53:22 77:9
117:17 305:23
315:8
**meant (2)**
124:16 211:18
**mechanism (1)**
297:24
**Medical (2)**
98:6 272:20
**medicine (3)**
98:4,21 272:25
**meet (1)**
293:24
**meeting (21)**
84:16,18,19,23
84:25 85:24
86:2,24 87:2
87:12,17,22,25
89:18,19

100:18 108:14
111:21 113:19
134:18 279:15
**meetings (7)**
90:3,5 93:19,21
279:13,16
286:16
**member (3)**
80:4 284:20
308:19
**members (6)**
114:25 252:19
282:11 285:12
285:17 308:16
**memorize (1)**
281:20
**memory (1)**
290:7
**mentioned (2)**
57:20 91:4
**mentions (1)**
112:15
**Mentor (1)**
153:15
**menu (4)**
192:21,21,21,22
**mere (1)**
53:23
**merits (3)**
54:12 58:14
72:7
**met (7)**
86:21 102:23
168:6 211:7,9
293:16 311:6
**meted (1)**
265:17
**Mickey (1)**
285:4
**middle (2)**
102:1 112:16
**Mike (5)**
49:23 50:7
119:7,12 260:9
**milkshakes (1)**
153:3
**million (2)**

75:23 273:4
**millions (1)**
75:21
**mind (3)**
193:19 208:17
229:12
**minister (7)**
189:13,15,17,21
189:23,24
190:1
**minority (1)**
66:17
**minute (5)**
58:18 60:5
95:23 183:20
186:2
**minutes (14)**
165:15 178:7
179:7,8 183:9
184:25 188:8
285:2 302:2
304:21 305:15
306:16,22,24
**misconduct (1)**
299:10
**missing (3)**
173:7,17 300:13
**Missionary (1)**
190:2
**mistaken (3)**
76:11 77:25
94:22
**moment (4)**
55:24 62:3
91:19 265:3
**moments (1)**
173:7
**Monday (3)**
122:3 154:24,25
**money (25)**
89:4,6 130:20
132:18,18
133:16,17
144:15 147:4
147:17,23
148:6,7,8,12
162:16 177:16

177:18 201:18
201:21,23,24
213:11 226:4,5
**month (1)**
121:7
**months (17)**
95:5 105:24
137:25 138:12
138:13,18,20
150:19,20,23
151:4,6,13
152:15 154:4
221:14 236:18
**morning (7)**
95:11 96:2
200:2,4,11
222:16 310:25
**mother-fuckin...**
148:6
**motion (11)**
52:1,4 53:4,6,7,8
56:9 58:3,25
59:13,17
**motions (2)**
56:5 204:20
**Mouse (1)**
285:4
**move (11)**
52:5 129:19
141:15 159:19
181:20,21
231:5 247:22
313:17,20,21
**moved (3)**
155:16 205:20
313:9
**moving (6)**
53:24 59:10
61:7,15 105:23
181:4
**multiple (2)**
96:1 208:13
**M-c-D-o-n-n-e...**
220:23
**M-i-k-e (2)**
119:13,14

**N**

**N (3)**
50:1 51:1
228:18
**name (28)**
57:18 73:13
74:4 84:7
119:11,18
137:7 146:19
150:10 153:2
165:19,21,22
169:5 195:24
199:3,6,7,21
199:22,23
210:4 220:20
225:11 235:9
240:6 242:23
271:12
**named (2)**
54:13,13
**Naming (1)**
210:5
**necessarily (1)**
53:22
**necessary (3)**
53:20 54:4
261:18
**need (13)**
56:9 59:8,10
86:14 89:17
136:7 143:24
145:6 224:24
252:19 264:15
270:5 274:12
**needed (8)**
107:19 217:13
230:20 231:4
239:19 285:12
287:15 300:21
**needs (2)**
115:1,10
**negative (1)**
80:19
**negotiated (1)**
275:20
**negotiating (2)**
275:21 289:20

**negotiation (1)**
274:7
**negotiations (4)**
274:15 286:13
286:19,22
**neither (1)**
217:6
**neonatal (8)**
74:22 98:4,22
106:4 219:1
237:1,5 272:22
**nervous (3)**
119:15 120:21
227:7
**Network (3)**
152:5,7,8
**never (16)**
67:6 93:7,10
97:16 103:25
106:14 123:18
159:11 190:22
194:11 215:13
217:15 298:21
300:19,22
311:6
**new (4)**
53:11,19 256:8
272:19
**NICU (13)**
74:24,25 75:3,3
75:12,18 92:13
95:20 97:21
243:3 309:22
310:1,5
**nigger (19)**
68:20 117:6,11
124:21 130:5
148:8,10,11,11
149:1 162:18
177:15,17
202:3 205:24
228:22 245:15
247:2 253:11
**night (18)**
59:20 66:23
68:7 70:16
144:2 149:11

161:3,4 201:17
201:22 221:18
221:19,20
222:13 223:18
224:15 225:19
234:22
**nights (3)**
154:21 228:10
228:12
**nine (1)**
221:13
**Ninth (1)**
49:18
**nonunion (1)**
128:19
**non-complian...**
102:10
**non-designate...**
100:13
**Non-Discrimi...**
244:14
**non-employee...**
246:20 248:15
**non-UH (1)**
71:22
**normal (2)**
226:11 235:14
**normally (4)**
68:19 88:21
200:16 228:21
**Northeast (1)**
72:19
**Northern (2)**
59:16,24
**Notary (1)**
315:6
**notation (1)**
55:11
**note (4)**
64:20 99:8
158:6 236:5
**notes (4)**
85:22 149:25
157:23 158:13
**notice (8)**
83:2,21 94:10,13
173:9 180:14

181:4,22
noticed (3)
97:23 212:17
236:4
notices (1)
295:12
notwithstandi...
294:13
November (2)
151:12,14
Nuclear (4)
122:1,14,17
127:9
number (28)
48:8 50:16,20,21
50:22,23,24,25
51:5,6,7 53:13
55:10 65:13
66:2 69:18
79:22,23
132:20,23
156:17 179:24
244:19 258:4
307:18 308:3
309:18 313:3
numbered (1)
257:10
numbers (8)
158:7,8 178:24
178:24 179:6
179:10 182:9
257:12
numerous (1)
132:3
nutrition (2)
139:8,9
N-I-C-U (1)
75:3

————————
O
————————
oath (8)
73:20 119:21
137:13 196:5
220:25 240:16
271:17 306:14
object (7)
53:12 100:9

111:7 178:10
299:8 301:3,9
objected (3)
72:5 283:1,7
objection (32)
64:20 89:9
114:4,6 118:12
126:9,11
127:17,23,24
129:17 134:6
145:23 147:7
206:5 245:23
246:3 247:13
247:19 279:1
279:24 283:2
283:24 284:17
284:19 285:1
285:24 301:19
305:6,25 306:8
313:23
objections (2)
61:18 311:19
obnoxious (3)
80:2 308:13,16
observe (3)
81:21 82:12
101:12
observed (1)
184:17
obtain (1)
113:14
obtained (1)
121:23
obviously (3)
133:5 229:12
231:8
occasion (5)
103:1,7 105:25
106:12 186:17
occasions (1)
302:7
occurred (11)
83:5,11,17 85:18
85:19 87:3
191:20 193:7
239:7 304:13
304:14

occurs (2)
52:21 272:11
October (1)
221:13
offended (3)
164:16,16
252:21
offending (2)
81:23 101:14
offer (1)
54:25
offered (2)
179:22,24
offering (1)
179:9
office (24)
92:18,20,21
167:11,13
212:7 224:14
226:15 227:17
227:21 229:24
231:13 235:23
242:1,2 270:8
294:18,19,24
300:15,17
304:6,12
315:16
offices (2)
84:8 85:2
Oh (5)
156:5 194:12,15
198:21 206:1
Ohio (13)
48:19 49:9,19
59:17,25 65:12
72:19 139:15
139:16 190:3
315:2,6,16
okay (37)
57:9 64:19 75:2
80:7,24 94:17
110:23 112:14
116:9 129:23
136:15 139:5
151:23 153:4
168:8 171:12
171:13 174:4

175:7 181:11
191:19 195:6
196:11,12
200:2 201:9
202:5 208:10
208:21 213:7
215:17 226:2
241:18 244:19
267:11 275:14
277:11
old (2)
156:6 300:18
once (9)
59:2 112:11
122:25 132:6
148:16 155:2
165:7 225:3
275:11
ones (2)
216:6 270:6
one's (3)
82:1 101:17
115:8
one-half (1)
301:17
ongoing (2)
66:4,5
online (1)
55:14
onsite (1)
80:5
open (4)
161:2 172:19
227:18 312:20
opening (2)
64:21 73:5
operates (1)
65:17
operational (1)
241:12
operations (2)
197:18 232:11
operator (1)
153:15
opinion (5)
59:21 83:10
300:24 308:24

311:4
opportunities ...
274:20
opportunity (1...
170:19 180:6
252:13,15
264:11,22
265:5,16,19,20
311:1
opposing (1)
62:10
opposition (1)
53:9
orally (1)
59:20
order (13)
53:8 58:12
59:19 60:5
65:7 72:17
123:10 135:13
231:17 249:23
258:2 264:17
307:11
ordered (1)
61:19
organization (3)
54:12 66:11
78:1
orientation (18)
79:15,16 80:9,12
80:21 94:21
95:16,17,23
96:2,8,11,24
97:12,17 99:2
100:18 258:18
orientations (1)
96:1
oriented (2)
96:14,23
originally (1)
241:6
outer (1)
162:13
outset (2)
53:1 59:2
outside (8)
72:22 76:7,14

98:12,16 121:3
226:25 243:24
**outsider (1)**
258:7
**outsiders (1)**
184:23
**out-of-pocket ...**
157:20
**overall (4)**
109:11 116:19
197:20 282:19
**overhear (3)**
145:21 146:2
234:5
**overlapped (1)**
223:16
**overrule (1)**
58:3
**overruled (1)**
247:20
**overruling (1)**
63:5
**oversee (1)**
197:17
**overwhelming...**
291:11
**owner (11)**
72:10 76:20
77:10,12 81:23
86:22 101:14
121:15 271:1
284:6,7
**owners (2)**
125:12 284:13
**owner's (4)**
117:10,15 128:8
285:13
**Ozanne (18)**
84:1,3,4,7 85:2,3
85:6 93:24
94:2,5 102:22
108:2,7,10,16
108:17,19
262:15
**o'clock (2)**
48:22 314:15

**P**

**packaged (1)**
78:21
**packet (3)**
262:1,4 290:14
**page (50)**
50:15,19 51:4
73:6 77:15,20
80:10 81:15
82:9 97:3,25
98:1 99:6,9,15
99:16,21
100:15,16,22
101:4,6,25
102:1 104:4
109:18 110:18
112:9,12 115:4
244:20 248:13
252:10,24
253:22 254:22
254:23 263:5,6
267:10 273:22
274:11 275:8
275:12,15
288:17,18,20
288:21 307:17
**pages (3)**
79:15 223:25
269:18
**paid (3)**
121:19,20
161:17
**pants (3)**
179:16,18
181:25
**paper (6)**
100:8 162:2
166:13 167:18
167:21 249:24
**papers (1)**
303:2
**paragraph (22)**
66:22 73:6
109:16,20
110:18,19
111:2 112:8,10
112:12,17,20

249:11 253:2
254:23,23
263:5 267:10
267:10 275:9
275:10,11
**paragraphs (5)**
102:5,16 252:11
275:3,5
**parking (1)**
76:13
**part (42)**
57:20 62:1
65:15 73:3
76:16 77:25
79:13,18,19
80:9,13 88:14
95:16,19 96:24
98:7,11 99:8
101:2 105:18
105:21 109:8
109:10 116:18
147:11 156:4
209:24,24,25
226:6 243:3,14
269:23 272:15
274:15 282:19
287:13,15
297:3,19 299:1
306:23
**partake (3)**
67:20 267:13
305:22
**partaken (3)**
304:9 305:19
307:8
**participate (2)**
109:10 224:3
**participating (1)**
286:13
**participation (1)**
109:12
**particular (1)**
264:21
**parties (7)**
53:2 56:7 58:15
63:11 77:17,18
77:20

**partook (5)**
253:18,19 254:9
255:10 268:16
**party (10)**
52:7 53:11,20
56:21 65:4
66:11 67:1
78:6 263:9
315:12
**part-time (1)**
152:10
**passed (2)**
88:18 184:16
**password (1)**
258:4
**Pat (2)**
106:8,9
**patient (5)**
67:16,22 208:2
263:10 268:16
**patients (13)**
88:17,20 132:15
141:3 242:20
252:18 259:25
278:6,13
281:19 282:20
283:19,23
**patron (1)**
235:6
**pause (1)**
179:18
**paused (1)**
173:20
**pay (2)**
121:19 122:8
**paying (1)**
282:4
**payroll (1)**
180:16
**peace (1)**
194:24
**PEASE (1)**
49:13
**pending (2)**
59:15,18
**pennies (2)**
194:6,8

