# Appendix Exhibit 7

# Arbitration Transcript 7/2/09 with exhibits

R000759-R000955

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

- - -

In the matter of the        )
arbitration involving:      )
                            )
BUILDING AND CONSTRUCTION    )
LABORERS LOCAL UNION NO. 310,)
                            ) Case Number:
          Claimant,         ) 53 300 E 00098 09
and                         )
UNIVERSITY HOSPITALS HEALTH  ) Volume III
SYSTEMS, INC., et al.,       )
          Respondents.

- - -

BE IT REMEMBERED, that upon the hearing of
the above-entitled matter, held at Doubletree
Hotel, 1111 Lakeside Avenue, Cleveland, Ohio,
before Marvin J. Feldman, Impartial Arbitrator,
and commencing on Thursday, the 2nd day of July,
2009, at 10:00 o'clock a.m., at which time the
following proceedings were had.

- - -

R000759

317

1    **APPEARANCES:**

2

3         On Behalf of the Claimant:

4              GOLDSTEIN GRAGEL, LLC

5    BY:     Susan L. Gragel, Attorney at Law

6              Ami Banderyt, Attorney at Law

7              1040 The Leader Building

8              526 Superior Avenue, East

9              Cleveland, Ohio 44114-1401

10             216/771-6633

11

12        On Behalf of the Respondents:

13             VORYS, SATER, SEYMOUR AND PEASE, LLP

14   BY:     David A. Campbell, Attorney at Law

15             Charles F. Billington, III

16             Attorney at Law

17             2100 One Cleveland Center

18             1375 East Ninth Street

19             Cleveland, Ohio 44114-1724

20             216/479-6179

21

22        Also Present:  Mike Harting

23                       Sebastian Trusso

24

25

**COURT REPORTERS OF AKRON CANTON AND CLEVELAND**
330-666-9800              330-452-2400              216-621-6969

R000760

318

1                    I N D E X

2

3

4    **ON BEHALF OF THE UNION:**

5    **WITNESSES:**              DIR CROSS RED. REC. FRC

6    MICHAEL HARTING        324  360

7    ANTOIN ELEY            405  412              429

8    MICHAEL FERRITTO       434  440

9

10

11              RESPONDENT EXHIBITS

12                                       PAGE

13   Number 7                            378

14

15              UNION EXHIBITS

16                                       PAGE

17   Number 4                            338

18   Number 5                            359

19

20

21

22

23

24

25

R000761

319

1          **MR. FELDMAN:**      You may begin.

2          **MS. GRAGEL:**      By way of a brief

3     opening statement, Mr. Feldman, on behalf of

4     Local 310, along with the evidence presented at

5     the first and second days of the arbitration

6     hearing for cross-examination, Local 310 expects

7     the evidence to show that University Hospitals

8     breached the Project Labor Agreement by acting

9     as if it were the employer/contractor of 310's

10    members, including Mike Harting.

11          In this capacity, University

12    Hospitals discharged Local 310's member, Mike

13    Harting, without just cause.  University

14    Hospitals having usurped the role of the

15    contractor/employer is, therefore, liable for

16    the wages and benefits that Mr. Harting would

17    have earned if he had not been removed from the

18    workplace by University Hospitals.

19          The evidence will show that

20    Mr. Harting has been a construction laborer for

21    approximately 30 years.  As an experienced

22    laborer, he has functioned successfully at many

23    construction projects, and there will be

24    testimony about the kind of work he's done and

25    the places he's worked over his career.  He's

R000762

320

1    worked as a foreman, he's worked as a union

2    steward.

3              Between 2005 and the fall of 2008,

4    Mr. Harting was the steward at the Case Western

5    Reserve Animal Health Building project which was

6    next door to the University Hospitals project

7    that gives rise to this arbitration.  Three to

8    five times per week during that time of his

9    working career Mr. Harting purchased and ate his

10   meals in the University Hospitals' atrium

11   cafeteria that gives rise to this proceeding.

12   The Animal Health Building was completed in

13   November 2008 and Mr. Harting was laid off.

14             In January 2009, he was called to

15   employment at the University Hospitals Neonatal

16   Intensive Care project, the NICU project, and

17   assigned as the second shift steward.  He

18   continued to eat his evening meals in the atrium

19   cafeteria of University Hospitals.  No one told

20   him not to do so.  Other tradesmen continued to

21   eat in the cafeteria throughout the day shifts

22   and the evening shifts.  This will be confirmed

23   in the testimony here today by Mike Ferrito who

24   was the head labor steward working primarily on

25   the day shifts at the project.

R000763

321

1              There was a rather dingy break room
2    on one of the floors of the NICU unit when
3    Mr. Harting first arrived at the project in
4    early January 2009.  It was seldom, if ever,
5    used.  But by January 27, 2009, the date that
6    gives rise to this case, there was no break room
7    because that room had been demo'd out as part of
8    the rebuilding of that section of University
9    Hospitals.
10             Mr. Harting will then provide
11   evidence about some of his personal habits and
12   behaviors.  He maintains his family budget by
13   taking ten dollars, no more, no less, to work
14   with him every day.  At this site, he received
15   free parking at the Ozanne trail, so ten dollars
16   was enough.
17             So on January 27th, he had his
18   regular coffee break in the atrium cafeteria at
19   about 4:00 p.m., then he had dinner in the same
20   cafeteria with one or more of his co-workers,
21   including Antoin Eley who is here to testify
22   today.  Dinner was at about 7:00 p.m.  The
23   cafeteria was not busy at that time.  Mr. Eley
24   arrived at the cafeteria first and went through
25   the line seating at a table about two rows back

R000764

322

1    from the cafeteria cashier's line.  Mr. Harting

2    selected ten wings and a soda.  It costs $5.80.

3    When he reached the cashier, Lattisia Hanson, he

4    gave her all the money in his wallet, ten

5    dollars which at that time was two five dollar

6    bills.  The cashier was talking with another

7    cashier worker which was inside the cashier area

8    on the other side of the rail.  She gave him 20

9    cents change.  Mr. Harting asked her for the

10   four dollars.  Mr. Harting will describe what

11   happened next.  She became defensive.  She

12   seemed nervous.  He continued to ask her for the

13   money back.  She said she was calling her

14   manager, and he waited for a minute or so at the

15   line until the manager came over.

16           At no time during any of the contacts

17   with Ms. Hanson or with the manager who came a

18   minute or so later did Mr. Harting ever use

19   racially derogatory terms or profanity.  Then,

20   sir, there will be testimony about what happened

21   next over the rest of that day, over the next

22   few days.

23           On the following day, on January

24   29th, Mr. Harting ate in the cafeteria without

25   incident.  On January 29th, he received a coupon

R000765

323

1    back from the cafeteria manager, who told

2    Mr. Harting, according to the evidence that will

3    be presented today, this was being given to make

4    things right.

5            So then the evidence will demonstrate

6    as you've heard over the last few days that

7    University Hospitals, based on false information

8    from Ms. Hanson, without investigation,

9    terminated Mr. Harting from his employment at

10   the work site in violation of the Project Labor

11   Agreement.

12           Mr. Harting was damaged.  As we sit

13   here today, the evidence will show there was

14   work ongoing at that part of the project where

15   he worked.  Mr. Harting will describe his

16   employment history and the damages that he would

17   seek to have awarded in the event he prevails

18   with the union on this arbitration.  So with

19   that, Mr. Feldman, I'm prepared to call the

20   union's first witness.

21           **MR. FELDMAN:**      You may proceed.

22           **MS. GRAGEL:**      Mr. Harting.

23           **MR. FELDMAN:**      Have a seat,

24   Mr. Harting.  Mr. Harting, you've been

25   previously sworn in this matter when called upon

R000766

324

1    direct examination by the company.   Are you

2    aware of that swearing in?

3              MR. HARTING:        Yes.

4              MR. FELDMAN:        Do you continue to

5    abide by that?

6              MR. HARTING:        Yes.

7              MR. FELDMAN:        For the record,

8    state your name.

9              MR. HARTING:        Michael J. Harting,

10   H-a-r-t-i-n-g.

11             MR. FELDMAN:        Do you understand

12   you're under oath?

13             MR. HARTING:        Yes.

14             MR. FELDMAN:        You may inquire.

15                  MIKE HARTING

16   of lawful age, a witness herein, was examined

17   and testified as follows:

18                  DIRECT EXAMINATION

19   BY MS. GRAGEL:

20   Q.   Mr. Harting, I have some questions for you

21   about your personal background.

22        Where do you live, sir?

23   A.   I live in Mentor, Ohio.   7246 Culver

24   Boulevard.

25   Q.   And how long have you lived there?

**COURT REPORTERS OF AKRON CANTON AND CLEVELAND**
330-666-9800              330-452-2400              216-621-6969

R000767

325

1    A.   Roughly 27 years.

2    Q.   Are you married?

3    A.   Yes.

4    Q.   What's your wife's name?

5    A.   My wife's name is Darlene.

6    Q.   How long have you and Darlene been married?

7    A.   Twenty-eight years.

8    Q.   Do you have children?

9    A.   I have two children.

10   Q.   What are their names?

11   A.   Michael and Erin.

12   Q.   How old is Michael?

13   A.   Michael is 20.

14   Q.   And is that Erin --

15   A.   E-r-i-n.

16   Q.   That would be a daughter?

17   A.   Yes.

18   Q.   How old is your daughter?

19   A.   She is 23.

20   Q.   Do you have grandchildren?

21   A.   I have one grandchild.

22   Q.   What is your occupation?

23   A.   I am a laborer.

24   Q.   How long have you been a laborer?

25   A.   I've been laborer 27 years.

R000768

326

1    Q.    Are you a member of Local 310?

2    A.    Yes, I am.

3    Q.    How long have you been a member of Local

4    310?

5    A.    Twenty-seven years.

6    Q.    You've been here throughout the two earlier

7    days in this arbitration, correct?

8    A.    Yes, I have.

9    Q.    And you've heard all of the witnesses

10   testify?

11   A.    Yes, I have.

12   Q.    During those days, there's been testimony

13   about laborers, but I don't think anyone has

14   really described what a laborer does.

15        For the record, would you briefly describe

16   the work of a laborer?

17   A.    A laborer is basically we are tending

18   different crafts, bricklayers, carpenters, we do

19   a lot of demo cleanup.  Basically, we abide by

20   the contract that our local union has set up.

21   Q.    I have some more questions for you about

22   what you do and what you've done as a laborer,

23   but let me move over to another subject for a

24   minute.

25        Besides your employment as a laborer, do

R000769

1    you have a secondary occupation?

2    **A.**    Yes, I do.

3    **Q.**    What is your secondary occupation?

4    **A.**    I coach wrestling and football.

5              **MR. FELDMAN:**    You what?

6              **THE WITNESS:**    Coach wrestling and

7    football at Mentor High School.

8    **BY MS. GRAGEL:**

9    **Q.**    How long have you been a coach, sir?

10   **A.**    I've been a coach at Mentor for nine years.

11   I was a coach at Mayfield for 19, and for

12   St. Joe's for four.

13   **Q.**    And what age level students do you coach?

14   **A.**    Right now I'm with the ninth graders for

15   football at Mentor.  For the wrestling, I was

16   varsity -- varsity assistant coach, so that's

17   ninth through twelfth.

18   **Q.**    Coming back, sir, to your main occupation

19   as a laborer, have you worked in the course of

20   your career as a laborer's Local 310 steward?

21   **A.**    Yes, I have.

22   **Q.**    What does a steward do?

23   **A.**    The steward basically tries to abide by

24   what the contract is written out.  We try to

25   specify, work a lot on safety issues, but mostly

R000770

328

1  watching the job, making sure that hours are

2  turned in for the laborer who works and stuff

3  like that.

4  Q.  During the course of your working career as

5  a laborer, have you worked as a laborer/foreman?

