# Appendix Exhibit 10

# Respondent's Arbitration Brief 8-14-2009

R000982-R001411

### BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| Building & Construction Laborers Local Union No. 310, | : |
| | : |
| | : Case No. 53 300 E 00098 09 |
| Claimant, | : |
| | : Arbitrator Marvin J. Feldman, Esq. |
| v. | : |
| | : Case Manager: Carolyn T. Bridges |
| University Hospitals Health Systems, Inc., *et al.*, | : |
| | : |
| | : |
| Respondents. | : |

### <u>POST-HEARING ARBITRATION BRIEF OF RESPONDENTS, UNIVERSITY HOSPITALS HEALTH SYSTEMS, INC. AND GILBANE CONSTRUCTION, INC.</u>

R000982

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| Building & Construction Laborers Local Union No. 310, | : | Case No. 53 300 E 00098 09 |
| | : | |
| | : | Arbitrator Marvin J. Feldman, Esq. |
| Claimant, | : | |
| | : | Case Manager: Carolyn T. Bridges |
| v. | : | |
| | : | **POST-HEARING ARBITRATION** |
| University Hospitals Health Systems, Inc., | : | **BRIEF OF RESPONDENTS,** |
| *et al.*, | : | **UNIVERSITY HOSPITALS HEALTH** |
| | : | **SYSTEMS, INC. AND GILBANE** |
| Respondents. | : | **CONSTRUCTION, INC.** |

## I.     INTRODUCTION

This arbitration arises out of the exclusion of Michael J. Harting ("Harting") from Respondent University Hospitals Health Systems, Inc.'s ("UHHS") property.   It is undisputed that Harting was never employed by UHHS.   Accordingly, this is ***not*** an arbitration regarding a just cause discharge.

Rather, Harting was employed by a third-party contractor who was on UHHS' property performing construction services.   Harting was excluded from UHHS' property after UHHS learned that Harting, while in a prohibited area of its property, berated an employee of UHHS, accused her of theft in front of others, cussed at the her, and used a racial slur toward her.   Harting's yelling and inappropriate conduct continued for several minutes and the accusations of theft were voiced to several individuals over the course of this altercation.   As Harting's conduct was inappropriate for visitors to UHHS' property, he was excluded from the property, as would any other visitor.   At the arbitration, although he denied using a racial slur, Harting admitted to yelling, cussing, and calling the employee a thief.

Harting is a member of Claimant Building & Construction Laborers Local Union No. 310 ("Local 310").  Harting performed services on the UHHS' construction project as an employee of Rivera Construction ("Rivera").  Rivera is not a party to this arbitration, and no representative from Rivera testified at the hearing.  However, Harting's employment with Rivera was governed by a collective bargaining agreement between Rivera and Local 310.  Notwithstanding, Harting did not file a grievance under the Local 310 agreement after Rivera ceased employing him for work on the UHHS' worksite.  Instead, Local 310 filed this demand for expedited arbitration under a Project Labor (the "PLA") entered into by and between UHHS and the Cleveland Building and Construction Trades Council (the "Council").  The Council is not a party to this arbitration, did not employ Harting, and no representatives from the Council testified at the arbitration hearing.[1]

Respondent Gilbane Construction, Inc. ("Gilbane") (Gilbane and UHHS are collectively referred to herein as "Respondents") is UHHS' Construction Manager for the construction projects governed by the PLA.  Gilbane is not a party to the PLA and did not employ Harting.  Rather, Gilbane merely communicated UHHS' decision to exclude Harting to Local 310, Harting, and Rivera.

Paragraph 7 of the PLA requires that the construction project be completed pursuant to UHHS' policies and procedures, including UHHS' Code of Conduct.  Harting admitted that he was required to act professionally while on UHHS' property and that he was held to the same behavior standards as other visitors on UHHS' property.  Harting's admitted misconduct is inconsistent with UHHS' policies and procedures.  Moreover, any

---

[1] On day two of the hearing on the merits, Local 310 sought to amend its demand for arbitration to include the Council as a claimant.  This motion was denied.

2

R000984

reasonable business or property owner would have the right to exclude any individual based solely on the conduct admitted to by Harting. Accordingly, Harting was properly excluded from UHHS' property, and the grievance should be denied in its entirety.

## II.   RESPONDENTS ARE PROCEEDING WITH RESERVATIONS

Respondents continue to object to this arbitration under the PLA on the grounds that this matter is not arbitrable, and, therefore, Respondents submit this brief while reserving the issue of arbitrability for the federal court pursuant to Cleveland Elec. Illuminating Co. v. Utility Workers Union of Amer., 440 F.3d 809 (6th Cir. 2006) ("CEI").[2]  In CEI, the Sixth Circuit Court of Appeals held that a party reserves its objection to an issue when it submits to arbitration with reservation as to that issue. CEI, 440 F.3d at 813-14.

In this matter, Respondents have raised their objection to the issue of arbitrability, thus reserving the issue. Specifically, Respondents have objected to arbitrability: 1) in their Motion to Dismiss; 2) in their Answer to the demand for arbitration; 3) in their federal complaint seeking to enjoin this hearing; 4) verbally at each of the arbitration hearings; and 5) again, in this Arbitration Brief. (See Motion to Dismiss; Tr. 59-61; and Respondent's Federal Court Complaint ("Complaint") (attached hereto as Exhibit C.).) In line with CEI, the Arbitrator also held that Respondents have not waived the issue of arbitrability in this matter because that issue has been reserved from the outset of this arbitration. (Arbitration Transcript (hereinafter, "Tr.") 62 ("Ms. Gragel, there's been no waiver here. The employer has presented the issue of arbitrability ever since we sat down for the first time. [A]s far as I'm concerned, they've not waived anything in that regard

---

[2] All cited cases are attached hereto as Exhibit A.

3

R000985

by going forward.").)[3]

Thus, because Respondents have raised reservations as to the issue of arbitrability pursuant to CEI, Respondents have reserved their objection to the issue of arbitrability and continue to do so with the filing of this brief.

## III.   ARBITRATION ISSUE

Due to the divergent positions of the parties regarding the PLA, an issue could not be agreed upon.  Respondents assert that the arbitration issue is narrow.  Specifically, Local 310 and Harting do not dispute that Harting violated UHHS' policies and procedures.  To the contrary, Local 310 asserts that UHHS surrendered its rights to exclude union employees from the worksite by executing the PLA and allegedly granting this right to the management of the construction companies.  Accordingly, Respondents frame the arbitration issue as follows:  Do Respondents the right to exclude union employees from UHHS' property for violation of UHHS' policies and procedures?

## IV.   FACTUAL BACKGROUND

### A.   The Project Labor Agreement

On December 1, 2007, UHHS and the Council entered into the PLA.  (Tr. Joint Ex. 1.)  The PLA governs the Vision 2010 construction project, a large construction project designed to enhance UHHS' position as a premier healthcare provider.  (Tr. Joint Ex. 1.)  Paragraph 7 of the PLA sets forth the primary goals of the PLA:

> The purpose of this Agreement is to ensure the timely construction in a
> cost-efficient and quality manner of the Covered Projects so that UH can
> retain its premier position among healthcare providers in the United States
> of America and to achieve the construction of the Covered Projects in a
> cooperative arrangement with the Unions, and *in accordance with UH's
> policies and procedures, as may be amended from time to time and UH's
> Code of Conduct, as may be amended from time to time (collectively, the*

---

[3] All cited pages of the Arbitration Transcript are attached hereto as Exhibit B.

R000986

> *"UH Requirements").* In order to achieve this objective of critical importance to the Parties and the overall community, this Agreement is intended to provide and guarantee the efficient, cost effective, and uninterrupted construction of the Covered Projects.

(Tr. Joint Ex. 1) (emphasis added.)

Gilbane is not a party to the PLA. (See id.) Rather, Gilbane is UHHS' Construction Manager for the construction projects, and is charged with enforcing the terms of the PLA on UHHS' behalf. (Id. at 77, Joint Ex. 1.) Pursuant to its obligations under the PLA, Gilbane's Safety Plan (the "GSP") is applicable to the construction projects and imposes additional obligations on the union employees regarding workplace conduct. (See Id. at Joint Ex. 1, Attachment D; Respondent's Exhibit 1.) Specifically, the GSP directs employees on UHHS' worksite to "observe standards of behavior and conduct their work in a manner to avoid offending any owner, employees or visitors. Each individual on [the] project must be given the courtesy that would be extended to one's family or best friend." (Tr. 81, Joint Ex 1 at Attachment D.) Moreover, all union employees, including Harting, are required to attend training before being issued UHHS employee badges. (Id. 79-81.) This training includes the following statements regarding workplace conduct: union employees will "conduct [themselves] in a professional manner and not engage in any violence, horseplay, practical jokes or other behavior obnoxious to the general public" and not "harass anyone else on site or any member of the public . . . ." (Id. at Respondent's Ex. 1.)

Two provisions of the PLA are applicable to demands for arbitration. Although not a party to the PLA, Local 310 has filed its demand for arbitration against UHHS and Gilbane pursuant to Paragraph 26. The two applicable paragraphs provide:

25.   If a *worker has any grievance about the terms and/or application*

5

*of this Agreement* which are not covered by other provisions of this Agreement relating to dispute resolution, then such dispute shall be handled under the procedures set forth in the *applicable collective bargaining agreements.*

26.     Furthermore, *if the Parties to this Agreement have any disagreements over interpretation or application of this Agreement* (including on-site compliance), the aggrieved party shall have the right to process such dispute under the expedited settlement and arbitration procedures of the American Arbitration Association (except where judicial action is specifically provided for in Paragraph 23 or any other provision of this Agreement).

(Tr. at Joint Ex. 1) (emphasis added.)

Local 310 asserts that UHHS and Gilbane violated Paragraph 29 of the PLA by excluding Harting from UHHS' property. (Id. at 319.) Paragraph 29 provides:

29.     UH and the Contractors retain full and exclusive authority for the management of their operations and have no obligation to bargain over the exercise of their management rights.  Except as expressly limited by the provisions of this Agreement, the Contractors have the exclusive right to direct their working forces, including but not limited to the rights to select and utilize the means, methods, techniques, procedures and tools and materials for construction, and to hire, schedule, select supervision and tradesmen, promote, transfer, lay off, discharge, and make and enforce work rules for employees.  No rules, customs or practices shall be permitted or observed which in any way limit the selection or use of materials and equipment.

(Id. at Joint Ex. 1.)  The term "Contractors" is defined on page one of the PLA to include Gilbane, UHHS' Construction Manager.  (Id. at Joint Ex. 1.)  Specifically, the PLA states: "WHEREAS, UH has agreed to incorporate this Agreement as an exhibit to all agreements (unless specifically excepted herein) among UH, its construction managers and/or trade contractors on the Covered Projects ("Contractors")." (Tr. at Joint Ex. 1.)

Consistent with Paragraph 26 of the PLA, which directs worker grievances to the collective bargaining agreements governing the worker's employment, the PLA does not contain any just cause disciplinary provisions.  (Id. at Joint Ex. 1.)  Accordingly, unless

6

R000988

asserting a breach of the Local 310 collective bargaining agreement, which the Demand does not, Local 310 has no contractual basis for a just cause disciplinary requirement imposed on either Gilbane or UHHS.  (Id. at Joint Ex. 1.)

**B.    Harting's Involvement in the Construction Project**

Harting is a member of Local 310.  (Id. at 326.)  During his career as a laborer and member of Local 310, Harting has held the positions of union steward and foreman. (Tr. 327-28.)  In these positions, Harting received training and admitted that he fully understood his responsibilities while on the worksite.  (Id. at 361-62.)  In fact, while working on the UHHS' construction project during the time relevant to this arbitration, Harting held the position of union steward.  (Id. at 379.)

Harting admits that he was instructed by Local 310 to act like a "gentleman" and be "nice to people" when working on an owner's property.  (Id. at 125, 330.)  Most importantly, Harting admitted that he fully understood that, while on UHHS' property, he was required to abide by UHHS' rules and regulations just like any other visitor to UHHS' property.  (Tr. 124.)  Harting also admitted that he understood that visitors who violated UHHS' rules and regulations could be excluded from UHHS' property.  (Id. at 368.)

Further, Harting admitted that he is familiar with Local 310's collective bargaining agreement.  (Id. at 378-79.)  And, most relevant to this arbitration, Local 310's collective bargaining agreement incorporates the rules and regulations that an owner of a construction project selects to follow:

> It is expressly understood that working rules, by-laws, conditions, practices or customs, unless same or specifically mentioned in this agreement, shall be interpreted as being a part hereof.

R000989

(Id. at 380-81, Respondent's Ex. 7.) Harting elaborated that a laborers' on-site conduct is driven by the owner and used his experiences working at a personal residence and a museum as examples of locations at which additional obligations were imposed upon him by an owner. (Tr. 328-30, 396, 404.) Michael J. Ferritto, another Local 310 steward, agreed with Harting, testifying that each job has its own rules and regulations and that the Local 310 agreement incorporates these different rules. (Id. at 443-44.)

Two other Local 310 members testified at the hearing. (Id. at 405-48.) Michael J. Ferritto testified that Local 310 members are expected to act like "gentlemen" and that the owner of a project has the right to exclude a laborer from the worksite. (Id. at 440, 445.) Similarly, Antoin Eley confirmed the same understanding as to the level of his expected behavior with Local 310 and the owner's right to exclude him from the worksite. (Tr. 427.)

One of the construction projects governed by the PLA is UHHS' Rainbow Neonatal Intensive Care Unit ("NICU"). (Id. at Joint Ex. 1 at Attachment A.) Harting was a construction worker on the NICU Project. (Id. at 24.) Harting was first assigned to the NICU Project on January 7, 2009. (Id. at 332.) Harting's employer while on the NICU project was Rivera. (Tr. 120.) Neither Gilbane nor UHHS ever employed Harting. (Id. at 24, 76, and 120.) At all times during his employment with Rivera, Harting admits that his employment was governed by the Local 310 collective bargaining agreement. (Id. at 124.)

C.    **UHHS' Policies And Procedures**

As with Local 310's collective bargaining agreement, Paragraph 7 of the PLA required Harting and other Local 310 members to comply with UHHS' policies and

8

procedures.  (Tr. at Joint Ex. 1.)  Sue Peplowski, a UHHS Human Resources Manager, testified to the relevant portions of UHHS' policies and procedures.  (Id. at 244-53.) Peplowski also investigated Harting's misconduct and concluded that his conduct violated UHHS' policies and procedures and that exclusion from UHHS' property was consistent with UHHS' core values, policies, and procedures.  (Id. at 254.)

Peplowski also introduced the following UHHS' policies and procedures:  (1) Respondents Exhibit 4 – Anti-Harassment and Non-Discrimination Policy; (2) Respondents 5 – Workplace Violence Policy; and (3) Respondents 6 – Code of Conduct. (Id. at 244-53.)  These policies are consistent with Harting's understanding of his obligations while on an owner's property and the safety training provided by Gilbane, i.e., to act like a gentleman and treat others like they were your friend or family member. (Tr. 244-53 and 267-68.)

It should also be noted that diversity, equal opportunities and a discrimination-free work environment are core UHHS' values.  (Id. at 252.)  The PLA assisted UHHS in satisfying these core values and this was a major reason why UHHS elected to enter into the PLA.  (Id. at 274.)

UHHS' policies and procedures are available to all individuals visiting UHHS property.  (Id. at 256.)  In addition, the policies and procedures were readily available to Local 310, but Local 310 never requested copies.  (Tr. 270, 283.)

**D.     The January 27, 2009 Incident**

Harting had only been on the UHHS' worksite for a total of twenty days when the altercation that led to his exclusion took place.  (Id. at 332.)  On January 27, 2009, Harting was working the second shift at the NICU project.  (Id. at 332.)  The incident

9

R000991

occurred while Harting was on break.  (Tr. 332.)  UHHS' rules prohibited the union construction workers from using UHHS' cafeteria.  (Id. at 88, 278.)  However, despite being a union steward, Harting and his fellow union employees regularly bought and ate lunch in the main UHHS' cafeteria.  (Id. at 332.)

The main UHHS cafeteria is large and busy.  (Id. at 242.)  The cafeteria connects many UHHS buildings, and, therefore, it is a high traffic area for employees, patients, families, visitors and children.  (Tr. 242.)  In fact, one of the main hospitals attached to the cafeteria is the children's hospital.  (Id.)

On the evening in question, Latisha Hanson was operating a cash register in the cafeteria.  (Id. at 143-45.)  Hanson is an employee of UHHS.  (Id. at 137.)  Hanson had been a cashier at the UHHS main cafeteria for approximately eight months at the time of the incident.  (Id. at 137-38.)  In addition to her employment with UHHS, Hanson has been an evangelistic minister for two-and-a-half years for the Springfield Missionary Baptist Church in Cleveland, Ohio.  (Tr. 189.)

Between 7-8 p.m., Harting entered Hanson's line to pay for his food selection.  (Id. at 144, 192.)  Harting's food selection cost approximately $5.80.  (Id. at 335.)  Hanson testified that Harting gave her $6, a five and a one-dollar bill, and she gave him 20 cents in change.  (Id. at 144.)  Wrongly believing that Hanson had shorted him $4.00, Harting proceeded to accost Hanson for over two-and-one-half minutes.  (Tr. 144-45, 385.)  Specifically, Hanson testified to the following facts:

> And [Harting] said to me, "I gave you ten dollars."
> And I went, "No, sir, you gave me six dollars."
> He went, "I gave you [fucking] ten."
> I said, "No, sir."
> He was like, "you're going to give me my [fucking] money."
> ***

R000992

So because he was kind of leaning and he looked very angry, I said to him,
"I see I'm going to have get my manager."
And he said, "That's right, you go get your fucking manager."

(Id. at 144-45.)

Hanson also testified that she felt physically threatened by Harting's conduct, and, at this point, Hanson then signaled her manager, Andrew Powel, who was already approaching to speak to Harting. (Id. at 187-88, 145.) Upon Powel's arrival at Hanson's line, Hanson attempted to explain to Powel what the problem was, but Harting continued to loudly rant and rave over her. (Id. at 145.) Harting swore at Powel, stating "this is bullshit," "she's a fucking thief and she's not going to take my fucking money," and "you're going to give me my mother-fucking money." (Tr. 146.) Seeking to satiate Harting and avoid a public conflict, Powel stated to Harting, "sir, we're going to look at the cameras, and if the cameras show that she was wrong, I'll most gladly give you [your money] back." (Id. at 146.) At that point, Powel then escorted Harting out of line, so that he would not cause further disturbance and so Hanson could resume her work at the cash register. (Id.)

In addition to calling Hanson a "fucking thief," Hanson stated that Harting used the racial epithet "nigger" toward her several times. (Id. at 145.) Specifically, Hanson testified that Harting called her a "thieving nigger" and stated "that "nigger ain't going to get my money." (Tr. 145.) All of these events are described in Hanson's detailed statement recounting the January 27, 2009 event. (See id. at 143, Respondent's Ex. 2.) And that statement, entered in as Respondent's Exhibit 2, is consistent with Hanson's above-cited testimony at the hearing and her earlier recitations of the January 27, 2009

11

R000993

events to Sodexho managers David Hawk and Heather Dougherty McDonnell.  (See id. at

206, 208, Respondent's Ex. 2.)

Although Harting denies using a racial slur, Harting's admissions are significant

and demonstrate the need to exclude him from UHHS' property.  Specifically, Harting

admitted:

> Q.  You freely called her a thief in front of all those people [in the cafeteria]?
> A.  Yes.
> Q.  You cussed?
> A.  Yes.
> ***
> Q.  And you can be intimidating?
> A.  Yes.
> ***
> Q.  You raised your voice?
> A.  Yes.
> ***
> Q.  Did you ever in the conversation use the phrase "bullshit"?
> A.  Yes, I did.  I said, "This is bullshit."

(Tr. 128-29.)

While Harting's description of the events of January 27, 2009 paints him as

cordial and calm, video of the incident taken from a surveillance camera shows Harting

aggressively pointing at Powel and "glaring" at him.  (Id. at Union Ex. 4.)

As to the amount of money that Harting provided to Hanson, Harting testified that

he has a strict $10 dollar per day budget, which he used to buy food and drinks while at

work at the NICU Project.  (Id. at 376.)  While at work at the NICU Project, Harting had

both a "coffee break" and a lunch break, and, when he took his coffee break, he

sometimes purchased coffee or a snack.  (Id. at 376.)  While Harting testified that he gave

Hanson two five-dollar bills to pay for his $5.80 lunch on January 27, 2009, he also

stated that he *could* have purchased coffee on that day, leaving him with less than two

12

R000994

five-dollar bills. (Tr. 336, 376.) Harting even acknowledged Hanson's change would have been correct if he had purchased coffee on his "coffee break." (Id. at 376.) Antoin Eley corroborates that Harting regularly purchased coffee on his breaks and could have purchased coffee on his break on January 27, 2009. (Id. at 417.) Both of these gentlemen's testimony is corroborated by David Hawk's testimony that security camera footage of the incident revealed that Harting was given the correct change because he gave Hanson a five dollar bill and a one-dollar bill.

On January 29, 2009, Harting again entered the UHHS cafeteria to purchase his lunch and again visited Hanson's cashier's line. (Id. at 192.) At that time, Powel intercepted Harting before he could speak to Hanson, and, despite the fact that Hanson's drawer did not contain extra money on January 27, 2009 and the surveillance video showed that Harting had been given correct change, Powel presented Harting with a meal ticket. (Tr. 162.) When pressed, Powel stated to Hanson that he provided the meal ticket to Harting to "keep the peace." (Id. at 194.)

Following the January 27 and 29, 2009 incidents, Hanson continued to feel physically threatened, embarrassed, and offended by Harting's harassing conduct. (Id. at 187-88.) Sadly, based on the lasting impression Harting's conduct left on Hanson, Hanson testified that she and her husband decided that, if Harting were allowed to return to the UHHS cafeteria, Hanson would have to resign from her employment with UHHS. (Id. at 188.)

### E.    UHHS' Investigation of the January 27, 2009 Incident

Following Harting's second visit to Hanson's line on January 29, 2009, Heather Dougherty McDonnell, Retail Manager for the cafeteria and Sodexho employee, found

13

Hanson crying in the back of the cafeteria.[4] (Tr. 227.) Concerned, McDonnell pulled Hanson into her office and asked her what was bothering her. (Id.) Hanson recounted to McDonnell the incident of January 27, 2009, and how Harting had sworn at her, intimidated her, and called her a "nigger" and a "fucking thief." (Id. at 228.) Hanson stated that she was offended that Powel had just provided Harting with a meal ticket because Hanson had done nothing wrong. Id. at 164, 168.) Hanson further stated that she was frightened that Harting had come back because she felt physically threatened by Harting. (Id. at 168.) Unaware of the seriousness of the January 27, 2009 incident before this time, McDonnell asked Hanson to make a written statement per UHHS' and Sodexho's standard operating procedure for when a visitor is abusive to an employee. (Tr. 229.)

McDonnell then contacted Sue Peplowski, UHHS' Human Resources Manager, and Peplowski indicated that McDonnell should prepare witness statements for the individuals involved in the January 27, 2009 incident. (Id. at 251.) Peplowski also instructed McDonnell to obtain any photographs of Harting so that he could be identified, as the employees knew him only to be a construction worker. (Id. at 256.) McDonnell then sought out the security footage found in Union Exs. 4 and 6, and, through still photos taken from those videos, UHHS' construction manager was able to identify Harting. (Id. at 256; see also Tr. at Union Exs. 4-6.) At this time, McDonnell also spoke with Dan Ballard, Sodexho Operations Manager, as well as the rest of the Sodexho managers. (Tr. 232.)

---

[4] On January 27, 2009, McDonnell was also asked by Powel to observe Powel's interaction with Harting in case the situation "escalated," but did not witness the entire exchange between Harting and Hanson. (Tr. 224.)

14

After being informed of the January 27, 2009 incident by McDonnell, David Hawk, another Retail Manager for Sodexho in the UHHS cafeteria, immediately reviewed the surveillance video from a camera located immediately above Hanson's register. (Id. at 202.) From that video, Hawk was able to verify that Harting was given the correct change on January 27, 2009. (Id.) Hawk then interviewed Hanson. (Id. at 205.) Consistent with her written statement and her testimony at the arbitration, Hanson described the January 27, 2009 incident and told Hawk that Harting made her feel threatened and uncomfortable. (Tr. 206.) Hawk then interviewed Powel, who told him that Harting made him feel uncomfortable and that Harting kept saying "this is bullshit." (Id. at 207.)  Hawk also interviewed Executive Chef John Rivera, who could only corroborate that Harting yelled "bullshit" at Powel several times. (Id. at 208.) Based on his interviews, Hawk felt that the managers and employees of the UHHS cafeteria did not feel safe with Harting, and he sought permission from Sue Peplowski to exclude Harting. (Id.)

Based on the information provided by Hawk and McDonnell, Peplowski then determined that Harting had violated several UHHS policies and procedures and the UHHS Code of Conduct, by his inappropriate and unprofessional conduct, threats to a UHHS employee, and use of a racial slur. (Tr. 254.) While most of Harting's conduct was enough to exclude him from UHHS property, UHHS has a zero tolerance policy for racial slurs. (Id. at 245-46.) Based on this, Peplowski sent the material from her investigation to Margaret Hewitt, UHHS' Vice President of Construction, and recommended to Hewitt that Harting be excluded from UHHS property immediately. (Id. at 256.)  Hewitt reviewed the investigation material and determined that Harting's

15

R000997

conduct was disrespectful, intimidating, and threatening and that Harting's use of racial epithet was unacceptable.  (Id. at 278.)  Hewitt determined that Harting should be excluded and instructed Gilbane to that effect. (Tr. 277.)

After receiving verification that Harting was to be excluded, Hawk then approached Harting on January 30, 2009 in the cafeteria and told Harting that he was no longer to enter the UHHS cafeteria.  (Id. at 213.)  At that time, Harting stated to Hawk that Hanson was a "fucking thief" but left without other incident. (Id. at 212-13.)

### F.    Harting's Post-Rivera Employment

Following his exclusion from the UHHS' worksite, Harting did not file a grievance under the Local 310 collective bargaining agreement which governed his employment with Rivera. (Id. at 25.)  Following the exclusion, Harting admits that his Local 310 seniority was not impacted and he was free to be assigned to any other Local 310 worksite.  (Tr. 120.)  Harting also admitted that his rate of pay is determined by the Local 310 agreement so that his pay is the same regardless of the Local 310 worksite. (Id. at 121.)

Five-to-six weeks following his exclusion from the NICU project, Harting began working in March 2009. (Id. at 121, 358-59.)  Harting then worked at the Perry Nuclear Power Plant for four-to-five weeks.  (Id. at 121.)  Six weeks after he ceased working at Perry, Harting then worked for roughly six weeks at the Cleveland Institute of Art until about July 1, 2009.  (Tr. 122, 360.)

Importantly, the second shift of laborers at the NICU project, the shift on which Harting worked, ended in March 2009.  (Id. at 414.)  At that time, some of the Local 310 laborers were switched to different shifts but some were simply laid off.  (Id. at 414.)

16

R000998

## V.   LAW AND ANALYSIS

### A.   Respondent's Position

As the owner of the construction project, UHHS retained the right to exclude union employees who violate UHHS' policies and procedures. In fact, Paragraph 7 of the PLA explicitly requires the construction to be completed in accordance with UHHS' policies and procedures.

Local 310's collective bargaining agreement and member testimony confirms this position. The collective bargaining agreement incorporates the rules and regulations for each construction project, including the UHHS' construction project. Consistent with the collective bargaining agreement, the Local 310 members, including the grievant, testified that they understood their obligation to act as gentlemen on the worksite, their obligation to comply with the rules and regulations of the property owner, and the owner's right to exclude them from the property for violating these rules and regulations.

In this matter, Harting's conduct violated UHHS' policies and procedures. UHHS' investigation revealed that Harting used a racial slur, was threatening to a UHHS employee, yelled at the employee, called the employee a thief, and loudly cussed in the main UHHS cafeteria. Harting admits to all of this misconduct but the racial slur. This conduct violates UHHS' policies and procedures, and Harting was properly excluded from UHHS' property. Indeed, any reasonable property and/or property owner would have the right to exclude an individual engaging in the conduct to which Harting admitted. Accordingly, the grievance should be denied in its entirety.

### B.   Local 310 Bears the Burden of Proof.

Local 310's demand for arbitration arises under Paragraph 26 of the PLA. This

17

provision specifically refers to disputes regarding interpretation or application of the PLA:

> 26.    Furthermore, if the Parties to this Agreement *have any disagreements over interpretation or application of this Agreement* (including on-site compliance), the aggrieved party shall have the right to process such dispute under the expedited settlement and arbitration procedures of the American Arbitration Association (except where judicial action is specifically provided for in Paragraph 23 or any other provision of this Agreement).

(Tr. Joint Ex. 1) (emphasis added.)

Based on Paragraph 26, Local 310 cannot dispute that its grievance is one of contract interpretation.   Specifically, Local 310 asserts that Respondents violated Paragraph 29 of the PLA, the management rights' provision, by excluding Harting from the worksite. (See Demand for Arbitration.)

It is well-established that in matters of contract interpretation, the burden to establish a breach of the contract is on the moving party. Caelum Research Corp., 125 LA (BNA) 541, 2008 WL 4182845 (2008);  City of Phoenix, Arizona, 124 LA (BNA) 1729, 2008 WL 2390504 (2008); Corning Inc., 122 LA (BNA) 194, 2008 WL 2390504 (2006).[5] The standards for contract interpretation were recently set forth by Arbitrator Rosen as follows:

> In contract interpretation/enforcement actions, it is a well[-]recognized principle of labor arbitration that clear and unambiguous collective bargaining agreement language is the best evidence of the parties' intentions as to what they agreed upon. Such express language is to be enforced by its precise terms and common meaning to maintain the integrity of the parties' intended agreement, even if one party finds the result somehow contrary to its expectations. Only where the applicable provision language is unclear or ambiguous, it is generally accepted that extrinsic evidence, including negotiating history, and past practice, if any, may be relied upon to determine the parties' intent. In addition, words and phrases are rarely interpreted alone. To give force and effect to the entire

---

[5] All cited cases attached hereto as Exhibit A.

R001000

agreement, disputed language must be interpreted in context with its section, article, and in harmony with the Agreement as a whole.

Columbus Show Case Co., 126 LA (BNA) 600, 2009 WL 1693975 (2009). This Arbitrator set forth a similar standard in Staco Energy Prods. Co., 107 LA (BNA) 212, 1996 WL 611650, at*4 (1996) ("There is no doubt that this is a draconian section of the contract but an arbitrator cannot brandish his own industrial justice and determine a matter on language that he likes or create new language if he doesn't like the language of the written contract").

### B.    UHHS Has the Right to Exclude Visitors from Its Property.

One cannot dispute the fact that property rights are an essential part of the United States Constitution. NLRB v. Windemuller Elec., Inc., 34 F.3d 384, 394 (6th Cir. 1994). A license is a privilege given to an individual to do an act upon the land of another without possessing any interest therein and is usually terminable at the will of the licensor. Cambridge Village Condo. Ass'n. v. Cambridge Condo. Ass'n., 139 Ohio App.3d 328, 333 (Ohio App. 11th Dist. 2000). "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." Bresnik v. Beulay Park Ltd. P'ship, 67 Ohio St.3d 302, 303 (1993); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982). At common law, private proprietors are entitled to exercise this right, and can admit or exclude whomever they please so long as such exclusions are not in violation of other law. Id. at 304. Thus, Ohio law allows an owner to revoke an invitee's privilege to remain on the property simply by providing reasonable notification to leave. Marcus v. Revco Discount Drug Ctrs., Inc., No. 66090, 1994 WL 449672, at *2 (Ohio App. 8th Dist. Aug. 18, 1994).