**people (35)**
70:6 116:8,11
125:15 128:18
129:1 132:13
132:16 133:24
159:15 166:23
174:6 176:18
176:23 180:9
180:12 181:4,5
181:12 184:10
184:11,14,18
185:10,10,14
185:17 242:12
242:19 251:6
267:22 278:9
287:23 298:12
306:17
**PEPLOWKSI...**
245:12
**Peplowski (34)**
49:22 50:11
69:25 149:5
167:16 205:5,6
205:7 210:17
217:20 230:10
231:21 240:2,7
240:7,9,13,17
245:8 257:5
263:6 264:13
264:24 265:8
265:18 266:3,6
266:11,18,22
277:7,13,15
299:19
**Peplowski's (2)**
217:23 218:2
**Pepper (1)**
98:10
**percent (1)**
278:22
**perfect (2)**
194:10 201:25
**perform (2)**
78:20 213:8
**performance (6)**
106:13,15
116:19 198:12

198:16 222:8
**performed (1)**
77:11
**performing (1)**
76:25
**period (5)**
89:3 90:8,9 95:2
223:15
**permanently (1)**
90:8
**permitted (5)**
69:24 118:9
188:24 232:17
282:16
**permitting (1)**
285:22
**Perry (4)**
121:25 122:14
122:17 127:9
**person (24)**
165:18 169:19
172:3 174:12
176:4,11
177:12 182:22
182:24 183:1
211:7,9 231:18
247:5 259:2,3
259:8 261:25
264:18 265:8
269:2 270:1
287:22 311:6
**personal (5)**
81:19 82:4,14
266:17 311:4
**personnel (2)**
298:2,7
**persons (1)**
182:20
**pertinent (1)**
261:20
**phase (2)**
58:10 234:12
**phone (6)**
107:10,13 167:8
190:22 313:1,3
**photo (1)**
173:18

**photos (6)**
209:19 224:4
231:2 255:25
256:1,7
**phrase (1)**
102:19
**phraseology (2)**
276:10,12
**physical (8)**
104:20,22,24
105:3,5 248:11
253:24 263:8
**physically (2)**
188:3,5
**pick (1)**
159:21
**picture (7)**
173:11,12,13
174:3 179:1,2
231:16
**pictures (1)**
262:9
**piece (2)**
162:2 227:14
**Pike (1)**
98:10
**pinpoint (1)**
86:9
**PLA (10)**
60:13 66:13,22
97:23 98:8,12
246:17 249:10
249:11 254:22
**place (17)**
133:3 143:11,14
143:17,19
159:18 168:22
170:25 229:22
233:6 250:8
290:7 296:23
304:20 310:13
310:16 315:10
**placed (2)**
264:8 280:11
**places (1)**
156:16
**plainer (1)**

182:16
**plan (22)**
79:12,13,20
81:11,14 99:9
99:10,16 101:1
101:21 102:9
103:3 113:11
114:8,14,18,23
115:5 127:5
261:7 288:5
290:2
**planning (1)**
241:16
**Plant (4)**
122:1,14,17
127:10
**PLAs (1)**
98:13
**play (2)**
171:23 287:8
**played (2)**
171:17 179:13
**players (1)**
70:2
**please (9)**
62:3 74:4,6 97:5
137:7 161:25
214:14 224:17
263:5
**pleased (1)**
263:20
**plus (1)**
97:21
**point (32)**
53:17 56:11
69:2 70:20,25
85:15 113:10
121:1 136:13
145:4,6 148:14
179:10,19
181:18 182:6
182:12,23
183:6,12
203:20 208:17
212:19 225:18
230:4 239:19
246:18,19

248:14 265:13
284:21 293:8
**pointed (6)**
53:1 72:6
161:11 177:20
178:19 210:6
**pointing (5)**
99:12 172:8
176:21 199:17
219:17
**points (3)**
99:22 248:13
259:22
**police (1)**
216:2
**policies (52)**
65:22 66:21
70:3 71:6,11
71:13 112:23
113:3,11
123:13 125:20
243:9,10,12,16
243:23,25
244:5 247:16
247:17,18,23
249:19,24
250:1,4,6,7
251:13,22,24
254:18 255:2,5
255:19 257:20
258:3 259:11
259:14 264:15
267:14 268:6
268:21 269:3
269:19 270:16
270:18 275:17
278:25 282:25
283:10 297:6
**policy (26)**
70:22 127:5
244:12,14,20
245:4 246:1,14
246:16 248:7,9
248:14,20
251:7,24 252:2
252:4 254:5
255:15 259:19

268:12 278:10
279:22 280:2
302:13,19
**political (1)**
273:9
**portable (1)**
310:17
**portion (3)**
75:25 76:3,17
**portions (4)**
75:11,12 82:11
179:12
**pose (2)**
210:21,22
**position (35)**
52:23,23 54:2
57:10 62:8
65:5 71:3,15
72:4,20 137:22
137:24 139:7
191:23 197:11
197:12 208:1
217:23 221:12
222:3,5 241:3
241:5 252:14
272:3,6 280:6
285:11,16,20
286:12 294:14
304:15 305:20
305:21
**positions (1)**
138:25
**positively (1)**
260:6
**possession (1)**
290:19
**possible (1)**
259:13
**possibly (1)**
299:12
**posted (8)**
94:10,13 195:13
219:12 295:12
295:16,17,18
**potential (1)**
263:8
**potentially (2)**

98:7 313:10
**Powel (8)**
141:17,19
146:20 198:7
207:12 217:4
261:22 263:17
**power (5)**
122:1,14,17
127:10 218:24
**practical (3)**
80:1 82:5
308:12
**practices (4)**
79:20 99:7
307:15,16
**preclude (1)**
118:19
**preference (1)**
314:11
**prejudice (3)**
52:20 55:25
56:4
**prejudicial (2)**
56:17,20
**prep (1)**
155:17
**prepare (1)**
55:5
**prepared (5)**
58:8 162:11
287:1,4 315:7
**prerequisites (1)**
113:13
**presence (1)**
187:6
**present (2)**
49:22 63:12
**presented (5)**
62:24 63:1
203:21 291:11
304:20
**preserve (1)**
311:22
**president (7)**
52:9 126:23
272:4 286:8
287:8,18

288:19
**pretty (2)**
95:10 301:14
**prides (1)**
216:25
**primary (1)**
59:1
**prime (4)**
78:17 84:4
93:23,24
**prior (12)**
61:23 63:23
91:16 102:25
104:13 116:22
153:17 203:7
225:1 228:10
261:1 265:16
**privy (2)**
57:7 113:6
**probably (8)**
121:7 137:25
181:2 184:7
192:23 212:9
233:10 257:8
**problem (3)**
212:22 285:22
314:9
**problems (1)**
198:20
**procedure (5)**
123:14 124:6
127:5 134:17
229:13
**procedures (31)**
65:23 66:21
67:13 70:3
71:6,12,14
112:23 113:3
113:12 125:20
213:2,10 243:9
243:10,12
251:14 254:18
255:3,6,15,19
264:7,12,15
267:14 269:23
270:16 275:18
282:25 283:10

**proceed (4)**
58:9,14,15 300:4
**proceeding (4)**
54:11 60:17
63:23 191:12
**proceedings (8)**
48:23 54:4 57:6
136:22 314:14
315:7,9,10
**process (23)**
53:6,10,18,25
62:21 80:10
96:24 97:13
118:18 156:23
171:10 180:3
234:12 258:18
266:7 291:23
291:23 292:11
296:16 302:20
302:24 303:24
306:12
**processes (1)**
133:19
**produce (1)**
266:20
**produced (1)**
315:8
**profanity (1)**
209:11
**professional (...**
79:25 125:9
251:23 252:3,8
265:1 266:15
267:20 268:23
284:23 308:4,7
**professionalis...**
268:3
**professionally ...**
264:25 285:13
**program (2)**
114:1 272:18
**progress (2)**
93:18,21
**progressive (1)**
302:20
**prohibit (3)**
248:10 253:7

283:22
**prohibited (2)**
82:6 124:16
**project (129)**
52:14 54:5
61:12,24 62:1
66:4,6,8,19
67:4,4 71:9,16
71:17,18,22
72:15,18,23
74:17,20,21,22
74:23,24,25
75:2,3,5,7,10
75:12,15,16,17
75:18,18,19
76:18 77:5,7,9
77:10 78:6,10
78:11 79:14
81:3,24 85:3
88:9 90:13,14
90:20 91:1,6
92:12,13 95:20
96:7 97:21
98:5 99:6,20
101:1,15,21
102:8,12 103:2
105:18 106:4
108:9 109:8,11
109:13,15,16
109:25 110:4,5
110:6,10 111:5
112:9 113:21
114:3,7,16,24
115:6 127:1
128:1 260:19
260:23 261:2,6
267:9,13
269:17,23
273:3,6,10,20
273:24 274:8
275:1,4,9,16
275:22 278:4
282:7 286:14
286:17 287:20
288:4,5 289:13
292:25 293:7,7
293:9,16,24

297:11,19
302:18
**projects (22)**
75:17 76:9,23
97:21,24 98:9
98:16,20
112:21,22
122:5,11,24
255:1 274:2,3
274:4 277:22
288:10 289:18
293:11 294:25
**promoted (1)**
241:7
**promotion (1)**
155:13
**proper (6)**
56:7,16 58:15
93:11 100:2
307:19
**properly (3)**
61:12 71:15
72:8
**property (18)**
67:14 68:3
104:6 105:10
105:13 121:3
124:12,14,18
206:4 211:14
248:12 258:9
266:8,25
292:23 294:5
310:10
**Protective (5)**
216:5,7,11
231:14 263:12
**protocol (7)**
230:20 298:16
299:21 300:11
300:13,15,21
**proud (1)**
72:19
**prove (2)**
64:12 91:16
**provide (6)**
59:25 78:23
96:22 97:10,16

265:10
**provided (8)**
68:13 80:7,19,20
95:17 170:4,24
261:7
**Providence (1)**
136:10
**provides (1)**
296:19
**provisions (2)**
102:10 307:17
**public (8)**
80:2,4 133:15
226:16 308:13
308:16,20
315:6
**publication (1)**
266:21
**published (5)**
249:19,21
264:12,19
265:7
**pull (6)**
202:21 204:6,9,9
204:13 231:15
**pulled (9)**
172:14 202:5,6
202:12,22
204:4,14
227:20 230:3
**purchase (5)**
227:1 310:5,7,10
310:15
**purchased (2)**
88:2 93:7
**purpose (1)**
52:12
**purposes (12)**
54:22 60:22
68:17 79:2
109:8 142:14
203:9,17
223:21 244:7
247:25 249:7
**pursuant (12)**
61:3,14,15 65:18
65:22 66:8,21

67:4,5 69:8
71:24 112:22
**put (12)**
60:7,10,11 135:5
166:12 167:18
167:21 212:10
223:9 231:16
272:19 279:3
**putting (2)**
170:6 269:7
**P-e-p-l-o-w-s-...**
217:22 240:10
**P-o-w-e-l (1)**
141:19
**p.m (14)**
87:15,16 136:21
136:23 137:2
140:25 154:22
154:22 160:10
192:3,4 221:17
223:14 314:15

_____
### Q
**qualified (1)**
315:6
**question (57)**
60:12 65:9
66:23 68:7
70:16 72:7
81:1 97:9
99:20 100:7,20
100:23 103:15
103:21 113:8
115:3 116:12
116:13,22
118:22 120:20
125:24 126:20
127:25 128:3,6
138:21,24
139:1,22,23
145:18 151:2
171:10,12
194:4 195:9
201:8 214:13
223:9,18 225:9
246:10,10
247:20 264:6

273:16 280:8
280:10 283:4
285:25 291:14
293:12 302:22
306:18 307:1,3
**questioned (1)**
70:15
**questions (47)**
88:12 91:20,21
97:8 101:4
109:14 111:16
111:19 115:14
116:15 117:22
118:3,24 119:4
120:1 124:9
125:19 134:24
150:4,5,12
166:19 171:7
172:11 187:12
189:4 190:5
195:7 206:13
213:24,25
219:25 221:5
232:20 238:25
239:2 257:1,1
263:1 267:3
269:12 271:5
285:7 286:2
294:17 309:12
310:22
**quick (2)**
111:15 118:3
**quiet (1)**
147:21
**quit (4)**
188:18,20 189:1
191:4
**quite (9)**
58:25 65:13
130:15 140:13
162:8 178:2
195:9 231:6
250:17
**quitting (1)**
191:5
**quiz (3)**
79:16 94:16