6  A.  Yes, I have.

7  Q.  What does a laborer/foreman do?

8  A.  Laborer/foreman is basically to specify to

9  the laborers underneath you what to do, how to

10  do it and basically run the labor part of the

11  job.

12  Q.  Would you describe for the arbitrator some

13  of the projects that you have worked at as a

14  laborer; and if you worked there as a steward or

15  a foreman, would you tell the arbitrator that,

16  too?

17  A.  I worked at Progressive Field, which was

18  then called Jacob's Field.  I was the general

19  foreman there.  I was there for probably two

20  years and maybe a couple months.  I ran all the

21  brick work and block work and all the stone

22  work.

23      I've been a labor steward for Mr. Lerner on

24  his residence for three years.  I've worked at

25  Ben Venue as a steward.  I worked at St. Francis

R000771

329

1    of Assisi as a steward.  I worked at Higley

2    Company as a steward in their warehouse and a

3    lot of other littler jobs.

4    **Q.**   You talked, sir, about working for

5    Mr. Lerner at the residence.  When did you work

6    on that job?

7    **A.**   That job was completed -- it started in

8    2000.  It was completed in 2003 or early '4.  I

9    basically had three years there.

10   **Q.**   And how big was the residence?

11   **A.**   We were told not to ever talk about the

12   specifics of the job.

13   **Q.**   Did you work there after the owners took

14   occupancy?

15   **A.**   Yes.

16   **Q.**   Did you work both inside and outside the

17   Lerner residence?

18   **A.**   Yes.

19   **Q.**   Did you work there after Mr. Lerner passed

20   away?

21   **A.**   Yes, I did.

22   **Q.**   Did you come to know Mrs. Lerner?

23   **A.**   Yes, I did.

24   **Q.**   In order to work, sir, on that job, did you

25   need to pass security clearance?

R000772

330

1    A.    Yes, we did.

2    Q.    Have you had to have security clearance on

3    other jobs where you worked?

4    A.    Yes, because I also was at the Federal

5    Reserve Bank.

6    Q.    When you testified here at the last hearing

7    on June 9th, sir, you said that the union

8    instructed you to act as a gentleman.

9          Did you receive specific instructions from

10   the union on that subject?

11   A.    No.

12   Q.    When you gave that testimony, what were you

13   referring to?

14   A.    Well, I perceived -- the proper way to act

15   accordingly to the situation, you know, to

16   basically be nice to people and to do what you

17   have to do.

18   Q.    And did you receive those kinds of

19   instructions when you were called to work at the

20   Lerner residence?

21   A.    Yes.

22   Q.    From whom?

23   A.    From our business agent.

24   Q.    And who was that?

25   A.    Mr. Trusso and John Gilbane.

R000773

331

1    **Q.**   Did you, sir, work at the Case Western

2    Reserve Animal Health Building?

3    **A.**   Yes.

4    **Q.**   When did you work there?

5    **A.**   2005 to 2008.

6    **Q.**   And what was your position at that site?

7    **A.**   I was the steward.

8    **Q.**   And where was that project in relation to

9    the University Hospitals Rainbow Babies and

10   Children's Building?

11   **A.**   It is across the street.

12   **Q.**   When you worked at the Case Animal Health

13   Building, where did you take your breaks and

14   your meals?

15   **A.**   Usually we took them at the University

16   cafeteria.

17   **Q.**   And is that the same atrium cafeteria that

18   has been the subject of the testimony in this

19   arbitration?

20   **A.**   Yes, it is.

21   **Q.**   Now, I know you've testified before in the

22   earlier hearings, and I'm not going to ask you

23   to repeat that testimony, but for point of

24   reference, about when did you begin work at the

25   University Hospitals Neonatal Intensive Care

R000774

332

1    Unit job?

2    **A.**    It was either the 7th or the 8th of

3    January.

4    **Q.**    What shift were you assigned to work?

5    **A.**    Second shift.

6    **Q.**    Were you designated as the second shift

7    steward?

8    **A.**    Yes, I was.

9    **Q.**    Did you receive a badge?

10   **A.**    Yes, I did.

11   **Q.**    Now, after you started work, what was your

12   break time for second shift?

13   **A.**    Break time -- our coffee break was roughly

14   around 5:00, and then lunch break was anywhere

15   between 7:00 to 7:30, whenever we caught a break

16   in what we had to do.

17   **Q.**    Where did you take your breaks?

18   **A.**    We took our break in the cafeteria.

19   **Q.**    Where did you eat your meals?

20   **A.**    In the cafeteria.

21   **Q.**    When you were having your breaks or meals

22   in the cafeteria, did you see other construction

23   workers in the cafeteria?

24   **A.**    Yes.

25   **Q.**    Did anyone before January 27, 2009 ever

R000775

333

1    instruct you not to eat in the cafeteria?

2    A.    No.

3    Q.    Did you, sir, from time to time receive

4    employee discounts or some type of discounts

5    when you purchased food?

6    A.    I don't know, but it could have been.

7    Q.    Was there an area in University Hospitals

8    for laborers to use to eat meals or to drink

9    coffee other than the cafeteria when you got to

10   the site?

11   A.    There was a break room on the fourth floor

12   that served as a break room and like a storage

13   room.

14   Q.    Did you, when you got to the job, take any

15   of your breaks or meals in that room?

16   A.    Never.

17   Q.    Why not?

18   A.    Because it was cramped and there were all

19   sorts of working materials around and everything

20   like that.

21   Q.    On January 27, 2009, sir, did that break

22   room still exist?

23   A.    No.

24   Q.    What happened to it?

25   A.    We gutted it out to put a new Neonatal

R000776

334

1    Intensive Care Unit.

2    Q.   During your career, sir, as a laborer, did

3    you have any habit about the kind of money that

4    you took to work every day?

5    A.   My wife put me on a strict budget of ten

6    dollars a day.

7    Q.   So, sir, I'd like to turn your attention to

8    January 27th, 2009, which is the date that

9    underlies our grievance here.  How much money

10   did you take to work?

11   A.   I took two fives.

12   Q.   What time of your workday was it when you

13   took your dinner break?

14   A.   It was roughly around 7:00.

15   Q.   Did anybody go to eat with you?

16   A.   I don't remember his name, but Mark -- we

17   call him Mark the fireman, and Antoin.

18   Q.   Who, if anyone, went through the line with

19   you?

20   A.   I was probably behind him by about maybe

21   100 feet or so, so they had already gotten

22   through the line before I came in.

23   Q.   What did you buy to eat that night?

24   A.   I'm pretty sure I bought ten chicken wings

25   and a Coke.

R000777

335

1   **Q.**   What was the cost of your meal?

2   **A.**   It was $5.80.

3   **Q.**   At the last hearing Ms. Lattisia Hanson

4   testified.  Do you remember that?

5   **A.**   Yes, I do.

6   **Q.**   Did you know her name before last week?

7   **A.**   No, I did not.

8   **Q.**   Was she your cashier on January 27th?

9   **A.**   Yes, she was.

10   **Q.**   When you got to the food line that night,

11   was the cafeteria busy or not busy?

12   **A.**   Not busy.

13   **Q.**   Was anyone in line besides you?

14   **A.**   I do not think so.

15   **Q.**   When you got to the checkout line, was

16   Ms. Hanson alone or was she with someone else?

17   **A.**   There was another gentleman standing next

18   to her in another line.

19   **Q.**   What was she doing?

20   **A.**   She was talking to him while she was

21   ringing things up.

22   **Q.**   You said your meal cost was $5.80.  What

23   money did you give to the cashier?

24   **A.**   I gave her my two fives.

25   **Q.**   What did you receive back?

R000778

336

1  **A.**   I received 20 cents back.

2  **Q.**   What happened next?

3  **A.**   I said, "You are mistaken.  You gave me the

4  wrong change.  You owe me four dollars and 20

5  cents."

6  **Q.**   What, if anything, did Ms. Hanson say?

7  **A.**   Ms. Hanson said, "No, I didn't, sir."

8      I said, "I know I gave you two fives," and

9  she started getting real defensive and fumbling

10  with the money in the cash register drawer.  And

11  then she said again, "No, I didn't, sir."

12  **Q.**   Was there anyone in line behind you at this

13  time, if you remember?

14  **A.**   No.

15  **Q.**   Did the subject of getting the manager come

16  up during the conversation?

17  **A.**   Yeah.  She said, "I'm going to have to talk

18  to my manager."

19      I said, "Go ahead."

20  **Q.**   Did he come right away?

21  **A.**   He came probably within a minute.

22  **Q.**   Where did you go while --

23  **A.**   I stayed in line because there was no one

24  else in line behind me.

25  **Q.**   While you were waiting, did you continue to

R000779

337

1    talk to Ms. Hanson?

2    **A.**    I just said, "You gave me the wrong

3    change," and that's what -- she kept on fumbling

4    and kind of getting boisterous.

5                    **MR. FELDMAN:**        I'm sorry, repeat

6    that.

7                    **THE WITNESS:**        She started talking

8    louder to me as she fumbled with the money.

9    **BY MS. GRAGEL:**

10   **Q.**    Did the manager come?

11   **A.**    Yes, he did.

12   **Q.**    Do you know the manager's name?

13   **A.**    Devan, I think.

14   **Q.**    Can you describe what he looked like?

15   **A.**    Younger kid, blond hair.

16   **Q.**    What happened when you got to the counter

17   or the cashier's --

18   **A.**    By this time there were people coming in

19   the line.  We stepped to the side.

20   **Q.**    Who spoke first?

21   **A.**    He wanted to know what the problem was and

22   I told him.

23   **Q.**    Did Ms. Hanson speak to him that you heard?

24   **A.**    Not that I remember.

25   **Q.**    When you talked to the manager, what did

R000780

338

1    you tell him?

2    **A.**    I said that she gave me the wrong change;

3    she's a thief.

4    **Q.**    Why did you use that word?

5    **A.**    Because she got -- as soon as I questioned

6    her at it, she got real defensive and started

7    putting the money back in the drawer and playing

8    with the money.

9    **Q.**    Did you, in speaking to the manager, sir,

10    at any time use the word "fuck"?

11    **A.**    No.

12    **Q.**    Did you use the word "fucking"?

13    **A.**    No.

14    **Q.**    Did you at any time use the term "nigger"?

15    **A.**    No.

16                (Thereupon, Union Exhibit 4 was

17                marked for purposes of

18                identification.)

19    **BY MS. GRAGEL:**

20    **Q.**    Mr. Harting, as part of preparing for this

21    arbitration, did you have the opportunity to

22    review the video that was submitted by

23    University Hospitals in response to the

24    subpoena?

25    **A.**    Yes.

R000781

339

1    Q.    And that was the video that was played here

2    on my laptop at the last hearing?

3    A.    Yes.

4    Q.    Since we were here last, I had some still

5    shots made of excerpts of the video.  Have you

6    also had a chance to review these with me?

7    A.    Yes.

8    Q.    Each of these shots, sir, has a number in

9    the upper left corner.  Do these compare to the

10   tracking numbers at the bottom corner of each

11   frame of that video?

12   A.    Yes.

13   Q.    In Exhibit 4, sir, would you turn to the

14   first photo which is tagged with 19 seconds?  Do

15   you see that?

16   A.    Yes.

17   Q.    Are you in that photo?

18   A.    Yes.

19   Q.    Where are you?

20   A.    I'm in the upper left.  That's my stomach.

21   (Indicating.)

22   Q.    What color is your shirt?

23   A.    It would be white.

24   Q.    And is that your slim stomach that I see in

25   the upper left corner?

R000782

340

1   **A.**   Yes, it is.

2   **Q.**   There is a window-looking area with a

3   circle in it, do you see that?

4   **A.**   Yes.

5   **Q.**   Is Ms. Hanson behind the window?

6   **A.**   Yes, she is.

7                **MR. FELDMAN:**     This person right

8   here?