R001001

A business invitee is an individual who enters the property of another by invitation for a purpose beneficial to the property owner. Light v. Ohio Univ., 28 Ohio St.3d 66, 68 (1986) ("Business invitees are persons who come upon the premises of another, by invitation, express or implied, for some purpose which is beneficial to the owner"). In the construction setting, an Ohio court has held that a construction worker on an owner's construction site is a business invitee of the property owner. Dramble v. Marc W. Lawrence Building Corp., Nos. 2001CA00332, 2001CA00337, 2002 WL 31027073 (Ohio Ct. App. 5th Dist. Sept. 10, 2002).

In this matter, as a construction worker invited by UHHS onto UHHS property to perform construction services for the benefit of UHHS, Harting was a business invitee. As with other invitees, Ohio law provides that an owner may revoke a business invitee's license to enter the owner's property. State v. Carriker, 5 Ohio App.2d 255 (1964).

The PLA does not alter UHHS' common law right to exclude business invitees from its property. To the contrary, Paragraph 7 of the PLA explicitly incorporates UHHS' policies and procedures, including UHHS' Code of Conduct. (Tr. at Joint Ex. 1) (the construction projects must be completed "in accordance with UH's policies and procedures, as may be amended from time to time and UH's Code of Conduct, as may be amended from time to time.") Moreover, the PLA does *not* contain a just cause provision. Rather, pursuant to the plain terms of the PLA, UHHS retains the right to revoke the license granted to union employees to enter UHHS' property if UHHS determines that the union employee has violated UHHS' policies and procedures, including UHHS' Code of Conduct.

The Local 310 collective bargaining agreement and the testimony of the three

R001002

Local 310 union members is consistent with the PLA.  The Local 310 collective bargaining agreement explicitly incorporates UHHS' policies and procedures into Harting's employment relationship with Rivera:

> It is expressly understood that working rules, by-laws, conditions, practices or customs, unless same or specifically mentioned in this agreement, shall be interpreted as being a part hereof.

(Tr. at Respondent's Ex. 7, 380-381).  Notably, this Arbitrator has held that publication through a collective bargaining agreement is constructive publication to all union employees. Staco Energy Prod. Co., 107 LA (BNA) 212, 1996 WL 611650, at *3 (1996) ("There is no doubt that the publication to the bargaining unit was made at the time the bargaining unit voted on the agreement").

The testimony of Harting, a Local 310 union steward, and Harting's union brothers further confirms UHHS' right to exclude Local 310 employees from the worksite.  Specifically, Michael J. Ferritto, a Local 310 union steward, testified that each job has its own rules and regulations and that the Local 310 contract incorporates these different rules.  (Tr. at 443-44.)  Ferritto further testified that Local 310 members are expected to act like "gentlemen," and that the owner of a project has the right to exclude a laborer from the worksite.  (Tr. at 440, 445.)  Similarly, Antoin Eley confirmed the same understanding as to the level of his expected behavior with Local 310 and the owner's right to exclude him from the worksite.  (Tr. at 427.)  Most importantly, Harting admitted that he was required to act like a "gentleman," be "nice to people," and to abide by UHHS' rules and regulations when on UHHS' property.  (Tr. at 124, 125, and 330.)

Therefore, based on the plain language of the PLA, the Local 310 collective bargaining agreement, and the testimony of the Local 310 employees, including Harting,

R001003

it cannot be disputed that Harting was required to abide by UHHS' policies and procedures when on UHHS' property and that his failure to abide by these policies and procedures permitted UHHS to lawfully exclude Harting from the worksite. UHHS, just as any other reasonable business or property owner, had the right to exclude Harting based solely on his admitted to conduct, and, therefore, this grievance should be denied *in toto*.

### C.   Arbitral Authority Also Supports UHHS' Property Rights.

Two arbitration decisions highlight a property owner's absolute right to exclude union employees of a business invitee from an owner's worksite. Burns Int'l Sec. Servs., 98 LA (BNA) 226, 1991 WL 331013 (1991); Fru-Con Corp., 78 LA (BNA) 424, 1982 WL 30907 (1982). Both the Burns and Fru-Con decisions support the conclusion that Harting's grievance, if any were filed, should have been directed to his employer, not the property owner.

In Burns, the grievant was a security guard employed by a security company that provided security services at a nuclear plant. Burns, 98 LA (BNA) 226, at *2. The union employee at issue fell asleep on the job for no more than "four or five minutes." Id. When the owner learned of the union employee's inattentiveness, the owner excluded the union employee from the worksite. Id. The union employee then filed a grievance against his employer, and an arbitrator held that he was not discharged for just cause. Id. The owner, however, refused to reinstate the union employee because it deemed the inattentiveness a safety concern. Id. Although ordering reinstatement, the arbitrator did not order backpay despite the fact that the arbitrator firmly understood the employer's inability to return the union employee to the worksite resulting in his unpaid leave of

22

R001004

absence. Id. at *2.

Similarly, in Fru-Con, the arbitrator found that a union employee was barred from entering an owner's property through no fault of his own. Fru-Con, 78 LA (BNA) 424, at *4. In fact, the arbitrator found that the owner and general contractor "arbitrarily and without good cause" excluded the grievant from the worksite. Id. at *5. In addition, although the employer sought to return the union employee to the worksite, the owner refused to permit the union employee onsite. Id. at *4. The issue for the arbitrator was whether the union employee's employer was responsible for backpay. Id. at *4. The arbitrator set forth the arbitral authority permitting an employer to discharge a union employee who has become *persona non grata* to a customer when that customer has a good-faith basis for exclusion of a grievant from its premises. Fru-Con, 78 LA (BNA) 424, at *5. However, in Fru-Con, the issue was an employer's liability when the owner's *persona non grata* conclusion was not made in good faith. Id. at **5-6. Therefore, the arbitrator held that the employer was responsible for backpay and that it had an obligation to affirmatively seek reinstatement of the union employee.[6] Id. at **6-7.

Like Fru-Con, this case is a *persona non grata* case in a wrongful discharge case's clothing. In a typical *persona non grata* case:

> [T]he employee necessarily performs some or all of the task associated with his or her job on the premises of a third party, the third party becomes disenchanted with the employee for reasons that may or may not constitute "just cause" for disciplinary action under the labor agreement, and the third party then bars the employee from its premise.

UGL UNICCO, 126 LA (BNA) 474, 2008 WL 6150848, at **8-9 (2008). Such is the exact factual scenario in this matter.

---

[6] Based on this arbitral authority, it is obvious that Local 310 does not have a remedy through this arbitration. Rather, any remedy available to Harting is through his employer and this Arbitrator should direct Harting to file a grievance under the Local 310 collective bargaining agreement.

23

R001005

In cases like this one, arbitrators have dealt with *persona non grata* cases by determining whether or not the banning of an employee from a customer's premises was made in good faith. Id. This case is akin to the "good faith" variety of *persona non grata* case. See Rebar Eng'g, Inc., 105 LA (BNA) 662, 1995 WL 17007367 (1995) (absent testimony of collusion on the part of the third-party and employer, an employee was properly terminated by his employer after he was excluded by a third-party in good faith for his belligerent and uncooperative on-site conduct); United Tel. Co. of Florida, 1992 WL 726466 (1992); Harris Trucking Co., 80 LA (BNA) 496, 1983 WL 29965 (1983) (exclusion of an employee due to his on-site disruption at a customer's property); but see UGL UNICCO, 126 LA (BNA) 474, 2008 WL 6150848 (banning an employee from a third-party's facility based on the mere unsupported assertion that he has a bad attitude, and thus effectively terminating him from his job is not good faith).

In this matter, as discussed below, UHHS had a good-faith and valid reason for excluding Harting from the worksite, i.e., his misconduct in the UHHS cafeteria. Arbitral authority makes clear that Harting's grievance, if any, is properly filed against his employer, not the owner of the property.[7] This arbitral authority procedure is also required under Paragraph 25 of the PLA:

> 25.     If a ***worker has any grievance about the terms and/or application of this Agreement*** which are not covered by other provisions of this Agreement relating to dispute resolution, then such dispute shall be handled under the procedures set forth in the applicable collective bargaining agreements.

(Tr. at Joint Ex. 1) (emphasis added); see also Rebar Eng'g, Inc., 105 LA (BNA) 662, 1995 WL 17007367 (1995) (explaining that "the Union has no collective bargaining

---

[7] Indeed, this assertion is bolstered by the fact that in all of the arbitral authority located dealing with the *persona non grata* issue, the claims were brought against the grievant's employer and not the third-party.

R001006

relationship with the [third-party] general contractor and therefore the only relief they are able to seek in this forum is against the Company [with which it has a collective bargaining agreement].")]

### D. UHHS Has Good Faith and Valid Reasons for Excluding Harting.

Unlike the owner in Fru-Con, UHHS had good-faith and valid reasons for excluding Harting from its property. Namely, UHHS' investigation revealed that its employee felt threatened and that she believed Harting used a racial slur. Moreover, the investigation revealed that: the altercation lasted several minutes; Harting yelled during the altercation; Harting was in a prohibited area; Harting openly referred to the employee as a thief; and Harting cussed during the altercation. Harting admits to all of this misconduct except for the racial slur.

The only testimony on UHHS' policies and procedures was presented by UHHS. This testimony confirms that Harting violated UHHS' policies and procedures and that he was treated identically to any other individual. Moreover, Harting admitted that he understood that he was required to act as a "gentleman" while on UHHS' property, and it is obvious that his admitted misconduct, in an open and busy cafeteria, was anything but gentlemanly. Accordingly, it cannot be disputed that UHHS has just and good faith grounds for excluding Harting.

### E. Local 310's Contract Argument is Frivolous.

The only arguments presented by Local 310 are that Harting was unfamiliar with UHHS' policies and procedures and that UHHS waived its right to exclude Harting from the worksite. Both arguments are legally and factually flawed.

As to knowledge of UHHS' policies and procedures, all of the Local 310

25

R001007

employees testified that they understood their obligations while on an owner's property and the owner's right to exclude them from the property.  In addition, Gilbane's representatives testified to the on-site training that is provided to union employees and the materials that are given to the union employees.  Next, the Local 310 collective bargaining agreement expressly incorporates the owner's rules and regulations, and Harting admitted that his conduct had to be calibrated according to each worksite. Finally, as this arbitrator has found, the fact that these obligations were set forth in the Local 310 collective bargaining agreement and the PLA provided constructive notice to the Local 310 employees, including Harting.  Staco Energy Prods. Co., 107 LA (BNA) 212, 1996 WL 611650, at *3 (1996) ("There is no doubt that the publication to the bargaining unit was made at the time the bargaining unit voted on the agreement.").

The waiver argument is similarly flawed.  Local 310's claimed waiver is based upon Paragraph 29 of the PLA:

> 29.    UH and the Contractors retain full and exclusive authority for the management of their operations and have no obligation to bargain over the exercise of their management rights.  Except as expressly limited by the provisions of this Agreement, the Contractors have the exclusive right to direct their working forces, including but not limited to the rights to select and utilize the means, methods, techniques, procedures and tools and materials for construction, and to hire, schedule, select supervision and tradesmen, promote, transfer, lay off, discharge, and make and enforce work rules for employees.  No rules, customs or practices shall be permitted or observed which in any way limit the selection or use of materials and equipment.

(Tr. at Joint Ex. 1.)

Local 310 claims that this paragraph waives UHHS' right to exclude any and all union employees from its worksites.  However, the initial sentence explicitly provides that UHHS retains full and exclusive authority for management of its operations.  Setting

26

R001008

forth rules of conduct for the cafeteria is the management of UHHS' operations.  In fact, if this arbitrator were to permit Harting to engage in such misconduct and be returned to the worksite, UHHS would be placed in the untenable position of being unable to protect its employees, visitors, and patients from misconduct directed toward them from union employees.  Needless to say, Ohio law will not grant UHHS a pass if the next union employee physically harms another individual.

In addition, the term "Contractors" is defined on page one of the PLA.  (Id.)  The term is defined to include Gilbane, UHHS' Construction Manager: "WHEREAS, UH has agreed to incorporate this Agreement as an exhibit to all agreements (unless specifically excepted herein) among UH, its construction managers and/or trade contractors on the Covered Projects ("Contractors")."  (Id.)  In this matter, UHHS directed Gilbane to exclude Harting from the worksite.  The plain language of Paragraph 29 provides Gilbane with this right under Local 310's reading.  Accordingly, by acting through its construction manager, UHHS and Gilbane firmly complied with the PLA.

## VI.  CONCLUSION

Based on the foregoing arguments and authorities, Harting was permissibly excluded from UHHS' property and, therefore, the grievance should be denied in all respects.

Respectfully submitted,

David A. Campbell (0066494)
Charles F. Billington III (0083143)
Vorys, Sater, Seymour and Pease LLP
2100 One Cleveland Center
1375 East Ninth Street
Cleveland, Ohio 44114-1724

R001009

Phone (216) 479-6100
Fax: (216) 479-6060
Email: dacampbell@vorys.com
      cfbillington@vorys.com

*Attorneys for Respondents*

R001010

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing

*Post-Hearing Arbitration Brief of Respondents University Hospitals Health Systems, Inc.*

*and Gilbane Building Construction, Inc.* has been served regular U.S. Mail, this 14th day

of August, 2009, upon the following:

Marvin J. Feldman, Esq.
1104 The Superior Bldg.
815 Superior Avenue N.E.
Cleveland, OH  44114

*One of the Attorneys for*
*Respondents University*
*Hospitals Health System, Inc.*
*and Gilbane Building Company*

29

R001011

Westlaw.

440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152 Lab.Cas. P 10,633, 2006 Fed.App. 0092P
**(Cite as: 440 F.3d 809)**

▷

United States Court of Appeals,
Sixth Circuit.
THE CLEVELAND ELECTRIC ILLUMINATING
COMPANY; FirstEnergy Nuclear Operating Company; FirstEnergy Generation Corporation,
Plaintiffs-Appellees/Cross-Appellants,
v.
UTILITY WORKERS UNION OF AMERICA,
Local 270, Defendant-Appellant/Cross-Appellee.
**Nos. 04-3566, 04-3567.**

Argued: June 10, 2005.
Decided and Filed: March 14, 2006.
Rehearing Denied May 11, 2006.

**Background:** Employer brought action to vacate
arbitrators' decision that union's grievance regarding retiree health benefits was arbitrable. The
United States District Court for the Northern District of Ohio, John M. Manos, J., upheld arbitrators'
decision but required retirees' consent as condition
of union representation, and parties appealed.

**Holdings:** The Court of Appeals, Jordan, District
Judge, held that:
(1) employer waived the issue of whether court or
arbitrators had power to decide arbitrability of
grievance;
(2) issue of the retirees' health benefits was presumptively arbitrable under collective bargaining
agreement (CBA);
(3) union had standing to represent interests of retirees when it filed grievance; and
(4) union was required to obtain consent of retirees
before taking grievance to arbitration.

Affirmed.

West Headnotes

**[1] Labor and Employment 231H ☞ 1549(4)**

231H Labor and Employment
   231HXII Labor Relations
     231HXII(H) Alternative Dispute Resolution
      231HXII(H)3 Arbitration Agreements
       231Hk1543 Construction and Operation
       231Hk1549 Matters Subject to Arbitration Under Agreement
        231Hk1549(4) k. Arbitrability.
Most Cited Cases
If the parties to a collective bargaining agreement
(CBA) have agreed to allow the arbitrator to decide
arbitrability, the district court should give considerable leeway to the arbitrator, setting aside his or her
decision only in certain narrow circumstances; on
the other hand, if the parties did not agree to submit
the arbitrability question to the arbitrator, then the
district court conducts an independent review.

**[2] Labor and Employment 231H ☞ 1604**

231H Labor and Employment
   231HXII Labor Relations
     231HXII(H) Alternative Dispute Resolution
      231HXII(H)5 Judicial Review and Enforcement
       231Hk1603 Decisions Reviewable or
Enforceable
       231Hk1604 k. In General. Most
Cited Cases
Employer waived the issue of whether court or arbitrators had power to decide arbitrability of retirees' grievance regarding employer's change in
health benefits by submitting the matter to arbitration without reservation; employer submitted the
question of arbitrability to the arbitrator for his determination, without indicating that it wanted to reserve the question of arbitrability for the court.

**[3] Labor and Employment 231H ☞ 1549(4)**

231H Labor and Employment



EXHIBIT
A

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152 Lab.Cas. P 10,633, 2006 Fed.App. 0092P
**(Cite as: 440 F.3d 809)**

231HXII Labor Relations
   231HXII(H) Alternative Dispute Resolution
      231HXII(H)3 Arbitration Agreements
         231Hk1543 Construction and Operation
            231Hk1549 Matters Subject to Arbitration Under Agreement
               231Hk1549(4) k. Arbitrability.
Most Cited Cases
Although a court is usually the proper venue for decisions about arbitrability, if the parties to a collective bargaining agreement (CBA) clearly and unmistakably submit the issue to the arbitrator without reservation, then the parties have waived their right to have a court make the decision.

**[4] Labor and Employment 231H** 1623(1)

231H Labor and Employment
   231HXII Labor Relations
      231HXII(H) Alternative Dispute Resolution
         231HXII(H)5 Judicial Review and Enforcement
         231Hk1618 Scope of Inquiry
            231Hk1623 Interpretation of Collective Bargaining Agreement
               231Hk1623(1) k. In General.
Most Cited Cases
Arbitrator's decision resolving labor dispute will not be disturbed unless it fails to draw its essence from the collective bargaining agreement (CBA).

**[5] Labor and Employment 231H** 1549(12)

231H Labor and Employment
   231HXII Labor Relations
      231HXII(H) Alternative Dispute Resolution
         231HXII(H)3 Arbitration Agreements
            231Hk1543 Construction and Operation
            231Hk1549 Matters Subject to Arbitration Under Agreement
               231Hk1549(12) k. Pensions and Other Benefits. Most Cited Cases

Issue of the retirees' health benefits was presumptively arbitrable under collective bargaining agreement (CBA), where CBA's arbitration clause provided for arbitration of any controversy involving CBA's interpretation, and parties contracted for retiree health benefits in the CBA. Labor-Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[6] Labor and Employment 231H** 1549(12)

231H Labor and Employment
   231HXII Labor Relations
      231HXII(H) Alternative Dispute Resolution
         231HXII(H)3 Arbitration Agreements
            231Hk1543 Construction and Operation
            231Hk1549 Matters Subject to Arbitration Under Agreement
               231Hk1549(12) k. Pensions and Other Benefits. Most Cited Cases
Presumption of arbitrability applies to disputes over retirees' benefits if the parties have contracted for such benefits in their collective bargaining agreement (CBA) and if there is nothing in the agreement that specifically excludes the dispute from arbitration. Labor-Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[7] Labor and Employment 231H** 1564

231H Labor and Employment
   231HXII Labor Relations
      231HXII(H) Alternative Dispute Resolution
         231HXII(H)4 Proceedings
         231Hk1559 Grievance Proceedings
            231Hk1564 k. Parties. Most Cited Cases
Union had standing to represent interests of retirees when it filed grievance over retiree health benefits, although other remedies were available to retirees, such as filing action against employer for breach of contract. Labor-Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152 Lab.Cas. P 10,633, 2006 Fed.App. 0092P
**(Cite as: 440 F.3d 809)**

**[8] Labor and Employment 231H ⟜ 1549(12)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
           231HXII(H)3 Arbitration Agreements
                231Hk1543 Construction and Operation
                231Hk1549 Matters Subject to Arbitration Under Agreement
                231Hk1549(12) k. Pensions and Other Benefits. Most Cited Cases

Union was required to obtain consent of retirees before taking grievance over retiree health benefits to arbitration; retirees risked losing their rights to pursue their claims directly with employer if union obtained unfavorable arbitration decision, and union could have been faced with numerous retirees' claims and lawsuits if determination was made that union was not authorized to act on retirees' behalf.
**\*810 ARGUED:** Emily A. Tidball, Goldstein & O'Connor, Cleveland, Ohio, for Appellant. Gary W. Spring, Roetzel & Andress, Akron, Ohio, for Appellees. **ON BRIEF:** Emily A. Tidball, Bryan P. O'Connor, Goldstein & O'Connor, Cleveland, Ohio, for Appellant. Gary W. Spring, Roetzel & Andress, Akron, Ohio, for Appellees.

Before: NORRIS and DAUGHTREY, Circuit Judges; JORDAN, District Judge.<sup>FN\*</sup>

    FN\* The Honorable Leon Jordan, Senior United States District Judge for the Eastern District of Tennessee, sitting by designation.

#### \*811 OPINION

LEON JORDAN, District Judge.

The Cleveland Electric Illuminating Company,

FirstEnergy Nuclear Operating Company, and FirstEnergy Generation Corporation, the plaintiffs in this case, appeal the district court's enforcement of the arbitrator's determination that the grievance filed by defendant Utility Workers Union of America, Local 270, on behalf of retirees was arbitrable. The defendant cross-appeals the portion of the district court's ruling requiring the retirees' consent as a condition of representation. For the reasons that follow, we affirm the district court's opinion.

#### I. BACKGROUND

On December 2, 2002, the defendant, Utility Workers Union of America, Local 270 ("Union"), filed a grievance on behalf of its members and retirees against the plaintiffs, Cleveland Electric Illuminating Company, FirstEnergy Nuclear Operating Company, and FirstEnergy Generation Corporation (collectively "Cleveland Electric"), alleging that Cleveland Electric's decision to make changes in health benefits was a violation of the collective bargaining agreement ("CBA"). The grievance states: "The Company unilaterally and without bargaining changed the health care provisions and providers including but not limited to Preferred Provider Organizations, Prescription Coverage, Traditional Plans, and Health Maintenance Organizations for both active and retired members." The complaint proceeded through the CBA's grievance steps to arbitration with Cleveland Electric contending all along the way that the Union's grievance was not arbitrable with respect to the retirees because they were not employees covered by the CBA.

The parties submitted the issue of arbitrability to the arbitrator for his consideration, and he determined that the Union was not required to represent the retirees or to bargain on their behalf because the retirees were not members of the Union.<sup>FN1</sup> But, since the Union and Cleveland Electric agreed to include retirees' benefits in the CBA, the Union had standing to seek arbitration on behalf of the retirees

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152 Lab.Cas. P 10,633, 2006 Fed.App. 0092P
(Cite as: 440 F.3d 809)

for benefits that were included in the CBA. Importantly, at arbitration, Cleveland Electric did not argue that the arbitrator had no authority to decide the issue of arbitrability. Rather, Cleveland Electric's argument focused solely on the arbitrability of the retirees' health benefits.

> FN1. At arbitration, the parties agreed to bifurcate and stay the active employees' grievance on this matter until the issue concerning the retirees' representation was settled.

Thereafter, pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, Cleveland Electric filed a complaint in federal court seeking to have the arbitrator's decision vacated. Cleveland Electric claimed that the arbitrator's ruling did not derive its essence from the CBA and was contrary to the CBA's express terms. Further, in its brief to the district court, Cleveland Electric questioned for the first time whether the arbitrator had authority to determine the arbitrability question. The district court found that the parties submitted the issue of arbitrability to the arbitrator "without reservation" and that Cleveland Electric thereby waived its right to have the issue decided by the court. On the issue of whether the retirees' dispute over the changes in their health care provisions was arbitrable, the district court upheld the arbitrator's decision that the Union could represent the retirees in arbitration, but disagreed with the arbitrator's determination that the retirees' consent was not necessary unless evidence submitted in arbitration demonstrated otherwise.*812 The district court found that the retirees, unlike the active employees, had individual contractual rights and that they could not be forced to arbitrate their grievance. The district court held that the retirees must consent to the Union's representation.

In its appeal, Cleveland Electric argues that the district court erred: (1) in finding that Cleveland Electric waived its right to have the court decide the is-

sue of arbitrability and (2) in upholding the arbitrator's decision on arbitrability. The Union appeals the portion of the district court's opinion requiring the Union to obtain the retirees' consent before proceeding to arbitration over the health benefits.

## II. ANALYSIS

### A. Standard of Review

A district court's decision that confirms or refuses to vacate an arbitration decision is reviewed under the same standards as other district court decisions. This court must accept the district court's findings of fact unless they are clearly erroneous, but questions of law are reviewed de novo. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 947-48, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); AK Steel Corp. v. United Steelworkers, 163 F.3d 403, 407 (6th Cir.1998).

### B. Arbitrability of the Retirees' Grievance

The framework considered by the Supreme Court in First Options is useful in separating the issues before this court. There are three issues present in this case: (1) the propriety of Cleveland Electric's changes to the health care provisions of the CBA (the merits of the dispute); (2) whether the Union can force Cleveland Electric to arbitrate the merits related to the retirees' benefits; and (3) who has the authority to decide the second matter. See First Options, 514 U.S. at 942, 115 S.Ct. 1920. Only the last two issues are before this court, and the last issue will be considered first.

#### 1. Who has the authority to decide arbitrability?

[1][2] The question of who, the court or the arbitrator, has the authority in a particular case to decide the arbitrability of a grievance determines the standard of review of the arbitrator's decision. If the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152 Lab.Cas. P 10,633, 2006 Fed.App. 0092P
**(Cite as: 440 F.3d 809)**

parties have agreed to allow the arbitrator to decide arbitrability, the district "court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." *Id.* at 943, 115 S.Ct. 1920. On the other hand, if the parties did not agree to submit the arbitrability question to the arbitrator, then the district court conducts an independent review. *Id.*

Cleveland Electric raised the issue of who should decide arbitrability for the first time in its brief to the district court. It argued that the arbitrator had no authority to determine arbitrability of the retirees' grievance and, therefore, that his decision is void *ab initio.* Citing cases from the Supreme Court and this court, Cleveland Electric asserts that the question of whether the parties agreed to arbitrate a certain matter is to be decided by the court, not the arbitrator. *See AT & T Techs. Inc. v. Commc'ns Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (reaffirming the principle that the court is to determine whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, on the basis of the parties' contract); *see also Armco Employees Indep. Fed'n v. AK Steel Corp.,* 252 F.3d 854, 859 (6th Cir.2001) (finding that courts determine substantive arbitrability).

The Union did not address this issue in the district court because it had not been \*813 raised before, and its brief was filed the same day as Cleveland Electric's brief. In its brief to this court, the Union agrees with the general statement of the law set out above but argues that the district court was correct in its conclusion that the parties "clearly and unmistakably consented to the arbitrator's jurisdiction on the issue" and waived the right to have the issue decided by the court.

[3] In *AT & T Technologies,* the Supreme Court referenced the "Steelworkers Trilogy," a series of cases decided in 1960,[FN2] and reiterated four principles for which these cases stand, one of which is that the question of arbitrability of a particular dis-

pute is a matter for judicial determination. *AT & T Techs.,* 475 U.S. at 649, 106 S.Ct. 1415. In this circuit, however, although a court is usually the proper venue for decisions about arbitrability, if the parties "clearly and unmistakably" submit the issue to the arbitrator "without reservation," then the parties have waived their right to have a court make the decision. *See Vic Wertz Distrib. Co. v. Teamsters Local 1038,* 898 F.2d 1136, 1140 (6th Cir.1990); *see also Interstate Brands Corp. v. Chauffeurs, Teamsters, Warehousemen & Helpers Local Union No. 135,* 909 F.2d 885, 890 (6th Cir.1990).

> FN2. The "Steelworkers Trilogy" cases are *Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

In *Interstate Brands,* the union filed a grievance related to the dismissal of one of its members. The company participated in the arbitration proceedings on the issue of arbitrability as well as the merits, but later complained that the issue of arbitrability was a question for the court. *Interstate Brands,* 909 F.2d at 890. The court, relying on *Vic Wertz,* held that an agreement to have the arbitrator decide the issue of arbitrability will be implied where the parties did not bring the issue to the district court in the first place. *Id.* Thus, the company waived its right to have the court decide the arbitrability question by participating in the arbitration proceedings. *Id.*

In *First Options,* a case cited by Cleveland Electric in support of its argument, the Supreme Court held that deference to an arbitrator's decision on arbitrability is not necessary unless there is evidence of a clear and unmistakable willingness to arbitrate the issue. *First Options,* 514 U.S. at 944, 115 S.Ct.



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152 Lab.Cas. P 10,633, 2006 Fed.App. 0092P
**(Cite as: 440 F.3d 809)**

1920. However, *First Options* did not involve a union or a collective bargaining agreement, so there was no underlying agreement between the parties providing for arbitration. The issue was whether private parties could be forced to arbitrate the issue of arbitrability just because they filed a brief with the arbitrator objecting to the arbitrator's jurisdiction. *Id.* at 946, 115 S.Ct. 1920. The Supreme Court found that the objecting party (the Kaplans) forcefully opposed the arbitrator deciding whether they had to arbitrate their dispute, and the arbitrator's ruling, therefore, was entitled to a court's independent review. *Id.* at 946-47, 115 S.Ct. 1920.

The circumstances in this case are more like those in *Interstate Brands* than *First Options*. Cleveland Electric submitted the question of arbitrability to the arbitrator for his determination, and we can find nothing in the record to indicate that Cleveland Electric wanted to reserve the question of arbitrability for the court. The district court found, and this court agrees, that Cleveland Electric waived the issue of who had the power to decide the arbitrability of the retirees' grievance by submitting **\*814** the matter to arbitration "without reservation."

### 2. Was the decision on arbitrability correct?

[4] The arbitrator found, and the district court agreed, that the issue of the retirees' health benefits was arbitrable. Based on this court's finding that the parties submitted the issue of arbitrability to the arbitrator, the arbitrator's decision is entitled to a deferential review. The arbitrator's decision will not be disturbed "unless it fails to 'draw its essence from the collective bargaining agreement.' " *Vic Wertz,* 898 F.2d at 1140 (quoting *Eberhard Foods, Inc. v. Handy,* 868 F.2d 890, 891 (6th Cir.1989)).

[5] Cleveland Electric argues that the district court erred in finding that the issue of the retirees' health benefits was arbitrable. Cleveland Electric contends that the presumption of arbitrability does not apply

to retirees, and without the presumption, the unambiguous language of the agreement excludes retiree disputes from the arbitration process. Further, the retirees have remedies in court that the members of the collective bargaining unit do not, so arbitration of disputes is not necessary.

In response, the Union argues that the presumption of arbitrability applies to the dispute in this case, because it was the Union not the retirees who filed the grievance and the dispute is actually between the Union and Cleveland Electric. Second, the Union argues that the dispute involves the interpretation or application of a provision of the CBA. The fact that the dispute relates to retirees' benefits is not the deciding factor. Third, the language of the CBA is broad enough to encompass the dispute concerning the retirees' benefits making the presumption of arbitrability particularly applicable. Finally, the Union argues that the retirees' other remedies do not bar arbitration.

In addition to the principle of judicial determination of arbitrability discussed above, the Steelworkers Trilogy also established a "presumption of arbitrability." *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). If the collective bargaining agreement contains an arbitration clause, the Supreme Court found that it should be presumed that the parties intended to arbitrate the dispute unless there is "positive assurance" that the arbitration clause does not cover the matter. *Id.* "[I]n cases involving broad arbitration clauses the Court has found the presumption of arbitrability 'particularly applicable,' and only an express provision excluding a particular grievance from arbitration or 'the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.' " *See United Steelworkers v. Mead Corp., Fine Paper Div.,* 21 F.3d 128, 131 (6th Cir.1994) (quoting *AT & T Techs.,* 475 U.S. at 650, 106 S.Ct. 1415).

This court has held that the presumption of arbit-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152 Lab.Cas. P 10,633, 2006 Fed.App. 0092P
**(Cite as: 440 F.3d 809)**

rability is particularly applicable where the arbitration clause provides for arbitration of any controversy involving the interpretation of the CBA. *See Commc'ns Workers v. Mich. Bell Tel. Co.,* 820 F.2d 189, 193 (6th Cir.1987); *see also Mead Corp.,* 21 F.3d at 132. In the agreement before this court, the parties clearly bargained for retirees' health benefits. The relevant provisions are found in Article X, section 3, of the CBA. The grievance procedures are set out in Article V of the CBA. Section 1 of Article V provides that "the following grievance procedure shall be used by the Union to settle or adjust any disagreement concerning the interpretation or application of this Agreement." There follows a set of procedures beginning with a grievance being filed and ending **\*815** with arbitration. Nothing in the CBA expressly excludes retirees' benefits from arbitration.