99:2
**quotation (1)**
55:22

_____
### R
**R (3)**
315:1,5,22
**racial (29)**
69:3,11 70:8
72:12,13,13
124:16,18
127:14 228:15
244:16 245:1
246:23 247:4
268:24 276:15
276:22,25
278:21,25
280:17 283:14
285:18,21
290:22 291:12
294:10 304:10
308:23
**Rainbow (8)**
65:14 139:19
237:14 242:24
242:25 243:3,6
272:23
**raise (1)**
69:3
**raised (4)**
52:25 129:21
180:24 188:11
**raising (1)**
59:3
**rang (2)**
144:5 162:11
**range (1)**
183:9
**ranting (1)**
146:25
**rapid (1)**
242:4
**rate (3)**
121:19 122:8
301:1
**raving (1)**
146:25

**Ray (2)**
293:19,23
**reach (1)**
301:12
**reached (7)**
176:4 177:16
301:5,8,14,20
301:22
**reaching (2)**
176:5 232:3
**react (1)**
181:14
**reacting (2)**
180:4 182:20
**reaction (2)**
180:7 225:22
**reacts (1)**
251:8
**read (11)**
55:23 79:23
82:13 99:15
112:10,11
142:25 275:10
275:11 281:9
282:9
**reading (2)**
102:7 267:12
**reads (2)**
101:12 263:6
270:5
**ready (6)**
58:13 92:6
145:14 212:8
214:1 230:7
**real (1)**
283:25
**realize (1)**
292:14
**really (18)**
57:11 119:3
129:6 130:16
130:17,22
162:16,18
175:21 176:13
190:17 194:1
223:2 226:5
236:11 252:17

266:22 278:8
**real-time (1)**
173:7
**reason (17)**
55:8 57:11
64:13 88:6
102:11 103:17
114:5,14
129:16 180:18
180:19 181:7
225:20 245:4,8
274:25 298:19
**reasonable (2)**
264:20 271:1
**reassign (1)**
127:2
**rebuttal (2)**
311:17,24
**REC (1)**
50:4
**recall (13)**
146:7 161:21
205:15 219:16
232:5 236:23
276:11 288:12
288:15 290:17
294:7 295:18
295:25
**receipt (1)**
263:14
**receive (4)**
107:15 155:16
155:22 156:3
**received (8)**
83:20 87:6
95:15 106:22
107:3 157:12
250:12 257:19
**recess (5)**
91:24 92:5
136:20 220:15
271:8
**recipient (1)**
57:7
**recognize (16)**
77:4 79:8 84:12
161:5 173:21

177:12 179:2
182:13,22,24
199:8 214:5
229:1 235:6,12
249:12
**recognized (1)**
263:24
**recollection (6)**
87:23 120:23
149:21 165:16
227:13 229:11
**recommendati...**
209:5 256:13
260:8,11
**recommended...**
69:23 249:2
**reconsider (1)**
293:25
**record (53)**
54:19 56:11,21
58:12 59:8
60:8,11,17,25
61:3,14 63:4
63:24 64:20
73:12 77:2
92:2 99:11,18
119:10 120:16
120:21 139:12
140:23 145:7
146:18 148:9
161:10 170:23
173:5,8,16
176:20 178:3
195:23 196:9
196:11 200:14
201:1 202:25
203:7,9 220:19
240:5 264:8
279:25 280:12
283:3 291:17
291:21 299:4,5
301:24
**recordings (2)**
237:21,25
**records (1)**
96:13
**recovering (1)**

312:10
**recross (1)**
135:5
**RECROSS-E...**
115:18 190:6
269:15 309:16
**RED (1)**
50:4
**redirect (8)**
111:14,17 117:3
187:13 267:6
270:13 303:19
303:21
**reduced (1)**
315:7
**refer (14)**
65:10 74:13
78:17 79:22
108:24 112:8
143:24 252:10
253:1 254:21
259:22,25
275:8 307:16
**reference (12)**
73:4 179:10,19
181:18 182:3,6
182:7,12,23
183:5 260:3
275:15
**referenced (2)**
260:2 270:6
**references (2)**
103:6 110:11
**referred (3)**
112:17 113:25
115:4
**referring (4)**
97:2,14 108:24
219:20
**refers (3)**
104:22 109:17
249:10
**reflect (8)**
77:2 92:3 99:12
161:11 173:6
173:16 176:21
203:1

**refresh (1)**
87:6
**refreshing (1)**
193:7
**refuse (1)**
270:17
**refused (1)**
270:22
**regard (3)**
58:21 63:3
102:8
**regarding (4)**
94:11 101:24
288:23 290:15
**regardless (6)**
121:14 127:4
134:2 187:4
246:16 291:11
**regards (2)**
250:18 262:8
**regionalism (1)**
66:14
**register (24)**
68:9 89:4
143:18 146:23
147:14 158:19
159:14,15,20
162:25 168:15
176:11,21
179:5 182:19
194:5 201:24
201:25 205:21
226:20,22
237:16,17,25
**regular (4)**
154:5,13 155:7
185:22
**regulations (2)**
111:25 124:13
**related (1)**
107:22
**relating (2)**
113:7 275:6
**relation (4)**
53:15 218:25
233:11 237:1
**relations (2)**

69:9 241:16
**relationship (2)**
110:22 251:2
**relative (1)**
315:12
**relax (1)**
119:17
**relevance (1)**
56:22
**relevant (2)**
65:4 70:2
**relocated (1)**
272:22
**relocating (1)**
272:25
**rely (1)**
114:17
**remainder (1)**
218:15
**remedy (1)**
69:13
**remember (6)**
130:15 165:19
168:21 169:14
183:12 186:9
**remembered (2)**
48:17 168:14
**reminded (1)**
93:19
**removal (9)**
103:17 104:5,15
105:10 106:17
116:16 288:23
290:1 299:2
**remove (8)**
70:14 104:17
107:21 289:24
290:5,20 294:5
297:8
**removed (13)**
70:24 90:12,13
103:12 105:12
107:20,23
239:16,17
277:21 292:23
293:16 302:5
**removing (1)**

70:14
**repeat (4)**
115:3 142:2
161:25 307:4
**Repeated (2)**
102:7,19
**rephrase (2)**
206:8 246:13
**report (12)**
149:9,11,13
185:5 210:17
217:11 234:11
263:11,15,17
276:5 290:11
**reported (1)**
190:16
**reporter (5)**
139:21 151:1
196:10 314:6
315:5
**reporting (2)**
261:7 315:14
**represent (3)**
150:11 174:2
232:24
**representative...**
70:13,23 108:25
121:10 230:14
304:1
**representative...**
67:11 85:22
102:23 126:21
133:25 134:1
279:10
**represented (1)**
286:23
**representing (1)**
170:17
**reps (1)**
126:22
**request (7)**
71:25 91:23
107:25 230:2
233:5 275:13
283:1
**requested (2)**
84:8 97:17

**requesting (1)**
90:3
**requests (1)**
270:22
**require (1)**
63:9
**required (3)**
63:19 80:25
109:21
**requirements ...**
66:15 80:22
97:1 113:21
**requires (1)**
258:3
**resemble (1)**
62:18
**reservation (4)**
59:11 61:16
62:16 63:22
**reservations (1)**
61:7
**reserve (6)**
152:5,6,8 214:17
214:22 311:14
**residents (1)**
66:16
**resolve (1)**
69:12
**resources (6)**
217:24 241:4,7
241:15 244:25
263:18
**respect (5)**
57:10 267:23
284:15 299:13
301:24
**respectful (4)**
252:19 278:5,11
278:12
**respond (1)**
54:1
**Respondent (4)**
50:18 79:11
97:3,3
**respondents (6)**
48:13 49:12
59:3 61:8

64:24 67:7
**respondent's (...**
65:5 79:1,6,8,10
94:15 99:1,21
142:13,18
157:25 167:5
190:12 206:20
223:20 228:25
231:2 244:6,11
247:24 248:4
249:6,13
259:18 263:2
307:14 314:1
**response (3)**
63:25 68:16
195:9
**responsibilitie...**
74:19 81:18
250:2 272:9,15
**responsibility ...**
75:13 78:12
243:14 280:13
**responsible (5)**
75:6 210:3
241:23 272:10
289:19
**rest (3)**
138:18 148:17
166:24
**Restraining (2)**
53:8 59:19
**restricted (1)**
281:21
**result (1)**
294:5
**resulted (1)**
286:19
**retail (7)**
196:17,18
197:14,15,17
221:11 262:12
**return (6)**
69:24 211:14,24
218:4,15
232:17
**returned (4)**
90:4 113:18

211:3 292:24
**returns (1)**
312:12
**reveal (2)**
63:6 170:24
**review (17)**
170:14,16 180:6
204:18 215:20
251:18 260:19
264:15 265:16
282:24 283:9
287:13 288:8
288:12,15,22
296:18
**reviewed (11)**
61:9 68:11,12
69:6 219:15
256:1 268:6
288:14,18
290:10 303:2
**reviewing (4)**
204:25 205:2
265:6 287:9
**rewarded (2)**
164:10 187:21
**Rhode (1)**
136:10
**right (68)**
55:12 62:20
71:4 79:6
84:15 111:13
114:2 123:16
125:1,6 126:3
127:11,12
128:5,16,23
129:24 130:12
130:21 131:15
132:4 133:6,16
133:17 136:17
145:12 147:19
150:6 151:11
153:21 156:7
156:18 158:15
158:16,20
160:7,7 161:9
168:22,24
169:21 173:23

176:25 182:4
182:18 185:12
191:11,14,20
194:1 199:14
204:24 211:19
215:25 233:16
242:10 243:5
243:16 253:2
257:23 262:7
268:13,22
304:10,16
311:15 312:4,5
**rights (2)**
62:16 63:22
**right-hand (1)**
77:20
**ring (2)**
161:24 162:5
**ringing (4)**
163:5,13,14
226:20
**Rivera (32)**
66:24,25 67:2,3
71:21,22,25
103:8,22 104:1
108:13,15,18
108:23,24
109:1,2,3,5,10
120:4 123:19
123:23 124:2
130:24 133:21
207:21,22
209:9 232:4
262:20,23
**Roach (1)**
310:14
**Road (1)**
294:21
**robbery (1)**
253:25
**Roger (1)**
288:1
**role (8)**
97:20 142:1,4
196:15 198:25
287:8,18
289:13

**room (15)**
85:4 108:5
113:19 161:6
224:17,20,23
225:2,7 226:24
226:25 235:24
236:1 239:16
285:4
**rooms (1)**
295:11
**rude (1)**
185:4
**rule (19)**
88:18,22 94:11
103:11,14
105:14,15,18
105:21 111:21
156:6,19
264:18,19
265:4,15 281:7
282:19 315:15
**rules (26)**
78:24 82:12
88:14 100:4,5
111:24,25
124:13 134:4
134:10 156:15
257:6,20
260:22 264:19
264:23 265:6
265:16 266:2,2
269:19,20
281:7,15
282:18 292:4
**run (4)**
65:7 142:8
214:16,21
**rush (1)**
160:17

———————
**S**
**safe (5)**
79:20 99:7
208:18 307:15
307:16
**safety (46)**
67:12 79:12,13

79:14,16,17,19
80:9,11,18
81:11,13 94:21
96:8 99:9,10
99:16,21
100:18 101:1
101:21,23
102:9 103:3
111:23 113:11
113:22 114:1,7
114:14,18,23
115:4 127:5
216:15,22
261:6 269:21
288:5 290:2
302:23,23,24
303:4,5,6
**salad (5)**
177:1 181:6,13
182:13,18
**sat (6)**
62:25 89:20
212:17,21
229:23 299:8
**SATER (1)**
49:13
**save (2)**
209:14 220:13
**saved (1)**
209:18
**saw (16)**
69:21 80:18
85:11 164:7
173:12 187:20
193:3 202:15
208:6 234:17
235:7 241:21
255:25 295:23
295:25 302:4
**saying (18)**
54:5 57:10
89:21 107:16
107:22 132:20
145:22 147:2
162:18 168:14
168:17 178:10
204:22 207:20

208:14 226:21
278:24 294:7
**says (13)**
55:10 60:6
71:10 77:17
85:21 86:4
100:1 102:6
110:20 126:13
129:8 147:16
269:1
**scene (1)**
69:1
**schedule (2)**
95:9 312:14
**scheduling (1)**
75:8
**Schwendeman...**
197:24
**screaming (1)**
306:16
**screen (2)**
178:4 215:24
**scuffling (1)**
82:5
**seal (1)**
315:16
**seat (2)**
86:25 135:7
**seated (4)**
161:8 233:22,25
234:2
**seating (1)**
233:2
**Sebastian (2)**
49:24 293:16
**second (22)**
84:25 91:4,5
95:14,18,24
96:3 98:12,15
106:5 134:21
157:2,9 173:17
173:17 185:6
202:20 253:23
272:21,23
310:11,20
**Secondly (1)**
57:5