9                **THE WITNESS:**     Yes.  This is

10  Ms. Hanson and this is me.  (Indicating.)

11               **MR. FELDMAN:**     This is Ms. Hanson,

12  this person with black hair?

13               **THE WITNESS:**     Yes.

14  **BY MS. GRAGEL:**

15  **Q.**   You testified that there was an individual

16  in the cashier area to whom she was speaking?

17  **A.**   Yes.

18  **Q.**   Where is that individual?

19  **A.**   Right to her right.  He is standing up.

20  **Q.**   Before I leave this picture, sir, in the

21  bottom right corner there's an African-American

22  male with a light-colored shirt seated.

23  **A.**   Yes.

24  **Q.**   Do you know that person?

25  **A.**   I don't know him as a name, but we always

R000783

341

1    talk because he coaches Glenville like I do at

2    Mentor.

3    Q.    Would you then, sir, turn with me to the

4    next frame which is the photo taken at 20

5    seconds?  Do you see that?

6    A.    Yes.

7    Q.    What does this show?

8    A.    This shows me standing at the cashier and

9    talking to her.

10   Q.    Nothing changed much than in the last

11   picture?

12   A.    Nothing changed much.

13   Q.    Again, sir, the next ones are frames 22 and

14   23.  What do you see in those photos?

15   A.    Nothing, just still talking -- the man THAT

16   she was talking to on her right is now walking

17   away.

18   Q.    In what frame, sir?

19   A.    That would be 23.

20   Q.    What is depicted in frame 30?

21   A.    Me talking to her again.

22            MR. CAMPBELL:    Just so -- is this

23   frame 30 or 30 seconds?

24            THE WITNESS:    Thirty seconds.

25            MR. CAMPBELL:    Are you taking out

R000784

342

1    seven frames or is this 30 seconds?

2         MS. GRAGEL:      Thirty seconds.

3         MR. CAMPBELL:      I think the record

4    should be clear because if it's frame 30 then

5    we've taking out seven frames, so it's 30

6    seconds.

7         MS. GRAGEL:      Yes.

8              And for the record, Mr. Arbitrator,

9    if I have at any time misspoken and referred to

10   them by numbers, it is a shorthand way of saying

11   seconds.

12   BY MS. GRAGEL:

13   Q.   Skipping ahead to the next photo in Union

14   Exhibit 4 is one marked at one minute, 30

15   seconds.

16        MR. FELDMAN:      What did we have

17   for 30?

18        MS. GRAGEL:      I'm sorry.

19   BY MS. GRAGEL:

20   Q.   In the photo at 30 seconds, are you

21   depicted?

22   A.   Yes, I am.

23   Q.   Where are you?

24   A.   I'm still in the left-hand corner.

25   Q.   From what you see in this picture, was

R000785

343

1    anyone in line with you?

2    **A.**    No.

3    **Q.**    Was anyone in the cashier area talking to

4    Ms. Hanson?

5    **A.**    No.

6    **Q.**    Is that Ms. Hanson, as far as you know,

7    with her back towards you?

8    **A.**    Yes.

9    **Q.**    Is that where she stayed throughout this

10   video?

11   **A.**    Yes.

12   **Q.**    Again, sir, in the frame marked one minute,

13   30 seconds, do you see yourself in the photo?

14   **A.**    Yes.

15   **Q.**    Where are you?

16   **A.**    I am still in the left-hand corner.

17   **Q.**    What, if you know, were you doing at that

18   time?

19   **A.**    I was still trying to tell her that she

20   still owed me four dollars.

21   **Q.**    Had the manager come into the conversation

22   yet?

23   **A.**    No.

24   **Q.**    The next photo in Exhibit 4, sir, is at one

25   minute, 56 seconds.

R000786

344

1   A.   Yes.

2   Q.   Are you in the photo?

3   A.   Yes, I am.

4   Q.   Where are you, sir?

5   A.   I'm on the left-hand side.

6   Q.   Is Ms. Hanson in the photo?

7   A.   Yes.

8   Q.   Has her position changed?

9   A.   No, she's still sitting there.

10  Q.   What were you doing at this time?

11  A.   I was waiting for the manager to show up.

12  Q.   Was there any conversation going on between

13  you and Ms. Hanson at that time?

14  A.   I don't think so.

15  Q.   Turning ahead in the book, sir, to the

16  frame at two minutes, 21 seconds, what is

17  depicted in this photo?

18  A.   I am talking to the manager now.  He is

19  standing behind her.

20  Q.   Again, sir, skipping ahead to the frame

21  from two minutes, 31 seconds, what is shown in

22  that photo?

23  A.   Me and him still talking.

24  Q.   Turn to the frame from two minutes, 35

25  seconds.  What is shown in that picture, sir?

R000787

345

1   **A.**   I moved off to the side and he came out

2   because someone was coming up behind us.

3                **MR. FELDMAN:**      The cashier is

4   gone?  Is the cashier still there?

5                **THE WITNESS:**      The cashier is

6   still there.

7                **MS. GRAGEL:**      Can you point out

8   for the arbitrator where --

9                **THE WITNESS:**      She's still right

10  here.  (Indicating.)

11               **MR. FELDMAN:**      I thought you said

12  that was the manager.

13               **THE WITNESS:**      No, the manager is

14  next to him right here.  The thin guy is the

15  manager(Indicating.)

16               **MR. FELDMAN:**      I'm looking at

17  2:31.

18               **THE WITNESS:**      2:31, this man with

19  his back is the manager, and you can see the top

20  of her head over her right shoulder.

21               **MR. FELDMAN:**      I got you.

22  **BY MS. GRAGEL:**

23  **Q.**   To catch up again, sir, would you turn to

24  2:35, two minutes, 35 seconds, where is the

25  manager?

R000788

346

1    **A.**   Me and the manager are moving off quickly

2    to the right to talk.

3    **Q.**   And the Caucasian individual with the white

4    shirt in the upper left corner, is that the

5    manager?

6    **A.**   Yes, it is.

7    **Q.**   Ms. Hanson continued to be seated in the

8    cashier's area?

9    **A.**   Yes.

10   **Q.**   Would you turn with me then to the frame

11   from two minutes, 38 seconds?

12   **A.**   Yes.

13   **Q.**   Is that you?

14   **A.**   Yes.

15   **Q.**   Who were you speaking to?

16   **A.**   I was speaking to the manager.

17   **Q.**   What do you remember saying to him at that

18   time?

19   **A.**   He said, "Sir, I will look into it," and I

20   pointed and said, "You better look into it."

21   **Q.**   Did you ever in the conversation use the

22   phrase "bullshit"?

23   **A.**   Yes, I did.  I said, "This is bullshit."

24   **Q.**   Is this the time in the conversation when

25   you remember using that word?

R000789

347

1    **A.**    Yes, it is.

2    **Q.**    Did you use the word at any other time?

3    **A.**    No, I did not.

4    **Q.**    Earlier, sir, you talked about the coach

5    from Glenville.  Is that him in the bottom right

6    corner?

7    **A.**    Yes, it is.

8    **Q.**    Do you draw any significance from the way

9    he is seated in the photo --

10                **MR. CAMPBELL:**    I'm going to

11   object.  I object to asking this person to draw

12   significance from somebody else that's in the

13   photo other than him.

14                **MR. FELDMAN:**    You may make your

15   argument.

16   **BY MS. GRAGEL:**

17   **Q.**    From this photo, sir, from your review of

18   the video, did the individual in the upper right

19   corner ever react to you?

20   **A.**    Upper right corner?

21   **Q.**    Bottom right corner.

22   **A.**    No, he never reacted.

23   **Q.**    Did you raise your voice when you talked to

24   the manager in this section at two minutes, 38

25   seconds?

R000790

348

1    A.    No.

2    Q.    Turn, then, sir, with me to the frame two

3    minutes, 48 seconds.  What do you have in your

4    hand?

5    A.    I think I have what's left of my thing and

6    I have a Coke by my belly.

7    Q.    Were you talking to anyone?

8    A.    I think I was just talking to the manager

9    as I walked away.

10   Q.    Would you then look at the frame from two

11   minutes, 42 seconds?  What is shown there, sir?

12   A.    I'm -- if you see, I have the -- I'm eating

13   what I'm supposed to eat and I'm talking to

14   Antoin, who was over here and -- (Indicating)

15   Q.    When you say "over here," where is Antoin?

16   A.    Antoin would be over here.  He would

17   probably be at the next table.  (Indicating.)

18   Q.    That was your co-worker?

19   A.    Yes.

20   Q.    And the table he would have been sitting at

21   is off camera?

22   A.    Yes, it is.

23   Q.    What did you do after you walked off

24   camera, sir?

25   A.    We sat down, we ate at our break and we

R000791

349

1    went back to work.

2    Q.   Did you talk to Antoin about what happened?

3    A.   I just said, "The lady tried to steal four

4    dollars from me."

5    Q.   Did you use any profanity when you talked

6    to Antoin Eley about this incident?

7    A.   No.

8    Q.   Did you talk to anyone else before you left

9    the cafeteria?

10   A.   I don't think so.

11   Q.   Where did you go next?

12   A.   We went back to work.

13   Q.   Anything unusual happen for the rest of

14   your shift?

15   A.   No.

16   Q.   Did you go to work the next day which would

17   have been January 28th?

18   A.   Yes, I did.

19   Q.   Where did you have dinner?

20   A.   In the cafeteria.

21   Q.   Anything unusual happen in the cafeteria?

22   A.   Not on that day, no.

23   Q.   Did you return to the cafeteria on what

24   would be the next day, January 29th?

25   A.   Yes, I did.

R000792

350

1    Q.    What, if anything, happened in the

2    cafeteria on that day?

3    A.    On this day, the manager came over and took

4    my money and the cashier just backed away and I

5    gave the money to the manager.

6    Q.    When you say "cashier," do you mean

7    Ms. Hanson?

8    A.    Yes, I do.

9    Q.    And when you say "manager," was it the same

10   manager that you had been speaking with in the

11   photographs?

12   A.    Yes, it was.

13   Q.    What happened next?

14   A.    After I paid, he came up to me and handed

15   me a five dollar coupon.

16   Q.    What did he say to you?

17   A.    He said, "I hope everything is cool."

18         And I said, "Not a problem."

19   Q.    What did you do next?

20   A.    I went down and sat down.

21   Q.    Did you finish your meal?

22   A.    Yes, I did.

23   Q.    Anything unusual happen that day?

24   A.    No.

25   Q.    Did you go back to the cafeteria on the

R000793

1   next day, which would be January 30th?

2   **A.**   Yes.

3   **Q.**   What, if anything, happened on that day?

4   **A.**   I was eating.  This time I was either late

5   or early because I was by myself, and I think

6   the guy's name is Mr. Hawk, the head manager,

7   walked over to me and he shook my hand, he sat

8   down and he said, "I heard there was a problem

9   here," and I explained to him my side.  And then

10   he -- I said, "Are you kicking me out?"

11   He said, "We would feel more comfortable if

12   you didn't eat here anymore."

13   And I said, "Okay," and I got up and I

14   walked out.

15   **Q.**   Sir, I'd like to direct your attention to

16   February 2nd, 2009.  Do you recall that as being

17   the day that you were contacted by Gilbane and

18   asked to leave the work site?

19   **A.**   Yes, I was.

20   **Q.**   What happened?

21   **A.**   I was working in one of the NICU units and

22   I got a telephone call from Mr. Trusso telling

23   me to go down to Ozanne's trailer.

24               **MR. FELDMAN:**     What was the date?

25   **BY MS. GRAGEL:**

R000794

352

1   Q.   Do you recall that, sir, as being

2   February 2, 2009?

3   A.   February 2nd.

4   Q.   Did you go to the Ozanne trailer?

5   A.   Yes, I did.

6   Q.   Did anyone go with you?

7   A.   No.

8   Q.   Who did you see at the Ozanne trailer?

9   A.   I think his name was Gallata.

10   Q.   Gallata?

11   A.   I think.

12   Q.   His first name is Tony?

13   A.   Yeah, from Ozanne.

14   Q.   Did Mr. Tony Gallata from Ozanne speak with

15   you?