Cleveland Electric argues that the retirees are not part of the collective bargaining unit and that the grievance procedures do not apply to them. This argument is unavailing. In *Allied Chemical & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 159, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), the Supreme Court considered whether a midterm modification of retirees' insurance benefits was an unfair labor practice. The company sought to modify its contributions to the retirees' health benefits because Medicare was enacted. *Id.* at 161, 92 S.Ct. 383. The National Labor Relations Board found that the retirees' benefits were a mandatory subject of collective bargaining. *Id.* at 162, 92 S.Ct. 383. The Supreme Court held that the Board's decision was not supported by law; that the term "employee" does not include retired workers; that the retired workers are not employees included in the collective bargaining unit; and that retired workers' benefits are only a permissive subject of collective bargaining. *Id.* at 166-82, 92 S.Ct. 383. Nevertheless, the Supreme Court recognized that a union and company may agree to bargain for retirees' benefits, and once these bargained-for benefits are vested, retired workers may have contract rights under the collective bargaining agreement which they could enforce pursuant to § 301 of the Labor Management Relations Act if the benefits are changed. *Id.* at 181, 92 S.Ct. 383, n. 20.

In spite of the fact that retirees' benefits are not a mandatory subject of bargaining, several courts, including this one, have held that where a union and a company bargain for retirees' benefits and include the benefits in their contract, the union has standing to represent the retirees in any dispute concerning those benefits. For example, in *Michigan Bell,* we held that the presumption of arbitrability applied to a dispute over retirees' benefits brought by the union because the union and the employer were parties to the contract providing for arbitration. *Mich. Bell,* 820 F.2d at 192. We pointed out that the union's assertion of rights for parties outside the bargaining unit was not dispositive of the duty to arbitrate. *Id.; see also Int'l Union, (UAW) v. Yard-Man, Inc.,* 716 F.2d 1476, 1486 (6th Cir.1983) (noting that the union, as a signatory to the contract, could bring an action for third party beneficiary retirees because it has a direct interest in maintaining the integrity of the retiree benefits created by the collective bargaining agreement).

The Eighth Circuit's opinion in *Anderson v. Alpha Portland Industries, Inc.,* 752 F.2d 1293 (8th Cir.1985), was cited with approval in *Michigan Bell.* In *Alpha Portland,* the individual retirees were seeking enforcement of their rights in federal court, but the company objected arguing that the retirees had to exhaust the CBA's grievance procedures before filing suit in federal court under § 301. In arriving at its decision that the retirees did not have to exhaust the grievance procedures, the Eighth Circuit noted that the union would have had standing to represent the retirees rights under a collective bargaining agreement if it chose to do so, and an employer could not have refused to arbitrate its contractual obligations with the union. *Id.* at 1296.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152 Lab.Cas. P 10,633, 2006 Fed.App. 0092P
**(Cite as: 440 F.3d 809)**

The panel in *Yard-Man* relied on the Third Circuit's opinion in *United Steelworkers v. Canron, Inc.,* 580 F.2d 77 (3d Cir.1978). In *Canron,* the Third Circuit considered a dispute over retirees' benefits brought by the union against the employer and noted that the employer was not required to bargain with the union over benefits of retired employees of its *816 predecessor company. But, when a company contracts with the union to underwrite the premium costs of retirees' benefits, "the union has a legitimate interest in protecting the rights of the retirees and is entitled to seek enforcement of the applicable contract provisions." *Id.* at 80-81. The *Canron* court held that the union had standing to represent the retirees in seeking arbitration under its labor contract with the employer and stated that the arbitrability of the dispute was not to be "calculated by the status of the grievants but by the nature and duties of the obligations of the parties under the contract." *Id.* at 80-82.

Cleveland Electric relies on *Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984), to support its argument that the presumption of arbitrability does not apply in this case. In *Schneider,* the trustees of an employees' benefit trust fund brought suit against two companies who were parties to a multi-employer trust fund and who had not made the contributions to the fund as required by the trust agreement, as incorporated into the terms of the applicable collective bargaining agreement. The union was not involved in the case. The Supreme Court rejected the presumption of arbitrability because nothing in the trust agreement or the collective bargaining agreements evidenced an intent by the parties to require exhaustion of the arbitration remedies set out in the collective bargaining agreements. *Id.* at 372, 104 S.Ct. 1844. Nevertheless, the Court recognized that "[t]he presumption of arbitrability is, of course, generally applicable to any disputes between the union and the employer." *Id.* at 372, 104 S.Ct. 1844, n. 14. The obvious distinction between *Schneider* and the case before this court is that in *Schneider* it was the trustees who were seeking to enforce trust agreements, not the union seeking to enforce provisions of collective bargaining agreements.

[6] We find that the presumption of arbitrability applies to disputes over retirees' benefits if the parties have contracted for such benefits in their collective bargaining agreement and if there is nothing in the agreement that specifically excludes the dispute from arbitration. Thus, unless there is "forceful evidence of a purpose to exclude the claim from arbitration," the arbitrator's determination in this case that the dispute is arbitrable must stand.

[7] Cleveland Electric argues that the retirees have other remedies that the active employees do not, such as the right to file a § 301 action against the company. *See, e.g., Pittsburgh Plate,* 404 U.S. at 182, 92 S.Ct. 383, n. 20 ("The retiree, moreover, would have a federal remedy under § 301 ... for breach of contract if his benefits were unilaterally changed."); *Yard-Man,* 716 F.2d at 1485 (stating that "[e]ach retiree has an undisputable and effective remedy against the employer for a breach of contract under § 301(a)"). The fact that the retirees have an alternative remedy, however, does not preclude the Union from undertaking to represent the retirees' interests. We recognized as much in *Yard-Man,* when we found that the union would have standing to bring suit on behalf of the retirees to enforce their bargained-for benefits because the union had a "direct interest in maintaining the integrity of the retiree benefits created by the collective bargaining agreement," notwithstanding the fact that the retirees may choose to deal with the company on their own. *Yard-Man,* 716 F.2d at 1486-87.

We find that the arbitrator's decision "drew its essence from the CBA." Therefore, in the absence of any forceful evidence of a purpose to exclude the dispute over the retirees' benefits from arbitration, we affirm the district court's adoption of the arbit-



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

R001019

440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152 Lab.Cas. P 10,633, 2006 Fed.App. 0092P
**(Cite as: 440 F.3d 809)**

rator's decision as to the arbitrability of the dispute.

**\*817 C. Consent of the Retirees to Union Representation**

[8] The Union has cross-appealed the district court's decision to require the Union to obtain the consent of the retirees before taking the grievance to arbitration. The Union argues that because it has standing to pursue the retirees' benefits grievance, consent of the retirees is unnecessary; that a consent requirement contravenes national labor policy; and that the nature and extent of the consent requirement is ambiguous. Cleveland Electric contends that if the grievance is arbitrable, the district court was correct in its determination that the Union must secure the consent of the retirees before proceeding to arbitration.

The arbitrator recognized that the retirees might have individual rights outside of the CBA, particularly under ERISA, but he reserved a decision on the need for the Union to obtain the retirees' consent because it was not clear that the Union's claims were related to any of the retirees' statutory rights. The district court disagreed with the arbitrator's decision not to require the Union to obtain the retirees' consent. Unlike the arbitrator, the district court found that *Rossetto v. Pabst Brewing Co., Inc.*, 128 F.3d 538 (7th Cir.1997), applied in this case. In *Pabst Brewing*, the Seventh Circuit recognized that a union has standing to arbitrate the meaning of a collective bargaining agreement that grants rights to third parties simply by virtue of the fact that the union is a party to the contract. *Id.* at 539. But this did not end the court's inquiry. The court held that because the retirees had statutory rights to the benefits, as well as other types of claims, which they could pursue directly with the company, the union must obtain the assent of the retirees before purporting to represent them at arbitration. *Id.* at 541.

We agree with the district court on this issue. There are at least two dangers in failing to require the Union to obtain the retirees' consent. On the one hand, as pointed out in the *Pabst Brewing* decision, the retirees could lose their rights to pursue their claims directly with Cleveland Electric if the Union obtains an unfavorable arbitration decision. *Id.* at 540 (stating that if the union "loses in arbitration, the retirees lose, period"); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Acme Precision Prods., Inc.*, 515 F.Supp. 537, 540 (E.D.Mich.1981) (finding that in the absence of a de facto class action, the union's filing of a grievance or a lawsuit would preclude retirees from pursuing their claims with the company).

On the other hand, Cleveland Electric could be faced with numerous retirees' claims and lawsuits if a determination is made that the Union was not authorized to act on the retirees' behalf. This point was made clear in *Meza v. General Battery Corp.*, 908 F.2d 1262 (5th Cir.1990). In *Meza*, an injured former employee filed suit against his employer for disability and pension benefits provided for in the collective bargaining agreement. The union had filed a previous lawsuit over these same benefits and claimed that its intent was to represent all the injured employees. The Fifth Circuit held that res judicata did not apply to Meza's suit because he was not a party to the prior suit; he was not in privity with the union and was not bound by the union's action; and he had not expressly or impliedly authorized the union to represent his interests. *Id.* at 1280. Thus, Meza's suit was allowed to go forward notwithstanding the fact that the same issues had been considered in prior litigation between the union and company.

The Union argues that if it is required to obtain the retirees' consent, the district **\*818** court's consent requirement was ambiguous in that it did not set out the exact nature and extent of the consent to be obtained. Cleveland Electric takes the position that anything short of a 100% yes-or-no response by the retirees is unacceptable. It is not this court's re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152 Lab.Cas. P 10,633, 2006 Fed.App. 0092P
**(Cite as: 440 F.3d 809)**

sponsibility, however, to define the consent require-
ment for the parties. The arbitrator is in a much bet-
ter position to establish the consent guidelines.

Therefore, we agree with the district court that the
arbitrator cannot defer the issue of whether the Uni-
on has received the consent of the retirees. In order
to arbitrate a retiree's benefits, the Union must ob-
tain the consent of the retiree. It will be the arbitrat-
or's responsibility to establish the nature and extent
of the consent requirement.

### III. CONCLUSION

For these reasons, we find that the parties submitted
the question of arbitrability to the arbitrator and
that the arbitrator correctly decided that the Union
has standing to arbitrate the issue of the retirees' be-
nefits. The Union's grievance over the retirees' be-
nefits is arbitrable, and the district court's decision
is AFFIRMED.

C.A.6 (Ohio),2006.
Cleveland Elec. Illuminating Co. v. Utility Workers
Union of America
440 F.3d 809, 179 L.R.R.M. (BNA) 2211, 152
Lab.Cas. P 10,633, 2006 Fed.App. 0092P

END OF DOCUMENT



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

R001021

Westlaw. 

Decision of Arbitrator
In re CAELUM RESEARCH CORPORATION
[White Sands Testing Facility, N.M.] and
WHITE SANDS LOCAL LODGE NO. 392, IN-
TERNATIONAL ASSOCIATION OF MACHIN-
ISTS AND
AEROSPACE WORKERS 07/003065
FMCS Case No. 07/003065
May 14, 2008
Arbitrator: Patrick Halter, selected by parties
through procedures of the
Federal Mediation and Conciliation Service
BNA Labor Relations Reporter Headnotes - LA

HOLIDAY PAY

[1] Day of mourning

C115.71

C24.367

Employer did not violate collective-bargaining
agreement when it did not give security employees
holiday pay for President Ford's funeral, even
though they were provided holiday pay for Presid-
ent Reagan's funeral and employer gave holiday
pay to facilities and logistics employees, where em-
ployer did not authorize or designate day of funeral
as holiday, payment for Reagan's funeral did not es-
tablish past practice, and facilities and logistics em-
ployees were covered by different agreement.

Appearances: For the employer--Marcia J. Mills,
general counsel. For the union--Marion (Bud)
Duryea, directing business representative.

DAY OF MOURNING

HALTER, Arbitrator.

Stipulated Issue

Did the Company violate the Collective Bargaining

unit by not giving employees holiday pay for 2 Jan.
2007 (President Ford's Funeral) in accordance wi-
thEO\11582Executive Order 11582?

If so, what should the remedy be?

Relevant Contract Language

Article 29, Holidays, Section 1--Holiday List,
states:

Full-time employees shall be granted the following
holidays:

New Year's Day

Martin Luther King Jr. Day

Washington's Birthday

Memorial Day

Independence Day

Labor Day

Columbus Day

Veteran's Day

Thanksgiving Day

Christmas Day

In addition to the holidays above, employees will
be granted any additional holiday or other special
days authorized by the Company and by the Gov-
ernment (NASA).

[Emphasis added.]

The parties disagree over the interpretation and ap-
plication of the italicized wording.

Background



COPR. © 2009 The Bureau of National Affairs, Inc.

125 LA (BNA) 541                                                                 Page 2

2008 WL 4182845 (Lab.Arb.), 125 Lab. Arb. (BNA) 541, 125 LA (BNA) 541

Honeywell Technology Services, Inc. (HTSI) is the prime contractor to the National Aeronautics and Space Administration (NASA), Goddard Space Flight Center, Greenbelt, Maryland. The prime contract--Near Earth Network Services or "NENS"--includes responsibility for HTSI to provide security services for NASA operations located at White Sands Test Facility (WSTF) in New Mexico and its remote locations.

HTSI executed a collective bargaining agreement with the International Association of Machinists and Aerospace Workers, White Sands Local Lodge No. 392, covering the period of October 29, 2003, through October 29, 2007. The Lodge or Union represents the bargaining-unit employees engaged in security work at WSTF; unit employees' terms and conditions of employment are set forth in the Agreement.

At some point after the execution of the 2003-2007 Agreement, HTSI subcontracted the security services under NENS to Caelum Research Corporation and its wholly owned subsidiary Caelum West Corporation--hereinafter referred to as the Company or Employer in the context of the labor relations under the Agreement.

On January 04, 2007, the Union filed a grievance alleging a violation of Article 29, Section 1 "and any other Article or Section that may apply" when the Company did not remunerate unit employees with holiday pay for January 02, 2007. The requested remedy is for "all employees who fall under this contract be made whole for January 2, 2007."

On January 25, 2007, the Company denied the grievance at Step 1 and on February 15, 2007, it denied the grievance at Step 3. According to the Company, President Bush "ordered a day of mourning, not a holiday. The agencies out here that are closed are treating the day as administrative leave (regular work day). For anyone who can report to work, they are paid as a regular pay day. An admin-

istrative leave day is not a holiday[.]"

Upon exhaustion of the grievance procedure, the Union timely invoked arbitration.

Summary of the Union's Position

Employees are entitled to receive holiday pay for January 02, 2007, pursuant to Article 29. In this regard, President Bush signed an Executive order declaring January 02 as a holiday in honor and respect for President Ford's funeral.

President Bush referencedEO\11582Executive Order 11582, Observance of holidays by Government agencies, when he issued the Executive order for January 02. By §1 in the order, it applies to all executive departments, independent agencies, and Government corporations including field services. The U.S. Office of Personnel Management provided guidance to affected departments and other organizations that the pay for January 02, 2007, would fall within the statutes and Executive orders governing holidays. "The Union feels that the Caelum employees fall under this section and therefore should have gotten the holiday."

The precedent for authorizing holiday pay for a presidential funeral was established when the Company provided holiday pay for President Reagan's funeral (June 11, 2004) which was designated a holiday by presidential Executive order. Three years after President Reagan's funeral, and only after this grievance arose, did the Company claim that it had erroneously provided holiday pay on that occasion.

The Company refused to authorize a holiday for unit employees even though facilities and logistics employees under the NENS contract received holiday pay, according to the Union, pursuant toEO\11582Executive Order 11582. In other words, only security personnel employed by the Company did not receive holiday pay whereas those under the NENS contract (facilities, logistics) did receive hol-

COPR. © 2009 The Bureau of National Affairs, Inc.



125 LA (BNA) 541                                                                Page 3
2008 WL 4182845 (Lab.Arb.), 125 Lab. Arb. (BNA) 541, 125 LA (BNA) 541

iday pay. Even the guards patrolling the outside or exterior access to the facility and employed by Wackenhut were on the holiday schedule and paid accordingly.

If federal employees at WSTF and facilities and logistics employees received the day off, then the test facility is closed and security guards should have received holiday pay notwithstanding the Company's position that the wording incorporated from the federal acquisition regulation (FAR) into the prime contract for HTSI's logistics personnel authorized payment for those employees or that the language in another, different labor agreement is not the same as the wording in Article 29.

The Union seeks a make whole remedy "in all aspects" to include compensation for all affected unit employees for the January 02, 2007, holiday.

Summary of the Company's Position

The Company relies on HTSI to provide direction because it has no direct contact with NASA's Goddard Space Flight Center (GSFC). In following the guidance issued by HTSI, the Company did not violate the Agreement because the Company and the Government (NASA) did not agree that January 02, 2007, would be an additional holiday under Article 29.

In this regard, GSFC issued a directive to HTSI in response to President Bush's executive order stating that the order "did not apply to those offices and installations ... or other departments, independent establishments, and governmental agencies [where] the heads thereof determine should remain open for reasons of national security or defense or other essential public business."

When the Union inquired whether January 02 would be a holiday, the Company advised the Lodge (based on HTSI's guidance) that January 02 was not a holiday or administrative leave day for NENS employees including contract personnel. The

basis for this guidance is in NENS which incorporates NASA FAR Supplement Clause 1852.242-72, Observance of Legal Holidays, with Basic Clause and Alternate II which stipulates that the contractor has access to the WSTF so January 02 is a normal workday for the contractor; Alternate II flows to the Company as subcontractor. Unit employees are under Alternate II so there was no special or nonstandard holiday.

Contract personnel required to work on January 02 received holiday or premium pay only if Alternative I to 1852.242-72 was included in the contract and was appropriate under established compensation practices or collective bargaining agreements. Employees at WSTF who received holiday pay are under Alternate I in NASA's prime contract with HTSI and did not have access to WSTF on January 02. Alternate I does not include or cover unit employees.

Article 29 authorizes a non-standard holiday when that is authorized by the Customer (NASA) and the Company; the Company did not authorize a holiday. The "plain meaning" rule applies to Article 29, Section 1--when "words are plain and clear, conveying a distinct idea, there is no occasion to resort to interpretation, and their meaning is to be derived entirely from the nature of the language used." How Arbitration Works, 6th ed. at 434. Wording in Article 29 is clear--there is no additional holiday for unit personnel unless the Company and NASA agree. The Company and NASA communicated to the Union that they did not agree that January 02 was a holiday.

The Company does not dispute that it compensated unit employees for President Reagan's funeral on June 11, 2004. Holiday pay was applicable only if Alternate I applied and it did not apply to these unit personnel since they are subject to Alternate II. This guidance, however, did not reach the unit personnel's company commander so June 11, 2004, was erroneously compensated as a holiday. One in-



COPR. © 2009 The Bureau of National Affairs, Inc.

stance of an error does not constitute a past practice and, furthermore, a past practice cannot be enforced to override clear wording in the Agreement. How Arbitration Works, 6th ed. at 627.

Employees at WSTF in another bargaining unit represented by a different labor organization did receive holiday pay for January 02 because wording in that collective bargaining agreement states that "employees will be granted any additional holiday or other special days authorized by Congress or the President ... that result in a WSTF government holiday."

As for IAMAW's reliance upon documents showing that federal employees are entitled to receive holiday pay, those documents do not reference or identify private-sector employees as receiving equal treatment.

For all of the reasons set forth above, the grievance should be denied.

Findings and Conclusions

Labor arbitration is a matter of contract. The role of the parties in labor-management relations is to determine through negotiations the value of their exchange and embody that value in the terms and conditions of a collective bargaining agreement. The role of an arbitrator is to interpret that agreement consistent with the parties' negotiated preferences.

Article 18, Arbitration, Section 3 states that a joint or separate submission agreement shall identify the specific clause or clauses of the Agreement that the arbitrator is to apply or interpret. In conjunction with Section 3, the parties authorize the arbitrator under Section 4 to interpret and apply Article 29, Section 1 but the "arbitrator shall not have the authority to amend or modify this Agreement or to establish new terms and conditions of this Agreement."

Article 18 frames the role and function of the arbit-

rator by limiting it to the terms and conditions specified in the Agreement. Interpreting or applying the Agreement in a manner that provides a new term or benefit of employment would be inconsistent with that delegation of authority. This framework and delegation comports with the custom and practice that an arbitrator is "confined to interpretation and application of the [Agreement]" because an award is "legitimate only so long as it draws its essence from the collective bargaining agreement." United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 [ 34 LA 569] (1960)

In interpreting and applying Article 29 the arbitrator recognizes a number of well-founded and long accepted rules of contract construction. The most basic of these is that the Agreement speaks for itself. When the terms of an agreement are free from ambiguity they must be given full force and effect notwithstanding equity in common law. As one arbitrator observed, "[where] the contract is clear, logic and equity will be cast aside, regardless of the result." Safeway Stores, 85 LA 472, 475 (Tharp 1985)

[1] Article 29 specifies twelve (12) holidays and Section 1 in that Article concludes with the provision that additional holidays beyond those enumerated are provided when the Company and the Government agree to a non-standard holiday. There is no dispute that the Company did not authorize or designate January 02, 2007, as a holiday. There is no evidence that its decision to do so is arbitrary or capricious or driven by anti-union animus or other discriminatory practice designed to preclude unit employees from receiving a contractually mandated benefit.

There is no alternative interpretation of Section 1 advanced by the Union that would bring the disputed wording into the ambit of a contract violation. Rather, the Union relies on holiday payment for President Reagan's funeral observation in June



COPR. © 2009 The Bureau of National Affairs, Inc.

2004. Testimony and documentation by the Company rebuts the Union's reliance on the prior payment. There is no past practice established by that payment and there is no provision in the Agreement that required the Company to move forward 3 years ago with its rationale provided in the context of this grievance. The Executive order signed by President Bush was directed to Federal Government departments and agencies and not contractors.

Employees receiving January 02 as a holiday were under a different labor agreement or designated to receive it under Basic Clause, Alternate I. There is no dispute that unit employees are under Alternate II. On the surface there is no prohibition on the Union negotiating coverage of holiday pay to fit the circumstances presented in this grievance but there is a prohibition on the arbitrator to change the current wording in the Agreement to grant such a benefit.

Rules of contract interpretation may aid in resolving disputed wording but the first and foremost guide to that intent is the plain wording in the form of actual language in the Agreement. Where, as here, contract language is plain and evident, the words must be given their ordinary meaning and application. To sustain the grievance would be reformation of the plain and evident wording agreed upon by the parties in the Agreement. That places the arbitrator in the position of rendering an award that does not draw its essence from the Agreement.

In matters of contract interpretation, the burden to establish the alleged violation of the collective bargaining agreement resides with the moving party, the Union. In the circumstances of this grievance, there is insufficient evidence to sustain the grievance. Unless the Company and the Government agree to a non-standard holiday, the Company is not contractually obligated by Article 29 to expand the list of 12 holidays.

All arguments, testimony, documentary evidence, and issues not specifically mentioned in the preceding paragraphs have been considered in rendering these findings and conclusions which are set forth in the award that follows.

AWARD

The grievance is denied.

END OF DOCUMENT



COPR. © 2009 The Bureau of National Affairs, Inc.

Westlaw. 

124 LA (BNA) 1729                                                                                        Page 1
2008 WL 2390504 (Lab.Arb.), 124 Lab. Arb. (BNA) 1729, 124 LA (BNA) 1729

Decision of Arbitrator
In re CITY OF PHOENIX, ARIZONA and AMER-
ICAN FEDERATION OF STATE, COUNTY,
AND
MUNICIPAL EMPLOYEES, LOCAL 2960
07/03272-A
FMCS Case No. 07/03272-A
May 9, 2008
Arbitrator: Jack H. Calhoun, selected by parties
through procedures of the
Federal Mediation and Conciliation Service
BNA Labor Relations Reporter Headnotes - LA

WORK SCHEDULES

[1] Changing shift

C100.47

C24.369

C24.111

City did not violate memorandum of understanding
(MOU) when it denied senior employee opportunity
to switch shifts, even though it states that it would
have done so if he had let his desire be known be-
fore it hired applicant who could only work that
shift to fill vacancy, where MOU does not obligate
city to solicit applications by going beyond its regu-
lar recruitment process, it is beyond belief that em-
ployee would not have known that personnel move-
ment was afoot, and practice of supervisors coming
to employees and asking them if they were inter-
ested in particular opening is one of two approaches
that had been used.

Appearances: For the employer--Bob Oberstein,
labor relations administrator. For the union--Debra
Novak-Scott, chief representative.

CHANGING SHIFT

CALHOUN, Arbitrator.

I. Background

The American Federation of State, County and Mu-
nicipal Employees, Local 2960 (the Union) and the
City of Phoenix, Arizona (the Employer or City)
are parties to a Memorandum of Understanding
(MOU) that provides employees an opportunity to
change work schedules. The Grievant herein, John
Estes, applied for a transfer to a different shift. The
application was rejected. Estes then filed a griev-
ance that ended in arbitration. The parties agreed
the dispute was properly before the arbitrator for a
decision on the merits of the case.

II. Issue

The parties agreed that the issue in dispute is
whether management violated Article 4, Section
4-1C, paragraph 4 of the Memorandum of Under-
standing, and if so, what is the proper remedy.

III. Relevant Contract Provisions

The following provisions of the MOU are relevant
to the issue in dispute:

ARTICLE 4: Hours of Work/Working Conditions

Section 4-1: Hours of Work (7*)

* * *

Employees may request to be changed to another
work schedule, and when a position on such sched-
ule becomes vacant and available, shall be so reas-
signed on a seniority preferred basis when qualific-
ations and experience are deemed equal by the City.
(See Article 4, section 4-4 Seniority)

* * *

Section 4-4: Seniority (33*)

Seniority shall be used as a factor consistent with

COPR. © 2009 The Bureau of National Affairs, Inc.

Westlaw.

established Civil Service procedures in choice of work assignments ...

IV. Facts

The City stipulated that John Estes was the most senior employee and his qualifications and experience were not an issue. Had he let his desire be known, he would have been selected for the shift in question.

The dispute arose in the Police Department where the Grievant had worked for approximately 18 years and was the most senior of the Senior Computer Operators. The unit in which he works is the information technology function in the Computer Services Bureau. It is a small subdivision of the total organization and is made up of six employees, including three Senior Operators, two Lead Operators and a Supervisor. A Project Manager and an Administrator complete the civilian chain of command. The Assistant Chief of Police is the uniformed position in charge of the Computer Services Bureau and other subdivisions of the Police Department.

When Jerry McElhaney was promoted to the position of Information Technology Supervisor and Tom Sphar was promoted to a Lead Operator position, Sphar's old position as Senior Computer Operator was left vacant. The vacant position was advertised in a Police Department weekly publication entitled Transfer Opportunity Bulletin for the week of December 20 through 26, 2004. The deadline to apply for the vacancy was December 23, 2004. The publication shows all Police Department positions being recruited for and is made available to all employees and is posted at various locations including the Computer Services Bureau. The announcement did not state which shift, i.e., first, second or third, the position would be on. Also, applications were taken through the regular City recruitment process.

After the recruitment was completed, all transfer re-

quests from current employees were honored because management wanted to recruit for the specific shift the hiring was for, the second shift. The reason being management wanted to hire someone who knew what shift the successful candidate would be on because that is where the person would likely be for a long time with little opportunity for change. Since the Grievant had not put in a request for a transfer or otherwise let his wishes be known, he was not considered.

While days off were not part of recruitment, shift was. Therefore, when one of the current Senior Computer Operators refused the open shift, because the days off were not suited to her personal schedule, management hired Jeanie Lucas, who would not have taken the position if it had been on any other shift.

The Grievant's request would have been honored had he made it known prior to Lucas being hired. That was one of the ways openings in the unit had been filled in the past. Employees in the unit let the supervisor know they wanted to transfer to a different schedule. Since the unit is so small, less formality is required than in the larger subdivisions of the Police Department. Another way openings were filled was for the supervisor to approach each employee and ask each about his or her interest in a particular vacancy. Over the years, there were few vacancies; therefore, few opportunities to change shifts and days off.

After the Grievant's request to go to the second shift became known, Administrator Lori Rhyons asked one of the Senior Operators, Hortense Glenn, who was on shift two, if she would be willing to move to shift three. She initially agreed, however, she later rescinded the agreement leaving no place for the Grievant to move.

Ms. Lucas was hired April 25, 2005 and placed on shift three with Mr. McElhaney for training on procedures. She worked with him on different shifts

COPR. © 2009 The Bureau of National Affairs, Inc.



R001028

during the training period. She was permanently assigned to shift two July 4, 2005 with Friday, Saturday and Sunday off. The Grievant's June 11, 2005 request to transfer to shift two was not honored because Ms. Lucas was promised that shift when she was hired. It was permissible to hire for a specific shift because all transfer requests had been reviewed and it was determined that no present employee wanted the shift.

Employees in the information technology unit, including the Grievant would have known that transfer opportunities were going to become available because of all the personnel actions that were taking place. A supervisor had retired and one employee was off on an extended injury leave. Moreover, the Grievant and Jerry McElhaney worked for months together and the Grievant never mentioned he wanted a transfer. During the same time all operators were working overtime because of a long-term vacancy in a position.

Although the Police Department's Transfer Bulletin did not indicate which days one would have off, Ms. Rhyons believed the Grievant should have let his wishes be known. Six employees have been hired since the Grievant was hired. He never has let his desire to have weekends off be known.

V. Summary of Union's Position

The Union contends the Employer violated Article 4, Section 4-1 of the Memorandum of Understanding because it did not award the shift two opening to John Estes once he became aware of the opening and applied for it. If management does not notify employees about vacant work schedules, they cannot expect them to make their interest known prior to the vacancy becoming available. In the past supervisors advised employees when there was a vacancy. The process was informal and did not require anything in writing. Schedules were assigned by seniority and new employees received what was left.

The MOU does not require an expression of interest prior to a vacancy becoming available, the Union maintains. The MOU supersedes any policy to the contrary. The employees in the unit assumed that since Ms. Auzenne was a Lead Operator and had requested a transfer to third shift, the new Lead Operator who would be promoted would fill Auzenne's position on second shift so there would be a supervisor on each shift. Instead, the newly promoted Lead Operator, Tom Sphar, was placed on first shift. Then management made the decision to violate past practice and decline to notify employees of the vacancy on second shift. Mr. McElhaney spoke to only two of the three Senior Computer Operators, Ms. Glenn and Ms. Lucas. He did not speak with the Grievant. He spoke with Ms. Lucas to see if she wanted Friday, Saturday and Sunday off or Saturday, Sunday and Monday off.

When John Estes learned that the new hire would be placed on second shift with weekends off after she finished training, he immediately submitted a written request on June 11, 2005 to be placed in that work schedule. At that point the work schedule was vacant. Ms. Auzenne did not move to third shift until July 4, 2005, the same day Ms. Lucas completed training and was able to work days. It was Ms. Auzenne's work schedule that Ms. Lucas was given.

Under the MOU, the Union argues, Mr. Estes had seniority and was the most qualified and experienced employee; therefore, he should have been given the work schedule. Despite there being no argument from the City about his seniority, experience or qualifications, Mr. Estes request was denied.

VI. Summary of Employer's Position

The Employer contends that this case is one of contract interpretation and the burden of proof is on the Union to demonstrate there was a contract violation of the clause stated on the grievance or that a past



COPR. © 2009 The Bureau of National Affairs, Inc.

practice existed and was violated. In order for the City to have violated the clause in question, the Union must have demonstrated that the Grievant gave notice to management of his wish to change shifts. He admitted he had never done this either formally or informally, despite having worked side-by-side with Mr. McElhaney because he believed it was management's responsibility to notify him. Management cannot violate the provision in question unless the employee first gives notice. The Grievant relied on a past practice theory that required management to come to each employee and see if he was interested in each opportunity.