**seconds (6)**
173:14 178:8
179:7 183:10
183:14,16
**secretary (2)**
77:24 312:23
**section (3)**
101:11 182:11
259:22
**security (15)**
169:23 170:3,4
204:23 209:17
209:17 215:20
216:15,19,23
239:3 298:2,6
298:8,12
**see (84)**
53:17 60:2
72:24 81:18
82:2 91:19
101:4 102:2,14
102:19 107:11
110:18 112:16
112:18,25
143:15 145:10
148:18 170:11
171:6,12
172:13 174:8
174:10 175:1,4
175:9,12,14,14
175:16,17,18
175:19,21,21
175:22 176:3,3
176:6,17,19
177:2,11,14,24
178:23 179:18
180:15 181:15
182:14,14,19
183:24 184:12
186:18 187:15
199:9 202:9
204:14,15,15
204:19 205:19
207:12 219:20
236:20 238:6
238:21 244:20
253:9 254:3

256:3,6,9
263:12 275:15
295:12,17,21
295:22 300:1
308:5,20
**seeing (3)**
173:10,16
236:23
**seen (21)**
101:18 110:8
142:18 156:15
158:22 161:15
187:7 191:2
195:17,17
206:21 209:21
209:23 214:8
223:25 235:10
268:20 273:17
288:16 295:6
296:21
**sees (1)**
171:15
**seminar (1)**
113:23
**send (4)**
72:2 231:20
256:8 270:24
**sending (2)**
72:2 282:11
**seniority (7)**
64:13,17 71:16
71:24 120:9
123:2 138:16
**sense (10)**
60:20 136:8
151:24,25
203:8 261:13
264:25 265:3
283:21 296:13
**sent (3)**
256:17 262:9
298:7
**sentiment (1)**
111:4
**separate (1)**
68:25
**separating (1)**

172:7
sequence (4)
179:9 191:19
204:9 205:3
series (2)
79:11 310:22
seriousness (1)
250:15
serve (1)
152:18
served (1)
151:3
service (13)
76:13 155:10,23
156:4,16
196:18 208:3
214:16,21
222:12,20
231:15 235:21
services (13)
65:8 216:5,8,11
242:2 262:12
263:12 272:5
281:12,23
282:24 298:18
300:18
SESSION (1)
137:1
set (9)
53:4 77:18
193:10,13,14
193:15 275:4
294:17 315:15
seven (5)
92:22 150:23
151:4,5 213:6
sexually (3)
80:4,6 308:20
SEYMOUR (1)
49:13
shaking (3)
140:1 175:2
177:7
shared (1)
250:18
shed (1)
239:15

sheet (4)
96:25 97:1
100:7 164:23
shelving (1)
159:19
shift (40)
84:25 95:14,18
95:24 96:3
106:5 140:16
140:18,19,24
141:11,12
153:7,8,9,10
154:17,18,19
154:20,22
160:10,12,25
163:25 164:1
172:15 200:14
200:16 218:16
221:15,19
222:15,25
223:13 235:14
235:19,22
310:12,20
shifts (1)
310:18
shimmy (1)
237:10
shirt (3)
179:16,19
181:25
short (7)
90:9 157:19
194:4 201:24
205:18 243:1
289:16
shortchanged ...
68:8 69:6,7
133:11
shortchanging...
68:14,15 88:25
shorted (1)
201:17
shorting (1)
201:21
shot (2)
128:14 174:10
shouting (1)

252:7
show (23)
71:8 78:25
123:3 148:3
159:1,1,4,5
170:23 179:6
180:12 181:13
194:25 200:8
206:19 209:21
213:2,10
223:19 228:24
266:21 307:12
310:14
showed (6)
159:5 187:15
189:3 203:1,4
215:23
showing (3)
177:21 204:2
223:24
shown (3)
203:2,25 249:18
shows (5)
159:3 171:20
180:7,10
182:11
side (10)
77:20 99:8
162:13 164:12
172:2,2,22
179:4 199:12
215:6
sidetracked (1)
204:5
sign (3)
79:21 295:21,24
signatory (1)
289:10
signature (2)
78:3 287:11
signed (3)
77:23 109:24
287:2
significance (1)
261:5
significant (1)
187:1

signifies (1)
80:17
signify (2)
80:16,16
signs (2)
195:13 219:12
simple (3)
196:20 197:15
272:8
simply (10)
60:4,5 61:2
63:23 69:4
71:10,25 72:14
86:4 171:21
sir (35)
73:20 86:25
94:9,14 97:19
99:20 101:11
101:25 103:5
104:4,21 105:8
105:20 106:7
109:14,17
110:17 133:10
134:15 138:9
138:14 144:10
144:13 148:2
148:13 183:22
203:15 204:3
212:22 213:1,8
213:19 219:15
291:14 299:3
sisters (1)
68:6
sit (4)
105:1 119:16
159:23 257:18
site (62)
68:3 70:21 71:5
72:3,9,9 80:3,8
85:13 88:10
90:4,7 93:4,6
95:2,3,4 97:8
102:12 106:17
108:23 109:2,3
120:11,15,18
121:3,6,12,15
121:15,22

125:3,9,13
126:7 127:7,16
242:3 258:2,16
270:11,22,25
271:2 281:17
281:22 283:21
285:13,18,22
285:23 290:5
304:4,24 305:4
305:11 308:19
309:3,8 310:9
310:15
sites (9)
116:10 125:22
125:25 126:3
278:8 281:14
288:24 297:10
309:3
sits (1)
295:19
sitting (14)
84:14 112:5
132:8 147:19
149:5 159:14
172:21 176:15
178:10 180:4
230:14 233:11
258:7 293:17
situation (23)
69:12 131:3
168:18 190:9
190:15 191:19
201:4 217:13
218:19 239:18
239:22 250:14
250:16,19
251:8,16 254:7
254:8 256:3
260:12,19
262:9 263:21
situations (1)
302:15
six (20)
110:19 122:20
122:21 138:18
144:5,10
150:19,20,23

151:4,5 152:14
153:12,17
154:4 183:22
200:10,10
213:5 272:12
**Sixth (4)**
61:3,6,14 62:11
**size (1)**
129:7
**skills (1)**
222:12
**sleep (1)**
221:7
**slipped (1)**
130:17
**slowed (1)**
163:19
**slur (1)**
70:8
**slurs (7)**
72:13 245:1
247:4 253:8
276:22 278:21
280:17
**small (1)**
222:13
**smoothie (1)**
153:3
**smoothies (1)**
152:18
**Sodexho (41)**
65:5,7,17 66:3
68:11,24 69:4
69:8,18,22,23
105:4 141:23
141:24 142:5,8
154:10,12
165:23,24
169:9,12
196:14,20,23
197:22,23,24
214:16,24
215:7 216:2,14
216:21,25
217:25 221:9
222:1 250:22
251:1 263:22

**Sodexho's (3)**
141:25 142:4
196:15
**Soggs (2)**
77:23 78:2
**somebody (20)**
70:22 106:23
131:19 133:14
140:1 158:14
162:4 165:5
167:24 174:20
176:3,4 188:7
227:8 240:11
247:7 262:7
268:10,24
302:21
**somebody's (1)**
165:5
**son (1)**
293:24
**soon (1)**
251:15
**sorry (20)**
73:24 118:13
145:8 146:14
165:16 178:15
201:9 215:15
228:3,5 232:7
232:7 245:7,12
269:1 276:8
293:23 305:9
305:23 309:24
**sort (6)**
136:4 242:9
245:10 297:25
300:13 304:2
**Sosnowski (6)**
107:2,22,25
288:1 302:10
302:14
**sound (3)**
151:10 159:7
233:16
**space (1)**
93:9
**speak (9)**
150:25 160:5

175:6 184:17
190:11 211:16
264:13 299:6
301:24
**speaks (3)**
111:8 114:8,9
**special (2)**
123:9 236:5
**specific (6)**
83:7,17 88:22
125:5 287:22
297:14
**specifically (5)**
110:17 146:7
236:23 247:5
304:8
**specifics (1)**
274:12
**specified (1)**
315:11
**spell (6)**
74:6 119:17
137:9 152:25
169:5 217:20
**spelled (2)**
240:13 257:25
**spells (1)**
240:11
**spend (4)**
213:18 235:19
235:22 294:24
**spoke (8)**
165:18 190:8
211:18,21
262:8,10
263:19 304:3
**spoken (2)**
211:11 262:3
**spots (1)**
173:10
**spouse (1)**
190:9
**spreading (1)**
63:4
**Springfield (1)**
190:2
**SS (1)**

315:3
**staff (3)**
251:5,8 295:13
**stalking (1)**
253:25
**stand (4)**
63:24 92:4
152:19 153:7
**standard (1)**
229:8
**standards (2)**
81:22 101:12
**standing (28)**
131:22 147:13
147:18 163:20
165:10 172:3
173:12,13
174:1,18,24
176:2,3,7,18
176:23,25
179:4 180:14
180:19 181:6,9
181:12 184:10
184:11,12
208:8 226:19
**standpoint (1)**
267:19
**stands (2)**
238:11 247:20
**Stanley (1)**
77:23
**start (3)**
136:18 176:14
224:8
**started (21)**
52:2 95:6 97:19
100:25 122:3
122:14 146:23
151:9,12,21
154:13 174:16
178:6,13,21
191:13 202:1
221:13 234:8
300:19,19
**starting (4)**
55:16 95:10
102:19 153:20

**starts (1)**
181:19
**state (12)**
71:5 74:4,19
119:11 220:20
240:6 273:12
299:4 308:11
308:18 315:2,6
**stated (11)**
57:16 70:5
115:6 202:2
205:17,23
207:15,21
210:19 212:21
301:4
**statement (30)**
56:10 58:17,19
58:24 59:9
62:5 64:21
73:5 101:20
115:2,11
142:22 143:6
143:25 149:14
149:18 177:15
192:2 206:24
207:3 213:7
251:17,18
255:21 261:14
261:19 266:2
290:15,17
308:21
**statements (8)**
143:17 201:11
232:1,4 251:11
251:19 256:17
311:18
**states (2)**
244:21 254:25
**stating (4)**
61:2 112:20
177:20 301:19
**stations (1)**
172:2
**status (1)**
138:8
**stay (6)**
53:7 59:17

98:17 154:17
161:2 295:13
**stayed (2)**
163:14 281:21
**steal (3)**
125:15 132:18
133:17
**stealing (3)**
130:10 132:17
226:4
**Stenotypy (1)**
315:7
**step (7)**
73:2 77:1
133:10 146:12
148:14 157:9
303:25
**Stephanie (2)**
315:5,22
**steps (4)**
96:7 123:9
157:11 297:17
**Steve (1)**
77:23
**stills (2)**
209:22,23
**stipulate (1)**
86:7
**stipulated (1)**
199:16
**stipulation (1)**
309:20
**stole (3)**
133:16 162:16
226:4
**stood (1)**
294:4
**stop (3)**
145:17 181:15
183:5
**stopped (3)**
55:21 146:25
181:9
**story (2)**
69:22 189:11
**strategic (1)**
272:18

**street (2)**
49:18 99:3
**strongly (3)**
53:12 72:5
301:9
**stuff (1)**
162:12
**subcontractor...**
94:3
**subcontracts (1)**
78:21
**subject (14)**
91:22 105:23
124:13 134:22
135:5 156:14
217:16 245:15
253:20 254:11
269:8 280:3
311:16,17
**subsequent (3)**
87:11 90:2
91:15
**substantial (1)**
56:6
**succession (1)**
241:16
**sudden (1)**
230:18
**Sue (32)**
49:22 205:4,5,7
208:21 209:5
209:12,13,13
209:13 210:14
210:17 211:6
211:18,21
217:20 220:8
230:7,10,12,17
230:19 231:21
231:23,25
232:2,5,11
240:22 252:24
257:1 277:13
**sufficient (1)**
89:15
**sum (1)**
194:14
**SUMMIT (1)**

315:3
**superintenden...**
85:5 106:10
108:8
**Superior (1)**
49:8
**superiors (2)**
260:9 261:8
**supervise (2)**
105:25 196:23
**supervises (1)**
65:18
**supervision (1)**
109:3
**supervisor (10)**
85:2 106:2
132:7,9 141:16
197:23,24
261:22 263:11
263:19
**supervisors (6)**
132:9 133:6,7
149:16 262:2
263:18
**supper (1)**
192:21
**supplies (1)**
310:16
**supply (1)**
310:13
**supplying (1)**
108:19
**support (3)**
224:19,20
241:12
**supposed (5)**
88:4 96:5
103:19 140:6
292:3
**sure (37)**
54:20 77:9,22
78:16 79:24
80:9 83:2 87:1
87:24 89:23
110:3 157:4
159:6,8 167:6
167:23 171:10