16   A.   Yes, he did.

17   Q.   What did he say?

18   A.   He said, "I heard there is a problem.  They

19   want to see you in Gilbane's trailer."

20   Q.   What happened next?

21   A.   We walked over to the trailer where we met

22   Pat Tomy and Todd -- I don't know what his last

23   name is.

24   Q.   Todd Gerber?

25   A.   Todd Gerber, yeah.

R000795

353

1   Q.   What happened when you got to the Gilbane's

2   trailer?

3   A.   I explained to them what happened, and they

4   said, "Well, we've got to let you go."

5   Q.   Did you leave the job?

6   A.   Yes, I did.

7   Q.   Did they ask you, sir, if you used any

8   racially derogatory terms in the cafeteria?

9   A.   No.

10  Q.   Did they ask you if you used any profanity

11  in the cafeteria?

12  A.   No.

13  Q.   Were you present here in the arbitration on

14  January 9th when Mr. Gerber testified?

15  A.   Yes, I was.

16  Q.   Do you recall, sir, that he testified that

17  he asked you if you knew that you were not to be

18  eating in the cafeteria and you said you knew

19  that?

20  A.   I knew that.

21  Q.   Did you have that discussion with

22  Mr. Gerber on February 2nd?

23  A.   On February 2nd -- on February 2nd he said

24  it's in some sort of minutes or something that

25  we are not allowed to go down there.

R000796

354

1   Q.   Did you know that before January 27th,

2   2009?

3   A.   No, I did not.

4           MR. FELDMAN:     I don't think this

5   is an incident in which the grievant is

6   indicated to be really a persona non grata

7   because he was eating in the cafeteria.  The

8   situation that the owner was concerned with is

9   an alleged violation of really rules of civility

10   which were deemed to be use of the word "nigger"

11   and use of the word "fucking" and use of the

12   word "thief" rather than a situation in which

13   the man was removed from the premises by virtue

14   of his eating in the cafeteria.  That would be

15   an easy problem because there are plenty of

16   other things in the cafeteria, and picking and

17   choosing this particular individual wouldn't cut

18   it, so let's just talk about the swearing and

19   defamation, et cetera.

20   BY MS. GRAGEL:

21   Q.   You were present, sir, for the testimony of

22   Ms. Lattisia Hanson, do you remember that?

23   A.   Yes, I was.

24   Q.   She testified at the prior hearing that you

25   told her that you had given her fucking ten

R000797

355

1    dollars.  Did you say that to her?

2    A.    No, I did not.

3    Q.    What did you say?

4    A.    I said, "I gave you two fives."

5    Q.    She testified, sir, that you commented

6    after she told you that she had to get her

7    manager to the effect of "Go get your fucking

8    manager."  Did you say that?

9    A.    No, I didn't.

10   Q.    What did you say?

11   A.    "Go get your manager."

12   Q.    She testified that you told the manager

13   that she was a fucking thief.  Did you say that?

14   A.    I said she was a thief.

15   Q.    She testified that you said on that day,

16   "Give me my fucking money."  Did you say that?

17   A.    No.

18   Q.    She also testified, sir, that you said,

19   "You are going to give me my fucking money."

20   Did you say that?

21   A.    No.

22   Q.    Ms. Hanson testified that you said, "This

23   nigger is not going to take my fucking money."

24   Did you say that?

25   A.    No.

R000798

356

1  **Q.**   In the written statement that she made on a

2  date after January 27th that's been admitted

3  into evidence, Ms. Hanson wrote that you said,

4  "Give me my fucking money, you fucking nigger."

5  Did you say that?

6  **A.**   No.

7  **Q.**   Did you say anything like that?

8  **A.**   No.

9  **Q.**   Mr. Harting, I'm putting before you what's

10  been marked as Respondent's Exhibit 1 from the

11  prior hearing.  Would you turn, sir, to about

12  the third page of the project code of safe

13  practices?  Do you have that?

14  **A.**   Yes.

15  **Q.**   Would you read paragraph 11, sir, to

16  yourself?

17  **A.**   (Witness complies with request.)

18        **MS. GRAGEL:**      Mr. Arbitrator, do

19  you need to see a copy of that?

20        **MR. FELDMAN:**      I'm taking notes.

21  I will also have the transcript.  It's more

22  important I hear the witness.

23  **BY MS. GRAGEL:**

24  **Q.**   This paragraph starts just for point of

25  reference, "I will conduct myself in a

R000799

357

1   professional manner and not engage in violence,

2   horseplay, et cetera."

3   A.   Yes.

4   Q.   Did you, sir, on January 27, 2009 violate

5   paragraph 11 of the code of safe practices?

6   A.   No, I did not.

7   Q.   Mr. Harting, I've put before you what's

8   been marked in the prior hearing as Respondent's

9   Exhibit 4.  What is that?

10  A.   It's an anti-harassment paper.

11  Q.   Have you, sir, at any time seen that

12  document before this arbitration?

13  A.   No.

14  Q.   Did you, sir, on January 27, 2009

15  discriminate against Ms. Lattisia Hanson based

16  on her race?

17  A.   No.

18  Q.   Did you discriminate against her on the

19  basis of her gender, female?

20  A.   No.

21  Q.   Did you, sir, on January 27th, 2009 harass

22  Ms. Hanson based on her race?

23  A.   No.

24  Q.   Did you harass her based on her gender?

25  A.   No.

R000800

358

1    **Q.**    I'm handing you what's been previously

2    marked as Respondent's Exhibit 6, and in

3    particular, page 14 of that.  Respondent's

4    Exhibit 6 is a University Hospitals Code of

5    Conduct.  Did you ever see that before this

6    arbitration?

7    **A.**    No, I have not.

8    **Q.**    What page do you have in front of you?

9    **A.**    Page 14.

10   **Q.**    Page 14, there is a list in Italics of a

11   number of kinds of prohibited conduct such as

12   violence and so forth.  Take a minute and read

13   those over.  My question, sir, is whether you

14   engaged in any of that conduct on January 27th,

15   2009.

16   **A.**    No, I have not.

17   **Q.**    Sir, after you left the work site on

18   February 2nd, 2009, did you register for work

19   through the Local 310 out-of-work list?

20   **A.**    Yes, I did.

21   **Q.**    How long was it, sir, before you obtained

22   employment, as best you can remember?

23   **A.**    Five or six weeks.

24   **Q.**    Where did you go to work after?

25   **A.**    The Perry Nuclear Power Plant.

R000801

359

1   **Q.**   How long did you work there?

2   **A.**   Roughly five weeks.

3   **Q.**   Were you laid off from that job?

4   **A.**   Yes.

5   **Q.**   How long were you off before you got

6   another job?

7   **A.**   Until the second week of May, so another

8   seven weeks.

9   **Q.**   Where did you go to work then, sir?

10  **A.**   I was working at the Cleveland Institute of

11  Art.

12  **Q.**   And are you still working there?

13  **A.**   No, I just got laid off.

14  **Q.**   And when were you laid off?

15  **A.**   Yesterday.

16  **Q.**   As part of the preparation for this

17  arbitration hearing, did you work with my office

18  to develop a schedule showing the lost wages and

19  benefits for the time between your layoff and

20  the time that you began work out at Perry

21  Nuclear Plant?

22  **A.**   Yes.

23                (Thereupon, Union Exhibit 5 was

24                marked for purposes of

25                identification.)

R000802

360

1    BY MS. GRAGEL:

2    Q.    Mr. Harting, does Exhibit 5 represent the

3    calculation of the lost wages and damages that

4    you made for the period between February and the

5    time that you were recalled to work at Perry?

6    A.    Yes.

7    Q.    As far as you know, sir, was work still

8    going on at the place at University Hospitals

9    where you were working before you were laid off?

10   A.    Yes.

11   Q.    And if these same calculations were applied

12   to cover the period in which you were laid off

13   after Perry, before you started at the Cleveland

14   Institute of Art, would the same formula hold

15   true?

16   A.    Yes.

17           MS. GRAGEL:      Mr. Arbitrator,

18   thank you.  I'll pass the witness.

19           MR. FELDMAN:     You may inquire.

20                   CROSS-EXAMINATION

21   BY MR. CAMPBELL:

22   Q.    Mr. Harting, I questioned you on two

23   occasions and I don't have too many questions

24   for you today, but I want to ask you a little

25   bit.

R000803

361

1          I've met on several occasions with John

2      Gilbane and Terry Joyce.  Are you familiar with

3      those two individuals?

4      A.    Yes.

5      Q.    And they're some of the elected

6      representatives from Local 310?

7      A.    Yes.

8      Q.    And I'm familiar with the policies and

9      procedures of 310 in talking with them.  I just

10     want to ask you, on the stewards I'm assuming

11     there's training and you have to do something

12     within union before you get the title of

13     steward.

14     A.    Yes.

15     Q.    And you probably have to go through some

16     training before you get the title of a foreman.

17     A.    Yes.

18     Q.    And the training for the stewards and the

19     foreman are all through Local 310?

20     A.    No, not all of them.

21     Q.    Or directed for you to go outside Local

22     310?

23     A.    Yes.

24     Q.    And the steward and the foremen --

25     certainly as a steward, in looking at the

R000804

362

1    Collective Bargaining Agreement, a steward

2    actually can file grievances on behalf of some

3    of the other laborers, right?

4    **A.**    Yes.

5    **Q.**    So you're familiar with the contract

6    between Local 310 and the Contractor's

7    Association?

8    **A.**    I know there's one, but I don't know

9    exactly --

10    **Q.**    If you're a steward, you understand that

11    you know how to get a copy of the contract?

12    **A.**    Yes.

13    **Q.**    You would know how to find out if there's a

14    grievable offense?

15    **A.**    Yes.

16    **Q.**    If somebody comes to you and says, "Hey,

17    Mike, I think there's a problem," are you just

18    going to say, "I have no idea about the

19    contract," or are you going --

20    **A.**    No, I would probably call my business agent

21    up and find out exactly what the problem is.

22    **Q.**    So you're going to go locate the

23    contractual terms and see if there is a

24    grievable offense?

25    **A.**    Yes.

R000805

363

1    Q.    Tell me about the steward training.  What
2    type of things did Local 310 either direct you
3    to go to or that you actually did for steward
4    training?
5    A.    Most of our steward training is -- once
6    again, safety oriented, and then we try to
7    follow the book as much -- our agreement book as
8    much as possible during different situations.
9    Q.    And that's the contract.  You're saying the
10   agreement book is your contract?
11   A.    The contract with our -- you know, like the
12   carpenter's union and stuff like that.  It has
13   nothing to do with --
14   Q.    The Local 310 Collective Bargaining
15   Agreement that they've negotiated, right?
16   A.    Yes.
17   Q.    And then each job site that you go on,
18   you've talked about you were at Progressive
19   Field, you were at the Lerner household, Ben
20   Venue, St. Francis, Higley, Cleveland Institute
21   of Art, Perry Nuclear facility, UH, you were at
22   a number of work sites around the Cleveland
23   area, right?
24   A.    Yes.
25   Q.    At each of those work sites, some of them

R000806

364

1    like Progressive Field, you weren't necessarily

2    there with employees because Progressive was

3    going from the foundation up, right?  You

4    weren't there with people working for

5    Progressive or for Jacob's Field at the time,

6    you were just in construction?

7    **A.**    Yes.  At least in the beginning, yes.

8    **Q.**    And like the "Lerner household, you're

9    actually in a household, right?

10    **A.**    Yes.

11    **Q.**    You're on the grounds of a private

12    residence?

13    **A.**    Yes.

14    **Q.**    Grandchildren might be around?

15    **A.**    Yes.

16    **Q.**    The Lerners might be around?

17    **A.**    Yes.