The Union argues, according to the City, that the information technology unit is obligated to ask employees and gather information such as is done in the Communications Bureau so that management knows who wants to go to what shift. That, however, is not required. Moreover the Communications Bureau has 200 employees and such information is necessary to manage it. The IT unit has six employees and does not need such formality.

The shift assignment that Ms. Lucas was placed on was decided prior to the date, June 11, 2005, when Mr. Estes notified Ms. McElhaney he wanted the shift. The commitment was made so that Ms. Lucas could he trained, the City urges. The Union ignores the fact that the City approached Ms. Glenn regarding days off since she had previously notified management of her desire, in accordance with the MOU. If the Grievant had given the same notice, he would have been offered the shift and days off. However, the Grievant admitted under oath, that he never gave any notice of any kind. During that period he was working overtime to fill in when the unit was short an employee. It strains the imagination to think he was not aware there was a hiring process going on in such a small work group. The hiring of someone would not mean a certain shift or schedule would be available but it would mean a possibility existed.

The City contends the Union did not establish the existence of a past practice to show that management was obligated to notify employees by seniority of any shift or assignment changes in advance and to poll them for their interest regardless of whether they had given notice of their interest as required by the MOU. There was no clear uncontroverted proof any one practice had existed for a reasonably long time. The alleged practice did not occur repeatedly or clearly and consistently and it was not known to and accepted by both parties.

VII. Opinion

It is basic to arbitration procedure that in contract interpretation cases, such as this, the Union has the burden of proof to show that its interpretation of the language in question is the more reasonable. The question then is by what quantum of proof does the Union have to meet to sustain its burden. Evidentiary labels used by courts are not useful in arbitration. Absent specific language in the agreement (MOU) the standard used here will be for the Union to persuade the arbitrator that its interpretation is the more reasonable of the two.

Collective bargaining agreements are to be interpreted consistent with the intent of the parties. In an attempt to determine contractual intent, arbitrators rely on three primary principles as guides: (1) standards of contract interpretation, (2) past practice, and (3) reasonableness. The Common Law of the Workplace, Carlton Snow, Section 2.1 BNA Books 1998 at p. 65.

When no ambiguity exists in the language of the disputed provision of a contract, when read in the context of the whole contract, the obvious intent of the language prevails and must be enforced. When the language is sufficiently clear so that the parties intent can be reasonably ascertained, the apparent intent of the words of the contract govern and reference to past practice and other guides is not necessary.



COPR. © 2009 The Bureau of National Affairs, Inc.

Where ambiguity exists in a contract, as it does in this case, it is necessary to look to the parties' bargaining history and past practice as it applies to the provision at issue. Arbitrator Levak, in Empire Paper Company, 88 LA 1096 (1986) explained the concept of ambiguity:

The arbitrator will declare an agreement to be clear and unambiguous when he is able to determine its meaning without any other guide than knowledge of the simple facts on which, from the nature of the language, in general, its meaning depends, where, however, the simple facts allow both sides to advance plausible contentions for conflicting interpretations, the arbitrator will declare the language to be unenforceable, and will make reference to pre-contract bargaining history, past practice and other rules of construction in order to arrive at the true meaning of the disputed provision.

The facts of the instant case show that both parties have offered plausible contentions for conflicting interpretations of the contract provision that is the focus of this dispute. The language of Article 4-1, C is not without ambiguity. The intention of the parties in agreeing to the language of the provision is not clear and cannot be determined using no guide other than the contract itself. The seminal treatise on arbitration law, by Elkouri and Elkouri, How Arbitration Works, p. 623, (6th ed. 2003), Ruben Ed. In Chief, states the role of custom and past practice:

The custom or past practice of the parties is the most widely used standard to interpret ambiguous and unclear contract language. It is easy to understand why, as the parties intent is most often manifest in their actions. Accordingly, when faced with ambiguous language, most arbitrators rely exclusively on the parties' manifestation of intent as shown through past practice and custom. Indeed, use of past practice to give meaning to ambiguous contract language is so common that no citation of arbitral authority is necessary. Past practice may he

introduced even when contract language is clear and concise, to establish that the contract has been amended or modified by mutual agreement or action of the parties. Under such circumstances, the past practice may be considered as part of the formal agreement between the parties. In such cases, the past practice would be as binding as the written terms of the contract. See Motor Wheel Corporation, 102 LA 922 (Chattman 1994) citing Elkouri, How Arbitration Works, p. 437, 4th ed. (1985).

In Celanese Corporation of America, 24 LA 168 (Justin 1954), the arbitrator held that three requirements must be satisfied before past practice can bind the parties. First, the practice must be unequivocal. Second, it must be clearly enunciated and acted upon. Third, it must be readily ascertainable over a reasonable period of time as a fixed and established practice accepted by both parties.

A past practice that serves to clarify an ambiguous provision in a contract becomes the definitive interpretation of that term until there is mutual agreement on rewriting the contract. The practice cannot be repudiated unilaterally. See Common Law of the Workplace, supra at p. 83-84.

The Union alleged there was a past practice of the unit supervisor informing employees of vacancies as they came up. The best that can be said, based on the evidence on the record, is there were two ways of dealing with transfer opportunities. Under one approach, and the one the Grievant testified to, the supervisor came to him and asked him if he was interested in a particular opening. Under the other approach, the one Mr. Rhyons, Mr. McElhaney and Ms. Cornett testified about, the supervisor did not come to the employees about openings, but rather the employees made their desires known. Ms. Glenn said she had no recollection of any supervisor telling anyone about shift or days off opportunities. She had previously indicated her desire to change shifts and was approached by Mr. McElhaney about the opening in controversy here. The



R001031

practice by the City in filling vacancies was not un-equivocal and it was not a fixed and established practice that was accepted by both parties.

The Union witnesses, who testified about the practice of supervisors coming to employees when there were opportunities to transfer, had no knowledge as to whether those other employees who were approached may have previously given notice of their desire to move.

[1] As the Union argues, the agreement (MOU) does not require that an employee express his interest in a vacant work schedule prior to it becoming available; however, if that employee's interest is not known, the employee can find himself in the same situation as Mr. Estes. If he applies late, he may find the vacancy no longer exists. The provision in question here obligates the City to promote senior qualified employees who have requested to be changed; it does not obligate the City to solicit applications by going beyond its regular recruitment process. While employees are not required to submit requests, in some fashion, the City is not required to conduct a poll. The City published the Senior Computer Operator opening in December of 2004. It is beyond belief that any current employee of this IT unit would not know personnel movement was afoot, especially a long-term employee like Mr. Estes. Whether he knew or did not know is not significant; however, because the agreement provides a perfect solution: If an employee wants a transfer, he should keep an active request on file or at least make it known on a regular basis. That approach shifts the burden to the Employer to comply with the provision at issue and consider senior qualified employees first.

In summary, I find that management did not violate Article 4, Section 4- 1C, paragraph 4 if the Memorandum of Understanding. Accordingly, I will enter an award.

VIII. AWARD

The grievance is denied.

2008 WL 2390504 (Lab.Arb.), 124 Lab. Arb. (BNA) 1729, 124 LA (BNA) 1729

END OF DOCUMENT

COPR. © 2009 The Bureau of National Affairs, Inc.



Westlaw.



122 LA (BNA) 194                                                                                   Page 1
2006 WL 1045444 (Lab.Arb.), 122 Lab. Arb. (BNA) 194, 122 LA (BNA) 194

Decision of Arbitrator
In re CORNING INCORPORATED
(HARRODSBURGH [Ky.] PLANT and AMERICAN
FLINT GLASS
WORKERS LOCAL UNION 1016
FMCS Case No. 05/51586
January 3, 2006
Arbitrator: Jerry A. Fullmer, selected by parties through
procedures of the
Federal Mediation and Conciliation Service
BNA Labor Relations Reporter Headnotes - LA

WORK SCHEDULES

[1] Change in starting time

C115.251

C115.253

C116.1033

C24.369

C24.37

Employer did not violate collective-bargaining contract, which provides that employee who works more than eight hours on day before holiday gets greater holiday pay, when it established start and finish of workweek to be 11:45 p.m. on Sunday for plant under continuous operation, even though this meant that employee who worked four hours on day before holiday (Thursday) that immediately followed eight-hour shift on Wednesday did not get 12 hours pay for holiday, where union has only one "pay stub" for one week showing purported practice that would contradict way employer has structured workweek and holiday payment, and neither party made proposals on starting time in bargaining that followed change.

Appearances: For the employer--Scott F. Zimmerman (Reed Smith), attorney. For the union--Emmanuel S.

"Spurge" Mason, assistant to the director.

CHANGE IN STARTING TIME

FULLMER, Arbitrator.

This case [FN1] concerns a twelve grievances concerning "payroll issues".

I. Facts

A. Background Facts

The Employer manufactures glass products at its plant in Harrodsburg, Kentucky (hereafter referred to simply as "the Harrodsburg Plant"). The Union, since 1952 has represented a unit of production and maintenance employees. The Harrodsburg Plant has "five or six" departments. Operations are conducted on a seven day a week, twenty-four hour basis. There are A, B, C and D shifts on which some employees work on a rotating basis.

The successive bargaining agreements have provided for overtime premium payments at time and one-half for the somewhat basic: 1) time worked in excess of eight hours in one workday and 2) time worked in excess of 40 hours in any workweek, in addition to these basic entitlements, provision has been made for payment at time and one-half for: 1) time worked as "emergency time" and 2) time worked on Sunday. In addition there has been provision for payments at rates greater than time and one half for: 1) time worked on eleven specified holidays (double time and one half); and 2) time worked on Christmas Day (triple time); In addition there has been provision for payments at "base" rate for the twelve specified holidays when the holiday is not worked. Beyond these aspects there are particularized provisions at Article 7, Section 4.G and Sections 6, 7, 8, and 9, quoted in full below, which modify and govern some of the payments outlined in the previous portion of the paragraph.

The foregoing provisions are not uncomplicated, both in

COPR. © 2009 The Bureau of National Affairs, Inc.



R001033

122 LA (BNA) 194                                                                                    Page 2
2006 WL 1045444 (Lab.Arb.), 122 Lab. Arb. (BNA) 194, 122 LA (BNA) 194

and of themselves, and perhaps even more in light of the 7/24 and rotating shifts aspects. The Company has a number of other plants and the payroll system is administered by the Company on a more or less centralized basis from the Company headquarters in Corning, NY. There are of course payroll administrators and clerks in each of the local plants including Harrodsburg, KY.

The keystone to many of the calculations necessary in making the premium payments required are the parameters of the "workweek" and the "workday" in the "workweek". A crude example would be whether an employee working a sixteen consecutive hour shift with the hours equally bracketed at the end of the workweek would be entitled to "daily" overtime for the second eight hours of his/her work.

According to the testimony of Company witnesses the administration of the payroll system during the "background" period fell into two epochs. One epoch was years between 1953 and 1988. It featured a workweek established by the Company with seven consecutive days that started and ended at the same time each week. The "day" in the workweek was to be a "scheduled day" from the time that an employee starts work. One of the features of such a system is that the seventh day of an employee's work week is likely to be less than 24 hours unless he starts work on his first day at the exact time that the new workweek starts.

The second epoch was during the years between 1988 and the events of this case. During this epoch the Company eliminated time clocks in the course of embracing principles of "employee involvement". During the following years, according to the Company witnesses, various discrepancies and inconsistencies arose in the administration of payroll practices at the Harrodsburg Plant. There is something of an undertone, but no accusation, that given employees chose whatever method of calculation as was likely to yield the greatest overtime payments.

The Union disputes the Company's version of this background in a number of aspects. It claims that the back-

ground is instead consistent with its current position as to how the payroll system is to be run.

This brings us to the cusp of the events leading to the present grievances.

B. Facts Leading to the Grievance

An audit was conducted by the Company of the payroll practices at the Harrodsburg Plant in 2000. It revealed to the Company's satisfaction the discrepancies described above. On May 2, 2001 the Company's Plant HR Manager at the Harrodsburg Plant sent the then President of the Local Union a memorandum concerning "Time Cards and Payroll Related Items--Harrodsburg, Ky Plant". This was part of the Company's implementation of the "Automated Time and Attendance" ["ATA"] at the Harrodsburg plant. The memorandum stated in relevant portion that:

"This memo is provided for the purpose of clarifying Corning's position on the following Payroll related items. It is the intent of the Company to communicate these practices to all employees and to train supervisors in their consistent application.

Workweek:

The workweek for all employees will begin at 2345 on Sunday and will continue for 168 consecutive hours.

Sunday:

Sunday will be defined as the final 24 consecutive hours of the workweek (2345 Saturday to 2345 Sunday)

Holidays:

Holidays will be defined as the 24 consecutive hours beginning at 2345 on the calendar day prior to the holiday.

Shift Differential:

Shift Differential applies to an eight hour block of time for the evening shift and an eight hour block of time for

COPR. © 2009 The Bureau of National Affairs, Inc.



the night shift. For employees starting at 1545 and 2345 no shift differential shall begin before 1600 or extend beyond 0800 (for administration purposes these times will be interpreted as 5 minutes before the hour). No hours worked may be paid at more than one shift differential rate. To qualify for shift differential, employees on overtime must work 4 hours or more in a shift paying shift differential.

Time Card Notations:

Employees are only to mark the following items on their time card: time actually worked and changes to normal schedule. Changes to normal schedule must be approved in advance by the employee's supervisor and the supervisor must note and sign the timecard. No additional marks are to be made on the time card (e.g. computing time or calculation of premium rates).

Unworked Hours Counted as Hours Worked (Ghosted):

The labor Agreement authorizes three (3) situations for paying unworked time as hours worked for the purpose of computing weekly overtime pay.

These situations are:

1. Unworked Holidays

2. Time Off for Death In Family

3. Jury Duty

No other unworked hours qualify as hours worked for ghosting purposes (e.g. day-at-a-time vacation is not

| 1 | 03-06 |
| 2 | 03-07 |
| 3 | 03-12 |
| 5 | 03-18 |
| 6 | 03-19 |

"Group B" Dealing with daily overtime over 8 hours only.

| 4 | 03-15 |

ghosted)."

The "clarification" was amplified before and since by further documentation from the Company; was discussed at meetings with the Local Union; and was the subject of training of both unit employees and supervisors. These aspects will be discussed in more detail subsequently. Suffice it to say that the Union did not agree with the some of the applications of the "clarification" and it filed twelve grievances concerning the above matters, between the dates of April 30, 2003 and January 27, 2004. A representative text of one of the grievances (03- 06) is as follows:

"Worked over on Wednesday April 16th until 0355, Thursday April 17th, was off Friday should have got 12 hours for unworked holiday pay but only received 8 hours for unworked holiday pay. This the day that is in question but the contract states 12 consecutive hours is overtime which people are also not receiving. Regardless of when the Corning clock stops it was 12 consecutive hours from the time they started and the time they stopped. We the Union are asking that these people be treated as a whole."

The grievances, as categorized by the Union, fell into the following categories: [FN2]

"Group A" Dealing with daily overtime over 8 hours and the "Greater Rule" on unworked holidays.

COPR. © 2009 The Bureau of National Affairs, Inc.



```
7    03-20
9    03-23
11   03-31
12   04-01
```
"Group C" Dealing with the "Greater Rule" only.

```
8    03-22
10   03-28
```
These grievances were processed through the steps of the grievance procedure to arbitration.

II. Potentially Applicable Contract Provisions

ARTICLE 7

WORKWEEK, HOLIDAYS, AND PREMIUM PAY

Section 1. A regular workweek consisting of seven (7) consecutive days shall be established by the Company for each department or group of employees. Such work-week shall start and end at the same time each week. Each day in the workweek will be considered a scheduled day. A workday shall consist of twenty-four (24) consecutive hours from the time an employee starts work....

Section 2. The twelve (12) designated holidays are set forth below: ...

The hours at which work will cease and be resumed shall be in accordance with past Company practice; and in computing premium time, each of the above holidays shall consist of a 24-hour consecutive period in accordance with past Company practice....

Section 4....

G. When an employee works more than eight (8) hours on either of the qualifying workdays immediately preceding or following the holiday, he will be paid unworked holiday pay for the greater number of hours worked on these two qualifying days, provided he otherwise qualifies for unworked holiday pay in accordance with F. above.

Section 6. When an employee works continually for more than twenty-four (24) consecutive hours from the start of his regularly scheduled shift and into his regularly scheduled shift on the next workday, he will be paid at time and one-half for all time worked during that second regularly scheduled shift, except on a holiday.

Section 7. When an employee is required by the Company to work sixteen (16) consecutive hours, at least eight (8) hours of which is in the new work week, he shall be paid time and one-half for the second eight (8) hour shift in accordance with the Emergency Time provision of the Agreement, regardless of the time of notification.

Section 8. When an employee on a 7-day continuous operation is required to work on his regularly scheduled day off, he will be paid for such time worked at time and one-half in accordance with the Emergency Time payment provision of the Agreement, even though the twenty-four hours' notice is given, and provided he has worked his full work schedule in that week.

ARTICLE 35

TERM OF CONTRACT

* * *

Section 3 This Agreement is in full settlement of all the issues in dispute between the Company and the Union.

III. Issue

Did the Company violate the parties' agreement when it implemented those aspects of its "Time Cards and Payroll Related Items" memorandum of May, 2001 which allegedly impacted upon the calculation of daily overtime pay and/or pay for unworked holidays? If so,

COPR. © 2009 The Bureau of National Affairs, Inc.



R001036

what shall be the remedy?

IV. Positions of the Parties

The Union Position

The Union cites the provisions of Article 7, Sections 1,2,3,4 &7; Article 12, Section 1,2,3 and Article 35, Section 2 as being those violated. The Union's position is not precluded by the course of the 2002 negotiations. It only introduced a general issue about time cards. The Company sought to eliminate the "greater rule", but was unsuccessful It cannot get in arbitration what it did not get in the negotiations.

The Company is in violation of the National Labor Relations Act by taking unilateral action with respect to a mandatory subject of bargaining under said Act. There was never any notice to bargain. Training and information is not negotiations. All of the payroll issues that were ultimately changed by the Company were mandatory subjects of bargaining. The treatise by Bruce S. Feldacker "Labor Guide to Labor Law" (Fourth Ed., Prentice Hall) is cited and quoted.

The Company's claims that "nothing has changed" are belied by the issuance of its memo. If nothing had changed there would be no need for the memo. This is true of virtually every aspect of the changes that the Company made] The training of the supervisors and bargaining unit employees was emblematic of the fact that the changes were new and unfamiliar to those involved.

The arbitrator should make the employees whole who were affected by the unilateral changes made by the Company. The Company should be instructed to adhere to the agreement with respect to the payroll issues.

The Company Position

The Union's fundamental claim is that after the time clocks were removed in 1988 some employees at the plant were claiming overtime pay on bases not in accord with the Company's company-wide payroll procedures.

The Union argues that the Company's failure, between 1988 and 2001 to correct such deviations created a binding past practice which could only be changed by mutual agreement and that the Company violated the contract by unilaterally correcting the Harrodsburg deviations from the payroll procedures after 2003 bargaining.

The Union's argument has no merit. It is absolutely clear that the record does not support the conclusion that a binding practice was created because the deviations were not consistent, were not clearly enunciated and acted upon and were not fixed and established as a practice accepted by both parties. When the Company discovered that inconsistencies existed the Union was promptly notified; extensive discussions were conducted. In the 2002 bargaining the Company placed the Union on notice that the inconsistencies would be corrected in a manner which was described in explicit detail.

It was incumbent upon the Union, after receiving such notice during bargaining, to obtain written agreement specifying the deviations from the Company payroll procedures which it claimed the Company could not unilaterally correct. There is nothing in the record to indicate that the Union protested the notification of the inconsistencies. Instead the Union withdrew its request for continued discussion of this issue. The contract was ultimately settled without a work stoppage. [FN3]

The grievances should be denied.

V. Discussion

A. Introduction

The present case is a contract interpretation case involving certain facets of the implementation of the Company's aspects of its "Time Cards and Payroll Related Items" Memorandum of May, 2001. The parties recognize that the Union has the burden of proof to establish the facts indicating that a contract provision has been violated.



COPR. © 2009 The Bureau of National Affairs, Inc.

This having been said, there is more than the usual difficulty in establishing the parameters of the case to be decided. First, there is the question of whether every aspect of the May, 2001 Memorandum should be reviewed, or whether the review should be limited to those aspects covered by the 12 grievances submitted as part of the record. It seems to the arbitrator that the proper response is that the review should be confined to the issues presented by the grievances. As discussed above, even the Union concedes that these are essentially that of daily overtime and the application of the "greater than" rule to unworked holidays. The arbitrator concludes that issues such as shift premium which are not involved in the grievances should not and will not be considered.

Second, there is the question of whether all the grievances should be considered in this case or just those individual grievances which were subject to specific factual presentations by the Union at the hearing. The Company takes the narrower view. The Union takes the broader view. [FN4] The arbitrator concludes that the Union view is the correct one since most of the hearing dealt with general principles rather than the details of the specific grievances. Therefore the principles involved in all the grievances will be considered.

Third, there is a question as to whether the 12 grievances considered should be considered on an individual basis, with the traditional verdict as to whether that particular Grievant "wins" or "loses" and whether that Grievant is entitled to back pay and, if so, how much. The Union goes even further and advocates that a remedy should be afforded to "all Employees ... who were affected by the unilateral changes made by the Company." The alternative is to consider the 12 grievances more or less in the aggregate with respect to the principles involved. The arbitrator concludes that the latter approach is the preferable one. This is essentially for the same reasons as in the preceding paragraph, i.e. that there was either no, or not much, attention given to the individual grievances and some details may have been omitted. It would thus be difficult to decide if the specific Grievant was entitled to "win" and get back pay or

not. Still less would it be proper to consider a remedy for "all" employees, including ones not covered by grievances. The proper approach then is one of considering the case essentially one in which the Union is seeking the arbitral equivalent of a "declaratory" judgment that the May, 2001 memorandum was a violation of the parties' agreement with respect to the matters covered. The remaining discussion will proceed on the basis of the three preceding conclusions.

We turn first to the contract provisions involved and thence, as necessary, to the considerations involving past practice and bargaining history.

B. The Specific Contractual Provisions.

It is well understood that if the specific terms which the parties have negotiated are clear and unambiguous, the arbitrator has the duty to apply them as written. We proceed to consideration of that aspect.

As discussed above, the two issues to be considered from the grievances are "daily overtime" and the "greater rule" with respect to unworked holiday pay.

1. Daily Overtime.

Daily overtime under Article 7, Section 4 A. is payable on the following basis:

"A. Time worked in excess of eight (8) hours in one (1) workday will be paid at time and one-half rate..." (bold added by arbitrator)

"Workday" is defined in the last sentence of Article 7, Section 1 as:

"A workday shall consist of twenty-four (24) consecutive hours from the time an employee starts work." (bold added by arbitrator)

This is to be contrasted with the preceding sentence [third] in that section which states that:

"Each day in the workweek shall be considered a scheduled day." (bold added by arbitrator)



COPR. © 2009 The Bureau of National Affairs, Inc.

Under the first sentence of Article 7, Section 1 A. the Company has established the start and finish of the workweek at 11:45 p.m. on Sunday night. [FN5] This action *as to the week itself* seems to be relatively uncontroversial. But, the Company's interpretation of the "workday" of the employees (i.e. that which governs the payment of daily overtime) is, for example, as follows:

"The first workday in the workweek begins when the employee is scheduled to begin work or begins work, whichever is earlier, and continues for 24 consecutive hours. Each succeeding workday begins at the end of the previous workday if the employee is then at work. If he is not then at work, the next workday begins when the employee is next scheduled to begin work or begins work, or begins work, whichever is earlier. In either case, the workday continues for 24 consecutive hours or until the end of the workweek, whichever is earlier."

The Union's interpretation of "workday" is somewhat more elusive. [FN6] Apparently it is a more literal interpretation of the last sentence of Article 7, Section 1, last sentence, i.e. that the "workday" simply starts when the employee starts work.

But, there is certainly room for confusion in the interpretation of the last two sentences of Article 7, Section 1. The third sentence refers to "Each day in the workweek" being considered "a scheduled day" and the fourth sentence referring to a "workday" being "twenty-four (24) consecutive hours from the time an employee starts work." Certainly it *cannot* be said that the provisions concerning "workday" are clear and unambiguous and mandate the interpretation of either the Company or the Union. There is thus room for assistance from the aides to interpretation such as past practice and bargaining history.

We turn to the other issue covered by the grievances, i.e. the application of the "greater than" rule with respect to unpaid holidays.

## 2. The "Greater Than" Rule.

The "greater than" rule is contained in Article 7, Section

4. G. It provides for holiday pay "greater than" the more wide spread eight hours of straight time for unworked holidays, under the following specified circumstances:

"Section 4....

G. When an employee works more than eight (8) hours on either of the qualifying workdays immediately preceding or following the holiday, he will be paid unworked holiday pay for the greater number of hours worked on these two qualifying days, provided he otherwise qualifies for unworked holiday pay in accordance with F. above."

The Company maintains that the parameters of the "qualifying workdays" are governed by the its previously quoted definition of "workdays". The Union maintains that it's more elusive definition of "workday" is that which should govern.

The conclusion then as to the "workday" in the application of the "greater than" provision is the same as with respect to the application with respect to daily overtime. There is ambiguity with respect to the provision which justifies reference to aids to interpretation such as past practice and bargaining history. [FN7]

Before turning to these issues, a word or two about the import of this conclusion is appropriate. The Union devotes a great deal of argument in support of its proposition that the Company is not entitled to make unilateral changes in wages, hours and terms and conditions of employment. A treatise, i.e. Bruce Feldacker's "Labor Guide to Labor Law" (4th Ed, Chapter, 5, The Duty to Bargain, p. 208) is cited to this effect. Also cited are the provisions of Section8(d) of the National Labor Relations Act. But, it may be taken as a given that the amount of overtime premium that employees are to paid when they work more than 8 hours in a workday and the amount that they are to be paid on unworked holidays are such terms and conditions of employment and are mandatory subjects for bargaining. Here the parties have bargained and reached agreement on these subjects, in Article 7, Section 4 A. and Article 7, Sections F

COPR. © 2009 The Bureau of National Affairs, Inc.



and G respectively. As discussed above, this case is not as though the Employer has issued a memorandum abrogating the specific terms of these provisions. As indicated, the terms are ambiguous and in need of administration. It is instead a matter in which the Employer's human relations and payroll minions have issued the May, 2001 Memorandum pertaining to the specifics and details of the arrangements.

We turn to past practice and bargaining history, as necessary.

C. Past Practice.

1. Introduction.

The Union claims that the May, 2001 Memorandum violates a binding past practice between the parties with respect to the establishment of the "workday" for both the purposes of daily overtime and the application of the "greater than" rule with respect to unpaid holidays. Since, as discussed above, the Union has the overall burden of proof in a contract interpretation case, this burden also pertains to the establishment of the binding past practice upon which the Union relies. [FN8] We turn first to the general principles concerning past practice and then to the application of those principles to the facts of this case.

2. The Principles.

The past practice principles are not mysterious and are set out in one secondary authority in the following terms:

"... many arbitrators have recognized that, 'In the absence of a written agreement, "past practice", to be binding on both Parties, must be (1) unequivocal; (2) clearly enunciated and acted upon; (3) readily ascertainable over a reasonable period of time as a fixed, and established practice accepted by both Parties.'

Another commonly used formulation requires 'clarity, consistency, and acceptability.' Speaks to 'mutuality' in the custom or practice...." [FN9]

4. The Application of the Principles.

The main aspects of the test requiring application are the "reasonable period" of time; the "clear enunciation"; the "ascertainability"and the "acceptability" by both parties of the past practice. We turn to these in the order stated.

a. The "Reasonable Period".

The Union's strongest case would be appear to be in the period between the elimination of the time cards in July, 1988, and the first indications from the Company in March, 2001, that it wanted to "clarify" the payroll practices. [FN10] This period would certainly be long enough to constitute a "reasonable period" for the claimed past practice, if the other portions of the test are met. Concentrating on this, the strongest period for the Union's case, eliminates the need for extensive analysis of the period preceding what can hereafter be described as "the applicable period".

b. The Clarity of the Past Practice.

As discussed above, the Company's operations in the Harrodsburg Plant are complicated not only as to manufacturing, but as to payroll. The 24/7 operations; the many employees on rotating shifts; the many different types of overtime, the different rates and the complicating factors of at Article 7, Section 4.G and Sections 6, 7, 8, and 9 are discussed above. In this setting, improvisational and "self serve" payroll accounting will not do. The testimony of the Company witnesses was to the effect that this was something of what was going on during the applicable period, due to the elimination of the time clocks.

In this setting, the "clarity" of the Union's claimed past practice during the applicable period is somewhat problematical. The Union's basic position seems to be simply that the Company's definition of the "workday" is not correct and not in accord with past practice. But, if that is the case then logic suggests that the Union should be able to put forth its own definition of the workday that was uniformly followed during the applic-



COPR. © 2009 The Bureau of National Affairs, Inc.

able period and which was found acceptable by the parties. As mentioned above, the arbitrator does not see such a definition in the post-hearing brief and did not find it in the record of the hearing. The primary contention by the Union seems to be that the definition of the "workday" should be solely with respect to the "time an employee starts work" (Article 7, Section 1, last sentence) without reference to any "scheduled day" factors under the preceding sentence (Article 7, Section 1, third sentence) and without reference to the start or end of the "regular workweek". (Article 7, Section 1, first sentence). [FN11]

The Company accuses the Union of being inconsistent in its configuration of the workday. In Grievance 03-22 the Union is said to have adopted the Company's definition of the "workday" to allegedly establish a claim for "greater than" pay for an unworked holiday, July 4. The key factor was in the Union's acceptance of the Company's view that the end of the prior workweek at 11:45 p.m. on Sunday triggered a new workday for the employees then working. In Grievance 03-28 the Union is said to have eschewed the Company's definition of the "workday" to allegedly establish a claim for "greater than" pay for a pair of unworked holidays, Thanksgiving and Day After Thanksgiving. The key factor was the Union's ignoring the Company's view that the end of the prior workweek at 11:45 p.m. on Sunday triggered a new workday for the employees then working.

These aspects lead to the conclusion that the past practice claimed by the Union during the relevant period is not clear. We turn to ascertainability.

c. The Ascertainability

of the Past Practice.

Aside from "clarity", the past practice must be "ascertainable" which the arbitrator understands to mean susceptible of proof. Unlike past practices dealing with many facets of the workplace, past practices involving payroll should be uniquely susceptible of definitive proof from the payroll records. The key factor is they

involve money, which is presumably dear both to the Company's and the employees' hearts. [FN12]

[1] Here the relevant period was July, 1988 to March, 2001. This period no doubt offered untold situations where daily overtime was worked and perhaps 33 holidays in which "greater than" pay might have been issue for employees not working the holiday. If there was a clear past practice with respect to the definition of the "workday" and its application to daily overtime and "greater than" on unworked holidays, then these applications should be ascertainable through voluminous exhibits of the employees' own payment records and/or the Company payroll records. [FN13] The Union's documentation in this respect is one "pay stub" for one employee for one week, i.e. the week ending 12/26/99. This falls short of an evidentiary record leading to the ascertainability of a clear practice in the Union's favor during the applicable period.

d. The Mutual Acceptance

of the Past Practice.

Had the past practice been established as both clear and ascertainable, there might be an inference that the practice had been mutually accepted on the basis that the Company knew what it was doing when it made the payments on the basis of the Union's definition of "workday". But, as seen from the previous discussion, that is not the case here.

Instead what we are looking for is some "smoking gun" in the evidence in which the Company can be said to have agreed either verbally or in writing that the Union's definition of the "workday" was the correct and mutually agreed upon definition. The Union argues extensively that the Company's Memorandum of May 2, 2001 must have been a change in what went before, otherwise it would have not been issued. This is fair enough, but it ignores the question of what went before. The Company's view is that there was a sort of administrative chaos associated with the payroll practices after the elimination of time cards. A "mixed practice" such



COPR. © 2009 The Bureau of National Affairs, Inc.

as that is not sufficient to enable the Union to win the case. As discussed above, there is no evidence of a "clear" and "ascertainable" past practice in the Union's favor. Neither is there any evidence of a "smoking gun" in which the Employer agreed verbally or in writing to the Union's alleged past practice during the applicable period.

e. The Conclusion as to Past Practice.