171:20 174:14
174:23 181:11
184:18 192:3
216:24 231:6
236:11 237:18
238:7 244:3,15
251:6 256:5
280:24 287:10
288:8 289:25
291:17
**surgery (1)**
312:11
**surmised (1)**
226:1
**surprise (6)**
266:20 278:23
279:21 285:14
285:15,19
**surprising (1)**
285:10
**surrounded (1)**
159:24
**Susan (6)**
49:5 50:11
150:10 232:23
240:2,7
**swearing (1)**
228:13
**swipe (3)**
185:23 186:1,6
**system (6)**
64:25 65:10,16
231:12 239:4
300:4
**SYSTEMS (1)**
48:12
**s-a-n (1)**
240:9
**S-o-d-e-x-h-o (...**
65:6
**S-u (1)**
240:8

_____
T
_____

**T (2)**
315:1,1
**table (7)**

84:14 132:8
174:13 199:13
226:23 233:10
233:22
**tables (1)**
172:21
**take (45)**
54:14 77:1
79:17 88:6
91:18 104:1,11
105:9 110:2
116:1 123:9
135:8,14
136:16,16
143:11 147:4
147:23 148:7
148:12,17
156:21 162:14
166:23 167:4
177:16,17
185:3,6 205:21
210:23 213:3
215:15 216:14
220:3 228:25
229:22 236:5
238:5 285:11
285:16 297:17
302:6 303:25
312:12
**taken (12)**
59:13 72:17
92:5 123:5
130:20 136:21
157:11 220:15
271:8 315:7,9
315:10
**takes (2)**
139:24 173:13
**talk (31)**
82:20 92:3
130:16 135:22
149:8 166:11
167:7,21,24
169:3 184:25
210:14 217:10
222:21 224:11
224:21 226:8

232:8 246:17
247:17 251:10
261:17,21,25
262:13,15,17
262:20 281:4
291:1,5
**talked (21)**
163:17 166:9
167:15 168:4,9
168:12,13
169:4 174:7
201:12,12,14
211:6 216:11
217:15 231:25
256:5 257:5,22
261:23,24
**talking (30)**
63:17 75:20
86:25 87:3
100:25 107:24
130:9 140:1,2
147:5 158:17
163:6,21
169:14 197:21
199:10 200:19
201:4 202:5
209:13 217:19
217:20 232:14
233:7 239:18
243:9 265:2,3
281:5 297:18
**talks (3)**
104:8 244:14
252:5
**taller (1)**
172:3
**tantamount (1)**
293:3
**tape (15)**
170:3,5,5 171:22
179:10,11
180:6,10
181:19 182:11
184:13 219:15
225:15 256:4
306:25
**tapes (3)**

215:21 216:1,2
**target (1)**
263:8
**teach (1)**
231:15
**teaches (2)**
125:6,8
**team (4)**
222:18 232:13
232:13 244:1
**tell (60)**
75:14 77:6
82:25 83:4,6
83:10,13 84:3
84:16,17 85:17
87:21 88:13
89:11 102:6
132:17 135:18
135:20 144:1
147:20 148:25
164:4 176:13
179:25 181:19
183:15 184:15
184:20 189:15
194:22 195:4
199:20,23,24
200:23 201:5
201:14 205:15
208:4 211:20
212:2,15
219:12 224:12
225:3 227:16
228:17 229:15
240:22 244:11
248:4 249:22
250:10 251:1
272:8 274:11
277:24 280:20
307:8 313:6
**telling (8)**
146:7 165:12
189:4 201:19
267:24 305:1
305:18 307:2
**tells (1)**
99:23
**temp (9)**

138:4,18 139:1
150:20 151:18
152:1 153:14
154:5,15
**temping (2)**
151:21 152:15
**temporary (6)**
53:8 59:18
138:7 150:18
151:3 152:9
**ten (8)**
144:8,12 147:3
183:21,23
185:13 221:14
285:2
**ten-minute (1)**
92:1
**term (9)**
117:7 124:20
144:18 148:10
149:1 245:15
247:2 253:11
275:20
**terminated (3)**
64:16 71:16
247:5
**termination (8)**
64:12,13 102:13
157:4,6,10
245:20,21
**terms (15)**
76:6,24 91:6
110:20 127:14
144:18 196:20
197:15 246:19
248:15 272:8
274:19 276:21
276:25 286:14
**terrorism (1)**
254:1
**Terry (6)**
52:8 126:22
279:8,16,18
282:23
**test (2)**
80:20 246:7
**testified (21)**

73:11 102:21
119:9 134:10
137:5 163:4
172:1 174:5
180:8 195:22
220:18 240:4
271:11 277:15
280:3 284:20
299:24 302:2
303:24 304:18
309:1
**testify (20)**
66:2 67:11
69:25 85:23
89:17 134:1
135:13,19
140:9,10
178:13,14,19
178:20 220:9
225:25 241:22
250:20 255:12
299:11
**testifying (1)**
178:11
**testimony (10)**
118:2 135:3
188:10 239:25
255:16,23
259:18 279:25
280:10 290:4
**testing (1)**
269:19
**thank (27)**
58:4 62:6 64:23
72:23 73:8
74:1 137:17
140:4 161:12
195:18 209:12
215:16 220:1
221:22 238:23
239:24,24
240:19 264:3
267:2 271:7,20
286:5 303:16
303:20 309:15
313:15
**theft (1)**

133:1
**thefts (1)**
132:23
**They'd (1)**
185:7
**thief (35)**
68:20 69:17,20
70:6 117:15
128:9,25 130:3
130:7,10,12,14
131:1,8,19,24
132:3,7,11
147:22 148:7
148:11 162:18
212:24 213:4
228:13,23
276:22,24
304:22,23
305:2,16
306:15,17
**thieving (4)**
177:15,17
228:18,22
**thing (3)**
131:3 181:16
298:24
**things (12)**
56:25 66:18
68:2 80:18
93:13 125:5
179:24 215:18
244:3 281:5,12
313:2
**think (91)**
53:22 57:24
58:5 60:9,19
63:16 64:5,14
75:22,22 86:20
89:25 90:1
96:15 97:22
99:14 115:1,10
117:9,12,13
120:3 123:4
128:12 130:23
131:18,22
132:23,25
133:11,12

| | | | | |
|---|---|---|---|---|
| 135:23 136:12 | 188:2,3,5 | 160:24 166:7 | 202:3 205:8,9 | **told (44)** |
| 136:14 142:6 | 206:15,16 | 167:15 168:6 | 205:10 206:13 | 89:17,19 125:21 |
| 142:10 146:2 | 208:25 209:10 | 168:24,25 | 206:14,14 | 125:24 127:1 |
| 147:24 148:13 | 249:1 278:19 | 171:21 173:18 | 207:2,9 222:2 | 130:11 131:15 |
| 148:20 151:12 | **threatening (6)** | 174:2,6 179:9 | 222:11 225:10 | 132:7,11,13 |
| 158:4,13 | 69:16 70:7 | 179:14 182:10 | 225:16 226:8 | 133:20,20,21 |
| 162:17 166:6 | 252:7 254:6,8 | 183:7,7,8,11 | 226:16,18,20 | 146:15 149:20 |
| 166:16 167:22 | 278:18 | 184:2 185:2 | 227:18,18 | 149:25 150:1 |
| 168:11 170:1,4 | **threatens (1)** | 190:5 191:25 | 229:4,4,5 | 162:14 165:14 |
| 171:3 173:5 | 268:25 | 192:16 193:13 | 237:16 239:16 | 166:1 168:1 |
| 178:18 179:23 | **threats (2)** | 193:15 194:5,9 | 239:18 | 169:17 173:2 |
| 192:5 200:7,24 | 248:11,17 | 199:21 202:21 | **Tish's (1)** | 188:15,18,25 |
| 203:19 205:3,3 | **three (12)** | 210:6,21 | 225:19 | 190:14,16,24 |
| 205:4 206:12 | 74:15 79:15 | 211:22 212:5 | **title (7)** | 194:23 201:6 |
| 208:6 209:13 | 93:3 97:21 | 212:10 216:10 | 74:16,17 76:17 | 201:23 208:25 |
| 210:13 213:4 | 98:20 123:6 | 221:20 223:12 | 77:24 197:13 | 209:2 211:5 |
| 213:19 215:12 | 172:18 173:21 | 223:15 226:10 | 197:14 221:10 | 228:11,11 |
| 216:4 223:4 | 217:17 223:9 | 226:11,17,18 | **today (47)** | 231:25 266:13 |
| 227:6 229:23 | 250:3 299:23 | 227:11 230:5 | 52:19 53:10 | 267:18 292:21 |
| 231:4,12,25 | **three-party (1)** | 232:20 233:23 | 59:21 63:2 | 294:13 308:9 |
| 233:9 234:8 | 274:15 | 236:1 237:15 | 82:23 91:11,14 | 309:7 |
| 237:12 247:15 | **Thursday (8)** | 237:20 238:12 | 94:12 102:21 | **tolerance (11)** |
| 265:9 267:17 | 201:22 205:19 | 240:14 246:25 | 105:1 107:4 | 72:12 245:25 |
| 270:4,24 279:2 | 205:20 223:10 | 247:3 248:24 | 110:8 113:23 | 246:14,16,23 |
| 282:6 285:3 | 227:15 230:25 | 255:3,3 258:17 | 120:6,12 | 248:17,20 |
| 293:2 297:7 | 312:9 313:14 | 260:14,18 | 121:11 125:21 | 253:16 254:14 |
| 298:13 301:13 | **ticket (5)** | 261:1 288:22 | 137:17 140:7 | 254:15 278:25 |
| 304:7 | 162:13 193:8,16 | 290:19 295:22 | 140:10 142:19 | **tolerated (2)** |
| **thinking (2)** | 194:17 228:7 | 295:23,25 | 149:21 150:1 | 244:23 256:20 |
| 154:11 172:10 | **tier (2)** | 315:10 | 161:6 187:8 | **Tom (3)** |
| **third (8)** | 198:1,2 | **timer (1)** | 206:21 214:6 | 197:24 256:9 |
| 65:4 79:19 99:6 | **time (100)** | 171:21 | 220:11 221:22 | 288:1 |
| 140:18,19,24 | 48:22 52:21 | **times (12)** | 222:22 250:20 | **tomorrow (3)** |
| 141:12 263:8 | 56:7 58:7 62:7 | 95:17,23 132:3 | 255:12,22 | 136:8,10 312:23 |
| **thought (12)** | 63:1 72:23 | 132:21 141:12 | 257:5,18 261:1 | **Tony (4)** |
| 58:2 130:19 | 89:3 90:8,9,15 | 156:17 160:11 | 269:22 273:17 | 106:8,9,13 108:8 |
| 211:16,18 | 90:16 91:22 | 185:9 190:14 | 275:24 284:20 | **top (8)** |
| 215:15 217:13 | 92:11 93:3 | 208:14 296:4 | 296:5 303:24 | 55:9 79:12,15 |
| 228:8,9 236:12 | 97:14 102:25 | 302:3 | 304:18 308:9 | 83:25 84:24 |
| 254:6 264:9,24 | 106:12 112:24 | **time-lapsed (1)** | 308:15 309:1,7 | 197:22,24 |
| **thoughts (1)** | 112:24 116:11 | 173:6 | **today's (1)** | 202:23 |
| 280:16 | 119:4 120:2 | **timing (1)** | 60:1 | **total (3)** |
| **threat (3)** | 131:5 134:24 | 91:7 | **Todd (8)** | 138:5 150:14 |
| 210:12 253:24 | 135:8,9 136:17 | **tired (1)** | 50:6 73:9,14 | 151:19 |
| 254:3 | 140:23 141:1 | 285:7 | 74:5 79:5 | **tough (1)** |
| **threatened (11)** | 143:15 149:9 | **Tish (28)** | 82:17 91:20 | 313:11 |
| 181:8 187:23 | 150:4 156:3,3 | 191:2 201:17,20 | 92:3 | **town (1)** |

98:18
**track (2)**
204:6 242:4
**trade (6)**
76:25 77:13
78:18,23 96:5
131:17
**trades (18)**
52:7,10,16,17
53:14,15 54:3
54:8 56:1,16
57:15,15 66:10
67:25 72:16
78:5 94:8
108:12
**tradesmen (3)**
114:2 117:14,17
**traffic (2)**
160:20 242:16
**trailer (6)**
92:20 94:23,25
99:3 295:19
296:4
**trailers (3)**
92:22 93:1
295:11
**train (3)**
155:21,21
270:15
**trained (3)**
156:6,11 216:15
**training (12)**
101:19,20
155:16,19,20
155:22,25
156:2 189:19
270:21 296:18
297:3
**transaction (2)**
144:5 185:8
**transactions (2)**
158:21 169:24
**transcription (...**
315:8,9
**transpired (1)**
67:8
**trash (2)**