18    **Q.**    Family and friends?

19    **A.**    Yes.

20    **Q.**    And no different than Ben Venue, you were

21    probably, I'm assuming, doing construction with

22    employees and visitors coming to the Ben Venue

23    site?

24    **A.**    Yes.

25    **Q.**    Cleveland Institute of Art, you had

R000807

365

1    visitors coming in to see the Institute of Art?

2    **A.**    Yes.

3    **Q.**    No different than UH, there's patients,

4    there's visitors, there's other employees coming

5    through the grounds?

6    **A.**    Yes.

7    **Q.**    Now, I'm assuming the steward training, the

8    foreman training and your -- how many years have

9    you been a laborer?

10   **A.**    Twenty-seven.

11   **Q.**    Twenty-seven years, and you've been a high

12   school coach, right?

13   **A.**    Yes.

14   **Q.**    When you go visit another facility, I'm

15   assuming you tell your guys, "Hey, we're going

16   to be professional, we're going to be

17   respectful, and we're going to follow all the

18   rules and be a gentleman," right?

19   **A.**    Yes.

20   **Q.**    If somebody goes into the other gym and

21   acts like a jerk, you're going to take some

22   action, right?

23   **A.**    Yes.

24   **Q.**    And you don't just do that on the high

25   school field, you understand that as a laborer,

R000808

366

1    when you went in the Lerner household, you're

2    going to be a gentleman?

3    A.    Yes.

4    Q.    You're not going to go in the Lerner

5    household and work with one of their -- if they

6    have a maid or somebody that's working for the

7    Lerner household and call them a thief in the

8    household, are you?

9    A.    No.

10   Q.    You're going to handle those issues through

11   your process that you have?

12   A.    Yes.

13   Q.    Right?

14   A.    Uh-huh.

15   Q.    And the process, you have a grievance

16   process, you have your business agent, you have

17   many avenues to go to 310 to say, "Hey, guys,

18   I've got a problem," right?

19   A.    Yes.

20   Q.    And I'm assuming you've told your guys and

21   310 and your business agents have told you, have

22   you ever heard of the -- in the union lingo that

23   you work first, grieve later?

24   A.    I've never heard it.

25   Q.    Let me see if you understand the principle.

R000809

367

1    If you're on the work site and somebody -- a

2    supervisor might tell you something that you

3    don't think is right to the contract, you follow

4    the order unless there's a safety issue and then

5    you go to your B.A. and file a grievance after

6    the fact, right?

7    A.    Yes.

8    Q.    You don't create a scene and start

9    picketing on the work site?  You work first and

10   grieve later, right?  Is that right?

11   A.    Yes.

12   Q.    There's a process to go through, and you

13   follow the process, and your union is there in

14   order to solve those problems, right?

15   A.    Yes.

16   Q.    Now, at the UH project, you've already

17   testified extensively to me on two occasions

18   that you understood, as no different than at the

19   high school or at the Lerner field or Cleveland

20   Institute of Art, when you were on campus at the

21   UH facility, you were there to act like a

22   gentleman, right?

23   A.    Yes.

24   Q.    And no different than if I were to visit

25   the facility, I'm not there to yell, scream,

R000810

368

1    cuss, use racial slurs, right?

2    **A.**    Yes.

3    **Q.**    And if you understood that if a visitor

4    such as me or Ms. Gragel or your business agent,

5    anybody who wasn't an employee, if a visitor

6    came on and violated their policies and

7    procedures that they could be excluded.  An

8    owner can do that, right?

9    **A.**    Yes.

10   **Q.**    If you go in the Cleveland Institute of Art

11   and you start yelling and screaming, somebody

12   can say, "Hey, you've got to leave."

13   **A.**    Yes.

14   **Q.**    In fact, when they came up to you in the

15   cafeteria and said, "You know what, we can't

16   have that conduct here, you've gotta go," you

17   willingly left?

18   **A.**    Yes.

19   **Q.**    You didn't start yelling and screaming at

20   them?

21   **A.**    No.

22   **Q.**    You said fine?  You have the right to say

23   you can leave, right?

24   **A.**    Yes.

25   **Q.**    And I take it from your discussion, you

R000811

369

1    didn't even call the B.A. to say, "Hey, I want a

2    grievance about this."

3    A.   No, because I just -- okay, they don't want

4    me in here and I just left.

5    Q.   Your testimony is you didn't have anyplace

6    to eat, right?

7    A.   I would have went maybe and sat outside or

8    something like that.

9    Q.   So here you are, you've been excluded from

10   the cafeteria at this point, all your friends

11   are going to eat in there, you've testified at

12   length you have no other place to eat, they've

13   taken the break room out, all these issues.  We

14   don't call the B.A., we don't file a grievance,

15   we don't go to UH, we just simply say "That's

16   fine" and walk away, right?

17   A.   Me, yes.

18   Q.   No issues.  If Gilbane wouldn't have called

19   you in and said, "You know what, we found out

20   about this, we're going to exclude you from the

21   work site," I would bet Ms. Gragel and your

22   business agent would have never known anything

23   about this, would they?  You wouldn't have told

24   them.

25   A.   I probably would have told him, yes.

R000812

370

1  Q.  Well, you didn't tell them before you were

2  excluded from the work site, did you?

3  A.  No.

4  Q.  Just so I understand you, you come every

5  day with ten dollars.

6  A.  Yes.

7  Q.  Now, what time did you typical -- when you

8  started -- you didn't start at UH until about

9  three weeks before this incident, right?

10  A.  Yes.

11  Q.  And you were at the Case site for how many

12  years?

13  A.  Three years.

14  Q.  Over those three years I think you said you

15  went into the cafeteria quite often?

16  A.  Yes.

17  Q.  No problems before that?

18  A.  No.

19  Q.  Nobody stole money from you before that?

20  A.  The change was always different, and that's

21  why we always laughed because you have that

22  badge and you don't know if they're giving you

23  the discount or -- we don't know.

24  Q.  You didn't start yelling and screaming when

25  the change was different?

R000813

371

1    **A.**    No.

2    **Q.**    No other incidents prior to January 27,

3    right?

4    **A.**    Right.

5    **Q.**    You went into the cafeteria, you acted like

6    everybody else in there, got your food, ate, and

7    didn't make an incident, right?

8    **A.**    Yes.

9    **Q.**    Yet, you were fully familiar with the

10   cafeteria and what was expected of people in

11   that cafeteria?

12   **A.**    Yes.

13   **Q.**    This was three years of using this

14   cafeteria, right?

15   **A.**    Yes.

16   **Q.**    On a regular basis?

17   **A.**    Yes.

18   **Q.**    How many times a week do you think you used

19   it over these three years?

20   **A.**    Five to seven.

21   **Q.**    Five to seven times a week over this time.

22   So you were very familiar with UH campus, right?

23   **A.**    Yes.

24   **Q.**    You knew patients were walking around?

25   **A.**    Yes.

R000814

372

1   **Q.**   You knew Rainbow is right there connected

2   to the atrium, right?

3   **A.**   Yes.

4   **Q.**   And Rainbow is the Children's Hospital,

5   right?

6   **A.**   Yes.

7   **Q.**   I've been in the cafeteria, oftentimes

8   there's kids and their moms and dads there?

9   **A.**   Yes.

10   **Q.**   Kids visiting their relatives or friends

11   who are in the hospital, right?

12   **A.**   Uh-huh.

13   **Q.**   Just say "yes."

14   **A.**   Yes.

15   **Q.**   And this is a very crowded cafeteria.  Not

16   all times, but sometimes it's very crowded.

17   **A.**   Yes.

18   **Q.**   And there's all sorts of people, everybody

19   from a UH employee, from a clerical to a doctor

20   to all types of visitors?

21   **A.**   Yes.

22   **Q.**   All types of patients?

23   **A.**   Yes.

24   **Q.**   And throughout all these three years, you

25   didn't go in there and yell and scream, right?

R000815

373

1   A.   No.

2   Q.   You acted professionally and polite?

3   A.   Yes.

4   Q.   Even though there were times when you

5   thought, why is my change wrong, right?

6   A.   Yes.

7   Q.   So now when you come in with ten dollars, I

8   think on the opening I heard that's your typical

9   day, just so I understand the typical day, what

10  time would you get in once you started in

11  January, what time did you start?

12  A.   We started about 3:00.

13  Q.   So you started at three and worked until

14  when?

15  A.   We worked until -- end of the shift.

16  Q.   What time would --

17  A.   11:00, 11:30.

18  Q.   Take two coffee breaks?

19  A.   One coffee break.

20  Q.   One coffee break and then you had lunch?

21  A.   Yes.

22  Q.   What do you bring to the work site?  When

23  you came to UH, what did you bring?

24  A.   I just bring -- when I come to UH or Case,

25  I just bring my hammer and my tools.

R000816

374

1   Q.   So you bring your ten dollars every day for
2   lunch?
3   A.   Yes.
4   Q.   And you get coffee and you get dinner?
5   A.   I drink water in the morning.
6   Q.   You drink water in the morning.
7   A.   Coffee break.
8   Q.   Coffee and dinner is what you get, right?
9   A.   Yes.
10  Q.   And the atrium is the big cafeteria?
11  A.   Yes.
12  Q.   And atrium has like an Einstein Bagels?
13  A.   Yes.
14  Q.   And it has the regular cafeteria that all
15  these pictures show where you can go through the
16  buffet?
17  A.   Yes.
18  Q.   And you go in the atrium.  On this day I
19  heard Ms. Gragel say you went in the atrium and
20  got your coffee and then went back to work?
21  A.   I got water.
22  Q.   Was Ms. Gragel mistaken when she said you
23  went in there to get coffee?
24  A.   It's a coffee break, but I drink water.
25  Q.   Where did you get your water?  Did you go

R000817

375

1   up there and buy a bottle?

2   **A.**   No, you get it free.  If you look at the

3   thing, there's an ice machine with a cup of

4   water.

5   **Q.**   So you're saying Ms. Gragel was mistaken

6   when she said in her opening --

7   **A.**   I call it a coffee break, but I'm trying

8   to --

9   **Q.**   Because if you got coffee, you would have

10  used two of your five dollar bills, right?

11  **A.**   Yes.

12  **Q.**   So Ms. Gragel was right that you got your

13  coffee break before dinner, you wouldn't have

14  had two five dollar bills when you went to

15  dinner, right?

16  **A.**   Yes.

17  **Q.**   But it's your testimony that Ms. Gragel was

18  mistaken that you only got free water, you

19  didn't get coffee?

20  **A.**   Yes, I got free water.

21  **Q.**   So you didn't use your two five dollar

22  bills on coffee, Ms. Gragel is wrong, right?

23  **A.**   Yes.

24  **Q.**   Now, did you see me laugh over here when

25  Ms. Gragel said you had your coffee break first

R000818

376

1    during her opening?

2    A.    No.

3    Q.    So you got free water.  Others got coffee.

4    A.    Yes.

5    Q.    And you didn't buy any coffee on that

6    break?

7    A.    I don't remember.  Sometimes I do, but most

8    of the times I don't.

9    Q.    So you could have gotten coffee?

10    A.    I could have, yes.

11    Q.    And if you got coffee, it wasn't free,

12    right?

13    A.    Yes.

14    Q.    And you would have had to break one of your

15    fives to get coffee?

16    A.    Yes.

17    Q.    So for sake of argument, if on this day you

18    actually bought coffee, you wouldn't have had

19    two five dollar bills when you went through the

20    cafeteria?

21    A.    I wouldn't have, no.

22    Q.    You would have had a five and a one?

23    A.    Yes, I would have.

24    Q.    And 20 cents would have been the correct

25    change?

R000819

377

1   **A.**   It would have been.

2   **Q.**   Who did you have the coffee break with that

3   day?

4   **A.**   Probably Antoin.

5   **Q.**   He's going to be here to testify?

6   **A.**   Yes.