Based on the above discussion the conclusion as to the Union's claim of a binding past practice in its favor is that the claim was not supported by evidence that the claimed past practice was clear, ascertainable or mutually accepted. We turn, as necessary, to the bargaining history.

D. Bargaining History

1. Background.

The current collective bargaining agreement bears a term of February 1, 2002 to February 1, 2006. The negotiations for the current agreement took place in the months preceding the effective date.

It has been determined that in the "reasonable period" discussed above, preceding the start of the contract negotiations, there was at best a "mixed practice" with respect to the definition of "workday". The question then is whether there was anything in the contract negotiations which would lead to the conclusion that the Union's definition of the "workday" became embedded in the labor agreement.

2. The Developments in the Negotiations.

The negotiations took place against a background of the Company's efforts to introduce the payroll principles enunciated in its memoranda of May 2, 2001 and the "Contract Review" of March, 2001. The point is that the Union clearly knew that the Company had developed a desire to "clarify" the payroll administration concepts.

In the negotiations, the main developments were two.

First, the Union did introduce one proposal, or at least reserved the right to introduce such a proposal i.e. dealing with "Timecards". Presumably this had the potential at least for dealing with the matters at hand. But, the details are not clear and there is no indication that the Union ever did submit such a proposal. The Company submitted a proposal that would have entirely eliminated "greater than" pay with respect to unworked holidays. This proposal was not adopted and it is clear that "greater than" pay remains in the contract in Article 7, Section 1 G.

We turn to a conclusion as to bargaining history. First, as discussed above, the Company's proposed "clarifications" are not a direct change in the specific terms and conditions of employment covered by Section8(d) of the National Labor Relations Act. Second, both the Union and the Company were on notice as to the pendency of the "clarifications" and had the right to negotiate new contract terms specifically banning the clarifications [i.e. taking the Union's view] or specifically sanctioning the clarifications [i.e. taking the Company's view]. There is no evidence that any such proposal was made by either party, still less adopted. The dropping of the Union's "time card" proposal the Company's "greater than proposal are interesting, but not definitive. The "mixed practice" from the "relevant period" continued through, but outside the negotiations, subject to being dealt with by the Company after the negotiations closed.

V. Conclusion

The case concerns a group of twelve grievances concerning "payroll issues". The consideration in this case only as to the issues raised in the grievances, i.e. the definition of "workday" with respect to daily overtime and the calculation of "greater than" pay for unworked holidays. The consideration is also of the matter essentially in terms of "declaratory judgment" aspects rather than individual quests for monetary awards. Based on these aspects, the Union's case must stand or fall based on its evidence concerning a clear, ascertainable and mutually accepted past practice during the relevant period of July, 1988 to March, 2001. Unfortunately for the



COPR. © 2009 The Bureau of National Affairs, Inc.

Union, the evidence does not meet these criteria. It is held that there is no binding past practice in accord with the Union's definition of "workday". Nothing in the bargaining history of the current agreement leads to a different conclusion. The overall conclusion then is that the Union has not sustained its burden of proof.

To the extent that it may not be otherwise clear, the issue concerning the merits is answered in the negative, i.e. the Company did not violate the parties' agreement when it implemented those aspects of its "Time cards and payroll Related Items" memorandum of May, 2001 which allegedly impacted upon the calculation of daily overtime pay and/or pay for unworked holidays. The award draws its essence from the arbitrator's interpretation of Article 7 and Article 35 of the parties' agreement.

VII. AWARD

Grievance denied.

[FN1]. Corning Incorporated (Harrodsburg Plant) (hereafter referred to as "the Company") and American Flint Glass Workers Union, Local 1016 (hereafter referred to as "the Union"), are parties to a collective bargaining agreement dated February 1, 2002. The agreement provides in Article 17 for settlement of disputes through a grievance and arbitration procedure. A dispute has arisen between the parties concerning a group of 11 grievances concerning "payroll issues". The Union's grievances concerning this matter were dated at various points between April 30, 2003 and January 27, 2004.

[FN2]. Numeric references in the table are to, successively, the page number of Jt. Ex. 2 at which the grievance is found and to the grievance number.

[FN3]. A paraphrase bordering on quotation of the "Summary of Argument" at page 10 of the Employer's post hearing brief.

[FN4]. In the Company's view the Union only made presentations on the four grievances designated as Jt.

Ex. 2, p. 3 (03-12), p. 8 ((03-22), p. 10 (03-28) and p. 12 (04-01).

[FN5]. "A regular workweek consisting of seven (7) consecutive days shall be established by the Company for each department or group of employees."

[FN6]. For instance, the arbitrator did not notice any compact and specific definition of "workday" in the Union's post-hearing brief.

[FN7]. Since the "workday" is the key concept for both the daily overtime and the "greater than" pay for unworked holidays, subsequent conversation will concentrate simply on the "workday".

[FN8]. The Employer also relies upon a claimed binding past practice in its favor, for the period between 1953 and 1988. But, since the Company is defending on the issue, it does not have to establish its past practice in order to win the case. This aspect will not be further discussed.

[FN9]. See Elkouri & Elkouri, How Arbitration Works (BNA, 6th Ed., 2003), pp. 608-609, as cited by Employer post-hearing brief, p. 11. No citations to the contrary appear in the Union brief.

[FN10]. The former is dated by Co. Ex. 6 of July 27, 1988. The latter apparently was the "annual contract review meetings" on March 6-7, 2001.

[FN11]. The alternate configurations of configuring the workday simply on the basis of consecutive 24 hour segments starting with 11:45 p.m. on Sunday night or configuring it on a calendar day basis seem not to be urged.

[FN12]. This is to be contrasted with claimed past practices such as, for example, the tolerance of 5 minute late returns from scheduled morning and afternoon breaks. No records are customarily kept on such matters.

[FN13]. The former from the employees' own records, the latter through requests for production of documents



COPR. © 2009 The Bureau of National Affairs, Inc.

122 LA (BNA) 194                                                                                          Page 12

2006 WL 1045444 (Lab.Arb.), 122 Lab. Arb. (BNA) 194, 122 LA (BNA) 194

and/or subpoena.

2006 WL 1045444 (Lab.Arb.), 122 Lab. Arb. (BNA) 194, 122 LA (BNA) 194

END OF DOCUMENT



COPR. © 2009 The Bureau of National Affairs, Inc.

R001044

Westlaw.

126 LA (BNA) 600                                                                Page 1

2009 WL 1693975 (Lab.Arb.), 126 Lab. Arb. (BNA) 600, 126 LA (BNA) 600

Decision of Arbitrator

In re COLUMBUS SHOW CASE COMPANY
[Columbus, Ohio] and LOCAL 2077, THE GREAT
LAKES COUNCIL OF THE U.B.C.; LOCAL 683,
INTERNATIONAL BROTHERHOOD OF ELEC-
TRICAL
WORKERS; LOCAL 372, GLAZIERS, ARCHI-
TECTURAL METAL AND GLASS WORKERS;
LOCAL
1275, INTERNATIONAL BROTHERHOOD OF
PAINTERS AND ALLIED TRADES; LOCAL 287,
SHEET
METAL WORKERS 09/53753
FMCS Case No. 09/53753
April 21, 2009
Arbitrator: Mark A. Rosen, selected by parties
through procedures of the
Federal Mediation and Conciliation Service
BNA Labor Relations Reporter Headnotes - LA

SENIORITY

[1] Layoffs

C117.232

C117.1132

C24.362

C24.359

Seniority date for purposes of layoff for employee
who started career at facility that had only one uni-
on and was closed is date he started work at main
facility of company, where language of collective-
bargaining agreement refers to "facility"--which is
consistent with plant address in preamble--as com-
pany's main facility, term "affected associates" in
provision providing employees' transfer rights if fa-
cility closed refers to employees covered by facil-
ity's five unions, which grievant first was when he
moved to main facility, and for six years unions did

not dispute company memorandum stating that em-
ployee's seniority date for layoff purposes was
when he started at main facility.

[2] Past practice

C117.232

C24.362

Seniority date for purposes other than layoff for
employee who started career at facility that was
closed is date he started work there, even though he
moved to main facility of company after his plant
closed and was entitled only to seniority of date he
started at main facility for layoff purposes, where
employer memo stated that his seniority for pur-
poses other than layoff was date of first hire at old
plant, and that use of seniority was once grieved but
never resolved, and he used longer seniority for
those other purposes, such as claiming overtime.

Appearances: For the employer--Sherrie Barrett,
human resources manager. For the unions--Dennis
Mullen, IBEW business representative.

LAYOFFS

ROSEN, Arbitrator.

Background

Local 2077 of the Great Lakes Regional Industrial
Council of the United Brotherhood of Carpenters
and Joiners, AFL-CIO, Local 683, International
Brotherhood of Electrical Workers, Local 372,
Glaziers, Architectural Metal and Glass Workers,
Local 1275, International Brotherhood of Painters
and Allied Trades, Local 287 Sheet Metal Workers
International Association (Unions) brought this
matter to arbitration challenging the December 11,
2008 decision of Columbus Showcase Company
(Company)regarding the definition and application

COPR. © 2009 The Bureau of National Affairs, Inc.

Westlaw.

of Edgar Shore's seniority for layoff/recall purposes, as more fully discussed below, as a violation of the parties' collective bargaining agreement (Agreement).

## Discussion and Analysis

The Company has manufactured retail store fixtures since 1895. The Preamble of the Agreement identifies the parties by name and further identifies the Company "in its plant at 4401 Equity Drive, Columbus Ohio", as the Employer. During its history, the Company has had other plants [FN1] located at two other locations The Company presently employs approximately 100 employees. [FN2] In 1986 the Company purchased the Castle Show Case company located in Ashland, Kentucky. On October 19, 2001, the Company closed the Ashland plant, moving its operation to the Columbus plant. At that time, the Company had a separate collective bargaining agreement covering the Ashland employees represented by the Great Lakes Regional Industrial Council, Millsmen's Local Union 116 of the United Brotherhood of Carpenters and Joiners of America, AFL, CIO (Local 116). That agreement expired by its terms November 15, 2002. The Company offered the 35 Ashland plant production employees represented by Local 116 the opportunity to be employed at the Columbus plant. Only three employee represented by Local 116 agreed to work at the Columbus plant. The other 32 employees took severance agreements. After a week, only two of the three former Castle Show Case employees (John Akers and Edgar Shore), who had transferred to Columbus, remained employed there. Since June 2005, only Edgar Shore, who had been originally hired by Castle Show Case on September 13, 1971, remains an employee of the Company.

Although there may have been some discussions in 2002 among the parties, Shore and Local 116 about Shore's seniority at the Company's Columbus plant, none of those discussions were reduced to written form, or, if so, retained by anyone. In fact, no agreement was negotiated, written or signed by any of the aforementioned parties to addressing the seniority of the Castle Show Case employees who went to work in Columbus for any purposes, including layoffs and recalls; nor was the parties' Agreement ever modified in that regard. The first written document regarding seniority for those employees was issued October 16, 2002 by Human Resources Manager Sherry Barrett to the Unions Stewards the "Seniority Roster", which stated

Due to the fact that my HR database does not have the ability to store two (2) seniority dates, I have both Edgar Shore and John Akers listed with their dates of hire as their seniority date. However, the company is aware of the fact that this seniority date applies to everything but layoff and recall. In the event of a layoff/recall, October 22,2001 will be the date used for both Edgar and John when making these determinations.

There is no evidence any of the Unions, including the Carpenters' Union/locals 2077 or 116 grieved or responded in any way to Barrett's memo. In fact, Shore and Akers used their Castle Show Case seniority to bid for voluntary overtime. A grievance dated February 6, 2003 was filed by Carpenter's Local 2077 Union Steward Maynard contesting both men being bypassed for overtime two days earlier and requesting Shore's seniority be restored to 9-13-71 and Akers to 6- 1-88 "per their Agreement with [Company President] Chris Aschinger [FN3] and per Article 3, Section 12."

It is undisputed that the operative language of Article 3, Section 12 has remained essentially the same since the 1999 Agreement and through it two successor collective bargaining agreements up until the present. The record does not contain any bargaining history pertaining to that provision. Article 3 is entitled Union Membership and Section 12 provides

Both the Employer and the Union agree that stabilized employment is an important objective to be

COPR. © 2009 The Bureau of National Affairs, Inc.



obtained. Therefore, if the Employer plans to terminate or relocate the facility, or any division or operation thereof, it will notify the Union at least three (3) months in advance of such action, so that a severance settlement can be negotiated for affected associates.

Affected associates will be given the opportunity to transfer to other facilities of the Company, without loss of seniority. The Employer will provide, where necessary, job retraining so that affected associates will be capable of performing other jobs with the Employer. The Employer will also provide adequate time for affected associates to relocate to the Employer's other facilities.

On February 11, 2003, Aschinger responded to the February 2003 grievance stating in relevant part:

This response is in reference to the grievance submitted by Ed Maynard on 2/6/03 concerning seniority for Edgar Shore and John Akers.

This issue has been raised several times by the unions. The first time was this Fall. The attached memo written by Sherrie Barrett on 10/16/02 (to the stewards) explains the company's understanding of how John Aker's and Edgar Shore's seniority was worked out by the 5 unions. It was our understanding the unions were in agreement on how the seniority issue for these two gentlemen was determined . The company also faxed on 10/25/02 the same memo to Steve Griffith and Steve Smith. [Emphasis added]

For your convenience, we have attached the Article 3, Section 12 language of the contract. This language states transfers will not lose their seniority status. We recognize this language is for Columbus employees.

From a global perspective, these two gentlemen worked in the Ashland facility and contributed to the retention of customers through their efforts. Those same customers have been transferred to Columbus and the Columbus employees now realize those benefits. Is seniority about protecting long-term employees who contribute to the success of the company?

It continues to be the company's position that the collective unions must agree on the placement of John's and Edgar's seniority. This was stated by the company at the onset of the transfer of employees from Ashland. We are hopeful it is done in a just and fair manner to all of our fellow associates.

On March 19, 2003, Barrett reiterated her 10/16/02 memo in response to Maynard regarding his earlier grievance. On April 15, 2003, the Unions, minus Carpenter's Local 2077, wrote Aschinger of the Unions had agreed "the seniority date for ... Akers and ... Shore at the [Company] started on their date of hire of October 21, 2001. We agree to this date for the purpose of layoff and recall, as well as vacation; any other conditions regarding their seniority have not been agreed upon." On April 30, Aschinger responded saying if all five Unions agreed to the Union's April 15 position, the Company would consider the matter "closed". Thereafter, there is no evidence Local 2077 ever agreed to the other Union' April 15, 2003 position. The record does not reflect any further processing of the Maynard grievance.

For approximately the next five plus years, Shore used 9/13/71 as his seniority for purposes of vacation, overtime and transferring from the Assembly department into Inspection. No grievance was filed protesting Shore's use of that date for such seniority related matters.

The present dispute concerns the seniority of Edgar Shore for purposes of layoff and recall. This matter has taken on importance as a result of the current state of the US economy, causing the Company to make and contemplate possible additional layoffs of employees in accordance to Article 12.



COPR. © 2009 The Bureau of National Affairs, Inc.

R001047

Article 12, Section 3 Non-Voluntary Lay-off provides "When the Company determines that lay-off is necessary, the first person to be laid-off shall be the junior person on the plant-wide seniority roster." Officials of the Sheet Metal Workers International, Local 287 informed the Company of its disagreement with the Company after it laid off Randy Martin on November 7, 2008. Martin has a October 8, 2001 seniority date. Shortly thereafter, the Company returned Martin to work and no grievance was filed. On December 11, 2008, Barrett wrote the Unions' Stewards

As you know, the question of Edgar Shore's seniority has come up several times over the last few weeks. The company has asked on more than one occasion for the unions to advise us on how you feel this should be handled. Because there is disagreement between the five unions, it puts the company in the precarious position of being unable to apply Edgar's seniority without violating one or more of the unions' positions.

Therefore, we are asking again that the five unions get together and decide what date you want used for Edgar's seniority and what conditions of employment it affects. If we do not hear back from you regarding how you would like us to apply Edgar's seniority, then we will treat him as we do all other associates of CSC Worldwide and use his date of hire (9/13/1971) as his seniority date for all intents and purposes addressed by the contract.

We believe that Edgar is a valued associate who has worked for CSC for a great many years both in Columbus and Ashland and we do not wish to treat him differently than any other of our valued associates.

On December 16, 2008, four of the Unions, minus the Carpenters Local 2077, filed a grievance stating "Shore's seniority date for lay-off and recall will be the date in which [he] started working at 4401 Equity Drive the date was October 22nd, 2001." On

December 19, 2008, Barrett denied the grievance "Based on the language in Article 3, Section 12 of the contract (current and the 6/22/99-6/21/02) we believe Edgar Shore working for a Division of CSC [Company] had the right to transfer to the Columbus facility without loss of seniority. Therefore, this grievance is denied."

On December 30, 2008, the parties had a joint meeting on the grievance. Barrett took notes of that meeting, generally reflecting the parties' positions in this matter:

The unions continue to disagree regarding how to handle Edgar Shore's seniority issue. The Carpenter's believe that the language in Article 13, Section 12 should allow Edgar to transfer from the Ashland Division of Columbus Show Case to Columbus without loss of Seniority and that his seniority date should be his original date of hire.

The other four unions disagree, believing that the contract is "site specific" and only applies to those working at the 4401 Equity Drive facility. They feel that the ability to transfer to other divisions without loss of seniority should only apply if someone from the 4401 Equity Drive facility is transferring TO another division and that anyone transferring FROM another division must use the date that they begin working at this facility as their seniority date. Allowing someone to retain their original seniority date would infringe on the rights of associates currently working at this facility. They believe though that Edgar should not lose his seniority as it applies to his vacation and other rights with the exception of Layoff and Recall.

There is also the belief that if the unions do not agree, that the majority should rule and that having 4 against 1 in this situation should mean that Edgar use the 10/01 date as his seniority date. However, the Carpenters are not in agreement with this either. Steve Griffith [of the Carpenter's Union] said that the "Steering Committee" is for the purpose of ne-

COPR. © 2009 The Bureau of National Affairs, Inc.



gotiating the labor contract and that this majority rules situation does not apply in this case.

In addition to the stewards and business agents, this group has also asked for input from Terry Miller, former Carpenter's steward, Henry Carter, former IBEW steward, and Donal Penwell, former Metal steward. Unfortunately, the memories of all involved do not match making it more difficult to understand how this matter was originally addressed or how it should be handled now. Terry Miller believes that there is some correspondence at the Carpenter's Union Hall that will indicate the 10/01 seniority date should be used. Steve Griffith remembers seeing no such correspondence, but will check into the matter. [FN4]

There is much correspondence regarding this situation which only adds more confusion in that sometimes it appears that the matter is understood and sometimes it appears that unless all five unions agree that the matter remains unresolved which is where it was left in the spring of 2003.

It is only now that this situation is being tested because Edgar's 10/01 date of hire here in Columbus has never fallen into a mandatory layoff group.

At this point, no matter how the company responds to the grievance this situation will not be resolved. Making an adjustment on this grievance that satisfies the Painters, Glaziers, Electric and Metal unions will only invite a new grievance from the Carpenters which will start the process all over.

Therefore, because of this the Company chooses to deny this grievance as no other response will resolve the matter.

Finally, we would like to note that the matter of Edgar Shore's seniority has been an issue that all five unions have been aware of for over seven years. We have had multiple conversations, meetings and correspondence regarding this matter. While the layoff and recall part of this has not been tested until now, we certainly have all been aware of it and it has been addressed in the past. We believe based on the grievance procedure in Article 13 of the contract that the submission of this grievance is nearly 5 years past due. If you look at the letter from the 4 unions dated April 15, 2003 and Chris Aschinger's response letter dated April 30, 2003 you will see that you have indeed raised the issue of layoff and recall and the matter was never grieved when there was no resolution. Therefore, we believe that the opportunity to grieve this matter is long past. [FN5]

In addition to the above, the Unions, minus Local 2077, point out it is unfair if only Carpenters would get seniority credit for transferring. These Unions also noted the Company records contain a New Hire Report dated 10/29/01 showing Shore having a hire date of 10/22/01. The Company emphasized the hire date should apply for all seniority related matters; and, Shore should not be treated any differently than any other of its employees.

Opinion

It is well recognized in labor law and labor relations that seniority is a matter solely up to the parties in a collective bargaining relationship to define and apply within the express terms of their collective bargaining agreement. [FN6] In the absence of any such agreement, seniority and its benefits and/or rights do not exist, but maybe addressed and/or modified by subsequent negotiations by the parties. Generally, labor arbitrators have held employees are not vested and credited with seniority for prior employment outside of the bargaining unit, unless the applicable collective bargaining agreement expressly so provides for the transfer of seniority rights into that agreement's bargaining unit from another bargaining unit. In the absence thereof, arbitrators have held the collective bargaining agreement gives only seniority rights/benefits at the plant location/bargaining unit where service was performed earning that seniority; and, that

COPR. © 2009 The Bureau of National Affairs, Inc.



seniority by itself does not survive that plants closing. [FN7]

Shore's seniority, while an employee at Ashland for both Crystal Show Case and later with the Company was the result of express terms of the collective bargaining agreement between Local 116 and the Crystal Show Case and subsequently with Local 116 and the Company. The present Unions were never signatories to any of those agreements. These Unions never amended any of their Agreements with the Company to address in any way employment service/seniority of persons not members of the Unions who worked and acquired seniority outside of the Company's Columbus plant before becoming employed at that plant and thereby represented by one of the five Unions. The critical point of reference in this inquiry is found in the Preamble to the Agreement, which clearly indicates the Agreement employment terms are established between the five specified Unions and the Company, as identified therein "in it's plant at 4401 Equity Drive, Columbus, Ohio, hereinafter called the Employer". Nothing in the parties's Agreements ever referred specifically to the Crystal Show Case and/or Ashland plant or employees previously represented by Local 116 in any manner.

In contract interpretation/enforcement actions, it is a well recognized principle of labor arbitration that clear and unambiguous collective bargaining agreement language is the best evidence of the parties' intentions as to what they agreed upon. Such express language is to be enforced by its precise terms and common meaning to maintain the integrity of the parties' intended agreement, even if one party finds the result somehow contrary to its expectations. Only where the applicable provision language is unclear or ambiguous, it is generally accepted that extrinsic evidence, including negotiating history, and past practice, if any, may be relied upon to determine the parties' intent. In addition, words and phrases are rarely interpreted alone. To give force and effect to the entire agreement, disputed language must be interpreted in context with its section, article, and in harmony with the Agreement as a whole.

[1] Both the Company and the Union's rely upon Article 3, Section 12 in support of its position. In doing so, neither party claims the language therein is unclear or ambiguous. Upon examination of that language, it is the Arbitrator's considered opinion the plain meaning of language of that provision does not support the Company's current position. Rather, the language in that provision supports the position taken by the Unions, minus the Carpenters. Specifically, the Article 3, Section 12 first paragraph reference to " the facility" [FN8] termination or relocation with can only be read to be consistent with the Columbus plant address in the Preamble. The term "affected associates" in the second paragraph can only refer to the associates represented by the five Unions. In that regard, Shore has only been represented by Local 2077 as of the date of his employment at the Columbus plant on October 22, 2001. Therefore, in the absence of specific Agreement language therein to the contrary, his seniority for layoff and recall is that date.

[2] These findings are also consistent with the October 16, 2002 memo, which set Shore's seniority for lay-off recall purposes as October 22, 2001. Although that memo was not a formal agreement signed off on by all five Unions, it was took on the quality of a binding past practice between the five Unions and the Company and as such is equivalent to an Agreement provision because it was not disputed and was essentially followed by all five Unions, including Local 2077, and the Company for 6 years. Likewise that Memo also created the basis by which a binding past practice arose among the parties by which Shore's September 13, 1971 date of hire at Crystal Show Case was used for other seniority purposes at the Company's Columbus plant. While that use of Shore's seniority was once grieved, that grievance was never unresolved, and Shore continued to so use that seniority date for



COPR. © 2009 The Bureau of National Affairs, Inc.

those other purposes. Therefore, Shores' use of seniority based upon the 9/13/71 date for vacations, Departmental transfers, etc. shall continue in effect as long as Shore remains employed by the Company.

Lastly, while the Arbitrator has the authority to resolve the present grievance in this case, he has no authority to tell the five Union how to govern their administration of the Agreement regarding the processing or settling of grievances. However, each of the five Unions and the Company, as signatories to the Agreement are bound by its terms, including this Arbitration decision, as a matter of law.

AWARD

The grievance is sustained for the reasons stated above. Shore's seniority for purposes of lay-off and recall is October 22, 2001. His seniority for other purposes under the Agreement is September 13, 1971.

[FN1]. Neither of those two plants has any bearing on the present dispute. One of those plants had no union representation.

[FN2]. The Agreement refers to the employees represented by the five Unions as factory associates or associates. These terms have been used interchangeably herein.

[FN3]. As noted above, no such "agreement" has been documented in this record. Aschinger did not testify in this Arbitration hearing.

[FN4]. As noted above, no such documentation was placed in this record.

[FN5]. At the Arbitration hearing, the Company stated it would like to see the dispute decided "without regard to any timing issue." It is generally recognized in Labor arbitration that matters of a repeating nature, such as the applicable date for seniority purposes, may constitute a grievance of "con-

tinuing" nature, which may not be subject to normal time limits. In any event, under these circumstances, there is no need to address the timeliness of the present grievance.

[FN6]. The only exception to that principle occurs when unlawful discrimination is involved in defining or in the exercise of seniority in a collective bargaining relationship. Such discrimination is not relevant in this case.

[FN7]. See Elkouri and Elkouri, How Arbitration Works, Chapter 14, Seniority, pages 586-649, BNA, 4th Ed., 1985.

[FN8]. The use of the term "facilities" in the second paragraph is at best a latent ambiguity having had some meaning in the past, when the Company had other plants, which is not the case now and thus has no current practical meaning. In the absence of any clear pertinent current bargaining history, such "hold over" or historical language should be so clarified or corrected in subsequent contract negotiations to avoid any further confusion.

2009 WL 1693975 (Lab.Arb.), 126 Lab. Arb. (BNA) 600, 126 LA (BNA) 600

END OF DOCUMENT

COPR. © 2009 The Bureau of National Affairs, Inc.



R001051



Westlaw.

107 LA(BNA) 212                                                            Page 1
1996 WL 611650 (Lab.Arb.), 107 Lab. Arb. (BNA) 212, 107 LA (BNA) 212

In re
STACO ENERGY PRODUCTS CO.
and
INTERNATIONAL UNION OF ELECTRONIC,
ELECTRICAL, TECHNICAL, SALARIED, AND MA-
CHINE
WORKERS, ACTING ON BEHALF OF AMALGAM-
ATED LOCAL 768
FMCS Case No. 96/03960
August 28, 1996
Arbitrator: Marvin J. Feldman, selected by parties
through procedures of the
Federal Mediation and Conciliation Service
BNA Labor Relations Reporter Headnotes - LA

ABSENTEEISM

-- Failure to report

C118.6362

Employee was properly discharged for twice failing to
call in, even if he had medical excuse for absences,
where collective-bargaining contract requires discharge
for two failures to call in, contractual provision allow-
ing excused absences for medical reasons does not per-
tain to failure to call in, and this was not just-cause dis-
charge but one for violating specific contractual provi-
sion.

-- Failure to report

C118.6362

Employee failed to report in, even though on previous
day he had told management he would report back as
soon as doctor released him, where collective-bargain-
ing contract required employees to call in within two
hours of starting time each day and employee's saying
that he will call when he can return lacks specificity
needed to schedule employees.

Appearances: For the employer -- Stephen A. Watring,

attorney; Karen Harper, law clerk; Steven Wendt, per-
sonnel manager; Harry E. Stiffler, production foreman;
Ron Hosler, vice president, operations. For the union --
James A. Hall, international representative; Steven A.
Rhoades, chief steward; George Mayrer, local president.

FAILURE TO REPORT

Statement of Facts

Arbitrator: Marvin J. Feldman

The facts in this particular case are rather straight for-
ward. The grievant was an eight year employee of the
company having served in a variety of classifications.
Prior to the discipline at hand the grievant had but one
discipline. The grievant was employed at the company
at the time of his termination under the 1992-1995 con-
tract. The specific clauses in that contract pertinent to
the matter at hand are found at article II, section 3, sub-
paragraph (c) and (d). Those paragraphs pertinent to the
matter at hand revealed the following:

""(c) The employee must notify the Company in ad-
vance or no later than two (2) hours after the start of
their scheduled work shift for any absence or early-out,
and must call in or report within two (2) hours if the
employee is going to be late. The employee must speak
with his immediate supervisor, or the personnel man-
ager, and must place the call personally, unless it is im-
possible to do so. Failure to call in as required will res-
ult in an automatic three (3) day disciplinary layoff, and
will result in the absence, tardy, or early-out being
treated as one occurrence under the above policy. The
second failure to call in as required within any twelve
(12) month period will result in discharge.

(d) In order for an absence to be excused, and thus not
charged to an employee under the above policy, the em-
ployee must supply written documentation of the reason
for the absence. In exceptional cases, exceptions may be
made in the Company's sole discretion on a non-
precedent basis. In view of the above, the Company will



COPR. © 2009 The Bureau of National Affairs, Inc.

not call the homes of absent employees for the purpose of determining the nature of their absence nor of expected return. Excused absences, tardies and early-outs are limited to (1) employee illness, supported by a doctor's statement that the employee was unfit for duty on the date(s) of absence, (2) court subpoena, supported by a court document, (3) official Union business for a Union officer, supported by written notice provided to the Company at least three (3) working days in advance, and (4) illness of the employee's mother, father, or an immediate family member residing in the employee's household, necessitating the employee's absence, as supported by a doctor's statement satisfactory to the Company, provided that other critical situations may be approved by Personnel." (It might be noted that the underlining indicated hereinabove are as a result of the arbitrator's emphasis on those words.)

The first discipline that the grievant was involved in was one of July 13, 1995. That activity by way of company indication revealed the following:

""You have violated Company Rule Number 4 and Article II, Section 3 (C) of the Labor Contract. Failure to call in notice of your absence on Thursday 7/13/95 within 2 hours after the start of your scheduled shift, you called in at 9:40am."

The disciplinary action taken by the company revealed the following:

""DISCIPLINARY ACTION: Your failure to properly notify results in a 3-day disciplinary layoff, to be served 7/17, 7/18 and 7/19/95. You are further advised that violations of this or other company rules could result in further disciplinary actions up to and including discharge."

On August 24, 1995, the date of the triggering event for the matter at hand revealed that the grievant again violated the same contractual clause. The language of that discipline of the company revealed the following:

""You have violated Company Rule Number 4 and Article II, Section 3 (C) of the Labor Contract. Failure to

call in notice of your absence on Thursday 8/24/95 within 2 hours after the start of your scheduled shift.

You were counseled and received a disciplinary suspension for your same failure on 7/13/95."

The disciplinary action taken by the company revealed the following:

""DISCIPLINARY ACTION: Your second failure to call in and notify the company in advance or no later than two (2) hours after the start of your scheduled work shift, within a twelve (12) month period, results in your discharge from Staco Energy Products Company."

The same day of the activity by the company in terminating the grievant, a protest was filed and the protest revealed the following:

""I R protest the action of the company for my discharge. I went to the doctor on 8-23-95, he put me off for my back problem and I was to return to him on 8-24-95. I called in at 6:20 + 6:32 on 8-23-95 to tell the company what I was doing. I then brought in my paper from the doctor on 8-24-95 at 2:45 to show the company. This is a violation of Art II Section 3 (a,b,c,d) ."