100:2 307:19
**treat (6)**
114:25 244:18
267:24,25
284:14 303:11
**treated (5)**
255:8 261:10
262:6 268:11
303:8
**treating (4)**
114:23 125:12
267:22 268:10
**trial (2)**
313:8,11
**tribunal (1)**
62:21
**tried (2)**
69:12 281:25
**trip (1)**
312:12
**TRO (3)**
60:6 61:1,16
**troops (1)**
220:8
**true (13)**
57:18 143:3
149:18,22
156:9,10 160:3
216:21 234:12
234:13 250:6
261:12 315:8
**Trusso (3)**
49:24 293:17,21
**truth (3)**
189:5,7 313:7
**truthful (2)**
189:9 306:6
**try (8)**
56:22 208:20
220:7,10
252:16,17
313:11,12
**trying (10)**
147:20 180:25
189:2,4 193:22
194:23,24,25
205:2 217:12

**Tuesday (4)**
48:21 201:17
202:13 223:10
**turn (14)**
77:15 81:5,15
97:18 101:25
181:15 199:12
210:25 252:9
254:22 267:8
273:21 274:10
307:15
**turned (6)**
86:22 88:7
132:1 167:10
181:10 269:6
**turning (2)**
215:18 225:12
**Twenty (1)**
284:4
**two (47)**
67:7 77:20
82:10 85:6
88:12 94:21
98:13 102:5,16
122:5 133:24
138:5,15
145:21 150:15
150:17 151:20
153:12 160:7
172:1,18
173:21 178:7
179:7,8 183:9
188:8 189:24
202:11 217:5
217:17 223:25
228:9,12 231:2
231:7 251:24
264:6 272:2,7
272:19 300:18
304:21 305:15
306:15,22,24
**two-page (1)**
223:24
**two-week (1)**
312:11
**type (3)**
78:14 296:5,18

**typed (1)**
287:1
**types (3)**
75:8 242:18
248:9
**typical (1)**
95:12
**typically (3)**
200:15 221:16
310:17
**T-o-d-d (1)**
73:15
**T-shirt (4)**
174:2 175:13,14
175:19

───────

**U**

**UCI (1)**
273:13
**UH (111)**
56:20 65:11,19
65:19,19,21,23
65:24 66:9
67:4,6,14 68:3
68:9,22 69:23
69:24 70:10
71:3,17 72:12
72:16,23 77:8
78:9 85:11,22
85:24 88:14
90:3,7 110:22
111:4 112:1,4
114:17 117:14
120:18 121:3
121:15,20
122:9,11
123:11 124:12
124:16 125:5
126:3 127:5,11
127:13,20
132:14 133:25
196:23 197:1,9
210:12,13,18
222:1 242:22
245:14 247:16
247:23 248:7
248:18 249:20

250:23 251:1,3
252:22 253:12
254:9 255:10
255:20 256:15
256:21,23
258:2 262:6
269:6,8 274:21
276:17 277:4
277:18,22
278:2 280:1
281:17,18,21
281:22 283:18
285:22 288:24
292:23,24
297:6 298:23
303:11,14
304:22 306:12
307:11,22
308:1 309:3,8
309:8
**UH's (27)**
66:20,21 70:3
71:14 112:23
112:24 113:2
243:10,11
244:25 246:23
247:15 249:10
252:14 254:18
255:2,4,5
267:14,15
270:16 275:17
278:24 279:14
279:18,22
282:24
**Uh-huh (12)**
124:25 143:5
156:8 172:23
196:6 197:3
207:4 233:4
235:15 243:19
248:21 268:9
**ultimate (1)**
305:7
**ultimately (5)**
210:15 217:19
241:23 286:19
287:2

**unacceptable (...**
72:14 278:22
303:10
**unaware (6)**
278:24 283:13
283:17 284:22
285:12,17
**uncomfortabl...**
168:15 206:17
207:16
**underneath (2)**
78:22 253:1
**understand (29)**
73:19 97:4
118:21 119:20
124:20 126:5
137:12 138:22
144:17,17
171:11 184:1
196:4 202:15
202:19 220:24
228:14,20
240:15 242:8
271:16 278:9
279:22 280:1
289:14 291:18
291:20 294:18
296:16
**understanding...**
64:9 89:7,13,14
89:18,21
107:17,24
124:4 141:25
142:3 211:22
212:4 216:3,13
276:14,20,23
277:1,4 290:24
291:25
**understood (14)**
57:9 69:4 109:5
124:12,17,23
126:2 130:19
133:19 253:19
303:1,4 304:13
310:24
**unemployed (2)**
294:4,8

**unemploymen...**
153:25
**uniform (1)**
182:25
**union (72)**
48:7 51:3 53:20
54:5,21,25
55:2,3 57:19
61:5,11 64:3,6
64:10 66:15
67:9,10 68:5
68:21 72:16
77:11 80:7
82:17 90:3,6
117:17 118:10
120:9 121:10
121:16 124:1
125:8,21,24
126:5,13,20,21
128:18 131:9
131:15 133:21
133:22 134:2
150:5 155:5
189:2 203:8,10
203:12,13,16
203:22 213:25
267:17 270:2
270:25 280:19
281:2 285:11
285:16 293:6
293:10,19
304:1,19
305:18 306:6
306:12 307:8
307:21 309:2
**unions (19)**
54:7 57:16
66:20 77:13
78:19 110:12
110:14,22
111:4 112:16
112:18,20
254:25 267:12
274:17 278:24
282:11 283:16
307:21
**union's (3)**

118:8 134:22
305:21
**unit (7)**
98:5 219:2
237:2 272:22
309:22 310:1,5
**University (94)**
48:11 52:20,24
54:6 64:25
65:2,6,9,16
74:25 77:22
92:12,23 94:11
97:9 98:3,23
99:4,25 100:3
103:11 116:17
137:21 138:3,7
139:2,16
140:12 141:6
141:22 142:4
142:11 149:25
150:14 151:10
152:9 153:14
154:6,9,15
155:3,8 160:12
167:20 168:4
168:10 169:8
185:18,21
186:5 195:12
196:15 197:1
214:8 215:7,19
216:2,7 217:25
218:1,25 222:2
236:7,14,22
238:2 240:24
241:1 256:19
258:20,24
259:12 260:16
270:9 271:24
272:1,11
273:13 274:16
275:21 278:13
278:20 286:9
286:23 287:19
289:17 291:5
294:19 295:3
295:20 296:6
297:9 310:9,16

**unusual (5)**
116:6 160:17,19
250:22 284:13
**upset (18)**
69:5 70:19
164:14,20
165:9 187:20
190:22 205:25
224:19 227:5,6
227:20,23
228:8,12
234:19 238:13
239:17
**usage (1)**
249:24
**use (25)**
68:18,19 88:16
93:20 100:6
103:12 124:20
144:18,22
145:5 148:10
149:1 186:6
212:25 228:21
245:1,15
253:11 278:21
283:14 285:21
288:9 297:25
299:8 308:23
**uses (1)**
268:24
**usual (2)**
95:9 160:14
**usually (5)**
131:16 144:18
160:9,13
172:15
**Utility (1)**
61:5

───────

**V**

**vacate (1)**
56:18
**vacation (5)**
135:12,12 140:6
312:11 313:7
**valid (1)**
285:3

**value (1)**
252:22
**values (2)**
274:21,23
**various (2)**
57:16 286:16
**verbal (6)**
89:8,11 105:5,9
107:18 255:23
**verbally (1)**
204:20
**verification (2)**
97:11 208:21
**verified (4)**
68:13 209:11
210:25 211:21
**verify (13)**
113:10 117:25
118:8,18 119:6
120:3 121:11
125:18 129:21
143:15 210:13
229:1 271:1
**version (3)**
287:1 289:16
290:16
**vice (5)**
272:4 286:8
287:8,18
288:19
**vicinity (3)**
215:12 226:17
237:24
**victim (1)**
269:7
**video (42)**
68:14 79:17
80:18 94:18,19
101:19,20,23
115:9 171:12
171:17,19
173:6 177:20
189:3 202:6,7
202:8,10,15,20
202:21 203:1,5
203:10,11,14
203:22 204:5,6

204:23 209:14
209:24,25
210:9 290:12
291:10 296:18
296:21,23
297:4 314:4
**videos (5)**
94:21 95:15
204:13 298:7,8
**videotape (1)**
205:2
**videotapes (2)**
205:1,4
**view (4)**
89:1 245:1
268:18 278:21
**viewed (2)**
54:9 205:4
**viewing (1)**
264:23
**views (1)**
279:19
**violate (3)**
71:5 251:22
255:5
**violated (5)**
70:3 71:13
243:24 254:18
255:18
**violates (1)**
70:22
**violation (6)**
103:13 113:3
157:10 253:12
253:14 254:4
**violations (4)**
102:7 103:2
243:23 255:14
**violence (17)**
70:24 80:1
248:6,12
251:25 252:25
253:4,24,25
254:1,3,5
263:8 268:12
269:8 279:23
308:12

**violent (4)**
104:20,22,24
308:15
**violently (1)**
263:10
**virtue (2)**
63:5 110:2
**Vision (14)**
66:4 75:11,14,24
76:10,15,17,22
81:13 82:18
272:14,17,18
288:9
**visited (1)**
212:5
**visiting (2)**
67:15 268:16
**visitor (9)**
67:15 70:10
124:14 255:9
256:10 263:10
268:15,17,20
**visitors (18)**
68:22 81:24
101:15 114:24
132:15 141:9
242:18,21
245:2,22 246:1
246:11,15
259:23 282:21
283:19,23
304:24
**visits (2)**
67:16 268:24
**voice (1)**
129:22
**Volume (1)**
48:11
**VORYS (1)**
49:13
**voucher (1)**
238:16

———————
**W**
**wages (1)**
121:14
**wait (3)**

186:2 201:7
313:20
**waited (2)**
167:1 187:3
**waiting (1)**
89:2
**waive (1)**
284:23
**waived (1)**
63:3
**waiver (2)**
62:19,24
**walk (10)**
160:2 181:22
182:4 225:7
237:8,8,9
242:14,25
243:1
**walked (8)**
93:9 148:15
161:23 162:4
162:12 179:15
185:11 188:23
**walking (2)**
210:1 242:12
**walks (2)**
181:23 285:4
**walkway (1)**
172:16
**walk-thru (1)**
93:17
**wall (4)**
160:1 172:6
179:5 215:6
**want (68)**
58:19,23 60:2
61:13 63:24
64:14,17 77:3
79:22 88:15,15
88:23 99:18
107:22 112:8
117:24 118:7
118:18 119:5
120:21 125:18
131:5 135:7,17
143:23,25
145:5 157:16

170:13 171:5,9
182:19 186:3
195:4 201:5,7
209:11 210:20
210:23 221:6
223:7 224:8
232:8 243:8
244:4,19
247:22 252:9
253:1 254:21
270:15 273:14
273:16 275:8,9
275:25 280:7
282:3 284:23
291:16 299:3,7
299:16 300:9
307:14,16
313:17,19
**wanted (20)**
62:5,7 64:20
91:17 165:11
173:15 193:25
194:2 204:14
205:8,12
207:12 224:19
224:22 225:15
226:5 227:7,8
231:4,8
**wants (2)**
118:15 178:12
**warning (2)**
156:22 245:18
**warnings (3)**
157:12 247:10
254:13
**Warrensville (1)**
294:20
**washed (1)**
167:2
**wasn't (15)**
69:7 88:4 89:6
150:17 193:12
201:24 225:2
225:23 226:5
227:6 256:5
265:8,15,19
269:2

**watch (2)**
79:17 181:15
**watched (1)**
130:25
**watches (1)**
169:24
**watching (2)**
184:3,4
**way (26)**
55:1 63:23
109:10 160:23
172:15 179:14
181:10 184:6
187:2 244:18
246:8 247:18
254:7 255:16
260:9 261:10
263:21 265:23
266:23 267:25
268:2 278:12
281:19 282:1
303:8,11
**ways (2)**
130:20 132:24
**weapons (1)**
248:12
**wear (2)**
236:7,9
**wearing (3)**
182:24 236:20
296:5
**Wednesday (1)**
238:3
**week (14)**
152:12,13 169:1
235:16,17,18
312:9,14,17
313:7,8,9,10
313:13
**weekends (1)**
155:1
**weekly (2)**
93:18,21
**weeks (7)**
91:13,14 122:1,2
122:20,21
123:6