7   **Q.**   So we'll see what he has to say about your

8   coffee break and whether you got coffee or not.

9        On this -- and that was in the cafeteria,

10  no different than your dinner, right?

11  **A.**   Right.

12  **Q.**   Your coffee break or water break?

13  **A.**   Yes.

14  **Q.**   Whatever you got for break was in the

15  atrium.

16  **A.**   Yes.

17  **Q.**   Now, just so I understand the night as it

18  goes, you start work at seven, and about, what,

19  an hour later you have your water/coffee break?

20  **A.**   No, we started working at three.

21  **Q.**   Sorry.

22  **A.**   And at five we went to coffee break and

23  then at 7:00 to 7:30 we went to our lunch break.

24  **Q.**   And then the lunch break what you call

25  lunch, we'll go through it, the photos that

R000820

378

1    Ms. Gragel went through with you, that's your

2    lunch?

3    A.    Yes.

4    Q.    So now just so I understand the contract,

5    you were the steward and I just want to verify.

6              (Thereupon, Respondent's Exhibit 7

7              was marked for purposes of

8              identification.)

9    BY MR. CAMPBELL:

10   Q.    I'm a little surprised we haven't seen this

11   since you're a steward and we have a contract,

12   but you recognize this as the Local 310

13   contract, right?

14   A.    Yes, I do.

15   Q.    And just look at page 1 first before you

16   start leafing through.  Page 1 is we now have a

17   new contract, but this was in effect up until

18   the new contract went into effect just about,

19   what, 30 days ago?

20   A.    Yes.

21   Q.    Is that right?

22   A.    Yes.

23   Q.    You understand there was just negotiations,

24   and your B.A. can testify to it, but

25   negotiations about a month ago?

R000821

379

1   **A.**   Yes.

2   **Q.**   This contract was applicable to your

3   employment February 2009 and January 2009,

4   right?

5   **A.**   Yes.

6   **Q.**   And you were a steward so you were

7   explicitly there to help your laborers enforce

8   this contract as well as the Project Labor

9   Agreement, right?

10  **A.**   Yes.

11  **Q.**   Let's look through this contract and verify

12  a couple things.  Number one, I want to take you

13  to the article about the steward and verify

14  we're on the same page.  It's page 17 and it's

15  Article III, section 16, page 17.  Do you

16  recognize that with stewards?  See that on the

17  bottom right?

18  **A.**   Steward.

19  **Q.**   Section 16, stewards.

20  **A.**   I don't see where you're seeing it.

21  **Q.**   Page 17 here and 16 in bold "Stewards"?

22  **A.**   Yes.

23  **Q.**   You were a steward at the UH site, correct?

24  **A.**   Yes.

25  **Q.**   You've been a steward for many, many years

R000822

380

1    on many different work sites?

2    **A.**    Yes.

3    **Q.**    And if we look through the steward, there's

4    many duties and obligations and rights that

5    stewards have.  And if we look at page 18, one

6    of them is that the laborers have to report the

7    grievances to either the steward, the field

8    representative or the business manager, do you

9    see that on section L, page 18?

10   **A.**    Uh-huh.

11   **Q.**    Is that right?

12   **A.**    Yes.

13   **Q.**    Now, on the steward -- so you obviously

14   were very familiar with this contract or should

15   get familiar if somebody called you, correct?

16   **A.**    Uh-huh.

17   **Q.**    Is that right?

18   **A.**    Yes.

19   **Q.**    Now, I just want to ask you about these

20   points.  If we look at on this, and if we turn

21   to page 32, Article XI, section 1, okay, are you

22   with me?  Roman numeral XI, "General Provisions"

23   section 1, I'm going to read it and ask if you

24   can verify it.  Section 1.  "It is expressly

25   understood that working rules, by-laws,

R000823

381

1   conditions, practices or customs, unless same or

2   specifically mentioned in this agreement, shall

3   be interpreted as being a part hereof."  Did I

4   read that correctly?

5   **A.**   Yes, you did.

6   **Q.**   And that's what you were talking about when

7   you're on the Lerner site or if you're at the

8   Cleveland Institute of Art, when they have their

9   by-laws, conditions, practices or customs,

10   that's actually part of your 310 contract,

11   right?

12   **A.**   Yes.

13   **Q.**   So when you're there at UH, you were asked

14   about all these points about did UH train you --

15   in fact, your own contract, John Gilbane and

16   Terry Joyce, who negotiated on your behalf

17   actually made those policies and procedures,

18   customs, by-laws, practices, all part of your

19   310 contract and you were obligated to comply

20   with them and so were your other members,

21   correct?

22          **MR. FELDMAN:**        Excuse me.  That

23   was page 32?

24          **MR. CAMPBELL:**        Page 32,

25   Article XI, General Provision, section 1.

R000824

382

1            **THE WITNESS:**      I don't know

2    because I don't go that much in-depth about

3    everybody else's rules.

4    BY MR. CAMPBELL:

5    **Q.**   Would you agree that this is saying it is

6    expressly understood that working rules,

7    by-laws, conditions, practices or customs are

8    part of this agreement?  Do you see that?

9    **A.**   Yes.

10   **Q.**   So as a steward, you certainly could have

11   called your B.A. to say, "Hey, I'm going to the

12   UH work site.  Let's talk about my duties and

13   obligations and any specific customs or

14   practices," right?

15   **A.**   I never have done anything like that, but I

16   suppose, yes.

17   **Q.**   When you went to Lerner, your business

18   agent told you about do's and dont's, right?

19   **A.**   No.  We were brought in in a trailer with a

20   liaison from the Lerner Corporation who told us

21   exactly how to act and what to do.

22   **Q.**   From your testimony, I said that your quote

23   was B.A. told you at Lerner.

24   **A.**   Yeah, to go out there and work with them.

25   **Q.**   The business agent told you, "Be nice to

R000825

383

1    people," the business agent told you, right?

2    A.    Yes.

3    Q.    So your business agent is going to tell you

4    about, hey, you're going on a site, let's make

5    sure we -- you hear some peculiar rules like,

6    it's confidential, you can't tell people about

7    what we're doing at the Lerner house; is that

8    right?

9    A.    Yes.

10   Q.    The union is going to tell you those

11   things.

12        So you go on the UH work site.  You didn't

13   need to call because you were very familiar with

14   UH, right?

15   A.    Yes.

16   Q.    You've been in that cafeteria for years?

17   A.    Yes.

18   Q.    And you knew the rules and procedures and

19   what was expected of you and others when they

20   were eating there?

21   A.    Yes.

22   Q.    If fact, your contract explicitly made

23   those part of all those rules and procedures,

24   made those part of your obligations under those

25   contracts we just went through, didn't it?

R000826

384

1    A.    Again, I don't know, you know -- I'm

2    confused here on what -- am I supposed to know

3    the whole book of stuff to do?

4              MR. FELDMAN:    Answer to the best

5    of your knowledge.

6              THE WITNESS:    No, not to the best

7    of my knowledge, I don't know what I was

8    supposed to know.

9              MR. FELDMAN:    Next question.

10   BY MR. CAMPBELL:

11   Q.    Now, let's talk about the night in

12   question, and why don't we pull out -- you've

13   got that three-ring binder again.  Let's go

14   through it.  I want to verify what we're looking

15   at.  So we don't know what happened prior to

16   zero to 19 based on the still photos.  If we

17   look at number one, you're already standing at

18   the cash register with 19 seconds on the clock,

19   right?

20   A.    Yes.

21   Q.    So we don't know if you had been standing

22   there already 19 seconds or if it just started?

23   A.    Yes.

24   Q.    Do you know from Ms. Gragel, do you know if

25   you had already been standing there for 19

R000827

385

1    seconds?

2    **A.**    No, I don't know.

3    **Q.**    So we don't know if this is starting at

4    zero or 19 that you've been there.

5         Now, if we look through the minutes, before

6    the manager came over, let's keep leafing back

7    until we see the manager come into the front.

8    Tell me at what second the manager came into the

9    front.

10   **A.**    2:21.

11   **Q.**    So 2:21.  So you were either at this cash

12   register for two minutes, 21 seconds, or if you

13   just came up in 19 seconds, it was two minutes

14   and two seconds.  Can we agree on that?

15   **A.**    Yes.

16   **Q.**    So two minutes and two seconds before the

17   manager came over, at least two minutes you sat

18   there at the cash register with the UH

19   representative, the employee who was sitting

20   there at the cash register, right?

21   **A.**    Yes.

22   **Q.**    So for two minutes you were there.  Now,

23   we've talked about what you did and didn't do

24   during those two minutes.  But when we last went

25   through what you admitted to and what you didn't

R000828

386

1    admit to, you admitted that you cussed; is that

2    correct?

3    A.    Yes.

4    Q.    Now you're saying that you didn't use the

5    term "fuck," but you cussed.  What terms were

6    you using?

7    A.    "Bullshit."

8    Q.    You used "bullshit"?

9    A.    Yes.

10   Q.    And you said that although you didn't think

11   you got angry, you say that because of your

12   size, people would think you were angry, right?

13   A.    Yes.

14   Q.    And I want to just look at a couple of

15   these slides and verify because of your size and

16   see.  If we look at frame two minutes, 38

17   seconds, you're pointing at the manager, right?

18   A.    Yes, because he said, "Sir, I will look

19   into it," and I turned and I said, "You better;

20   this is bullshit."

21   Q.    And I would say that that supervisor is

22   much smaller than you, right?

23   A.    Yes.

24   Q.    You said he was a young kid?

25   A.    Yes.

R000829

387

1    **Q.**    Do you think the way you were turning

2    there, that might look a little aggressive?

3    **A.**    Not to me.

4    **Q.**    You turn around, you're pointing at him and

5    you're saying this is bullshit?

6    **A.**    Yes.

7    **Q.**    And this is two minutes and 38 seconds into

8    this altercation, right?

9                    **MS. GRAGEL:**        Objection.

10                   **MR. CAMPBELL:**       Objection?  What

11   are we objecting to?

12                   **MS. GRAGEL:**        "Altercation."

13   There's been no testimony about an altercation.

14   **BY MR. CAMPBELL:**

15   **Q.**    This is two minutes and 38 seconds into

16   this incident, correct?

17   **A.**    Yes.

18   **Q.**    So two minutes and 38 seconds you're still

19   saying this is bullshit and pointing at the

20   supervisor?

21   **A.**    Yes.

22   **Q.**    Now, if we turn to the next slide at 2:40,

23   you're giving a pretty aggressive scowl back

24   towards him as you're walking away, right?

25   **A.**    Once again, this is how I look.  I'm sorry,

R000830

388

1    you know.

2    Q.    Are you smiling in that picture?

3    A.    I never smile.

4    Q.    You're laughing now.  You're not smiling in

5    that picture, are you?

6    A.    I'm laughing in the next picture.

7    Q.    This took about -- you're not smiling, are

8    you?

9    A.    No.

10   Q.    You're walking away, you're turning at him

11   and you're glaring at him, right?

12   A.    Yes.

13   Q.    It's not real funny, is it, if you're him,

14   right?  Is it?

15   A.    No.

16   Q.    Do you think he's laughing?

17            MS. GRAGEL:        Objection.

18   BY MR. CAMPBELL:

19   Q.    Let me ask you this:  You didn't intend to

20   have him laugh at you, did you?

21   A.    No.

22   Q.    We asked what other people should have been

23   feeling and what people in this photo, you

24   intended to have him be a little intimidated by

25   you -- not a little, intimidated by you --

R000831

389

1    didn't you?

2    A.    No, not really because that's the way I

3    look.  I mean, sorry.

4    Q.    Now, for two minutes you're at the cash

5    register, you admit that you cussed, right?

6    A.    Yes.

7    Q.    You admit you called her a thief?

8    A.    Yes.

9    Q.    You admit that you got loud?

10   A.    The way I talk is loud, so --

11   Q.    You admit it was loud?

12   A.    Yes.

13   Q.    So are we supposed to excuse you because

14   you're a loud person and others aren't?