In denying those grievances the company filed two answers. The answer of August 31, 1995, revealed the following:

""The discharge of grievant R was just and in keeping with the specific contractual provision of Article II Section 3 (C). There has been no violation of the agreement therefore this grievance is denied."

The answer of September 29, 1995, revealed the following:

""As reviewed in the previous grievance steps the grievant R clearly violated company work rule number 4 and specifics provided in Article II, Section 3 (c) of the contractual agreement. He received a disciplinary suspension of 3 days for his violation as documented in his disciplinary action notice dated 7/13/95. His second

COPR. © 2009 The Bureau of National Affairs, Inc.



failure documented in disciplinary action notice dated 8/25/95 led to the progressive disciplinary action of his discharge. The past application of this contractual provision has been fairly and consistently administered to other bargaining unit employees. There has been no violation of the agreement therefore, this grievance is denied."

It might be noted that the grievant in this particular matter called in on August 23, 1995, at approximately 6:30 or 6:40 a.m. and notified the foreman that he would not be in because his back bothered him and that he would see his doctor that date and that he would report back as soon as the doctor released him. The grievant did see his doctor on that date and also saw the doctor on the next date. The grievant never called the company on the next date, i.e., August 24, 1995, but approximately at 1:30 p.m. delivered the following medical report to the company:

""Date: 8-23-95

This is to certify that: R is under my care. In order to avoid aggravation of his/her condition, I recommend he/she be excused from work 8-23-95 and 8-24- 95."

The company maintained that the grievant violated paragraph (c) of section 3, article II, i.e., the call-in paragraph and that as a result of that violation and as a result of the language therein the grievant by not calling in in the a.m. two hours prior to his shift pursuant to the terms of the contract therefore violated it and the mandatory language of discharge was followed and the grievant was terminated.

The union on the other hand indicated and stated that the grievant called in on August 23, 1995, at the appropriate time in the a.m.; that he in fact saw his doctor on that date and on the next date; that in fact the grievant was not fit for duty; that the grievant received the injury at work for which he saw the doctor and that the company interpretation of the contract is inappropriate especially under the circumstances of this particular matter.

The union further argued that this was a just cause matter and that under article II, section 1, the company could only terminate for just cause. The language of article II, section 1, entitled, Management Rights, revealed the following:

""ARTICLE II-MANAGEMENT RIGHTS

Section 1. Management Rights: By way of illustration, but not by way of limitation, it is agreed that the management of the plant and direction of the working forces, the types of products to be manufactured, the location of plants, the schedules of production, the methods, processes and means of manufacturing, the establishment of work and production standards, including revisions thereof, and establishment of reasonable rule and regulation, including but not limited to policies, rules, and regulations concerning drugs and alcohol, and the enforcement of all of the foregoing shall be the sole right of Staco Energy Products Co. or its successor(s). In addition, the supervision of all work, together with the right to hire, discipline, discharge for just cause, promote, demote, transfer, layoff or assign work, adopt, establish, and distribute copies of plant and safety rules, is the exclusive function of Management except it shall not be contrary to any of the terms of this Agreement. Provided, that nothing in this Section shall permit the Company to conduct random drug testing without prior discussion with the Union."

It was upon those facts that this matter rose to arbitration for opinion and award.

Opinion and Discussion

It must be determined in this case whether or not this was a just cause discharge. The fact of the matter is that the language of the contract in clear and unambiguous language stated that the second failure to call-in as required within any twelve month period will result in discharge. The grievant was charged with that violation of contract and not with a violation of a rule. As a result, this is not a matter of a just cause discharge as revealed in section 1 of article II, but rather a violation alleged of a contractual clause which takes it out of a just cause thought process and places it directly as a con-

COPR. © 2009 The Bureau of National Affairs, Inc.



R001054

107 LA(BNA) 212                                                                                              Page 4
1996 WL 611650 (Lab.Arb.), 107 Lab. Arb. (BNA) 212, 107 LA (BNA) 212

tractual violation matter. There is no doubt that the parties acquiesced to such activity under the terms of the contract. There is no doubt that the publication to the bargaining unit was made at the time the bargaining unit voted on the agreement.

The rules relating to a company rule are different in that a determination of just cause must be made and a determination of reasonableness must be made. Not so in the matter at hand. In the matter at hand the parties acquiesced to the rule by virtue of placing it within the four corners of the agreement and if an act contrary to the term of the agreement is violated then in that event it becomes a contractual discharge rather than a just cause discharge. That is exactly what happened in this particular case.

The grievant in July had been forewarned when he received the three day discipline that further activity of the same type would trigger discharge. The grievant had actual notice that that event would occur. On August 23, the grievant reported off as he should have pursuant to the indicated paragraph. The grievant in some way believed that his call-off of August 23, would also cover him for August 24. The language of the contract is quite clear and it stated that the employee must notify the company in advance or no later than two hours after the start of their scheduled work shift for any absence or early out and must call-in to report.

Telling a company that I will call you when I can come
AWARD

Grievance denied. The personnel record of the grievant shall reveal that the grievant resigned rather than was terminated for just cause and this notation shall be made upon the record of the grievant forthwith.
END OF DOCUMENT

back lacks the specificity needed to schedule the employees for their work. The contract demands calling. That is what the company is entitled to under the contract. There is no doubt that this is a draconian section of the contract but an arbitrator cannot brandish his own industrial justice and determine a matter on language that he likes or create new language if he doesn't like the language of the written contract. The fact of the matter is, the language of the contract stated that discharge lies for a second event and that is what the company did.

The union also pointed out in this particular matter that the grievant had a medical excuse and that he was entitled to an excuse for the absence under subparagraph (d). It might be noted that upon reading of the contract that paragraph (c) and paragraph (d) are mutually exclusive. Paragraph (c) pertains to call-outs and their violations and remedies and paragraph (d) pertains to absences and their remedies. One has nothing to do with the other and although the grievant may have had a proper excuse for an absence, failure to call-out is a separate event which is taken care of under the indicated and stated paragraph hereinabove.

As a result of all of this, the grievance of the grievant is not well taken and the termination is sustained.

COPR. © 2009 The Bureau of National Affairs, Inc.



R001055

Westlaw.

34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

P

United States Court of Appeals,
Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
WINDEMULLER ELECTRIC, INC., and Construction Employment Services, Inc., Respondents.
No. 92-6240.

Argued Aug. 3, 1993.
Decided Sept. 14, 1994.

National Labor Relations Board (NLRB) applied for enforcement of remedial order. The Court of Appeals, David A. Nelson, Circuit Judge, held that: (1) humorous reference by vice president and part owner of employer to employment applications submitted by union members did not constitute an unfair labor practice; (2) employer's unwillingness to let union stickers be displayed on company-owned hard hats did not constitute unfair labor practice; (3) finding that employer's selection of three union supporters for layoff was an unfair labor practice was supported by evidence; and (4) evidence was insufficient to establish that departure of temporary employee was an unfair labor practice.

Enforcement granted in part and denied in part.

Wellford, Senior Circuit Judge, filed an opinion concurring in part and dissenting in part.

West Headnotes

**[1] Constitutional Law 92 ⇐ 1911**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(O) Labor and Employment in General

        92k1910 Labor Relations
            92k1911 k. In General. Most Cited Cases
    (Formerly 92k90.1(7.1), 232Ak47 Labor Relations)

**Labor and Employment 231H ⇐ 970**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(A) In General
            231Hk970 k. Construction and Operation of Statutes, Ordinances, and Regulations, in General. Most Cited Cases
    (Formerly 232Ak47 Labor Relations)
NLRA does not and cannot repeal First Amendment with its prohibition against laws abridging freedom of speech. National Labor Relations Act, §§ 1 et seq., 8(c), as amended, 29 U.S.C.A. §§ 151 et seq., 158(c); U.S.C.A. Const.Amend. 1.

**[2] Labor and Employment 231H ⇐ 1472**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(G) Unfair Labor Practices
            231Hk1471 Expression of Views
                231Hk1472 k. In General. Most Cited Cases
    (Formerly 232Ak383.1 Labor Relations)
Employer speech that truly does interfere with, restrain, or coerce employees in the exercise of their collective bargaining rights can be abridged by the government. National Labor Relations Act, § 8(a)(1), as amended, 29 U.S.C.A. § 158(a)(1); U.S.C.A. Const.Amend. 1.

**[3] Labor and Employment 231H ⇐ 1473(1)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(G) Unfair Labor Practices



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

231Hk1471 Expression of Views
     231Hk1473 Particular Statements or Expressions
         231Hk1473(1) k. In General. Most Cited Cases
    (Formerly 232Ak384 Labor Relations)

Humorous comments by employer's vice president and part owner to employees, in response to question asked during a breakfast meeting, that employer had a lot of employment applications from the union in one locale did not interfere with, restrain, or coerce employees in the exercise of their collective bargaining agreements; there was no suggestion that the little jest made by vice president in response to question from audience was anything other than spontaneous, unplanned, and unrehearsed, vice president knew perfectly well it would have been illegal for him to discriminate against union activists, and union "salt" testified that vice president never indicated in meeting that he would not hire union members. National Labor Relations Act, § 8(a)(1), as amended, 29 U.S.C.A. § 158(a)(1).

**[4] Labor and Employment 231H ⟜ 1477(1)**

231H Labor and Employment
    231HXII Labor Relations
      231HXII(G) Unfair Labor Practices
        231Hk1475 Prohibiting Union Solicitation or Activity
          231Hk1477 Particular Restrictions
            231Hk1477(1) k. In General. Most Cited Cases
    (Formerly 232Ak386 Labor Relations)

Employer's unwillingness to let union stickers be displayed on company-owned hard hats did not constitute an unfair labor practice particularly when employer scrupulously honored presumptive right of employees to wear union insignia on their own clothing. National Labor Relations Act, § 8(a)(1), as amended, 29 U.S.C.A. § 158(a)(1).

**[5] Labor and Employment 231H ⟜ 1477(4)**

231H Labor and Employment
    231HXII Labor Relations
      231HXII(G) Unfair Labor Practices
        231Hk1475 Prohibiting Union Solicitation or Activity
          231Hk1477 Particular Restrictions
            231Hk1477(4) k. Place. Most Cited Cases
    (Formerly 232Ak386 Labor Relations)

Labor union has right to make use of employer's real property for purpose of communicating union messages, as long as employees are not beyond reach of reasonable union efforts to communicate with them by means that do not trespass upon employer's property rights.

**[6] Labor and Employment 231H ⟜ 1476**

231H Labor and Employment
    231HXII Labor Relations
      231HXII(G) Unfair Labor Practices
        231Hk1475 Prohibiting Union Solicitation or Activity
          231Hk1476 k. In General. Most Cited Cases
    (Formerly 232Ak386 Labor Relations)

Employees who are union supporters have no right to make use of employer's personal property for purpose of communicating union messages, as long as employees can make effective use of their own property for that purpose.

**[7] Labor and Employment 231H ⟜ 1746**

231H Labor and Employment
    231HXII Labor Relations
      231HXII(I) Labor Relations Boards and Proceedings
        231HXII(I)6 Weight and Sufficiency of Evidence
          231Hk1746 k. Layoff. Most Cited Cases
    (Formerly 232Ak564 Labor Relations)

Administrative law judge's (ALJ) finding that em-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



R001057

34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

ployer's selection of three union supporters for lay-off constituted an unfair labor practice was supported by testimony that superintendent became outraged at sight of union stickers that four temporary employees who were laid off had placed on hard hats issued to them by company, testimony of foreman that superintendent used the words "union people" to refer to persons to lay off first, and testimony that one union employee was being kept on only because he was an apprentice and would thus cost the company less money. National Labor Relations Act, § 8(a)(1), as amended, 29 U.S.C.A. § 158(a)(1).

**[8] Labor and Employment 231H ⟜ 1763**

231H Labor and Employment
  231HXII Labor Relations
    231HXII(I) Labor Relations Boards and Proceedings
      231HXII(I)6 Weight and Sufficiency of Evidence
        231Hk1763 k. Promotion, Demotion, or Transfer. Most Cited Cases
        (Formerly 232Ak561 Labor Relations)
Evidence was insufficient to establish that master electrician was reassigned and then effectively terminated because he intended to engage in organizational activities; rather, evidence established that company that supplied temporary labor to contractors gave the master electrician a different job which master electrician took. National Labor Relations Act, § 8(a)(1), as amended, 29 U.S.C.A. § 158(a)(1).

**\*385** Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Peter Winkler (briefed), Margaret E. Luke (argued and briefed), N.L.R.B., Office of Gen. Counsel, Washington, DC, Stephen M. Glasser, Acting Regional Dir., N.L.R.B., Detroit, MI, for N.L.R.B.

Peter J. Kok (argued and briefed), Elizabeth M. McIntyre (briefed), Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for Windemuller Elec., Inc.

Construction Employment Services, Inc., pro se.

Before: NELSON, Circuit Judge; and WELLFORD and GUY,[FN*] Senior Circuit Judges.

> FN* The Honorable Ralph B. Guy, Jr. assumed senior status on September 1, 1994.

**\*2** NELSON, Circuit Judge, delivered the opinion of the court, in which GUY, Senior Circuit Judge, joined. WELLFORD, Senior Circuit Judge (p. 397), delivered a separate opinion concurring in part and dissenting in part.

DAVID A. NELSON, Circuit Judge.

Having determined that the respondents (who were found to be "joint employers") committed certain unfair labor practices, the National Labor Relations Board has applied to us for enforcement of a remedial order. One of the respondents, a minority-owned company that supplies temporary labor to contractors, has failed to appear in the enforcement proceeding. The other respondent, an electrical contractor, vigorously contests several of the Board's findings.

The main issues we must decide are these: (1) whether substantial evidence supports the Board's finding that a humorous reference by one of the electrical contractor's owners to a dramatic influx of employment applications from union members several months earlier had a tendency "to interfere with, restrain, or coerce" the contractor's employees in the exercise of their statutory rights to organize and to join or assist labor unions; (2) whether the Board was justified in concluding that the contractor could not lawfully request the removal of union stickers from company-owned hard hats, notwithstanding that the temporary employees to whom the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

hats had been issued could and did continue wearing a variety of union insignia on their own clothing; (3) whether substantial evidence supports a finding that three temporary employees were laid off prematurely because of their union activities; and (4) whether there was sufficient evidence for the Board to find, as it did, that a fourth employee was reassigned and that his employment was then effectively terminated because he intended to engage in organizational activity.

**\*386** We conclude that the first, second and fourth issues must be resolved in favor of the contractor. The third will be resolved in favor of the Board.

### \*3 I

Respondent Windemuller Electric, Inc., is a non-union electrical contractor based in a suburb of Grand Rapids, Michigan.[FN1] The company has a branch office in Kalamazoo, some 50 miles away. During 1990, when the unfair labor practices are alleged to have occurred, the company employed between 130 and 150 people and worked on over 300 different jobs. The projects ranged in size from a few hundred dollars to over a million dollars.

> FN1. Windemuller has operated on an open-shop basis since 1970, when a union that had represented the company's electrical workers for several years was decertified following an NLRB-supervised election. A different union lost a representation election in 1978, and there has been no election since that time.

To meet fluctuating personnel needs at its various job sites, Windemuller routinely moves people from one job to another, scheduling overtime as necessary. It sometimes borrows employees from other contractors on a short-term basis, and in 1989 it started to make occasional use of temporary employees carried on the payroll of respondent Construction Employment Services, Inc. ("CES").

CES, according to testimony introduced at a hearing before an administrative law judge, was founded in May of 1989 by an African-American entrepreneur named Roosevelt Tillman. Mr. Tillman ran CES with the assistance of one other employee. The firm supplied contractors with temporary help in a variety of trades, ranging alphabetically from block masons and bricklayers to sprinkler fitters and welders.

Mr. Tillman, who represented CES at the hearing without the assistance of counsel, was called as a witness by Windemuller. Tillman testified that the first temporary employees furnished to Windemuller by CES were two apprentices whom he sent to Windemuller's vice president and part owner, Mike Windemuller, in September or **\*4** October of 1989. The apprentices worked for Windemuller "[a] [c]ouple of weeks."

During 1989, according to Mike Windemuller's testimony, Windemuller Electric received over 100 direct applications for employment. Of that number, 26 employment applications were received on a single day-October 18, 1989-when several car loads of International Brotherhood of Electrical Workers members drove to Windemuller's Grand Rapids office and presented applications on behalf of themselves and other members of the union. Among the applicants were the presidents of IBEW Local Unions 131 and 275, various other union officers, and two full-time paid union employees.

Many of the applications were accompanied by form letters from the IBEW advising Windemuller that "[s]hould you fail or refuse to fairly and nondiscriminatorily consider this applicant for employment ... we reserve the right to bring such failure or refusal to the attention of the National Labor Relations Board as violations of Section 8(a)(1) and (3) of the Act." Windemuller processed the employment applications in the normal manner, but none of the applicants was hired.



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

The unions subsequently filed unfair labor practice charges with the NLRB, alleging that Windemuller had refused to hire the applicants because they belonged to a union. These charges were ultimately picked up by the NLRB's general counsel in a complaint that triggered the administrative proceeding now under review. The administrative law judge who heard the case found other allegations in the complaint to be meritorious, but not these; the ALJ concluded that the general counsel "failed to prove that the Company discriminatorily refused to hire or consider the union applicants for employment...."

On January 17, 1990-a full three months after the mass submission of employment applications by the IBEW in Grand Rapids-Windemuller held a breakfast meeting at a Kalamazoo restaurant for those of its employees who worked in the Kalamazoo area. (The meeting-one of *5 a series of monthly breakfast sessions-provided an opportunity for management officials and others to update everyone on current and future projects in the area.) Mike Windemuller gave a talk in which he indicated that staffing on the company's jobs was growing tight, so the company was looking for people to hire. *387 Someone asked if there were any applications on file. Mr. Windemuller's response-which evoked laughter from the audience-was "yeah, [we've] had a lot of applications from the union." (Mr. Windemuller was referring, obviously, to the preceding October's flood of applications in Grand Rapids.) When the laughter subsided he added that he had checked with other contractors in the Grand Rapids area, and they too had received a lot of applications from the union. At the conclusion of Mr. Windemuller's talk, the Kalamazoo branch manager for Windemuller, Bill DeDoes, said that anyone who knew of any journeyman electricians in the Kalamazoo area should have them get hold of DeDoes, because more electricians would be needed.

It is the theory of the Board's general counsel that Mr. Windemuller's wry allusion to the union's October surprise in Grand Rapids constituted an unfair labor practice; in the general counsel's view it tended to coerce Kalamazoo-area employees by telling them, in effect, that Windemuller would not consider union applicants for employment. The record nonetheless indicates that Windemuller had repeatedly hired known union members in the past and was to do so again as early as January 23, 1990, six days after the breakfast meeting, at which time the company recalled an IBEW member named Eugene Roberts. (On January 22, 1990, the company recalled a black employee, Michael Hudnell, and a week later it hired a female applicant, Brenda Jackson, who started as an apprentice and is now a journeyman electrician.)

Windemuller wanted to increase the number of African-Americans and members of other racial minorities in its employ, and early in May of 1990 Mike Windemuller and a company superintendent named Kirk Strong had a luncheon meeting with Roosevelt Tillman, of CES, to *6 discuss possible ways of achieving this goal. In addition to talking about how Windemuller might improve its minority recruitment effort, Mr. Tillman made a sales pitch for CES. He then invited the men from Windemuller to accompany him to his office after lunch to examine employment applications on file from electricians who were seeking temporary jobs.

The invitation was accepted, and Messrs. Windemuller and Strong proceeded to review the qualifications of 20 to 30 applicants. Windemuller "pre-approved" approximately 10 applicants as acceptable candidates. At the hearing before the ALJ Mike Windemuller identified four of the people thus pre-approved as individuals whose work histories, which were set forth on their applications, showed that they were IBEW members or had union backgrounds. The union label did not deter Windemuller from pronouncing the applicants acceptable.

Mr. Tillman testified that Kirk Strong telephoned him on May 11, 1990, soon after their luncheon

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

meeting, with a request for several electricians in the journeyman and apprentice categories. Strong told him, according to Tillman, that he would need the people for one to two weeks. Mr. Tillman promptly called the applicants who had been pre-approved-taking it upon himself to tell them, based on past experience with construction work, that he thought the job would last approximately four weeks-and on the following Monday morning, May 14, 1990, five CES temporary employees reported for work at a job site where Windemuller was installing power and lighting items in two levels of a building being constructed in Kalamazoo for the Upjohn Company. Several electricians temporarily borrowed by Windemuller from other Kalamazoo-area contractors had already been put to work on this job, according to Mr. Windemuller's testimony, starting as early as late April or the beginning of May.

The general contractor on the Upjohn project required its subcontractors to have their employees wear hard hats of *7 designated colors. Each subcontractor was assigned a different color so that its people could be readily identified. Windemuller's assigned color was yellow. When the five temporary employees from CES reported for duty on May 14, each of them was issued a yellow hard hat owned by Windemuller and bearing Windemuller's name. They were also issued safety booklets containing decals with emergency telephone numbers. After reading the safety booklets, the men were instructed to affix the decals to the backs of their hard hats.

When the five CES people came to work the following day, their supervisor observed *388 that four of them had decorated their company-owned hard hats with stickers or decals bearing union messages. The four men were also displaying union buttons and union emblems on their clothing, which included union jackets and union T-shirts.

The first witness called by the general counsel at the hearing-Barry Alan, a "salt" surreptitiously placed with Windemuller by an IBEW local union-testified that Dick Thompson, a Windemuller superintendent, "became outraged" after seeing the union items on Windemuller's hard hats. Superintendent Thompson told two other management people and Mr. Alan (whom Thompson had promoted to a foreman's position) that "he [Thompson] didn't think that those union people should be wearing union buttons and stickers on Windemuller's hard hats because Windemuller wasn't a union contractor and they should take those stickers off."

Nothing was said to the CES employees at the time, but the following day Mr. Thompson asked them to remove all stickers from the hard hats except for the Windemuller name and the decals with the emergency telephone numbers. As one of the CES people testified, "Dick Thompson asked us if we would remove the stickers from their [Windemuller's] hard hats since it was their property and they didn't want the IBEW stickers on their hard hats."

Mike Windemuller testified that Mr. Thompson had talked to him about the union paraphernalia, and *8 Windemuller had told Thompson to ignore everything but the items on the company's hard hats and to ask the men to remove the unauthorized stickers from the hats. (Mr. Windemuller cited both marketing and safety reasons for not wanting additional stickers on the company's hats.) The CES men complied with Mr. Thompson's request, and they returned to work after taking the union stickers off the hats.

At some point during the week of May 14, according to the uncontradicted testimony of Mike Windemuller and Bill DeDoes, the Austin Company (Upjohn's general contractor) called a halt to work on a power riser contract under which Windemuller was installing feeder conduits between the basement and the penthouse of the building. Austin decided that it wanted to install some heavy equip-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
(Cite as: 34 F.3d 384)

ment on the upper floors before the power riser work continued. This decision meant that three Windemuller electricians who had been working on the riser project would be freed for other work. Windemuller assigned these employees to the ongoing project in the lower levels of the building, where they were to start work on Monday morning, May 21.

About mid-day on Thursday, May 17, superintendent Dick Thompson called foreman (and union "salt") Barry Alan and told him that he would be laying off Messrs. Sosnowski, Tishhouse and Ketchum-three of the CES temporaries-the following day. Mr. Alan responded, according to his testimony, that superintendent Strong had previously told him that workers borrowed from other contractors would be laid off first because their rate of pay was higher. Mr. Thompson then said, according to Alan, that he had just come from a meeting with Bill DeDoes, and the instructions were "to lay off the three union people first." When Alan pointed out that there were four union people among the CES employees, Thompson responded that they were going to keep Mike Stackpole-an apprentice-because he did not cost the company as much as the journeymen.

*9 Upon finishing work on Friday, May 18, Messrs. Sosnowski, Tishhouse and Ketchum went to the CES office, turned in their timecards, and told Roosevelt Tillman that they had been laid off and were available for other work. Mr. Tillman-who expressed surprise at seeing them back so soon-subsequently offered other work to each of the men, or attempted to do so.

The hearing record indicates that the three Windemuller employees who had previously been assigned to the riser project started work on the lower level job-the project to which all five CES employees had been assigned until May 18-on Monday, May 21. Barry Alan testified that of the workers on the lower level project who had been borrowed

from a contractor identified as Allied Electric Company, one quit during the week of May 21 and the rest were sent back to Allied at the end of the week.

*389 The final episode in question here involves an electrician named Bill Quick. Mr. Quick worked at Kemp Electric, a unionized contractor, from June 4 to July 28, 1990. Having been laid off from that job at the end of July, he testified, he went to the CES office on August 6, a Monday, and filled out an employment application.

Mr. Quick spoke briefly with Roosevelt Tillman on this occasion, telling Tillman about his work experience and licensure. Quick held a Michigan master electrician's license, and he showed the license to Tillman. The license listed Quick's employer as "Bill's Electrical Service." Quick had worked as an electrical contractor in several states, and he told Tillman, according to the latter's testimony, that he had built homes from the ground up in Florida. Mr. Tillman testified that he had understood that Mr. Quick possessed a Michigan electrical contractor's license-presumably for "Bill's Electric Service"-but Quick testified that his master electrician's license merely made him eligible to obtain a contractor's license upon payment of a fee; he did not possess a Michigan contractor's license on August 6.

*10 Tillman hired Quick and sent him to work at Windemuller, which needed a journeyman electrician. (A contemporaneously-prepared CES record indicated that Windemuller needed someone for a period of one to two weeks. Quick testified, however, that Tillman told him the job should last into early October.)

Mr. Quick presented himself for work at the Upjohn site early Tuesday morning, August 7. While visiting with Windemuller personnel before the starting whistle blew, he volunteered the information that he had been employed at Kemp Electric. Fred Syswerda, who had replaced Barry Alan as foreman [FN2] and whose own application for em-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

ployment at Windemuller indicated a union background, asked Quick if he belonged to the union. Quick replied that he was not a union member.

> FN2. IBEW Local 131, which since August of 1989 had been paying Mr. Alan under the table to act as its "salt," called Alan off the job as of August 3, 1990. There is no contention that Windemuller let Alan go because of his union activities. Indeed, notwithstanding notification from the union on June 1 that Alan would represent it for purposes of organizing, Windemuller gave Alan a merit pay increase in July. Alan himself testified that Windemuller was a good employer, in his judgment, and he thought the company treated him fairly.

After Mr. Quick's second day of work for Windemuller, Roosevelt Tillman placed a telephone call to Quick and, according to Tillman, left a message on the answering machine of the house where Quick was temporarily living. (Quick testified that he "could have" received the message, but did not remember having done so.) The message, Tillman testified, was that Quick should report back to the CES office on Friday for reassignment.[FN3]

> FN3. The timing of this call, as we shall see, is a matter of some importance. It was established through a CES long distance telephone bill that Mr. Tillman placed the call at 7:10 p.m. on Wednesday, August 8, 1990. The content of the message is also important. Mr. Tillman repeatedly testified that his message was that Mr. Quick should report on Friday "for reassignment," but those words were omitted from a prehearing affidavit that a representative of the NLRB prepared for Mr. Tillman's signature after interviewing him.

**\*11** The reason for the reassignment, Tillman testified, was that his mother, Virginia Tillman, was in the process of remodeling the apartment building in which she lived; Mr. Tillman had inspected the work on Tuesday, August 7, according to his affidavit, and determined that it was time for the electrical part of the job to be performed. Mrs. Tillman wanted to convert the electric service for two apartments into a single unit. Only a licensed electrical contractor could do this, and Mr. Quick possessed both the experience for such a job and, as Mr. Tillman understood it, the necessary license. It was Tillman's plan to have Quick do the work.

Mr. Quick's testimony indicates that Tillman stopped at the Upjohn site on Thursday, August 9, and dropped off a timecard and handbook for Mr. Quick. Tillman did not see Quick personally on Thursday, but left word, as Quick got the message, that he would be calling him the next day.

Although Mr. Quick was not a union member at this time, he had been keeping in **\*390** touch with IBEW Local 445, in Battle Creek, about the possibility of getting union work if any came up. He checked in at the union hall after his first day at Windemuller, and was asked at that time if he would be interested in acting as a "salt." Quick agreed to do so, and was given a union organizing pin to start wearing at a later time.

Mr. Quick first wore the union pin at work on Thursday morning, August 9. Foreman Fred Syswerda spoke with him that morning, but said nothing about the pin. Sometime during the day on Thursday Windemuller received a letter from Local 445 stating that Mr. Quick was engaged in organizing activities and was protected by the National Labor Relations Act.

Fred Syswerda saw Mr. Quick again on Friday morning, August 10, and said that he was disappointed in him for **\*12** lying about his union affiliation. Mr. Quick explained that he was not in fact a union member, but Syswerda said he was still disappointed. (The ALJ subsequently found that Mr.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
(Cite as: 34 F.3d 384)

Syswerda, a "lead man" like Barry Alan, was not acting as a supervisor or agent of the company; an allegation by the NLRB general counsel that the company had engaged in unlawful interrogation through Syswerda was dismissed.)

Mr. Quick had previously mentioned to Syswerda that he planned to leave work at noon on Friday in order to drive to Tennessee for the weekend. He asked Syswerda at lunchtime if this would still be all right, and Syswerda said it would.

Quick called Roosevelt Tillman at noontime on Friday, before leaving for Tennessee, and Tillman asked him to report to the CES office on Monday morning, August 13, because he had some other work for Quick to do. Quick promptly advised his foreman, Fred Syswerda, that he would not be at work on Monday because he was being transferred to another job, and as instructed, Quick presented himself at CES on the morning of the 13th.

Tillman, in the meantime, hired a journeyman electrician named Darwin Patterson [FN4] and directed Patterson to report at Windemuller's Upjohn building job site on the same Monday morning, August 13. Patterson did so, he testified, and worked there as Quick's replacement until August 31, the Friday before Labor Day.

> FN4. After Tillman had told Patterson he was hired, and while Patterson was filling out his tax forms, according to the latter's testimony, Tillman asked Patterson if he were a union man. Patterson responded that he was not. Tillman then told him-still according to Patterson-"that I could lie about it, but that usually he can tell by talking to someone whether they're truthful or not."

Tillman told Quick at their meeting on the morning of the 13th that the work he wanted him to do was at Tillman's mother's place. The two men then walked *13 through the job so that Tillman could explain what he wanted done. Quick, who had driven all night getting back from Tennessee, asked Tillman if it would be all right for him to start the job Tuesday morning. Tillman evidently agreed. Quick worked at Tillman's mother's residence both Tuesday and Wednesday, August 14 and 15, repairing circuits and installing new lighting fixtures.

On Thursday the 16th, as directed by Tillman, Quick started pricing and buying materials for the electrical service change. On Friday the 17th Quick gave Tillman receipts for his purchases and reported that he would have to drive to Lansing that day to update his contractor's license in order to get a permit for the service change. Tillman said he thought that Quick already had the license, but Quick told him that it had expired and needed to be revalidated.

On Monday morning, August 20, Quick presented himself at the CES office, as usual, and handed Tillman his timecard for the previous week. Tillman objected to paying for the hours Quick had charged on Thursday and Friday, and a disagreement arose as to what the hourly rate should be. Tillman said he could afford to pay only one dollar an hour more than Quick had been receiving as a journeyman on the Windemuller project, and Quick wanted more than that for working as a contractor. Quick became upset, according to Tillman, walked out the door, and never showed up again. As far as Tillman was concerned, this was a "voluntary *391 quit." Mr. Tillman testified, without contradiction, that Windemuller never asked him to remove Quick from its job site. Mike Windemuller testified to the same effect.

On August 14, 1990, IBEW Local Union 107 filed unfair labor practice charges against both CES and Windemuller for removing Mr. Quick from the Upjohn job and replacing him with another electrician. On August 22, 1990, the union filed an amended charge against CES, asserting that on August 20

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
(Cite as: 34 F.3d 384)

CES had constructively discharged Quick for union activities.