**went (37)**
68:6,8 71:22
85:4 93:10
110:4 111:23
113:12 121:12
124:4 132:1
144:10,12
148:16 154:8
154:14 162:15
163:19 164:7
165:8 167:2,3
181:3 183:7,8
183:23 187:5
190:14 191:2
201:21 210:5
212:16 225:3,5
225:6,15 233:5
**weren't (4)**
126:6 194:25
231:6,7
**Western (3)**
214:17,22 215:5
**we'll (15)**
67:10 71:21
85:21 136:5,16
136:17 170:11
171:16 177:3
179:18 183:5
187:12 220:10
220:13 313:12
**we're (27)**
53:19 58:8,13
59:6 60:17
61:15 75:20
77:16 78:8
127:2,21
135:14 148:2
151:8 173:10
173:16 197:21
199:10 200:19
204:6 222:21
232:13 247:17
275:24 285:6
306:10 312:14
**we've (21)**
53:3,25 56:5,12
56:13,14 59:12

59:14,17 64:5
120:3,16 243:9
272:14 274:14
278:10 283:24
285:1 299:10
299:19,19
**WHEREOF (1)**
315:15
**white (7)**
174:1 175:13,14
179:16,19
181:25 296:14
**wife (1)**
312:10
**willing (2)**
206:3 213:16
**withdraw (1)**
111:10
**witness (36)**
73:2,10 77:17
83:10 111:13
115:16 117:23
119:8 137:4
170:15 171:15
177:19 178:6
178:10,12,16
195:19,21
203:7 220:17
233:19 240:1,3
269:14 271:6
271:10 275:13
280:2,22,23
285:1 286:4
309:14 311:11
312:13 315:15
**witnesses (7)**
50:4 65:2
136:13 208:24
220:5 223:8
311:13
**wood (1)**
172:7
**word (9)**
208:11 228:19
228:23 247:4,6
247:8 276:6,9
305:23

**words (6)**
115:2 144:1,22
207:13 244:21
276:24
**work (112)**
67:17 70:21
71:5,17,20
72:3,9,9,22
78:20,23 81:22
85:13 90:4,7
92:13 95:9,10
95:14 101:13
106:1,3 108:20
108:20 121:6
121:12,24
122:17 123:4,5
123:10 125:3,9
125:13,22,25
126:3,7,14
127:7 130:25
135:15 136:1
140:14 152:1
153:6,13,16,19
154:1,9,13,25
155:2,10,11,12
156:12,19
159:18 160:14
164:14 165:23
167:3 185:18
185:21 188:12
198:15 200:15
200:16 206:11
208:6 212:7
218:16 221:15
221:16 222:8
223:3 235:16
235:19,25
236:6 238:2
241:13 244:1,2
244:15 250:24
251:4 253:2
258:20 259:2,3
260:22 265:9
270:25 271:2
278:3,3,5
285:18,23
288:19 289:21

295:7 297:9
304:4 305:4,11
309:3,3,8
**workday (2)**
235:20 294:24
**worked (25)**
74:21 75:2 93:4
95:1,3 110:3
121:25 138:6
138:17,23
151:16 152:1
152:16 153:15
153:17 160:9
186:13,14
195:11 200:9
221:18,19
222:11 236:19
284:7
**worker (10)**
69:10 70:9
143:13 144:2
145:19 186:18
214:21 256:10
258:16 297:20
**workers (35)**
61:5 67:17,24
68:1 76:22,24
78:14 93:13
94:6 95:13
99:23 186:13
186:18 195:14
195:15 219:4,8
219:13 236:2,9
236:15 266:1
269:20 278:2,8
281:13 284:14
292:5 296:8,17
296:24 297:4
302:4,8,15
**worker's (1)**
186:22
**working (31)**
67:3 72:1 82:18
84:25 99:23
120:11,14
121:2,20,22
122:6 136:18

140:16 141:11
150:13 151:9
159:13 166:22
206:3 212:19
219:5 222:15
231:6 235:13
235:22 297:11
297:13 309:21
310:1,4,11
**workplace (15)**
70:24 116:20
117:10 216:22
217:1 248:6
251:25 252:6
252:25 253:4
253:23 254:4
265:6 268:12
295:11
**workplaces (1)**
116:7
**works (4)**
165:24 222:13
222:14 259:9
**worry (1)**
169:18
**worse (1)**
210:25
**worth (1)**
306:16
**wouldn't (9)**
129:13,15
169:19 187:3
228:20 229:24
270:1 277:9
281:24
**wow (1)**
208:8
**wrestling (1)**
82:6
**write (22)**
80:5 143:6,8
158:8 163:15
163:16 164:4
164:19,20
165:4,17 167:4
229:4,5,6,11
229:15,17,21

234:25 235:3
299:25
**write-up (9)**
156:24 157:2,5,9
157:16 164:23
165:1 190:12
190:24
**write-ups (2)**
156:25 157:13
**writing (12)**
55:19 57:2,17
59:20 158:10
165:25 166:1
166:11,15,18
167:7 234:11
**written (17)**
77:19 86:12
143:17 201:11
207:3 245:18
247:10 251:10
251:17 255:21
261:14 263:15
265:4,7 266:2
290:10,13
**wrong (7)**
148:3 158:4
162:7 165:12
186:3 240:14
244:18
**wrote (12)**
142:22 149:14
149:24 162:1
164:17,20
166:22 190:24
192:1 229:4,24
230:1

---

**X**

**X (2)**
50:1 51:1

---

**Y**

**yards (1)**
93:2
**yeah (28)**
57:24 107:17
122:19 125:23

128:22 132:24
133:9 139:16
152:21 153:25
156:5 160:16
169:2 188:4,5
188:22 199:10
201:13 202:18
208:7 210:19
212:23 216:13
216:17,20
217:9,9 218:21
**year (15)**
93:3,6 95:2
110:3 138:4,5
140:20,21
151:16 158:5
186:12 195:11
214:10 221:13
241:8
**years (15)**
66:5 74:15
138:5,16
150:15,18
151:20 153:17
189:25 241:2
272:2,7 284:4
285:9 300:18
**yell (1)**
202:1
**yelling (5)**
207:17,19 208:9
305:16 306:16
**yellow (1)**
296:14
**young (1)**
135:16

---

**Z**

**zero (9)**
72:12 245:25
246:14,16,23
248:20 253:16
254:14,15
**zoom (2)**
158:20 181:14
**zoomed (1)**
182:21

---

**$**

**$12 (1)**
213:17
**$25 (2)**
156:20 194:11
**$350 (1)**
75:23
**$800 (1)**
273:4

---

**0**

**000 (1)**
181:19
**00098 (1)**
48:9
**002-U9N-J5O ...**
55:11
**08 (2)**
95:6,8
**09 (1)**
48:9

---

**1**

**1 (42)**
50:20 51:5
54:21,25 55:2
61:11,21,22
62:1 64:7
72:25 73:5
77:3 79:1,6,8
79:10,11 81:4
94:15 97:3,3
98:1 99:2,13
99:17,22,22
101:3 109:15
244:20 248:13
254:21 267:9
269:18 270:3
273:15,19
286:20 287:3
307:14 314:2
**1st (7)**
55:16 102:2,16
103:6,8,22,25
**1:00 (1)**
136:22
**1:05 (1)**

137:2
**10 (3)**
89:5 235:13,13
**10:00 (4)**
48:22 164:3
221:16 223:14
**10:30 (1)**
164:3
**100 (2)**
269:18 278:22
**1040 (1)**
49:7
**11 (3)**
79:22,23 308:3
**111 (1)**
50:6
**1111 (1)**
48:19
**112 (1)**
179:20
**115 (1)**
50:6
**117 (1)**
50:6
**119 (1)**
50:7
**12:00 (2)**
135:7 136:21
**13 (1)**
99:22
**13th (1)**
313:10
**137 (1)**
50:8
**1375 (1)**
49:18
**14 (7)**
77:15,21 252:10
252:24 253:22
263:5,6
**142 (1)**
50:21
**15 (8)**
97:25 98:1
102:1 123:4
233:13,16
273:22 288:17

**15th (1)**
315:16
**15:33 (1)**
171:20
**150 (1)**
50:8
**16 (2)**
241:13 274:11
**16th (2)**
312:6,7
**17 (1)**
54:7
**18 (1)**
95:5
**187 (1)**
50:8
**190 (1)**
50:8
**196 (1)**
50:9

---

**2**

**2 (22)**
50:16,21 51:6
53:13 60:18,21
60:24 61:25
104:13 105:24
142:13,18
157:25 167:5
190:13 203:11
203:13,16
206:20 215:23
228:25 314:7
**2nd (17)**
86:18,21 87:3,9
87:11,19 102:2
102:22,25
103:7 104:2
106:11,16,22
120:17 312:19
313:13
**2:00 (5)**
141:2 153:12
154:22 160:10
164:2
**2:30 (1)**
222:16

**20 (5)**
89:5 144:7
 147:3 259:19
 285:9
**20th (1)**
313:8
**2006 (1)**
61:6
**2007 (7)**
55:17 151:9,14
 151:22 286:10
 286:11 288:7
**2008 (4)**
90:23,24 158:2
 241:9
**2009 (34)**
48:22 85:21
 86:5,13 87:19
 97:15 103:7
 104:13 105:24
 106:16,22
 120:17 121:8
 140:17 143:21
 143:22 151:8
 158:3,23
 161:14 168:4
 171:20 200:20
 219:5 222:6
 223:8,12 233:1
 236:19 250:8
 290:6 309:22
 310:5 315:16
**2010 (16)**
66:4 75:11,14,24
 76:10,15,17,22
 81:13 82:18
 95:19 272:14
 272:17,18
 288:10 315:23
**203 (2)**
51:6,7
**21 (1)**
182:3
**2100 (1)**
49:17
**214 (1)**
50:9

**216-385-5347 ...**
313:3
**216/479-6179 (...**
49:20
**216/771-6633 (...**
49:10
**221 (1)**
50:10
**223 (1)**
50:22
**232 (1)**
50:10
**236 (1)**
178:25
**240 (1)**
50:11
**244 (1)**
50:23
**248 (1)**
50:24
**249 (1)**
50:25
**25 (1)**
182:6
**257 (1)**
50:11
**267 (1)**
50:11
**269 (1)**
50:11
**27 (4)**
158:23 171:22
 223:9 288:7
**27th (37)**
143:20,20
 161:14 163:22
 163:23 165:14
 166:8 171:20
 176:10 191:6
 191:20 193:1
 200:5 203:10
 203:14 204:2,9
 209:15 214:9
 216:19 217:5
 219:16 224:9
 224:13 226:13
 227:10,12

233:1 234:14
 235:8 236:19
 237:17 239:7
 239:22 263:18
 263:25 313:9
**270 (1)**
50:11
**271 (1)**
50:12
**28 (2)**
158:3 182:12
**28th (6)**
192:6,10 238:3
 238:20 239:7
 239:22
**28(D) (1)**
315:15
**286 (1)**
50:12
**29 (2)**
158:2 168:23
**29th (22)**
166:9 168:3
 190:20 191:8
 192:12 200:9
 203:11,21,23
 204:10 209:15
 214:9 216:19
 223:10 227:15
 230:25 236:19
 238:13 239:7
 239:15,22
 263:16

_____
**3**

**3 (20)**
50:22 51:7
 61:25 73:7
 109:18 112:9
 112:12 203:9
 203:12,16,22
 209:15 223:20
 231:2 244:19
 254:22,23
 267:10 275:8
 275:12
**3rd (2)**

86:18,23
**3:00 (1)**
221:21
**30 (3)**
183:9 257:8
 315:23
**30th (14)**
200:7,12,20
 212:11,12,13
 214:10 216:12
 218:5,8,19
 223:11 250:13
 312:13
**300 (1)**
48:9
**303 (1)**
50:12
**309 (1)**
50:12
**310 (38)**
48:7 52:16 54:2
 57:19 62:10
 70:23 71:3,19
 72:1 80:25
 121:2,17 122:6
 122:23 123:8
 124:2 125:6
 150:12 232:24
 262:18 270:7
 270:15,20
 279:11,21,25
 282:16,23
 283:9,12,16
 284:19,21
 285:3,20,23
 307:24 309:4
**32nd (1)**
270:8
**36 (1)**
178:8

_____
**4**

**4 (7)**
50:23 61:25
 110:18 112:18
 244:6,11
 259:19

**4:00 (1)**
136:1
**40 (4)**
152:12 179:7,8
 182:23
**440 (1)**
61:6
**44114-1401 (1)**
49:9
**44114-1724 (1)**
49:19

_____
**5**

**5 (4)**
50:24 247:24
 248:4 275:15
**5:00 (6)**
85:1 87:13,16
 136:1 212:9
 314:15
**5:30 (2)**
200:16 212:9
**50 (3)**
183:6,14,15
**52 (1)**
99:16
**526 (1)**
49:8
**53 (1)**
48:9
**54 (1)**
51:5

_____
**6**

**6 (7)**
50:25 109:16,20
 249:6,13 263:2
 314:2
**6th (1)**
313:7
**6:00 (9)**
136:10 140:25
 141:12 153:12
 154:22 160:10
 160:13,18
 164:2
**6:30 (1)**

95:11
**60 (1)**
50:16
**63 (1)**
257:11
**67 (6)**
81:15 82:9
    99:16 101:6
    102:1 288:17

---
**7**

**7 (19)**
66:22 73:6
    100:1 112:8,10
    112:12,17,20
    158:8 249:11
    254:23,23
    267:10,10
    275:9,10,11
    307:18 309:18
**7:00 (8)**
87:15 95:11
    192:2,3,4,24
    192:25 224:13
**7:15 (1)**
224:13
**74 (1)**
50:6
**79 (1)**
50:20

---
**8**

**8 (8)**
81:15 101:4,6
    110:18,19
    115:4 235:13
    235:14
**8:00 (13)**
192:3,4,24,25
    200:16,17,18
    200:21 221:17
    223:14 226:9
    226:11 227:12
**809 (1)**
61:6

---
**9**

**9th (2)**
48:21 312:5
**9:30 (1)**
200:24
**92 (1)**
50:6

**Gilbane**

PARKING STICKER # _____          HELMET STICKER # _____

# Safety Orientation Comprehension Quiz

**Name:** _____   **Date:** _____/_____/_____

I pledge to follow the safety rules as explained to me in this orientation and work in a safe manner.