15              MS. GRAGEL:       Objection.

16              MR. FELDMAN:       That's for me to

17   decide.  Next question.

18   BY MR. CAMPBELL:

19   Q.    And when we look through these photos, when

20   we start out at -- if we turn to page 1 again on

21   20 and 22, 23 seconds, 30 seconds -- I mean,

22   let's look at 30, can you tell whether anybody

23   else is in line or not at the 32 second mark?

24   A.    No.

25   Q.    We can't tell if anybody is in line or not.

R000832

390

1   **A.**   There is no one behind me.

2   **Q.**   We can't see anything -- it slices you in

3   half.  We can't see anything to the left of you,

4   right?

5   **A.**   Yes.

6   **Q.**   And you're taking up the whole spot along

7   the wood, so it's pretty difficult to see if

8   there's three people behind you or not; is that

9   right?

10  **A.**   Yes.

11  **Q.**   And there is a salad bar there with people

12  at the salad bar, right?

13  **A.**   There is a salad bar there, yes.

14  **Q.**   Do you see people?

15  **A.**   I see one person.

16  **Q.**   If we look at 1:56, you see a bunch -- four

17  or five people at the salad bar?

18  **A.**   Yes.

19  **Q.**   So we've got a salad bar there, we've got

20  you for two minutes.  So you're saying nobody

21  else came in the line for over two minutes of

22  you arguing with the manager and Ms. Hanson?

23  **A.**   Yes.

24  **Q.**   Nobody came?  Nobody was coming through the

25  line?

---

**COURT REPORTERS OF AKRON CANTON AND CLEVELAND**

330-666-9800                330-452-2400                216-621-6969

R000833

391

1   A.   No.

2   Q.   Certainly people at the salad bar could see

3   and hear this altercation?

4              MS. GRAGEL:        Objection --

5              MR. FELDMAN:       Sustained.

6              MS. GRAGEL:        -- to what they see

7   and hear and what the altercation was.

8              MR. FELDMAN:       He doesn't know

9   what the other person --

10             MR. CAMPBELL:      She's asked him

11  about what other people sitting in the cafeteria

12  thought.

13             MS. GRAGEL:        And the objection

14  was sustained.

15             MR. CAMPBELL:      She asked the

16  question.  It wasn't sustained.

17             MR. FELDMAN:       It was.  Go on to

18  the next question.

19  BY MR. CAMPBELL:

20  Q.   You're familiar with the cafeteria, right?

21  A.   Yes.

22  Q.   Big open space?

23  A.   Yes.

24  Q.   It's pretty easy to hear echoes and hear

25  people talking?

R000834

392

1   A.   Yeah.

2   Q.   And when we saw the video, there was

3   pointing at Ms. Hanson, wasn't there?

4   A.   Not at Ms. Hanson, no.

5   Q.   There was pointing when you were in line

6   before a manager came, right?

7   A.   No.  I would not -- I did not point at her.

8   Q.   You admit that you cussed, right?

9   A.   Yes.

10  Q.   You were loud?

11  A.   Yes, sir.

12          MS. GRAGEL:       I'd object.  Asked

13  and answered.

14          MR. FELDMAN:     It's

15  cross-examination.

16          Continue, please.

17  BY MR. CAMPBELL:

18  Q.   You called her a thief?

19  A.   Yes.

20  Q.   You called it to her, you called it to the

21  manager, and you were freely calling her a

22  thief, correct?

23  A.   Yes.

24  Q.   Now, just to verify, when you say you were

25  loud, you admitted the last time I

R000835

393

1   cross-examined you that you raised your voice.

2   A.   I always raise my voice when I talk.

3   Q.   Whether you always did or not, my question

4   is you raised your voice when you were calling

5   her a thief and cussing, isn't that correct?

6   A.   I probably raised my voice, yes.

7   Q.   Not probably, you recall that you did,

8   correct?

9   A.   Yes.

10  Q.   Now, you thought she had stolen five

11  dollars.  You're a union steward, you're very

12  familiar with the cafeteria.  Why not quickly

13  say, "I'd like to speak with your manager," go

14  speak with the manager, or raise it with someone

15  in the union?

16  A.   She, within the first couple of seconds we

17  were there said, "I'm going to have to talk to

18  my manager."

19       I said, talk -- "get your manager," and

20  that's what we waited for.

21  Q.   So it's your testimony you just stood there

22  quietly for two minutes?

23  A.   Yeah, basically.

24  Q.   Basically just stood there quietly?

25  A.   I was waiting for the manager to come.

R000836

394

1   Q.   And you're arguing with her.

2   A.   I was talking to her, but I don't think I

3   was arguing.

4   Q.   For two minutes if you're disagreeing and

5   you're calling her a thief, I think -- wouldn't

6   you agree that she might say that you were

7   arguing with her?

8   A.   Okay.

9   Q.   Would you agree?

10  A.   Yes.

11  Q.   If I sat there for two minutes and we timed

12  it and we are in a disagreement and I'm calling

13  you a thief, would you be happy with me?

14  A.   I called her a thief one time.

15  Q.   Whether you used the term thief, for two

16  minutes you were arguing with her about whether

17  you were owed 20 cents or $4.20, correct?

18  A.   Correct.

19  Q.   You were demanding her manager come?

20  A.   Yes.

21  Q.   You wanted her to be disciplined.

22  A.   I wanted her to find what the cause was,

23  not disciplined.

24  Q.   If we sat downstairs at the Starbucks for

25  two minutes and I called you a thief and was

R000837

395

1    questioning whether you stole four dollars from

2    me, would you be happy?

3    **A.**    No.

4    **Q.**    Now, the manager comes, and at this point

5    more than two minutes into this you're still

6    turning, pointing to the manager and calling her

7    a thief and that this is bullshit?

8    **A.**    Yes.

9    **Q.**    Now, that night, even though you don't have

10   any redress, they tell you they're going to

11   review the video, right?

12   **A.**    Yes.

13   **Q.**    You don't go to your B.A.?

14   **A.**    No.

15   **Q.**    You don't tell UH about it?

16   **A.**    No.

17   **Q.**    You don't do written grievances or anything

18   about this stolen four dollars?

19   **A.**    No.

20   **Q.**    You kept it quiet until finally Gilbane

21   kicked you off the site?

22   **A.**    Basically, I forgot about it until

23   Gilbane -- you know, four dollars is nothing.

24   **Q.**    It's nothing.  We sat for two minutes --

25   over two minutes and argued and you called her a

R000838

396

1    thief and cussed and pointed at a manager, and

2    that's nothing?

3    **A.**    Not in the whole scope of the world, no,

4    it's not.

5    **Q.**    Why didn't you just simply say, "I want to

6    see your manager; I want to talk to them"?

7    **A.**    Two days after I talked to the manager, he

8    gave me a coupon.  I thought it was over.

9    **Q.**    My question to you is, you're saying today

10   that this four dollars was nothing.  Why when

11   this happens don't you handle it as any other

12   customer would and go up to a manager and say,

13   "Hey, look I think I was short changed, let's

14   talk about it"?

15   **A.**    We did.

16   **Q.**    You did after you called her a thief, you

17   cussed and yelled, right?

18           **MS. GRAGEL:**        Objection.

19   **BY MR. CAMPBELL:**

20   **Q.**    Right?

21           **MR. FELDMAN:**        You may answer.

22           **MS. GRAGEL:**        He's misstating the

23   testimony, Mr. Arbitrator.  The record will show

24   that.

25           **MR. FELDMAN:**        He may answer.  You

R000839

397

1    may answer the question.  Do you understand the

2    question?

3              THE WITNESS:      I would not -- I

4    was not yelling.

5    BY MR. CAMPBELL:

6    Q.    I thought we just went through that you

7    admitted that you did raise your voice.

8    A.    Okay, that's not yelling.

9    Q.    So raising your voice is different?

10   A.    I raised my voice.

11   Q.    So to correct my statement, you talked to

12   the manager after calling her a thief, cussing,

13   raising your voice for over two minutes,

14   correct?

15   A.    I don't think we were there for two minutes

16   talking to -- I was talking to the manager.  If

17   I remember, I shook the manager's hand when he

18   walked over so it wasn't me and him having this

19   big altercation.

20   Q.    You didn't shake his hand when you left,

21   did you?

22   A.    No.

23   Q.    You pointed at him?

24   A.    Yes.

25   Q.    Said "This is bullshit," right?

R000840

398

1    **A.**    Uh-huh.

2    **Q.**    And walked out?

3    **A.**    Yes.

4    **Q.**    Now, you've been a steward for all these

5    years, right?

6    **A.**    Yes.

7    **Q.**    Continued to work on sites where your

8    conduct has to be at the highest level.  The

9    Institute of Art is quiet, people are in there

10   looking at art.  It's not a place to yell and

11   cuss and raise your voice, right?

12   **A.**    Yes.

13   **Q.**    You understood that when you're on a

14   site -- as they say, when you're in Rome, you do

15   as the Romans do.  When you're at UH or at the

16   Institute of Art, you've got to conform your

17   behavior to that work site, correct?

18   **A.**    Yes.

19   **Q.**    And you understand that over your three

20   years in the cafeteria -- how many years were

21   you in the cafeteria at UH?

22   **A.**    Roughly three.

23   **Q.**    Did you ever see anybody else over those

24   three years call a cashier a thief, raise their

25   voice and argue for two minutes about four

R000841

399

1    dollars?

2    **A.**   I've seen people argue about money, yes.

3    **Q.**   You see them for two minutes saying

4    "bullshit" and yell?

5    **A.**   I don't pay attention.  I just walk away.

6    **Q.**   Was it your employees?  Were they laborers?

7    **A.**   No.

8    **Q.**   So you weren't involved?  You don't know if

9    they were kicked off or not?

10   **A.**   Yes, sir.

11   **Q.**   As we sit here with a high school coach, a

12   laborer, a foreman, a steward, you understood

13   that that conduct wasn't appropriate, didn't

14   you?

15   **A.**   You're making it sound like I was screaming

16   and yelling.  I just talked the way I usually

17   talked.  There was no inappropriate action.  I

18   didn't -- no.

19   **Q.**   So it's your testimony that for a

20   two-minute argument, raising your voice, calling

21   her a thief and cussing is appropriate behavior

22   for a work site?

23   **A.**   No, it's not.

24   **Q.**   So you're admitting here to the arbitrator

25   that your conduct was not appropriate?

R000842

400

1          **MS. GRAGEL:**       Objection.

2          **THE WITNESS:**       You're telling me I

3  was screaming and yelling and everything like

4  this.  You make it sound like I was being

5  aggressive.  I was not if you look at it.

6  BY MR. CAMPBELL:

7  Q.   Just so I'm clear, calling her a thief

8  several times, raising your voice, cussing and

9  arguing for over two minutes, is that

10 appropriate or not for a worker at UH?

11         **MS. GRAGEL:**       Objection.

12 Misstates the testimony.

13 BY MR. CAMPBELL:

14 Q.   Was your conduct appropriate that evening?

15         **MR. FELDMAN:**       I told you I'll

16 decide it.

17         **MR. CAMPBELL:**       If he admits that

18 it's not, I think that would be the end of this

19 arbitration.  I can't imagine that I can't ask

20 him the ultimate question as to it.

21         **MS. GRAGEL:**       Objection.  It's

22 not whether the conduct is appropriate or

23 inappropriate, it's whether it's dischargeable.

24         **MR. FELDMAN:**       Next question.

25

R000843

401

1   BY MR. CAMPBELL:

2   Q.   Sir, as a steward -- and we've talked about

3   the Lerner household, you understood you had to

4   conform your behavior to the work site that

5   you're on, correct?

6   A.   Yes.

7   Q.   And if you violated it -- I'm not asking

8   you to admit that you violated it, but if you

9   violated what was expected of you, you could be

10  excluded from the work site, correct?