### *14 II

In an amended complaint issued through a regional director of the NLRB on December 27, 1990, the Board's general counsel alleged, among other things, that Windemuller and CES were joint employers. The complaint went on to allege that Windemuller had violated the National Labor Relations Act (1) by refusing to hire or consider for employment some 29 named individuals, most of whom were union people who had applied for employment in Grand Rapids on October 18, 1989; (2) by impliedly stating to employees on January 17, 1990, that it would not consider union electrician applicants for employment; (3) by prohibiting its employees from wearing union stickers on their hard hats on May 16, 1990; (4) by causing CES to lay off Tom Sosnowski, Steve Tishhouse and Larry Ketchum on May 18, 1990; and (5) by coercively interrogating employees on August 7, 1990, through its agent Fred Syswerda, regarding their union membership, activities, and sympathies. The complaint further alleged that CES had violated the National Labor Relations Act (1) by coercively interrogating employees on August 10 and September 20, 1990,[FN5] through its agent Roosevelt Tillman, regarding their union membership, activities, and sympathies, and (2) by refusing to hire or recall or consider for employment Tom Sosnowski and another individual, beginning September 21, 1990. Finally, the complaint alleged that Windemuller and CES had both violated the National Labor Relations Act on August 10, 1990, by causing employee William Quick to be removed from the Upjohn site.

> FN5. The September 20 incident involved a journeyman electrician named Keith Wolfsen who applied at CES on that date. Mr. Tillman looked over Wolfsen's employment application, which had no entries

under a section that called for a listing of "current professional affiliations and organizations," and asked Wolfsen if he belonged to any associations. Wolfsen replied that he belonged to the RESCS, a society for refrigeration engineers. Tillman asked no further questions.

**\*15** The matter came on for hearing before the administrative law judge on February 11, 1991, and the hearing was concluded 10 days later. (The hearing transcript is 777 pages long; the transcript and accompanying pleadings and exhibits form a stack of paper seven inches high, not counting the briefs that each party filed.) In due course the ALJ issued a decision and order containing detailed findings of fact and conclusions of law. The decision and order take up 33 single-spaced pages.

Windemuller took exception to portions of the ALJ's decision and filed a brief with the NLRB in support of its exceptions. On March 9, 1992, a three-member panel of the Board issued a very brief decision and order correcting one erroneous date in the ALJ's decision and otherwise affirming the decision and order without change.

On September 29, 1992, the NLRB applied to this court for enforcement of its order. We have had the benefit of comprehensive briefs and oral argument by Windemuller and the Board,[FN6] and the matter is ripe (if not overripe) for decision. Our principal task is to canvass the entire record and determine, in light of the record as a whole, whether the Board's decision is supported by substantial evidence. See *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

> FN6. CES, as noted at the outset of this opinion, did not enter an appearance and has not participated in the enforcement proceeding.

The Supreme Court has charged us, in performing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

this task, "not to abdicate the conventional judicial function." *Id.* at 466, 71 S.Ct. at 490. Further, the Court has said,

**\*392** "The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed **\*16** judgment on matters within its special competence or both." *Id.*

We bear these admonitions in mind as we turn, at last, to our analysis of the issues.

### III

*A. Mike Windemuller's Humorous Reference to the 26 Employment Applications Submitted in Grand Rapids on October 18, 1989.*

Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [of the Act]." Among those rights are "the right to self-organization [and the right] to form, join, or assist labor organizations...." 29 U.S.C. § 157.

[1] The Act does not and cannot repeal the First Amendment of the United States Constitution, with its prohibition against laws abridging freedom of speech. The sensitivity of Congress to this fact is reflected in § 8(c) of the Act, 29 U.S.C. § 158(c). That section provides that "[t]he expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit."

[2] It is a serious business for the government to censor the speech of its citizens. Employer speech that truly does "interfere with, restrain, or coerce employees" in the exercise of their collective bargaining rights can undoubtedly be abridged by the government-just as, in Justice Holmes' memorable conceit, the right to shout "fire" in a crowded theater can be abridged-but constitutional considerations suggest that we should be vigilant to see that the NLRB does not read elements of interference, restraint or coercion into speech that is in fact non-threatening and that would not strike a reasonable person as threatening.

[3] **\*17** When Mike Windemuller told the Kalamazoo-area employees, in response to the question asked during the breakfast meeting of January 17, 1990, that the company had a lot of employment applications from the union, he was undoubtedly referring, as the ALJ expressly found, to the large number of applications submitted at Grand Rapids on October 18 of the previous year. Windemuller undoubtedly regarded those applicants as being "from the union," and the ALJ found this as a fact too.

It would be fair to assume, moreover, that if it were up to him, Windemuller would probably have preferred not to be unionized. His audience probably knew this (and he probably knew that they knew it), which is probably why the audience broke into laughter. Windemuller's rueful reference to the sudden flood of union applications may not have been politically correct-there is not much laughter, one supposes, where political correctness holds sway-but his one-liner does seem to have had the virtue of being funny. It got a laugh. And there is no suggestion in the record that the little jest made by Mr. Windemuller in response to the question from the audience was anything other than spontaneous, unplanned, and unrehearsed.

It is true that threatening statements can sometimes be made in humorous terms. See *NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 550 (6th Cir.1984). Usually, however, they are not-and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

people who are being threatened do not usually find it amusing. If there was an unspoken threat in what Mr. Windemuller said, its presence is far from self-evident.

It is one thing for an employer to acknowledge, in a humorous way, that he has been the target of unusual attention from a union, but it is quite another thing for the employer to threaten to break the law in response. The ALJ concluded that the "plain implication" of what Windemuller said was that "the Company would not consider for employment those applicants whose manner of application indicated that they were likely to engage in **\*18** union organizational activity." Viewing the **\*393** record as a whole, we can discern no such implication.

Mr. Windemuller knew perfectly well that it would be illegal for him to discriminate against union activists-the union had told him so, for one thing, in the form letters accompanying the applications-and after an exhaustive review of the record, the ALJ found no proof that the union applicants had in fact been discriminated against. Windemuller Electric had already been through two representation elections, moreover, and Mike Windemuller obviously knew the rules of the game. Perhaps he did not like the rules, but that hardly means that he was publicly threatening to break them.

The ALJ relied heavily on the fact that after Mr. Windemuller had finished, Kalamazoo Branch Manager Bill DeDoes stood up and asked that anyone knowing of journeymen electricians in the Kalamazoo area refer them to DeDoes. This may well have indicated that the union people who had applied in Grand Rapids three months earlier were not going to be hired now to work in Kalamazoo, but no sinister inference can fairly be drawn from that fact. The two cities are 50 miles apart, and by industry standards the applications were hoary with age. Although applications were sometimes kept on file for more than 30 days, the ALJ found in a different context that "it is unlikely that DeDoes or

Windemuller would seriously consider applications over three months old, where the applicants had not contacted the Company since filing." The union applications to which Mr. Windemuller referred had obviously grown stale by the time of the breakfast meeting in Kalamazoo, and the record contains no indication that there was anyone in the room who did not know this.

Neither is there any indication in the record that Mr. Windemuller's response to the question about pending applications was calculated to create an "atmosphere," as we called it in *Indiana Cal-Pro, Inc. v. NLRB,* 863 F.2d 1292, 1300 (6th Cir.1988), wherein company employees **\*19** would feel coerced, restrained or otherwise interfered with in the exercise of their right to organize under union auspices. In the *Indiana Cal-Pro* case there were two employees who gave direct testimony about the creation of a threatening or intimidating atmosphere. *Id.* at 1299-1300. In the case at bar, by contrast, there was no such testimony at all.

The silence of the record is significant. Barry Alan, the union "salt," would have been in an ideal position to know if management people were issuing veiled threats-and nothing in his testimony remotely suggests that they were doing so. On the contrary, Mr. Alan explicitly testified that Mr. Windemuller never indicated in the January meeting that he would not hire IBEW members and never said that he would not consider IBEW applications. Not a single person in the Kalamazoo-area work force testified to the contrary. Viewing the record as a whole, we are satisfied that it contains no substantial evidence to support the conclusion that anything said at the breakfast meeting on January 17, 1990, violated § 8(a)(1) of the National Labor Relations Act.

*B. Windemuller's Unwillingness to Let Union Stickers Be Displayed on Company-Owned Hard Hats.*



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

[4] With regard to the company's decision to ask that union stickers be removed from company-owned hard hats, the ALJ found as a fact that "Windemuller wanted the stickers removed because the Company was a nonunion firm, and therefore [Windemuller Superintendent Dick Thompson] did not want any union identification on the hardhats, which he regarded as Company property." During the hearing the ALJ observed, at page 277 of the hearing transcript, that "it's obvious that we know exactly what happened." The only question presented, in the ALJ's view, was "a question of law, basically." We agree with this characterization of the question, if not with the answer the ALJ gave to it.

Citing *Malta Constr. Co.,* 276 NLRB 1494 (1985), enf'd, *20NLRB v. Malta Constr. Co.,* 806 F.2d 1009 (11th Cir.1986), the ALJ found that "the Company violated Section 8(a)(1) by prohibiting its employees from wearing union stickers on their hardhats." If the company had not permitted the men to wear union emblems on their clothing and other items owned by them-union jackets, union T-*394 shirts, union pencil holders, and union buttons, all of which remained on display after the stickers were removed from the hard hats-we assume that the finding of a violation would have been justified. See *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). But there is no dispute as to the fact that Windemuller scrupulously honored the presumptive right of the employees to wear union insignia on their own clothing, just as there is no dispute as to why it was that Superintendent Dick Thompson "regarded [the hard hats] as Company property." He regarded the hats as company property because that is what they were. The employees themselves acknowledged in their testimony that the hard hats belonged to the company, and the record makes it absolutely clear whose hats they were. Under these circumstances, it seems to us, the ALJ and the Board answered the legal question incorrectly. It was not an unfair labor practice for the company to

ask that hard hats owned by it not be used as billboards for the union, as long as employee-owned jackets, T-shirts and the like could be used for that purpose.

[5][6] In a line of United States Supreme Court decisions culminating in *Lechmere, Inc. v. NLRB,* 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992), the Court "has drawn a very clear line beyond which the organizational rights of the union may not take precedence over the property rights of the employer." *Oakwood Hospital v. NLRB,* 983 F.2d 698, 701 (6th Cir.1993). A labor union has no right to make use of an employer's real property for the purpose of communicating union messages, as long as the employees are not "beyond the reach of reasonable union efforts to communicate with them" by means that do not trespass upon the employer's property rights. *Lechmere,* 502 U.S. at ----, 112 S.Ct. at 849 (quoting *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 113, 76 S.Ct. 679, 685, 100 L.Ed. 975 (1956)). By a parity of reasoning, employees who are union supporters have no right to make use of an *21 employer's personal property for the purpose of communicating union messages, as long as the employees can make effective use of their own property for that purpose. See *Standard Oil Company of California,* 168 NLRB 153 (1967), and *Andrews Wire Corp.,* 189 NLRB 108 (1971), both of which are cases in which the Board recognized the employer's right to prohibit unapproved union insignia on employer-owned hard hats as long as the employees were not prohibited from displaying union insignia on their own clothes or other items of personal property.

The Board argues in its appellate brief that *Standard Oil of California* and *Andrews Wire* are not directly in point here because there were "special circumstances" in each of those cases that explained the employer's desire to keep its hard hats free of extraneous material. That is doubtless true.[FN7] The Board's brief goes on to argue, however, citing the decisions in *Malta Construction* and *Regal Tube*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

Co., 245 NLRB 968 (1970), that "[t]he mere claim of a property interest" does not entitle the employer to decide how its property shall be used.

> FN7. Windemuller contended before the ALJ, as it contends here, that in the instant case as well there were significant marketing and safety considerations that militated in favor of requiring removal of the stickers. The ALJ found that no such considerations existed, and we do not reach the question of whether this finding was supported by substantial evidence.

The use of the adjective, if we may say so, manifests a rather casual attitude toward the distinction between *meum et tuum*. "Mere" property, like life and like liberty itself, was not unimportant to the generation that gave us our Bill of Rights; making explicit what had been considered implicit in the Constitution from the beginning, the framers of the Fifth Amendment specifically provided that no person should be deprived of property without due process of law. They likewise provided that private property should not be taken for public use without just *22 compensation. The legacy the framers left us in the Fifth Amendment is a precious one, and each generation must take care to see that it is not nibbled away.FN8

> FN8. The Fifth Amendment, as the Supreme Court recently reminded us, is "as much a part of the Bill of Rights as the First Amendment or the Fourth Amendment;" it "should [not] be relegated to the status of a poor relation...." *Dolan v. City of Tigard*, 512 U.S. 374, ----, 114 S.Ct. 2309, 2320, 129 L.Ed.2d 304 (1994).

*395 The Supreme Court, in the line of cases that originated in *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), and culminated in *Lechmere*, has repeatedly declined to let organizational rights trump property rights

where there is no apparent need to do so. Nothing in the record of the case before us suggests that any such need exists here. As a matter of law, therefore, the fact that the hard hats were Windemuller's property provided justification enough for Windemuller's refusal to let the hats be stickered with union insignia.

**C.** *Windemuller's Selection of Three Union Supporters for Layoff on May 18, 1990.*

[7] The record leaves no room for doubt that because of an unexpected change in plans by the general contractor, three regular Windemuller employees who had been working on the riser project became available for reassignment at the end of the week of May 13, 1990. There is no room for doubt as to the reasonableness of Windemuller's decision to assign the three regular employees to the ongoing project in the lower levels of the building, displacing three other people who had been working there. The question is whether Windemuller singled out the three union adherents for displacement because of their public display of support for the union.

The ALJ found as a fact that the three union supporters would not have been laid off as early as May 18 but for their union activity. At least two of them, he found, would have remained on the job "much longer than one month" *23 had they not been victims of anti-union discrimination. We are more than a little dubious as to the validity of the ALJ's estimate of the amount of time the men would have continued to work, and some of the reasons given by the ALJ in support of the finding of discrimination appear dubious as well. Disregarding the proffered reasons that lack adequate support in the record, however, we are satisfied that there is still sufficient evidence to justify the finding that the selection of the union adherents for layoff on May 18 was discriminatory.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



R001069

34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

The record contains undisputed testimony that on May 15 Windemuller superintendent Dick Thompson "became outraged" at the sight of the union stickers that four of the CES temporary employees had placed on the hardhats issued to them by the company. Mr. Thompson had a right to ask that the stickers be removed, as we have held, but the ALJ had a right to view Thompson's "outrage" as indicative of some degree of anti-union animus.

There is more. Foreman Barry Alan gave undisputed testimony indicating that Windemuller superintendent Kirk Strong (who, like superintendent Thompson, never took the stand) had told him at some point that the first workers to be laid off on the lower level project would be employees borrowed from other electrical contractors. Although Windemuller normally followed a "last in first out" policy, which would have put the CES people first in line to go, Strong was said to have explained that Windemuller's labor costs for the borrowed employees were higher than its labor costs for the CES workers. And it is undisputed that the costs for the borrowed employees were in fact somewhat higher. Yet on May 17, when superintendent Thompson telephoned Alan to identify the people who were to be laid off the next day, he named three of the four CES employees who had been displaying union paraphernalia. When Alan questioned this choice, moreover, Thompson used the words "union people" to refer to the individuals he said he had been told to lay off first. The phraseology is obviously not helpful to the company's cause.

*24 Windemuller offers no reasonable explanation of why the one CES employee who was not a union person-a man named Randy Miller-happened to be kept on the job in preference to one of the three CES journeymen who were union people. It is true that Mike Stackpole, the other CES person who escaped layoff at this time, was also a union supporter; that is of little help to Windemuller, however, in light of Alan's uncontradicted testimony that Thompson said Stackpole was *396 being kept on

because he was only an apprentice and would thus cost the company less money.

Windemuller's brief offers a number of possible explanations as to why Windemuller might legitimately prefer to release temporary personnel before releasing personnel borrowed from other contractors. We have found nothing in the record, however, to show that these considerations did in fact inform the selection process. Although testimony was given by Bill DeDoes, the person whom Thompson was said to have named as the ultimate decisionmaker, DeDoes gave no reason at all for deciding to release the three union people in preference to three more expensive people borrowed from other contractors. The record is not without its ambiguities on this point, but the ambiguities are hardly sufficient to justify a reversal of the finding that the May 18 layoffs were discriminatory.

D. *Bill Quick's reassignment by CES and his ultimate departure from the new job.*

[8] Bill Quick, the master electrician who started working for Windemuller as a CES temporary on August 7, 1990, first displayed his union organizer's pin the following Thursday. At noontime on Friday Roosevelt Tillman instructed him to report to CES Monday morning to begin a new job. The theory of the ALJ was that notwithstanding contrary testimony from both Windemuller and Tillman, someone from Windemuller must have contacted Tillman after learning that Quick was a union organizer and asked Tillman to take Quick off Windemuller's hands.

One problem with this theory is that the record contains abundant evidence that Roosevelt Tillman really did have *25 another job; that it was a job which should have been right up Quick's alley; and that Tillman had decided no later than Wednesday-a day *before* Windemuller learned of Quick's union proclivities-to give the job to Quick. It is undis-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
(Cite as: 34 F.3d 384)

puted that Tillman's mother was having her apartment building remodeled and had reached a point in the remodeling project where she needed some electric work done. It is undisputed that a portion of the electrical work could only be preformed by a licensed contractor, such as the "Bills' Electrical Service" listed on the master electrician's license that Quick showed Tillman when he was hired. And it is undisputed that Roosevelt Tillman, who was overseeing the apartment project for his mother, placed a long distance call to Quick's residence at 7:10 p.m. on Wednesday, August 8, 1990, and left a message on the answering machine for Quick to see him Friday. Neither CES nor Windemuller knew on August 8 that Quick was slated to become a union organizer.

The ALJ speculated that Tillman did not really place the call to Quick for the purpose of telling him to report for reassignment, as Tillman testified, but merely wanted to let Quick know that Tillman would be stopping at the job site the next day to drop off a timecard for Quick. The record does not contain a shred of support for this hypothesis. Quick himself indicated that he was expecting the timecard anyway. There was no need for Tillman to make sure that Quick would be available to receive the timecard, because the card could just as well be left with one of the foremen-as, in fact, it was. (Quick did not happen to be available when Tillman visited the job site on Thursday, and Tillman simply left the timecard and a CES handbook with Fred Syswerda, who gave the materials to Quick on Friday morning.)

The ALJ purported to find it "incredible" that Tillman should have pulled a qualified employee off a company job, and sent a replacement without advance notice to the customer, simply to get a remodeling job done for his mother. If Roosevelt Tillman really operated that way, the *26 ALJ said, "it is probable that CES would not last long in business." [FN9] Further, said the ALJ,

FN9. CES was not established until May of 1989. Whether it is still in business we have no way of knowing, the company not having appeared in the instant enforcement proceeding.

"If Tillman were sincerely interested in having Quick do the remodeling work, then it is probable that he would have waited until the fall, when the Company was winding down, and then offer Quick a nice *397 indoor job. There was nothing urgent about the remodeling job."

This is very thin gruel indeed. It is apparent from the record that the people doing journeyman electrical work on Windemuller's Upjohn project were essentially fungible. There is no reason at all to suppose that Quick's replacement, journeyman Darwin Patterson, would have had the slightest difficulty in picking up Quick's work without delay. Windemuller had some advance notice of the switch, moreover, because Syswerda was told around noon on Friday of Quick's forthcoming reassignment, and Patterson testified that when he reported for work at the Upjohn building on Monday morning, August 13, the foreman greeted him with the words "You must be Darwin." And the notion that Tillman could just as well have let his mother's remodeling project remain half-finished until cold weather came, there being nothing "urgent" about completing the job once it had been started, rests on assumptions plucked out of thin air. Perhaps there are people who have been blessed with preternaturally patient and forebearing mothers, but there is no evidence at all that Mr. Tillman is among that number.

Finally, the ALJ found that "by offering Quick only an arrangement as an independent contractor, Tillman effectively terminated Quick as an employee." The Board's general counsel made no such allegation in the amended complaint, notwithstanding that IBEW Local 107 *27 had filed an unfair labor practice charge to this effect, and the finding is not sup-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

ported by substantial evidence. The evidence affirmatively shows, on the contrary, that Quick was perfectly willing to work on the Tillman project as an independent contractor. Quick ultimately quit the job not because he was required to function as a contractor-something he had done many times before-but because Tillman questioned the hours charged for off-site activities on Thursday and Friday and because Quick could not get as much premium pay as he wanted.

*E. Portions of the Board's order that are not contested.*

The ALJ recommended dismissal of some of the allegations against CES, but found that others-including the allegations that CES had illegally asked Darwin Patterson and Keith Wolfsen about union affiliations-were well founded. The finding as to Mr. Patterson is adequately supported by the record (see n. 4, *supra*), and although the finding as to Mr. Wolfsen strikes us as questionable (see n. 5, *supra*), CES has not challenged the finding and has not opposed enforcement of the remedial order. To the extent that we have not rejected the findings of illegal conduct on the part of CES in connection with our analysis of the findings regarding Windemuller, we shall allow the findings to stand and we shall grant enforcement of the remedial order against CES insofar as it is based on those findings.

The ALJ found that Windemuller and CES "codetermined" the "essential terms and conditions of employment" of electricians referred to Windemuller by CES, and were thus joint employers of such persons. *NLRB v. Checker Cab Co.,* 367 F.2d 692, 698 (6th Cir.1966), *cert. denied,* 385 U.S. 1008, 87 S.Ct. 715, 17 L.Ed.2d 546 (1967). Windemuller does not contest this finding and does not deny liability for the illegal questioning of Darwin Patterson by CES. Accordingly, and in light of our resolution of the issue discussed in Part III C of this opinion, we shall grant enforcement of the order

against Windemuller insofar as it is based on (a) the interrogation of Darwin Patterson and *28 (b) the layoff of Thomas Sosnowski, Steven Tishhouse and Larry Ketchum. In all other respects enforcement of the order against Windemuller will be denied.

Enforcement is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing opinion.
*29 WELLFORD, Senior Circuit Judge, concurring in all respects except as to Part III C. in which he dissents.

I am in entire accord with the recitation of the factual background of this controversy and with almost all of Judge Nelson's full opinion dealing with the issues herein. I have some reservations as to that portion of part III C. of the opinion with respect to Windemuller Electric, Inc. ("Windemuller") and Construction Employment Services, Inc. ("CES") being deemed joint employers in any respect. On this record, Mike Windemuller and Roosevelt Tillman, who were *398 principals in these entities, followed their own independent agendas and I find it ironic that Windemuller is "tagged" by NLRB as a joint employer because it sought Tillman's help in hiring minority employees, both union and non-union. Because Windemuller does not seriously contest the order with respect to questioning Darwin Patterson, I concur as to that part of III C., but not as to the layoff of three CES employees.

As to III C., I would not enforce the order concerning the alleged improper layoff in May of 1990 of three *temporary* CES employees. Windemuller's Kirk Strong and Tillman (d/b/a CES) both testified that these workers were hired for a short period (from one to four weeks). The work involved lasted no more than two weeks. Even if the ALJ were supported in his determination that the three employees' union status played a part in their layoff after a week's work, I would conclude that this is a *de minimis* violation at best. There was no atmosphere at Windemuller of threats, intimidation or coercion against unions or organizers, or even a union "salt" as noted in the majority opinion. I, therefore, dis-



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P
**(Cite as: 34 F.3d 384)**

sent from that portion of the opinion (III C. and E.) affirming the NLRB with respect to anything other than minimal back pay, if any, to Thomas Sosnowski, Steven Tishhouse, and Larry Ketchum.

C.A.6,1994.
N.L.R.B. v. Windemuller Elec., Inc.
34 F.3d 384, 147 L.R.R.M. (BNA) 2302, 128 Lab.Cas. P 11,183, 1994 Fed.App. 0321P

END OF DOCUMENT



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

R001073

Westlaw.

743 N.E.2d 954                                                                                              Page 1
139 Ohio App.3d 328, 743 N.E.2d 954
**(Cite as: 139 Ohio App.3d 328, 743 N.E.2d 954)**

Court of Appeals of Ohio,
Eleventh District, Lake County.
CAMBRIDGE VILLAGE CONDOMINIUM AS-
SOCIATION, Appellant and Cross-Appellee,
v.
CAMBRIDGE CONDOMINIUM ASSOCIATION,
Appellee and Cross-Appellant.
No. 99-L-100.

Decided Oct. 2, 2000.

Plaintiff condominium association sued defendant
condominium association, alleging that defendant's
declaration created legal obligation to plaintiff to
pay 67.07% of maintenance cost for recreational fa-
cilities used by unit owners in both associations.
The Court of Common Pleas, Lake County, granted
partial summary judgment in favor of defendant.
Plaintiff appealed. The Court of Appeals, Nader, J.,
held that: (1) defendant validly terminated its unit
owners' "perpetual license" to use facilities, and (2)
plaintiff had standing to bring action.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Licenses 238 ☞ 43**

238 Licenses
    238II In Respect of Real Property
        238k43 k. Nature of License in General.
Most Cited Cases

**Licenses 238 ☞ 56**

238 Licenses
    238II In Respect of Real Property
        238k56 k. Termination or Extinguishment.
Most Cited Cases
A "license" is a privilege given to an individual to
do an act upon the land of another without possess-
ing any interest therein and is usually terminable at
the will of the licensor.

**[2] Licenses 238 ☞ 56**

238 Licenses
    238II In Respect of Real Property
        238k56 k. Termination or Extinguishment.
Most Cited Cases

**Licenses 238 ☞ 58(2)**

238 Licenses
    238II In Respect of Real Property
        238k57 Revocation
            238k58 Licenses Revocable
                238k58(2) k. Licenses Coupled with an
Interest. Most Cited Cases
A license coupled with an interest becomes irrevoc-
able, meaning that it is no longer terminable at the
will of the licensor, and constitutes a right to do the
act rather than a mere privilege to do it.

**[3] Licenses 238 ☞ 44(3)**

238 Licenses
    238II In Respect of Real Property
        238k44 Licenses Distinguished from Other
Rights in Land
            238k44(3) k. Easement. Most Cited Cases
An irrevocable license is said to be an easement
rather than a license.

**[4] Easements 141 ☞ 30(1)**

141 Easements
    141I Creation, Existence, and Termination
        141k30 Abandonment or Nonuser
            141k30(1) k. In General. Most Cited
Cases
An easement may be terminated by abandonment,
which is effective when there is a relinquishment of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



R001074

743 N.E.2d 954                                            Page 2

139 Ohio App.3d 328, 743 N.E.2d 954

**(Cite as: 139 Ohio App.3d 328, 743 N.E.2d 954)**

possession with an intent to terminate the easement.

**[5] Condominium 89A ☞ 3**

89A Condominium
    89Ak3 k. Creation; Declarations. Most Cited Cases
Amendment to declaration of condominium ownership, which deleted provisions in declaration referring to perpetual licenses to use adjoining development's recreational facilities, did not need to be passed with unanimous consent of all of condominium association's unit owners; facilities were not part of association property and were thus not considered part of association's "common areas." R.C. § 5311.04.

**[6] Condominium 89A ☞ 3**

89A Condominium
    89Ak3 k. Creation; Declarations. Most Cited Cases
Even though condominium declaration provided that unit owners had perpetual license to use adjoining recreational facilities, amendment to declaration amending that provision was valid, where procedures for amending declaration were followed and 76% of condominium's unit owners approved amendment.

**[7] Declaratory Judgment 118A ☞ 295**

118A Declaratory Judgment
    118AIII Proceedings
        118AIII(C) Parties
            118Ak293 Necessary and Indispensable Parties
                118Ak295 k. Contracts. Most Cited Cases

**Declaratory Judgment 118A ☞ 301**

118A Declaratory Judgment
    118AIII Proceedings
        118AIII(C) Parties

        118Ak299 Proper Parties
            118Ak301 k. Contracts. Most Cited Cases
Plaintiff condominium association had standing to sue defendant condominium association and was not required to join all of defendant's unit owners, in declaratory action relating to defendant's obligation to collect assessments for costs of maintenance for recreational facilities used by defendant's owners. R.C. § 5311.20.

**955**  **329** James M. Lyons, Painesville, for appellant and cross-appellee.

Gerald J. Patronite, Cleveland, for appellee and cross-appellant.

NADER, Judge.

Appellant, Cambridge Village Condominium Association ("Cambridge Village"), appeals from the judgment of the Lake County Court of Common Pleas, granting partial summary judgment in favor of appellee, Cambridge Condominium Association ("Cambridge").

This appeal involves a dispute between the Cambridge Village Condominium Association and the Cambridge Condominium Association, which govern properties that occupy adjoining tracts of land in Painesville Township, Ohio, concerning the payment of maintenance costs for recreational facilities that are a part of the Cambridge Village Condominium complex.

**330** The condominium units comprising Cambridge Village and Cambridge were both developed by Community Development Services, Inc. ("Community"). On November 19, 1971, in the deed records of Lake County, Community filed a "Declaration of Condominium Ownership and **956** By-Laws of Unit Owners' Association," creating the Cambridge Condominium Association. The declaration included the following provisions regarding recreational facilities:



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

R001075

743 N.E.2d 954                                                                                      Page 3

139 Ohio App.3d 328, 743 N.E.2d 954

**(Cite as: 139 Ohio App.3d 328, 743 N.E.2d 954)**

"Article VI-Perpetual License to Owners of Family Units

"Community ('Community'), adjacent to the Community Property, upon land owned by it, has constructed certain Recreational Facilities, consisting of a Swimming Pool, a Community Building and Tennis Courts.

"Each owner of a Family Unit, for the use of himself and his immediate family, or the tenant of such owner and the tenant's immediate family, plus occasional guests as may be permitted under regulations established by Community or its successor in interest, for the use of such recreational facilities, shall have a perpetual non-exclusive license, so long as he is not in default of any obligations of an owner of a Family Unit as provided in this Declaration of Condominium, or in the By-Laws of the Unit Owners Association, to use such Recreational Facilities, subject, however, to such regulations for such use as may be from time to time established in its sole discretion by Community or its successors in interest. A share of the cost of the maintenance of such Recreational Facilities, as elsewhere provided for in this Declaration, shall be an obligation of each Family Unit, whether or not the owner shall utilize the license herein granted.

"Article X-Assessments

"B. Common Expenses

"The Common Expenses for which the owner of a Family Unit shall bear his proportionate share shall include[:] * * *

"(b) the expense of maintaining, protecting, insuring, and repairing the real property over which the owners of the Family Units enjoy the use as provided in Article VI hereof, including the maintaining, protecting, insurance, and repair or replacement of the personal property used at any time to complement the use of the said licensed real prop-

erty.

"It is understood that the foregoing expenses include in all instances a reasonable allowance for overhead and reasonable compensation to the person or corporation performing the service, not excepting such allowance and compensation to Community under its contract for the maintenance, protection, insurance and repair of the Common Areas and Facilities, as provided for in Article VII(D) above, and a similar reasonable allowance and compensation to Community with *331 respect to the areas to which the owners of the Family Units of this Condominium enjoy a perpetual license as provided in Article VI above."

In 1976, Community deeded the property that now comprises the Cambridge Village Condominium complex, including the recreational facilities, to Sanford Wasserman, trustee for the Cambridge Village Trust. On June 22, 1976, in the deed records of Lake County, Sanford Wasserman filed a "Declaration of Condominium Ownership for Cambridge Village Condominium," creating the Cambridge Village Condominium Association. As a result of Community's transfer, Cambridge Village Condominium Association gained control over the subject recreational facilities. Cambridge Village's declaration included the following provision regarding the recreational facilities:

"9. Use of Common Areas and Facilities

"It is hereby acknowledged that a perpetual license for the use of the swimming pool, community building and tennis courts located on the Common Area exists in favor of the owners of Family Units of the Cambridge Condominium adjacent to and immediately south of the subject property."