**Signature:** ~~_____~~

RESPONDENTS
6 / 9 / 0 9   SRD
COURT REPORTERS
OF AKRON CANTON AND CLEVELAND

**Company:** _____

1.  It's OK to enter an excavation without a         T          F
    competent person inspecting the soil?

2.  Safety glasses or eye protection must be worn    T          F
    at all times when you are on the job site.

3.  I only need to wear protective eyewear when I    T          F
    am cutting?



*Photography by Tin Can Alley, Form by J.P. O'Donovan 11/05*

R000694

**Gilbane**

4.  Lifting using your legs and keeping your back
    straight will help avoid back injury.          T       F



5.  A respirator must be worn when you are working   T       F
    around harmful chemicals such as Silica,
    Asbestos, Lead.



6.  I have to tie off with a harness when working in   T       F
    a scissor lift.



7.  Cranes and track excavators can kill you if you   T       F
    stand or walk where the counterweight can
    strike you.



8.  GFCI will save my life and must be used.          T       F



9.  Falls can kill. Fall protection such as a harness   T       F
    or guardrail must be used when you are more
    than 6 feet up.



*Photography by Tin Can Alley, Form by J.P. O'Donovan 11/05*

R000695

**Gilbane**

10. Scaffolds must have guardrails in place before     T      F
    you work off them.



*Photography by Tin Can Alley, Form by J.P. O'Donovan 11/05*

R000696



## PROJECT - CODE OF SAFE PRACTICES

Each individual working on this project will be required to attend a safety orientation meeting at the start of their assignment.  At the conclusion of the meeting, each will be required to sign a Code of Safe Practices as follows, indicating their agreement to follow that Code while on the Project.   This does not relieve the trade contractor of any responsibility to properly orient and train their employees for the specifics of their work.

**Sample Page:  Code of Safe Practices**

Project Name

Employee Name

I agree to abide by the following Code of Safe Practices while on this project.

1. I will work in a safe manner, protecting others, and myself and will report observed hazards to my supervisor.  If not addressed, I will further report these hazards to the Gilbane Superintendent.

2. I will dress appropriately for the project, wearing a long or short-sleeved shirt, long pants, and work boots with ankle protection, reinforced toes, and substantial soles.

3. I will use personal protective equipment as required by my trade, and will wear hard hat and safety glasses at all times.

4. I will abide by the six-foot fall protection rules, including use of harnesses where required.

5. I will park only in designated areas and observe a ten-mile per hour speed limit on site.

6. I will not smoke or use tobacco products of any type on site, except in designated areas.

7. I will eat only in designated areas and dispose of trash in proper containers.

8. I will not use any intoxicants or other controlled substances on the project.

9. I will report all injuries and accidents involving persons or property.

10. I will not bring any weapons, including knives with blades over 4 inches, onto the site.

11. I will conduct myself in a professional manner and not engage in any violence, horseplay, practical jokes, or other behavior obnoxious to the general public.  I will not harass anyone else on site or any member of the public, sexually or otherwise.  I will not bring onsite or write or draw any sexually explicit materials.

12. I will not use any headset-type radios or other music players or personal televisions on site.

13. I will comply with the security procedures established throughout the project, for entrance to the site.

Signed

Date _____

Name _____

Company _____

Please circle the correct answer

Fire Safety:

1.  University Hospitals Case Medical Center fire and medical emergency phone number is?

    A – 911, B- 4357, C – 5555, D – 844-1000

2.  Hot Work permits are required to be taken out everyday when cutting, brazing, torching spark producing work is performed.

    True or False

3.  Fire Extinguishers classified as an ABC type can extinguisher what type of fire?

    A – Wood and paper fires; B – Grease or Flammable Liquid fires; C- Electrical fires; D – All of the Above

4.  During a fire alarm activation an announcement is made stating "Code Red ". This is the code word indicating there is a fire alarm activation in the building.

    True or False

Infection Control:

1.  Dust control is one of the most important considerations in hospital construction.

    True or False

2.  Guidelines that need to be posted and followed at any worksite:

    Infection Control Manual or Infection Control Risk Assessment

R000698

# MEMORANDUM

To:  Kelly Lockhart
    UHHS Sr. Project Manager

From:  Gilbane

Date:  _____

Re:   UHHS Badge Request

Please complete the following:

Construction Employee Name:_____

Construction Company Name:_____

Trade:_____

For Access Into:_____

_____

_____

Please complete the following:

1. Confirmation of employee viewing of both UHCMC and
   Gilbane's Safety Videos     _____
2. Confirmation by Gilbane personnel of employee Photo ID _____
3. Successful completion of criminal background check _____
4. Successful completion of drug screening _____
5. Definition of areas requiring access:

_____

**Gilbane**

PARKING STICKER # _____          HELMET STICKER # _____

# Safety Orientation Comprehension Quiz

**Name:** _____   **Date:** _____ / _____ / _____

I pledge to follow the safety rules as explained to me in this orientation and work in a safe manner.

**Signature:** _____

**Company:** _____

1. It's OK to enter an excavation without a
   competent person inspecting the soil?               T        F



2. Safety glasses or eye protection must be worn
   at all times when you are on the job site.          T        F



3. I only need to wear protective eyewear when I
   am cutting?                                          T        F



*Photography by Tin Can Alley, Form by J.P. O'Donovan 11/05*

R000700

**Gilbane**

4. Lifting using your legs and keeping your back straight will help avoid back injury.     T     F



5. A respirator must be worn when you are working around harmful chemicals such as Silica, Asbestos, Lead.     T     F



6. I have to tie off with a harness when working in a scissor lift.     T     F



7. Cranes and track excavators can kill you if you stand or walk where the counterweight can strike you.     T     F



8. GFCI will save my life and must be used.     T     F



9. Falls can kill. Fall protection such as a harness or guardrail must be used when you are more than 6 feet up.     T     F



*Photography by Tin Can Alley, Form by J.P. O'Donovan 11/05*

R000701

**Gilbane**

10. Scaffolds must have guardrails in place before  T    F
    you work off them.



*Photography by Tin Can Alley, Form by J.P. O'Donovan 11/05*



## PROJECT - CODE OF SAFE PRACTICES

Each individual working on this project will be required to attend a safety orientation meeting at the start of their assignment.  At the conclusion of the meeting, each will be required to sign a Code of Safe Practices as follows, indicating their agreement to follow that Code while on the Project.   This does not relieve the trade contractor of any responsibility to properly orient and train their employees for the specifics of their work.

**Sample Page:  Code of Safe Practices**

Project Name

Employee Name

I agree to abide by the following Code of Safe Practices while on this project.

1. I will work in a safe manner, protecting others, and myself and will report observed hazards to my supervisor.  If not addressed, I will further report these hazards to the Gilbane Superintendent.

2. I will dress appropriately for the project, wearing a long or short-sleeved shirt, long pants, and work boots with ankle protection, reinforced toes, and substantial soles.

3. I will use personal protective equipment as required by my trade, and will wear hard hat and safety glasses at all times.

4. I will abide by the six-foot fall protection rules, including use of harnesses where required.

5. I will park only in designated areas and observe a ten-mile per hour speed limit on site.

6. I will not smoke or use tobacco products of any type on site, except in designated areas.

7. I will eat only in designated areas and dispose of trash in proper containers.

8. I will not use any intoxicants or other controlled substances on the project.

9. I will report all injuries and accidents involving persons or property.

10. I will not bring any weapons, including knives with blades over 4 inches, onto the site.

11. I will conduct myself in a professional manner and not engage in any violence, horseplay, practical jokes, or other behavior obnoxious to the general public.  I will not harass anyone else on site or any member of the public, sexually or otherwise.  I will not bring onsite or write or draw any sexually explicit materials.

12. I will not use any headset-type radios or other music players or personal televisions on site.

13. I will comply with the security procedures established throughout the project, for entrance to the site.

Signed _____

Date _____

Name _____

Company _____

Please circle the correct answer

Fire Safety:

1.    University Hospitals Case Medical Center fire and medical emergency phone number
      is?
        A – 911, B- 4357, C – 5555, D – 844-1000

2.    Hot Work permits are required to be taken out everyday when cutting, brazing, torching
      spark producing work is performed.

      True or False

3.    Fire Extinguishers classified as an ABC type can extinguisher what type of fire?

      A – Wood and paper fires; B – Grease or Flammable Liquid fires; C- Electrical fires;
      D – All of the Above

4.    During a fire alarm activation an announcement is made stating "Code Red ".
      This is the code word indicating there is a fire alarm activation in the building.

      True or False

Infection Control:

1.    Dust control is one of the most important considerations in hospital construction.

      True or False

2.    Guidelines that need to be posted and followed at any worksite:

      Infection Control Manual or Infection Control Risk Assessment

# MEMORANDUM

To:       Kelly Lockhart
          UHHS Sr. Project Manager

From:     Gilbane

Date:     _____

Re:       UHHS Badge Request

Please complete the following:

Construction Employee Name:_____

Construction Company Name:_____

Trade:_____

For Access Into:_____

_____

_____

Please complete the following:

1. Confirmation of employee viewing of both UHCMC and
   Gilbane's Safety Videos                                    _____

2. Confirmation by Gilbane personnel of employee Photo ID     _____

3. Successful completion of criminal background check         _____

4. Successful completion of drug screening                    _____

5. Definition of areas requiring access:

_____

R000705

RESPONDED 2
6.19.09  SRD
COURT REPORTERS
OF AKRON CANTON AND CLEVELAND

1/29/08
09

(CAMERA FOOTAGE) 7:29:32 - 1:29:08

Tuesday 13, 2009          1:27:09 - 7:22:15.

about 7:00pm - 8:00pm

A man came to my register
His Items cost 5.80 He gave me
$6:00 A five And A 1.00 Bill
I gave him .20 He said to me
I gave you a 10.00 Bill you
give me .20 I replied Very
nicely No Sir you gave me
6.00 He said I gave you
10.00 I said I 'll call my
manager hold on He replied
yeah call him cause you
aint gonna steal my money
Bu now Someone else called

R000706

Andrew hearing all the
Comotion Andrew came out
By the time he was getting
to my register the man
was screaming Angryly at
me you thief you gonna
Give me my fucking money
fucking Nigger Andrew
pulled him to the side.
first he told him
He would look at the camera
the man told him do that
look at the damn camera
Shes a thief She gonna
give me my fucking money
Andrew pulled him out

the line or asked him out
the line to talk to him
my line was long I dont
know what was said after
that. I went to talk to Andrew
He told me the man was still
in the Cafe and he didn't want
him to see us talking he
didnt want him to become more
Angry. I was thinking at
that moment I should have been
the one Angry I was a
Chief and a Nigger so.
I went back to my register
after Andrew walked away
from me.

R000708

the Camera Showed that
6.00 was given to me.
my bank was .06 over Andrew
told me that He told the
man Chhet if my bank was
over 4.00 or 5.00 He would refund
his money and give him a
meal ticket, I felt if it was
over it wasnt him the Camera
Said So. January 29, 2008 the
man Comes through my Line
again Andrew meets him and
replys I told you I would
take Care of this for you,
I could have fainted because
I fell the man thinks I Stole
from him.

R000709

Andrews reasoning for
this was to restore his
faith in us. He gave him a meal
ticket
what about me I didnt take
nothing from the Gentle man
who's not so Gentle (customer).

I didnt report this because
my manager had handled
this I thought But to
I dont know in my face.

Tish

Lattisia Hanson

I can't remember whe
was in the Cafe at
the time. EVS managers
were there I do remember
that they had stopped one
man looking

R000710

R000711