11           MS. GRAGEL:        Objection.

12           MR. FELDMAN:       You can answer.  Do

13  you understand the question?  If not, please

14  restate it.

15           MR. CAMPBELL:      I'll restate.

16  BY MR. CAMPBELL:

17  Q.   You understood if you were on the Lerner

18  household and you started yelling and screaming

19  and Mrs. Lerner said, "I don't want him here,"

20  that that would be appropriate for her to kick

21  you off the site, right?

22  A.   Yes.

23  Q.   No different than at UH.  If you didn't

24  conform your behavior -- I'm not asking you to

25  admit it, but you understand that if you didn't

R000844

402

1    conform your behavior to what's expected of UH

2    visitors, employees, patients and their

3    relatives, that you could be excluded from the

4    UH campus, correct?

5           MS. GRAGEL:      Objection.  That's

6    the ultimate issue for the arbitrator, whether

7    that behavior, where it falls on the scale, is

8    dischargeable or not.

9           MR. CAMPBELL:      Their whole

10   argument is that he somehow didn't know this.

11   If they didn't place that --

12          MR. FELDMAN:      I'll have to decide

13   whether he knew it or not from the evidence in

14   the record.

15          MR. CAMPBELL:      But I can't ask him

16   did he know and he says yes?

17          MR. FELDMAN:      He says he doesn't

18   know it.

19          MR. CAMPBELL:      No, he doesn't say

20   that.

21          MR. FELDMAN:      He said he didn't

22   see the rules before working on --

23          MR. CAMPBELL:      I'll lay a

24   foundation so we can get to it.  I think we've

25   gone through it all.

R000845

403

1              MR. FELDMAN:      You don't have to

2   lay a foundation on cross-examination.  But to

3   ask him the ultimate question that I have to

4   decide is something I'm not prepared to take as

5   part of the evidence in this case.

6              MR. CAMPBELL:      If the grievant

7   says to you, "Mr. Arbitrator, I knew what's

8   expected of me, and, yes, I could be excluded,"

9   I think that would be --

10              MR. FELDMAN:      I've taken notes on

11   that.

12   BY MR. CAMPBELL:

13   Q.  Have you ever been disciplined for arguing

14   or violence in your time as a laborer?

15   A.  No.

16   Q.  Ever been excluded from any other work

17   sites --

18   A.  No.

19   Q.  -- due to behavior?

20   A.  No.

21   Q.  Have some of your laborers been excluded

22   from work sites due to their behavior?

23              MR. FELDMAN:      To the best of your

24   knowledge.

25              THE WITNESS:      To the best of my

R000846

404

1  knowledge, no.

2  **BY MR. CAMPBELL:**

3  **Q.**  Over your 20 years, no laborer has ever

4  been excluded?

5  **A.**  Not to the best of my knowledge.  There

6  could have been a couple, but I don't --

7  **Q.**  Could have been?

8  **A.**  Could have been.

9  **Q.**  But as a steward, you understood that if

10  your -- if your laborers violated the customs,

11  the work rules, the practices of the owner's

12  site, that they could be excluded, correct?

13  **A.**  Yes.

14          **MR. CAMPBELL:**    No further

15  questions.

16          **MR. FELDMAN:**    Anything further of

17  this witness?

18          **MS. GRAGEL:**    Just a moment.

19          We have no questions.

20          **MR. FELDMAN:**    Let's take a

21  ten-minute recess.

22          (Thereupon, a recess was taken.)

23                  ANTOIN ELEY

24  of lawful age, a witness herein, having been

25  first duly sworn, was examined and testified as

R000847

405

1  follows:

2          MR. FELDMAN:      You have to talk

3  loud and clear because everything you say is

4  being taken down stenographically.

5          THE WITNESS:      A-n-t-o-i-n

6  E-l-e-y.

7          MR. FELDMAN:      Do you understand

8  that you're under oath?

9          THE WITNESS:      Yes.

10          MR. FELDMAN:      You're going to be

11  asked questions by Ms. Gragel and the attorney

12  for the respondent, the hospital.  Do you

13  understand?

14          THE WITNESS:      Yes.

15          MR. FELDMAN:      You may inquire.

16              DIRECT EXAMINATION

17  BY MS. GRAGEL:

18  Q.    What is your occupation?

19  A.    Laborer.

20  Q.    How long have you done that kind of work?

21  A.    Ten years.

22  Q.    Could you keep your voice up a little bit?

23  A.    Ten years.

24  Q.    Are you a member of Laborers Local 310?

25  A.    Yes.

R000848

406

1  Q.   How long have you been a member of the

2  union?

3  A.   For ten years.

4  Q.   Were you hired to work at University

5  Hospitals Neonatal Intensive Care project?

6  A.   Yes.

7  Q.   About when were you hired, sir?

8  A.   About January 7th or 8th.

9  Q.   Of 2009?

10  A.   Yes.

11  Q.   On which contract of payroll were you

12  assigned?

13  A.   Mark Rivera.

14  Q.   Which contractor issued you your paychecks?

15  A.   Rivera Construction.

16       MR. FELDMAN:     Rivera?

17       THE WITNESS:     Yes.

18  BY MS. GRAGEL:

19  Q.   Who directed your work at the workplace?

20  A.   Ozanne and Gilbane.

21  Q.   Did Rivera Construction have any

22  supervision on the workplace?

23  A.   I'm not sure who was -- their supervision,

24  no.

25  Q.   What shift were you assigned to work?

R000849

407

1    **A.**    Second shift.

2    **Q.**    Did you work with Mike Harting?

3    **A.**    Yes.

4    **Q.**    How many other laborers were in your second

5    shift crew?

6    **A.**    Four.  Other than -- two more with us, so

7    four.

8    **Q.**    Do you remember the names of the other crew

9    members?

10   **A.**    Yes.

11   **Q.**    Who were they?

12   **A.**    Mark and Brandon.

13   **Q.**    Where did your crew take their breaks?

14   **A.**    Either in the break room or the lunchroom.

15                **MR. FELDMAN:**      Break room -- what

16   was the second half of that?

17                **THE WITNESS:**      Break room or the

18   cafeteria.

19   **BY MS. GRAGEL:**

20   **Q.**    Did you take breaks with Mr. Harting?

21   **A.**    Yes.

22   **Q.**    What kind of food or beverage did you see

23   him purchase on breaks?

24   **A.**    He'd get like chips and water.

25   **Q.**    During the time that you worked at the job

R000850

408

1    in the first part of January, where was the

2    break room?

3    A.   In our work area.

4    Q.   And that would have been on the NICU

5    grounds?

6    A.   On the NICU grounds, yes.

7    Q.   Was it demo'd?

8    A.   Yes.

9    Q.   Was it demo'd while Mr. Harting was still

10   working on the site?

11   A.   Yes.

12   Q.   When your crew went to eat dinner in the

13   cafeteria, did you see other tradesmen there?

14   A.   Yes.

15   Q.   Carpenters?

16   A.   Yes.

17   Q.   Did you receive any instructions before

18   January 27, 2009 to refrain from eating in the

19   cafeteria?

20   A.   No.

21   Q.   Do you know, sir, that this incident that

22   led to the arbitration here took place on or

23   around January 27, 2009?

24   A.   Yes.

25   Q.   I'd like to have you look at that time.

R000851

409

1   Do you remember going to the cafeteria for

2   dinner with Mr. Harting on January 27th?

3   **A.**   Yes.

4   **Q.**   Who went through the line first?

5   **A.**   I did.

6   **Q.**   Where did you go to sit down?

7   **A.**   A few tables back from the exit where you

8   pay for your dinner.

9   **Q.**   I'm going to hand you, sir, what's been

10  marked as Union Exhibit 4 which are photographs

11  of the cafeteria.  The first page has the mark

12  in the upper left corner, 19 seconds.  Do you

13  see that, sir?

14  **A.**   Yes.

15  **Q.**   Would you hold that up for the arbitrator

16  and show where you remember going to sit?

17  **A.**   Probably was like a few tables back from

18  these tables.  (Indicating.)

19             **MR. FELDMAN:**      Off the picture?

20             **THE WITNESS:**      Yes, off the

21  picture.

22  BY MS. GRAGEL:

23  **Q.**   Did you see Mr. Harting as he came through

24  the line?

25  **A.**   Yes.

R000852

410

1  Q.   As he was coming through the line, did you

2  hear him say anything to anybody?

3  A.   No.

4  Q.   When he came to the table, was he carrying

5  food?

6  A.   Yes.

7  Q.   How did he appear?

8  A.   Just like a normal day.  He came and sat

9  down.

10  Q.   Did he say anything about what had happened

11  in the cafeteria line?

12  A.   He said there was a dispute about his

13  change and sat down.

14  Q.   When he told you about that, did he use any

15  racially derogatory terms?

16  A.   No.

17  Q.   Did you hear him use the "N" word?

18  A.   No.

19  Q.   Did he use any profanity when he told you

20  about the change situation?

21  A.   No.

22  Q.   Did you stay in the cafeteria for the rest

23  of the dinner break?

24  A.   Yes.

25  Q.   Did anyone come to the table to talk to

R000853

411

1    Mr. Harting that you remember?

2    **A.**    No.

3    **Q.**    After January 27th, 2009, did anyone from

4    University Hospitals ask to speak with you about

5    what you saw or heard or remembered from January

6    27?

7    **A.**    No.

8    **Q.**    Did anyone from Gilbane Construction come

9    and ask you to describe what took place on

10   January 27th?

11   **A.**    No.

12   **Q.**    During the time that you worked at the

13   University Hospitals NICU project between early

14   January and January 29th, 30th, that time frame,

15   did you work closely with Mr. Harting?

16   **A.**    Yes.

17   **Q.**    Did you work with him every day?

18   **A.**    Yes.

19   **Q.**    Did you work with him in the same work

20   areas?

21   **A.**    Yes.

22   **Q.**    How did he conduct himself?

23   **A.**    Like a gentleman.  We worked together side

24   by side.  We never had any problems.

25   **Q.**    Did he make any racially discriminatory or

R000854

412

1    harassing remarks in your presence?

2    A.    No.

3    Q.    Did you continue to work at the workplace

4    after Mr. Harting was removed from the job site?

5    A.    Yes.

6    Q.    About how long did you keep working at the

7    University Hospitals NICU project?

8    A.    A few more months after January.

9    Q.    Did you work straight time and overtime?

10   A.    Yes.

11   Q.    Before we came into the room here today,

12   did you have a chance to look with me at Union

13   Exhibit 5?

14   A.    Yes.

15   Q.    Does Union Exhibit 5, sir, match the pay

16   that you received for the hours that you worked

17   at the job site in January, February and March,

18   2009?

19   A.    Yes.

20              MS. GRAGEL:        I have nothing

21   further.

22              MR. FELDMAN:        Thank you.  You may

23   inquire.

24                   CROSS-EXAMINATION

25

R000855

413

1   **BY MR. CAMPBELL:**

2   **Q.**   Mr. Eley, when did your work at the NICU

3   unit end?

4   **A.**   Beginning of -- first of June, I think.

5   **Q.**   The first of June you were laid off?

6   **A.**   Yes.

7   **Q.**   Where are you working now?

8   **A.**   That might have been May.  It was May.

9   **Q.**   The first of May?

10  **A.**   Yeah, I was working until May.

11  **Q.**   So you worked --

12  **A.**   All the way through until May.

13  **Q.**   How many laborers -- did you continue to

14  work that same shift?

15  **A.**   No.

16  **Q.**   What shift did you move to?

17  **A.**   First.

18  **Q.**   When did you move from that third shift?

19  **A.**   I'm not sure exactly when it was, but it

20  was maybe the last two months.

21  **Q.**   The last two months?

22  **A.**   Yes.

23  **Q.**   If the first week of May you left, then

24  we're talking about really --

25  **A.**   Maybe like April and May.

R000856