From 1976 to 1997, Cambridge Village and Cambridge shared the recreational facilities, and each association collected maintenance fees from their respective unit owners. With 220 family units,



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

R001076

743 N.E.2d 954                                                                                                      Page 4
139 Ohio App.3d 328, 743 N.E.2d 954
**(Cite as: 139 Ohio App.3d 328, 743 N.E.2d 954)**

Cambridge collected 67.07 percent of the mainten- ance**957 costs from its unit owners, and with 108 family units, Cambridge Village collected 32.93 percent of the costs. In 1997, Cambridge objected to paying 67.07 percent of the maintenance costs assessed by Cambridge Village.

On July 9, 1997, Cambridge Village filed a com- plaint for declaratory judgment against appellee, re- questing that the court declare "the rights and duties of the parties as it relates to the payment for the common expenses of the maintenance, repairs and insurance for the recreational facilities" based on an interpretation of the parties' respective condomini- um declarations. On July 1, 1998, appellee filed the following "Amendment to the Declaration of Con- dominium Ownership for Cambridge Condomini- um" in the Lake County Recorder's Office:

" * * * [T]he Declaration of Condominium Owner- ship for Cambridge is hereby amended by the fol- lowing:

"DELETE ARTICLE VI entitled 'Perpetual Li- cense to Owners of Family Units' in its entirety as contained on Page 17 of the Declaration as recor- ded in Lake County Records Volume 758, Page 512 et seq.

"DELETE the first paragraph of ARTICLE X, SECTION B(b) entitled, 'Common Expenses' in its entirety as contained on Page 32 of the Declaration as recorded in Lake County Records Volume 758, Page 512 et seq."

**\*332** On September 8, 1998, appellant filed an amended complaint against appellee alleging that appellee's condominium declaration creates a legal obligation to appellant to pay 67.07 percent of the maintenance cost for the recreational facilities; the amendment to the declaration for Cambridge Con- dominium is null and void due to appellee's failure *to comply with* R.C. 5311; and appellee has breached its obligation to pay appellant for a road-

way easement, the only means of ingress and egress to the Cambridge Condominium complex.

Both parties moved for summary judgment, and ap- pellee filed a motion to dismiss. On June 1, 1999, the trial court denied appellee's motion to dismiss and granted partial summary judgment to appellant and partial summary judgment to appellee. In its judgment entry, the trial court stated:

"First, upon consideration of Plaintiff's request for the Court to declare Defendant's amendment null and void, the Court finds that making such a de- termination may possibly extend the Court's author- ity, especially for the reason that the Court believes such a declaration will not bear on the determina- tions made herein. Therefore, the Court finds Plaintiff's motion on this issue not well taken.

" * * * [T]he Court finds Plaintiff's motion well taken relative to the common roadway and grants Plaintiff summary judgment in its favor and against Defendant on that issue. * * * Further, the Court finds Plaintiff's motion not well taken as it relates to the recreational facilities. However, Plaintiff can collect from Defendant for its customary and usual usage of the recreational facilities up until the time the lawsuit was filed. The Court further finds that this assessment is appropriately based on Plaintiff's 67.07% calculation."

From this judgment, appellant assigns the following errors:

"[1.] Whether or not the trial court erred when it granted summary judgment for the defendant-ap- pellee and against the plaintiff-appellant on the ap- pellant's declaratory judgment claim for the sharing of costs for the recreational facilities (Count I of the amended complaint) and whether or not the trial court erred when it did not grant summary judg- ment to the appellant on the appellant's motion for summary judgment.

"[2.] Whether or not the trial court erred when it

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



743 N.E.2d 954

139 Ohio App.3d 328, 743 N.E.2d 954

**(Cite as: 139 Ohio App.3d 328, 743 N.E.2d 954)**

Page 5

did not specify a monetary amount for damages when it granted summary judgment to the appellant on Counts **958 II and III of the amended complaint and when the trial court limited the amount of the recovery against the appellee to the date that the lawsuit was filed against appellee.

"[3.] Whether or not the trial court erred when it did not rule on the appellant's claim that the appellee's amendment to its condominium declarations *333 was null and void and whether or not the trial court should have granted summary judgment to the appellant on this issue."

In its cross-appeal, appellee assigns the following error:

"Does a trial court err when it finds that a legal stranger to a condominium property has the right to sue under R.C. 5311.20 absent standing in tort or contract to do so?"

Because appellant's assignments of error are interrelated, we will address them together. In its first assignment of error, appellant alleges that the parties' respective condominium declarations create a mandatory obligation for appellee to pay 67.07 percent of the costs of maintenance for the recreational facilities, which cannot be revoked by appellee. In its second assignment of error, appellant alleges that the trial court should have specified the amount of damages that appellee was obligated to pay for its usage of the recreational facilities and should not have limited appellant's recovery to the date when the lawsuit was filed. In its third assignment of error, appellant alleges that the trial court should have ruled that appellee's amendment to the Cambridge Condominium declaration was null and void.

Appellant contends that the perpetual license granted to the owners of units within the Cambridge Condominium complex constitutes a license coupled with an interest or an easement and gives them the permanent right to use the recreational facilities located on the Cambridge Village property. Appellant also contends that the Cambridge Condominium declaration imposes upon appellee a mandatory, permanent duty to collect approximately 67 percent of the costs associated with the recreational facilities from its unit owners and remit that money to appellant.

[1][2][3][4] Appellant is correct in its contention that Article VI of the Cambridge Condominium declaration, granting a perpetual license to the unit owners within the Cambridge Condominium complex, confers a legal right to use the facilities upon each of the unit owners; however, we do not agree with appellant's contention that appellee must continue to pay for the maintenance of those facilities even when appellee terminated their right to use them. A license is a privilege given to an individual to do an act upon the land of another without possessing any interest therein and is usually terminable at the will of the licensor. *Mosher v. Cook* (1980), 62 Ohio St.2d 316, 317, 16 O.O.3d 361, 362, 405 N.E.2d 720, 721. If the parties intend the agreement to be permanent in nature, the license is said to be coupled with an interest. *Contract Crush & Screen Co. v. Neff Sand & Gravel, Inc.* (Mar. 7, 1997), Lake App. No. 96-L-043, unreported, 1997 WL 360827. A license coupled with an interest becomes irrevocable, meaning that it is no longer terminable at the will of the licensor, and constitutes *334 a right to do the act rather than a mere privilege to do it. *Kamenar RR. Salvage, Inc. v. Ohio Edison Co.* (1992), 79 Ohio App.3d 685, 691, 607 N.E.2d 1108, 1111-1112. An irrevocable license is said to be an easement rather than a license. See *id.;* American Law of Property, A Treatise on the Law of Property in the United States (2 Ed.1974), Section 8.112. An easement may be terminated by abandonment, which is effective when there is a "relinquishment of possession with an intent to terminate the easement." *W. Park Shopping Ctr., Inc. v. Masheter* (1966), 6 Ohio St.2d 142, 144, 35

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



R001078

743 N.E.2d 954                                                                                    Page 6

139 Ohio App.3d 328, 743 N.E.2d 954

**(Cite as: 139 Ohio App.3d 328, 743 N.E.2d 954)**

O.O.2d 216, 217, 216 N.E.2d 761, 762-763.

In the instant case, appellee effectively terminated its unit owners' "perpetual licenses" to use the recreational facilities located within the Cambridge Village complex**959 when it enacted the "Amendment to the Declaration of Condominium Ownership for Cambridge Condominium." The amendment deleted the provisions in Cambridge's declaration referring to the perpetual licenses to use the recreational facilities and the obligation to pay for them and specifically stated:

"Any conflict between these deletions and any other provisions of the Declaration and Bylaws shall be interpreted in favor of this amendment revoking the perpetual license to use the Recreational Facilities belonging to Cambridge Village and the responsibility for the costs of same, which shall become effective upon the recording of this amendment, or September 8, 1998, whichever occurs later."

[5] Appellant argues that the amendment enacted by appellee must be declared null and void because it was not passed with the unanimous consent of all of Cambridge's unit owners. Appellant relies on R.C. 5311.04:

"(A) * * * No action for partition of any part of the common areas and facilities may be commenced, * * * nor may any unit owner otherwise waive or release any rights in the common areas and facilities.

"* * *

"(D) Except as provided in section 5311.051 of the Revised Code, the percentage of interest in the common areas and facilities of each unit as expressed in the original declaration shall not be altered except by an amendment to the declaration unanimously approved by all unit owners affected. * * *"

[6] R.C. 5311.04 does not apply to the amendment

enacted by appellee because the recreational facilities are not a part of the Cambridge complex's common areas. The recreational facilities are owned by Cambridge Village. The unit owners of Cambridge had only a "perpetual license" to the facilities. Because the recreational facilities are not a part of Cambridge's condominium property, they cannot be considered a part of Cambridge's common areas. See *335 R.C. 5311.01(A) and (B). Article XV governs amendments to Cambridge's declaration and provides in part:

"Amendment of Declaration and By-Laws

"Except as provided in Article V above, and in addition thereto, this Declaration and the By-Laws attached hereto as Exhibit B may be amended upon the filing for record with the Recorder of Lake County, of an instrument in writing setting forth specifically the item or items to be amended and any new matter to be added, which instrument shall have been duly executed by the Family Unit owners entitled to exercise at least seventy-five percent (75%) of the voting power of the Association. Such amendment must be executed with the same formalities as this instrument, and must refer to the Volume and Page in which this instrument and its attached exhibits are recorded and must contain an affidavit by the President of the Association that a copy of the amendment has been mailed by certified mail to all mortgagees having bona fide liens of record against any Family Unit ownership."

Although Article VI of Cambridge's declaration provides that each unit owner shall have a perpetual license to use the recreational facilities, subject to regulations for such use as may be from time to time established in its sole discretion by Community or its successors in interest, this clause does not prohibit Cambridge from terminating those licenses. The clause providing that regulations for the use of the recreational facilities can be established by Community or its successor in interest, in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



R001079

its sole discretion, merely refers to regulations concerning the use of the facilities, such as the available hours of use and who may use them; it does not bar Cambridge from relinquishing its right to use the facilities.

Article XV gives appellee the power to amend the declaration and by-laws and provides procedures for the enactment of amendments. Article XV specifically provides an exception to those procedures and states that the provisions in Article XV do not apply to Article V, which sets forth the procedures for creating amendments to add condominium property. If Community **960 had intended that Cambridge be prohibited from deleting Article VI of the declaration, it could have so provided in Article XV, as it did by stating that Article XV does not apply to Article V. Because appellee followed the procedures for amending the declaration set forth in Article XV and 76.088 percent of the Cambridge's unit owners approved the amendment, we cannot say that it was null and void.

Effective September 8, 1998, appellee was not required to pay for the costs of maintenance to Cambridge Village's recreational facilities. The trial court erred by concluding that appellant could collect from appellee for the usage of the facilities only until the time the lawsuit was filed. Appellant's first assignment of *336 error has no merit. Appellant's second assignment of error has merit, and appellant's third assignment of error has no merit.

[7] In appellee's sole assignment of error in its cross-appeal, appellee alleges that appellant had no standing to sue it under R.C. 5311.20. Appellee contends that because appellant is not a part of the Cambridge Condominium Association, it has no standing to contest appellee's management decisions regarding future assessments of its unit owners. Appellant further contends that even if appellant has standing under R.C. 5311.20, all of Cambridge's unit owners should have been joined

as defendants pursuant to R.C. 2721.12, which provides:

"When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the Declaration. No declaration shall prejudice the rights of persons not parties to the proceedings."

The trial court did not err by determining that appellant had standing to sue under R.C. 5311.20 and was not required to join all of Cambridge's unit owners as defendants. R.C. 5311.20 provides:

"In any action relating to the common areas and facilities or to any right, duty, or obligation possessed or imposed upon the unit owners association, by statute or otherwise, the unit owners association may sue or be sued as a separate legal entity."

Because appellant's lawsuit related to appellee's obligation to collect assessments for the costs of maintenance for the recreational facilities used by Cambridge's unit owners, appellant properly sued appellee pursuant to R.C. 5311.20. Appellant's sole assignment of error has no merit.

For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed in part and reversed in part. This cause is remanded to the trial court so that it can determine the amount of damages resulting from the costs for maintenance owed to appellant until the effective date of the termination, September 8, 1998.

*Judgment accordingly.*

CHRISTLEY, P.J., and DONOFRIO, J., concur.
JOSEPH DONOFRIO, J., retired, of the Seventh Appellate District, sitting by assignment.

Ohio App. 11 Dist.,2000.
Cambridge Village Condominium Assn. v. Cambridge Condominium Assn.
139 Ohio App.3d 328, 743 N.E.2d 954



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

743 N.E.2d 954

139 Ohio App.3d 328, 743 N.E.2d 954

**(Cite as: 139 Ohio App.3d 328, 743 N.E.2d 954)**

END OF DOCUMENT



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

R001081

Westlaw.

617 N.E.2d 1096                                                          Page 1
67 Ohio St.3d 302, 617 N.E.2d 1096, 64 A.L.R.5th 933, 1993 -Ohio- 19
**(Cite as: 67 Ohio St.3d 302, 617 N.E.2d 1096)**

Supreme Court of Ohio.
BRESNIK, Appellee,
v.
BEULAH PARK LIMITED PARTNERSHIP, INC.
et al., Appellants.
No. 92-1130.

Submitted May 26, 1993.
Decided Sept. 15, 1993.

State-licensed agent for jockeys who was excluded from state-licensed racetrack sued racetrack owners for tortious interference with business relationship. The Court of Common Pleas, Franklin County, dismissed complaint, and agent appealed. The Court of Appeals reversed and remanded, and owners sought certification. The Supreme Court, Pfeifer, J., held that statute and regulations permitting racing commission and track stewards to exclude agents from racetracks did not abrogate racetrack owners' common-law right to do so.

Reversed.

A. William Sweeney, J., dissented and filed opinion in which Wright, J., joined.

West Headnotes

**[1] Property 315 ⟜ 7**

315 Property
   315k7 k. Ownership and Incidents Thereof.
Most Cited Cases

**Public Amusement and Entertainment 315T
⟜ 33**

315T Public Amusement and Entertainment
   315TII Licensing and Regulation
      315TII(A) In General
         315Tk31 Racing in General
            315Tk33 k. Horse and Dog Racing.
Most Cited Cases
   (Formerly 376k2 Theaters and Shows)

**Public Amusement and Entertainment 315T
⟜ 66**

315T Public Amusement and Entertainment
   315TII Licensing and Regulation
      315TII(C) Right of Admission or Accommodation; Tickets
         315Tk66 k. Right of Owner or Operator to Exclude, Eject or Control Conduct of Persons Attending. Most Cited Cases
   (Formerly 376k4 Theaters and Shows)
Racetrack owner had common-law property right to exclude jockey agent licensed by state from its business premises which was not abrogated or abolished either by statute permitting racing commission to exclude jockey agents from racetracks or by rules authorizing track stewards to do so; statute and rules supplemented common law by extending common-law right held by racetrack owners to commission and to stewards. R.C. § 3769.01 et seq.

**[2] Property 315 ⟜ 7**

315 Property
   315k7 k. Ownership and Incidents Thereof.
Most Cited Cases
Owner of private business has common-law right to exclude others from business premises, and common-law right continues until changed by statute.

**[3] Public Amusement and Entertainment 315T
⟜ 66**

315T Public Amusement and Entertainment
   315TII Licensing and Regulation
      315TII(C) Right of Admission or Accommodation; Tickets
         315Tk66 k. Right of Owner or Operator to Exclude, Eject or Control Conduct of Persons At-



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

617 N.E.2d 1096                                                                                      Page 2
67 Ohio St.3d 302, 617 N.E.2d 1096, 64 A.L.R.5th 933, 1993 -Ohio- 19
**(Cite as: 67 Ohio St.3d 302, 617 N.E.2d 1096)**

tending. Most Cited Cases
   (Formerly 376k4 Theaters and Shows)
Common-law right of owners of private places of
amusement and entertainment to exclude or admit
whomever they please applies to owners of
racetracks; racetracks are "places of amusement and
entertainment."

### **1096 Syllabus by the Court

*302 R.C. Chapter 3769 and its accompanying reg-
ulations do not abolish the common-law right of
proprietors to exclude individuals from their prop-
erty.

This case arises from a dispute over the right of an
owner of a private racetrack to exclude a state li-
censee from its premises. The facts stated below are
as alleged in the complaint. Appellee, Edward Bres-
nik, held a valid license as a jockey agent from the
Ohio State Racing Commission. This license al-
lowed appellee to represent jockeys in their racing
arrangements at state-licensed horse racing tracks.
Appellee had oral contracts to represent two jock-
eys, Luis Gonzalez and Robert McWhorter.

**1097 Appellants, Beulah Park Limited Partner-
ship, Inc., Buckeye Turf Club, Inc. and Capital Ra-
cing Club, Inc. ("Beulah Park") operate a thorough-
bred racetrack pursuant to a permit issued by the
Ohio State Racing Commission.

On February 3, 1991, appellee was informed by a
security officer that he was no longer permitted on
the grounds of Beulah Park.

Due to this exclusion, the appellee, on February 25,
1991, filed a complaint in the Court of Common
Pleas of Franklin County, alleging tortious interfer-
ence with a business relationship. The appellee also
requested a temporary restraining order and a pre-
liminary injunction to prevent Beulah Park from
barring his entry into the race park. Beulah Park
filed a motion to dismiss the complaint for failure
to state a claim, which the trial court granted.

Appellee then appealed to the Court of Appeals for
Franklin County. The court of appeals reversed the
trial court's judgment, and remanded the case for
further proceedings. Beulah Park then filed a notice
of appeal with the Ohio Supreme Court. The cause
is now before this court pursuant to the allowance
of a motion to certify the record.
*303 Mary Joseph Maxwell, for appellee.

Wiles, Doucher, Van Buren & Boyle Co., L.P.A.,
James M. Wiles and Jay B. Eggspuehler, and
Timothy P. McCarthy, for appellants.

Bricker & Eckler and Catherine M. Ballard, urging
affirmance for amicus curiae, Horseman's Benevol-
ent and Protective Ass'n.

Berry & Shoemaker, John F. Berry and D. Lewis
Clark, Jr., urging affirmance for amicus curiae,
Daniel A. Frasher.

Chester, Hoffman, Willcox & Saxbe, John J.
Chester, Roderick H. Willcox and Donald C. Brey,
urging reversal for amici curiae, Scioto Downs, Inc.
and Mid-America Racing Ass'n, Inc.

Arter & Hadden, John B. Lewis and Lois J. Cole,
urging reversal for amici curiae, Thistledown Ra-
cing Club, Inc., Randall Racing Club, Inc., Summit
Racing Club, Inc. and Cranwood Racing Club, Inc.

Carter, Ledyard & Milburn, Jack Kaplan and
Robert C. Malaby; and H. Bruce Talbott, urging re-
versal for amicus curiae, Thoroughbred Racing Pro-
tective Bureau.


PFEIFER, Justice.

PFEIFER, J. Beulah Park has a common-law right
to exclude persons from its business premises ab-
sent specific legislative language to the contrary.
The Revised Code contains no such language.

[1] Appellee contends that R.C. Chapter 3769,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



617 N.E.2d 1096                                                    Page 3
67 Ohio St.3d 302, 617 N.E.2d 1096, 64 A.L.R.5th 933, 1993 -Ohio- 19
**(Cite as: 67 Ohio St.3d 302, 617 N.E.2d 1096)**

which empowers the Ohio State Racing Commission with the right to exclude jockey agents from racetracks, abrogates any common-law rights of racetrack owners to exclude jockey agents from their premises. Appellee also argues that Ohio Adm.Code 3769-2-05 and 3769-4-22(B) authorize racing stewards to exclude jockey agents from a racetrack, and, thus, abolish Beulah Park's common-law right. We disagree.

[2] As the late Justice Thurgood Marshall noted, the common-law right to exclude has long been a fundamental tenet of real property law:

"The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.* (1982), 458 U.S. 419, 435, 102 S.Ct. 3164, 3176, 73 L.Ed.2d 868, 882.

[3] Proprietors of private enterprises, such as Beulah Park, possess this right. *Fletcher v. Coney Island, Inc.* (1956), 165 Ohio St. 150, 59 O.O. 212, 134 N.E.2d 371. In *Fletcher,* this court held at paragraph one of the syllabus that:

**\*304** "At common law, proprietors of private enterprises such as places of amusement and entertainment can admit or exclude whomsoever they please, and their common-law right continues until changed by legislative enactment."

**\*\*1098** Because horse racing tracks certainly qualify as "places of amusement and entertainment," Beulah Park possesses the common-law right to exclude whomsoever it pleases, provided the General Assembly has not abolished that right.

Contrary to appellee's assertion, R.C. Chapter 3769 and its accompanying regulations do not abolish the common-law right of proprietors to exclude individuals from their property. Not every statute is to be read as an abrogation of the common law. "Statutes are to be read and construed in the light of

and with reference to the rules and principles of the common law in force at the time of their enactment, and in giving construction to a statute the legislature will not be presumed or held, to have intended a repeal of the settled rules of the common law *unless the language employed by it clearly expresses or imports such intention.*" (Emphasis added.) *State v. Sullivan* (1909), 81 Ohio St. 79, 90 N.E. 146, paragraph three of the syllabus.

The rules and statute cited by the appellee provide a right to exclude to the racing commission and racing stewards, who are not addressed by the common law. This does not mean that racetrack owners who possessed this right at common law have lost that right due to rules and statutes providing the same right to others. R.C. Chapter 3769 and its accompanying regulations supplement the common law by providing the racing commission and stewards with a right to exclude jockey agents from a racetrack in addition to the right to exclude held by the proprietors of the track. Thus, the decision of the court of appeals is reversed.

*Judgment reversed.*

MOYER, C.J., and DOUGLAS, RESNICK and FRANCIS E. SWEENEY, Sr., JJ., concur.
A. WILLIAM SWEENEY and WRIGHT, JJ., dissent.A. WILLIAM SWEENEY, Justice, dissenting.
A. WILLIAM SWEENEY, J., dissenting. While at first blush the underlying theme of the majority's position appears unassailable, *i.e.,* that racetrack operators should be permitted to control whoever is on their premises so long as such control *is* not motivated by discrimination on grounds of race, color, religion, etc., I believe a closer examination of the Revised Code and related Administrative Code provisions compels a different result. Since I believe the court of appeals below correctly analyzed the statutory language and manifest intent of the General Assembly in this realm, I must respectfully dissent from the majority opinion.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



R001084

617 N.E.2d 1096                                                                 Page 4

67 Ohio St.3d 302, 617 N.E.2d 1096, 64 A.L.R.5th 933, 1993 -Ohio- 19

**(Cite as: 67 Ohio St.3d 302, 617 N.E.2d 1096)**

**\*305** The majority asserts that appellant Beulah Park has a "common-law right to exclude whomsoever it pleases," since racetracks qualify as "places of amusement and entertainment." First of all, however, the case upon which the majority relies for this proposition, *Fletcher v. Coney Island, Inc.* (1956), 165 Ohio St. 150, 59 O.O. 212, 134 N.E.2d 371, paragraph one of the syllabus, is readily distinguishable from the cause *sub judice. Fletcher* dealt with the exclusion of mere patrons of amusement facilities, whereas the appellee herein was on the racetrack grounds engaged in his employment by virtue of his license, which is authorized and regulated by the Ohio State Racing Commission. Second, assuming, *arguendo,* that racetracks qualify as the type of place characterized by the majority, a review of the pertinent statutes and regulations reveals that racetracks are a highly regulated industry in this state, unlike ordinary places of amusement or entertainment.

R.C. 3769.03 provides as follows:

"The state racing commission shall prescribe the rules and conditions under which horse racing may be conducted * * *.

" * * *

"The state racing commission may issue, deny, suspend, or revoke licenses to such persons engaged in racing and to such employees of permit holders as is in the public interest for the purpose of maintaining a proper control over horse-racing meetings. The *commission* may also, as is in the public interest for the purpose of maintaining**\*\*1099** proper control over horse-racing meetings, rule any person off a permit holder's premises. * * *

" * * *

"With respect to the issuance, denial, suspension, or revocation of a license to a participant in horse racing, the action of the commission shall be subject to Chapter 119. of the Revised Code. * * * *"

(Emphasis added.)

As I see it, the foregoing statutory language gives the State Racing Commission plenary power over the regulation of horse racing, including the power to determine who may be ruled off a permit holder's premises.

In the exercise of the regulatory power granted by the legislature, the State Racing Commission promulgated Ohio Adm. Code 3769-2-05, which provides:

"All thoroughbred racing in Ohio over which the commission has jurisdiction and supervision shall be conducted under the rules and regulations which the commission has set forth for such racing. If any case occurs which is not provided for in the rules of the Ohio state racing commission, the matter shall be determined by the stewards or by the commission as the case may be."

Additionally, Ohio Adm. Code 3769-4-22(B) appears to grant all power to the race stewards with regard to matters concerning licensees of the commission:

**\*306** "The stewards * * * shall determine all questions with regard to racing arising during the meeting * * * and in such questions their orders shall supersede the orders of the other officials of the permit holder."

Furthermore, stewards "have general supervision over all other persons licensed by the Ohio state racing commission while such persons are on the premises of a permit holder." Ohio Adm. Code 3769-4-26(B). Among the licensed persons subject to supervision by the steward are the track's general manager and head of security. Ohio Adm. Code 3769-2-24.

In my view, R.C. Chapter 3769 and the supporting Administrative Code rules clearly restrict a racetrack operator's power to control persons on its



© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

R001085

property, because persons involved in racing cannot enter the racetrack grounds unless they are licensed by the commission. Ohio Adm. Code 3769-2-27(A). Assuming, *arguendo*, that racetrack operators had a common-law right to exclude whomever they please from their premises, I believe that such prior right was clearly and substantially altered by R.C. Chapter 3769 in its scheme of licensing and regulation by the State Racing Commission.

Given the extensive regulatory scheme with respect to horse racing, I believe that a licensee, such as plaintiff, excluded by a track operator deserves the type of due process that the statutes and rules allow when a steward or an agent of the State Racing Commission excludes a licensee from a permit holder's premises. However, by adopting the position of appellants, the majority holds that a licensee must prove illegal discrimination in order to obtain any relief for a wrongful exclusion. In essence, the majority decision herein grants permit holders the power to exclude anyone for any other reason. However, such a position, and the reasoning behind it, should not be countenanced by this court, especially in light of several illuminating examples provided by *amicus curiae*, Horseman's Benevolent and Protective Association, in support of appellee:

"For example, the Permit Holder could arbitrarily exclude a licensed trainer from the racetrack premises because the trainer has objected to the safety of the racetrack surface. The Permit Holder could also arbitrarily exclude a licensed owner from the racetrack premises because the owner brought suit against the Permit Holder due to injuries sustained as a result of such unsafe conditions. The unfettered ability of the Permit Holder to act arbitrarily in excluding these licensed individuals from the racetrack premises would have the [e]ffect of not only barring such individuals from earning a livelihood in the horse racing industry, but could also be used as an **1100 unfair business practice which imposed unsafe or hazardous working conditions

upon both licensed horsemen and their horses.

*307 "Clearly, the Ohio legislature envisioned that this heavily regulated industry would be governed by the State in a fair and impartial manner rather than by private individuals whose actions would be without recourse for those affected."

However, under the sweeping language of the majority opinion herein, a racetrack operator is judge, jury and executioner to anyone who enters its grounds, regardless of whether such person is licensed to be there by the State Racing Commission. Clearly, this is not what the General Assembly intended when it enacted R.C. Chapter 3769. Nevertheless, under today's majority opinion, the power of the State Racing Commission is subject to the whim and caprice of the individual racetrack operators.

The better view, in my opinion, was cogently expressed by the court of appeals in its unanimous decision below:

"The state has issued a license authorizing plaintiff to act as a jockey agent at the racetrack in question, which necessarily requires him to enter the permit holder's premises in order to make mandatory reports. Under such circumstances, the apparent arbitrary exclusion of plaintiff by defendants from the permit premises is in conflict with the regulations and statutes. As to access to the premises by persons licensed by the commission to engage in racing upon the premises, the common law power of the permit holder over his premises has been altered. By applying for and accepting a permit to conduct horse racing, defendants have surrendered a substantial portion of the power and control they otherwise would have over the permit premises and expressly agree to abide by the rules and regulations of the commission and the regulations and orders of the stewards.

"Although there is no express provision in the regu-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



R001086

617 N.E.2d 1096                                                                Page 6
67 Ohio St.3d 302, 617 N.E.2d 1096, 64 A.L.R.5th 933, 1993 -Ohio- 19
**(Cite as: 67 Ohio St.3d 302, 617 N.E.2d 1096)**

lations requiring a permit holder to admit the holder of a license issued by the commission to engage in some aspect of racing on the permit premises, it is a necessary corollary to the issuance of the license, which necessarily requires the person for the proper utilization of that license to enter upon the permit premises."

Based on all of the foregoing, I would affirm the judgment of the court of appeals below.

WRIGHT, J., concurs in the foregoing dissenting opinion.
Ohio,1993.
Bresnik v. Beulah Park Ltd. Partnership, Inc.
67 Ohio St.3d 302, 617 N.E.2d 1096, 64 A.L.R.5th 933, 1993 -Ohio- 19

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



R001087

Westlaw.

102 S.Ct. 3164

Page 1

458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868, 8 Media L. Rep. 1849
**(Cite as: 458 U.S. 419, 102 S.Ct. 3164)**

▷

Supreme Court of the United States
Jean LORETTO, on behalf of Herself and all Others Similarly Situated, Appellant
v.
TELEPROMPTER MANHATTAN CATV CORP.
et al.
**No. 81-244.**

Argued March 30, 1982.
Decided June 30, 1982.

A New York City landlord sued cable television company claiming that defendant's installation of its facilities on plaintiff's property pursuant to New York law requiring a landlord to permit installation of such facilities on rental property constituted a constitutionally compensable taking. The Supreme Court, Special Term, New York County, Louis Grossman, Acting J., 98 Misc.2d 944, 415 N.Y.S.2d 180, rendered summary judgment for defendants. The Supreme Court, Appellate Division, 73 A.D.2d 849, 422 N.Y.S.2d 550, affirmed. The Court of Appeals, 53 N.Y.2d 124, 440 N.Y.S.2d 843, 423 N.E.2d 320, affirmed, and appeal was taken. The Supreme Court, Justice Marshall, held that: (1) physical occupation of plaintiff's rental property which occurred in connection with cable television company's installation of "crossover" and "noncrossover" cables on plaintiff's five-story apartment building constituted a "taking" notwithstanding that statute might be within state's police power as authorizing rapid development and maximum penetration by means of communication having important educational and community aspects; (2) allegedly minimal size of the physical installation was not determinative; (3) fact that statute applied only to rental property did not make it simply a regulation of use of real property; and (4) statute could not be construed as merely granting a tenant a property right as an appurtenance to his leasehold.

Decision of Court of Appeals reversed and remanded.

Justice Blackmun dissented and filed opinion in which Justice Brennan and Justice White joined.

West Headnotes

**[1] Eminent Domain 148 ⚖ 2.15**

148 Eminent Domain
   148I Nature, Extent, and Delegation of Power
      148k2 What Constitutes a Taking; Police and Other Powers Distinguished
         148k2.15 k. Telecommunications. Most Cited Cases
   (Formerly 148k2(1.1))
Physical occupation of plaintiff's rental property which occurred in connection with cable television company's installation of "crossover" and "noncrossover" cables on plaintiff's five-story apartment building constituted a "taking" for purpose of taking clause where installation was pursuant to New York law requiring a landlord to permit a cable television company to install its cable facilities on the rental property, notwithstanding that statute might be within state's police power as authorizing rapid development and maximum penetration by means of communication having important educational community aspects or minimal economic impact on landlord. U.S.C.A.Const.Amends. 5, 14; N.Y.McKinney's Executive Law § 828, subd. 1.

**[2] Eminent Domain 148 ⚖ 2.1**

148 Eminent Domain
   148I Nature, Extent, and Delegation of Power
      148k2 What Constitutes a Taking; Police and Other Powers Distinguished
         148k2.1 k. In General. Most Cited Cases
   (Formerly 148k2(1.1))
A permanent physical occupation authorized by

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

